BURSOR & FISHER, P.A.
L. Timothy Fisher (State Bar No. 191626)
2121 North California Blvd., Suite 1010
Walnut Creek, CA 94596
Telephone: (925) 482-1515
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com

BURSOR & FISHER, P.A.
Scott A. Bursor (*pro hac vice*)
369 Lexington Avenue, 10th Floor
New York, NY 10017
Telephone: (212) 989-9113
Facsimile: (212) 989-9163
E-Mail: scott@bursor.com

BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER, LLP
Alan R. Plutzik (State Bar No. 077785)
Michael S. Strimling (State Bar No. 96135)
2125 Oak Grove Road, Suite 120
Walnut Creek, CA 94598
Telephone: (925) 945-0200
Facsimile: (925) 945-8792
E-Mails: aplutzik@bramsonplutzik.com
            mstrimling@bramsonplutzik.com

Attorneys for Defendants Power
Ventures, Inc. and Steve Vachani

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FACEBOOK, INC.,<br><br>                       Plaintiff,<br><br>-against-<br><br>POWER VENTURES, INC. d/b/a POWER.COM, a California corporation; POWER VENTURES, INC. a Cayman Island Corporation, STEVE VACHANI, an individual; DOE 1, d/b/a POWER.COM, an individual and/or business entity of unknown nature; DOES 2 through 25, inclusive, individuals and/or business entities of unknown nature,<br><br>                       Defendants. | Case No. 5:08-cv-05780 JW<br><br>**DECLARATION OF L. TIMOTHY FISHER IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date: September 19, 2011<br>Time: 9:00 a.m.<br>Judge: Hon. James Ware<br>Courtroom: 5 – 17th Floor |

I, L. Timothy Fisher, declare as follows:

1.      I am a partner at Bursor & Fisher, P.A., counsel of record for Defendants Power Ventures, Inc. ("Power") and Steve Vachani (collectively, "Defendants").  I am an attorney at law licensed to practice in the State of California, and I am a member of the bar of this Court.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would testify competently thereto.

2.      I make this declaration in support of Defendants' Motion for Summary Judgment.

3.      Attached hereto as Exhibit A is a true and correct copy of Defendants' First Requests for Production, dated and served on Facebook, Inc. ("Facebook") on October 8, 2010.

4.      Attached hereto as Exhibit B is a true and correct copy of Facebook's Objections and Response to Defendants' Requests for Production, Set One, dated and served on Defendants on December 15, 2010.  Facebook's response to the document requests included objections, assertions of privilege, and a statement that responsive documents would be produced upon entry of a protective order.  However, even after the protective order was executed and then entered by the Court, Facebook produced nothing.

5.      Attached hereto as Exhibit C is a true and correct copy of the deposition transcript of Facebook's in-house counsel, Craig Clark, dated February 17, 2011.

6.      Attached hereto as Exhibit D is a true and correct copy of Defendants' First Set of Interrogatories, dated and served on Facebook on October 8, 2010.

7.      Attached hereto as Exhibit E is a true and correct copy of Facebook's Objections and Responses to Defendants' Interrogatories, Set One, dated and served on Defendants on December 15, 2010.

8.      Attached hereto as Exhibit F is a true and correct copy of the parties' Stipulation of Dismissal "so ordered" by the Court, dated February 17, 2011 (Docket Entry No. 97).

9.      Power answered Facebook's discovery requests on December 15, 2010 and produced all responsive documents on February 3, 2011, promptly after the protective order was entered.

10.     Attached hereto as Exhibit G is a true and correct copy of the Court's Order, dated July 20, 2010 (Docket Entry No. 89).

11.     Attached hereto as Exhibit H is a true and correct copy of Exhibit A to the Declaration of Julio C. Avalos in Support of Facebook's Motion for Judgment on the Pleadings or, in the Alternative, Motion for Summary Judgment, which constitutes email correspondence concerning the parties' negotiations about the implementation of Facebook Connect (Docket Entry No. 57-1).

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct, executed on May 6, 2011 at Walnut Creek, California.

_____

L. Timothy Fisher

# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FACEBOOK, INC.,<br><br>                                   Plaintiff,<br><br>-against-<br><br>POWER VENTURES, INC. et al.,<br><br>                                   Defendants. | Case No. 5:08-cv-05780<br><br>**DEFENDANTS' FIRST REQUESTS FOR PRODUCTION PURSUANT TO FED. R. CIV. P. 34** |

1.     Please produce all documents, all electronically stored information, and all tangible things concerning any injury that Facebook suffered as a result of the events described in Facebook's First Amended Complaint.

2.     Please produce all documents, all electronically stored information, and all tangible things concerning any expenditure that Facebook made as a result of the events described in Facebook's First Amended Complaint.

3.     Please produce all documents, all electronically stored information, and all tangible things concerning any complaints Facebook users made as a result of the events described in Facebook's First Amended Complaint.

Dated:  October 8, 2010

BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER, LLP


By_____/s/_____
              L. Timothy Fisher

L. Timothy Fisher (State Bar No. 191626)
2125 Oak Grove Road, Suite 120
Walnut Creek, CA  94598
Telephone:  (925) 945-0200
Facsimile:  (925) 945-8792

LAW OFFICES OF SCOTT A. BURSOR
Scott A. Bursor (*pro hac vice*)
369 Lexington Avenue, 10th Floor
New York, NY  10017-6531
Telephone:  (212) 989-9113
Facsimile:   (212) 989-9163

Attorneys for Defendants Power
Ventures, Inc. and Steve Vachani

# EXHIBIT B

1   I. NEEL CHATTERJEE (STATE BAR NO. 173985)
    nchatterjee@orrick.com
2   JULIO C. AVALOS (STATE BAR NO. 255350)
    javalos@orrick.com
3   ORRICK, HERRINGTON & SUTCLIFFE LLP
    1000 Marsh Road
4   Menlo Park, CA  94025
    Telephone:     +1-650-614-7400
5   Facsimile:     +1-650-614-7401

6   THOMAS GRAY (STATE BAR NO. 191411)
    tgray@orrick.com
7   Orrick, Herrington & Sutcliffe LLP
    4 Park Plaza, Suite 1600
8   Irvine, CA  92614-2558
    Telephone:     +1-949-567-6700
9   Facsimile:     +1-949-567-6710

10  Attorneys for Plaintiff
    FACEBOOK, INC.

11
                    UNITED STATES DISTRICT COURT
12
                  NORTHERN DISTRICT OF CALIFORNIA
13
                        SAN JOSE DIVISION
14

15

16  FACEBOOK, INC.,                      Case No.  5:08-cv-05780 JW (HRL)

17              Plaintiff,               **FACEBOOK, INC.'S OBJECTIONS
                                         AND RESPONSE TO DEFENDANTS'
18       v.                              REQUESTS FOR PRODUCTION,
                                         SET ONE**
    POWER VENTURES, INC. a Cayman Island
19  Corporation; STEVE VACHANI, an
    individual; DOE 1, d/b/a POWER.COM,
20  DOES 2-25, inclusive,

21              Defendants.

22

23

24

25

26

27

28

OHS West:261052298.2

1    Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Plaintiff Facebook, Inc.

2    ("Facebook") hereby responds to Power Ventures, Inc.'s and Steve Vachani's (collectively,

3    "Defendants")Request For Production, Set One as follows:

## GENERAL OBJECTIONS

5    In addition to any specific objections which may be made on an individual basis below,

6    Facebook objects generally to each of the requests as follows:

7    1.    Facebook objects to each Request to the extent it calls for information protected

8    from disclosure by the attorney-client privilege, the attorney work-product doctrine, or any other

9    applicable privilege, doctrine or protection.  To the extent Facebook produces any information

10   subject to the attorney-client privilege, the attorney work-product doctrine, or other applicable

11   privilege, doctrine or protection, such disclosure is inadvertent and does not constitute a general

12   waiver of the privilege, doctrine or protection.  Nothing contained herein is intended to be or

13   should be construed as a waiver of the attorney-client privilege, the attorney work-product

14   doctrine, or any other applicable privilege, protection or doctrine.

15   2.    Facebook objects to each Request to the extent it seeks legal conclusions.

16   Production of, or failure to produce any information, is not to be construed to endorse or reject

17   any legal conclusions.

18   3.    Facebook objects to each Request to the extent it is vague or ambiguous.

19   4.    Facebook objects to each Request to the extent it is not sufficiently limited in time

20   and/or subject matter, and is therefore overly broad, unduly burdensome, oppressive and will

21   cause undue hardship to Facebook.

22   5.    Facebook objects to all Requests as overly broad and unduly burdensome to the

23   extent they seek, individually or collectively, information that is not relevant to any claim or

24   defense of the case and that does not appear reasonably calculated to lead to the discovery of

25   admissible evidence in contravention of Rule 26(b)(1) of the Federal Rules of Civil Procedure.

26   6.    Facebook objects to all Requests insofar as they purport to call for information that

27   is outside the possession, custody or control of Facebook or to seek information on matters not

28

FACEBOOK, INC.'S OBJECTIONS AND RESPONSE
TO DEFENDANTS' REQUESTS FOR PRODUCTION,
SET ONE

1  known or reasonably available to Facebook, on the grounds that such discovery requests are

2  overly broad, unduly burdensome, oppressive and will cause undue hardship to Facebook.

3       7.    Facebook objects to each Request to the extent it seeks information that is a matter

4  of public record.  Facebook also objects to each Request to the extent the burden or expense of

5  discovery sought outweighs its likely benefit.

6       8.    Facebook objects to each Request to the extent it seeks information that may

7  encompass the proprietary information, trade secrets or other confidential commercial or business

8  information of Facebook and no protective order has been entered.

9  **SPECIFIC OBJECTIONS**

10  **REQUEST FOR PRODUCTION NO. 1:**

11      Please produce all documents, all electronically stored information, and all tangible things

12  concerning any injury that Facebook suffered as a result of the events described in Facebook's

13  First Amended Complaint.

14  **RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

15      Facebook incorporates by reference its General Objections as if fully set forth herein.

16  Facebook further objects to the use of the terms "injury," "suffered," and "events" as vague,

17  overly broad and unduly burdensome.  Facebook also objects to the Request to the extent it seeks

18  information protected from discovery by the attorney-client privilege, the attorney work-product

19  doctrine, or any other applicable privilege, protection or doctrine.  Facebook objects to the

20  Request to the extent it seeks Facebook's proprietary information, trade secrets or other

21  confidential commercial or business information and no protective order has been entered.

22  Facebook objects to the Request to the extent it calls for a legal conclusion or expert testimony to

23  determine the meaning of "injury."  Facebook also objects to this Request on the basis that it is

24  premature and that discovery is ongoing.  Facebook reserves its right to supplement its Response

25  to this Request and to produce documents as they are discovered.  Subject to, and without

26  waiving the foregoing objections, Facebook responds that it will produce any non-privileged and

27  responsive documents, if any, upon the entry of an appropriate protective order.

28

**REQUEST FOR PRODUCTION NO. 2:**

Please produce all documents, all electronically stored information, and all tangible things concerning any expenditure that Facebook made as a result of the events described in Facebook's First Amended Complaint.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 2:**

Facebook incorporates by reference its General Objections as if fully set forth herein. Facebook objects to the use of the term "events" and the phrase "as a result of" as vague, overly broad and unduly burdensome. Facebook objects to the Request to the extent it seeks information protected from discovery by the attorney-client privilege, the attorney work-product doctrine, or any other applicable privilege, protection or doctrine. Facebook objects to the Request to the extent it seeks Facebook's proprietary information, trade secrets or other confidential commercial or business information and no protective order has been entered. Facebook also objects to this Request on the basis that it is premature and that discovery remains ongoing. Facebook expressly reserves its right to supplement this response and to produce documents as they are discovered. Subject to, and without waiving the foregoing objections, Facebook responds that it will produce any non-privileged and responsive documents, if any, upon the entry of an appropriate protective order.

**REQUEST FOR PRODUCTION NO. 3:**

Please produce all documents, all electronically stored information, and all tangible things concerning any complaints Facebook users made as a result of the events described in Facebook's First Amended Complaint.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 3:**

Facebook incorporates by reference its General Objections as if fully set forth herein. Facebook objects to the use of the term "events" and the phrase "as a result of" as vague, overly broad and unduly burdensome. Facebook objects to the term "complaints" as vague and ambiguous. Facebook further objects to this Request on the basis that it seeks discovery that is neither relevant to a claim or defense of a party nor reasonably calculated to lead to discovery of admissible evidence. Facebook also objects to the Request to the extent it seeks information

FACEBOOK, INC.'S OBJECTIONS AND RESPONSE
TO DEFENDANTS' REQUESTS FOR PRODUCTION,
SET ONE

1  protected from discovery by the Electronic Communications Privacy Act, 18 U.S.C. § 2510 *et.*

2  *seq.* ("ECPA"), or any other applicable privilege, protection or doctrine.  Facebook further objects

3  to the Request to the extent it seeks documents outside Facebook's possession, custody or control.

4  Facebook objects to the Request to the extent it seeks Facebook's proprietary information, trade

5  secrets or other confidential commercial or business information and no protective order has been

6  entered.  Facebook also objects to this Request on the basis that it is premature and that discovery

7  remains  ongoing.  Facebook expressly reserves its right to supplement its response to this

8  Request and to produce documents as they are discovered.  Subject to, and without waiving the

9  foregoing objections, Facebook responds that it will produce any non-privileged and responsive

10  documents, if any, upon the entry of an appropriate protective order.

11

12  Dated: December 15, 2010                    ORRICK, HERRINGTON & SUTCLIFFE LLP

13

14

15                                              I. NEEL CHATTERJEE
                                                Attorneys for Plaintiff
16                                              FACEBOOK, INC.

17

18

19

20

21

22

23

24

25

26

27

28

FACEBOOK, INC.'S OBJECTIONS AND RESPONSE
TO DEFENDANTS' REQUESTS FOR PRODUCTION,
SET ONE

# EXHIBIT C

# In The Matter Of:

*FACEBOOK, INC.*
*v.*
*POWER VENTURES, INC. d/b/a POWER.COM*

_____

*CRAIG CLARK - Vol. 1*
*February 17, 2011*

_____

## CONFIDENTIAL

**MERRILL CORPORATION**
LegaLink, Inc.

225 Varick Street
10th Floor
New York, NY 10014
Phone: 212.557.7400
Fax: 212.692.9171

EXHIBIT C REDACTED

# EXHIBIT D

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

FACEBOOK, INC.,

                                        Plaintiff,

-against-

POWER VENTURES, INC. et al.,

                                        Defendants.

Case No. 5:08-cv-05780

**DEFENDANTS' FIRST SET OF INTERROGATORIES TO FACEBOOK, INC. PURSUANT TO FED. R. CIV. P. 33**

1. Please identify anyone that was misled by the messages referenced in ¶ 92 of your First Amended Complaint.

2. Where has the copyrighted work that you claim has been infringed appeared on the Facebook website?  Please provide the URL and the specific material on the page that you claim has been infringed.

3. Where has the infringing content appeared on our site?  Please provide the URL and the specific material on the page that you are referring to.

4. Where has the Facebook trademark appeared on our site?  Please provide the URL and the specific material on the page that you are referring to.

5. Please identify anyone that experienced any form of "customer confusion," "mistake," or "deception" caused by a Facebook trademark that appeared on our site.

Dated:  October 8, 2010

BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER, LLP

By_____/s/_____
              L. Timothy Fisher

L. Timothy Fisher (State Bar No. 191626)
2125 Oak Grove Road, Suite 120
Walnut Creek, CA  94598
Telephone:  (925) 945-0200
Facsimile:  (925) 945-8792

LAW OFFICES OF SCOTT A. BURSOR
Scott A. Bursor (*pro hac vice*)
369 Lexington Avenue, 10th Floor
New York, NY  10017-6531
Telephone:  (212) 989-9113
Facsimile:   (212) 989-9163

Attorneys for Defendants Power Ventures, Inc. and Steve Vachani

# EXHIBIT E

1  I. NEEL CHATTERJEE (STATE BAR NO. 173985)
   nchatterjee@orrick.com
2  JULIO C. AVALOS (STATE BAR NO. 255350)
   javalos@orrick.com
3  ORRICK, HERRINGTON & SUTCLIFFE LLP
   1000 Marsh Road
4  Menlo Park, CA  94025
   Telephone:     +1-650-614-7400
5  Facsimile:     +1-650-614-7401

6  THOMAS GRAY (STATE BAR NO. 191411)
   tgray@orrick.com
7  Orrick, Herrington & Sutcliffe LLP
   4 Park Plaza, Suite 1600
8  Irvine, CA  92614-2558
   Telephone:     +1-949-567-6700
9  Facsimile:     +1-949-567-6710

10 Attorneys for Plaintiff
   FACEBOOK, INC.

11

                      UNITED STATES DISTRICT COURT
12
                    NORTHERN DISTRICT OF CALIFORNIA
13
                           SAN JOSE DIVISION
14

15 FACEBOOK, INC.,                        Case No.  5:08-cv-05780 JW (HRL)

16              Plaintiff,                **FACEBOOK, INC.'S OBJECTIONS
                                          AND RESPONSES TO
17      v.                                DEFENDANTS'
                                          INTERROGATORIES, SET ONE**
18 POWER VENTURES, INC. a Cayman Island
   Corporation; STEVE VACHANI, an
19 individual; DOE 1, d/b/a POWER.COM,
   DOES 2-25, inclusive,
20
                Defendants.
21

22

23

24

25

26

27

28

OHS West:261055372.4

1     Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Plaintiff Facebook, Inc.

2     ("Facebook") hereby responds to Power Ventures, Inc.'s and Steve Vachani's (collectively,

3     "Defendants") Interrogatories, Set One as follows:

4     **GENERAL OBJECTIONS**

5     In addition to any specific objections which may be made on an individual basis below,

6     Facebook objects generally to each of the interrogatories as follows:

7     1.     Facebook objects to each Interrogatory to the extent it calls for information

8     protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, the

9     consulting expert exemption from discovery or any other applicable privilege, doctrine or

10     protection.  To the extent Facebook provides any information subject to the attorney-client

11     privilege, the attorney work-product doctrine, or other applicable privilege, doctrine or protection,

12     such disclosure is inadvertent and does not constitute a general waiver of the privilege, doctrine

13     or protection.  Nothing contained herein is intended to be or should be construed as a waiver of

14     the attorney-client privilege, the attorney work-product doctrine, or any other applicable

15     privilege, protection or doctrine.

16     2.     Facebook objects to each Interrogatory to the extent it seeks legal conclusions.

17     3.     Facebook objects to each Interrogatory to the extent it is vague or ambiguous.

18     4.     Facebook objects to each Interrogatory to the extent it is not sufficiently limited in

19     time and/or subject matter, and is therefore overly broad, unduly burdensome, oppressive and will

20     cause undue hardship to Facebook.

21     5.     Facebook objects to all Interrogatories as overly broad and unduly burdensome to

22     the extent they seek, individually or collectively, information that is not relevant to any claim or

23     defense of the case and that does not appear reasonably calculated to lead to the discovery of

24     admissible evidence in contravention of Rule 26(b)(1) of the Federal Rules of Civil Procedure.

25     6.     Facebook objects to all Interrogatories insofar as they purport to call for

26     information that is outside the possession, custody or control of Facebook or to seek information

27     on matters not known or reasonably available to Facebook, on the grounds that such discovery

28     requests are overly broad, unduly burdensome, oppressive and will cause undue hardship to

1   Facebook.  Facebook also objects to all of Defendants' Interrogatories to the extent that they seek

2   information in the possession of Defendants and/or a third party.

3         7.   Facebook objects to each Interrogatory to the extent it seeks information that is a

4   matter of public record.  Facebook also objects to each Interrogatory to the extent the burden or

5   expense of discovery sought outweighs its likely benefit.

6         8.   Facebook objects to each Interrogatory to the extent it seeks information that may

7   encompass the proprietary information, trade secrets or other confidential commercial or business

8   information of Facebook and no protective order has been entered in this action.

9         9.   By responding to any of Defendants' Interrogatories or providing any information

10  herewith, Facebook does not waive and expressly preserves the objections set forth herein and

11  does not concede the relevancy or admissibility of the response.

12        10.   Facebook objects to any and all of Defendants' Interrogatories to the extent they

13  seek information that may be derived or ascertained from the documents produced by Facebook

14  and the burden of deriving or ascertaining the answer is substantially the same for Defendants.

15  *See generally* Fed. R. Civ. P. 33(d).

16        11.   Facebook reserves the right to supplement or amend these objections and

17  responses upon, among other things:  further investigation; discovery of additional facts;

18  discovery of persons with knowledge or relevant information; or developments in this action or

19  any other proceeding.

20        **SPECIFIC OBJECTIONS**

21  **INTERROGATORY NO. 1:**

22        Please identify anyone that was misled by the messages referenced in ¶92 of your First

23  Amended Complaint.

24  **RESPONSE TO INTERROGATORY NO. 1:**

25        Facebook incorporates by reference its General Objections as if fully set forth herein.

26  Facebook objects to the use of the terms "anyone" and "misled" as vague, overly broad and

27  unduly burdensome.  Facebook also objects to this Interrogatory to the extent it seeks information

28  protected from discovery by the attorney-client privilege, the attorney work-product doctrine, or

- 2 -

1   any other applicable privilege, protection or doctrine.  Facebook objects to this Interrogatory to

2   the extent it seeks information protected from disclosure by the Electronic Communications

3   Privacy Act, 18 U.S.C. § 2510 *et. seq.* ("ECPA").  Facebook also objects to this Interrogatory on

4   the basis that it is premature and that discovery is ongoing.  Facebook expressly reserves its right

5   to supplement its response as information is discovered.  Facebook notes that information

6   responsive to this Interrogatory, to the extent such information exists, would likely be confidential

7   and could not be produced prior to the entry of an appropriate protective order in this action.

8   Subject to and without waiving its objections, Facebook responds as follows: Facebook users who

9   either opened or read the misleading message sent by Defendants and/or Facebook users who

10  used Defendants' unauthorized systems to access Facebook.

12  **INTERROGATORY NO. 2:**

13      Where has the copyrighted work that you claim has been infringed appeared on the

14  Facebook website?  Please provide the URL and the specific material on the page that you claim

15  has been infringed.

16  **RESPONSE TO INTERROGATORY NO. 2:**

17      Facebook incorporates by reference its General Objections as if fully set forth herein.

18  Facebook objects to the use of the terms "copyrighted work" and "appeared" as vague, overly

19  broad and unduly burdensome.  Facebook also objects to the Interrogatory to the extent it seeks

20  information protected from discovery by the attorney-client privilege, the attorney work-product

21  doctrine, or any other applicable privilege, protection or doctrine.  Facebook objects to this

22  Interrogatory to the extent it seeks Facebook's proprietary information, trade secrets or other

23  confidential commercial or business information and no protective order has been entered in this

24  action.  Facebook objects to this Interrogatory to the extent it calls for a legal conclusion or expert

25  testimony to determine what has been "infringed."  Facebook also objects to this Interrogatory on

26  the basis that it is premature and that discovery is ongoing.  Facebook expressly reserves its right

27  to supplement its response as information is discovered.

28

1    **INTERROGATORY NO. 3:**

2          Where has the infringing content appeared on our site? Please provide the URL and the

3    specific material on the page that you are referring to.

4    **RESPONSE TO INTERROGATORY NO. 3:**

5          Facebook incorporates by reference its General Objections as if fully set forth herein.

6    Facebook objects to the use of the terms "infringing content," "appeared," "our" and "site" as

7    vague, overly broad and unduly burdensome.  Facebook also objects to this Interrogatory to the

8    extent it seeks information protected from discovery by the attorney-client privilege, the attorney

9    work-product doctrine, or any other applicable privilege, protection or doctrine.  Facebook

10   objects to this Interrogatory to the extent it calls for a legal conclusion or expert testimony to

11   determine the meaning of "infringing content" and "appeared."  Facebook objects and notes that

12   discovery in this matter is still ongoing and that this request is objectionable as premature.

13   Indeed, no discovery has yet been received from Defendants.  Accordingly, Facebook is not yet in

14   possession of all evidence responsive to this Interrogatory.  Facebook expressly reserves its right

15   to supplement its response to this Interrogatory once all such discovery is received from

16   Defendants.

17

18   **INTERROGATORY NO. 4:**

19          Where has the Facebook trademark appeared on our site? Please provide the URL and the

20   specific material on the page that you are referring to.

21   **RESPONSE TO INTERROGATORY NO. 4:**

22          Facebook incorporates by reference its General Objections as if fully set forth herein.

23   Facebook objects to the use of the terms "Facebook trademark," "appeared," "our" and "site" as

24   vague, overly broad and unduly burdensome.  Facebook also objects to this Interrogatory to the

25   extent it seeks information protected from discovery by the attorney-client privilege, the attorney

26   work-product doctrine, or any other applicable privilege, protection or doctrine.  Facebook also

27   objects to this Interrogatory on the basis that it is premature and that information requested is in

28   Defendants' possession.  Relatedly, Facebook objects and notes that discovery in this matter is

1    still ongoing.  Indeed, no discovery has yet been received from Defendants.  Accordingly,

2    Facebook is not yet in possession of all evidence and/or information responsive to this

3    Interrogatory.  Facebook expressly reserves its right to supplement its response to this

4    Interrogatory.

5        Subject to and without waiving the foregoing objections, Facebook responds that one of

6    its trademarks appeared on at least the following URLs:

7        http://www.power.com/Pub/Login.aspx?ReturnUrl=%2fpriv%2fpower%2fhome.aspx

8        http://www.power.com/priv/power/home.aspx

9        http://power.com/pub/login.aspx

10        http://static.power.com/images/PressKit/Login_EN.jpg?v=327

11        http://static.power.com/images/PressKit/Mensagem_EN.jpg?v=327

12

13    **INTERROGATORY NO. 5:**

14        Please identify anyone that has experienced any form of "customer confusion," "mistake,"

15    or "deception" caused by a Facebook trademark that appeared on our site.

16    **RESPONSE TO INTERROGATORY NO. 5:**

17        Facebook incorporates by reference its General Objections as if fully set forth herein.

18    Facebook objects to the use of the terms "anyone," "experienced," "any form," "caused,"

19    "appeared," "our" and "site" as vague, overly broad and unduly burdensome.  Facebook also

20    objects to this Interrogatory to the extent it seeks information protected from discovery by the

21    attorney-client privilege, the attorney work-product doctrine, or any other applicable privilege,

22    protection or doctrine.  Facebook objects to this Interrogatory to the extent it seeks information

23    protected from disclosure by the ECPA.  Facebook also objects to this Interrogatory on the basis

24    that it is premature and that discovery is ongoing.  Facebook reserves its right to supplement its

25    response as information is discovered.  Facebook notes that information responsive to this

26    Interrogatory, to the extent such information exists, would likely be confidential and could not be

27    produced prior to the entry of an appropriate protective order in this action.  Subject to and

28    without waiving its objections, Facebook responds as follows:  Facebook users who used

1   Defendants' unauthorized systems to access Facebook and/or who viewed Facebook's name, logo

2   or other trademarks on any Power website, e-mail or other Power document or communication.

3

4

5   Dated: December 15, 2010                 ORRICK, HERRINGTON & SUTCLIFFE LLP

6

7   _____

8                                           I. NEEL CHATTERJEE
                                            Attorneys for Plaintiff
9                                           FACEBOOK, INC.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## VERIFICATION

2

3       I, Craig Clark, certify and declare that I have read the foregoing Interrogatory Responses

4   ("Responses") know their contents. I am an agent of Facebook, Inc. ("Facebook") a party to this

5   action. I am authorized to make this verification for Facebook and, on its behalf, I make this

6   verification. I am informed and believe and on that ground allege that the matters stated in the

7   Responses are true.

    I declare under penalty of perjury under the laws of the State of California that the

8   foregoing is true and correct to the best of my knowledge.

9       Executed this 15th day of December, 2010 at Palo Alto, California.

10

11

12

13                                                 CRAIG CLARK

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OHS West:260814557.2

1

**DECLARATION OF SERVICE**

2        I am more than eighteen years old and not a party to this action.  My business

3   address is Orrick, Herrington & Sutcliffe LLP, 1000 Marsh Road, Menlo Park, CA 94025.  On

4   December 15, 2010, I served the following document(s):

5        **FACEBOOK, INC.'S OBJECTIONS AND RESPONSE TO DEFENDANTS'**
         **INTERROGATORIES, SET ONE**

6

7        on the interested parties in this action by placing true and correct copies thereof in

8   sealed envelopes addressed as follows:

9   Scott A. Bursor *(admitted pro hac vice)*
    **LAW OFFICES OF SCOTT A. BURSOR**
    369 Lexington Avenue
10  10th Floor
    New York, NY 10017-6531
11  Tel: 212-989-9113
    Fax: 212-989-9163
12  scott@bursor.com

13                                              **COUNSEL FOR DEFENDANTS**
                                                **POWER VENTURES, INC.**
14  Alan R Plutzik                        **A CAYMAN ISLAND CORPORATION**
    aplutzik@bramsonplutzik.com                       **AND**
    Michael S. Strimling                        **STEVEN VACHANI**
15  mstrimling@bransonplutzik.com
    Lawrence Timothy Fisher
16  ltfisher@bramsonplutzik.com
    **BRAMSON, PLUTZIK, MAHLER &**
17  **BIRKHAEUSER LLP**
    2125 Oak Grove Road
18  Suite 120
    Walnut Creek, CA 94598
19  Tel: (925) 945-0200
    Fax: 925-945-8792
20

21        I deposited such envelopes with postage thereon fully prepaid in the United States

22  mail at a facility regularly maintained by the United States Postal Service at Menlo Park,

23  California on the date indicated above.

24        I declare under penalty of perjury that the foregoing is true and correct.

25        Executed on December 15, 2010, at Menlo Park, California.

26

27        _____
                        Elizabeth Kim

28

# EXHIBIT F

I. NEEL CHATTERJEE (STATE BAR NO. 173985)
nchatterjee@orrick.com
THERESA A. SUTTON (STATE BAR NO. 211857)
tsutton@orrick.com
JULIO C. AVALOS (STATE BAR NO. 255350)
javalos@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025
Telephone:  650-614-7400
Facsimile:  650-614-7401

Attorneys for Plaintiff
FACEBOOK, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| FACEBOOK, INC., | Case No. 5:08-cv-05780 JW (HRL) |
| Plaintiff, | **STIPULATION OF DISMISSAL PURSUANT TO FED. R. CIV. P. 41(A)(1)** |
| v. | |
| POWER VENTURES, INC. a Cayman Island Corporation; STEVE VACHANI, an individual; DOE 1, d/b/a POWER.COM, DOES 2-25, inclusive, | Judge:     Hon. James Ware<br>Courtroom: 8, 4th Floor |
| Defendants. | |

1    Plaintiff Facebook, Inc. and defendants Power Ventures, Inc.; Steve Vachani; and

2   POWER.COM hereby stipulate, pursuant to Rule 41(a)(1) of the Federal Rules of Civil

3   Procedure, to the dismissal with prejudice of the following claims for relief :

4        1.    **Fourth Claim for Relief**: Copyright Infringement, 17 U.S.C. § 101, *et seq.*

5        2.    **Fifth Claim for Relief**:  Violation of the Digital Millennium Copyright  Act

6   ("DMCA"), 17 U.S.C. §1201 *et. seq.*

7        3.    **Sixth Claim for Relief**: Trademark Infringement, 15 U.S.C. §§ 1114 and 1125(a)

8        4.    **Seventh Claim for Relief**: Trademark Infringement Under California Law

9        5.    **Eighth Claim for Relief**: Unlawful, Unfair and Fraudulent Competition Under

10  California Business & Professions Code § 17200, *et seq.*

11    All parties shall bear their own fees and costs. This stipulation shall have no effect on any

12  other claim in the case.

13

14  Dated: February 17, 2011                    ORRICK, HERRINGTON & SUTCLIFFE LLP

15

16                                                  */s/ I. Neel Chatterjee*
                                                   I. NEEL CHATTERJEE
17                                                 Attorneys for Plaintiff
                                                   FACEBOOK, INC.

18

19  Dated: February 17, 2011                    BURSOR & FISHER, P.A.

20

21                                                  */s/ Scott A. Bursor*
                                                   SCOTT A. BURSOR
                                                   Attorneys for Defendants
22                                                 POWER VENTURES, INC.; STEVE VACHANI;
                                                   and POWER.COM

23

24    **Filer's Attestation:**  Pursuant to General Order No. 45, §X(B), I attest under penalty of

25  perjury that concurrence in the filing of the document has been obtained from its signatory.

26  Dated: February 17, 2011            Respectfully submitted,

27                                                  */s/ I. Neel Chatterjee*
                                                   I. NEEL CHATTERJEE
28  / / /

1    PURSUANT TO STIPULATION, IT IS SO ORDERED:

2

3

4    DATED: ___February 18, 2011___    _____

                                        JAMES WARE
5                                       Chief United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT G

United States District Court

For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| Facebook, Inc., | NO. C 08-05780 JW |
| Plaintiff, | **ORDER DENYING FACEBOOK'S** |
| v. | **MOTION FOR JUDGMENT ON THE** |
| | **PLEADINGS; DENYING THE PARTIES'** |
| Power Ventures, Inc., et al., | **CROSS-MOTIONS FOR SUMMARY** |
| | **JUDGMENT; GRANTING FACEBOOK'S** |
| Defendants. | **MOTION TO DISMISS DEFENDANTS'** |
| _____/ | **COUNTERCLAIMS; DENYING** |
| | **FACEBOOK'S MOTION TO STRIKE** |
| Power Ventures, Inc., et al., | **DEFENDANTS' AFFIRMATIVE** |
| | **DEFENSES** |
| Counterclaimants, | |
| v. | |
| Facebook, Inc., | |
| Counterdefendants. | |
| _____/ | |

## I.  INTRODUCTION

Facebook, Inc. ("Plaintiff" or "Facebook") brings this action against Power Ventures, Inc. ("Defendant" or "Power") alleging, *inter alia*, violations of the California Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502 ("Section 502").  Facebook alleges that Power accessed the Facebook website in violation of Facebook's Terms of Use, and when Facebook tried to stop Power's unauthorized access, Power circumvented Facebook's technical barriers.  Power brings counterclaims against Facebook alleging, *inter alia*, violations of the Sherman Act, 15 U.S.C. § 2.

Case 5:08-cv-05780-JW Document 89 Filed 07/20/10 Page 2 of 28

Presently before the Court are Facebook's Motion for Judgment on the Pleadings Pursuant to Fed. R. Civ. P. 12(c) or, in the Alternative, Partial Summary Judgment of Liability Under California Penal Code § 502;[1] Defendants' Motion for Summary Judgment;[2] and Facebook's Motion to Dismiss Counterclaims and Strike Affirmative Defenses.[3]  The Court conducted a hearing on June 7, 2010.  Based on the papers submitted to date and oral argument, the Court DENIES Facebook's Motion for Judgment on the Pleadings, DENIES the parties' Cross-Motions for Summary Judgment, GRANTS Facebook's Motion to Dismiss Defendants' counterclaims for violations of Section 2 of the Sherman Act, GRANTS Facebook's Motion to Dismiss Defendants' UCL counterclaim, and DENIES Facebook's Motion to Strike Defendants' Affirmative Defenses.

## II.  BACKGROUND

**A.     Factual Background**

A detailed outline of the factual allegations in this case may be found in the Court's May 11, 2009 Order Denying Motion to Dismiss and Granting in Part and Denying in Part Motion for More Definite Statement.[4]  The Court will address the facts of the case, as they relate to the present Motions, in the Discussion section below.

**B.     Procedural History**

In its May 11 Order, the Court denied Defendants' Motion to Dismiss Plaintiff's claims for copyright infringement, violation of the Digital Millennium Copyright Act ("DMCA"), trademark infringement under federal law, trademark infringement under state law, and violation of the California Unfair Competition Law ("UCL"), and granted Defendants' Motion for a More Definite Statement with respect to Plaintiff's UCL claim.

---

[1]  (hereafter, "Facebook's Motion for Judgment on the Pleadings," Docket Item No. 56.)

[2]  (Docket Item No. 62.)

[3]  (hereafter, "Facebook's Motion to Dismiss," Docket Item No. 58.)

[4]  (hereafter, "May 11 Order," Docket Item No. 38.)

2

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    On October 22, 2009, the Court issued an Order Granting Facebook's Motion to Dismiss

2 Counter-Complaint and Strike Affirmative Defenses. (hereafter, "October 22 Order," Docket Item

3 No. 52.) In its October 22 Order, the Court found that the counterclaims, as stated in Defendants'

4 Answer and Counter-Complaint, were insufficient because they consisted only of conclusory

5 recitations of the applicable legal standard and a general "reference [to] all allegations of all prior

6 paragraphs as though fully set forth herein." (Id. at 3.) Similarly, the Court found Defendants'

7 affirmative defenses deficient because they referenced the introductory section without delineating

8 which allegations supported each affirmative defense. (Id. at 3-4.) The Court granted leave to

9 amend the counterclaims and affirmative defenses. (Id. at 4.) On November 23, 2010, Defendants

10 filed the Amended Answer and Counterclaims of Defendants Power Ventures, Inc. and Steve

11 Vachani. (hereafter, "Amended Answer," Docket Item No. 54.) On February 26, 2010, Judge Fogel

12 recused himself from the case. (See Docket Item No. 72.) On March 2, 2010, the case was

13 reassigned to Judge Ware. (See Docket Item No. 73.)

14    Presently before the Court are the parties' various Motions. The Court addresses each

15 Motion in turn.

16                                    **III. STANDARDS**

17 **A.    Motion for Judgment on the Pleadings**

18    Under Federal Rule of Civil Procedure 12(c), any party may move for judgment on the

19 pleadings at any time after the pleadings are closed but within such time as not to delay the trial.

20 Fed. R. Civ. P. 12(c). "For the purposes of the motion, the allegations of the non-moving party must

21 be accepted as true, while the allegations of the moving party which have been denied are assumed

22 to be false." Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc., 896 F.2d 1542, 1550 (9th Cir.

23 1990). Judgment on the pleadings is proper when the moving party clearly establishes on the face of

24 the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment

25 as a matter of law." Id. When brought by the defendant, a motion for judgment on the pleadings

26 under Federal Rule of Civil Procedure 12(c) is a "means to challenge the sufficiency of the

27 complaint after an answer has been filed." New. Net, Inc. v. Lavasoft, 356 F. Supp. 2d 1090, 1115

28                                          3

**United States District Court**
For the Northern District of California

1   (C.D. Cal. 2004). A motion for judgment on the pleadings is therefore similar to a motion to

2   dismiss. Id. When the district court must go beyond the pleadings to resolve an issue on a motion

3   for judgment on the pleadings, the proceeding is properly treated as a motion for summary

4   judgment. Fed. R. Civ. P. 12(c); Bonilla v. Oakland Scavenger Co., 697 F.2d 1297, 1301 (9th Cir.

5   1982).

6   **B.      Motion for Summary Judgment**

7           Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and

8   admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

9   material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P.

10  56(c). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims

11  or defenses." Celotex v. Catrett, 477 U.S. 317, 323-24 (1986).

12          The moving party "always bears the initial responsibility of informing the district court of

13  the basis for its motion, and identifying the evidence which it believes demonstrates the absence of a

14  genuine issue of material fact." Celotex, 477 U.S. at 323. The non-moving party must then identify

15  specific facts "that might affect the outcome of the suit under the governing law," thus establishing

16  that there is a genuine issue for trial. Fed. R. Civ. P. 56(e).

17          When evaluating a motion for summary judgment, the court views the evidence through the

18  prism of the evidentiary standard of proof that would pertain at trial. Anderson v. Liberty Lobby

19  Inc., 477 U.S. 242, 255 (1986). The court draws all reasonable inferences in favor of the non-

20  moving party, including questions of credibility and of the weight that particular evidence is

21  accorded. See, e.g. Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 520 (1992). The court

22  determines whether the non-moving party's "specific facts," coupled with disputed background or

23  contextual facts, are such that a reasonable jury might return a verdict for the non-moving party.

24  T.W. Elec. Serv. v. Pac. Elec. Contractors, 809 F.2d 626, 631 (9th Cir. 1987). In such a case,

25  summary judgment is inappropriate. Anderson, 477 U.S. at 248. However, where a rational trier of

26  fact could not find for the non-moving party based on the record as a whole, there is no "genuine

27  issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986).

28                                                      4

United States District Court
For the Northern District of California

1    Although the district court has discretion to consider materials in the court file not referenced

2    in the opposing papers, it need not do so.  See Carmen v. San Francisco Unified School District, 237

3    F.3d 1026, 1028-29 (9th Cir. 2001).  "The district court need not examine the entire file for evidence

4    establishing a genuine issue of fact."  Id. at 1031.  However, when the parties file cross-motions for

5    summary judgment, the district court must consider all of the evidence submitted in support of both

6    motions to evaluate whether a genuine issue of material fact exists precluding summary judgment

7    for either party.  The Fair Housing Council of Riverside County, Inc. v. Riverside Two, 249 F.3d

8    1132, 1135 (9th Cir. 2001).

9    **C.    Motion to Dismiss**

10    Pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed against

11    a defendant for failure to state a claim upon which relief may be granted against that defendant.

12    Dismissal may be based on either the lack of a cognizable legal theory or the absence of sufficient

13    facts alleged under a cognizable legal theory.  Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699

14    (9th Cir. 1990); Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 533-34 (9th Cir. 1984).  For

15    purposes of evaluating a motion to dismiss, the court "must presume all factual allegations of the

16    complaint to be true and draw all reasonable inferences in favor of the nonmoving party."  Usher v.

17    City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987).  Any existing ambiguities must be resolved

18    in favor of the pleading.  Walling v. Beverly Enters., 476 F.2d 393, 396 (9th Cir. 1973).

19    However, mere conclusions couched in factual allegations are not sufficient to state a cause

20    of action.  Papasan v. Allain, 478 U.S. 265, 286 (1986); see also McGlinchy v. Shell Chem. Co., 845

21    F.2d 802, 810 (9th Cir. 1988).  The complaint must plead "enough facts to state a claim for relief

22    that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  A claim is

23    plausible on its face "when the plaintiff pleads factual content that allows the court to draw the

24    reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 129

25    S. Ct. 1937, 1949 (2009).  Thus, "for a complaint to survive a motion to dismiss, the non-conclusory

26    'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a

27    claim entitling the plaintiff to relief."  Moss v. U.S. Secret Serv., 572 F.3d 962, 969 (9th Cir. 2009).

28                                                     5

United States District Court

For the Northern District of California

1    Courts may dismiss a case without leave to amend if the plaintiff is unable to cure the defect by

2    amendment.  Lopez v. Smith, 203 F.3d 1122, 1129 (9th Cir. 2000).

3                                        **IV.  DISCUSSION**

4    **A.      Statutory Standing**

5            As a threshold matter, Defendants contend that Facebook does not have standing to bring its

6    Section 502 claim because it has not made an adequate showing that it has suffered damage or loss

7    within the meaning of the statute.[5]

8            Section 502(e)(1) provides:

9                   In addition to any other civil remedy available, the owner or lessee of the computer,
     computer system, computer network, computer program, or data who suffers damage or loss
10   by reason of a violation of any of the provisions of subdivision (c) may bring a civil action
     against the violator for compensatory damages and injunctive relief.  Compensatory damages
11   shall include any expenditure reasonably and necessarily incurred by the owner or lessee to
     verify that a computer system, computer network, computer program, or data was or was not
12   altered, damaged, or deleted by the access. . . .

13           Facebook relies solely on the undisputed facts from the pleadings to support its Motion.  In

14   their Amended Answer, Defendants admit that: (1) Facebook communicated to Defendant Steven

15   Vachani ("Vachani"), the purported CEO of Power.com, its claim that "Power.com's access of

16   Facebook's website and servers was unauthorized and violated Facebook's rights, including

17   Facebook's trademark, copyrights, and business expectations with its users;"[6] (2) "Vachani offered

18   to attempt to integrate Power.com with Facebook Connect," a Facebook program that "permits

19   integration with third party websites," but "Vachani communicated concerns about Power's ability

20   to integrate Power.com with Facebook Connect on the schedule that Facebook was demanding;"[7]

21   and (3) "Facebook implemented technical measures to block users from accessing Facebook through

22

23

24   _____

25          [5] (Defendants' Reply Brief in Support of Motion for Summary Judgment at 5-14, hereafter,
     "Defendants' Reply re Summary Judgment," Docket Item No. 68.)

26          [6] (FAC ¶ 57, Amended Answer ¶ 57.)

27          [7] (FAC ¶¶ 28, 58, 60, Amended Answer ¶¶ 58, 60.)

28                                                  6

Power.com," but nonetheless "Power provided users with tools necessary to access Facebook through Power.com."[8]

In support of their contention that Plaintiff did not suffer damage or loss, Defendants provide the declaration of Vachani, in which he states that Facebook had no cause for concern over Power's access to its website, and that "in its communications with [Vachani], Facebook never suggested any concern that its computers or data had been altered, deleted, damaged, or destroyed."[9]  Vachani further declares that to his knowledge, "Facebook did not . . . make any expenditure to verify that its computers or data had not been altered, deleted, damaged, or destroyed."  (Id.)

Upon review of the pleadings and evidence presented, the Court finds that the undisputed facts show that Facebook suffered some damage or loss as a result of Power's actions.  Specifically, Defendants' admissions that Facebook attempted to block Power's access and that Power provided users with tools that allowed them to access the Facebook website through Power.com adequately demonstrates that Facebook expended resources to stop Power from committing acts that Facebook now contends constituted Section 502 violations.  Although Defendants contend that any steps that Facebook took to block Power's access to the Facebook website were *de minimus*, and would involve only a "a few clicks of a mouse . . . and ten keystrokes,"[10] Section 502 sets no threshold level of damage or loss that must be reached to impart standing to bring suit.  Under the plain language of the statute, any amount of damage or loss may be sufficient.

Moreover, Defendants provide no foundation to establish that Vachani has personal knowledge of what steps Facebook took, or would reasonably have to take, to block Power's access to the Facebook website.  Since information regarding Facebook's technical measures, and the cost

---

[8]  (FAC ¶¶ 63-64, Amended Answer ¶¶ 63-64.)

[9]  (Declaration of Steve Vachani in Support of Defendants' Opposition to Facebook Inc.'s Motion for Judgment on the Pleadings Pursuant to Fed. R. Civ. P. 12(c) or, in the Alternative, Partial Summary Judgment of Liability Under California Penal Code § 502(c) ¶ 12, hereafter, "Vachani Decl.," Docket Item No. 65.)

[10]  (Vachani ¶ 9.)

7

United States District Court

For the Northern District of California

1    Facebook expended implementing those measures, is likely to be in Facebook's possession and not

2    Power's, the Court finds that Vachani's declaration alone cannot defeat Plaintiff's standing.

3          Defendants further contend that to impart standing, damage or loss must amount to an

4    "injury." (Defendants' Reply re Summary Judgment at 4.) The statute defines an "injury" as "any

5    alteration, deletion, damage, or destruction of a computer system, computer network, computer

6    program, or data caused by the access, or the denial of access, to legitimate users of a computer

7    system, network, or program." Cal. Penal Code § 502(b)(8). However, Defendants provide no

8    authority for equating damage and loss with injury beyond the observation that the terms are

9    synonyms. (Defendants' Reply re Summary Judgment at 4.) In fact, the only place in Section 502

10   that the term injury appears, other than the clause defining the term itself, is in the criminal liability

11   provision, which has no bearing on the civil provision granting a private right of action. See §

12   502(d) (setting more stringent penalties for violations that result in an injury).

13         Since the undisputed facts demonstrate that Facebook has suffered some damage or loss in

14   attempting to block Power's access to the Facebook website, the Court finds that Facebook has

15   standing to bring suit pursuant to Section 502(e). The Court proceeds to examine Defendants'

16   liability under Section 502.

17   **B.    Defendants' Section 502 Liability**

18         Facebook contends that the undisputed facts prove that Defendants violated Section 502.

19   (Facebook's Motion for Judgment on the Pleadings at 1.) Facebook bases its Section 502 claim

20   solely on facts that Defendants admit in their Amended Answer, which Facebook contends show

21   beyond dispute that Power accessed the Facebook website in violation of the Facebook terms of use,

22   and that when Facebook tried to stop Power, Power worked around Facebook's technical barriers.

23   (Id.) Defendants respond, *inter alia*, that there is no evidence that Power ever accessed the

24

25

26

27

28

United States District Court

For the Northern District of California

Facebook website without the express permission of the user and rightful owner of the accessed data.[11]

On May 5, 2010, the Court granted the Electronic Frontier Foundation's ("EFF") Motion to File Amicus Curiae in support of Defendants' Motion.[12] EFF contends that in order to avoid constitutional vagueness concerns, the Court must construe the statutory phrase "without permission" narrowly to exclude access to a website or computer network that merely violates a term of use.[13] Allowing criminal liability based only on violation of contractual terms of service, EFF contends, would grant the website or network administrator essentially unlimited authority to define the scope of criminality and potentially expose millions of average internet users to criminal sanctions without any meaningful notice. (Id.)

The Court finds that all of the subsections of Section 502(c) that potentially apply in this case require that the defendant's actions be taken "without permission." See Cal. Penal Code § 502(c)(2), (3), (7). However, the statute does not expressly define the term "without permission." In interpreting any statutory language, the court looks first to the words of the statute. Lamie v. U.S. Trustee, 540 U.S. 526, 534 (2004). If the language is unambiguous, the statute should be interpreted according to the plain meaning of the text. Id. at 534. The structure and purpose of a statute can provide guidance in determining the plain meaning of its provisions. K-Mart Corp. v. Cartier, Inc., 486 U.S. 281, 291 (1988). Statutory language is ambiguous if it is capable of being understood in two or more possible senses or ways. Chickasaw Nation v. United States, 534 U.S. 84, 90 (2001). If

---

[11] (Defendants' Corrected Opposition to Facebook Inc.'s Motion for Judgment on the Pleadings Pursuant to Fed. R. Civ. P. 12(c) or, in the Alternative, Partial Summary Judgment of Liability Under California Penal Code § 502(c) at 11, hereafter, "Defendants' Opposition re Summary Judgment," Docket Item No. 74.)

[12] (Docket Item No. 79.)

[13] (Brief of Amicus Curiae Electronic Frontier Foundation in Support of Defendant Power Ventures' Motion for Summary Judgment on Cal. Penal Code 502(c) at 24-28, hereafter, "Amicus Brief," Docket Item No. 83.) On July 6, 2010, Facebook filed its Reply to EFF's Amicus Brief. (hereafter, "Amicus Reply," Docket Item No. 86.)

9

Case5:08-cv-05780-JW Document89-3 Filed05/09/11 Page41 of 79

a statutory provision is ambiguous, the court turns to the legislative history for guidance.  <u>SEC v.</u> <u>McCarthy,</u> 322 F.3d 650, 655 (9th Cir. 2003).

Here, the Court first looks to the plain language of the statute.  However, the term "without permission" can be understood in multiple ways, especially with regard to whether access is without permission simply as a result of violating the terms of use.  Thus, the Court must consider legislative intent and constitutional concerns to determine whether the conduct at issue here falls within the scope of the statute.  <u>See</u> <u>F.C.C. v. Fox Television Stations, Inc.,</u> 129 S. Ct. 1800, 1811 (2009) (noting that "the canon of constitutional avoidance in an interpretive tool, counseling that ambiguous statutory language be construed to avoid serious constitutional doubts").

### 1.       Plain Language of the Statute

Here, Facebook does not allege that Power has altered, deleted, damaged, or destroyed any data, computer, computer system, or computer network, so the subsections that require that type of action are not applicable.  However, the Court finds that the following subsections of Section 502 do not require destruction of data, and thus may apply here:

(1)      Section 502(c)(2) holds liable any person who "[k]nowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network;"

(2)      Section 502(c)(3) holds liable any person who "[k]nowingly and without permission uses or causes to be used computer services;" and

(3)      Section 502(c)(7) holds liable any person who "[k]nowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network."

To support its claim that Defendants violated these provisions, Facebook relies solely on facts that Defendants admitted in their Amended Answer.  Specifically, Facebook points to Defendants' admissions that: (1) "Power permits users to enter their account information to access the Facebook site through Power.com;"[14] (2) "Defendants developed computer software and other automated devices and programs to access and obtain information from the Facebook website for

---

[14]  (Amended Answer ¶¶ 18, 45, 50.)

10

Case 5:08-cv-05780-JW  Document 89  Filed 07/20/10  Page 11 of 25

aggregating services;"[15] (3) Facebook communicated to Vachani its claims that "Power.com's access of Facebook's website and servers was unauthorized and violated Facebook's rights, including Facebook's trademark, copyrights, and business expectations with its users;"[16] (4) "Facebook implemented technical measures to block users from accessing Facebook through Power.com;"[17] and (5) "Power provided users with tools necessary to access Facebook through Power.com."[18]  Since all three of the subsections at issue here require that Defendants' acts with respect to the computer or computer network be taken without permission, the Court analyzes that requirement first.

Defendants and EFF contend that Power's actions could not have been without permission because Power only accessed the Facebook website with the permission of a Facebook account holder and at that account holder's behest.  (See Defendants' Opposition re Summary Judgment at 11; Amicus Brief at 11.)  Facebook, on the other hand, contends that regardless of whatever permission an individual Facebook user may have given to Power to access a particular Facebook account, Power's actions clearly violated the website's terms of use, which state that a Facebook user may not "collect users' content or information, or otherwise access Facebook, using automated means (such as harvesting bots, robots, spiders, or scrapers) without [Facebook's] permission."[19]

Since Power admits that it utilized "automated devices" to gain access to the Facebook website, the Court finds that it is beyond dispute that Power's activities violated an express term of

---

[15]  (Id. ¶ 74; FAC ¶ 74.)

[16]  (Amended Answer ¶ 57; FAC ¶ 57.)

[17]  (Amended Answer ¶ 63.)

[18]  (Id. ¶ 64.)

[19]  (Facebook Inc.'s Reply Brief in Support of its Motion for Judgment on the Pleadings or, in the Alternative, Partial Summary Judgment of Liability Under California Penal Code Section 502 and Opposition to Defendants' Motion for Summary Judgment at 5-6, hereafter, "Facebook's Reply re Summary Judgment," Docket Item No. 66.)

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1    the Facebook terms of use.[20]  The issue then becomes whether an access or use that involves a

2    violation of the terms of use is "without permission" within the meaning of the statute.  In the

3    modern context, in which millions of average internet users access websites every day without ever

4    reading, much less understanding, those websites' terms of use, this is far from an easy or

5    straightforward question.  Without clear guidance from the statutory language itself, the Court turns

6    to case law, legislative intent, and the canon of constitutional avoidance to assist in interpreting the

7    statute, and then analyzes whether the acts at issue here were indeed taken without permission.

8        **2.    Caselaw**

9        Since the California Supreme Court has not directly addressed the question of whether the

10   violation of a term of use constitutes access or use without permission pursuant to Section 502, the

11   Court looks to analogous state appellate court cases and federal court cases from this district for

12   guidance as to the statute's proper construction.  The Court also considers cases interpreting the

13   Computer Fraud and Abuse Act ("CFAA"), the federal corollary to Section 502, in evaluating how

14   broad an application Section 502 should properly be given.

15       EFF relies on two state appellate cases for the proposition that Section 502 should not apply

16   to persons who have permission to access a computer or computer system, but who use that access in

17   a manner that violates the rules applicable to that system.  Chrisman v. City of Los Angeles, 155

18   Cal. App. 4th 29, 32 (Cal. Ct. App. 2007); Mahru v. Superior Court, 191 Cal. App. 3d 545, 549 (Cal.

19   Ct. App. 1987).  In Chrisman, the court found that a police officer did not violate Section 502 when,

20   while on duty, the officer "accessed the Department computer system [] for non-duty-related

21   activities."  155 Cal. App. 4th at 32.  The court found that at essence, Section 502 is an anti-hacking

22   statute, and "[o]ne cannot reasonably describe appellant's improper computer inquiries about

23   celebrities, friends, and others as hacking."  Id. at 35.  The officer's "computer queries seeking

24   _____

25       [20] This, of course, assumes that Power was in fact subject to the Facebook terms of use, an
     issue which was not briefed by either party.  However, the terms of use state, "By accessing or using

26   our web site . . . , you (the 'User') signify that you have read, understand and agree to be bound by
     these Terms of Use . . . , whether or not you are a registered member of Facebook."  (FAC, Ex. A.)

27   Thus, in the act of accessing or using the Facebook website alone, Power acceded to the Terms of
     Use and became bound by them.

28                                                       12

United States District Court

For the Northern District of California

information that the department's computer system was designed to provide to officers was misconduct if he had no legitimate purpose for that information, but it was not hacking the computer's 'logical, arithmetical, or memory function resources,' as [the officer] was entitled to access those resources." Id. While Chrisman does not address the specific issue before the Court here, and focuses on the statutory definition of "access" rather than "without permission," the Court finds that the case helps to clarify that using a computer network for the purpose that it was designed to serve, even if in a manner that is otherwise improper, is not the kind of behavior that the legislature sought to prohibit when it enacted Section 502.

In Mahru, the court found that the director and part owner of a data-processing firm was not liable under Section 502 when he instructed the company's chief computer operator to make specified changes in the names of two files in a former customer's computer program in retaliation for that customer terminating its contract with the company. 191 Cal. App. 3d at 547-48. These changes had the effect of preventing the former customer's employees from being able to run their computer programs without the assistance of an expert computer software technician. Id. In finding that Section 502 had not been violated by the company's actions, the court stated:

> The Legislature could not have meant, by enacting section 502, to bring the Penal Code into the computer age by making annoying or spiteful acts criminal offenses whenever a computer is used to accomplish them. Individuals and organizations use computers for typing and other routine tasks in the conduct of their affairs, and sometimes in the course of these affairs they do vexing, annoying, and injurious things. Such acts cannot all be criminal.

Id. at 549. However, the court in Mahru based its finding of no liability in part on documentary evidence establishing that the company, and not the former customer, owned the computer hardware and software, which explains why the company's manipulation of files stored on that computer hardware was merely vexatious and not unlawful hacking. The Court finds that Mahru is not applicable to the circumstances here, where it is undisputed that Power accessed data stored on Facebook's server.

In support of its contention that Facebook users cannot authorize Power to access Facebook's computer systems, Facebook relies on a previous order in this case and another case from this

United States District Court
For the Northern District of California

1  District.  On May 11, 2009, Judge Fogel issued an order denying Defendants' Motion to Dismiss

2  Plaintiff's copyright infringement, DMCA, and trademark infringement claims.  In addressing

3  Plaintiff's copyright infringement claim, Judge Fogel found that, "[v]iewing the allegations in the

4  FAC as true, the utilization of Power.com by Facebook users exceeds their access rights pursuant to

5  the Terms of Use.  Moreover, when a Facebook user directs Power.com to access the Facebook

6  website, an unauthorized copy of the user's profile page is created."  (May 11 Order at 6-7.)  The

7  Court finds that whether or not Facebook users' utilization of Power.com exceeds their access rights

8  under Facebook's terms of use is not the issue presented in these Motions.  Instead, the Court must

9  determine whether such a violation of the terms of use constitutes use "without permission" within

10  the meaning of Section 502, a question that the May 11 Order did not directly address.

11  Finally, in Facebook, Inc. v. ConnectU LLC, Judge Seeborg found that a competing social

12  networking site violated Section 502 when it accessed the Facebook website to collect "millions" of

13  email addresses of Facebook users, and then used those email addresses to solicit business for itself.

14  489 F. Supp. 2d 1087, 1089 (N.D. Cal. 2007).  In that case, Judge Seeborg found unavailing

15  ConnectU's contention that it did not act without permission because it only "accessed information

16  on the Facebook website that ordinarily would be accessible only to registered users by using log-in

17  information voluntarily supplied by registered users."  Id. at 1090-91.  Judge Seeborg found that

18  ConnectU was subject to Facebook's terms of use and rejected ConnectU's contention that "a

19  private party cannot define what is or what is not a criminal offense by unilateral imposition of terms

20  and conditions of use."  Id. at 1091.  The court held that "[t]he fact that private parties are free to set

21  the conditions on which they will grant such permission does not mean that private parties are

22  defining what is criminal and what is not."  Id.

23  The Court finds that of the cases discussed so far, the holding in ConnectU is most applicable

24  to the present case.  However, the Court respectfully disagrees with ConnectU in one key respect.

25  Contrary to the holding of ConnectU, the Court finds that allowing violations of terms of use to fall

26  within the ambit of the statutory term "without permission" does essentially place in private hands

27  unbridled discretion to determine the scope of criminal liability recognized under the statute.  If the

28                                                                 14

United States District Court
For the Northern District of California

issue of permission to access or use a website depends on adhering to unilaterally imposed contractual terms, the website or computer system administrator has the power to determine which actions may expose a user to criminal liability.  This raises constitutional concerns that will be addressed below.

Although cases interpreting the scope of liability under the CFAA do not govern the Court's analysis of the scope of liability under Section 502, CFAA cases can be instructive.  EFF points to several CFAA cases for the proposition that the CFAA prohibits trespass and theft, not mere violations of terms of use.  See, e.g., LVRC Holdings LLC v. Brekka, 581 F.3d 1127, 1130 (9th Cir. 2009) ("[F]or purposes of the CFAA, when an employer authorizes an employee to use a company computer subject to certain limitations, the employee remains authorized to use the computer even if the employee violates those limitations."); Diamond Power Int'l, Inc. v. Davidson, 540 F. Supp. 2d 1322 (N.D. Ga. 2007) ("Under the more reasoned view, a violation for accessing 'without authorization' occurs only where initial access is not permitted."); But see Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage, Inc., 119 F. Supp. 2d 1121, 1125-29 (W.D. Wash. 2000) (finding employee may be held liable under CFAA for taking employer information from the company's computer system to his next job on the ground that he was "without authorization" when he "allegedly sent [the employer's] proprietary information to the defendant").

While there appears to be some disagreement in the district courts as to the scope of the term "without authorization" in the CFAA context, the Court finds the Ninth Circuit's opinion in LVRC Holdings to be particularly useful in construing the analogous term in Section 502.  In that case, the Ninth Circuit found that access to a computer may be "authorized," within the statutory meaning of the term, even if that access violates an agreed upon term of using that computer.  In general, the Court finds that the more recent CFAA cases militate for an interpretation of Section 502 that does not premise permission to access or use a computer or computer network on a violation of terms of use.  However, since none of the cases discussed provides a definitive definition of without permission under Section 502, the Court now looks to the legislative purpose of the statute to the extent that it can be discerned.

### 3. Legislative Purpose

Section 502 includes the following statement of statutory purpose:

> It is the intent of the Legislature in enacting this section to expand the degree of protection afforded to individuals, businesses, and governmental agencies from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems. The Legislature finds and declares that the proliferation of computer technology has resulted in a concomitant proliferation of computer crime and other forms of unauthorized access to computers, computer systems, and computer data.
>
> The Legislature further finds that protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals as well as to the well-being of financial institutions, business concerns, governmental agencies, and others within this state that lawfully utilize those computers, computer systems, and data.

Cal. Penal Code § 502(a).

Facebook contends that this language evidences legislative intent to address conduct beyond "straightforward hacking and tampering." (Facebook's Reply re Summary Judgment at 2.) Specifically, Facebook contends that the legislature's use of the phrases "protection . . . from . . . unauthorized access" and "protection of the integrity of all types and forms of computers, computer systems, and computer data" demonstrates a far-reaching legislative purpose to protect the entire commercial computer infrastructure from trespass. (Id. at 2-3.)

The Court declines to give the statute's statement of legislative intent the sweeping meaning that Facebook ascribes to it. Section 502(a) speaks in general terms of a "proliferation of computer crime and other forms of unauthorized access to computers," but does not offer any further guidance as to what specific acts would constitute such crime or unauthorized access. It is far from clear what conduct the legislature believed posed a threat to the integrity of computers and computer systems, or if the legislature could even fathom the shape that those threats would take more than twenty years after the statute was first enacted.

Thus, the Court does not assign any weight to the statute's statement of legislative intent in construing the liability provisions of Section 502.

16

United States District Court

For the Northern District of California

**4.**     **Rule of Lenity**

EFF contends that interpreting Section 502 broadly to allow liability where the absence of permission is based only on the violation of a contractual term of use or failure to fully comply with a cease and desist letter would render the statute unconstitutionally vague, stripping the statute of adequate notice to citizens of what conduct is criminally prohibited.  (Amicus Brief at 24-28.)  EFF further contends that giving the statute the broad application that Facebook seeks could expose large numbers of average internet users to criminal liability for engaging in routine web-surfing and emailing activity.  (Id.)

"It is a fundamental tenet of due process that '[n]o one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes." Lanzetta v. New Jersey, 306 U.S. 451, 453 (1993).  Thus, a criminal statute is invalid if it "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden."  United States v. Harriss, 347 U.S. 612 (1954).  Where a statute has both criminal and noncriminal applications, courts must interpret the statute consistently in both contexts.  Leocal v. Ashcroft, 543 U.S. 1, 11 n.8 (2004).  In the Ninth Circuit, "[t]o survive vagueness review, a statute must '(1) define the offense with sufficient definiteness that ordinary people can understand what conduct is prohibited; and (2) establish standards to permit police to enforce the law in a non-arbitrary, non-discriminatory manner.'" United States v. Sutcliffe, 505 F.3d 944, 953 (9th Cir. 2007).

The Court finds that interpreting the statutory phrase "without permission" in a manner that imposes liability for a violation of a term of use or receipt of a cease and desist letter would create a constitutionally untenable situation in which criminal penalties could be meted out on the basis of violating vague or ambiguous terms of use.  In the words of one commentator, "By granting the computer owner essentially unlimited authority to define authorization, the contract standard delegates the scope of criminality to every computer owner."[21]  Users of computer and internet services cannot have adequate notice of what actions will or will not expose them to criminal

---

[21] Orin S. Kerr, *Cybercrime's Scope: Interpreting "Acess" and "Authorization" in Computer Misuse Statutes*, 78 N.Y.U. L. Rev. 1596, 1650-51 (2003).

United States District Court
For the Northern District of California

1    liability when a computer network or website administrator can unilaterally change the rules at any

2    time and are under no obligation to make the terms of use specific or understandable to the general

3    public.  Thus, in order to avoid rendering the statute constitutionally infirm, the Court finds that a

4    user of internet services does not access or use a computer, computer network, or website without

5    permission simply because that user violated a contractual term of use.[22]

6         If a violation of a term of use is by itself insufficient to support a finding that the user's

7    access was "without permission" in violation of Section 502, the issue becomes what type of action

8    would be sufficient to support such a finding.   The Court finds that a distinction can be made

9    between access that violates a term of use and access that circumvents technical or code-based

10   barriers that a computer network or website administrator erects to restrict the user's privileges

11   within the system, or to bar the user from the system altogether.[23]  Limiting criminal liability to

12   circumstances in which a user gains access to a computer, computer network, or website to which

13   access was restricted through technological means eliminates any constitutional notice concerns,

14   since a person applying the technical skill necessary to overcome such a barrier will almost always

15   understand that any access gained through such action is unauthorized.  Thus, the Court finds that

16   accessing or using a computer, computer network, or website in a manner that overcomes technical

17   or code-based barriers is "without permission," and may subject a user to liability under Section 502.

18        Applying this construction of the statute here, the Court finds that Power did not act "without

19   permission" within the meaning of Section 502 when Facebook account holders utilized the Power

20   website to access and manipulate their user content on the Facebook website, even if such action

21   violated Facebook's Terms of Use.  However, to the extent that Facebook can prove that in doing so,

22   Power circumvented Facebook's technical barriers, Power may be held liable for violation of

23   Section 502.  Here, Facebook relies solely on the pleadings for its Motion.  In their Answer,

24

25        [22]  This is not to say that such a user would not be subject to a claim for breach of contract.
     Where a user violates a computer or website's terms of use, the owner of that computer or website
26   may also take steps to remove the violating user's access privileges.

27        [23]  See generally Kerr, supra note 20.

28
                                                      18

United States District Court

For the Northern District of California

1    Defendants do not directly admit that the tools Power provided to its users were designed to

2    circumvent the technical barriers that Facebook put in place to block Power's access to the Facebook

3    website.  Thus, the Court finds that there is a genuine issue of material fact as to whether Power's

4    access or use of the Facebook website was "without permission" within the meaning of Section 502.

5         EFF contends that even if Power evaded the technical barriers that Facebook implemented to

6    deny it access, Power's conduct does not fall within the scope of Section 502 liability.  (Amicus

7    Brief at 19-28.)  More specifically, EFF contends that it would be inconsistent to allow liability for

8    ignoring or bypassing technical barriers whose sole purpose is to enforce contractual limits on

9    access while denying liability for violating those same contractual limits when technological means

10   of restricting access are not employed.  (Id. at 19.)  Thus, according to EFF, Power's efforts to

11   circumvent Facebook's IP-blocking efforts did not violate Section 502 because Facebook was

12   merely attempting to enforce its Terms of Use by other means.[24]  (Id. at 23-24.)  The Court finds

13   EFF's contentions unpersuasive in this regard.  EFF has not pointed to any meaningful distinction

14   between IP address blocking and any other conceivable technical barrier that would adequately

15   justify not finding Section 502 liability in one instance while finding it in the other.  Moreover, the

16   owners' underlying purpose or motivation for implementing technical barriers, whether to enforce

17   terms of use or otherwise, is not a relevant consideration when determining the appropriate scope of

18   liability for accessing a computer or network without authorization.  There can be no ambiguity or

19   mistake as to whether access has been authorized when one encounters a technical block, and thus

20

21

22

23   _____

24        [24]  The Court notes that although both parties discuss IP address blocking as the form of
     technological barrier that Facebook utilized to deny Power access, Facebook's use of IP-blocking
25   and Power's efforts to avoid those blocks have not been established as undisputed facts in this case.
     However, for purposes of this Motion, the Court finds that the specific form of the technological
26   barrier at issue or means of circumventing that barrier are not relevant.  Rather, the issue before the
     Court is whether there are undisputed facts to establish that such avoidance of technological barriers
27   occurred in the first instance.

28                                                    19

**United States District Court**
For the Northern District of California

1    there is no potential failure of notice to the computer user as to what conduct may be subject to

2    criminal liability, as when a violation of terms of use is the sole basis for liability.[25]

3        Accordingly, the Court DENIES Facebook's Motion for Judgment on the Pleadings, and

4    DENIES the parties' Cross-Motions for Summary Judgment as to Facebook's Section 502 cause of

5    action.

6    **C.      Defendants' Counterclaims**

7        Facebook moves to dismiss Defendants' causes of action for violation of Section 2 of the

8    Sherman Act ("Section 2") on the ground that Defendants have failed to allege sufficient facts to

9    state a claim for monopolization or attempted monopolization.  (Facebook's Motion to Dismiss at 4-

10   9.)

11       To state a Section 2 claim for monopolization, the claimant must show that the alleged

12   monopolist (1) possesses monopoly power in the relevant market (2) through the willful acquisition

13   or maintenance of that power, as distinguished from growth or development as a consequence of a

14   superior product, business acumen, or historic accident, (3) that causes antitrust injury.  Verizon

15   Commc'ns v. Trinko, 540 U.S. 398, 407 (2004).

16       Since the Court finds that the element of willful acquisition or maintenance of monopoly

17   power is dispositive, the Court addresses this issue first.  Defendants allege, in pertinent part:

18           Facebook has acquired and maintained market power through two devices:
     Facebook solicited (and continues to solicit) internet users to provide their account names
19   and passwords for users' email and social networking accounts, such as Google's Gmail,
     AOL, Yahoo, Hotmail, or other third party websites.  Facebook then uses the account
20   information to allow the user to access those accounts through Facebook, and to run
     automated scripts to import their lists of friends and other contacts–i.e., to "scrape
21   data"–from those third-party sites into Facebook.  This practice fueled Facebook's growth by
     allowing Facebook to add millions of new users, and to provide users with convenient tools
22   to encourage their friends and contacts to join Facebook as well.  On information and belief
     it is estimated that at least approximately 35% to 50% of Facebook's "132 million active
23   users" . . . registered with Facebook as a result of an invitation generated using this device.

24

25       [25]  As Facebook contends in its Amicus Reply, the Court finds that evidence of Power's
     efforts to circumvent Facebook's technical barrier is also relevant to show the necessary mental state
26   for Section 502 liability.  (Amicus Reply at 10-11.)  Since the facts relating to such circumvention
     efforts are still in dispute, the Court finds that there is also a genuine issue of material fact as to
27   whether Defendants possessed the requisite mental state.

28

United States District Court
For the Northern District of California

1    Facebook simultaneously prohibited (and prohibits) users from using the same type
     of utility to access their own user data when it is stored on the Facebook site.  Thus,
2    Facebook prohibits users from logging into Facebook through third-party sites, such as
     Power.com, and also restricts users from running automated scripts to retrieve their own user
3    data from the Facebook site.

4    (Amended Answer ¶ 174.)

5           Facebook has also maintained its monopoly power by systematically threatening new
     entrants, such as Power.com and others, who seek to attract users through the same device
6    . . . that Facebook itself used to fuel its own growth.  On information and belief, for
     approximately the past 36 months, Facebook has threatened dozens of new entrants since
7    2006 with baseless intellectual property claims, and has engaged in systematic and
     widespread copyright misuse . . . to discourage market entry and to stifle competition from
8    new entrants.

9    (Amended Answer ¶ 176.)

10          The Court finds that Defendants' allegations cannot support a Section 2 monopolization

11   claim.  Defendants cite no authority for the proposition that Facebook is somehow obligated to allow

12   third-party websites unfettered access to its own website simply because some other third-party

13   websites grant that privilege to Facebook.  In fact, the Ninth Circuit has held that merely introducing

14   a product that is not technologically interoperable with competing products is not violative of

15   Section 2.  See Foremost Pro Color, Inc. v. Eastman Kodak Co., 703 F.2d 534 (9th Cir. 1983).

16          In response to Facebook's Motion, Defendants merely assert that Facebook's actions are

17   anticompetitive because Defendants have alleged so, and that the Court must accept this allegation

18   as true at the motion to dismiss stage.[26]  In maintaining this position, Defendants miss the fact that the

19   issue of whether or not a particular practice is anticompetitive is determinative of an essential

20   element of a monopoly claim, and is thus a question of law that may be determined by the Court.

21   The Court is not obligated to accept as true Defendants' allegations that amount to conclusions of

22   law, and the Court rejects Defendants' naked assertion here that Facebook's practices are predatory.

23   Papasan, 478 U.S. at 286.

24

25   _____

26          [26] (Defendants' Opposition to Motion of Facebook, Inc. to Dismiss Counterclaims and Strike
     Affirmative Defenses at 4-5, hereafter, "Defendants' Opposition re Motion to Dismiss," Docket Item
27   No. 63.)

28                                              21

United States District Court

For the Northern District of California

1       The Court likewise finds that Defendants' allegation that Facebook maintained monopoly

2   power by threatening potential new entrants to the social networking market with baseless

3   intellectual property lawsuits cannot support a Section 2 claim.  If Facebook has the right to manage

4   access to and use of its website, then there can be nothing anticompetitive about taking legal action

5   to enforce that right.  Furthermore, whether or not a particular lawsuit is "baseless" is a legal

6   conclusion, and thus the Court need not accept Defendants' allegations as to the merits of

7   Facebook's lawsuits as true.  Again, Defendants cite no authority for the proposition that filing

8   lawsuits against competitors for infringing on one's intellectual property rights can be deemed an

9   anticompetitive or predatory practice.

10      In light of the Court's finding that Defendants do not plead sufficient facts to satisfy one of

11  the essential elements of their Section 2 claim, the Court need not address the sufficiency of

12  Defendants' pleadings as to the remaining elements.  Since anticompetitive conduct is also an

13  element of a claim for attempted monopolization under Section 2, the Court finds that Defendants'

14  pleadings are deficient as to that claim as well.  See Coalition for ICANN Transparency, Inc. v.

15  VeriSign, Inc., 567 F.3d 1084, 1093 (9th Cir. 2009).

16      Accordingly, the Court GRANTS Facebook's Motion to Dismiss Defendants' counterclaims

17  for violations of Section 2 of the Sherman Act.  Since Defendants have already had the opportunity

18  to amend their counterclaims once, the Court dismisses these claims with prejudice.

19  **D.    UCL Claim**

20      Facebook moves to dismiss Defendants' UCL claim on the ground that if Facebook's

21  conduct is not anticompetitive under Section 2 of the Sherman Act, a UCL claim cannot be premised

22  on that same conduct.  (Facebook's Motion to Dismiss at 8-9.)

23       The UCL prohibits "any unlawful, unfair or fraudulent business act or practice."  Cal. Bus.

24  & Prof. Code § 17200.  "The broad scope of the statute encompasses both anticompetitive business

25  practices and practices injurious to consumers.  An act or practice may be actionable as 'unfair'

26  under the unfair competition law even if it is not 'unlawful.'"  Chavez v. Whirlpool Corp., 93 Cal.

27  App. 4th 363, 375 (Cal. Ct. App. 2001).

28                                              22

United States District Court
For the Northern District of California

In <u>Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tele. Co.</u>,[27] the court concluded that an act or practice is "unfair" under the UCL if that conduct "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." Likewise,

> the determination that the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is not "unfair" toward consumers. To permit a separate inquiry into essentially the same question under the unfair competition law would only invite conflict and uncertainty and could lead to the enjoining of procompetitive conduct.

<u>Chavez</u>, 93 Cal. App. 4th at 375.

Here, the Court has found that Facebook's conduct is not anticompetitive. Thus, Defendants cannot premise their UCL claim on Facebook's conduct under either the unlawful or the unfair prong. Accordingly, the Court GRANTS Facebook's Motion to Dismiss as to Defendants' UCL counterclaim with prejudice.

**E.** **<u>Affirmative Defenses</u>**

Facebook moves to strike Defendants' affirmative defenses of misuse of copyright and fair use. (Facebook's Motion to Dismiss at 9-11.)

Pursuant to Federal Rule of Civil Procedure 12(f), "the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." However, "[m]otions to strike are generally regarded with disfavor because of the limited importance of pleading in federal practice, and because they are often used as a delaying tactic." <u>Neilson v. Union Bank of Cal., N.A.</u>, 290 F. Supp. 2d 1101, 1152 (C.D. Cal. 2003); <u>see, e.g.</u>, <u>Cal. Dep't of Toxic Substances Control v. Alco Pac., Inc.</u>, 217 F. Supp. 2d 1028 (C.D. Cal. 2002). Accordingly, such motions should be denied unless the matter has no logical connection to the controversy at issue and may prejudice one or more of the parties to the suit. <u>SEC v. Sands</u>, 902 F. Supp. 1149, 1166 (C.D. Cal. 1995); <u>LeDuc v. Kentucky Central Life Ins. Co.</u>, 814 F. Supp. 820, 820 (N.D. Cal. 1992). When considering a motion to strike, the court "must view the pleading in a light

---

[27] 20 Cal. 4th 163, 187 (Cal. Ct. App. 1999).

United States District Court

For the Northern District of California

1  most favorable to the pleading party." <u>In re 2TheMart.com, Inc. Securities Litig.</u>, 114 F. Supp. 2d

2  955, 965 (C.D. Cal. 2000).

3          Here, the Court previously struck Defendants' affirmative defenses because they

4  "contain[ed] no factual allegations." (October 22 Order at 3.) Instead, the pleadings merely referred

5  back to the "Introduction and Background" section with the phrase "conduct, as described herein."

6  (<u>Id.</u> at 4.) The Court found such barebones pleading inadequate, but gave Defendants leave to

7  amend. In their Amended Answer, Defendants plead in much greater detail their misuse of

8  copyright and fair use affirmative defenses. (Amended Answer ¶¶ 161-68.) The Court finds that

9  Defendants' amended allegations are sufficient to provide Facebook with "fair notice of the

10  defense." <u>See Mag Instrument, Inc. v. JS Prods.</u>, 595 F. Supp. 1102, 1107 (C.D. Cal. 2008).

11          Accordingly, the Court DENIES Facebook's Motion to Strike Defendants' Affirmative

12  Defenses.

13                                    **V.  CONCLUSION**

14          The Court DENIES Facebook's Motion for Judgment on the Pleadings, DENIES the parties'

15  Cross-Motions for Summary Judgment, GRANTS Facebook's Motion to Dismiss Defendants'

16  counterclaims for violations of Section 2 of the Sherman Act with prejudice, GRANTS Facebook's

17  Motion to Dismiss Defendants' UCL counterclaim with prejudice, and DENIES Facebook's Motion

18  to Strike Defendants' Affirmative Defenses.

19          On **August 23, 2010 at 10 a.m.**, the parties shall appear for a Further Case Management

20  Conference. On or before **August 13, 2010**, the parties shall file a Joint Case Management

21  Statement. The Statement shall include an update on the parties' discovery efforts and proposed

22  schedule on how this case should proceed in light of this Order.

23

24  Dated:  July 20, 2010

25                                              JAMES WARE
                                                United States District Judge

26

27

28                                         24

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

Alan R Plutzik aplutzik@bramsonplutzik.com
Cindy Ann Cohn cindy@eff.org
David P. Chiappetta david.chiappetta@corrs.com.au
Indra Neel Chatterjee nchatterjee@orrick.com
Jessica Susan Pers jpers@orrick.com
Joseph Perry Cutler JCutler@perkinscoie.com
Julio Cesar Avalos javalos@orrick.com
Lawrence Timothy Fisher ltfisher@bramsonplutzik.com
Scott A. Bursor scott@bursor.com
Thomas J. Gray tgray@orrick.com

Dated:  July 20, 2010                                    Richard W. Wieking, Clerk


                                                         By:    /s/ JW Chambers
                                                              **Elizabeth Garcia**
                                                              **Courtroom Deputy**

**United States District Court**
For the Northern District of California

# EXHIBIT H

# EXHIBIT A

Page 1 of 2

Case 5:08-cv-05780-JK   Documents 98-3   Filed 05/29/11   Page 59 of 79
Case 5:08-cv-05780-JK   Documents 98-3   Filed 05/28/09   Page 2 of 2

**Dalton, Amy**

| | |
|---|---|
| **From:** | steve@stevevachani.com |
| **Sent:** | Friday, December 12, 2008 1:24 PM |
| **To:** | Cutler, Joseph P. (Perkins Coie) |
| **Cc:** | felipe.herrera@corp.power.com; Eric Santos |
| **Subject:** | Power.com |

Thank you for patience to allow us to clarify our plan of action on Power in regards to our discussion on Wednesday.

We decided to move forward with the following steps

1) We will implement Facebook connect on our main login page and work with the capabilities of Facebook connect for the login to our site. Instead of a login for Facebook, users will have a button which then opens the Facebook connect window and allows them to login through Facebook connect. We will say that Facebook connects current capabilities are extremely limited and we would love the opportunity to provide a Facebook connect extension to Facebook that would allow us to enrich the experience for Facebook users. We will show that to the bus dev guys when we have a chance to meet with them.

2) We will delete any Facebook friend information we currently have.

3) We will move forward and use the Facebook features to utilize Facebook's IM, updates, and some other functionality that is already available. After we finish the implementation, we would like the opportunity to get Facebook's feedback. We have some simple innovative ideas that will follow Facebook connects system, but allow for better usability and integration. As stated earlier, we do believe that the user experience of Facebook connect is extremely limited at this stage and we hope to have an open and friendly relationship with the Facebook team to share ideas and complete solutions to allowing partners to do greater integration while addressing Facebook's concerns.

4) We are finishing a solution that we have already been discussing with other sites that is an extension to Facebook connect that Facebook could enable that will allow us to provide more functionality to Facebook users while protecting all the concerns of Facebook.

5) We do understand that there is no guarantee that Facebook will accept this solution, but our only request is that

6) We estimate that it will take us 2 weeks to completely finish this integration with Facebook connect and shift the user experience for our current users.

7) While have made the decision today to do this, we would request only one thing. We would like to meet with the business dev and guys involved on the product for thinking about solution for providing more flexibility with partners and at least present our simple code that Facebook could add that would allow us to provide a richer experience to our users and at the same time do it in a way that Facebook finds compatible with you they are envisioning their partners working with them in the future.

I believed that this email addresses everything we discussed.

12/3/2009

The two requests we have and hope you will faciliate.

1) Can we get an email introduction to the correct people inside Facebook. We only ask for the introduction and we will follow up and see their interest to meet.

2) Provide us 2 (instead of one you offered) to implement this new solution.

We did study Digsby and others and saw the changes they made in their UI to implement Facebook connect.

Please call me now and we can discuss this further. I am heading to a flight shortly.

12/3/2009

## Dalton, Amy

| | |
|---|---|
| **From:** | Cutler, Joseph P. (Perkins Coie) [JCutler@perkinscoie.com] |
| **Sent:** | Monday, December 15, 2008 5:01 PM |
| **To:** | steve@stevevachani.com; filipe.herrera@powerinc.net |
| **Cc:** | Demetrescu, Nicole (Perkins Coie); McCullagh, James R. (Perkins Coie) |
| **Subject:** | RE: Power.com |

Steve and Felipe,

I am sorry that we were not able to match schedules on Friday.  Facebook has reviewed this letter, and is willing to accept your offer to have Facebook Connect implemented by EOD December 26 – which is two weeks from the date you sent the letter.

Meanwhile, as you may know, Facebook has taken technical measures to limit the interaction between Power.com and its network at this time.  In order to fully initialize your integrated Facebook Connect status, and to lift those technical measures, Facebook requires written confirmation of the following:

1. That Power.com has purged and destroyed all data that it obtained from the Facebook network or from Facebook users prior to implementation of Facebook Connect, including all login information and/or any other data obtained or scraped from Facebook's site.
2. That Power.com has ceased displaying Facebook's trademarks on its website, except as expressly permitted by Facebook's Terms of Use, Developer Terms of Service, and/or Facebook's Connect Policies (see http://wiki.developers.facebook.com/index.php/Facebook_Connect_Policies).
3. That Power.com has implemented Facebook Connect in strict adherence to Facebook's Terms of Use, Developer Terms of Service, and/or Connect Policies.
4. That Power.com has removed all compatibility with Facebook's site that does not comply with Facebook's Terms of Use, Developer Terms of Service and/or Connect Policies.
5. That Power.com will in the future adhere to all of Facebook's Terms of Use, Developer Terms of Service, Connect Policies.

While Facebook does not object to Power.com's efforts to interact with Facebook's developer teams via normal channels, it will not set up any special developer meetings for Power.com.

Lastly, regarding your proposed notice to Facebook users: your Connect interaction must strictly comply with Facebook's applicable Terms and Policies.  Posting a notice that casts Facebook's Connect system in a negative light will likely become counterproductive to your stated goals of working together with Facebook's developers.  Facebook reserves its right to deny approval for any Facebook Connect application for any reason.

I would still like to go over these items together on the phone.  Are you available for a call tomorrow (Tuesday)?  If so, what time?

Please confirm that you agree with these terms, and that you will commit to integrating Facebook Connect by EOD, December 26, 2008.  Please also confirm that you intend to provide the written confirmation as described above by that time.

Thanks,

12/3/2009

Page 2 of 3

Case 5:08-cv-05780-HK   Document 98-3   Filed 05/29/11   Page 63 of 79
Case 5:08-cv-05780-JW   Document 28-3   Filed 12/23/09   Page 63 of 22

Joe

---

**From:** steve@stevevachani.com [mailto:steve@stevevachani.com]
**Sent:** Friday, December 12, 2008 1:24 PM
**To:** Cutler, Joseph P. (Perkins Coie)
**Cc:** felipe.herrera@corp.power.com; Eric Santos
**Subject:** Power.com

Thank you for patience to allow us to clarify our plan of action on Power in regards to our discussion on Wednesday.

We decided to move forward with the following steps

1) We will implement Facebook connect on our main login page and work with the capabilities of Facebook connect for the login to our site. Instead of a login for Facebook, users will have a button which then opens the Facebook connect window and allows them to login through Facebook connect. We will say that Facebook connects current capabilities are extremely limited and we would love the opportunity to provide a Facebook connect extension to Facebook that would allow us to enrich the experience for Facebook users. We will show that to the bus dev guys when we have a chance to meet with them.

2) We will delete any Facebook friend information we currently have.

3) We will move forward and use the Facebook features to utilize Facebook's IM, updates, and some other functionality that is already available. After we finish the implementation, we would like the opportunity to get Facebook's feedback. We have some simple innovative ideas that will follow Facebook connects system, but allow for better usability and integration. As stated earlier, we do believe that the user experience of Facebook connect is extremely limited at this stage and we hope to have an open and friendly relationship with the Facebook team to share ideas and complete solutions to allowing partners to do greater integration while addressing Facebook's concerns.

4) We are finishing a solution that we have already been discussing with other sites that is an extension to Facebook connect that Facebook could enable that will allow us to provide more functionality to Facebook users while protecting all the concerns of Facebook.

5) We do understand that there is no guarantee that Facebook will accept this solution, but our only request is that

6) We estimate that it will take us 2 weeks to completely finish this integration with Facebook connect and shift the user experience for our current users.

7) While have made the decision today to do this, we would request only one thing. We would like to meet with the business dev and guys involved on the product for thinking about solution for providing more flexibility with partners and at least present our simple code that Facebook could add that would allow us to provide a richer experience to our users and at the same time do it in a way that Facebook finds compatible with you they are envisioning their partners working with them in the future.

I believed that this email addresses everything we discussed.

12/3/2009

Page 3 of 3

Case 5:08-cv-05780-JK   Document 98-3   Filed 05/29/11   Page 64 of 79
Case 5:08-cv-05780-JK   Document 97-3   Filed 12/23/09   Page 7 of 21

The two requests we have and hope you will faciliate.

1) Can we get an email introduction to the correct people inside Facebook. We only ask for the introduction and we will follow up and see their interest to meet.

2) Provide us 2 (instead of one you offered) to implement this new solution.

We did study Digsby and others and saw the changes they made in their UI to implement Facebook connect.

Please call me now and we can discuss this further. I am heading to a flight shortly.

12/3/2009

## Dalton, Amy

| | |
|---|---|
| **From:** | steve@stevevachani.com |
| **Sent:** | Wednesday, December 17, 2008 10:29 PM |
| **To:** | filipe.herrera@powerinc.net; Cutler, Joseph P. (Perkins Coie) |
| **Cc:** | Demetrescu, Nicole (Perkins Coie); McCullagh, James R. (Perkins Coie) |
| **Subject:** | Re: Power.com |

Joseph,

I just finished a meeting with our team. They have changed the priorities of our product team to begin a complete reintegration of Facebook with Facebook connect. They are putting together a detailed product plan and studying intensively how to get the maximum innovation through Facebook connect.

I am waiting for them to final the complete product plan and schedule and allocation of resources.

Based on the more detailed feedback, I am concerned that my goal of December 26th may have been too optimistic. Rather than waiting until the last day, I would like to have an open and transparent conversation with you about our progress and also early next week share with you a visual product plan on what is being implemented for you to fully appreciate the amount of resources and time we are putting into this reintegration with Facebook connect.

It is my hope that after I present this that you and your team will see the good faith effort that our team is making to make this integration as smooth as possible.

I would like to reconvene by telephone with you on December 23rd at the end of the day to present the latest progress.

I am not expecting anything from you now, but only to provide you an update on our progress and ensure that we have open communication as we make a full effort to integrate this. On December 23rd, I will share a demo showing how we are integrating Facebook connect.

Thanks,
Steve

--- On **Mon, 12/15/08, Cutler, Joseph P. (Perkins Coie)** *<JCutler@perkinscoie.com>* wrote:

> From: Cutler, Joseph P. (Perkins Coie) <JCutler@perkinscoie.com>
> Subject: Re: Power.com
> To: steve@stevevachani.com, filipe.herrera@powerinc.net
> Cc: "Demetrescu, Nicole (Perkins Coie)" <NDemetrescu@perkinscoie.com>,
> "McCullagh, James R. (Perkins Coie)" <JMcCullagh@perkinscoie.com>
> Date: Monday, December 15, 2008, 6:16 PM
>
> Sounds good.  Let's shoot for 1:30 pm?
>
> I'll call you.
>
> Thanks for getting back to me, Steve.

Joe

Joseph P. Cutler
Attorney at Law
Perkins Coie, LLP
206. 359. 6104 (Office)
206. 359. 7104 (Fax)
jcutler@perkinscoie.com

-----Original Message-----
From: steve@stevevachani.com <steve@stevevachani.com>
To: Cutler, Joseph P. (Perkins Coie); filipe.herrera@powerinc.net <filipe.herrera@powerinc.net>
CC: Demetrescu, Nicole  (Perkins Coie); McCullagh, James R.  (Perkins Coie)
Sent: Mon Dec 15 18:05:14 2008
Subject: Re: Power.com

I will be free to go over these terms tomorrow. I am on a flight all morning, but should be free to talk
around noon.

Thanks,
Steve

Thanks,
Steve

Sent via BlackBerry by AT&T

_____

From: "Cutler, Joseph P. (Perkins Coie)"
Date: Mon, 15 Dec 2008 17:00:53 -0800
To: <steve@stevevachani.com>; <filipe.herrera@powerinc.net>
Subject: RE: Power.com

Steve and Felipe,

I am sorry that we were not able to match schedules on Friday.  Facebook has reviewed this letter, and is
willing to accept your offer to have Facebook Connect implemented by EOD December 26 – which is two
weeks from the date you sent the letter.

Meanwhile, as you may know, Facebook has taken technical measures to limit the interaction between
Power.com and its network at this time.  In order to fully initialize your integrated Facebook Connect
status, and to lift those technical measures, Facebook requires written confirmation of the following:

1.     That Power.com has purged and destroyed all data that it obtained from the Facebook network or
from Facebook users prior to implementation of Facebook Connect, including all login information and/or
any other data obtained or scraped from Facebook's site.
2.     That Power.com has ceased displaying Facebook's trademarks on its website, except as expressly
permitted by Facebook's Terms of Use, Developer Terms of Service, and/or Facebook's Connect Policies
(see http://wiki.developers.facebook.com/index.php/Facebook_Connect_Policies).
3.     That Power.com has implemented Facebook Connect in strict adherence to Facebook's Terms of Use,
Developer Terms of Service, and/or Connect Policies.
4.     That Power.com has removed all compatibility with Facebook's site that does not comply with
Facebook's Terms of Use, Developer Terms of Service and/or Connect Policies.

5.    That Power.com will in the future adhere to all of Facebook's Terms of Use, Developer Terms of Service, Connect Policies.

While Facebook does not object to Power.com's efforts to interact with Facebook's developer teams via normal channels, it will not set up any special developer meetings for Power.com.

Lastly, regarding your proposed notice to Facebook users: your Connect interaction must strictly comply with Facebook's applicable Terms and Policies.  Posting a notice that casts Facebook's Connect system in a negative light will likely become counterproductive to your stated goals of working together with Facebook's developers.  Facebook reserves its right to deny approval for any Facebook Connect application for any reason.

I would still like to go over these items together on the phone.  Are you available for a call tomorrow (Tuesday)?  If so, what time?

Please confirm that you agree with these terms, and that you will commit to integrating Facebook Connect by EOD, December 26, 2008.  Please also confirm that you intend to provide the written confirmation as described above by that time.

Thanks,

Joe

_____

From: steve@stevevachani.com [mailto:steve@stevevachani.com]
Sent: Friday, December 12, 2008 1:24 PM
To: Cutler, Joseph P. (Perkins Coie)
Cc: felipe.herrera@corp.power.com; Eric Santos
Subject: Power.com

Thank you for patience to allow us to clarify our plan of action on Power in regards to our discussion on Wednesday.

We decided to move forward with the following steps

1) We will implement Facebook connect on our main login page and work with the capabilities of Facebook connect for the login to our site. Instead of a login for Facebook, users will have a button which then opens the Facebook connect window and allows them to login through Facebook connect. We will say that Facebook connects current capabilities are extremely limited and we would love the opportunity to provide a Facebook connect extension to Facebook that would allow us to enrich the experience for

Facebook users. We will show that to the bus dev guys when we have a chance to meet with them.

2) We will delete any Facebook friend information we currently have.

3) We will move forward and use the Facebook features to utilize Facebook's IM, updates, and some other functionality that is already available. After we finish the implementation, we would like the opportunity to get Facebook's feedback. We have some simple innovative ideas that will follow Facebook connects system, but allow for better usability and integration. As stated earlier, we do believe that the user experience of Facebook connect is extremely limited at this stage and we hope to have an open and friendly relationship with the Facebook team to share ideas and complete solutions to allowing partners to do greater integration while addressing Facebook's concerns.

4) We are finishing a solution that we have already been discussing with other sites that is an extension to Facebook connect that Facebook could enable that will allow us to provide more functionality to Facebook users while protecting all the concerns of Facebook.

5) We do understand that there is no guarantee that Facebook will accept this solution, but our only request is that

6) We estimate that it will take us 2 weeks to completely finish this integration with Facebook connect and shift the user experience for our current users.

7) While have made the decision today to do this, we would request only one thing. We would like to meet with the business dev and guys involved on the product for thinking about solution for providing more flexibility with partners and at least present our simple code that Facebook could add that would allow us to provide a richer experience to our users and at the same time do it in a way that Facebook finds compatible with you they are envisioning their partners working with them in the future.

I believed that this email addresses everything we discussed.

The two requests we have and hope you will faciliate.

1) Can we get an email introduction to the correct people inside Facebook. We only ask for the introduction and we will follow up and see their interest to meet.

2) Provide us 2 (instead of one you offered) to implement this new solution.

We did study Digsby and others and saw the changes they made in their UI to implement Facebook connect.

Please call me now and we can discuss this further. I am heading to a flight shortly.

NOTICE: This communication may contain privileged or other confidential information. If you have
received it in error, please advise the sender by reply email and immediately delete the message and any
attachments without copying or disclosing the contents. Thank you.

Page 1 of 8

Case 5:08-cv-05780-JK   Document 98-3   Filed 05/09/11   Page 72 of 79
Case 5:08-cv-05780-JF   Document 59-3   Filed 12/29/09   Page 57 of 62

## Dalton, Amy

| | |
|---|---|
| **From:** | steve@stevevachani.com |
| **Sent:** | Friday, December 26, 2008 9:50 PM |
| **To:** | felipe.herrera@powerinc.net; Cutler, Joseph P. (Perkins Coie) |
| **Cc:** | Demetrescu, Nicole (Perkins Coie); McCullagh, James R. (Perkins Coie); steve@power.com |
| **Subject:** | Power.com Update - sent December 26th, 2008 |

Dear Joseph,

I am writing to follow up to our discussions regarding Power.com's integration of Facebook connect, your requests for us to take down our current Power browser compatability with Facebook, and your complaints regarding our users storing their Facebook login information inside the Power Browser. I hope you will pass this letter on to Sam and other appropriate parties inside of Facebook to communicate our sincere desire to diplomatically resolve our current disagreement and help you reduce these disagreements with well intentioned companies like Power.

Power.com is very committed to working with Facebook and we sincerely hope that this message of diplomacy and good intention is very clear in this letter. We would like to reiterate that we have made the decision to make every diplomatic effort possible to cooperate with Facebook to integrate your Facebook Connect solution on our login page. We had originally expected that it would take us 2 weeks to complete this integration, but with the holidays and the amount of work necessary to complete this integration, we realistically don't expect have this new solution fully integrated until January 30th, as we had previously discussed. After careful consideration and after previously thinking that it would better to take Facebook comptability down while we implemented this new solution, we have made the business decision to not prevent the interruption of service to our millions of users while working closely to make these changes to address Facebook's concerns. We sincerely hope that while this is not your desired action, you will respect our reasons for doing this and keep the door open and approve Power.com inside of Facebook connect when we go live in one month. Furthermore, we would like to work with Facebook to offer our complete browser tools to users with Facebook's consent and input into the user experience.

The Power.com browser provides our users value added features across their Internet experience.  Like most browsers, we have little interest to cause harm to Facebook or reduce Facebook's revenues. On the contrary, we are taking proactive steps to pass all Facebook ads through to the user inside our browser. Similar to Firefox, Internet Explorer, Flock, and other browsers and browser add-ons, we provide our users a browser to navigate and continue to use their existing sites and do not in any way attempt to obstruct users from using the sites they are accustomed to using every day. Like most browsers, we do offer our users the option to either start their experience on our home page or start on their default social network.

Furthermore, we are about to launch a new solution which will pass Facebook ads inside of all Facebook content which is displayed outside of Facebook. This is something we can have ready by the end of January and which we can also enable for you to offer to other develpment partners whose only desire is to create positive applications for Facebook users. We are committed to working with the entire industry to responsibly create a borderless web where all

parties interests are respected when widgets, apps, messages, and other content are distributed outside of Facebook or outside the host site of any other web publisher.

Power strives for complete transparency with our users by providing them explicit statements on our front page in two different places about the nature of our application, the fact that we are a value added browser with no endorsement by other sites, and we also require a user before using our service to read through and proactively accept our terms and conditions where we for the third time clarify the users consent and understanding that we are in no way affiliated with or endorsed by Facebook.

We completely understand Facebook's position to not begin any business discussions with Power.com until we have become compliant with Facebook requests. We request that you please reconsider this decision and enable us to meet with Facebook as early as possible to diplomatically resolve this issue in a way that will allow us to keep creating new applications for Facebook and also help Facebook better accommodate other innovators and application developers like Power.com who only want to enrich your user's experiences. We are working to implement this complete solution with Facebook's cooperation by January 30th and sincerely hope that you will not misinterpret this delay and our decision to not interrupt the user experience of our mutual users as our lack of desire to work together with Facebook.

If you maintain that you cannot faciliate a direct meeting, we will happily use our own contacts to start these discussions with Facebook, but it is difficult to start these discussions until after the holidays are over. We have no problem using our own contacts to get to the appropriate people at Facebook engaged in discussions in January to resolve this, but naturally prefer your assistance to speed things up.

We believe that it would be a serious strategic mistake to disrupt the experience of the millions of Power.com users while we are actively working to complete the integration of Facebook connect. We believe that this would create unnecessary attention and disruption among users, the media, and the industry around what we believe is a discussion that can be handled maturely and quietly between our companies.

I believe that Facebook understands the current challenges as Meebo and soon thousands of other sites that will connect to Facebook using open source technology solutions and other user driven solutions that are not endorsed by Facebook. We respect Facebook's objectives to create an open Internet which respects and protects users and enables developers to create new innovations to serve Facebook users. We think that it is important that we all diplomatically work together to achieve these goals for the best interests of users. The borderless web is inevitable and we all need to work together to define the best practices for this new and exciting Internet which Facebook has already played such a pivotal role in helping create over the past years.

Power.com is very interested in sitting down with Facebook to discuss together the future of the borderless internet and work to address all of Facebook's concerns. I am willing to fly to San Francisco as early as possible to proactively present our solutions or we are happy to wait until after January 30th when we complete our integration of Facebook connect on our initial login page.

Case 5:08-cv-05780-JK   Document 59-3   Filed 12/29/09   Page 4 of 12

We believe that that your number one concern of protecting a users username and password will be resolved by our implemention of Facebook connect or by Facebook using an extension to Facebook connect that we would like to present to you which would allow Power and other outside developers maximum flexibility to innovate on top of Facebook while keeping the users username and password locked securely and safely outside the reach of Power.com or any other developer. We are currently supporting and helping introduce a new industry wide solution that will ensure that sites like Power.com, Meebo, eBuddy, and thousands of others will never have access or store Facebook usernames and passwords, but still have the maximum flexibility to innovate new applications on top of Facebook and all other sites on the Internet. We all share similar investors and partners and we are all striving for the same objectives.

We believe that Facebook's second concern is the potential loss of revenues when Facebook content is accessed outside of Facebook. This coming month, Power.com will be introducing a solution which will pass all Facebook advertising through with your content that is displayed outside of Facebook. We are proceeding with this without being asked in order to further demonstrate our desire to diplomatically and responsibly address the issues of distributed content inside of mashed up websites. Power.com has no interest to interfere or to prevent Facebook from receiving revenue from all its content and will go out of its way to showcase to the industry how to responsibly solve this problem. We would welcome the opportunity to work with you to define these standards together with the leading sites on the web and introduce these standards together to the industry and inside of Facebook connect.

Finally, as a browser, most of our users experience is actually inside of Facebook and other destination sites  and we do not in any way prevent users from viewing the entire Facebook experience with all ads and revenues streams intact.

While we understand your current requests to take down the current Facebook compatibility with the Power Browser today, we strongly believe that it is a mistake to disrupt the user experience of our millions of users and create attention around our private discussions.

Unlike some other sites that you are dealing with that may truly be causing harm to Facebook, Power.com's only goal is to enable new applications which enhance Facebook's users experience inside your site.

Therefore, we diplomatically request that you please grant us an extension until January 30th to work to achieve compliance with Facebook's request and to have time to diplomatically sit down with Facebook to present solutions that will assist you in dealing with these core issues not only with Power.com, but with the hundreds of other well intentioned developers who are only looking to create new innovations for Facebook, but who do not yet have the flexibility from Facebook to support their innovations. The floodgates are about to open and we would love to work proactively to solve these challenges together.

We sincerely hope you respect our decision on this and look forward to building a healthy and diplomatic dialogue with Facebook to address your true concerns of protecting your users. And we apologize for the lack of clarity on our position until today and for any confusion we may have created from this lack of clarity. Facebook's initial strong reaction did catch us off guard and after careful consideration, we have crafted this letter to make clear our position and

desire and commitment to work together.


Best Regards,

Steve Vachani

CEO, Power.com


--- On **Tue, 12/16/08, Cutler, Joseph P. (Perkins Coie) <*JCutler@perkinscoie.com*>** wrote:

> From: Cutler, Joseph P. (Perkins Coie) <JCutler@perkinscoie.com>
> Subject: RE: Power.com
> To: steve@stevevachani.com, felipe.herrera@powerinc.net
> Cc: "Demetrescu, Nicole (Perkins Coie)" <NDemetrescu@perkinscoie.com>,
> "McCullagh, James R. (Perkins Coie)" <JMcCullagh@perkinscoie.com>
> Date: Tuesday, December 16, 2008, 10:41 AM
>
> Steve,
>
>
> I imagine you are in the air right now, but upon landing – could you confirm whether you
> are still available at 12:00 Pacific Time?  My schedule moved a bit today – and I now have
> either 12-12:30 or after 2:00 available.  I'd like to talk at noon as you originally proposed.
> Will that work?
>
>
> If I haven't heard from you then, I'll call you at noon.
>
>
> Thanks,
>
>
> Joe
>
> ------------------------------------------------------------
>
> **From:** steve@stevevachani.com [mailto:steve@stevevachani.com]
> **Sent:** Monday, December 15, 2008 6:05 PM
> **To:** Cutler, Joseph P. (Perkins Coie); felipe.herrera@powerinc.net
> **Cc:** Demetrescu, Nicole (Perkins Coie); McCullagh, James R. (Perkins Coie)
> **Subject:** Re: Power.com

Page 5 of 8

Case 5:08-cv-05780-JF Document 98-3 Filed 05/09/11 Page 76 of 79
Case 5:08-cv-05780-JF Document 59-1 Filed 12/28/09 Page 76 of 22

I will be free to go over these terms tomorrow. I am on a flight all morning, but should be free to talk around noon.

Thanks,
Steve

Thanks,
Steve
Sent via BlackBerry by AT&T

---

**From**: "Cutler, Joseph P. (Perkins Coie)"
**Date**: Mon, 15 Dec 2008 17:00:53 -0800
**To**: <steve@stevevachani.com>; <filipe.herrera@powerinc.net>
**Subject**: RE: Power.com

Steve and Felipe,

I am sorry that we were not able to match schedules on Friday.  Facebook has reviewed this letter, and is willing to accept your offer to have Facebook Connect implemented by EOD December 26 – which is two weeks from the date you sent the letter.

Meanwhile, as you may know, Facebook has taken technical measures to limit the interaction between Power.com and its network at this time.  In order to fully initialize your integrated Facebook Connect status, and to lift those technical measures, Facebook requires written confirmation of the following:

1. That Power.com has purged and destroyed all data that it obtained from the Facebook network or from Facebook users prior to implementation of Facebook Connect, including all login information and/or any other data obtained or scraped from Facebook's site.
2. That Power.com has ceased displaying Facebook's trademarks on its website, except as expressly permitted by Facebook's Terms of Use, Developer Terms of Service, and/or Facebook's Connect Policies (see http://wiki.developers.facebook.com/index.php/Facebook_Connect_Policies).
3. That Power.com has implemented Facebook Connect in strict adherence to Facebook's Terms of Use, Developer Terms of Service, and/or Connect Policies.
4. That Power.com has removed all compatibility with Facebook's site that does not comply with Facebook's Terms of Use, Developer Terms of Service and/or Connect Policies.
5. That Power.com will in the future adhere to all of Facebook's Terms of Use, Developer Terms of Service, Connect Policies.

Page 6 of 8

Case 5:08-cv-05780-JK Document 98-3 Filed 05/09/11 Page 77 of 79
Case 5:08-cv-05780-JK Document 59-3 Filed 12/29/09 Page 20 of 22

While Facebook does not object to Power.com's efforts to interact with Facebook's developer teams via normal channels, it will not set up any special developer meetings for Power.com.

Lastly, regarding your proposed notice to Facebook users: your Connect interaction must strictly comply with Facebook's applicable Terms and Policies. Posting a notice that casts Facebook's Connect system in a negative light will likely become counterproductive to your stated goals of working together with Facebook's developers. Facebook reserves its right to deny approval for any Facebook Connect application for any reason.

I would still like to go over these items together on the phone. Are you available for a call tomorrow (Tuesday)? If so, what time?

Please confirm that you agree with these terms, and that you will commit to integrating Facebook Connect by EOD, December 26, 2008. Please also confirm that you intend to provide the written confirmation as described above by that time.

Thanks,

Joe

---

**From:** steve@stevevachani.com [mailto:steve@stevevachani.com]
**Sent:** Friday, December 12, 2008 1:24 PM
**To:** Cutler, Joseph P. (Perkins Coie)
**Cc:** felipe.herrera@corp.power.com; Eric Santos
**Subject:** Power.com

Thank you for patience to allow us to clarify our plan of action on Power in regards to our discussion on Wednesday.

We decided to move forward with the following steps

1) We will implement Facebook connect on our main login page and work with the capabilities of Facebook connect for the login to our site. Instead of a login for Facebook, users will have a button which then opens the Facebook connect window and allows them to login through Facebook connect. We will say that Facebook connects current capabilities are extremely limited and we would love the opportunity to provide a Facebook connect extension to Facebook that would allow us to enrich the experience for Facebook users. We will show that to the bus dev guys when we have a chance to meet with them.

2) We will delete any Facebook friend information we currently have.

3) We will move forward and use the Facebook features to utilize Facebook's IM, updates, and some other functionality that is already available. After we finish the implementation, we would like the opportunity to get Facebook's feedback. We have some simple innovative ideas that will follow Facebook connects system, but allow for better usability and integration. As stated earlier, we do believe that the user experience of Facebook connect is extremely limited at this stage and we hope to have an open and friendly relationship with the Facebook team to share ideas and complete solutions to allowing partners to do greater integration while addressing Facebook's concerns.

4) We are finishing a solution that we have already been discussing with other sites that is an extension to Facebook connect that Facebook could enable that will allow us to provide more functionality to Facebook users while protecting all the concerns of Facebook.

5) We do understand that there is no guarantee that Facebook will accept this solution, but our only request is that

6) We estimate that it will take us 2 weeks to completely finish this integration with Facebook connect and shift the user experience for our current users.

7) While have made the decision today to do this, we would request only one thing. We would like to meet with the business dev and guys involved on the product for thinking about solution for providing more flexibility with partners and at least present our simple code that Facebook could add that would allow us to provide a richer experience to our users and at the same time do it in a way that Facebook finds compatible with

you they are envisioning their partners working with them in the future.

I believed that this email addresses everything we discussed.

The two requests we have and hope you will faciliate.

1) Can we get an email introduction to the correct people inside Facebook. We only ask for the introduction and we will follow up and see their interest to meet.

2) Provide us 2 (instead of one you offered) to implement this new solution.

We did study Digsby and others and saw the changes they made in their UI to implement Facebook connect.

Please call me now and we can discuss this further. I am heading to a flight shortly.

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.