BURSOR & FISHER, P.A.
L. Timothy Fisher (State Bar No. 191626)
Sarah N. Westcot (State Bar No. 264916)
2121 North California Blvd., Suite 1010
Walnut Creek, CA  94596
Telephone: (925) 482-1515
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com
         swestcot@bursor.com

BURSOR & FISHER, P.A.
Scott A. Bursor (State Bar No. 276006)
369 Lexington Avenue, 10th Floor
New York, NY  10017
Telephone:  (212) 989-9113
Facsimile:  (212) 989-9163
E-Mail: scott@bursor.com

BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER, LLP
Alan R. Plutzik (State Bar No. 077785)
Michael S. Strimling (State Bar No. 96135)
2125 Oak Grove Road, Suite 120
Walnut Creek, CA  94598
Telephone:  (925) 945-0200
Facsimile:  (925) 945-8792
E-Mails: aplutzik@bramsonplutzik.com
         mstrimling@bramsonplutzik.com

Attorneys for Defendants Power Ventures, Inc. and Steve Vachani

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FACEBOOK, INC., <br><br> Plaintiff, <br><br> -against- <br><br> POWER VENTURES, INC. d/b/a POWER.COM, a California corporation; POWER VENTURES, INC. a Cayman Island Corporation, STEVE VACHANI, an individual; DOE 1, d/b/a POWER.COM, an individual and/or business entity of unknown nature; DOES 2 through 25, inclusive, individuals and/or business entities of unknown nature, <br><br> Defendants. | Case No. 5:08-CV-05780 JW <br><br> **DEFENDANTS' OPPOSITION TO FACEBOOK, INC.'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS** <br><br> Date: October 24, 2011 <br> Time: 9:00 a.m. <br> Courtroom 15, 18th Floor <br> Judge James Ware |

# TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................................................................1
II. ARGUMENT .......................................................................................................................1
    A. Facebook Waived its Right to Compel Production of Documents Because its Motion is Untimely ..................................................................................1
    B. Power Conducted a Coordinated and Systematic Search for Documents .........................................................................................................................3
        1. Vachani made a good-faith determination that an email search was the most likely method to produce the documents Facebook requested ............................................................................................3
        2. Vachani searched his email using a variety of methods: keyword searches and manually scanning each message within a range of dates........................................................................................5
        3. Vachani requested a similar search from Eric Santos, Chief Technology Officer and head of the Facebook integration team .........................................................................................................................6
    C. Power Produced Few Documents Because Facebook was an Extremely Small Portion of its Business ....................................................................8
        1. Facebook users constituted less than one percent of Power's user base, and Power received almost no revenue from Facebook operations......................................................................................8
        2. Facebook integration was never a core component of Power's business..........................................................................................................9
III. CONCLUSION ....................................................................................................................9

# TABLE OF AUTHORITIES

**CASES**                                                                                                                          **Page(s)**

*Aristocrat Tech. v. Int'l Game Tech.*,
   2009 WL 3573327 (N.D. Cal. Oct. 30, 2009) ........................................................................2

*Everett v. Aldi, Inc.*,
   2009 WL 940379 (N.D. Ind. Apr. 6, 2009 ...............................................................................2

*Haviland v. Catholic Health Initiatives-Iowa Corp.*,
   692 F.Supp.2d 1040 (S.D. Iowa 2010) ....................................................................................2

*Johnson v. Dovey*,
   2011 WL 802035 (E.D. Cal. Feb 11, 2011) ............................................................................1

*Murata Mfg. Co. v. Bel Fuse, Inc.*,
   242 F.R.D. 470 (N.D. Ill. 2007) ..............................................................................................2

*Ridge Chrysler Jeep LLC v. Daimler Chrysler Services North America LLC*,
   2004 WL 3021842 (N.D. Ill. Dec. 30, 2004) ..........................................................................2

I.   **INTRODUCTION**

By the time the Court considers this motion, it will have been over a year since Plaintiff Facebook, Inc. ("Facebook") served the document requests at issue in this motion. Defendant Power Ventures, Inc. ("Power") responded to those requests on December 15, 2010 and produced its responsive documents on February 3, 2011. For months after Power responded to Facebook's document requests and produced its documents, Facebook did nothing and did not raise any issue with Power's responses or its production. Only now does Facebook contend that the search for documents was inadequate.

On July 20, 2011 Facebook took the deposition of Power's founder Steve Vachani. Mr. Vachani provided a detailed description of the search methods he used to identify documents responsive to Facebook's document requests. He sorted through his business records, which were stored in his email account. He spent hours searching through key terms such as "Facebook" "PowerScript," and "PowerScript with Facebook." He scanned every email during the period when Power developed Facebook integration and he enlisted the aid of his former Chief Technology Officer Eric Santos to conduct a similar search for responsive documents.

Nonetheless, Facebook contends that there must be additional documents. Facebook overlooks a simple fact: Facebook integration was not a critical part of Power's business model. In fact, Power received almost no revenue from Facebook operations, and less than one percent of its users had adopted Facebook. Facebook integration was an ancillary concern to Power. That is why Power did not produce additional documents. The documents Facebook seeks simply do not exist. The Court should deny Facebook's motion to compel.

II.   **ARGUMENT**

  A.   **Facebook Waived its Right to Compel Production of Documents Because its Motion is Untimely**

Motions to compel production of documents must be timely and the "[f]ailure to timely file a motion to compel will be construed as a waiver . . . ." *Johnson v. Dovey*, 2011 WL 802035, at *6 (E.D. Cal. Feb. 11, 2011).

1    It is within the Court's "broad discretion" to determine the timeliness of a motion to compel
2    document production. *Aristocrat Tech. v. Int'l Game Tech.*, 2009 WL 3573327, at *1 (N.D. Cal.
3    Oct. 30, 2009) (stating that in the context of deciding motions to compel, district courts have
4    "broad discretion" over discovery matters). This is a fact-intensive inquiry. *See, e.g., Murata Mfg.
5    Co. v. Bel Fuse, Inc.*, 242 F.R.D. 470, 475 (N.D. Ill. 2007) ("[The timeliness of motions to compel]
6    must necessarily be found in the entire complex of circumstances that gave rise to the motion, and
7    what is untimely in one case may not be in another."). Motions brought months after the initial
8    discovery request are often considered untimely. *See, e.g., Haviland v. Catholic Health Initiatives-
9    Iowa Corp.*, 692 F. Supp.2d 1040, 1044-45 (S.D. Iowa 2010) (finding a motion untimely where
10   fifteen months lapsed between the initial production of documents and the filing of a motion);
11   *Ridge Chrysler Jeep L.L.C. v. Daimler Chrysler Services North America, L.L.C.*, 2004 WL
12   3021842, at *4 (N.D. Ill. Dec. 30, 2004) (finding a motion untimely where it was brought near the
13   end of discovery, and the parties failed to make "a good faith effort to resolve discovery disputes
14   before filing a motion to compel"); *Everett v. Aldi, Inc.*, 2009 WL 940379, at *2 (N.D. Ind. Apr. 6,
15   2009) (finding a motion untimely where the moving party provided "no new explanations for the
16   delay, simply citing a litany of ongoing problems with communication and cooperation . . . .").
17   District courts consider several guidelines to make their determination, such as "(i) how
18   long was the delay; (ii) was there an explanation for it; and (iii) what happened during the delay."
19   *Everett*, 2009 WL 940379, at *2. Applying these guidelines, Facebook's motion is untimely.
20   *First*, by the time this motion is heard by the Court on October 24, 2011 it will have been an entire
21   year since Facebook served its document requests on Defendants on October 22, 2010. *Second*,
22   Facebook has failed to offer any explanation for the delay. Power served its responses on
23   December 15, 2010. Facebook did not raise any issue with Defendants' responses until more than
24   six months later on May 17, 2011. *Third*, even after Facebook asserted that Power's responses
25   were inadequate, it still waiting another three months to file its motion to compel.
26   Ultimately, Facebook has waived its right to relief. Facebook cannot explain why it needed
27   over half a year to determine that it was unsatisfied with Power's responses and production of
28   documents.

### B. Power Conducted a Coordinated and Systematic Search for Documents

Facebook distorts the deposition testimony of Vachani to make its argument that Power did not perform an adequate search for responsive documents. To the contrary, Vachani described his search methodology in great detail. It was coordinated and systematic.

First, Mr. Vachani determined that his work emails were the most likely source of the documents Facebook requested. Second, he searched these emails using a variety of methods, namely keywords and manual scanning. Third, he requested a similar search from the top executive in charge of Facebook integration, Chief Technology Officer Eric Santos. In doing so, Mr. Vachani made a good-faith determination of the best method to locate relevant documents, and he conducted his search diligently.

#### 1. Mr. Vachani made a good-faith determination that an email search was the most likely method to produce the documents Facebook requested

During his deposition, Mr. Vachani repeatedly testified that an email search was the most likely method to produce the documents Facebook requested. This belief was based on several factors. *First*, emails were the preferred method of intra-office communication at Power:

> Q. And how did you know what people were working on, just word of mouth?
> A. *The managers manage their employees and they know what -- they know what people are working on and they assign tasks and those are E mails.* What we did is we searched all E mails and conversations related to Facebook . . .
> . . .
> Q. Did you search for [meeting] agendas when you produced documents in this case?
> A. They're not electronic. This would typically be somebody put it on a word thing and then distributed an electronic copy and it was a very informal agenda, if there was even a[n] agenda. [There] was no formal process for that . . . *If they were relevant, they would be sent out in E mails, so when I searched the E mails with anything related to Facebook they could have come up* -- they would have come up in the E mail searches for the most part.

Vachani Dep. at 136:3-136:11, 294:25-295:22 (emphasis added).

*Second*, Mr. Vachani said his email was copied on important office communications. Essentially, his business records are stored in his email account:

---

DEFENDANTS' OPPOSITION TO FACEBOOK, INC.'S MOTION TO COMPEL         3
CASE NO. 5:08-CV-05780 JW

| | | |
|---|---|---|
| Q. | Where were those documents stored? | |
| A. | *Any document that was sent electronically is still in my E mailbox.* | |
| Q. | What if it wasn't sent electronically? | |
| A. | If it wasn't sent electronically, -- There's -- I don't know which -- They're -- *For the most part, I would say most of our communications were sent electronically*, but if somebody prepared, for example, a -- a Word document and never sent it out to anyone, which I don't think happened very often, and then there would be no way to locate that. | |
| | . . . | |
| Q. | Did you search this -- Is this word "system" still stored anywhere – | |
| A. | *I personally, whenever somebody wanted me to review something, I would get it in my E mailbox because I just preferred that, so I would always request that to be sent to my E mail. So if, there was anything related to Facebook or these other issues, it would have been in my E mailbox.* Also, because that was my personal practice and preference if people if they had a document – I personally never -- never used that -- the shared stuff -- shared -- put it on the servers very often and many people -- *E mail was the preferred form of communication in the company.* | |
| Q. | And did you -- Again, did you search any of the word "system" documents to see if there were any materials -- | |
| A. | *Every document that I've ever reviewed that I can -- To the best of my knowledge, was usually E mailed to me*, you know. That was -- because I was not always -- I was moving -- I was moving between traveling a lot, and in general, the -- People would E mail it to me, so it would be my E mailbox and *I've searched that entire E mail box*. | |
| Q. | How far back does your E mail box go back? | |
| A. | It goes back to well before Power was started. | |

*Id.* at 296:14-298:16 (emphasis added).

*Finally*, Mr. Vachani clearly indicated on several occasions that his Yahoo account contained the vast majority (if not all) of his work-related emails. For this reason, it was unnecessary for Mr. Vachani to extend his search beyond his Yahoo email account:

| | |
|---|---|
| Q. | The E mails you searched, are they only the E mails that are on your own -- are on your own computer? |
| A. | None of them are on my computer. They're all on -- *Every E mail was on Yahoo. Yahoo is where I had all my Power E mails, and I accessed all my E mail in my Yahoo Web mail*. |
| Q. | Did you search backup systems? |
| A. | There is no backups of my E mails. All of them -- every -- *Every E mail I've sent or received it comes -- it comes through Yahoo*, so that is my E mail. |
| Q. | So -- |

1     A.     That is -- *Every E mail that I've ever received for Power since I -- I've been using that Yahoo account before I started Power and that's been my interface [to] all my E mail.*
. . .
Q.     When you say you "haven't looked" does that mean you didn't search to see if there were E mails on that system?
A.     Didn't need to. *I have every E mail that I ever received or sent was -- I have access to on my Yahoo account.*

*Id.* at 138:24-140:17 (emphasis added).

Ultimately, Mr. Vachani made a good-faith determination that his Yahoo email account contained the documents Facebook requested. Emails were the preferred method of office communication, and Mr. Vachani knew he was copied on important matters. Moreover, his Yahoo account stored most, if not all, of his work-related emails and business records.

### 2. Mr. Vachani searched his email using a variety of methods: keyword searches and manually scanning each message within a range of dates

Mr. Vachani described his methodology in great detail. First, he searched through a number of keywords. To the best of his recollection, these keywords included terms such as "Facebook," "FB," "PowerScript," and "PowerScript with Facebook." Second, Mr. Vachani manually scanned every email from the period that Power worked on the Facebook code, from November 2007 to February 2008. *Id.* at 230:2-13.

Q.     How did you search -- What was your search methodology for E mails?
A.     *I searched -- I took every term relating to Facebook and PowerScript and conversations that related to the Power – the PowerScript for Facebook.* I don't know the exact terms I searched. I searched all terms. The second thing I did is I went -- *I went to that period of time and I went through every single. I scanned down every single E mail to see if I had -- if I had possibly missed any E mails in the search in the standard search just to see -- to be thorough.*
. . .
Q.     When you say you searched for E mails, did you use keyword searches?
A.     As I said, a combination. *First, I looked at everything in that date period just one by one manually and scanned down to see if there were any messages. The second thing I did is I searched the name of Facebook, PowerScript, and anything that I thought was related to – that would be related to Facebook to find conversations on the subject on the development.* They were -- And then provided those to you.
. . .
Q.     What's the period you searched?

A. I actually searched everything from -- I did a -- an entire four years first, but the individual E mails I searched over a -- You know, I think that whole -- that whole period from the six-month period until, I guess, January or February of 2008.  Actually, I searched afterwards too, but *the primary activity relating to Facebook was in the November, December, January, February of 2007 and 2008*, but I did search before and after, too, to see if there was other stuff.
. . .
Q. First of all, what precise search terms did you use in searching your Yahoo e-mail account?
A. I think I've answered that to the best of my knowledge already.
Q. The one I heard was Facebook.
A. No.  *I think I said I searched every E mail that had any discussion of the word Facebook in it between our employees, and then I also searched PowerScript, and then PowerScript with Facebook, and then related terms I can't remember every -- every micro-term*.  But as I mentioned, I also went through that period of time and looked at E mails.
. . .
Q. Do you know if you searched, for instance, the letters F-B?
A. Did I search the letters F-B?
Q. Yes.
A. I believe I did.
Q. Do you know?
A. I -- I searched Facebook and I probably -- I would be happy to do another search again, but *I believe I searched for F-B* because that's a terminology that -- Although, we don't use that terminology internally, I've searched – *I searched quite a lot of terms that day.  As I mentioned, I went through every individual -- Irrelevant of the searching, I went through every E mail in that period, so if I had missed something in a search term, I would have found it in my manual search by date*.  I mean, again, it's possible. Anything's possible, but I did -- I made my best effort to -- to search and provide everything.

*Id.* at 136:12-137:19, 138:13-23, 143:12-145:6 (emphasis added).

The record is clear.  Mr. Vachani's search was coordinated and systematic.  He searched a variety of keywords and then manually scanned each message during the period that Power worked on its Facebook code.

### 3. Mr. Vachani requested a similar search from Eric Santos, Chief Technology Officer and head of the Facebook integration team

In addition to his previous efforts, Mr. Vachani sent a request to Eric Santos for a similar search.  Mr. Santos helped form Power, along with Mr. Vachani.  *Id.* at 21:5-22:12.  He also led the

technology team and served as Power's Chief Technology Officer.  *Id.*  Most importantly, Mr. Santos led the effort to develop Facebook code for Power:

> Q. Can you recall what software -- the names of the software programmers associated with the development process to connect power.com to Facebook?
> A. Well, of course, *Eric was leading this* and it would have been Danilo or Carlos.
> Q. That's Eric Santos?
> A. Yes.
> Q. You think it also may have been --
> A. Well, it would have been Eric.  *Eric would be the primary person.*  He's the -- This was an important, you know, new site, so we -- he was -- *he was driving all the decisions for that.*
> . . .
> Q. Who were the other employees who were involved in the discussions [about Facebook integration]?
> A. *Eric Santos was the primary person.*  I don't remember who else . . .

*Id.* at 112:8-20, 245:20-23 (emphasis added).

Mr. Vachani requested this search with good reason.  He knew Mr. Santos was copied on important emails, particularly those regarding Facebook integration:

> Q. Do you know if -- Do you know if Mr. Delgado searched for E mails?
> A. I requested from -- *I requested for Eric [Santos] to contact anyone that he -- any E mails that he would have been involved in*, so in general, if -- if any E mail that Eric -- that Mr. Delgado was writing, *he would have copied Eric on it, because in our protocol of our company, he was his manager so anything related to the project would have gone through Eri*c; so while I didn't – I didn't go into every detail because *I know that it was common practice to copy your manager on E mails* on a product or project that you're working on.
> Q. Do you know if Mr. Bacelar searched for E mails?
> A. I would have to ask Eric to -- exactly his specific -- his specific procedure that he used.  I cannot clarify the micro-details of how they did that.  What I do know is I -- *Eric, based on the best of my knowledge, would have been copied on -- on relevant E mails relating to product decisions since he's -- since he's the -- he's the core person behind that*.

*Id.* at 141:13-142:10 (emphasis added).

Mr. Vachani made an educated determination that Mr. Santos had control of documents related to Facebook integration.  Indeed, Mr. Santos led the development team, planned Facebook integration, and was copied on all relevant emails.  Mr. Vachani testified that, "I trusted Eric to

search for himself. I requested him and then he's pretty good . . . . I was very explicit in my request. I don't need to -- to look over his shoulder you know. I asked him, you know, to look and he provided it." *Id.* at 141:2-9. Ultimately, Mr. Vachani used reasonable methods to produce the requested documents from his former staff.

> **C.     Power Produced Few Documents Because Facebook was an Extremely Small Portion of its Business**

Facebook alleges that Power *must* be in possession of more responsive documents, despite Mr. Vachani's search. However, Facebook fails to recognize that it was an extremely small portion of Power's business. Facebook was almost an afterthought to Power.

Mr. Vachani's testimony indicates that Facebook integration was not an important part of Power's business. First, Facebook users constituted less than one percent of Power's user base. Indeed, most of Power's users came from other sites, such as Orkut. Power also received almost no revenue from Facebook operations. Second, Facebook integration was never a core component of Power's business model.

> **1.     Facebook users constituted less than one percent of Power's user base, and Power received almost no revenue from Facebook operations**

Facebook fails to recognize that its users made up an extremely small percentage of Power's user base. At his deposition, Mr. Vachani testified that Facebook users made up "less than one percent" of Power's entire user base (Vachani Dep. at 173:2) and that "99 percent" of Power's users "were not using Facebook" (*id.* at 184:18-20). *See also id.* at 199:18-200:23 ("I think [Facebook] represented less than one percent of our overall users.") and 227:9-22 (estimating that Power had between "5 to 6 million" users as of December, 2008 and only 30,000 of those were Facebook users). In addition, Facebook was only up on Power's site "for a few weeks" before Power voluntarily took it down. *Id.* at 174:20-22, 228:18-229:6.

Instead, the vast majority of Power's users and revenue came from other sites, such as Orkut. Mr. Vachani testified that "well over 90 percent of our users were Orkut users." *Id.* at 191:18-19. In addition, "probably 99 percent of [2008 revenue] was generated from Orkut." *Id.* at 223:21-22. A possible reason for these numbers is that the vast majority of Power's users were

from India and Brazil.  As Mr. Vachani indicated, "[W]e knew that over 90 percent or more [of our users] were coming from India and Brazil."  *Id.* at 225:22-24.

Furthermore, Facebook operations provided almost no revenue to Power.  In 2008, Power only received $1,000 to $2,000 from Facebook operations, "and that's probably overestimating of total revenues that might have been generated from Facebook because it was such a small amount."  *Id.* at 224:4-6.

### 2. Facebook integration was never a core component of Power's business

Facebook incorrectly assumes that Facebook integration was a core component of Power's business.  The purpose of Power was to collect all of one's contacts in one place, under one browser.  Mr. Vachani indicated this numerous times in his testimony.  For instance, Mr. Vachani stated that "one of the main values of our services was I want to be able to abrogate all my contacts in one place."  *Id.* at 150:4-6.  Mr. Vachani went on to elaborate that, "*Our business did not revolve around Facebook*.  We were a very well-funded, venture funded company building a very -- a very unique and technology platform programming language and other components on something that, you know, was -- that was having and would continue to have a major impact on the future of the Internet . . . one of our main value propositions was, you know, our core message was all your -- all your -- everything in one place."  *Id.* at 135:15-21, 152:25-153:3 (emphasis added).

Facebook integration was not necessary to achieve Power's vision.  The company never placed a heavy emphasis on Facebook integration, given that Power had an international user base who had not adopted Facebook.  For these reasons, Facebook incorrectly assumes that it was a driving force behind Power's business decisions and that there must be a wealth of documents referring to Facebook.  The truth is there is no such treasure trove and Power produced the responsive documents it was able to locate.

### III. CONCLUSION

This motion to compel comes at the eleventh hour.  There is no reason why Facebook needed over six months to determine that Power's production of documents was unsatisfactory.  Over a year has passed since the original document request.

Moreover, Facebook downplays Mr. Vachani's diligent search for documents. Mr. Vachani examined his email because it contained his business records, including meeting agendas and inter-department communications. He searched for key terms such as "Facebook" and "PowerScript." He also scanned every email during the period when Power worked on Facebook integration. He even enlisted the aid of his former Chief Technology Officer Eric Santos to conduct a similar search.

But most significantly, Facebook fails to consider another reason why Power produced few relevant documents: Facebook integration was not an important part of Power's business. Less than one percent of Power users had adopted Facebook, and Power only received $2,000, at most, from Facebook operations.

Dated:  September 6, 2011                    BURSOR & FISHER, P.A.


                                             By                /s/                         
                                                     L. Timothy Fisher

                                             L. Timothy Fisher (State Bar No. 191626)
                                             Sarah N. Westcot (State Bar No. 264916)
                                             2121 North California Blvd., Suite 1010
                                             Walnut Creek, CA  94596
                                             Telephone:  (925) 482-1515
                                             E-Mail:  ltfisher@bursor.com
                                                      swestcot@bursor.com

                                             BURSOR & FISHER, P.A.
                                             Scott A. Bursor (State Bar No. 276006)
                                             369 Lexington Avenue, 10th Floor
                                             New York, NY  10017
                                             Telephone:  (212) 989-9113
                                             E-Mail:  scott@bursor.com

                                             BRAMSON, PLUTZIK, MAHLER &
                                             BIRKHAEUSER, LLP
                                             Alan R. Plutzik (State Bar No. 77785)
                                             Michael S. Strimling (State Bar No. 96135)
                                             2125 Oak Grove Road, Suite 120
                                             Walnut Creek, CA  94598
                                             Telephone:  (925) 945-0200
                                             E-Mail: aplutzik@bramsonplutzik.com
                                                     mstrimling@bramsonplutzik.com

                                             Attorneys for Defendants Power
                                             Ventures, Inc. and Steve Vachani