**EXHIBIT 2**

1                UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                    SAN JOSE DIVISION

4

5   FACEBOOK, INC.            :

6              Plaintiff,     :

7                             :

8         v.                  :

9                    :

10  POWER VENTURES, INC. d/b/a:

11  POWER.COM, a California   :

12  corporation; POWER        :        Case No.

13  VENTURES, INC. a Cayman   :    5:08-CV-05780

14  Island Corporation, STEVE :       JW (HRL)

15  VACHANI, an individual;   :

16  DOE 1, d/b/a POWER.COM, an:

17  individual and/or business:

18  entity of unknown nature; :

19  DOES 2 through 25,        :

20  inclusive, individuals    :

21  and/or business entities  :

22  of unknown nature,        :

23              Defendants.   :

24  _____

25          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1

BARKLEY
Court Reporters

09:57 1    having worked as a product manager, but I could not

09:57 2    code in any of this.

09:57 3                Q.        And how about Perl?

09:57 4                A.        I'm familiar -- familiar with it

09:57 5    again, but no -- no programming experience.

09:57 6                Q.        Are you familiar with the term

09:57 7    "script" as it's used in computer programming?

09:57 8                A.        Yes.

09:57 9                Q.        All right.  What would your

09:57 10   understanding of a script be?

09:57 11               A.        A script is a -- an auto -- it's

09:58 12   something that you instruct a -- a computer to do

09:58 13   something.

09:58 14               Q.        Have you ever been involved in the

09:58 15   development of any types of scripts?

09:58 16               A.        Personally?

09:58 17               Q.        Yes.

09:58 18               A.        I mean, I've been involved as a

09:58 19   product manager.  Not as a programmer or coder.

09:58 20               Q.        Okay.  In the level --

09:58 21               A.        Project manager -- as a CEO

09:58 22   leading products.

09:58 23               Q.        As a CEO or as a project manager --

09:58 24               A.        Yes.  That's correct.

09:58 25               Q.        -- working with scripts, what

15

BARKLEY
Court Reporters

10:04 1          A.          Legally, no.  As I mentioned at

10:04 2   the moment, any new activities that I'm pursuing,

10:04 3   I'm pursuing under this entity, so I'm currently

10:04 4   engaged in conversations with -- with people.

10:04 5          Q.          And when did you join Power?

10:04 6          A.          Power was founded in -- It was

10:04 7   2006 is when our -- our primary activities started.

10:04 8   We incorporated Power, I believe it was, if I'm not

10:04 9   mistaken, late 2006 and -- but the activities

10:05 10  started previously as a start-up, we started

10:05 11  working on it.

10:05 12         Q.          Were you one of the creators of

10:05 13  Power?

10:05 14         A.          I was the founder of the company.

10:05 15         Q.          Now, when you say it was

10:05 16  incorporated in 2006 but started before then, was

10:05 17  it started under the Web site title www.power.com?

10:05 18         A.          No.  It was originally -- When we

10:05 19  originally started it, there was no Web site.  It

10:05 20  was a -- Like many startups we were -- we were

10:05 21  working on a core, you know, product idea, and

10:05 22  later the name power.com came about in 2007.  I

10:05 23  believe we acquired the domain in 2007.

10:05 24         Q.          Who helped -- Besides yourself,

10:05 25  who helped create Power.com.  You used the --

21

BARKLEY
Court Reporters

02:33 1          Q.        Do you know if there were

02:33 2     documents reflecting Power's ideas being bantered

02:33 3     about describing how they could get new members?

02:33 4          A.        Yes.  I believe we provided those

02:33 5     to you.

02:33 6          Q.        Do you know -- How many documents

02:33 7     do you believe you provided to Facebook

02:34 8     approximately?

02:34 9          A.        I think it was -- not -- less -- I

02:34 10    don't know.  It was less than ten, I believe.

02:34 11         Q.        The -- And how often were

02:34 12    marketing schemes discussed internally at Power, if

02:34 13    you know?

02:34 14         A.        How often?  They would be in

02:34 15    conversations, like, we'd have -- we -- meetings.

02:34 16    There would be conversations if anything became

02:34 17    relevant or useful.  There would be -- Most of them

02:34 18    were e-mail discussions, so e-mail discussions

02:34 19    would be where most of conversations took place,

02:34 20    but obviously they were also verbal conversations.

02:34 21         Q.        Do you know if any particular

02:34 22    discussions ever occurred relating to soliciting

02:34 23    members from Facebook?

02:34 24         A.        Soliciting members from Facebook?

02:34 25    What do you mean?

                                181

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

BARKLEY
Court Reporters

02:34    1          Q.        To join -- To join Power.

02:34    2          A.        We didn't have access to -- The

02:35    3    users could invite their friends.  So that was a

02:35    4    feature that -- One of our promotions in our

02:35    5    features was that you could invite your friends to

02:35    6    join, invite your friends on Facebook to join, and

02:35    7    so people could -- they could make promotions so

02:35    8    they could create events around -- around a power

02:35    9    creativity around Power.  So we gave our user -- We

02:35   10    encourage our users, in fact, to bring their

02:35   11    friends in the same way that Facebook encourages

02:35   12    its users to bring their friends from other sites.

02:35   13    But we employed same tactics that are used by --

02:35   14    similar tactics where you invite your friends, so

02:35   15    we did use invite friends features and promotions.

02:35   16          Q.        If you go back to Exhibit 103, you

02:35   17    see various -- "Displayed a Launch Promotion" in

02:35   18    the upper left-hand corner?

02:35   19          A.        Yup.

02:35   20          Q.        It says, "First 100 people who

02:35   21    bring 100 new friends to power.com earn $100?

02:36   22          A.        Yes.

02:36   23          Q.        Is that an example of a pop-up

02:36   24    that was made available on the site that was

02:36   25    designed to encourage new users to the site?

182

BARKLEY
Court Reporters

02:36  1          A.          I don't know if this was a pop-up.

02:36  2   You can see it was prominently displayed on the

02:36  3   front page.  That's not more than that, it's not a

02:36  4   pop-up.  I think the terminology is not pop-up it's

02:36  5   an ad -- In fact, it's a prime-placed ad on the

02:36  6   home page.

02:36  7          Q.          Do you know whose idea it was for

02:36  8   this particular promotion?

02:36  9          A.          That was mine.

02:36 10          Q.          Do you know when you came up with

02:36 11   it?

02:36 12          A.          While I was sleeping.  I just

02:36 13   thought a hundred, hundred, hundred was a good

02:36 14   idea.

02:36 15          Q.          All right.  And when you clicked

02:36 16   on the Number 100, what would happen?

02:36 17          A.          It gave you a chance to -- to

02:36 18   select which friends you wanted to -- to, I guess,

02:36 19   invite to -- to join -- to join Power.

02:36 20          Q.          All right.  And was that -- Would

02:36 21   you agree that, as reflected on Exhibit 103, that

02:37 22   particular promotion was made available at the time

02:37 23   that you were connected to Facebook?

02:37 24          A.          Yes.  It was.

02:37 25          Q.          And if you clicked on 100 people,

183

BARKLEY
Court Reporters

02:37  1    you would be invited to ask your friends to join

02:37  2    power.com?

02:37  3           A.      No.  You would have the option to

02:37  4    invite your friends to join just like you have the

02:37  5    option on Facebook to invite your friends to join

02:37  6    Facebook and every other site on the Internet, and

02:37  7    if they did, if they reach a hundred friends that

02:37  8    joined, they would earn $100.

02:37  9           Q.      And if you accepted the feature

02:37 10    that came up saying would you -- it said something

02:37 11    like, "Would you like to invite your friends to

02:37 12    Power"?

02:37 13           A.      Yes.

02:37 14           Q.      If you hit "yes" or "I agree" --

02:37 15           A.      Yes.

02:37 16           Q.           -- how -- what -- what

02:37 17    automation would occur at that point?

02:37 18           A.      So first of all, you have to

02:38 19    remember that 99 percent of our users were not --

02:38 20    were not using -- were not using Facebook.  They

02:38 21    were users on other sites, so we actually -- I

02:38 22    guess you could say we were actually a big source

02:38 23    of providing users to Facebook in Brazil.  In fact,

02:38 24    as -- I guess you could say it was a gift, but we

02:38 25    -- we brought a large amount of Orkut users to

                              184

BARKLEY
Court Reporters

02:38  1    Facebook, so that's where a lot of our promotions

02:38  2    were -- Because our users already, as you know,

02:38  3    have -- Prior to having Facebook, we had millions

02:38  4    of users who have hundreds of friends already in

02:38  5    the system, and that represented 99 percent of our

02:38  6    contacts in our system.  Facebook was a very small

02:38  7    part of this world.  At that time, obviously it's a

02:38  8    much larger site today but in our world, in our

02:38  9    growth it was -- it was introduced later.  So we

02:38 10    were encouraging our friends -- our users to go and

02:38 11    register at Facebook and become Facebook users.

02:38 12    Because in our -- in our view, the more social

02:39 13    networks that users were using, the more value it

02:39 14    would be to, you know, to aggregate different

02:39 15    sites.  So we encouraged users to sign up for

02:39 16    Facebook.  In fact, we're giving free marketing to

02:39 17    Facebook.  So to answer your question, a lot of

02:39 18    these users -- You could see all your friends from

02:39 19    all your sites and say, "Hey.  Join Facebook when

02:39 20    you're at Facebook."  That was a big part of our

02:39 21    promotions.  That was the largest part of our

02:39 22    promotions.  And then, of course, if they have

02:39 23    friends that are already using Facebook -- Facebook

02:39 24    and they wanted to invite their friends to come use

02:39 25    Power, that's the smaller part.  But the biggest

185

BARKLEY
Court Reporters

02:39  1  one were obviously the friends that the user had

02:39  2  already put in the system.

02:39  3          Q.      The promotion itself had to have

02:39  4  an attribute created for it in the MSQL database.

02:39  5  Correct?

02:39  6          A.      Yes.  That's correct.

02:39  7          Q.      And that attribute would then be

02:40  8  assigned to anybody who clicked on the promotion.

02:40  9  Correct?

02:40  10          A.      What do you mean "the attribute"?

02:40  11          Q.      Well, if someone clicked on the

02:40  12  promotion, their user name would then be assigned

02:40  13  to the attribute associated with the promotion.

02:40  14  Correct?

02:40  15          A.      If they selected to invite a

02:40  16  friend, they could send an invitation to that

02:40  17  friend.

02:40  18          Q.      That's not what I'm talking about.

02:40  19  The minute that -- Let's say I'm Ms. Almeirda who's

02:40  20  being shown on the screen shot.

        21          A.      Okay.

02:40  22          Q.      If Ms. Almeirda clicks on the

02:40  23  launch promotion --

02:40  24          A.      Yes.

02:40  25          Q.      -- she would have received a --

186

BARKLEY
Court Reporters

02:42 1   technically it was -- it was much easier just to

02:42 2   manually look and I believe -- We can see how many

02:42 3   friends people invited so -- and then we just

02:42 4   manually took those people out.  I think they were

02:42 5   -- When we provided it, I think there might have

02:42 6   been 30 or 40 people that achieved it, so it was

02:42 7   literally just looked on the list of people who

02:42 8   invited friends to Power who had more than a

02:43 9   hundred.

02:43 10          Q.       All right.  But when say, "looked

02:43 11  on the list" you were looking in a database table.

02:43 12  Correct?

02:43 13          A.       Yeah.  We went to our database.

02:43 14  Importing friends is a -- is a feature.  It's a --

02:43 15  It's a -- As I mentioned many times, it's one of

02:43 16  our features on our site.

02:43 17          Q.       And in order to see how the

02:43 18  promotion was set up in terms of identification of

02:43 19  those who were participating in it, I'd need to see

02:43 20  the database.  Correct?

02:43 21          A.       To see the -- Every single user on

02:43 22  our site has the option to invite friends.  Who

02:43 23  achieved a hundred, I can tell you.  I don't know

02:43 24  the number but it was 30 something people that

02:43 25  received -- that reached a hundred friends, so I

189

BARKLEY
Court Reporters

02:44  1    looked in the database.  Correct?

02:44  2            A.        We looked in our database,

02:44  3    correct.  And we provided the numbers, I believe,

02:44  4    on that promotion to you guys.

02:45  5            Q.        When somebody clicked on the

02:45  6    launch promotion and they were given, like you to

02:45  7    invite your friend" --

02:45  8            A.        That's correct.

02:45  9            Q.          -- and they hit yes, at that

02:45 10    point the importer, as we've been calling it, would

02:45 11    automatically contact all friends on Facebook to

02:45 12    invite them to --

02:45 13            A.        Let's be clear.  We don't have

02:45 14    access to any friends' e-mail addresses, so there

02:45 15    was not a single E mail sent by Face -- by Power

02:45 16    for -- We have e-mail addresses for friends on

02:45 17    other sites, but on -- so we -- If they wanted to

02:45 18    invite, as I said 99 -- well over 90 percent of our

02:45 19    users were Orkut users and Orkut friends and had

02:45 20    friends from other sites where they -- on sites

02:45 21    that allowed their E mails, but Facebook didn't --

02:45 22    didn't allow E mails, otherwise, we would have been

02:45 23    happy to send an invitation to those friends to

02:45 24    invite them; so that was not available for us for

02:46 25    Facebook.

191

BARKLEY
Court Reporters

02:46  1          Q.        At this point, I haven't even

02:46  2     talked about E mail.  All I meant is at the point

02:46  3     at which someone said yes they'd like to invite

02:46  4     their friends, the database would then recognize,

02:46  5     using its importer function and the idea of the

02:46  6     registered user Power, who the friends were.

02:46  7     Correct?

02:46  8          A.        It would show you a list of all

02:46  9     your friends, yes, from your friends list.

02:46 10          Q.        And the invitation to join was

02:46 11     then automatically forwarded to those friends

02:46 12     whether through E mail if you're on Orkut or some

02:46 13     other way on Facebook.  Correct?

02:46 14          A.        A user had to say, "I want to

02:46 15     invite this friend," so it's -- An authorized user

02:46 16     said, "Yes, these are my friends, and these are the

02:46 17     friends I want to invite to this site."  That is

02:46 18     correct.

02:46 19          Q.        All right.  And at that point, an

02:46 20     automated script would contact whatever friends

02:46 21     were identified.  Correct?

02:46 22          A.        Depends on -- So if the friend was

02:46 23     a non-- Facebook did not provide E mails.  If the

02:47 24     friend was, like, on another site and they had the

02:47 25     E mail, they could -- they could send on E mail

                                192

BARKLEY
Court Reporters

02:51 1  copy their friends and say, "Sign up with this

02:51 2  link."  They were unlimited ways that people can

02:51 3  communicate with their friends.

02:51 4          Q.          All right.  But the link was

02:51 5  provided in the communication by Power.  Correct?

02:51 6          A.          The link was given -- Power

02:51 7  provided a link to our users to encourage them to

02:51 8  invite their friends.

02:51 9          Q.          And did Power also prepare the

02:51 10 script that was included with that invitation?

02:51 11         A.          I think, yeah, we provided them --

02:51 12 we provided them a script, yeah.  As every single

02:51 13 -- As Facebook does and everybody else does.

02:51 14         Q.          Now, in the case of Facebook, you

02:51 15 say that Facebook didn't permit you to contact

02:51 16 through E mails?

02:51 17         A.          What do you mean "Facebook doesn't

02:51 18 permit"?  Facebook did -- It has nothing to do with

02:51 19 permitting it.  We wanted -- If we wanted to -- We

02:51 20 just didn't have access to the E mails because

02:52 21 Facebook -- If we wanted to, we could have -- We

02:52 22 didn't get to that, but we would be happy to build

02:52 23 a feature that imported your E mail contacts, but

02:52 24 we didn't -- we didn't do that.  We never got to

02:52 25 that point.

197

BARKLEY
Court Reporters

02:53  1    that you could determine how many Facebook

02:53  2    registered users were contacted as part of this

02:53  3    promotion?

02:53  4             A.        Facebook registered users?

02:53  5    Meaning if they were contacted -- In what manner?

02:53  6    If they happened -- If they were contacted at Orkut

02:53  7    and they happened to have an account on Facebook

02:53  8    but were not contacted through -- through the help

02:53  9    of Facebook?

02:53 10             Q.        No.  I'm talking about were there

02:53 11    individuals at Facebook contacted on the Facebook

02:53 12    -- through the Facebook system --

02:53 13             A.        Yes.

02:53 14             Q.         -- as a result of this promotion?

02:53 15             A.        Yes.  Of course.

02:53 16             Q.        Is there a way to determine how

02:53 17    many were contacted?

02:54 18             A.        Well, we could do -- If you take a

02:54 19    few minutes, we can probably figure out -- It's

02:54 20    obviously very small, but -- Because the Facebook

02:54 21    users were so small, but let's think about -- So

02:54 22    people created events on Facebook, so promoting it,

02:54 23    because our users were -- You know, some of them

02:54 24    created events saying, "Come on Facebook," about

02:54 25    come and joining, they created messages.  They

199

BARKLEY
Court Reporters

02:57  1   at that time, but I know it's usually standard, you

02:58  2   know, more common to have a default to invite all

02:58  3   your friends.  I think Facebook does that, in fact.

02:58  4          Q.        Setting aside what the default

02:58  5   was, as part of the invitation, would list the

02:58  6   friends that could be contacted?

02:58  7          A.        That's correct.

02:58  8          Q.        And that would list the friends

02:58  9   who were available as friends on Facebook.

02:58 10   Correct?

02:58 11          A.        I believe so, yes.

02:58 12          Q.        And for the friends who were

02:58 13   contacted on Facebook, an invitation to join Power

02:58 14   would then be set if the person had that person

02:58 15   selected as, "Yes.  I would like them to be

02:58 16   invited"?

02:58 17          A.        Yeah.  If they could communicate

02:58 18   to invite them, they would be invited.

02:58 19          Q.        And earlier you said that however

02:58 20   the mechanism was, whether it was events or E mails

02:58 21   for other Web sites or whatever -- setting aside

02:58 22   the telephone call, if it was in a text-based

02:58 23   communication --

02:58 24          A.        Yes.

02:58 25          Q.           -- Power would provide the text

203

BARKLEY
Court Reporters

02:58  1   and the URL link to Power as part of that

02:58  2   communication so --

02:58  3            A.        Yes.

02:59  4            Q.            -- so the friends would know

02:59  5   where to go to be invited.  Correct?

02:59  6            A.        We would provide them text that

02:59  7   they could use.  Correct.  Of course.

02:59  8            Q.        And the list of friends was

02:59  9   recovered from the database and the variables that

02:59  10  were associated with friends with that user ID?

02:59  11           A.        Every -- I think -- Every user --

02:59  12  One of our core features is you can access all your

02:59  13  friends and create a friends list.  So, yes, I

02:59  14  mean, you have a friends list and you can select

02:59  15  from your aggregated friends list who you want to

02:59  16  invite.

02:59  17           Q.        Now, earlier you said while most

02:59  18  people contacted their Web site dynamically inside

02:59  19  the browser, the functionality existed to have the

02:59  20  automation available on through the PowerScript

02:59  21  also contact the Web sites.  Correct?

02:59  22           A.        What do you mean?

02:59  23           Q.        In other words, you -- In order to

02:59  24  obtain -- user content, for instance, from Web

02:59  25  sites, you could use the automated script available

BARKLEY
Court Reporters

02:59  1   through PowerScript to download --

02:59  2        A.        That's what any importer does.

03:00  3   When you use an importer, you're -- you're

03:00  4   basically authorizing a script to go to another

03:00  5   site and access certain data.  So, like, when

03:00  6   Facebook -- as your Facebook import you authorize a

03:00  7   script written by Facebook to go to another site,

03:00  8   take that data, bring it back, and then Facebook

03:00  9   sends an invitation on behalf of the user.  That's

03:00 10   the same process that we go through.  That is

03:00 11   correct.

03:00 12        Q.        And in the invitation that was

03:00 13   then sent as part of the launch promotion to a

03:00 14   Facebook user, how would the Power site know what

03:00 15   function or what feature on Facebook to populate

03:00 16   the invitation to?  In other words, how would it

03:00 17   know to send it to an event or say an instant

03:00 18   message or whatever medium of communication?

03:00 19        A.        Well, Facebook doesn't have

03:00 20   instant message.  You know, a user can go and -- If

03:00 21   a user wanted to manually click on a friend and

03:01 22   say, "Hey," I don't believe even they had Facebook

03:01 23   chat at that time, so there wasn't even -- I don't

03:01 24   think it was a feature, so we didn't even interact

03:01 25   with that.  They could write a message to their

205

BARKLEY
Court Reporters

03:01 1    friend.  They could create an event or they could

03:01 2    go and, I guess, take that link up and paste it and

03:01 3    write an E mail to their friend.

03:01 4          Q.         Was one of the ways that Power was

03:01 5    able to make the invitation available to Facebook

03:01 6    users is that the PowerScript would set up an event

03:01 7    on Facebook on behalf of the user who had clicked

03:01 8    on --

03:01 9          A.         If the user authorized for the

03:01 10   creation of the event, yes.

03:01 11         Q.         And if the -- How did the -- How

03:01 12   did Power know it was to set up an event as opposed

03:01 13   to any other way of communicating --

03:01 14         A.         Because the user said, "Create an

03:01 15   event for me," so user authorized the creation of

03:01 16   an event.

03:01 17         Q.         Was that made available on the

03:01 18   promotion -- on the pop-up that made -- would come

03:02 19   up --

03:02 20         A.         That was -- As I said, if you

03:02 21   clicked that, that was one of the options that the

03:02 22   user had an option to create an event.

03:02 23         Q.         What other options did the user

03:02 24   have?  We can take a break here.

03:02 25                    THE VIDEOGRAPHER:  It's 3:01.  Off

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

BARKLEY
Court Reporters

03:02  1   the record, Tape 4.

03:02  2                      (Whereupon, a recess is taken.)

03:14  3                      THE VIDEOGRAPHER:  3:13, on the

03:14  4   record.  Beginning of Tape 5.

03:14  5          Q.        Mr. Vachani, just before the break

03:14  6   you indicated that in the instance of Facebook

03:14  7   being contacted by Power --

03:14  8                      MR. COOPER:  Strike that.

03:14  9          Q.        That in the instance in which a

03:14  10  friend of somebody who had indicated their interest

03:14  11  in participating in the launch promotion, the

03:14  12  friend was on Facebook, that one option that was

03:14  13  available to contact that friend was events.  Do

03:14  14  you recall that before the break saying?

03:15  15         A.        I believe creating a event.

03:15  16         Q.        Do you recall what the other

03:15  17  options were?

03:15  18         A.        I don't offhand, but I think they

03:15  19  provided a link where they could -- So everyone was

03:15  20  given a unique link so they could go do whatever

03:15  21  they want with that link, write E mails to friends,

03:15  22  call on the phone, whatever so that was -- When

03:15  23  they clicked, they were made available a link, and

03:15  24  I think that maybe send in a message so Facebook --

03:15  25  While they can't send an E mail, they can send a

                              207

BARKLEY
Court Reporters

03:15  1  message to friends on Facebook, so they could

03:15  2  message their friend.  So if the user said, "I want

03:15  3  to send a message, private message," they could

03:15  4  send a private message to their friend, if I'm not

03:15  5  mistaken.

03:15  6          Q.      Let me -- Any other options?

03:15  7          A.      I don't remember offhand, but

03:15  8  those are the -- I think the primary ones, but

03:15  9  obviously they had -- they had a link that they

03:15 10  could use whatever way they wanted to.  They could

03:15 11  create an event -- create an event, send a message.

03:16 12  Those are the ones I could think of off hand, but I

03:16 13  believe whatever details on this were also provided

03:16 14  in the past in the previous declarations.

03:16 15          Q.      In the case of providing a link,

03:16 16  in what way was the link displayed on Facebook?

03:16 17          A.      When the user is provided a link

03:16 18  on Power, and they can copy and paste and do

03:16 19  whatever they want to -- to go promote that link.

03:16 20          Q.      I see.

03:16 21          A.      So just as any invitation process

03:16 22  on sites.  You give a unique link which has your

03:17 23  unique identifier in it, so if someone signs up

03:17 24  from that link you -- you get credit for it.

03:17 25          Q.      And that link would be the URL to

                                    208

BARKLEY
Court Reporters

03:20  1   that was sent to Facebook --

03:20  2              A.        Usually --

03:20  3                  MR. BURSOR:  Objection.  Vague and

03:20  4   ambiguous.

03:20  5          Q.        Do you know who created the text

03:20  6   that was prepared through the automated script that

03:20  7   was sent by Power to Facebook users?

03:20  8                  MR. BURSOR:  Objection.  Vague and

03:20  9   ambiguous.  Assumes facts not in evidence.  Lacks

03:20 10   foundation.  You can answer.

03:20 11          A.        I'm repeating what he said.

03:20 12   Objecting.  It's vague and ambiguous.

03:21 13                  MR. BURSOR:  I objected.  If you

03:21 14   can understand it, you can answer it.

03:21 15          Q.        Mr. Vachani, as I said at the

03:21 16   beginning, your attorney has the right to interject

03:21 17   actions unless he instructs you not to answer --

03:21 18          A.        Okay.

03:21 19          Q.        Let me -- One of the ways that you

03:21 20   said that Facebook users would be contacted for

03:21 21   this promotion was the Power user could say they

03:21 22   wanted to participate and contact friends to create

03:21 23   an event?

03:21 24          A.        Correct.

03:21 25          Q.        And you said the automatic script

212

BARKLEY
Court Reporters

03:21 1  -- the automated script created by Power would, in

03:21 2  fact, create an event on Facebook?

03:21 3      A.      If the user authorized it and

03:21 4  indicated they wanted to do that.  That's correct.

03:21 5      Q.      As part of the creation of that

03:21 6  event, was text included as part of event set up --

03:21 7      A.      They were shown texts just like

03:21 8  standard practice.  They were shown it and

03:21 9  authorized it.

03:21 10      Q.      And that text included the same

03:22 11  link to the URL to Power?

03:22 12      A.      I would assume it has the link in

03:22 13  it, yes.

03:22 14      Q.      The E mails that you said were

03:22 15  sent to users of, like, Orkut that had e-mail

03:22 16  addresses available on your site --

03:22 17      A.      Correct.

03:22 18      Q.      To the best of your knowledge --

03:22 19  And you said the link itself was one way that you

03:22 20  would be allowed to contact users.  Correct?

03:22 21      A.      Well, you could take the link and

03:22 22  pass the link.  It's -- You provide them a unique

03:22 23  link and they can go to messenger and copy that

03:22 24  link and say, "Hey, go sign up for -- for Power."

03:22 25      Q.      Do you know if that URL had an ID

213

BARKLEY
Court Reporters

04:14  1   create an event as part of $100 promotion use the

04:14  2   language, "Bring 100 friends and 100 bucks"?

04:14  3                    MR. BURSOR:  Hold on a second.

04:14  4   Objection.  Vague, ambiguous.  Assumes facts not in

04:14  5   evidence.  Lacks foundation.  If you could clarify

04:14  6   whether you're referring to PowerScript or Facebook

04:14  7   script, that might help clear up some of the --

04:14  8                    MR. COOPER:  I asked specific -- I

04:14  9   will say it again.  Was the language, "Bring 100

04:14 10   friends and win 100 bucks," language that was used

04:14 11   in the Power automated script when it set up the

04:14 12   event on Facebook?

04:14 13                    MR. BURSOR:  Objection.  Vague,

04:14 14   ambiguous.  Assumes facts not in evidence.  Lacks

04:15 15   foundation.  Listen to the question carefully, and

04:15 16   if you can understand it, you can answer it.

04:15 17            A.        Bring 100 friends and 100 bucks

04:15 18   was our -- our tag line, so -- but I don't --

04:15 19   whether the user entered that in on their own or

04:15 20   whether they -- they put this.  I cannot say from

04:15 21   this -- from looking at this, but that was the

04:15 22   language that we suggested to users to use.  But

04:15 23   many users changed the language, too, and put other

04:15 24   language in those events, so I can't -- This is one

04:15 25   example of a user creating an event.  I cannot say

256

BARKLEY
Court Reporters

04:15  1   what -- you know, how this was specifically created

04:15  2   because they -- they had -- they could have created

04:15  3   this event and the language was -- That was the tag

04:15  4   line we were promoting, but I do not know if this

04:15  5   was specifically -- this specific E mail or if they

04:16  6   copied and pasted it if they did whatever.  But

04:16  7   what I do know is, this was an event where the user

04:16  8   specifically authorized us and said -- either

04:16  9   created this event manual or specifically

04:16 10   authorized us to create this event.

04:16 11               MR. COOPER:  We've got to go off

04:16 12   the record.

04:16 13               THE VIDEOGRAPHER:  It's 4:15.  Off

04:16 14   the record.  End of Tape 5.

04:16 15               (Whereupon, a recess is taken.)

04:23 16               THE VIDEOGRAPHER:  4:22, on the

04:23 17   record.  Beginning of Tape 6.

04:23 18        Q.        Before the break you indicated

04:23 19   that, "Bring 100 friends and win 100 bucks" was the

04:23 20   tag line but you couldn't say for sure how the --

04:23 21               MR. COOPER:  Strike that.

04:23 22        Q.        Before the break, you indicated

04:23 23   that "Bring 100 friends and win 100 bucks" was the

04:23 24   tag line employed by Power.  Correct?

04:23 25        A.        That was the tag line of the

257

BARKLEY
Court Reporters

04:23  1    campaign and the suggested text and promotion that

04:23  2    we encourage our users to promote in any kind of

04:23  3    promotion they made in the acquisition of and

04:23  4    invitation of friends.

04:23  5            Q.        Where would I find documentation

04:23  6    reflecting precisely what language was suggested

04:23  7    that users use with Facebook events?

04:23  8            A.        That would have been on the -- the

04:23  9    power -- on this page.  On the page after they

04:24  10   clicked on this promotion, so it came up with a

04:24  11   page --

04:24  12           Q.        Talking about Exhibit 103?

04:24  13           A.        I don't know if that page -- Does

       14    it exist?

04:24  15           Q.        I'm asking if you're talking about

       16    Exhibit 103.

04:24  17           A.        I'm talking about this page.  I

04:24  18   don't know if there's an exhibit.

04:24  19           Q.        You're pointing to Exhibit 103?

04:24  20           A.        Exhibit 103, I'm sorry.  So if

04:24  21   they clicked on that, there was a page that they

04:24  22   went to.

04:24  23           Q.        And --

04:24  24           A.        Gave them those options.

04:24  25           Q.        Where, if at all, does that

                              258

**BARKLEY**
Court Reporters



259

BARKLEY
Court Reporters



260

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO





261

04:28  1    application PowerScript application?

04:28  2              A.        The actual language?

04:28  3              Q.        Yes.

04:28  4              A.        Was -- That was -- That phrase

04:28  5    "Bring 100 friends, 100 bucks" was created by me.

04:28  6              Q.        Do you know if the remainder of

04:28  7    any text that was employed in suggested text in

04:28  8    private messages that were used on Facebook as a

04:29  9    result of automated script were prepared by you?

04:29  10             MR. BURSOR:  Could you read that

04:29  11   back, please?

04:29  12             (Whereupon, the last question is

04:29  13   read back by the reporter.)

04:29  14             MR. BURSOR:  Objection.  Vague,

04:29  15   ambiguous.  Assumes facts not in evidence.  Lacks

04:29  16   foundation.  You can answer.

04:29  17             A.        Repeat the question one more time.

04:29  18             Q.        You earlier indicated private

04:29  19   messages were one of the ways that the automated

04:29  20   script would permit somebody using this campaign to

04:29  21   contact friends on Facebook.

04:29  22             A.        Okay.  So to be clear --

04:29  23             Q.        Yes or no.

04:29  24             A.        I want to clarify.  Earlier I said

04:29  25   that could be one of the ways that someone could

                                262

BARKLEY
Court Reporters

04:29  1   send it.  I honestly don't know if we actually ever
04:29  2   used private messages.  It was a long time ago.  To
04:29  3   my recollection, I don't -- I don't remember us
04:29  4   sending private messages, but it was definitely
04:30  5   something we -- we discussed, but I don't know if
04:30  6   we actually ever got to employing that method.
04:30  7   It's been a long time since that happened.  It's
04:30  8   possible that users took suggested text and wrote
04:30  9   messages to friends and if -- I don't remember if
04:30 10   we actually employed that technique, but it's
04:30 11   something we obviously would have been happy to do
04:30 12   because if the user authorized us to do it, I just
04:30 13   don't remember if we actually did it.
04:30 14              Q.        Looking at Exhibit 103, the launch
04:30 15   promotion --
04:30 16              A.        Yup.
04:30 17              Q.          -- who prepared the PowerScript
04:30 18   that is reflected in that launch promotion?
04:30 19              A.        It could have been Carlos or
04:30 20   Danilo.
04:30 21              Q.        What documentation shows how that
04:30 22   launch promotion was implemented on power.com?
04:30 23              A.        It was either -- It was either a
04:30 24   verbal, "Hey, use this text," in a meeting, said,
04:31 25   "Hey, this is the text you should use," and they

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

BARKLEY
Court Reporters

04:31 1    took it or there was an E mail.  I don't know.

04:31 2           Q.      But you see the box, "Launch

04:31 3    Promotion."  Correct?

04:31 4           A.      Yes.

04:31 5           Q.      That is a feature that is made

04:31 6    available to the power.com user through the

04:31 7    power.com Web site.  Right?

04:31 8           A.      Yes.

04:31 9           Q.      None of the aggregated social

04:31 10   networks prepared the contents shown in that

04:31 11   promotional box.  Correct?

04:31 12          A.      Right.

04:31 13          Q.      Where would I find documentation

04:31 14   showing me how that launch promotion was

04:31 15   implemented on power.com?

04:31 16          A.      So it either was in a meeting that

04:31 17   we had where I said, "Hey, this is the text you

04:31 18   want to use for this promotion," and they would

04:31 19   have noted it down, or it would have been an E mail

04:31 20   that was sent saying, "Use this text."  One of

04:31 21   those two.  I don't know which one it was because

04:31 22   we had weekly meetings where we discussed ideas and

04:31 23   this was -- this was an idea that I had come up

04:32 24   with.  So many times I would share my idea.  I

04:32 25   would say, "Eric, use this text.  This is a

**BARKLEY**
Court Reporters



266

04:41 1        Q.        And it was sued, in part, because

04:41 2    of Facebook's allegations relating to how this

04:41 3    launch promotion was employed.  Correct?

04:41 4        A.        I don't know what Facebook made

04:41 5    allegations to is right there.

04:41 6        Q.        Earlier you said that Facebook is

04:41 7    responsible for sending the E mail notification

04:41 8    about the invite.

04:41 9        A.        Yeah.  That was sent by Facebook

04:42 10   servers.

04:42 11       Q.        But Facebook's E mail servers

04:42 12   would not send the invite, but for the initiation

04:42 13   of the event.  Correct?

04:42 14       A.        A user has to authorize -- A user

04:42 15   has to create an event for Facebook to do that and

04:42 16   a user has to log in with their user name and

04:42 17   password and do this, so Facebook authorizes its

04:42 18   users to create events as part of their -- That's

04:42 19   the relationship Facebook has with its users.

04:42 20       Q.        You indicated some of the events

04:42 21   are set up through the automated scripted?

04:42 22       A.        No.  What I indicated is that

04:42 23   users -- users created these events.  Whether the

04:42 24   user authorized -- whether they authorized an agent

04:42 25   to go do it for them or they did it, it's the same

273

BARKLEY
Court Reporters

04:42  1    thing.  It's initiated by the user, that's what we

04:42  2    know.

04:42  3           Q.      The automated script, though, is

04:42  4    operated by power.com?

04:42  5           A.      It's a -- An automated script for

04:42  6    PowerScript, are initiated by users and executed by

04:42  7    power.com in the same way that an exporter is

04:43  8    initiated by user and managed by the site that's

04:43  9    doing it on behalf of the user.  Did you get that?

04:43  10   Yes.

04:43  11                  (Whereupon, Exhibit 107 is marked

04:43  12   for identification by the reporter.)

04:43  13          Q.      Mr. Vachani, Exhibit 107 is

04:43  14   Exhibit A to the first amended complaint that was

04:43  15   106.  Have you seen this document before today?

04:43  16          A.      What is this document I'm looking

04:43  17   at?

04:43  18          Q.      Exhibit A to the first amended

04:43  19   complaint.

04:43  20          A.      Is this the Facebook Terms and

04:43  21   Conditions?

04:43  22          Q.      Yes.

04:44  23          A.      I have -- Vaguely -- I've seen

04:44  24   this before, yes.  I don't know if I've seen this

04:44  25   specific version.  I've read the Facebook Terms and

274

BARKLEY
Court Reporters

04:45  1  says Page 415?

04:45  2          A.       Yes.

04:45  3          Q.       Can you read the first bullet

04:45  4  point to yourself and tell me when you've finished?

04:45  5          A.       The first bullet point?  Yes.

04:45  6                   Okay.

04:45  7          Q.       As of December 1st, 2008, do you

04:45  8  know one way or another whether anybody at Power

04:45  9  had read that particular provision in the Facebook

04:45 10  Terms of Service?

04:45 11          A.       Yes.

04:45 12          Q.       Had you read it?

04:45 13          A.       Yes.

04:45 14          Q.       All right.  Did you have an

04:46 15  understanding whether power.com enabled users to

04:46 16  registered users to violate the Terms of Service?

04:46 17          A.       I don't understand how a message

04:46 18  that a user wants to send to another friend --

04:46 19  First of all, it's an unsolicited message; and

04:46 20  second, I don't understand what this Terms and

04:46 21  Conditions has anything to do with -- with -- I

04:46 22  don't understand how the relevance to the

04:46 23  questions.

04:46 24          Q.       Did you have an understanding

04:46 25  whether or not power.com to enabled its registered

276

BARKLEY
Court Reporters

04:47  1    and not only Facebook but the entire Internet, that

04:47  2    what we were doing definitely has a pretty strong

04:48  3    grounds to be value.  Obviously, there's no legal

04:48  4    precedent whatsoever anywhere that exists relating

04:48  5    to this issue, so that's why I don't understand

04:48  6    what this discussion is about.

04:48  7         Q.       Mr. Vachani, whether you

04:48  8    understand what it's about, my question is simply

04:48  9    did Power have an understanding whether it was

04:48 10    enabling registered users of Power to violate the

04:48 11    Terms of Service of Facebook?

04:48 12         A.       Let me be clear.  You specifically

04:48 13    asked about unsolicited communications and we did

04:48 14    not send any unsolicited E mails or communications.

04:48 15    Neither did our users.  If our users wanted to send

04:48 16    a message to their friend, they have the right to

04:48 17    send a message or authorize the sending of a

04:48 18    message.  This is a -- This is something that it's

04:48 19    commonplace and used by every site including

04:48 20    Facebook as a core part of their business.  That's

04:48 21    why I don't understand why we're talking about

04:48 22    unsolicited communications.

04:48 23         Q.       Mr. Vachani, again, I asked simply

04:49 24    -- you don't need to even look at the any of the

04:49 25    bullet points.  Did power.com, as of December 1st,

278

BARKLEY
Court Reporters

04:50  1    the question read back and then just answer the

04:50  2    question.

04:50  3                A.      So what's the question?

04:50  4                        (Whereupon, the last question is

04:50  5    read back by the reporter.)

04:50  6                        MR. BURSOR:  Is the question:

04:50  7    Does he see that in the agreement?

       8                        MR. COOPER:  Yeah, that's all I

       9    asked.

      10                        MR. BURSOR:  Yeah, so do you see

04:50 11    that -- do you see that --

04:50 12                A.      I see that in the agreement.

04:50 13                        MR. BURSOR:  Yeah, so then you've

04:50 14    answered the question.

      15                A.      Okay.  Yeah, I see that in your

04:50 16    agreement.

04:50 17                Q.      Have you read that language as of

04:50 18    December 1st, 2008?

04:50 19                A.      Yes.  I had read it many times.

04:50 20                Q.      Had anybody else at power.com read

04:50 21    that language as of December 1st, 2008?

04:50 22                A.      I don't know if they read it.  It

04:51 23    was my job to read it and I think Filipe probably

04:51 24    read it.  Those are the two people that I know.

04:51 25                Q.      As of December 1st, 2008, had you

                                        280

BARKLEY
Court Reporters

04:56  1   I think she was one of the lawyers, but I could --

04:56  2   Yeah.

04:56  3          Q.       All right.  All I'm just asking if

04:56  4   you can recall the name of lawyers who handle --

04:56  5   I'm not even asking any specific legal matter --

04:56  6          A.       We did have counsel in the United

04:56  7   States, and at a later point Wilson Sonsini was our

04:56  8   lawyer after we moved from Skadden to Wilson

04:56  9   Sonsini.

04:56  10         Q.       Who at Wilson Sonsini?

04:56  11         A.       I apologize.  It was -- The

04:56  12   interactions were not extensive with those

04:56  13   companies.

04:56  14         Q.       Besides Mr. Herrera, did you ever

04:57  15   have any discussions with anybody at Power about

04:57  16   Facebook's Terms of Service?

04:57  17         A.       It would be with Eric.

04:57  18         Q.       Eric Santos?

04:57  19         A.       Eric and Filipe were the two

       20   primary people that I would consult on these

       21   issues.

       22         Q.       Okay.  So Filipe --

04:57  23         A.       Not on -- Primarily Filipe.

04:57  24         Q.       Mr. Herrera, my understanding --

04:57  25   Was he listed as general counsel by Power?

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

BARKLEY
Court Reporters

05:00   1           A.        No.  From Facebook.  I received an

05:01   2   E mail from Mr. Cutler.

05:01   3           Q.        Did you receive the E mail or the

05:01   4   letter from Facebook first?

05:01   5           A.        The E mail.

05:01   6           Q.        Did the E mail include this

05:01   7   letter?

05:01   8           A.        Yes.  This was sent on December

05:01   9   1st, if I remember correctly.

05:01  10           Q.        All right.  Going back to Exhibit

05:01  11   107, could you turn to Page 9 of 107.  Do you see

05:01  12   the bottom of Page 9 there's a discussion of

05:01  13   Facebook Connect?

05:01  14           A.        Yes.

05:01  15           Q.        As of December 1st, 2008, had

05:01  16   Power ever evaluated whether they could use

05:01  17   Facebook Connect to connect the Power site or

05:01  18   integrate the Power site with Facebook?

05:02  19           A.        Extensively.

05:02  20           Q.        All right.  And do you recall how

05:02  21   long that evaluation lasted?

05:02  22           A.        I don't remember, but we

05:02  23   definitely talked about it, looked at it, and I

05:02  24   made a conclusion that it did not in any way.  It

05:02  25   would not in any way enable the functionality that

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

BARKLEY
Court Reporters

05:02  1   our users were expecting from us.

05:02  2          Q.        When did these -- How were these

05:02  3   -- First of all, who were you referring to that we

05:02  4   discussed this when you --

05:02  5          A.        Typically, it would be in a weekly

05:02  6   meeting.  It would probably come up on the agenda,

05:02  7   Facebook Connect, and Eric would usually lead this.

05:02  8   He probably would have looked at -- with his team

05:02  9   he would have evaluated and played with Facebook

05:02  10  Connect to see what they could do and what its

05:02  11  capable in evaluating stuff and would have reported

05:02  12  on this at a meeting, at a weekly meeting.

05:02  13         Q.        Who participated in these weekly

05:02  14  meetings?

05:02  15         A.        It would be members of program --

05:02  16  members of the -- Typically, it would be management

05:03  17  but if there was a specific person other than

05:03  18  management that was necessary such as a member of

05:03  19  the team, we would -- they would come in and

05:03  20  consult on an issue.

05:03  21         Q.        Let me be clear.  Did you

05:03  22  participate in these weekly meetings?

05:03  23         A.        In many of them.  Not all of them.

05:03  24         Q.        Who do you recall besides yourself

05:03  25  and Mr. Santos?

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

BARKLEY
Court Reporters

# C E R T I F I C A T I O N

I, PATRICIA MULLIGAN CARRUTHERS, a
Certified Shorthand Reporter and Notary Public of
the State of New Jersey and a Notary Public of the
State of New York, do hereby certify that prior to
the commencement of the examination the witness was
sworn by me to testify as to the truth, the whole
truth, and nothing but the truth.

I do further certify that the foregoing is
a true and accurate transcript of the testimony as
taken stenographically by and before me at the
time, place, and on the date hereinbefore set
forth.

I do further certify that I am neither of
counsel nor attorney for any party in this action
and that I am not interested in the event nor
outcome of this litigation.

_____
Patricia Mulligan Carruthers, CSR
Certificate No. XI00780
Notary Public of the State of New York
Notary Public of the State of New Jersey

Dated:  JULY 27, 2011


My commission expires October 28, 2015      (N.J.)
My commission expires December 21, 2013     (N.Y.)