# EXHIBIT 1

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                  SAN JOSE DIVISION

4

5   FACEBOOK, INC.            :

6              Plaintiff,     :

7                             :

8         v.                  :

9                   :

10  POWER VENTURES, INC. d/b/a:

11  POWER.COM, a California    :

12  corporation; POWER        :          Case No.

13  VENTURES, INC. a Cayman    :     5:08-CV-05780

14  Island Corporation, STEVE  :        JW (HRL)

15  VACHANI, an individual;    :

16  DOE 1, d/b/a POWER.COM, an:

17  individual and/or business:

18  entity of unknown nature;  :

19  DOES 2 through 25,         :

20  inclusive, individuals     :

21  and/or business entities   :

22  of unknown nature,         :

23              Defendants.    :

24  _____

25          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1

**BARKLEY**
Court Reporters

09:47  1                    THE VIDEOGRAPHER:  I'm the video

09:48  2    operator, Peter Ledwith of Barkley Reporting.

09:48  3    Today's date is July 20th, 2011.  The time is 9:47

09:48  4    a.m. We're here at the offices of Bursor and Fisher

09:48  5    located at 369 Lexington Avenue, New York, New York

09:48  6    to take the videotaped deposition of Steve Vachani

09:48  7    in the matter of Facebook, Inc., v. Power Ventures,

09:49  8    Inc., in the Northern District of California.

09:49  9    Counsel, please, identify themselves whom they

09:49  10   represent.

09:49  11                   MR. COOPER:  Monty Cooper of the

09:49  12   law firm Orrick, Herrington & Sutcliff representing

09:49  13   the plaintiff Facebook, Inc.

09:49  14                   MR. BURSOR:  Scott Bursor from

09:49  15   Bursor & Fisher from the -- for the defendant Steve

09:49  16   Vachani and Power Ventures.

17    S T E V E N   V A C H A N I,

18             2425 B Channing Way 216,

19             Berkeley, California  94704,

20             having been first duly sworn according

09:50  21             to law, testifies as follows:

09:50  22                     (Whereupon, there is a discussion

23    held off the record.)

24                    THE VIDEOGRAPHER:  9:49, off the

09:50  25   record.

7

BARKLEY
Court Reporters

09:54  1    Berkeley and undergraduate degrees in political

09:54  2    science and a minor in business administration.

09:54  3                    MR. BURSOR:  Just a moment.

09:55  4            A.        I'll repeat that.  I graduated

09:55  5    from UC Berkeley and a undergraduate degree in

09:55  6    political science and business -- a minor in

09:55  7    business administration.

09:55  8            Q.        Have you taken any graduate level

09:55  9    courses?

09:55  10           A.        Courses, yes, but no formal

09:55  11   graduate degree.

09:55  12           Q.        All right.  What courses have you

09:55  13   taken graduate level and where?

09:55  14           A.        Business class -- Business courses

09:55  15   at UC Berkeley while I was an undergraduate.

09:55  16           Q.        So you took graduate level

09:55  17   business courses while you were still an

09:55  18   undergraduate?

09:55  19           A.        I believe I took one or two.

09:55  20           Q.        When did you graduate from the

09:55  21   University of California?

09:55  22           A.        I graduated in 1996.  I believe

09:55  23   that was the official time.

09:55  24           Q.        Mr. Vachani, do you have any

09:55  25   skills in computer programming?

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

BARKLEY
Court Reporters

09:55  1              A.        Yes, I do.

09:55  2              Q.        All right.  What -- What

09:55  3    programming languages are you familiar with?

09:55  4              A.        My own programming skills are --

09:55  5    are limited, but I am familiar with C Pascal and

09:56  6    HTML.

09:56  7              Q.        When you say you're "familiar

09:56  8    with" can you give me an understanding of what you

09:56  9    mean by "familiar with"?

09:56  10             A.        Well, I -- I interact with -- I've

09:56  11   been interacting with programmers and developers,

09:56  12   building products for almost 15 years, and so I --

09:56  13   as a manager I -- I'm able to ask questions and

09:56  14   answers and ask intelligent questions, but I'm not

09:56  15   a -- a skilled programmer by profession.

09:56  16                       MR. BURSOR:  I'm sorry to

09:56  17   interrupt, but you're going very fast.  There's

09:56  18   no -- There's no pause between his questions and

09:56  19   your answers, so --

09:56  20                       THE WITNESS:  No problem.

09:56  21                       MR. BURSOR:  -- I just -- It

22          hasn't been a problem as of yet --

23                              THE WITNESS:  Okay.

09:56  24                       MR. BURSOR:  -- but I don't want

09:56  25   it to get out of control.  Slow down a little bit.

                                    13

BARKLEY
Court Reporters

09:56  1                        THE WITNESS:  Okay.  No problem.

09:56  2            Q.          Have you ever actually written any

09:56  3  software code for any of the companies you've

09:56  4  worked for?

09:56  5            A.          I have not.

09:57  6            Q.          You mentioned that you're familiar

09:57  7  with C Pascal and HTML?

09:57  8            A.          Yes.

09:57  9            Q.          Are you familiar with PHP?

09:57  10           A.          Yes.  I'm familiar with PHP.

09:57  11           Q.          How about MySQL?

09:57  12           A.          I -- What level of familiarity?

09:57  13  I'm familiar with them in terms of managing

09:57  14  products and asking intelligent questions, but I

09:57  15  cannot write code at that level.

09:57  16           Q.          That's effectively what I was

09:57  17  trying find out is if you would be able to code in

09:57  18  MySQL?

       19           A.          I could not.

09:57  20           Q.          All right.  Are you familiar with

09:57  21  Cplus Plus?

09:57  22           A.          I'm familiar, but I could not -- I

09:57  23  could not code in any of those.

09:57  24           Q.          All right.  How about Java?

09:57  25           A.          I'm familiar with it, again,

                                14

BARKLEY
Court Reporters

| | | |
|---|---|---|
| 02:34 | 1 | Q.        To join -- To join Power. |
| 02:34 | 2 | A.        We didn't have access to -- The |
| 02:35 | 3 | users could invite their friends.  So that was a |
| 02:35 | 4 | feature that -- One of our promotions in our |
| 02:35 | 5 | features was that you could invite your friends to |
| 02:35 | 6 | join, invite your friends on Facebook to join, and |
| 02:35 | 7 | so people could -- they could make promotions so |
| 02:35 | 8 | they could create events around -- around a power |
| 02:35 | 9 | creativity around Power.  So we gave our user -- We |
| 02:35 | 10 | encourage our users, in fact, to bring their |
| 02:35 | 11 | friends in the same way that Facebook encourages |
| 02:35 | 12 | its users to bring their friends from other sites. |
| 02:35 | 13 | But we employed same tactics that are used by -- |
| 02:35 | 14 | similar tactics where you invite your friends, so |
| 02:35 | 15 | we did use invite friends features and promotions. |
| 02:35 | 16 | Q.        If you go back to Exhibit 103, you |
| 02:35 | 17 | see various -- "Displayed a Launch Promotion" in |
| 02:35 | 18 | the upper left-hand corner? |
| 02:35 | 19 | A.        Yup. |
| 02:35 | 20 | Q.        It says, "First 100 people who |
| 02:35 | 21 | bring 100 new friends to power.com earn $100? |
| 02:36 | 22 | A.        Yes. |
| 02:36 | 23 | Q.        Is that an example of a pop-up |
| 02:36 | 24 | that was made available on the site that was |
| 02:36 | 25 | designed to encourage new users to the site? |

182

BARKLEY
Court Reporters

02:36  1          A.        I don't know if this was a pop-up.

02:36  2    You can see it was prominently displayed on the

02:36  3    front page.  That's not more than that, it's not a

02:36  4    pop-up.  I think the terminology is not pop-up it's

02:36  5    an ad -- In fact, it's a prime-placed ad on the

02:36  6    home page.

02:36  7          Q.        Do you know whose idea it was for

02:36  8    this particular promotion?

02:36  9          A.        That was mine.

02:36 10          Q.        Do you know when you came up with

02:36 11    it?

02:36 12          A.        While I was sleeping.  I just

02:36 13    thought a hundred, hundred, hundred was a good

02:36 14    idea.

02:36 15          Q.        All right.  And when you clicked

02:36 16    on the Number 100, what would happen?

02:36 17          A.        It gave you a chance to -- to

02:36 18    select which friends you wanted to -- to, I guess,

02:36 19    invite to -- to join -- to join Power.

02:36 20          Q.        All right.  And was that -- Would

02:36 21    you agree that, as reflected on Exhibit 103, that

02:37 22    particular promotion was made available at the time

02:37 23    that you were connected to Facebook?

02:37 24          A.        Yes.  It was.

02:37 25          Q.        And if you clicked on 100 people,

                              183

BARKLEY
Court Reporters

02:37  1   you would be invited to ask your friends to join

02:37  2   power.com?

02:37  3          A.        No.  You would have the option to

02:37  4   invite your friends to join just like you have the

02:37  5   option on Facebook to invite your friends to join

02:37  6   Facebook and every other site on the Internet, and

02:37  7   if they did, if they reach a hundred friends that

02:37  8   joined, they would earn $100.

02:37  9          Q.        And if you accepted the feature

02:37 10   that came up saying would you -- it said something

02:37 11   like, "Would you like to invite your friends to

02:37 12   Power"?

02:37 13          A.        Yes.

02:37 14          Q.        If you hit "yes" or "I agree" --

02:37 15          A.        Yes.

02:37 16          Q.             -- how -- what -- what

02:37 17   automation would occur at that point?

02:37 18          A.        So first of all, you have to

02:38 19   remember that 99 percent of our users were not --

02:38 20   were not using -- were not using Facebook.  They

02:38 21   were users on other sites, so we actually -- I

02:38 22   guess you could say we were actually a big source

02:38 23   of providing users to Facebook in Brazil.  In fact,

02:38 24   as -- I guess you could say it was a gift, but we

02:38 25   -- we brought a large amount of Orkut users to

                              184

BARKLEY
Court Reporters

02:38  1   Facebook, so that's where a lot of our promotions

02:38  2   were -- Because our users already, as you know,

02:38  3   have -- Prior to having Facebook, we had millions

02:38  4   of users who have hundreds of friends already in

02:38  5   the system, and that represented 99 percent of our

02:38  6   contacts in our system.  Facebook was a very small

02:38  7   part of this world.  At that time, obviously it's a

02:38  8   much larger site today but in our world, in our

02:38  9   growth it was -- it was introduced later.  So we

02:38  10  were encouraging our friends -- our users to go and

02:38  11  register at Facebook and become Facebook users.

02:38  12  Because in our -- in our view, the more social

02:39  13  networks that users were using, the more value it

02:39  14  would be to, you know, to aggregate different

02:39  15  sites.  So we encouraged users to sign up for

02:39  16  Facebook.  In fact, we're giving free marketing to

02:39  17  Facebook.  So to answer your question, a lot of

02:39  18  these users -- You could see all your friends from

02:39  19  all your sites and say, "Hey.  Join Facebook when

02:39  20  you're at Facebook."  That was a big part of our

02:39  21  promotions.  That was the largest part of our

02:39  22  promotions.  And then, of course, if they have

02:39  23  friends that are already using Facebook -- Facebook

02:39  24  and they wanted to invite their friends to come use

02:39  25  Power, that's the smaller part.  But the biggest

185

BARKLEY
Court Reporters

02:39  1   one were obviously the friends that the user had

02:39  2   already put in the system.

02:39  3          Q.        The promotion itself had to have

02:39  4   an attribute created for it in the MSQL database.

02:39  5   Correct?

02:39  6          A.        Yes.  That's correct.

02:39  7          Q.        And that attribute would then be

02:40  8   assigned to anybody who clicked on the promotion.

02:40  9   Correct?

02:40 10          A.        What do you mean "the attribute"?

02:40 11          Q.        Well, if someone clicked on the

02:40 12   promotion, their user name would then be assigned

02:40 13   to the attribute associated with the promotion.

02:40 14   Correct?

02:40 15          A.        If they selected to invite a

02:40 16   friend, they could send an invitation to that

02:40 17   friend.

02:40 18          Q.        That's not what I'm talking about.

02:40 19   The minute that -- Let's say I'm Ms. Almeirda who's

02:40 20   being shown on the screen shot.

      21          A.        Okay.

02:40 22          Q.        If Ms. Almeirda clicks on the

02:40 23   launch promotion --

02:40 24          A.        Yes.

02:40 25          Q.           -- she would have received a --

186

**BARKLEY**
Court Reporters

02:42  1    technically it was -- it was much easier just to

02:42  2    manually look and I believe -- We can see how many

02:42  3    friends people invited so -- and then we just

02:42  4    manually took those people out.  I think they were

02:42  5    -- When we provided it, I think there might have

02:42  6    been 30 or 40 people that achieved it, so it was

02:42  7    literally just looked on the list of people who

02:42  8    invited friends to Power who had more than a

02:43  9    hundred.

02:43  10       Q.       All right.  But when say, "looked

02:43  11   on the list" you were looking in a database table.

02:43  12   Correct?

02:43  13       A.       Yeah.  We went to our database.

02:43  14   Importing friends is a -- is a feature.  It's a --

02:43  15   It's a -- As I mentioned many times, it's one of

02:43  16   our features on our site.

02:43  17       Q.       And in order to see how the

02:43  18   promotion was set up in terms of identification of

02:43  19   those who were participating in it, I'd need to see

02:43  20   the database.  Correct?

02:43  21       A.       To see the -- Every single user on

02:43  22   our site has the option to invite friends.  Who

02:43  23   achieved a hundred, I can tell you.  I don't know

02:43  24   the number but it was 30 something people that

02:43  25   received -- that reached a hundred friends, so I

189

BARKLEY
Court Reporters

02:43  1    can tell you that every single user of our site had

02:43  2    the ability to invite friends.  And if -- if some

02:43  3    of them reached a hundred, which was obviously not

02:43  4    an easy task to reach, they would -- they would win

02:43  5    this award, so I think only 30 something people

02:43  6    reached it, if I -- if I remember correctly.

       7            Q.        All right.

02:44  8            A.        So I don't know if that answers

02:44  9    your question correctly.

02:44 10            Q.        What data was -- Whether it was

02:44 11    automatedly or manually viewed, what data was

02:44 12    viewed in order to determine who had invited 100

02:44 13    friends to join Facebook?

02:44 14            A.        Well, it's -- In the same -- When

02:44 15    any site creates an import or invitation, when a

02:44 16    friend registers because of your invitation, you

02:44 17    know this is -- This is a feature that was in our

02:44 18    site, always in our site.  We know how many friends

02:44 19    were invited.  We know how many friends were

02:44 20    converted.  Just as Facebook publicly displays it

02:44 21    on their site and every other site does that.  So

02:44 22    we just looked and saw the people that were above

02:44 23    the hundred on that date, and we -- and we -- and

02:44 24    we gave them a hundred dollar check.

02:44 25            Q.        And when you say you looked, you

                              190

BARKLEY
Court Reporters

02:44  1    looked in the database.  Correct?

02:44  2            A.        We looked in our database,

02:44  3    correct.  And we provided the numbers, I believe,

02:44  4    on that promotion to you guys.

02:45  5            Q.        When somebody clicked on the

02:45  6    launch promotion and they were given, like you to

02:45  7    invite your friend" --

02:45  8            A.        That's correct.

02:45  9            Q.          -- and they hit yes, at that

02:45  10   point the importer, as we've been calling it, would

02:45  11   automatically contact all friends on Facebook to

02:45  12   invite them to --

02:45  13           A.        Let's be clear.  We don't have

02:45  14   access to any friends' e-mail addresses, so there

02:45  15   was not a single E mail sent by Face -- by Power

02:45  16   for -- We have e-mail addresses for friends on

02:45  17   other sites, but on -- so we -- If they wanted to

02:45  18   invite, as I said 99 -- well over 90 percent of our

02:45  19   users were Orkut users and Orkut friends and had

02:45  20   friends from other sites where they -- on sites

02:45  21   that allowed their E mails, but Facebook didn't --

02:45  22   didn't allow E mails, otherwise, we would have been

02:45  23   happy to send an invitation to those friends to

02:45  24   invite them; so that was not available for us for

02:46  25   Facebook.

                                191

BARKLEY
Court Reporters

02:49 1          A.          Yeah.  Anybody who got to a

02:49 2    hundred.

02:49 3          Q.          All right.  For somebody who

02:49 4    clicked on the launch promotion and -- Well, first

02:49 5    of all, who was responsible for manually reviewing

02:49 6    the database to determine who were the 37 or so you

02:49 7    say were eligible?

02:49 8          A.          I don't know.  It would probably

02:49 9    have been someone on Eric's team.  I don't know the

02:49 10   person.

02:49 11         Q.          You didn't do that manual review?

02:49 12         A.          I didn't personally do it, but I

02:49 13   know -- I think I signed the checks or at least --

02:49 14   I don't know.  Whatever we send out it was, like,

02:49 15   20, 30 people, whatever the number was.

02:49 16         Q.          Do you, as you sit here today,

02:49 17   know how the database was set up in order to

02:49 18   recognize who was eligible for this award?

02:49 19         A.          I think I've already answered.

02:49 20   Every single person in our database was eligible.

02:49 21   Anybody who acquired a hundred friends that came as

02:49 22   a result of them receiving -- received this.

02:50 23         Q.          How -- In your database, what

02:50 24   particular parameter told you, Power, who -- just

02:50 25   the name of the parameter?

195

BARKLEY
Court Reporters

02:50  1          A.          Every friend, when they -- they

02:50  2  have a link, when they invite friends just like --

02:50  3  When you send -- When you tell a friend, there's a

02:50  4  unique link that you can give to your friends.

02:50  5  Say, "Here, use this link when you join."  If they

02:50  6  use that link, whether it came from -- whatever was

02:50  7  the invitation that a user sent to their friends,

02:50  8  they would get credit for that because of the

02:50  9  unique identifier.

02:50  10         Q.          And that unique -- that link, as

02:50  11 you are putting it, was a URL.  Correct?

02:50  12         A.          Yeah.  URL is the -- the primary

02:50  13 way that this is physically done.  We provided our

02:50  14 users with a URL.

02:50  15         Q.          All right.  And in the case, for

02:50  16 instance, of somebody who contacted Orkut, that

02:50  17 link would be embedded in an E mail sent to Orkut

02:50  18 saying, "I would like you to join me on Power."

02:50  19         A.          It would be whatever way the user

02:51  20 wants to communicate with their friend.  They could

02:51  21 send on E mail.  They can -- They can call them on

02:51  22 the phone and say use this URL.  They can -- I

02:51  23 mean, there's -- They could go to them in a chat

02:51  24 room and say, "Go use this.  Click on this link."

02:51  25 In Microsoft messenger on their instant messenger,

196

BARKLEY
Court Reporters

02:51  1    copy their friends and say, "Sign up with this

02:51  2    link."  They were unlimited ways that people can

02:51  3    communicate with their friends.

02:51  4          Q.        All right.  But the link was

02:51  5    provided in the communication by Power.  Correct?

02:51  6          A.        The link was given -- Power

02:51  7    provided a link to our users to encourage them to

02:51  8    invite their friends.

02:51  9          Q.        And did Power also prepare the

02:51  10   script that was included with that invitation?

02:51  11         A.        I think, yeah, we provided them --

02:51  12   we provided them a script, yeah.  As every single

02:51  13   -- As Facebook does and everybody else does.

02:51  14         Q.        Now, in the case of Facebook, you

02:51  15   say that Facebook didn't permit you to contact

02:51  16   through E mails?

02:51  17         A.        What do you mean "Facebook doesn't

02:51  18   permit"?  Facebook did -- It has nothing to do with

02:51  19   permitting it.  We wanted -- If we wanted to -- We

02:51  20   just didn't have access to the E mails because

02:52  21   Facebook -- If we wanted to, we could have -- We

02:52  22   didn't get to that, but we would be happy to build

02:52  23   a feature that imported your E mail contacts, but

02:52  24   we didn't -- we didn't do that.  We never got to

02:52  25   that point.

197

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

BARKLEY
Court Reporters

02:57  1   at that time, but I know it's usually standard, you

02:58  2   know, more common to have a default to invite all

02:58  3   your friends.  I think Facebook does that, in fact.

02:58  4           Q.        Setting aside what the default

02:58  5   was, as part of the invitation, would list the

02:58  6   friends that could be contacted?

02:58  7           A.        That's correct.

02:58  8           Q.        And that would list the friends

02:58  9   who were available as friends on Facebook.

02:58  10  Correct?

02:58  11          A.        I believe so, yes.

02:58  12          Q.        And for the friends who were

02:58  13  contacted on Facebook, an invitation to join Power

02:58  14  would then be set if the person had that person

02:58  15  selected as, "Yes.  I would like them to be

02:58  16  invited"?

02:58  17          A.        Yeah.  If they could communicate

02:58  18  to invite them, they would be invited.

02:58  19          Q.        And earlier you said that however

02:58  20  the mechanism was, whether it was events or E mails

02:58  21  for other Web sites or whatever -- setting aside

02:58  22  the telephone call, if it was in a text-based

02:58  23  communication --

02:58  24          A.        Yes.

02:58  25          Q.            -- Power would provide the text

203

BARKLEY
Court Reporters

02:58  1    and the URL link to Power as part of that

02:58  2    communication so --

02:58  3          A.        Yes.

02:59  4          Q.          -- so the friends would know

02:59  5    where to go to be invited.  Correct?

02:59  6          A.        We would provide them text that

02:59  7    they could use.  Correct.  Of course.

02:59  8          Q.        And the list of friends was

02:59  9    recovered from the database and the variables that

02:59  10   were associated with friends with that user ID?

02:59  11         A.        Every -- I think -- Every user --

02:59  12   One of our core features is you can access all your

02:59  13   friends and create a friends list.  So, yes, I

02:59  14   mean, you have a friends list and you can select

02:59  15   from your aggregated friends list who you want to

02:59  16   invite.

02:59  17         Q.        Now, earlier you said while most

02:59  18   people contacted their Web site dynamically inside

02:59  19   the browser, the functionality existed to have the

02:59  20   automation available on through the PowerScript

02:59  21   also contact the Web sites.  Correct?

02:59  22         A.        What do you mean?

02:59  23         Q.        In other words, you -- In order to

02:59  24   obtain -- user content, for instance, from Web

02:59  25   sites, you could use the automated script available

                              204

BARKLEY
Court Reporters

02:59  1    through PowerScript to download --

02:59  2              A.        That's what any importer does.

03:00  3    When you use an importer, you're -- you're

03:00  4    basically authorizing a script to go to another

03:00  5    site and access certain data.  So, like, when

03:00  6    Facebook -- as your Facebook import you authorize a

03:00  7    script written by Facebook to go to another site,

03:00  8    take that data, bring it back, and then Facebook

03:00  9    sends an invitation on behalf of the user.  That's

03:00  10   the same process that we go through.  That is

03:00  11   correct.

03:00  12             Q.        And in the invitation that was

03:00  13   then sent as part of the launch promotion to a

03:00  14   Facebook user, how would the Power site know what

03:00  15   function or what feature on Facebook to populate

03:00  16   the invitation to?  In other words, how would it

03:00  17   know to send it to an event or say an instant

03:00  18   message or whatever medium of communication?

03:00  19             A.        Well, Facebook doesn't have

03:00  20   instant message.  You know, a user can go and -- If

03:00  21   a user wanted to manually click on a friend and

03:01  22   say, "Hey," I don't believe even they had Facebook

03:01  23   chat at that time, so there wasn't even -- I don't

03:01  24   think it was a feature, so we didn't even interact

03:01  25   with that.  They could write a message to their

                                    205

BARKLEY
Court Reporters

03:01 1  friend.  They could create an event or they could

03:01 2  go and, I guess, take that link up and paste it and

03:01 3  write an E mail to their friend.

03:01 4      Q.       Was one of the ways that Power was

03:01 5  able to make the invitation available to Facebook

03:01 6  users is that the PowerScript would set up an event

03:01 7  on Facebook on behalf of the user who had clicked

03:01 8  on --

03:01 9      A.       If the user authorized for the

03:01 10  creation of the event, yes.

03:01 11      Q.       And if the -- How did the -- How

03:01 12  did Power know it was to set up an event as opposed

03:01 13  to any other way of communicating --

03:01 14      A.       Because the user said, "Create an

03:01 15  event for me," so user authorized the creation of

03:01 16  an event.

03:01 17      Q.       Was that made available on the

03:01 18  promotion -- on the pop-up that made -- would come

03:02 19  up --

03:02 20      A.       That was -- As I said, if you

03:02 21  clicked that, that was one of the options that the

03:02 22  user had an option to create an event.

03:02 23      Q.       What other options did the user

03:02 24  have?  We can take a break here.

03:02 25                    THE VIDEOGRAPHER:  It's 3:01.  Off

206

BARKLEY
Court Reporters

03:17  1    Power --

03:17  2            A.        Those would be the URL to -- to

03:17  3    Power.  They can register.  Once they come to

03:17  4    Power, they can register their Facebook account.

03:17  5            Q.        In the case of creating an event,

03:17  6    did Power provide the promotional language the way

03:17  7    it did with E mails to other sites?

03:17  8            A.        I think it's standard in all

03:17  9    things.  You always provide suggested text or text

03:17 10    whatever.

03:17 11            Q.        Did Power's automated script

03:17 12    create the event?

03:17 13            A.        I believe that the authorizer,

03:17 14    they just say, "Create this event for me."  They

03:17 15    could do that for them, yeah.

03:17 16            Q.        And how did -- Power's automated

03:17 17    script would create an event and contact all

03:17 18    friends through that event --

03:17 19            A.        It doesn't contact friends.

03:17 20    Events are something you post and then you just

03:18 21    create an event.  I don't think -- I think that's

03:18 22    -- I'm not sure exactly.  I believe events you can

03:18 23    only create them.

03:18 24            Q.        But the event -- Friends that are

03:18 25    friends of those who create the events are

209

BARKLEY
Court Reporters

03:20  1    that was sent to Facebook --

03:20  2            A.        Usually --

03:20  3                    MR. BURSOR:  Objection.  Vague and

03:20  4    ambiguous.

03:20  5            Q.        Do you know who created the text

03:20  6    that was prepared through the automated script that

03:20  7    was sent by Power to Facebook users?

03:20  8                    MR. BURSOR:  Objection.  Vague and

03:20  9    ambiguous.  Assumes facts not in evidence.  Lacks

03:20 10    foundation.  You can answer.

03:20 11            A.        I'm repeating what he said.

03:20 12    Objecting.  It's vague and ambiguous.

03:21 13                    MR. BURSOR:  I objected.  If you

03:21 14    can understand it, you can answer it.

03:21 15            Q.        Mr. Vachani, as I said at the

03:21 16    beginning, your attorney has the right to interject

03:21 17    actions unless he instructs you not to answer --

03:21 18            A.        Okay.

03:21 19            Q.        Let me -- One of the ways that you

03:21 20    said that Facebook users would be contacted for

03:21 21    this promotion was the Power user could say they

03:21 22    wanted to participate and contact friends to create

03:21 23    an event?

03:21 24            A.        Correct.

03:21 25            Q.        And you said the automatic script

212

BARKLEY
Court Reporters

03:21  1    -- the automated script created by Power would, in

03:21  2    fact, create an event on Facebook?

03:21  3              A.        If the user authorized it and

03:21  4    indicated they wanted to do that.  That's correct.

03:21  5              Q.        As part of the creation of that

03:21  6    event, was text included as part of event set up --

03:21  7              A.        They were shown texts just like

03:21  8    standard practice.  They were shown it and

03:21  9    authorized it.

03:21 10              Q.        And that text included the same

03:22 11    link to the URL to Power?

03:22 12              A.        I would assume it has the link in

03:22 13    it, yes.

03:22 14              Q.        The E mails that you said were

03:22 15    sent to users of, like, Orkut that had e-mail

03:22 16    addresses available on your site --

03:22 17              A.        Correct.

03:22 18              Q.        To the best of your knowledge --

03:22 19    And you said the link itself was one way that you

03:22 20    would be allowed to contact users.  Correct?

03:22 21              A.        Well, you could take the link and

03:22 22    pass the link.  It's -- You provide them a unique

03:22 23    link and they can go to messenger and copy that

03:22 24    link and say, "Hey, go sign up for -- for Power."

03:22 25              Q.        Do you know if that URL had an ID

213

BARKLEY
Court Reporters

04:03 1          A.          Just to be clear, December 2008, I

04:03 2    believe, only Simon was on the board on that date.

04:03 3    Andreas was on the board, but I think on that date

04:03 4    Simon was the only one on the board from DFJ.

04:03 5          Q.          Do you know when Mr. Stavropoulos

04:03 6    became a member of the board?

04:03 7          A.          He was a member earlier.  In two

04:04 8    -- He became a member, I think, at the end of 2007.

04:04 9    That's at the time that Simon and Andreas -- They

04:04 10   were both from DFJ when they came in with their

04:04 11   investment.

04:04 12         Q.          Did Mr. Stavropoulos leave the

04:04 13   board?

04:04 14         A.          Simon was the only representative

04:04 15   at that time, I believe, on the board.

04:04 16         Q.          Was Ms. Dyson ever a member of the

04:04 17   board?

04:04 18         A.          Never.

04:04 19         Q.          Was anybody else that I have not

04:04 20   named ever members of the board?

04:04 21         A.          At that time?  Let me just think

04:04 22   who was on the board.  I think there was -- Let me

04:04 23   think.  I think -- No.  At that time in December I

04:04 24   believe on that date, December 2008, I think that I

04:05 25   need -- I think that it was Simon -- Simon Olson

247

BARKLEY
Court Reporters

04:11 1          A.          Ask the question again.

04:11 2          Q.          Earlier I asked you -- Earlier we

04:11 3   discussed that there are three ways Facebook users

04:11 4   could be contacted using the power automated script

04:11 5   when an -- when someone indicated they wanted to

04:12 6   invite their friends to join power.  Correct?

04:12 7          A.          Yes.

04:12 8          Q.          And one of the ways was by setting

04:12 9   up an event.  Correct?

04:12 10         A.          Yes.

04:12 11         Q.          And you indicated that the

04:12 12  automated script would include the language that

04:12 13  would then be used as part of the event

04:12 14  notification as well as a link.  Correct?

04:12 15         A.          Yes.

04:12 16         Q.          All I'm asking you is, to the best

04:12 17  of your knowledge, is the language that exists

04:12 18  between lines 9 and 20 on -- in Paragraph 70 of the

04:12 19  first amended complaint language that you believe

04:12 20  was used as part of that automated script?

04:12 21                     MR. BURSOR:  Objection.  Vague,

04:12 22  ambiguous.  Assumes facts not in evidence.  Lacks

04:12 23  foundation.  Compound.  If you can understand the

04:12 24  question, you can answer.

04:12 25         A.          I do understand the question, but

254

BARKLEY
Court Reporters

04:14 1    create an event as part of $100 promotion use the

04:14 2    language, "Bring 100 friends and 100 bucks"?

04:14 3              MR. BURSOR:  Hold on a second.

04:14 4    Objection.  Vague, ambiguous.  Assumes facts not in

04:14 5    evidence.  Lacks foundation.  If you could clarify

04:14 6    whether you're referring to PowerScript or Facebook

04:14 7    script, that might help clear up some of the --

04:14 8              MR. COOPER:  I asked specific -- I

04:14 9    will say it again.  Was the language, "Bring 100

04:14 10   friends and win 100 bucks," language that was used

04:14 11   in the Power automated script when it set up the

04:14 12   event on Facebook?

04:14 13             MR. BURSOR:  Objection.  Vague,

04:14 14   ambiguous.  Assumes facts not in evidence.  Lacks

04:15 15   foundation.  Listen to the question carefully, and

04:15 16   if you can understand it, you can answer it.

04:15 17        A.        Bring 100 friends and 100 bucks

04:15 18   was our -- our tag line, so -- but I don't --

04:15 19   whether the user entered that in on their own or

04:15 20   whether they -- they put this.  I cannot say from

04:15 21   this -- from looking at this, but that was the

04:15 22   language that we suggested to users to use.  But

04:15 23   many users changed the language, too, and put other

04:15 24   language in those events, so I can't -- This is one

04:15 25   example of a user creating an event.  I cannot say

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

BARKLEY
Court Reporters

04:15  1    what -- you know, how this was specifically created

04:15  2    because they -- they had -- they could have created

04:15  3    this event and the language was -- That was the tag

04:15  4    line we were promoting, but I do not know if this

04:15  5    was specifically -- this specific E mail or if they

04:16  6    copied and pasted it if they did whatever.  But

04:16  7    what I do know is, this was an event where the user

04:16  8    specifically authorized us and said -- either

04:16  9    created this event manual or specifically

04:16  10   authorized us to create this event.

04:16  11             MR. COOPER:  We've got to go off

04:16  12   the record.

04:16  13             THE VIDEOGRAPHER:  It's 4:15.  Off

04:16  14   the record.  End of Tape 5.

04:16  15             (Whereupon, a recess is taken.)

04:23  16             THE VIDEOGRAPHER:  4:22, on the

04:23  17   record.  Beginning of Tape 6.

04:23  18        Q.      Before the break you indicated

04:23  19   that, "Bring 100 friends and win 100 bucks" was the

04:23  20   tag line but you couldn't say for sure how the --

04:23  21             MR. COOPER:  Strike that.

04:23  22        Q.      Before the break, you indicated

04:23  23   that "Bring 100 friends and win 100 bucks" was the

04:23  24   tag line employed by Power.  Correct?

04:23  25        A.      That was the tag line of the

257

BARKLEY
Court Reporters

04:23  1   campaign and the suggested text and promotion that

04:23  2   we encourage our users to promote in any kind of

04:23  3   promotion they made in the acquisition of and

04:23  4   invitation of friends.

04:23  5          Q.      Where would I find documentation

04:23  6   reflecting precisely what language was suggested

04:23  7   that users use with Facebook events?

04:23  8          A.      That would have been on the -- the

04:23  9   power -- on this page.  On the page after they

04:24  10  clicked on this promotion, so it came up with a

04:24  11  page --

04:24  12         Q.      Talking about Exhibit 103?

04:24  13         A.      I don't know if that page -- Does

       14  it exist?

04:24  15         Q.      I'm asking if you're talking about

       16  Exhibit 103.

04:24  17         A.      I'm talking about this page.  I

04:24  18  don't know if there's an exhibit.

04:24  19         Q.      You're pointing to Exhibit 103?

04:24  20         A.      Exhibit 103, I'm sorry.  So if

04:24  21  they clicked on that, there was a page that they

04:24  22  went to.

04:24  23         Q.      And --

04:24  24         A.      Gave them those options.

04:24  25         Q.      Where, if at all, does that

                              258

BARKLEY
Court Reporters



259



260





261

BARKLEY
Court Reporters

04:28  1   application PowerScript application?

04:28  2          A.        The actual language?

04:28  3          Q.        Yes.

04:28  4          A.        Was -- That was -- That phrase

04:28  5   "Bring 100 friends, 100 bucks" was created by me.

04:28  6          Q.        Do you know if the remainder of

04:28  7   any text that was employed in suggested text in

04:28  8   private messages that were used on Facebook as a

04:29  9   result of automated script were prepared by you?

04:29  10          MR. BURSOR:  Could you read that

04:29  11  back, please?

04:29  12          (Whereupon, the last question is

04:29  13  read back by the reporter.)

04:29  14          MR. BURSOR:  Objection.  Vague,

04:29  15  ambiguous.  Assumes facts not in evidence.  Lacks

04:29  16  foundation.  You can answer.

04:29  17          A.        Repeat the question one more time.

04:29  18          Q.        You earlier indicated private

04:29  19  messages were one of the ways that the automated

04:29  20  script would permit somebody using this campaign to

04:29  21  contact friends on Facebook.

04:29  22          A.        Okay.  So to be clear --

04:29  23          Q.        Yes or no.

04:29  24          A.        I want to clarify.  Earlier I said

04:29  25  that could be one of the ways that someone could

262

BARKLEY
Court Reporters

04:29  1   send it.  I honestly don't know if we actually ever
04:29  2   used private messages.  It was a long time ago.  To
04:29  3   my recollection, I don't -- I don't remember us
04:29  4   sending private messages, but it was definitely
04:30  5   something we -- we discussed, but I don't know if
04:30  6   we actually ever got to employing that method.
04:30  7   It's been a long time since that happened.  It's
04:30  8   possible that users took suggested text and wrote
04:30  9   messages to friends and if -- I don't remember if
04:30  10  we actually employed that technique, but it's
04:30  11  something we obviously would have been happy to do
04:30  12  because if the user authorized us to do it, I just
04:30  13  don't remember if we actually did it.
04:30  14          Q.       Looking at Exhibit 103, the launch
04:30  15  promotion --
04:30  16          A.       Yup.
04:30  17          Q.          -- who prepared the PowerScript
04:30  18  that is reflected in that launch promotion?
04:30  19          A.       It could have been Carlos or
04:30  20  Danilo.
04:30  21          Q.       What documentation shows how that
04:30  22  launch promotion was implemented on power.com?
04:30  23          A.       It was either -- It was either a
04:30  24  verbal, "Hey, use this text," in a meeting, said,
04:31  25  "Hey, this is the text you should use," and they

BARKLEY
Court Reporters

04:31  1  took it or there was an E mail.  I don't know.

04:31  2          Q.        But you see the box, "Launch

04:31  3  Promotion."  Correct?

04:31  4          A.        Yes.

04:31  5          Q.        That is a feature that is made

04:31  6  available to the power.com user through the

04:31  7  power.com Web site.  Right?

04:31  8          A.        Yes.

04:31  9          Q.        None of the aggregated social

04:31  10  networks prepared the contents shown in that

04:31  11  promotional box.  Correct?

04:31  12          A.        Right.

04:31  13          Q.        Where would I find documentation

04:31  14  showing me how that launch promotion was

04:31  15  implemented on power.com?

04:31  16          A.        So it either was in a meeting that

04:31  17  we had where I said, "Hey, this is the text you

04:31  18  want to use for this promotion," and they would

04:31  19  have noted it down, or it would have been an E mail

04:31  20  that was sent saying, "Use this text."  One of

04:31  21  those two.  I don't know which one it was because

04:31  22  we had weekly meetings where we discussed ideas and

04:31  23  this was -- this was an idea that I had come up

04:32  24  with.  So many times I would share my idea.  I

04:32  25  would say, "Eric, use this text.  This is a

264

BARKLEY
Court Reporters

04:32  1    promotion."  So either it was that or it was an

04:32  2    E mail.  I don't know which one it was.

04:32  3            Q.        Again, I'm not talking about the

04:32  4    text.  I'm talking about the actual function of

04:32  5    bringing up this block, this functional block.

04:32  6            A.        This is an HTML code.  It's just a

04:32  7    standard HTML that would access an image.

04:32  8            Q.        Where would the information

04:32  9    showing how that image was linked to the text exist

04:32 10    if at all at power.com?

04:32 11            A.        They would exist in our -- I don't

04:32 12    -- Since this is an HTML code, it would exist in

04:32 13    our site, the HTML code and if it -- if there was

04:32 14    -- if there was a call to a -- a text, it would

04:32 15    come from a content management -- from a content

04:32 16    management access.  I don't know exactly how they

04:32 17    managed content, but it was -- it was not -- That

04:33 18    content is usually not stored in a source -- the

04:33 19    actual content.  There could be a call to the

04:33 20    content and that would be in the PowerScript.

04:33 21            Q.        And that's because the underlying

04:33 22    -- the browser embeds the underlying script for

04:33 23    PowerScript.  Correct?

04:33 24            A.        The browser has nothing to do with

04:33 25    this -- this message -- This message here is just a

                                265

BARKLEY
Court Reporters



266





267

BARKLEY
Court Reporters

04:41 1          Q.          And it was sued, in part, because

04:41 2    of Facebook's allegations relating to how this

04:41 3    launch promotion was employed.  Correct?

04:41 4          A.          I don't know what Facebook made

04:41 5    allegations to is right there.

04:41 6          Q.          Earlier you said that Facebook is

04:41 7    responsible for sending the E mail notification

04:41 8    about the invite.

04:41 9          A.          Yeah.  That was sent by Facebook

04:42 10   servers.

04:42 11         Q.          But Facebook's E mail servers

04:42 12   would not send the invite, but for the initiation

04:42 13   of the event.  Correct?

04:42 14         A.          A user has to authorize -- A user

04:42 15   has to create an event for Facebook to do that and

04:42 16   a user has to log in with their user name and

04:42 17   password and do this, so Facebook authorizes its

04:42 18   users to create events as part of their -- That's

04:42 19   the relationship Facebook has with its users.

04:42 20         Q.          You indicated some of the events

04:42 21   are set up through the automated scripted?

04:42 22         A.          No.  What I indicated is that

04:42 23   users -- users created these events.  Whether the

04:42 24   user authorized -- whether they authorized an agent

04:42 25   to go do it for them or they did it, it's the same

273

BARKLEY
Court Reporters

04:42  1    thing.  It's initiated by the user, that's what we

04:42  2    know.

04:42  3            Q.        The automated script, though, is

04:42  4    operated by power.com?

04:42  5            A.        It's a -- An automated script for

04:42  6    PowerScript, are initiated by users and executed by

04:42  7    power.com in the same way that an exporter is

04:43  8    initiated by user and managed by the site that's

04:43  9    doing it on behalf of the user.  Did you get that?

04:43  10   Yes.

04:43  11                     (Whereupon, Exhibit 107 is marked

04:43  12   for identification by the reporter.)

04:43  13           Q.        Mr. Vachani, Exhibit 107 is

04:43  14   Exhibit A to the first amended complaint that was

04:43  15   106.  Have you seen this document before today?

04:43  16           A.        What is this document I'm looking

04:43  17   at?

04:43  18           Q.        Exhibit A to the first amended

04:43  19   complaint.

04:43  20           A.        Is this the Facebook Terms and

04:43  21   Conditions?

04:43  22           Q.        Yes.

04:44  23           A.        I have -- Vaguely -- I've seen

04:44  24   this before, yes.  I don't know if I've seen this

04:44  25   specific version.  I've read the Facebook Terms and

274

BARKLEY
Court Reporters

04:44  1   Conditions previously.

04:44  2          Q.        As of December 1st, 2008, had you

04:44  3   read the Terms and Conditions that were available

04:44  4   on the Facebook Web site?

04:44  5          A.        I didn't read it all a hundred

04:44  6   percent, but we had read -- people in our company

04:44  7   had read it.

04:44  8          Q.        So who in your company had read it

04:44  9   -- if anybody?

04:44  10          A.        It would have been myself -- I

04:44  11   believe -- I do remember reading it.  Filipe would

04:44  12   have also read it.

04:44  13          Q.        Mr. Herrera?

04:44  14          A.        Yes.  I would have asked was there

04:44  15   anything relevant in the terms.  He would have been

04:44  16   the person I talked to.

04:44  17          Q.        Could you turn to Page 4?

04:44  18          A.        Sure.

04:44  19          MR. BURSOR:  Are you using the

04:44  20   page numbers at the top?

04:44  21          MR. COOPER:  Yes.  I'm sorry if

04:44  22   that wasn't clear.

04:44  23          Q.        Mr. Vachani, your counsel made a

04:45  24   good point.  I'm referring to the page numbers in

04:45  25   the upper right-hand corner.  You see the one that

275

BARKLEY
Court Reporters

04:45  1    says Page 415?

04:45  2            A.      Yes.

04:45  3            Q.      Can you read the first bullet

04:45  4    point to yourself and tell me when you've finished?

04:45  5            A.      The first bullet point?  Yes.

04:45  6                    Okay.

04:45  7            Q.      As of December 1st, 2008, do you

04:45  8    know one way or another whether anybody at Power

04:45  9    had read that particular provision in the Facebook

04:45 10    Terms of Service?

04:45 11            A.      Yes.

04:45 12            Q.      Had you read it?

04:45 13            A.      Yes.

04:45 14            Q.      All right.  Did you have an

04:46 15    understanding whether power.com enabled users to

04:46 16    registered users to violate the Terms of Service?

04:46 17            A.      I don't understand how a message

04:46 18    that a user wants to send to another friend --

04:46 19    First of all, it's an unsolicited message; and

04:46 20    second, I don't understand what this Terms and

04:46 21    Conditions has anything to do with -- with -- I

04:46 22    don't understand how the relevance to the

04:46 23    questions.

04:46 24            Q.      Did you have an understanding

04:46 25    whether or not power.com to enabled its registered

                                  276

BARKLEY
Court Reporters

04:49  1    2008, have an understanding whether it was

04:49  2    permitting registered users of Facebook to violate

04:49  3    the Terms of Service of Facebook?

04:49  4            A.      I don't know -- I'm not at liberty

04:49  5    to say what -- what's a violation of Facebook's

04:49  6    terms and we -- As I already stated, we did not

04:49  7    participate in sending any kind of unsolicited

04:49  8    users and our users were sending messages to their

04:49  9    own friends, so I don't understand if a user sends

04:49  10   a message to their friend how that's unsolicited

04:49  11   and how that has anything to do with this

04:49  12   terminology.

04:49  13           Q.      Would you look at the third bullet

04:49  14   point?

04:49  15           A.      Yeah.

04:49  16           Q.      You see where it says -- if you

04:49  17   read the -- It starts with, "In addition, you agree

04:49  18   not to use the service or site to," and then the

04:49  19   third bullet point is, "use automated scripts to

04:49  20   collect information from or otherwise interact with

04:50  21   the service or the site."

04:50  22                   THE WITNESS:  Scott, is this even

04:50  23   relevant to the conversation?  I don't -- I don't

04:50  24   understand.

04:50  25                   MR. BURSOR:  Why don't we just get

279

BARKLEY
Court Reporters

04:50  1      the question read back and then just answer the

04:50  2      question.

04:50  3               A.      So what's the question?

04:50  4                       (Whereupon, the last question is

04:50  5      read back by the reporter.)

04:50  6                       MR. BURSOR:  Is the question:

04:50  7      Does he see that in the agreement?

       8                       MR. COOPER:  Yeah, that's all I

       9      asked.

       10                       MR. BURSOR:  Yeah, so do you see

04:50  11     that -- do you see that --

04:50  12              A.      I see that in the agreement.

04:50  13                       MR. BURSOR:  Yeah, so then you've

04:50  14     answered the question.

       15              A.      Okay.  Yeah, I see that in your

04:50  16     agreement.

04:50  17              Q.      Have you read that language as of

04:50  18     December 1st, 2008?

04:50  19              A.      Yes.  I had read it many times.

04:50  20              Q.      Had anybody else at power.com read

04:50  21     that language as of December 1st, 2008?

04:50  22              A.      I don't know if they read it.  It

04:51  23     was my job to read it and I think Filipe probably

04:51  24     read it.  Those are the two people that I know.

04:51  25              Q.      As of December 1st, 2008, had you

                                      280

BARKLEY
Court Reporters

05:38  1    remember any substantial conversation.

05:38  2            Q.        All right.  Do you know -- The

05:38  3    second sentence of Exhibit 109 says, "Eric we need

05:38  4    to be prepare for Facebook to try and to block us

05:38  5    and the turn this into a national battle that gets

05:39  6    us huge attention"?

05:39  7            A.        Yes.

05:39  8            Q.        Why did you think Facebook was

05:39  9    going to block you?

05:39  10           A.        Obviously, they sent this letter

05:39  11   to us saying very clearly it was -- I thought it

05:39  12   was absurd, but that -- nonetheless that they were

05:39  13   trying to do this, but it was clear that that's

05:39  14   what they would do.

05:39  15           Q.        By what the way, do you remember

05:39  16   the name of the Facebook individual that Nevo

05:39  17   suggested you talk to?

05:39  18           A.        I do not recall it right mow.

05:39  19           Q.        Do you know if it was the same Sam

05:39  20   O'Rourke?

05:39  21           A.        That name sounds familiar, but I

05:39  22   don't -- I know I've heard that name.

05:39  23           Q.        Why did you -- The third sentence

05:39  24   says, "We need to address the scraping argument and

05:39  25   the soliciting log in credentials"?

313

BARKLEY
Court Reporters

CERTIFICATION

I, PATRICIA MULLIGAN CARRUTHERS, a Certified Shorthand Reporter and Notary Public of the State of New Jersey and a Notary Public of the State of New York, do hereby certify that prior to the commencement of the examination the witness was sworn by me to testify as to the truth, the whole truth, and nothing but the truth.

I do further certify that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place, and on the date hereinbefore set forth.

I do further certify that I am neither of counsel nor attorney for any party in this action and that I am not interested in the event nor outcome of this litigation.

_____
Patricia Mulligan Carruthers, CSR
Certificate No. XI00780
Notary Public of the State of New York
Notary Public of the State of New Jersey

Dated: JULY 27, 2011

My commission expires October 28, 2015     (N.J.)
My commission expires December 21, 2013     (N.Y.)

361