# EXHIBIT 2

```
 1                UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF CALIFORNIA
 3                     SAN JOSE DIVISION
 4
 5   FACEBOOK, INC.              :
 6            Plaintiff,         :
 7                               :
 8         v.                    :
 9                               :
10   POWER VENTURES, INC. d/b/a  :
11   POWER.COM, a California     :
12   corporation; POWER          :      Case No.
13   VENTURES, INC. a Cayman     :      5:08-CV-05780
14   Island Corporation, STEVE   :      JW (HRL)
15   VACHANI, an individual;     :
16   DOE 1, d/b/a POWER.COM, an  :
17   individual and/or business  :
18   entity of unknown nature;   :
19   DOES 2 through 25,          :
20   inclusive, individuals      :
21   and/or business entities    :
22   of unknown nature,          :
23            Defendants.        :
24   _____
25         HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

                              1
```

```
04:42  1    thing.  It's initiated by the user, that's what we
04:42  2    know.
04:42  3           Q.      The automated script, though, is
04:42  4    operated by power.com?
04:42  5           A.      It's a -- An automated script for
04:42  6    PowerScript, are initiated by users and executed by
04:42  7    power.com in the same way that an exporter is
04:43  8    initiated by user and managed by the site that's
04:43  9    doing it on behalf of the user.  Did you get that?
04:43 10    Yes.
04:43 11                   (Whereupon, Exhibit 107 is marked
04:43 12    for identification by the reporter.)
04:43 13           Q.      Mr. Vachani, Exhibit 107 is
04:43 14    Exhibit A to the first amended complaint that was
04:43 15    106.  Have you seen this document before today?
04:43 16           A.      What is this document I'm looking
04:43 17    at?
04:43 18           Q.      Exhibit A to the first amended
04:43 19    complaint.
04:43 20           A.      Is this the Facebook Terms and
04:43 21    Conditions?
04:43 22           Q.      Yes.
04:44 23           A.      I have -- Vaguely -- I've seen
04:44 24    this before, yes.  I don't know if I've seen this
04:44 25    specific version.  I've read the Facebook Terms and
```

274

```
04:44   1    Conditions previously.
04:44   2           Q.      As of December 1st, 2008, had you
04:44   3    read the Terms and Conditions that were available
04:44   4    on the Facebook Web site?
04:44   5           A.      I didn't read it all a hundred
04:44   6    percent, but we had read -- people in our company
04:44   7    had read it.
04:44   8           Q.      So who in your company had read it
04:44   9    -- if anybody?
04:44  10           A.      It would have been myself -- I
04:44  11    believe -- I do remember reading it.  Filipe would
04:44  12    have also read it.
04:44  13           Q.      Mr. Herrera?
04:44  14           A.      Yes.  I would have asked was there
04:44  15    anything relevant in the terms.  He would have been
04:44  16    the person I talked to.
04:44  17           Q.      Could you turn to Page 4?
04:44  18           A.      Sure.
04:44  19                   MR. BURSOR:  Are you using the
04:44  20    page numbers at the top?
04:44  21                   MR. COOPER:  Yes.  I'm sorry if
04:44  22    that wasn't clear.
04:44  23           Q.      Mr. Vachani, your counsel made a
04:45  24    good point.  I'm referring to the page numbers in
04:45  25    the upper right-hand corner.  You see the one that
```

275

```
04:45   1   says Page 415?
04:45   2            A.      Yes.
04:45   3            Q.      Can you read the first bullet
04:45   4   point to yourself and tell me when you've finished?
04:45   5            A.      The first bullet point?  Yes.
04:45   6                    Okay.
04:45   7            Q.      As of December 1st, 2008, do you
04:45   8   know one way or another whether anybody at Power
04:45   9   had read that particular provision in the Facebook
04:45  10   Terms of Service?
04:45  11            A.      Yes.
04:45  12            Q.      Had you read it?
04:45  13            A.      Yes.
04:45  14            Q.      All right.  Did you have an
04:46  15   understanding whether power.com enabled users to
04:46  16   registered users to violate the Terms of Service?
04:46  17            A.      I don't understand how a message
04:46  18   that a user wants to send to another friend --
04:46  19   First of all, it's an unsolicited message; and
04:46  20   second, I don't understand what this Terms and
04:46  21   Conditions has anything to do with -- with -- I
04:46  22   don't understand how the relevance to the
04:46  23   questions.
04:46  24            Q.      Did you have an understanding
04:46  25   whether or not power.com to enabled its registered
```

276

| | | |
|---|---|---|
| 04:49 | 1 | 2008, have an understanding whether it was |
| 04:49 | 2 | permitting registered users of Facebook to violate |
| 04:49 | 3 | the Terms of Service of Facebook? |
| 04:49 | 4 | A.     I don't know -- I'm not at liberty |
| 04:49 | 5 | to say what -- what's a violation of Facebook's |
| 04:49 | 6 | terms and we -- As I already stated, we did not |
| 04:49 | 7 | participate in sending any kind of unsolicited |
| 04:49 | 8 | users and our users were sending messages to their |
| 04:49 | 9 | own friends, so I don't understand if a user sends |
| 04:49 | 10 | a message to their friend how that's unsolicited |
| 04:49 | 11 | and how that has anything to do with this |
| 04:49 | 12 | terminology. |
| 04:49 | 13 | Q.     Would you look at the third bullet |
| 04:49 | 14 | point? |
| 04:49 | 15 | A.     Yeah. |
| 04:49 | 16 | Q.     You see where it says -- if you |
| 04:49 | 17 | read the -- It starts with, "In addition, you agree |
| 04:49 | 18 | not to use the service or site to," and then the |
| 04:49 | 19 | third bullet point is, "use automated scripts to |
| 04:49 | 20 | collect information from or otherwise interact with |
| 04:50 | 21 | the service or the site." |
| 04:50 | 22 |             THE WITNESS:  Scott, is this even |
| 04:50 | 23 | relevant to the conversation?  I don't -- I don't |
| 04:50 | 24 | understand. |
| 04:50 | 25 |             MR. BURSOR:  Why don't we just get |

| | | |
|---|---|---|
| 04:50 1 | the question read back and then just answer the | |
| 04:50 2 | question. | |
| 04:50 3 | A. | So what's the question? |
| 04:50 4 | | (Whereupon, the last question is |
| 04:50 5 | read back by the reporter.) | |
| 04:50 6 | | MR. BURSOR:  Is the question: |
| 04:50 7 | Does he see that in the agreement? | |
| 8 | | MR. COOPER:  Yeah, that's all I |
| 9 | asked. | |
| 10 | | MR. BURSOR: Yeah, so do you see |
| 04:50 11 | that -- do you see that -- | |
| 04:50 12 | A. | I see that in the agreement. |
| 04:50 13 | | MR. BURSOR:  Yeah, so then you've |
| 04:50 14 | answered the question. | |
| 15 | A. | Okay.  Yeah, I see that in your |
| 04:50 16 | agreement. | |
| 04:50 17 | Q. | Have you read that language as of |
| 04:50 18 | December 1st, 2008? | |
| 04:50 19 | A. | Yes.  I had read it many times. |
| 04:50 20 | Q. | Had anybody else at power.com read |
| 04:50 21 | that language as of December 1st, 2008? | |
| 04:50 22 | A. | I don't know if they read it.  It |
| 04:51 23 | was my job to read it and I think Filipe probably | |
| 04:51 24 | read it.  Those are the two people that I know. | |
| 04:51 25 | Q. | As of December 1st, 2008, had you |

280

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

BARKLEY
Court Reporters

```
05:38  1    remember any substantial conversation.
05:38  2          Q.     All right.  Do you know -- The
05:38  3    second sentence of Exhibit 109 says, "Eric we need
05:38  4    to be prepare for Facebook to try and to block us
05:38  5    and the turn this into a national battle that gets
05:39  6    us huge attention"?
05:39  7          A.     Yes.
05:39  8          Q.     Why did you think Facebook was
05:39  9    going to block you?
05:39 10          A.     Obviously, they sent this letter
05:39 11    to us saying very clearly it was -- I thought it
05:39 12    was absurd, but that -- nonetheless that they were
05:39 13    trying to do this, but it was clear that that's
05:39 14    what they would do.
05:39 15          Q.     By what the way, do you remember
05:39 16    the name of the Facebook individual that Nevo
05:39 17    suggested you talk to?
05:39 18          A.     I do not recall it right mow.
05:39 19          Q.     Do you know if it was the same Sam
05:39 20    O'Rourke?
05:39 21          A.     That name sounds familiar, but I
05:39 22    don't -- I know I've heard that name.
05:39 23          Q.     Why did you -- The third sentence
05:39 24    says, "We need to address the scraping argument and
05:39 25    the soliciting log in credentials"?
```

313

```
05:50  1         A.    Yes.  We were -- We were live all
05:50  2   the way until we voluntarily took it down once --
05:50  3   once the communications once it broke down we made
05:50  4   a decision that we'll voluntarily take it down and
05:50  5   we'll implement Facebook Connect anyway, even
05:50  6   though Facebook was being very, you know, difficult
05:50  7   to work with we said -- we made the decision that
05:50  8   we'll go ahead and implement Facebook Connect.  It
05:50  9   was not going to happen -- it was not a simple --
05:50 10   We realized that it was not going to happen in a
05:50 11   simple way, but we did take it down and we launched
05:50 12   Facebook Connect which you're probably aware of
05:50 13   that we did turn on Facebook Connect.
05:50 14         Q.    Did fate Facebook block access to
05:51 15   its site?
05:51 16         A.    To what?
05:51 17         Q.    At any point, did you become aware
05:51 18   that Facebook was attempting to block access from
05:51 19   Power to the site?
05:51 20         A.    I don't know if they were --
05:51 21   Obviously, we expected that they would but he we
05:51 22   also know that our system doesn't get blocked
05:51 23   because there's nothing -- there's nothing it's
05:51 24   technically doing.  It's just users accessing the
05:51 25   site so that it can't really be blocked.  The
```

323

```
05:51  1   system can't be -- you can't -- Unless you want to
05:51  2   block your users from entering your site, Power's
05:51  3   technology is just implementing -- just emulating
05:51  4   what users are wanting to do, so there was no
05:51  5   really conversation about whether they were going
05:51  6   to be blocked.  We know that they would try, but we
05:51  7   also know that it was built to -- it would not be
05:51  8   blockable.
05:51  9          Q.      You see in the final page there's
05:51 10   a reference, second page, "We did study Digsby and
      11   others and saw the changes they made to their UI to
05:52 12   implement Facebook Connect"?
05:52 13          A.      Yes.
05:52 14          Q.      Do you know what Digsby is?
05:52 15          A.      Digsby was a company that Facebook
05:52 16   was aggressively threatening legally that was
05:52 17   aggregating accounts.
05:52 18          Q.      Do you know if -- When you say "we
05:52 19   did study Digsby" what study was made of Digsby?
05:52 20          A.      We evaluated what they -- what
05:52 21   they originally did and then how they implemented
05:52 22   Facebook Connect and just to -- because we knew at
05:52 23   that time it was a -- one of the many, many, sites
05:52 24   that Facebook was threatening.
05:52 25          Q.      Is there any document reflecting
```

324

CERTIFICATION

I, PATRICIA MULLIGAN CARRUTHERS, a Certified Shorthand Reporter and Notary Public of the State of New Jersey and a Notary Public of the State of New York, do hereby certify that prior to the commencement of the examination the witness was sworn by me to testify as to the truth, the whole truth, and nothing but the truth.

I do further certify that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place, and on the date hereinbefore set forth.

I do further certify that I am neither of counsel nor attorney for any party in this action and that I am not interested in the event nor outcome of this litigation.

*Patricia M. Carruthers*
Patricia Mulligan Carruthers, CSR
Certificate No. XI00780
Notary Public of the State of New York
Notary Public of the State of New Jersey

Dated: JULY 27, 2011

My commission expires October 28, 2015 (N.J.)
My commission expires December 21, 2013 (N.Y.)

361

EXHIBIT 100