BURSOR & FISHER, P.A.
L. Timothy Fisher (State Bar No. 191626)
Sarah N. Westcot (State Bar No. 264916)
1990 North California Blvd., Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail: ltfisher@bursor.com
         swestcot@bursor.com

BURSOR & FISHER, P.A.
Scott A. Bursor (State Bar No. 276006)
369 Lexington Avenue, 10th Floor
New York, NY  10017
Telephone:  (212) 989-9113
Facsimile:   (212) 989-9163
E-Mail: scott@bursor.com

BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER, LLP
Alan R. Plutzik (State Bar No. 077785)
2125 Oak Grove Road, Suite 120
Walnut Creek, CA  94598
Telephone:  (925) 945-0200
Facsimile:   (925) 945-8792
E-Mails: aplutzik@bramsonplutzik.com

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FACEBOOK, INC.,<br><br>                      Plaintiff,<br><br>-against-<br><br>POWER VENTURES, INC. d/b/a POWER.COM, a California corporation; POWER VENTURES, INC. a Cayman Island Corporation, STEVE VACHANI, an individual; DOE 1, d/b/a POWER.COM, an individual and/or business entity of unknown nature; DOES 2 through 25, inclusive, individuals and/or business entities of unknown nature,<br><br>                      Defendants. | Case No. 5:08-CV-05780 JW<br><br>**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO FACEBOOK'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT 1 (CAN-SPAM ACT, 15 U.S.C § 7704)**<br><br>Date: January 23, 2012<br>Time: 9:00 a.m.<br>Courtroom 9 – 19th Floor<br>Chief Judge James Ware |

# TABLE OF CONTENTS

**PAGE(S)**

I.   INTRODUCTION ....................................................................................................................1

II.  FACTUAL BACKGROUND ................................................................................................2

III. THE RULE 56 SUMMARY JUDGMENT STANDARD .....................................................3

IV.  THE CAN-SPAM ACT..........................................................................................................4

V.   THE COURT SHOULD DENY FACEBOOK'S MOTION FOR
     SUMMARY JUDGMENT ON ITS CAN-SPAM ACT CLAIM...........................................5

     A.   Defendants Did Not "Initiate" Any Of The Email Messages....................................5

     B.   Power Did Not Procure Anyone To Send The Email Messages .............................11

     C.   The Email Messages Did Not Contain Materially False Or
          Misleading Headers ..................................................................................................11

     D.   Facebook Was Not "Adversely Affected By" The Email Messages .......................14

     E.   Trebling of Damages Is Inappropriate......................................................................16

VI.  CONCLUSION .....................................................................................................................17

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*ASIS Internet Servs. v. Azoogle.com, Inc.*,
   357 Fed.Appx. 112 (9th Cir. 2009) .................................................................................... 15

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
   504 U.S. 451 (1992) ............................................................................................................ 4

*Fonteno v. Upjohn*,
   780 F.2d 1190 (5th Cir. 1986) ............................................................................................ 4

*Gordon v. Virtumundo, Inc.*,
   575 F.3d 1040 (9th Cir. 2009) ............................................................................ 2, 5, 14, 15

*Neely v. St. Paul Fire and Marine Insur. Co.*,
   584 F.2d 341 (9th Cir. 1978) ............................................................................................ 12

*Nelson v. City of Davis*,
   571 F.3d 924 (9th Cir. 2009) .............................................................................................. 4

*Nissan Fire & Marine Ins. Co. v. Fritz*,
   210 F.3d 1099 (9th Cir. 2000) ........................................................................................ 3, 4

*T. W. Electrical Services, Inc. v. Pacific Electrical Contractors Ass'n*,
   809 F.2d 626 (9th Cir. 1987) .............................................................................................. 4

*U.S. v. Diebold*,
   369 U.S. 654 (1962) ............................................................................................................ 4

*United States v. Perry*,
   431 F.2d 1020 (9th Cir. 1970) ............................................................................................ 4

**STATUTES**

15 U.S.C. § 7702(a)(9) ............................................................................................................ 10

15 U.S.C. § 7704 ............................................................................................................. Passim

15 U.S.C. § 7704(a)(1) .............................................................................................................. 5

15 U.S.C. § 7706(g)(1) .............................................................................................................. 5

Fed. R. Civ. P. 56(c) ................................................................................................................. 3

**TREATISE**

10A Charles Alan Wright, Arthur R. Miller and Mary Kay Kane,
   *Federal Practice and Procedure* § 2727 (3d ed. 1998) ..................................................... 4

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO FACEBOOK'S MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 5:08-CV-05780 JW

ii

Defendants Power Ventures, Inc. ("Power") and Steve Vachani respectfully submit this memorandum of points and authorities in opposition to Facebook's Motion for Partial Summary Judgment on Count 1 (CAN-SPAM Act, 15 U.S.C § 7704).

## I. INTRODUCTION

Facebook moves for summary judgment on its claim under the CAN-SPAM Act, but Facebook's motion is built on a foundation of sand. Facebook's entire motion is premised on the false claim that defendants "sent at least 60,627 messages to Facebook users." Facebook's Motion at 1. The truth is that Power did not send a single one of those messages. Declaration of Steve Vachani at ¶ 18. Facebook sent all of those messages. *Id.* The messages came from Facebook's servers and identify Facebook as the party who sent the email. *Id.* The messages included a closing signature from "The Facebook Team." *Id.* The return address is Facebook's address. *Id.*

The email messages also do not include any false or misleading headers. The messages correctly stated that they were initiated by Facebook. Indeed, Facebook's in-house counsel Craig Clark admitted at his deposition that the "from" line and other contents of the emails were "automatically generated by Facebook's computers." *See* Clark Dep. at 68:10-69:25, Fisher Decl. Exh. A ("That 'from' line was automatically generated by Facebook's computers. . . ."); *id.* at 87:12-88:4 ("'Thanks, The Facebook Team' is appended to the email by Facebook itself"); *see also* Vachani Decl. ¶ 18 ("Facebook appends that very same text to every e-mail communication it sends after an event is created."). Power had no control over the content of the messages. Vachani Decl. at ¶ 20. Tellingly, Facebook has failed to identify even a single person who was in any way misled by any of the email messages. *Id.* at ¶ 21.

Finally, Facebook fails to demonstrate how it has been "adversely affected" in any way by the messages. At his deposition, Mr. Clark admitted that Facebook was not harmed by anything Power did. *See* Clark Dep. at 116:14-18, Fisher Decl. Exh. A ("Q: Can you identify anything that Power did that caused Facebook to lose money? . . . A. I can't answer that."); *see also id.* at 117:18-25 ("Q. Are you aware of any document concerning any injury that Facebook suffered as a

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO FACEBOOK'S MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 5:08-CV-05780 JW

1

result of the events described in the First Amended Complaint?  Just the existence of a document.  A. I don't know.  Q. As you sit here today, you couldn't identify any document that would relate to that?  A. No, I don't believe I can.").  In its motion, Facebook devises some vague and immeasurable "harms" that it supposedly suffered but fails to demonstrate that those "harms" are even redressable under the CAN-SPAM Act.  *See Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1053-54 (9th Cir. 2009) (holding that a plaintiff in a CAN-SPAM case must prove more than "ordinary inconveniences" or "the mere annoyance of spam and greater than the negligible burdens typically borne" by an ISP in the "ordinary course of business.").

Facebook's motion is long on accusations and bluster, but short on undisputed facts.  The Court should deny Facebook's motion for summary judgment on its CAN-SPAM Act claim.

## II.     FACTUAL BACKGROUND

Beginning in 2006, defendant Power operated a website known as Power.com, which allowed users to access various social networking websites (*e.g.* MySpace and Orkut) in one place.  Declaration of Steve Vachani at ¶ 2.  Specifically, Power created a browser that allowed users to login and access all of their various social networking accounts at once.  *Id.* at ¶ 3.  Users could update their photos, messages, music, and videos, and these updates would be portable across various social networking sites.  *Id*.  For approximately two months from December 2008 through January 2009, Power offered Facebook users the ability to connect to Facebook through Power's browser.  *Id*. at ¶ 4.

Power ran a contest during this time to promote the launch of its Facebook support (the "Launch Promotion").  *Id.* at ¶ 5.  The Launch Promotion offered $100 to the first 100 people who referred 100 new Power.com users.  *Id.*  To participate, Power users would see a button on the Power.com website stating, "First 100 people who bring 100 new friends to Power.com win $100.  Join now!"  *Id.* at ¶ 6.  There was a checkbox that said, "Share with friends through events."  *Id.*  Power users were then presented with the options "Yes, I do!" or "No, thanks."  *Id.*  If the box authorizing the event was checked and Power users clicked "Yes, I do!," the user's friends were

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO FACEBOOK'S MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 5:08-CV-05780 JW

2

then invited to attend the launch promotion event. *Id.* at ¶ 7. If a Power user chose not to participate, he or she had four opportunities to decline: by ignoring the Launch Promotion notice, by unchecking the box authorizing the creation of a Facebook event, by clicking "No, thanks," or by clicking the "X" in the corner of the Launch Promotion to close the offer. *Id.* at ¶ 8. If a Facebook user authorized PowerScript to create the event, Facebook then automatically sent an email notification to everyone who was invited to the Launch Promotion event, which Facebook does whenever a Facebook user is invited to an event. *Id.* at ¶ 9.

In late December 2008, Facebook attempted to prevent Power's users from accessing Facebook through Power.com by blocking one IP ("Internet Protocol") address utilized by Power.[1] *Id.* at ¶ 10. This IP block was ineffective because Facebook blocked only one outdated IP address Power had used, and did not block other IPs that Power was using in the normal course of business. *Id.* at ¶ 11. After it became aware of the attempted IP blocking, Power undertook efforts to implement Facebook Connect[2] as Facebook had requested. *Id.* at ¶ 12. Negotiations between Power and Facebook over the implementation of Facebook Connect broke down, and Power voluntarily shut down its Facebook integration completely in early 2009. *Id.* at ¶ 13.

Power never made any additional attempts to connect to Facebook in any way. *Id.* at ¶ 14. Power shut down the Power.com website in April, 2011. *Id.* at ¶ 15.

III. **THE RULE 56 SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate where "there is no issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co. v. Fritz*, 210 F.3d 1099, 1102 (9th Cir. 2000)

---

[1] An IP address is simply a numeric label that is assigned to devices participating in a computer network, including web servers and other types of computers. Vachani Decl. at ¶ 10. For example, the IP address for the Facebook.com web server is 66.220.149.11 as of November 26, 2011. *Id.*

[2] Facebook Connect is a platform designed by Facebook that allows third party websites to connect to Facebook. Vachani Decl. at ¶ 12.

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO FACEBOOK'S MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 5:08-CV-05780 JW

3

(*citing* 10A Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, *Federal Practice and Procedure* § 2727 (3d ed. 1998)).

To meet its burden of production, Facebook must produce evidence of every factual element of its claim and must also demonstrate that there is no genuine issue as to any of those facts. *See Fonteno v. Upjohn*, 780 F.2d 1190, 1194 (5th Cir. 1986) (holding when a plaintiff moves for summary judgment on an issue upon which he bears the burden of proof, "he must establish beyond peradventure all of the essential elements of the claim to warrant judgment in his favor"). The court must accept all of the nonmoving party's direct evidence as true. *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 457, 112 S.Ct. 2072, 2077 (1992). The "district court has the responsibility to construe all facts in the light most favorable to the non-moving party." *Nelson v. City of Davis*, 571 F.3d 924, 928 (9th Cir. 2009). All ambiguities or questions of credibility are to be resolved against the moving party. *U.S. v. Diebold*, 369 U.S. 654 (1962). "[I]f a rational trier of fact might resolve the issue in favor of the nonmoving party, summary judgment must be denied." *T. W. Electrical Services, Inc. v. Pacific Electrical Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). Even where the underlying facts are undisputed, "[s]ummary judgment should not be granted where contradictory inferences may be drawn from undisputed evidentiary facts." *United States v. Perry*, 431 F.2d 1020, 1022 (9th Cir. 1970).

"If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything . . . [and] may defeat the motion for summary judgment without producing anything." *Nissan Fire*, 210 F.3d at 1102. If, however, a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense. *Id.*

## IV. THE CAN-SPAM ACT

Facebook seeks summary adjudication of its claim under the CAN-SPAM Act, which was enacted in response to mounting concerns associated with the rapid growth of spam emails.

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO FACEBOOK'S MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 5:08-CV-05780 JW

4

*Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1047 (9th Cir. 2009). The Act does not prohibit spam outright, but rather provides a code of conduct to regulate commercial email messaging practices. *Id.* at 1047-48. It prohibits practices such as transmitting messages with "deceptive subject headings" or "header information that is materially false or materially misleading." *Id.* at 1048. The Act also imposes requirements regarding the content, format, and labeling of email messages. *Id.* Each one of the substantive prohibitions of the CAN-SPAM Act makes it unlawful to "initiate" the transmission of prohibited commercial electronic mail messages. *See, e.g.*, 15 U.S.C. § 7704(a)(1) ("It is unlawful for any person to initiate the transmission . . . of a commercial electronic mail message . . . that contains . . . header information that is materially false or materially misleading."). Congress provided a "limited private right of action" for any "provider of Internet access service adversely affected" by a violation of the Act. 15 U.S.C. § 7706(g)(1); *see also Gordon*, 575 F.3d at 1048.

### V. THE COURT SHOULD DENY FACEBOOK'S MOTION FOR SUMMARY JUDGMENT ON ITS CAN-SPAM ACT CLAIM

#### A. Defendants Did Not "Initiate" Any Of The Email Messages

Facebook argues that defendants violated the Act because they supposedly "initiated at least 60,627 messages that contained materially misleading header information and failed to disclose that defendants had paid for their initiation." Facebook's Motion at 12. But neither Power nor Vachani initiated any of the 60,627 messages referenced in Facebook's motion. In fact, Facebook initiated each and every one of those messages.

The messages at issue were disseminated as part of Facebook's "event creation" process. *Id.* (Facebook's acknowledgement that all of the messages were "Event-related messages"). Facebook allows its users to create "events" and invite their friends to attend. Vachani Decl. at ¶ 16. Here is how the "event creation" process works. First, a Facebook user creates the event using this screen:

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO FACEBOOK'S MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 5:08-CV-05780 JW

5



*Id*. at ¶ 17.  Second, the Facebook user selects which friends should be invited to the event using this screen:



DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO FACEBOOK'S MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 5:08-CV-05780 JW

6

*Id.*  Third, after the user has created the event and selected which friends to invite, Facebook sends the invitations by email:



*Id.*

The emails Facebook is complaining about were sent by Facebook.  *Id.*; *see also* Pollock Dep. at 107:3-21, Exh. B to the Fisher Decl. ("I'm aware that there was a discussion over the origination of the invites.  But my understanding was, is that the invites were originated by Facebook and Facebook users.").  The messages came from Facebook's servers and identify Facebook as the party who sent the email. Vachani Decl. at ¶ 18.  The return address is Facebook's address.  *Id.*  This is true for all 60,627 emails referred to by Facebook in its motion.  Facebook determines the address that appears in the "From:" field.  *Id.*  Facebook also adds the closing signature from "The Facebook Team."  *Id.*  Neither Power nor its users have any control over these elements of the email message.  *Id.*  All of the content in these email messages that Facebook alleges to be misleading and false was written and appended to the message by Facebook.  *Id.*

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO FACEBOOK'S MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 5:08-CV-05780 JW

7

Facebook appends that very same text to every email communication it sends after an event is created. *Id.*

"The specific email referenced in Facebook's complaint was generated by Facebook as a result of a Facebook user named 'Nik' creating an event and selecting the friends to invite." *Id*. at ¶ 19. "It was Nik, not Power, that logged on to Facebook and created the event." *Id.* "It was Nik, not Power, that chose the friends he wished to invite." *Id.* "Nik could only send the invitation to other Facebook members who had agreed to 'friend' Nik, and thus had expressly agreed to receive communications from Nik." *Id.* "Facebook then sent an email to those friends on Nik's behalf." *Id.* "Power did not initiate this message. Power did not select the recipients to whom it was sent. And Power had no control over the content of the message or the header information. Only Facebook did." *Id.* Power did not transmit any email message to any Facebook account. *Id.* Nor did Power make available any utility that would enable a user to transmit such messages. *Id.*

The deposition testimony of Facebook's in-house counsel Craig Clark confirms the emails were sent by Facebook and could not have been sent by Power:

> Q: All right. So let me focus in on just the "from" line. Okay? The one-and-only party that has any control over the content of that line is Facebook itself; isn't that true?
>
> MR. CHATTERJEE: Speculation.
>
> THE WITNESS: As I said, I'm not sure. I believe so, but I'm not sure.
>
> MR. BURSOR: Q. If Power wanted to change that line just to say "From: Power," they have no ability to do that; isn't that true?
>
> MR. CHATTERJEE: Speculation.
>
> THE WITNESS: I don't believe anybody would draft this. This would be an automated part of the email creation that would occur when somebody initiated the transmission of a message. Right. So, I mean, there's nobody sitting there typing the "from" line.
>
> …
>
> Q: That "from" line was automatically generated by Facebook's computers; right?

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO FACEBOOK'S MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 5:08-CV-05780 JW

8

> THE WITNESS:  *Automatically generated by Facebook's computers or their systems*, based on a prompt from somebody outside.  Right.  Could be a user.  Could be whoever – whoever's creating the event.

Clark Dep. at 68:10-69:25, Fisher Decl. Exh. A (emphasis added).

> Q: And then do you see in the body of the message it says "Nik invited you"?
>
> A: Mm-hmm, yes.
>
> Q: Who's Nik?
>
> A: I don't know.
>
> Q: Did Nik initiate this message?
>
> MR. CHATTERJEE:  Speculation.
>
> A: I don't know who Nik is, so I don't know if Nik initiated this message.

*Id.* at 74:16-75:6.

> Q: You see at the bottom of the page where it says "Thanks, The Facebook Team"?
>
> A: Mm-hmm.
>
> Q: Yes?
>
> A: Yes.
>
> Q: Who wrote that?
>
> MR. CHATTERJEE:  Speculation.
>
> THE WITNESS:  I don't know.
>
> MR. BURSOR:  Didn't Facebook itself write that?
>
> MR. CHATTERJEE:  Same objections.
>
> THE WITNESS:  I don't know.
>
> MR. BURSOR:  Q.  Isn't it true that Facebook appends that very same text to every e-mail communication it sends after an event is created?
>
> MR. CHATTERJEE:  Same objection.  Speculation.

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO FACEBOOK'S MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 5:08-CV-05780 JW

9

THE WITNESS:  I don't know.

*Id.* at 87:12-88:4; *see also* Vachani Decl. ¶ 18 ("Facebook appends that very same text to every email communication it sends after an event is created.").

Q: So you see where it says "Nik invited you to the event"?  See that?

…

Q: Can you focus in on that?

A: I can focus in on that, yes.

Q: Who wrote that?

MR. CHATTERJEE:  Speculation.

THE WITNESS:  I don't recall – or I don't know.

MR. BURSOR:  Q.  Who would know the answer to that?

A: Again, I believe the header information, as with other elements of this message, would have been ***auto-generated***.  So as far as "write this," I don't know [who] would write this.

Q: It would have been auto-generated by whom?

MR. CHATTERJEE:  Vague.

THE WITNESS:  By the system that was called to send out the invitation.

MR. BURSOR:  Q.  What system is that?

A: ***That would probably be Facebook's system***.

Clark Dep. at 98:18-99:25, Fisher Decl. Exh. A (emphasis added); *see also id.* at 101:7-102:20 (describing the event-creation process).

Power did not initiate those emails.  The CAN-SPAM Act defines the term "initiate" as meaning "to originate or transmit [a commercial electronic mail message] or to procure the origination or transmission of such message."  15 U.S.C. § 7702(a)(9).  In light of the evidence above, there can be no question that Power did not initiate any of the 60,627 messages at issue in this case.  Facebook, not Power, originated and transmitted those messages.  Power had no

capability to send those messages and had no knowledge which Facebook users created the events that led to the dissemination of the messages at issue in this case.

### B.     Power Did Not Procure Anyone To Send The Email Messages

Knowing that defendants could not possibly have sent the email messages, Facebook asserts a new theory in its summary judgment motion, claiming for the first time that Power "procured" others to send the messages.  Facebook's Motion at 12-14 ("Additionally, Defendants are liable for initiation for messages because of the monetary incentive they offered their users to recruit Facebook users.").  Facebook asserts that defendants are liable under the "procurement" theory because they offered $100 to any Facebook user who successful invited 100 other Facebook users to sign up for Power.com.  Facebook's Motion at 12-13.

Facebook's "procurement" theory is dead on arrival, however.  That argument directly contradicts Facebook's prior contention that Power, not Facebook or its users, sent the email messages.  *See id.* at 12 ("Defendants initiated the transmission of commercial electronic messages to Facebook users in violation of the CAN-SPAM Act.").   As shown above, Facebook sent the messages, not Power.  No one else but Facebook could possibly have transmitted the messages, and there is no evidence that Power gave any consideration to Facebook to procure transmission of the messages.  Moreover, Facebook users did nothing other than create events and invite their friends to join Power.  The emails at issue were sent by Facebook.

### C.     The Email Messages Did Not Contain Materially False Or Misleading Headers

Facebook argues that the email messages at issue "inserted misleading information regarding who initiated the transmission of the messages."  Facebook's Motion at 15.  Once again, Facebook is wrong.  Section 7704(a)(1) of the CAN-SPAM Act prohibits commercial electronic mail messages with "header information that is materially false or materially misleading."  There was no violation of this section because the header information on the email was accurate and showed that Facebook had sent the messages.  Vachani Decl. ¶ 18 ("The messages came from Facebook's servers and identify Facebook as the party who sent the email.  The return address is

Facebook's address. This is true for all 60,627 emails referred to by Facebook in its motion. Facebook determines the address that appears in the 'From:' field."). The "from" line and other contents of the email were "automatically generated by Facebook's computers" and were also accurate and not misleading. *See* Clark Dep. at 68:10-69:25, Fisher Decl. Exh. A ("That 'from' line was automatically generated by Facebook's computers. . . ."); *id.* at 87:12-88:4 ("'Thanks, The Facebook Team' is appended to the email by Facebook itself"); Vachani Decl. ¶ 18 ("Facebook appends that very same text to every e-mail communication it sends after an event is created.").

Furthermore, even if those aspects of the messages were misleading in any way – and there is no evidence they were – "Power had no control over them." Vachani Decl. ¶ 20. "They were auto-generated by Facebook and Power could not have changed them if it wanted to." *Id.*; *see also* Clark Dep. at 68:10-69:25, Fisher Decl. Exh. A ("Q: . . . The one-and-only party that has any control over the content of that line is Facebook itself; isn't that true? A: . . . I believe so. . . .") (objection omitted). Thus, Facebook itself, and not Power, was the "but-for" cause, proximate cause, and superseding intervening cause of any misleading header information or other content. *See, e.g.*, *Neely v. St. Paul Fire and Marine Insur. Co.*, 584 F.2d 341, 345-46 (9th Cir. 1978).

Facebook has also failed to offer any evidence that anyone was misled at all. Facebook was unable to identify anyone who was misled by the events described in the complaint and was unable to produce any documents evidencing anyone being misled. *See* Fisher Decl. Exhs. C and D (Facebook's responses to Power's document requests and interrogatories); Clark Dep. at 58:5-7, Fisher Decl. Exh. A ("Q: Can you tell me the name of anyone that was misled by this message? A: I can't."). Since no one was misled, no one complained:

> Q: Have you ever seen a document concerning a Facebook user complaining about something that Power did on Facebook?
>
> A: I don't believe so.

Clark Dep. at 51:18-21, Fisher Decl. Exh. A.

> Q: You see [document request] 3 asks for any complaints Facebook users made as a result of the events described in Facebook's First Amended Complaint? You see that?

| | | |
|---|---|---|
| A: | I see that. | |
| Q: | But you've never seen any documents like that; right? | |
| MR. CHATTERJEE: | Overly broad. Vague. | |
| THE WITNESS: | Again, there are documents I've seen that may be responsive to this category. If you're asking if I've seen any specific complaints about Power.com, I have not. | |
| Q: | Have you seen general complaints about Power.com? | |
| A: | No. | |
| Q: | All right. So you haven't seen any specific complaints and you haven't seen any general complaints. What kind of complaints have you seen? | |
| A: | I've not seen any complaints regarding Power.com based on my preparation for this deposition or otherwise. | |

*Id.* at 121:6-25.

Mr. Vachani's testimony is in accord with Mr. Clark's. Mr. Vachani states that, "Like Facebook, Power also has not received a single complaint from a Facebook user about any of the events described in Facebook's complaint. No one complained to Power about the email referenced in ¶ 92 of Facebook's complaint. Nor has anyone complained to Power about any of our activities related to Facebook. Nor has anyone claimed to have been misled by anything we did." Vachani Decl. ¶ 21.

There is a simple explanation why nobody was misled: Facebook sends similar email notifications every hour of every day. By default, every time a Facebook user is invited to an event, he or she receives an email notification. Facebook does not contend that any of its other email notifications have misleading headers. Facebook does not contend that any of its 800 million active users[3] violate the CAN-SPAM Act when they create events. Here, Facebook now contends that its email notifications are misleading when Power users create events. This is arbitrary.

---

[3] "People on Facebook: More than 800 million active users. More than 50% of our active users log on to Facebook in any given day." Statistics, http://www.facebook.com/press/info.php?statistics (last accessed Nov. 30, 2011).

### D. Facebook Was Not "Adversely Affected By" The Email Messages

Facebook argues that it was "adversely affected" by the email messages and seeks to recover more than $18 million in statutory damages. Prior to filing its summary judgment motion, Facebook was unable to produce any document evidencing any loss to, or expenditure by, Facebook. *See* Fisher Decl. Exhs. C and D. Mr. Clark then admitted that Facebook has no evidence that it suffered any damage or loss:

> Q: Can you identify anything that Power did that caused Facebook to lose money?
>
> A: Same answer.
>
> Q: You can't answer?
>
> A: I can't answer that.

Clark Dep. at 116:14-18, Fisher Decl. Exh. A.

> Q: Are you aware of any document concerning any injury that Facebook suffered as a result of the events described in the First Amended Complaint? Just the existence of a document.
>
> A: I don't know.
>
> Q: As you sit here today, you couldn't identify any document that would relate to that?
>
> A: No, I don't believe I can.

*Id.* at 117:18-25.

Despite its discovery responses and Mr. Clark's deposition testimony, Facebook now claims significant adverse effects including time spent by its engineers and lawyers as well as damage to Facebook's reputation and goodwill. Facebook's Motion at 11. None of these "harms" are redressable under the CAN-SPAM Act. The Act does not list specific examples of harm that satisfy the "adversely affected" requirement. *Gordon*, 575 F.3d at 1053. "At minimum, however, the harm must be both *real and of the type experienced by ISPs*." *Id.* (emphasis added) (affirming summary judgment dismissal of CAN-SPAM claims based on plaintiff's lack of standing for failure to show an adverse effect from the alleged statutory violations). It must go beyond

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO FACEBOOK'S MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 5:08-CV-05780 JW

14

1  "ordinary inconveniences" or "the mere annoyance of spam and greater than the negligible burdens
2  typically borne" by an ISP in the "ordinary course of business." *Id.* at 1054.  Thus, the harms
3  redressable under CAN-SPAM should reflect those types of harms "uniquely encountered by" ISPs
4  including "network crashes, higher bandwith utilization, and increased costs for hardware and
5  software upgrades, network expansion and additional personnel." *Id.* at 1054.  For example,
6  "evidence of some combination of operational or technical impairments and related financial costs
7  attributable to unwanted commercial e-mail would suffice." *Id*.  However, the ordinary costs and
8  burdens associated with operating an Internet access service do not constitute harm upon which a
9  plaintiff can rest its claim.  *See id.*

10  The supposed "harms" identified by Facebook do not meet this standard and clearly fall
11  with the category of the "negligible burdens typically borne by an [ISP] in the ordinary course of
12  business.  Facebook did not submit evidence demonstrating network crashes or other harm relating
13  to bandwidth utilization, hardware, network integrity or overhead costs.  *See Gordon*, 575 F.3d at
14  1055-56.  All of the "harms" identified by Facebook's security manager Ryan McGeehan are
15  vague and lacking in any sort of specificity.  Mr. McGeehan identifies no unusual or extraordinary
16  cost that Facebook incurred.  *See ASIS Internet Servs. v. Azoogle.com, Inc.*, 357 Fed.Appx. 112,
17  113-114 (9th Cir. 2009) (holding ISP was not adversely affected by CAN-SPAM violations and
18  lacked standing to sue where ISP argued harm based on employee time devoted to spam issues).  In
19  fact, everything described by Mr. McGeehan sounds like the sort of thing that Facebook deals with
20  all the time.  ██████████████████████████████████████████
21  ██████████████████████████████████████████
22  ██████████████████████████████████████ Facebook
23  also attempts to claim its legal bills as part of its supposed "harm."  Facebook fails to identify any
24  authority supporting the recovery of legal bills under such circumstances or how its legal costs
25  associated with its dispute with Power are recoverable under the Act.

### E. Trebling of Damages Is Inappropriate

Facebook argues trebling of damages is warranted because Power willfully and knowingly violated the CAN-SPAM Act when it "initiated at least 60,627 electronic mail messages." Facebook's Motion at 16. Facebook does not cite any case in which a court has ever awarded treble damages under the Act. Moreover, as demonstrated above, the messages were sent by Facebook through its own mail servers, have Facebook listed as the return address, and correctly identify Facebook as the sender. Vachani Decl. at ¶ 18, 20.

Facebook then contends that Power "destroyed key evidence about the PowerScript operation." Facebook's Motion at 16. That is not true. Power did not destroy any evidence. When Power.com shut down in April 2011, Power preserved its files by transferring them to an online backup. Power's Supplemental Responses to Facebook's Interrogatories No. 21, Fisher Decl. Exh. F. Nearly every file was preserved, but one database file was over 100 GB, which was too large to feasibly be transferred. *Id.* This file did not contain critical user data, such as profiles, personal information, settings, or passwords. *Id.* Instead, it logged the activities of Power's servers. *Id.* For this reason, Power necessarily omitted this file from its backup. *Id.*

Facebook finally argues that Power "harvested" the login "credentials of affected users to gain access to all their friends' contact details and to send unsolicited promotional messages to those contacts." Facebook's Motion at 17. That is also inaccurate. Power's users chose to enter their own valid usernames and passwords to use Power's browser. Vachani Decl. at ¶ 22 ("Power merely offered users a different and potentially superior browser through which they could access their Facebook accounts to copy, update, and/or port their own 'User Content.' And users did so by entering their won valid usernames and passwords, which Power never copied or stored for any purpose."). Moreover, users exercised control over the event creation process. *Id.* at ¶ 6-8. Users were given the option of creating an event, and they had numerous opportunities to decline. *Id*. Facebook may be dissatisfied that some users accessed its website through Power's browser, but Power did not harvest login data for the purpose of sending unsolicited commercial messages.

## VI. CONCLUSION

Facebook has completely failed to satisfy its burden of providing factual evidence in support of every element of its claim under the CAN-SPAM Act. In fact, Facebook has failed to show that Power initiated the email messages at issue, that the messages contained any false or misleading information, or that Facebook was "adversely affected" by anything Power did. The Court should deny Facebook's motion for summary judgment.

Dated:  December 2, 2011                              BURSOR & FISHER, P.A.


                                                     By:_____/s/_____
                                                              L. Timothy Fisher

                                                     BURSOR & FISHER, P.A.
                                                     L. Timothy Fisher (State Bar No. 191626)
                                                     Sarah N. Westcot (State Bar No. 264916)
                                                     1990 North California Blvd., Suite 940
                                                     Walnut Creek, CA  94596
                                                     Telephone:  (925) 300-4455
                                                     Facsimile:   (925) 407-2700
                                                     E-Mail:  ltfisher@bursor.com
                                                                  swestcot@bursor.com

                                                     BURSOR & FISHER, P.A.
                                                     Scott A. Bursor (State Bar No. 276006)
                                                     369 Lexington Avenue, 10th Floor
                                                     New York, NY  10017
                                                     Telephone:  (212) 989-9113
                                                     Facsimile:   (212) 989-9163
                                                     E-Mail:  scott@bursor.com

                                                     BRAMSON, PLUTZIK, MAHLER &
                                                     BIRKHAEUSER, LLP
                                                     Alan R. Plutzik (State Bar No. 77785)
                                                     2125 Oak Grove Road, Suite 120
                                                     Walnut Creek, CA  94598
                                                     Telephone:  (925) 945-0200
                                                     Facsimile:   (925) 945-8792
                                                     E-Mail: aplutzik@bramsonplutzik.com

                                                     Attorneys for Defendants Power
                                                     Ventures, Inc. and Steve Vachani