# EXHIBIT 3

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

--oOo--

| | |
|---|---|
| FACEBOOK, INC., a Delaware corporation, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) Case No. ) C-08-05780-FJ ) |
| POWER VENTURES, INC. d/b/a POWER.COM, a California corporation; POWER VENTURES, INC., a Cayman Island Corporation; STEVEN VACHANI, an individual; DOE 1, d/b/a POWER.COM, an individual and/or business entity of unknown nature; DOES 2 through 25, inclusive, individuals and/or business entities of unknown nature, | ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |
| _____ | ) |

CONFIDENTIAL DEPOSITION OF

CRAIG CLARK

_____

Thursday, February 17, 2011

Volume 1  (Pages 1 - 135)

REPORTED BY:  ANA M. DUB, RMR, CRR, CSR 7445

(03-433213)

1          CRAIG CLARK

2       _____

3    called as a witness by the Defendants Power

4    Ventures, Inc., and Steven Vachani who, having been

5    first duly sworn, was examined and testified as

6    follows:

7              --oOo--

8       P R O C E E D I N G S                          09:08:12

9          THE VIDEOGRAPHER:  This is the video           09:15:05

10   operator speaking, Jennifer McKay of Merrill Legal    09:15:06

11   Solutions, 225 Varick Street, New York, New York      09:15:09

12   10014.                                                09:15:13

13          Today is February 17th, 2011, and the time    09:15:15

14   is 9:15.  We're at the offices of Orrick Herrington    09:15:19

15   in San Francisco, California, to take the deposition   09:15:23

16   of Craig Clark in the matter of Facebook, Inc. vs.     09:15:26

17   Power Ventures, Inc., in United States District        09:15:30

18   Court, Northern District of California.  The case      09:15:31

19   number is 5:08-CV-05780 JF RS.                         09:15:36

20          Will counsel please introduce themselves       09:15:46

21   for the record.                                        09:15:49

22          MR. CHATTERJEE:  Neel Chatterjee for           09:15:51

23   Facebook.                                              09:15:52

24          MR. BURSOR:  Scott Bursor for the              09:15:53

25   defendants Power Ventures and Steven Vachani.          09:15:55

CONFIDENTIAL
CRAIG CLARK - 2/17/2011

Page 7

| | | |
|---|---|---|
| 1 | A.    I speak with product folks.  I manage some | 09:16:53 |
| 2 | of the motion practice in subpoena cases. | 09:16:58 |
| 3 | Q.    What are subpoena cases? | 09:17:07 |
| 4 | A.    Somebody subpoenas Facebook for records. | 09:17:08 |
| 5 | Q.    How long have you been at Facebook? | 09:17:12 |
| 6 | A.    Since September 2009. | 09:17:13 |
| 7 | Q.    What'd you do before that? | 09:17:15 |
| 8 | A.    I was a lawyer. | 09:17:16 |
| 9 | Q.    Where? | 09:17:18 |
| 10 | A.    White & Case. | 09:17:19 |
| 11 | Q.    Where? | 09:17:23 |
| 12 | A.    Palo Alto. | 09:17:24 |
| 13 | Q.    Okay.  Have you ever held any other | 09:17:29 |
| 14 | position at Facebook besides litigation counsel? | 09:17:32 |
| 15 | A.    No. | 09:17:35 |
| 16 | Q.    Well, let me introduce myself again.  My | 09:17:37 |
| 17 | name's Scott Bursor.  I'm also a lawyer.  I | 09:17:39 |
| 18 | represent the defendants in this lawsuit, Facebook | 09:17:42 |
| 19 | against Power Ventures and Steven Vachani. | 09:17:44 |
| 20 | And I'm going to take your deposition | 09:17:47 |
| 21 | today.  You understand that's what's happening? | 09:17:49 |
| 22 | A.    Yes. | 09:17:52 |
| 23 | Q.    You were a litigator at White & Case? | 09:17:52 |
| 24 | A.    I was. | 09:17:55 |
| 25 | Q.    Yeah.  So you've been involved in many, | 09:17:55 |

CONFIDENTIAL
CRAIG  CLARK - 2/17/2011

Page 23

| | | |
|---|---|---|
| 1 | A.   I understand. | 09:32:42 |
| 2 | MR. CHATTERJEE:  Argumentative. | 09:32:43 |
| 3 | Scott, you know, you don't need to argue | 09:32:43 |
| 4 | with him.  If you want to ask him a question about | 09:32:45 |
| 5 | his factual knowledge, you can.  He wasn't even at | 09:32:48 |
| 6 | the company when this complaint was filed. | 09:32:51 |
| 7 | MR. BURSOR:  Q.  I'm asking a factual | 09:32:54 |
| 8 | question.  Do you understand that Facebook's lawyer | 09:32:56 |
| 9 | wrote this sentence? | 09:32:58 |
| 10 | A.   I do not know who wrote this sentence. | 09:32:59 |
| 11 | Q.   All right.  Sitting here today, is it true | 09:33:01 |
| 12 | that Facebook users may be contacted only by | 09:33:02 |
| 13 | Facebook or other registered Facebook users? | 09:33:05 |
| 14 | A.   I think that you need to read this | 09:33:09 |
| 15 | paragraph in the context with the other paragraphs. | 09:33:12 |
| 16 | But if you're talking about users of the site being | 09:33:14 |
| 17 | contacted through the site, then yes. | 09:33:18 |
| 18 | Q.   So that is true? | 09:33:20 |
| 19 | MR. CHATTERJEE:  Asked and answered. | 09:33:23 |
| 20 | THE WITNESS:  I gave you my answer. | 09:33:24 |
| 21 | MR. BURSOR:  All right.  Can you read back | 09:33:25 |
| 22 | the prior answer, please. | 09:33:33 |
| 23 | (Record read as follows: | 09:33:34 |
| 24 | "ANSWER:  I think that you need to read | 09:33:49 |
| 25 | this paragraph in the context with the | 09:33:49 |

CONFIDENTIAL
CRAIG  CLARK - 2/17/2011

Page 26

| | | |
|---|---|---|
| 1 | MR. BURSOR:  Q.  But that's what I'm | 09:36:12 |
| 2 | asking.  So far as you're aware, there have been no | 09:36:13 |
| 3 | instances where an e-mail from an outside source was | 09:36:16 |
| 4 | transmitted to a user's Facebook account? | 09:36:19 |
| 5 | MR. CHATTERJEE:  Lacks foundation, calls | 09:36:22 |
| 6 | for speculation. | 09:36:23 |
| 7 | THE WITNESS:  I don't know. | 09:36:24 |
| 8 | MR. BURSOR:  Q.  Okay.  Sitting here | 09:36:27 |
| 9 | today, can you identify any instance when that has | 09:36:28 |
| 10 | happened? | 09:36:32 |
| 11 | MR. CHATTERJEE:  Same objections. | 09:36:33 |
| 12 | THE WITNESS:  I cannot. | 09:36:35 |
| 13 | MR. BURSOR:  Q.  So in order for -- | 09:36:40 |
| 14 | A.  Unless . . . | 09:36:43 |
| 15 | There's a message in this complaint. | 09:36:51 |
| 16 | Well, I don't know.  I would be speculating based on | 09:36:57 |
| 17 | my knowledge today, so . . . | 09:37:03 |
| 18 | Q.  All right.  Now, you're familiar with the | 09:37:25 |
| 19 | concept of adding a friend to your profile on | 09:37:26 |
| 20 | Facebook? | 09:37:29 |
| 21 | A.  I don't know what you mean by "familiar." | 09:37:30 |
| 22 | Am I familiar with the code?  Am I familiar with | 09:37:31 |
| 23 | what, what aspect of it? | 09:37:34 |
| 24 | Q.  The user experience. | 09:37:35 |
| 25 | A.  Yeah. | 09:37:36 |

CONFIDENTIAL
CRAIG  CLARK - 2/17/2011

| | | |
|---|---|---|
| 1 | testimony. | 10:04:18 |
| 2 | THE WITNESS:  I remember -- | 10:04:18 |
| 3 | MR. BURSOR:  In terms of documents. | 10:04:18 |
| 4 | MR. CHATTERJEE:  Okay. | 10:04:19 |
| 5 | THE WITNESS:  I remember looking at | 10:04:20 |
| 6 | e-mails. | 10:04:21 |
| 7 | MR. BURSOR:  Q.  What factual information | 10:04:25 |
| 8 | did you garner from the e-mails you looked at? | 10:04:27 |
| 9 | A.  Background details on the investigation of | 10:04:29 |
| 10 | Power.com's activities:  scraping, spamming. | 10:04:31 |
| 11 | Q.  Anything else? | 10:04:46 |
| 12 | A.  Not that I recall. | 10:04:47 |
| 13 | Q.  In the course of your work verifying these | 10:04:51 |
| 14 | interrogatory responses, did you review any | 10:04:58 |
| 15 | documents related to customers -- users of Facebook | 10:05:05 |
| 16 | complaining about Power's activities? | 10:05:09 |
| 17 | A.  I did not. | 10:05:12 |
| 18 | Q.  Have you ever seen a document concerning a | 10:05:15 |
| 19 | Facebook user complaining about something that Power | 10:05:17 |
| 20 | did on Facebook? | 10:05:20 |
| 21 | A.  I don't believe so. | 10:05:25 |
| 22 | Q.  Have you ever had a conversation with | 10:05:25 |
| 23 | anyone inside Facebook about a Facebook user | 10:05:26 |
| 24 | complaining about something that Power did on | 10:05:32 |
| 25 | Facebook? | 10:05:35 |

CONFIDENTIAL
CRAIG CLARK - 2/17/2011

| | | |
|---|---|---|
| 1 | Q.   How do you know that? | 10:10:38 |
| 2 | A.   Because of the message itself.  The | 10:10:38 |
| 3 | message was not -- was initiated by Power and says | 10:10:41 |
| 4 | that it comes from Facebook. | 10:10:48 |
| 5 | Q.   Can you tell me the name of anyone that | 10:10:53 |
| 6 | was misled by this message? | 10:10:54 |
| 7 | A.   I can't. | 10:10:57 |
| 8 | Q.   Have you ever seen a document referring to | 10:10:58 |
| 9 | anyone being misled by this message? | 10:11:00 |
| 10 | A.   Yes. | 10:11:03 |
| 11 | Q.   What was that document? | 10:11:04 |
| 12 | A.   This document. | 10:11:05 |
| 13 | Q.   The Amended Complaint written by | 10:11:06 |
| 14 | Facebook's lawyers? | 10:11:08 |
| 15 | A.   That's -- that's one document. | 10:11:09 |
| 16 | Q.   Okay.  That's one.  Are there any others? | 10:11:11 |
| 17 | A.   Yes.  The e-mail message itself would be | 10:11:14 |
| 18 | an example of a message that is misleading. | 10:11:19 |
| 19 | Q.   Are you aware of any document that could | 10:11:22 |
| 20 | be used to provide the name of anyone who was | 10:11:26 |
| 21 | supposedly misled by this message? | 10:11:29 |
| 22 | MR. CHATTERJEE:  Vague. | 10:11:33 |
| 23 | THE WITNESS:  I believe that anyone who | 10:11:35 |
| 24 | received this message would have been misled. | 10:11:37 |
| 25 | MR. BURSOR:  Q.  So just from the fact | 10:11:39 |

CONFIDENTIAL
CRAIG CLARK - 2/17/2011

Page 68

| | | |
|---|---|---|
| 1 | Q.   Okay.   Isn't it true that the one-and-only | 10:20:55 |
| 2 | party with any control over the content of that | 10:21:01 |
| 3 | header -- you refer to that as a header; right? | 10:21:05 |
| 4 | MR. CHATTERJEE:  Vague. | 10:21:09 |
| 5 | MR. BURSOR:  Q.  When you said "header" | 10:21:10 |
| 6 | earlier today, this is what you were talking about; | 10:21:11 |
| 7 | right? | 10:21:13 |
| 8 | A.   I was talking to all the information that | 10:21:13 |
| 9 | is not the body of the message. | 10:21:15 |
| 10 | Q.   All right.  So let me focus in on just the | 10:21:17 |
| 11 | "from" line.  Okay?  The one-and-only party that has | 10:21:19 |
| 12 | any control over the content of that line is | 10:21:23 |
| 13 | Facebook itself; isn't that true? | 10:21:26 |
| 14 | MR. CHATTERJEE:  Speculation. | 10:21:29 |
| 15 | THE WITNESS:  As I said, I'm not sure.  I | 10:21:30 |
| 16 | believe so, but I'm not sure. | 10:21:33 |
| 17 | MR. BURSOR:  Q.  If Power wanted to change | 10:21:37 |
| 18 | that line just to say "From:  Power," they have no | 10:21:38 |
| 19 | ability to do that; isn't that true? | 10:21:43 |
| 20 | MR. CHATTERJEE:  Speculation. | 10:21:46 |
| 21 | THE WITNESS:  I don't believe they would. | 10:21:48 |
| 22 | MR. BURSOR:  Q.  There's no one at Power | 10:21:50 |
| 23 | that wrote "From:  Facebook <eventmaster . . . ." | 10:21:51 |
| 24 | and the rest of that line; right?  That drafting did | 10:21:56 |
| 25 | not come from anyone at Power? | 10:21:59 |

CONFIDENTIAL
CRAIG  CLARK - 2/17/2011

Page 69

| | | |
|---|---|---|
| 1 | MR. CHATTERJEE:  Speculation. | 10:22:02 |
| 2 | THE WITNESS:  I don't believe anybody | 10:22:03 |
| 3 | would draft this.  This would be an automated part | 10:22:03 |
| 4 | of the e-mail creation that would occur when | 10:22:06 |
| 5 | somebody initiated the transmission of a message. | 10:22:09 |
| 6 | Right.  So, I mean, there's nobody sitting | 10:22:15 |
| 7 | there typing the "from" line. | 10:22:17 |
| 8 | MR. BURSOR:  Q.  Right. | 10:22:21 |
| 9 | A.    That would be part of how e-mail works. | 10:22:22 |
| 10 | Q.    That "from" line was automatically | 10:22:32 |
| 11 | generated by Facebook's computers; right? | 10:22:34 |
| 12 | MR. CHATTERJEE:  Speculation. | 10:22:38 |
| 13 | THE WITNESS:  That's pretty -- excuse me. | 10:22:40 |
| 14 | That's pretty -- I'm sorry. | 10:22:47 |
| 15 | Can you repeat the -- can you read back | 10:22:48 |
| 16 | the question? | 10:22:50 |
| 17 | (Record read as follows: | 10:22:50 |
| 18 | "QUESTION:  That 'from' line was | 10:22:55 |
| 19 | automatically generated by Facebook's | 10:22:55 |
| 20 | computers; right?") | 10:22:55 |
| 21 | THE WITNESS:  Automatically generated by | 10:22:56 |
| 22 | Facebook's computers or their systems, based on a | 10:23:00 |
| 23 | prompt from somebody outside.  Right?  Could be a | 10:23:07 |
| 24 | user.  Could be whoever -- whoever's creating the | 10:23:13 |
| 25 | event. | 10:23:15 |

| | | |
|---|---|---|
| 1 | MR. BURSOR:  Yeah, yeah. | 10:26:27 |
| 2 | THE WITNESS:  Is that -- let's proceed. | 10:26:27 |
| 3 | MR. BURSOR:  Q.  All right.  So you recall | 10:26:28 |
| 4 | saying more than ten times today that Power | 10:26:29 |
| 5 | initiated this message; right? | 10:26:31 |
| 6 | A.  I don't recall how many times it was, but | 10:26:33 |
| 7 | yes, Power initiated this message. | 10:26:35 |
| 8 | Q.  That's part of your story; right? | 10:26:37 |
| 9 | A.  Does that -- | 10:26:41 |
| 10 | MR. CHATTERJEE:  Objection; argumentative. | 10:26:42 |
| 11 | Do you have a question that's actually | 10:26:43 |
| 12 | going to factual knowledge, Scott? | 10:26:44 |
| 13 | MR. BURSOR:  Q.  You see "Subject:  Nik"? | 10:26:47 |
| 14 | You see that? | 10:26:49 |
| 15 | A.  I see it. | 10:26:50 |
| 16 | Q.  And then do you see in the body of the | 10:26:51 |
| 17 | message it says "Nik invited you"? | 10:26:52 |
| 18 | A.  Mm-hmm, yes. | 10:26:54 |
| 19 | Q.  Who's Nik? | 10:26:57 |
| 20 | A.  I don't know who Nik is. | 10:27:00 |
| 21 | Q.  Did Nik initiate this message? | 10:27:02 |
| 22 | MR. CHATTERJEE:  Speculation. | 10:27:04 |
| 23 | THE WITNESS:  I don't know who Nik is, so | 10:27:05 |
| 24 | I don't know if Nik initiated this message. | 10:27:07 |
| 25 | But my understanding is this was initiated | 10:27:09 |

CONFIDENTIAL
CRAIG  CLARK - 2/17/2011

Page 75

| | | |
|---|---|---|
| 1 | on behalf of a user named Nik through Power. | 10:27:13 |
| 2 | MR. BURSOR:  Q.  What's the basis for that | 10:27:17 |
| 3 | understanding? | 10:27:18 |
| 4 | A.   The -- | 10:27:20 |
| 5 | MR. CHATTERJEE:  Attorney-client | 10:27:21 |
| 6 | privilege.  Instruction not to answer. | 10:27:21 |
| 7 | MR. BURSOR:  Q.  Did you rely on that | 10:27:28 |
| 8 | understanding when you signed the verification to | 10:27:29 |
| 9 | the interrogatory responses? | 10:27:31 |
| 10 | A.   What understanding? | 10:27:35 |
| 11 | Q.   The understanding you just testified to, | 10:27:38 |
| 12 | that Power initiated this message. | 10:27:40 |
| 13 | A.   Yes.  That, I believe, underpins | 10:27:43 |
| 14 | everything.  Power initiated the message based on | 10:27:46 |
| 15 | the way it was -- contact importing and scraping -- | 10:27:49 |
| 16 | (Court reporter clarifies.) | 10:27:59 |
| 17 | THE WITNESS:  Contact importing and | 10:27:59 |
| 18 | logging into Facebook on behalf of other people | 10:27:59 |
| 19 | without permission. | 10:28:03 |
| 20 | MR. BURSOR:  Q.  Without whose permission? | 10:28:05 |
| 21 | A.   Without Facebook's permission. | 10:28:08 |
| 22 | Q.   Did they have Nik's permission? | 10:28:09 |
| 23 | A.   Without the user's permission. | 10:28:10 |
| 24 | Q.   Did they have Nik's permission? | 10:28:12 |
| 25 | A.   I don't know who Nik is.  I don't believe | 10:28:14 |

CONFIDENTIAL
CRAIG CLARK - 2/17/2011

| | | |
|---|---|---|
| 1 | Facebook? | 10:32:42 |
| 2 | A.   Ryan McGeehan. | 10:32:44 |
| 3 | Q.   Did you discuss with Ryan McGeehan how | 10:32:46 |
| 4 | this event was created? | 10:32:48 |
| 5 | A.   Yeah.  I believe it was -- I believe that | 10:32:54 |
| 6 | involved counsel as well.  So I may have got it | 10:32:57 |
| 7 | secondhand. | 10:33:01 |
| 8 | Q.   So the only information you have about | 10:33:05 |
| 9 | this message came to you filtered through Facebook's | 10:33:07 |
| 10 | lawyers who are litigating the case; isn't that | 10:33:10 |
| 11 | true? | 10:33:12 |
| 12 | MR. CHATTERJEE:  Object to the form; | 10:33:13 |
| 13 | argumentative. | 10:33:14 |
| 14 | THE WITNESS:  I don't think that's what I | 10:33:16 |
| 15 | said.  But as I wasn't here when the complaint -- I | 10:33:17 |
| 16 | wasn't working at Facebook when the complaint was | 10:33:22 |
| 17 | filed, pretty much, yeah, my knowledge of this | 10:33:24 |
| 18 | Amended Complaint is based on that. | 10:33:27 |
| 19 | MR. BURSOR:  Q.  I'm not asking about your | 10:33:29 |
| 20 | knowledge of the Amended Complaint.  I'm asking | 10:33:31 |
| 21 | about your knowledge of how the event that led to | 10:33:33 |
| 22 | the message in paragraph 70 was created. | 10:33:35 |
| 23 | And you don't have any knowledge about | 10:33:37 |
| 24 | that; right? | 10:33:38 |
| 25 | A.   No, that's not true.  I do have knowledge. | 10:33:40 |

CONFIDENTIAL
CRAIG  CLARK - 2/17/2011

Page 85

| | | |
|---|---|---|
| 1 | produce the documents, we might be able to | 10:35:41 |
| 2 | supplement; but you're asking him -- I don't know | 10:35:43 |
| 3 | what you're asking him about.  He wasn't even at the | 10:35:44 |
| 4 | company when this stuff happened. | 10:35:47 |
| 5 |      MR. BURSOR:  Q.  You made statements that | 10:35:48 |
| 6 | Power scraped from the website; right? | 10:35:49 |
| 7 |     A.   Mm-hmm. | 10:35:51 |
| 8 |     Q.   Yes? | 10:35:52 |
| 9 |     A.   Yes. | 10:35:52 |
| 10 |     Q.   You don't have any basis to make that | 10:35:53 |
| 11 | statement other than what you heard from Facebook's | 10:35:55 |
| 12 | lawyers; isn't that true? | 10:35:57 |
| 13 |     A.   Other than what I heard from Facebook's | 10:36:02 |
| 14 | lawyers. | 10:36:04 |
| 15 |     Q.   Right. | 10:36:04 |
| 16 |     A.   I don't -- no.  I have basis based on the | 10:36:05 |
| 17 | investigation that -- yeah, and the investigation | 10:36:08 |
| 18 | came through Facebook's lawyers. | 10:36:11 |
| 19 |     My discussion with Facebook's lawyers, my | 10:36:13 |
| 20 | discussion with Ryan McGeehan, yes, that's where my | 10:36:15 |
| 21 | knowledge comes from. | 10:36:18 |
| 22 |     Q.   So you don't have any firsthand knowledge | 10:36:20 |
| 23 | of anything that Power did; right? | 10:36:21 |
| 24 |     A.   I was not at the company -- | 10:36:23 |
| 25 |     Q.   That's not -- | 10:36:25 |

CONFIDENTIAL
CRAIG  CLARK - 2/17/2011

Page 86

| | | |
|---|---|---|
| 1 | A.    -- then. | 10:36:25 |
| 2 | Q.    -- my question. | 10:36:25 |
| 3 | My question is:  You don't have any | 10:36:26 |
| 4 | firsthand knowledge of anything Power did; right? | 10:36:27 |
| 5 | A.    Firsthand knowledge?  No.  I've never used | 10:36:31 |
| 6 | Power's site. | 10:36:33 |
| 7 | Q.    And you don't have -- even have any | 10:36:34 |
| 8 | secondhand knowledge other than what you've heard | 10:36:36 |
| 9 | from lawyers? | 10:36:38 |
| 10 | A.    I don't understand -- | 10:36:40 |
| 11 | MR. CHATTERJEE:  Vague. | 10:36:41 |
| 12 | THE WITNESS:  -- that question. | 10:36:41 |
| 13 | MR. BURSOR:  Q.  All right.  Isn't it true | 10:36:43 |
| 14 | that Facebook itself initiated the message in | 10:36:50 |
| 15 | paragraph 70? | 10:36:54 |
| 16 | A.    No. | 10:36:56 |
| 17 | MR. CHATTERJEE:  Calls for speculation. | 10:36:57 |
| 18 | MR. BURSOR:  Q.  All right.  How do you | 10:36:57 |
| 19 | know that that's not true? | 10:36:58 |
| 20 | A.    Based on my understanding of what Power | 10:37:01 |
| 21 | was doing at the site, they were the initiators of | 10:37:03 |
| 22 | the message. | 10:37:07 |
| 23 | Q.    Based on your -- what is your | 10:37:08 |
| 24 | understanding of what Power did on the site? | 10:37:09 |
| 25 | A.    My understanding is that they were -- they | 10:37:12 |

CONFIDENTIAL
CRAIG  CLARK - 2/17/2011

Page 87

| | | |
|---|---|---|
| 1 | were soliciting people's log-in information and, in | 10:37:15 |
| 2 | this instance, offering monetary compensation to | 10:37:19 |
| 3 | send invites to get people to sign up for Power. | 10:37:23 |
| 4 | Q.   And where did you get that information | 10:37:30 |
| 5 | from? | 10:37:31 |
| 6 | A.   My knowledge at the company working in a | 10:37:33 |
| 7 | legal role. | 10:37:36 |
| 8 | Q.   So that part's not privileged? | 10:37:37 |
| 9 | A.   I don't know what "that part" is that | 10:37:42 |
| 10 | you're referring to. | 10:37:44 |
| 11 | This message is not privileged. | 10:37:49 |
| 12 | Q.   You see at the bottom of the page where it | 10:37:59 |
| 13 | says "Thanks, The Facebook Team"? | 10:38:01 |
| 14 | A.   Mm-hmm. | 10:38:04 |
| 15 | Q.   Yes? | 10:38:04 |
| 16 | A.   Yes. | 10:38:05 |
| 17 | Q.   Who wrote that? | 10:38:05 |
| 18 | MR. CHATTERJEE:  Speculation. | 10:38:07 |
| 19 | THE WITNESS:  I don't know. | 10:38:10 |
| 20 | MR. BURSOR:  Q.  Didn't Facebook itself | 10:38:11 |
| 21 | write that? | 10:38:13 |
| 22 | MR. CHATTERJEE:  Same objections. | 10:38:14 |
| 23 | THE WITNESS:  I don't know. | 10:38:15 |
| 24 | MR. BURSOR:  Q.  Isn't it true that | 10:38:15 |
| 25 | Facebook appends that very same text to every e-mail | 10:38:17 |

CONFIDENTIAL
CRAIG  CLARK - 2/17/2011

Page 88

| | | |
|---|---|---|
| 1 | communication it sends after an event is created? | 10:38:20 |
| 2 | MR. CHATTERJEE:  Same objection. | 10:38:24 |
| 3 | Speculation. | 10:38:25 |
| 4 | THE WITNESS:  I don't know. | 10:38:26 |
| 5 | MR. BURSOR:  Q.  Do you think it's | 10:38:26 |
| 6 | misleading for Facebook to do that if Facebook is | 10:38:27 |
| 7 | not, in fact, the initiator of the message? | 10:38:30 |
| 8 | MR. CHATTERJEE:  Form. | 10:38:34 |
| 9 | THE WITNESS:  Could you break that down? | 10:38:38 |
| 10 | MR. BURSOR:  Q.  Sure.  Facebook put that | 10:38:39 |
| 11 | text in the message? | 10:38:40 |
| 12 | A.  I don't -- | 10:38:42 |
| 13 | Q.  You understand that; right? | 10:38:42 |
| 14 | A.  I don't know. | 10:38:43 |
| 15 | Q.  Well, let me ask you to assume that that's | 10:38:43 |
| 16 | true.  Do you think that's misleading? | 10:38:46 |
| 17 | MR. CHATTERJEE:  Incomplete hypothetical. | 10:38:48 |
| 18 | THE WITNESS:  Are you asking me -- | 10:38:50 |
| 19 | MR. BURSOR:  Q.  Let me ask you a more | 10:38:54 |
| 20 | specific question. | 10:38:55 |
| 21 | A.  Great. | 10:38:56 |
| 22 | Q.  You created an event on Facebook; right? | 10:38:56 |
| 23 | A.  I have created an event on Facebook. | 10:38:59 |
| 24 | Q.  How many events have you created? | 10:39:01 |
| 25 | A.  I don't know. | 10:39:03 |

CONFIDENTIAL
CRAIG  CLARK - 2/17/2011

Page 98

| | | |
|---|---|---|
| 1 | of this message? | 10:45:57 |
| 2 | A.   I don't recall. | 10:45:58 |
| 3 | Q.   You didn't even bother to look for that | 10:45:59 |
| 4 | before you signed the verification? | 10:46:02 |
| 5 | MR. CHATTERJEE:  Argumentative. | 10:46:02 |
| 6 | THE WITNESS:  That's not what I said.  I | 10:46:03 |
| 7 | said I don't recall. | 10:46:04 |
| 8 | MR. BURSOR:  Q.  So it's possible you | 10:46:06 |
| 9 | looked at it? | 10:46:07 |
| 10 | A.   I don't recall looking at it. | 10:46:08 |
| 11 | Q.   So you don't know what's behind the | 10:46:11 |
| 12 | redaction there? | 10:46:13 |
| 13 | A.   I do not recall. | 10:46:15 |
| 14 | Q.   So do you see where it says -- so it's not | 10:46:18 |
| 15 | Power that redacted it; right? | 10:46:20 |
| 16 | A.   I don't recall.  But given that this is | 10:46:24 |
| 17 | our complaint, I assume we made the redactions. | 10:46:26 |
| 18 | Q.   So you see where it says "Nik invited you | 10:46:31 |
| 19 | to the event"?  See that? | 10:46:33 |
| 20 | A.   I see where it says: | 10:46:34 |
| 21 | "Nik [Redacted] invited you | 10:46:36 |
| 22 | to the event" -- | 10:46:39 |
| 23 | Q.   Okay. | 10:46:40 |
| 24 | A.   -- "'Bring -- | 10:46:41 |
| 25 | Q.   No.  I'm only asking -- | 10:46:42 |

CONFIDENTIAL
CRAIG  CLARK - 2/17/2011

Page 99

| | | |
|---|---|---|
| 1 | A.    "100 friends" -- | 10:46:43 |
| 2 | Q.    -- you about that part. | 10:46:43 |
| 3 | "Nik . . . invited you to the | 10:46:44 |
| 4 | event" -- | 10:46:45 |
| 5 | "Nik [Redacted] invited you | 10:46:46 |
| 6 | to the event . . . ." | 10:46:48 |
| 7 | Can you focus in on that? | 10:46:48 |
| 8 | A.    I can focus in on that, yes. | 10:46:50 |
| 9 | Q.    Who wrote that? | 10:46:51 |
| 10 | MR. CHATTERJEE:  Speculation. | 10:46:52 |
| 11 | THE WITNESS:  I don't recall -- or I don't | 10:46:54 |
| 12 | know. | 10:46:55 |
| 13 | MR. BURSOR:  Q.  Who would know the answer | 10:47:08 |
| 14 | to that? | 10:47:11 |
| 15 | A.    Again, I believe the header information, | 10:47:12 |
| 16 | as with other elements of this message, would have | 10:47:15 |
| 17 | been auto-generated.  So as far as "write this," I | 10:47:18 |
| 18 | don't know would write this. | 10:47:23 |
| 19 | Q.    It would have been auto-generated by whom? | 10:47:26 |
| 20 | A.    By the -- | 10:47:32 |
| 21 | MR. CHATTERJEE:  Vague. | 10:47:33 |
| 22 | THE WITNESS:  By the system that was | 10:47:34 |
| 23 | called to send out the invitation. | 10:47:37 |
| 24 | MR. BURSOR:  Q.  What system is that? | 10:47:40 |
| 25 | A.    That would probably be Facebook's system. | 10:47:41 |

CONFIDENTIAL
CRAIG CLARK - 2/17/2011

1    Q.   What outside counsel?                               11:06:10

2    A.   I spoke with Orrick, and I spoke with               11:06:11

3    Perkins Coie about pre-filing investigation.             11:06:17

4    Q.   Did either the Orrick firm or the Perkins           11:06:26

5    Coie firm make a pre-filing investigation to             11:06:28

6    determine to whom this message had been sent?            11:06:33

7         MR. CHATTERJEE:  Speculation.  I'm going            11:06:38

8    to let him answer as long as you agree it's not any      11:06:40

9    waiver of any privilege or work product.                 11:06:44

10        MR. BURSOR:  Sure.                                  11:06:46

11        THE WITNESS:  I was not at Facebook at the          11:06:47

12   time the pre-filing investigation was done.              11:06:48

13        MR. BURSOR:  Q.  All right.  But that               11:06:50

14   wasn't my question.  My question was:  Did either of     11:06:51

15   those two firms, Orrick -- the Orrick firm or the        11:06:53

16   Perkins Coie firm, make a pre-filing investigation       11:06:57

17   to determine to whom this message had been sent?         11:07:00

18        MR. CHATTERJEE:  Same objection.  We're             11:07:04

19   okay?  I don't mind him answering as long as you         11:07:05

20   agree there's no waiver.                                 11:07:08

21        MR. BURSOR:  That's fine.                           11:07:09

22        THE WITNESS:  I know a pre-filing                   11:07:10

23   investigation was done.                                  11:07:11

24        MR. BURSOR:  Q.  Do you know if the                 11:07:12

25   pre-filing investigation involved looking into who      11:07:12

CONFIDENTIAL
CRAIG  CLARK - 2/17/2011

| | | |
|---|---|---|
| 1 | language about compensatory damages aside, just are | 11:16:28 |
| 2 | you aware of any economic loss that Facebook has | 11:16:31 |
| 3 | suffered as a result of the actions of Power? | 11:16:35 |
| 4 | MR. CHATTERJEE:  Same instruction. | 11:16:39 |
| 5 | If you have personal knowledge of it, you | 11:16:41 |
| 6 | can go ahead and answer; but if it's privileged | 11:16:43 |
| 7 | information, you shouldn't. | 11:16:46 |
| 8 | THE WITNESS:  Yeah, I don't think I can | 11:16:50 |
| 9 | answer that without getting into attorney-client | 11:16:51 |
| 10 | privilege. | 11:16:53 |
| 11 | MR. BURSOR:  Q.  Do you have any personal | 11:16:55 |
| 12 | knowledge of such a loss? | 11:16:56 |
| 13 | A.   Same answer. | 11:16:59 |
| 14 | Q.   Can you identify anything that Power did | 11:17:26 |
| 15 | that caused Facebook to lose money? | 11:17:27 |
| 16 | A.   Same answer. | 11:17:33 |
| 17 | Q.   You can't answer? | 11:17:33 |
| 18 | A.   I can't answer that. | 11:17:34 |
| 19 | MR. BURSOR:  Let me ask the court reporter | 11:17:56 |
| 20 | to mark as Exhibit 1-4 a single-page document.  It's | 11:17:57 |
| 21 | Defendant's First Request for Production Pursuant to | 11:18:00 |
| 22 | Federal Rule of Civil Procedure 34.  It's dated | 11:18:03 |
| 23 | October 8th, 2010. | 11:18:07 |
| 24 | (Whereupon, Defendants' Exhibit 1-4 was | 11:18:32 |
| 25 | marked for identification.) | 11:18:32 |

CONFIDENTIAL
CRAIG  CLARK - 2/17/2011

| | | |
|---|---|---|
| 1 | MR.  BURSOR:   Q.   Mr. Clark, you have | 11:18:34 |
| 2 | Exhibit 1-4? | 11:18:34 |
| 3 | A.   I do. | 11:18:36 |
| 4 | Q.   Have you seen that before? | 11:18:37 |
| 5 | A.   Not that I recall. | 11:18:39 |
| 6 | Q.   You know what a document request is; | 11:18:46 |
| 7 | right? | 11:18:47 |
| 8 | A.   I do. | 11:18:47 |
| 9 | Q.   Now, I already asked you about No. 3 | 11:18:48 |
| 10 | because earlier today I asked you if you were aware | 11:18:50 |
| 11 | of any documents concerning any complaints made by | 11:18:52 |
| 12 | Facebook users and you told me you were not. | 11:18:57 |
| 13 | Do you remember that? | 11:18:59 |
| 14 | A.   I did. | 11:19:00 |
| 15 | Q.   So I want to ask the same question about | 11:19:01 |
| 16 | Item 1. | 11:19:03 |
| 17 | A.   Excuse me. | 11:19:08 |
| 18 | Q.   Are you aware of any document concerning | 11:19:08 |
| 19 | any injury that Facebook suffered as a result of the | 11:19:12 |
| 20 | events described in the First Amended Complaint? | 11:19:14 |
| 21 | Just the existence of a document. | 11:19:16 |
| 22 | A.   I don't know. | 11:19:23 |
| 23 | Q.   As you sit here today, you couldn't | 11:19:25 |
| 24 | identify any document that would relate to that? | 11:19:26 |
| 25 | A.   No, I don't believe I can. | 11:19:33 |

| | | |
|---|---|---|
| 1 | Q.   And I want to ask the same as to Request | 11:19:35 |
| 2 | No. 2.  As you sit here today, are you aware of any | 11:19:38 |
| 3 | document concerning any expenditure that Facebook | 11:19:44 |
| 4 | made as a result of the events described in | 11:19:47 |
| 5 | Facebook's First Amended Complaint? | 11:19:49 |
| 6 | A.   Am I aware of the existence of any | 11:19:58 |
| 7 | documents regarding expenditures that Facebook made | 11:20:00 |
| 8 | as a result of the events described in the First | 11:20:06 |
| 9 | Amended Complaint? | 11:20:08 |
| 10 | Q.   Yes. | 11:20:09 |
| 11 | A.   Yes. | 11:20:09 |
| 12 | Q.   Other than Mr. Chatterjee's bills and the | 11:20:10 |
| 13 | Perkins Coie bills. | 11:20:12 |
| 14 | A.   I can't discl- -- documents exist that | 11:20:14 |
| 15 | would probably all be work product.  There may be | 11:20:18 |
| 16 | other documents.  As with all these cases, there may | 11:20:20 |
| 17 | be other documents. | 11:20:23 |
| 18 | I'm not saying no documents exist.  I'm | 11:20:24 |
| 19 | saying I'm not aware of any.  That's all. | 11:20:26 |
| 20 | Q.   So you're not aware of any documents that | 11:20:29 |
| 21 | are responsive to any of these three categories? | 11:20:30 |
| 22 | A.   As I sit here today, I'm not aware of any | 11:20:33 |
| 23 | specific documents. | 11:20:34 |
| 24 | Q.   And when you met with Mr. Chatterjee | 11:20:35 |
| 25 | earlier this week, you didn't see any documents that | 11:20:37 |

CONFIDENTIAL
CRAIG  CLARK - 2/17/2011

| | | |
|---|---|---|
| 1 | it was the easiest. | 11:22:10 |
| 2 | A.   Right. | 11:22:11 |
| 3 | Q.   All right.  You testified that you weren't | 11:22:11 |
| 4 | aware -- | 11:22:12 |
| 5 | A.   But -- okay.  Go ahead. | 11:22:13 |
| 6 | Q.   You see 3 asks for any complaints Facebook | 11:22:14 |
| 7 | users made as a result of the events described in | 11:22:18 |
| 8 | Facebook's First Amended Complaint?  You see that? | 11:22:20 |
| 9 | A.   I see that. | 11:22:22 |
| 10 | Q.   But you've never seen any documents like | 11:22:23 |
| 11 | that; right? | 11:22:25 |
| 12 | MR. CHATTERJEE:  Overly broad, vague. | 11:22:29 |
| 13 | THE WITNESS:  Again, there are documents | 11:22:30 |
| 14 | I've seen that may be responsive to this category. | 11:22:34 |
| 15 | If you're asking if I've seen any specific | 11:22:36 |
| 16 | complaints about Power.com, I have not. | 11:22:38 |
| 17 | MR. BURSOR:  Q.  Have you seen general | 11:22:42 |
| 18 | complaints about Power.com? | 11:22:44 |
| 19 | A.   No. | 11:22:46 |
| 20 | Q.   All right.  So you haven't seen any | 11:22:49 |
| 21 | specific complaints and you haven't seen any general | 11:22:51 |
| 22 | complaints.  What kind of complaints have you seen? | 11:22:53 |
| 23 | A.   I've not seen any complaints regarding | 11:22:56 |
| 24 | Power.com based on my preparation for this | 11:23:02 |
| 25 | deposition or otherwise. | 11:23:07 |

### CERTIFICATE OF REPORTER

I, ANA M. DUB, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled cause;

That said deposition was taken down in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision;

That before completion of the deposition, review of the transcript [ ] was [X] was not requested.  If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the event of this cause, and that I am not related to any of the parties thereto.

DATED:  March 3, 2011.

ANA M. DUB, RMR, CRR, CSR No. 7445

135