# EXHIBIT 4

```
 1              UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF CALIFORNIA
 3                    SAN JOSE DIVISION
 4
 5   FACEBOOK, INC.              :
 6            Plaintiff,         :
 7                               :
 8         v.                    :
 9                               :
10   POWER VENTURES, INC. d/b/a  :
11   POWER.COM, a California     :
12   corporation; POWER          :      Case No.
13   VENTURES, INC. a Cayman     :      5:08-CV-05780
14   Island Corporation, STEVE   :      JW (HRL)
15   VACHANI, an individual;     :
16   DOE 1, d/b/a POWER.COM, an  :
17   individual and/or business  :
18   entity of unknown nature;   :
19   DOES 2 through 25,          :
20   inclusive, individuals      :
21   and/or business entities    :
22   of unknown nature,          :
23            Defendants.        :
24   _____
25         HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

                         1
```

```
10:40  1          Q.      Were any other individuals besides
10:40  2   yourself associated with the operation of the Web
10:40  3   site investors in Power Ventures?
10:40  4          A.      When you say "any individuals."
10:40  5   As I mentioned, the company employed up to a
10:40  6   hundred people at its peak.
10:40  7          Q.      Were any of those hundred people
10:40  8   also investors in --
10:40  9          A.      Investors.  I'm sorry.  The
10:40 10   employees?
10:40 11          Q.      Yes.
10:40 12          A.      There were.  There were individual
10:40 13   investors besides Draper Fisher but there was no --
10:40 14   employees were not investors.
10:40 15          Q.      Okay.  Earlier you said the
10:41 16   primary asset remaining of the company is IP?
10:41 17          A.      That's correct.
10:41 18          Q.      What IP are you referring to?
10:41 19          A.      Referring to the core power --
10:41 20   Power technology.
10:41 21          Q.      Would that be the code?
10:41 22          A.      That would be the code and all the
10:41 23   components of the code.
10:41 24          Q.      And when you refer to "components"
10:41 25   what do you mean?
```

49

10:41 1  A. The PowerScript as we refer to it
10:41 2 is our core language for developing the site and
10:41 3 our Power browser.
10:41 4  Q. What is the Power browser?
10:41 5  A. That's a browser that users use to
10:41 6 browse the Internet. It's a Web-based browser.
10:41 7 When they log into Power, they can browse -- they
10:41 8 can browse through sites.
10:41 9  Q. It's a browser in the same
10:41 10 sense that, for instance, Netscape or --
10:41 11  A. Correct. But it's Web-based.
10:41 12 It's similar to that. It's a browser that it can
10:41 13 use to browse sites. Browse, like, different sites
10:41 14 including Facebook.
10:42 15  Q. What language is that browser in?
10:42 16  A. It was written in C Sharp.
10:42 17  Q. What language is Power script
10:42 18 written in?
10:42 19  A. C Sharp. Just to be clear, there
10:42 20 obviously may be other technical languages and
10:42 21 decisions used that I was not aware of, but that's
10:42 22 the primary, core language.
10:42 23  Q. Okay. Are there any other assets
10:42 24 that you consider part of the IP besides the core
10:42 25 source code, Power script and Power browser?

50

```
01:21  1           A.      Your photos and your -- Content.
01:21  2   Your photos and your contacts.  So your friends in
01:21  3   particular.  Those are the most commonly accessed
01:21  4   data.
01:21  5           Q.      There's a second sentence that
01:21  6   says, "'User content' includes photos, profiles,
01:21  7   messages, notes, text, information, music, video,
01:21  8   advertisements, listings, and other content that
01:21  9   users can upload, publish, or display on the
01:21 10   Facebook site?
01:21 11           A.      That is correct.
01:21 12           Q.      How was the -- How was user
01:21 13   content emulated on the Power site?
01:21 14           A.      It wasn't emulated.  It was --
01:21 15   We're a browser, so the user was on Facebook
01:21 16   accessing -- Like, he was in his browser and he
01:21 17   went to -- he went to Facebook.  He was looking at
01:21 18   his own content, data, inside our browser.  And
01:22 19   second, when he's on the main Power Page, it's
01:22 20   passing that information -- he's pulling that
01:22 21   content to a central page.
01:22 22                   (Whereupon, Exhibit 103 is marked
01:22 23   for identification by the reporter.)
01:22 24           Q.      Mr. Vachani, I put in front of you
01:22 25   Exhibit 103, a screen shot taken from the power.com
```

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

BARKLEY
Court Reporters

```
01:22   1    Web site.
        2            A.      Correct.
01:22   3            Q.      Does this look like a profile that
01:22   4    existed on power.com sometime in December or
01:22   5    January -- December 2008 or January 2009?
01:22   6            A.      Yes.
01:22   7            Q.      Do you see there is a list of
01:22   8    categories called, "My Friends"?
01:22   9            A.      That's correct.
01:22  10            Q.      All right.  Do you see that there
01:23  11    is an individual Carina?
01:23  12            A.      Yes.  I do.
01:23  13            Q.      There's a logo next to her.  Do
01:23  14    you see that?  Her name.
01:23  15            A.      That's an Orkut logo.
01:23  16            Q.      Next to Carina, there is an
01:23  17    individual named Carlos.  Correct?
01:23  18            A.      Yes.
01:23  19            Q.      And there is a Facebook logo next
01:23  20    to his name.  Correct?
01:23  21            A.      That's correct.
01:23  22            Q.      How in your database did power.com
01:23  23    know to identify a picture from Carlos as
01:23  24    associated with Facebook?
01:23  25            A.      This is dynamic.  Everything here
```

126

```
01:23  1    it's being accessed on Facebook because the user
01:23  2    has opened up access to his account.
01:23  3           Q.      Right.  How does Power know to
01:23  4    emulate that photograph on Power through its own
01:23  5    browser?
01:23  6           A.      It's passed -- The browser is
01:23  7    accessing that and the user is able to view
01:23  8    multiple sites, photos from multiple sites
01:23  9    dynamically and simultaneously.
01:24 10           Q.      The photograph has been
01:24 11    reformatted to be presented on Power though.
01:24 12    Correct?
01:24 13           A.      That's his -- That's the photo.
01:24 14    It's being passed through.  That is correct.
01:24 15           Q.      But it's being reformatted so that
01:24 16    it can be -- it can be imaged in the context of "My
01:24 17    Friends" on power.com.  Correct?
01:24 18           A.      Yes.
01:24 19           Q.      How would Facebook know what
01:24 20    information was parsed so that you could reformat
01:24 21    that photograph on power.com?
01:24 22           A.      How would they know what
01:24 23    information?  It's a photo.  There's -- There's
01:24 24    just a photo there as you can see.  Photo and the
01:24 25    name.  There's no other information.
```

127

```
01:24  1           Q.      However, the photograph had to
01:24  2   have been parsed to have been displayed on
01:24  3   power.com.
01:24  4           A.      It was passed through, yeah.  It
01:24  5   was passed through and parsed, but the photo is the
01:24  6   same photo.
01:24  7           Q.      Where would Facebook be able to
01:24  8   see how you parsed their data on the power.com Web
01:24  9   site?
01:24 10           A.      How we parsed it?
01:24 11           Q.      Yes.
01:24 12           A.      We -- We -- A PowerScript goes to
01:24 13   the site, accesses it and passes it through, so
01:25 14   it's using a PowerScript that's doing that, so the
01:25 15   functionality that makes that possible is described
01:25 16   in this document.
01:25 17           Q.      And the Get command that does that
01:25 18   can vary in many different ways if the parses
01:25 19   information.  Correct?
01:25 20           A.      Actually, a get photo is pretty
01:25 21   straightforward.  You access a site, you get a
01:25 22   photo and you pass it through.
01:25 23           Q.      However, the way it was actually
01:25 24   done is reflected in the code.
01:25 25           A.      It's just a different PowerScript.
```

128

```
01:25  1    It's reflected in a -- in a PowerScript command.
01:25  2    You're right.  You can write get it, but go to --
01:25  3    go there, click on this page.  It's -- It's a
01:25  4    PowerScript.  You are correct.
01:25  5           Q.      And that PowerScript is developed
01:25  6    specifically with commands directed towards the
01:25  7    Facebook content.  Correct?
01:25  8           A.      That is correct.  Not just
01:25  9    Facebook.  To all -- To all the sites that the user
01:25 10    has authorized us access.
01:25 11           Q.      But because of the -- the social
01:25 12    design of Facebook and how it codes its own site,
01:26 13    will vary from how other sites are coded.  Specific
01:26 14    commands have to be directed towards Facebook.
01:26 15    Correct?
01:26 16           A.      I'm not sure I understand -- I
01:26 17    mean, the -- the difference -- Yes, it's a
01:26 18    different layout, but it's the same -- the same
01:26 19    framework, meaning you log in, you go to your photo
01:26 20    page, you click on the photo.  It's a very -- It's
01:26 21    very similar if not almost the same -- on all the
01:26 22    other sites.  There's very little -- Of course,
01:26 23    it's unique.  You might have to go to a different
01:26 24    route to get there, but those are just a --
01:26 25    literally a two-second adjustment on a PowerScript.
```

129

02:07 1     Q.    Do you know if that automated
02:07 2 script that would import the friends identification
02:07 3 and image would also search for friends of friends?
02:07 4     A.    What do you mean, friends of
02:07 5 friends? Would it go to their friends?
02:07 6     Q.    Yes.
02:07 7     A.    No.
02:07 8     Q.    Okay. Are you aware on Facebook
02:07 9 that if you have -- that Facebook permits as a
02:08 10 setting that you can look at the profiles of those
02:08 11 who are your friends and their friends as well?
02:08 12     A.    Can you repeat that question?
02:08 13     Q.    Are you aware of whether or not on
02:08 14 Facebook, if I have you friended you Steve Vachani,
02:08 15 that I can actually see the profiles of your
02:08 16 friends who are not listed as mine?
02:08 17     A.    I think if the user -- If the user
02:08 18 authorizes that, I believe Facebook allows the user
02:08 19 to do that.
02:08 20     Q.    Do you know if the automated
02:08 21 script that would import the Facebook information
02:08 22 that's shown in my friends on Power employed a
02:08 23 spider program as you described it earlier?
02:08 24     A.    I believe it used a similar
02:08 25 program that Facebook uses to -- Well, similar

159

```
04:49  1   2008, have an understanding whether it was
04:49  2   permitting registered users of Facebook to violate
04:49  3   the Terms of Service of Facebook?
04:49  4           A.      I don't know -- I'm not at liberty
04:49  5   to say what -- what's a violation of Facebook's
04:49  6   terms and we -- As I already stated, we did not
04:49  7   participate in sending any kind of unsolicited
04:49  8   users and our users were sending messages to their
04:49  9   own friends, so I don't understand if a user sends
04:49 10   a message to their friend how that's unsolicited
04:49 11   and how that has anything to do with this
04:49 12   terminology.
04:49 13           Q.      Would you look at the third bullet
04:49 14   point?
04:49 15           A.      Yeah.
04:49 16           Q.      You see where it says -- if you
04:49 17   read the -- It starts with, "In addition, you agree
04:49 18   not to use the service or site to," and then the
04:49 19   third bullet point is, "use automated scripts to
04:49 20   collect information from or otherwise interact with
04:50 21   the service or the site."
04:50 22                   THE WITNESS:  Scott, is this even
04:50 23   relevant to the conversation?  I don't -- I don't
04:50 24   understand.
04:50 25                   MR. BURSOR:  Why don't we just get
```

279

```
04:50  1    the question read back and then just answer the
04:50  2    question.
04:50  3           A.      So what's the question?
04:50  4                   (Whereupon, the last question is
04:50  5    read back by the reporter.)
04:50  6                   MR. BURSOR:  Is the question:
04:50  7    Does he see that in the agreement?
       8                   MR. COOPER:  Yeah, that's all I
       9    asked.
      10                   MR. BURSOR:  Yeah, so do you see
04:50 11    that -- do you see that --
04:50 12           A.      I see that in the agreement.
04:50 13                   MR. BURSOR:  Yeah, so then you've
04:50 14    answered the question.
      15           A.      Okay.  Yeah, I see that in your
04:50 16    agreement.
04:50 17           Q.      Have you read that language as of
04:50 18    December 1st, 2008?
04:50 19           A.      Yes.  I had read it many times.
04:50 20           Q.      Had anybody else at power.com read
04:50 21    that language as of December 1st, 2008?
04:50 22           A.      I don't know if they read it.  It
04:51 23    was my job to read it and I think Filipe probably
04:51 24    read it.  Those are the two people that I know.
04:51 25           Q.      As of December 1st, 2008, had you
```

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

BARKLEY
Court Reporters

C E R T I F I C A T I O N

I, PATRICIA MULLIGAN CARRUTHERS, a Certified Shorthand Reporter and Notary Public of the State of New Jersey and a Notary Public of the State of New York, do hereby certify that prior to the commencement of the examination the witness was sworn by me to testify as to the truth, the whole truth, and nothing but the truth.

I do further certify that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place, and on the date hereinbefore set forth.

I do further certify that I am neither of counsel nor attorney for any party in this action and that I am not interested in the event nor outcome of this litigation.

*Patricia M Carruthers*
Patricia Mulligan Carruthers, CSR
Certificate No. XI00780
Notary Public of the State of New York
Notary Public of the State of New Jersey

Dated: JULY 27, 2011

My commission expires October 28, 2015 (N.J.)
My commission expires December 21, 2013 (N.Y.)

361

EXHIBIT 100