Pages 1 - 40

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JAMES WARE

| | | |
|---|---|---|
| FACEBOOK, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | No. C 08-5780 JW |
| | ) | |
| POWER VENTURES, INC. a Cayman | ) | |
| Island Corporation; STEVE VACHANI, | ) | |
| an individual; DOE 1, d/b/a | ) | |
| POWER.COM, DOES 2-25, inclusive, | ) | |
| | ) | San Francisco, California |
| Defendants. | ) | Monday |
| _____ | ) | January 23, 2012 |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

| For Plaintiff: | ORRICK, HERRINGTON & SUTCLIFFE |
| | 1020 Marsh Road |
| | Menlo Park, California  94025 |
| BY: | **I. NEEL CHATTERJEE, ESQUIRE** |
| | **MONTE M.F. COOPER, ESQUIRE** |
| | **MORVARID METANAT, ESQUIRE** |

| For Defendants Power Ventures Steve Vachani: | BURSOR & FISHER, P.A. |
| | 1990 North California Blvd., Suite 940 |
| | Walnut Creek, California 94596 |
| BY: | **LAWRENCE TIMOTHY FISHER, ESQUIRE** |
| | **SARAH NICOLE WESTCOT, ESQUIRE** |

Reported By:     *Katherine Powell Sullivan, CSR #5812*
                 *Official Reporter - U.S. District Court*

**P R O C E E D I N G S**

**JANUARY 23, 2012**                                    **9:25 A.M.**

            **THE CLERK:**  Calling case C 08-5780, Facebook versus
Power Ventures.

            Counsel, please approach and state your name for the
record.

            **MR. FISHER:**  Good morning, Your Honor.  Timothy
Fisher for Defendants Power Ventures and Steve Vachani.

            **MR. CHATTERJEE:**  Good morning, Your Honor.  Neel
Chatterjee for Facebook.  With me is Monte Cooper and Morvarid
Metanat.

            **THE COURT:**  Good morning, all.

            So these are cross motions.  I didn't look to see who
started the fight, but who wants to go first?

            **MR. FISHER:**  I will, Your Honor.

            **THE COURT:**  Very well.

            **MR. FISHER:**  I started it.

            Your Honor, I'd like to begin by focusing on the
e-mails that are at the center of the litigation.  Facebook
claims that my client sent 60,000 e-mails as part of the e-mail
invitation system that Facebook has.

            And I'd really like to draw the Court's attention to
the e-mail and look at the e-mail.  They only put one e-mail
into the record -- a little unusual in a CAN-SPAM Act case, but

1  they put one e-mail in excerpted into their brief.  And I'd

2  like to draw the Court's attention to several parts of that

3  e-mail, which I think really go to the heart of the matter.

4          First, if the Court looks -- and I have a copy of the

5  e-mail if Your Honor would like to have it in front of you.

6          **THE COURT:**  I'd like to have the one you're referring

7  to, because I thought that I also had a facsimile or an actual

8  one in the pleadings.

9          **MR. FISHER:**  If Your Honor looks at the "from" line

10  of the e-mail, it says the e-mail is from Facebook.  Then the

11  e-mail address that follows says "eventmaster," and then

12  there's a series of numbers and letters.  And then the e-mail

13  there is Facebookmail.com.

14          Then at the bottom of the e-mail, it says, "Thanks,

15  the Facebook team."  And then below that, "Want to control

16  which e-mails you receive from Facebook?"  And there's a link.

17  And those are all aspects of the e-mail that are controlled by

18  Facebook.

19          Neither Power nor any of the users could change any

20  aspect of this e-mail.  Those are things that they could not

21  have adjusted in any way had they wanted to.

22          And I think it's very difficult to find liability

23  under the CAN-SPAM Act for having false and misleading headers

24  and subject lines when you can't even change them in any way.

25          **THE COURT:**  I'm sorry?  Why does that follow?

```
1          MR. FISHER:  The CAN-SPAM Act requires that Facebook

2    prove that there were false and misleading headers and other

3    information in the e-mail.

4          THE COURT:  Right.  Is your argument that if the

5    e-mail is initiated from someone other than Facebook, the fact

6    that Facebook's name appears in the header cannot serve as a

7    basis for liability even if Facebook did not initiate the

8    e-mail?

9          MR. FISHER:  It seems to me, Your Honor, there

10   shouldn't be liability under the CAN-SPAM Act for including

11   false and misleading headers and information if you don't have

12   any control over that information itself.

13         THE COURT:  What do you mean by "control"?

14         MR. FISHER:  That I couldn't put what supposedly

15   would be the correct information into that e-mail.  How can I

16   possibly comply with the law if I have no control over what

17   goes into the e-mail?

18         THE COURT:  You have control over whether the e-mail

19   is sent.

20         MR. FISHER:  Actually not.  Facebook designed its

21   system so that the e-mails were sent no matter what.  Power nor

22   its users could not stop those e-mails from being sent when

23   they created an event on a Facebook website.

24         THE COURT:  So I'm now coming closer to

25   understanding.  In other words, Power did not create this
```

1  Facebook event, it only did something other than that.  And so

2  by Facebook appearing here, it is appearing based upon no

3  conduct by Power.

4           **MR. FISHER:**  That is exactly my argument, Your Honor.

5           **THE COURT:**  So who initiated the e-mail?

6           **MR. FISHER:**  Facebook initiated the e-mail, Your

7  Honor.

8           **THE COURT:**  I see.  So Facebook was sending this out?

9           **MR. FISHER:**  Yes, it came from Facebook's server.

10          **THE COURT:**  No, Facebook, the company.  Not the

11  server.  The server doesn't do anything unless it's instructed

12  to.  So some individual at Facebook initiated this, is your

13  argument?

14          **MR. FISHER:**  Well, I don't think there's somebody --

15  I mean, I think hundreds of millions of these kinds of e-mails

16  go out.  Every time somebody creates an event on Facebook,

17  these e-mails go out.  It is an automated --

18          **THE COURT:**  I understand.  So the someone who created

19  the event was a Facebook employee.

20          **MR. FISHER:**  The person who created the event was a

21  user of the Facebook system.

22          **THE COURT:**  So it wasn't a Facebook -- Facebook

23  didn't initiate it, some user initiated.

24          **MR. FISHER:**  A user would initiate the e-mail.  The

25  e-mail would not go without the user initiating an event.

```
 1          THE COURT:  And Power was not the user.

 2          MR. FISHER:  No, no, Power is not a user.

 3          THE COURT:  Power didn't initiate this event?

 4          MR. FISHER:  That's right.

 5          THE COURT:  All right.  Let me -- to me, that would

 6   be the end of the argument, because the statute requires

 7   initiation.  And your argument is there's no initiation.

 8          MR. FISHER:  That's right.  That's the heart of our

 9   argument.

10          THE COURT:  All right.  So let me interrupt your

11   argument and go to your opponent to respond to that.

12          MR. FISHER:  Sure, Your Honor.

13          MR. CHATTERJEE:  Your Honor, if I may address your

14   questions, I think there's a little bit of confusion in my

15   opposing counsel's argument.

16          You'll notice in page 7, which he gave you as a

17   demonstrative exhibit, the first complete sentence says,

18   "Defendant's PowerScript's software also initiated and sent an

19   additional electronic message to the Facebook user's friends."

20          And they want to and have consistently focused on the

21   e-mail that is sent as a consequence of posting an event on the

22   Facebook system.

23          But on page 6 of our brief, we actually talk in

24   detail about the fact that the PowerScript software, that was

25   created by Power.com, actually created the event and the text
```

```
 1  for the event that was posted on the Facebook system and sent
 2  to other Facebook users was actually drafted by Power.
 3          And we actually give the direct quote of what is
 4  posted on the Facebook event.  It's like a calendar invite on
 5  the Facebook system.  That was the first message.  The e-mail
 6  message was the consequence of posting that event message.
 7          Now, what my opposing counsel wants to do is they
 8  want to redefine what "initiate" means under the CAN-SPAM Act.
 9  "Initiate," as defined by the statute, includes procurement of
10  messages.  And what Power did was they paid their users -- and
11  we submitted evidence on this from the 30(b)(6) testimony of
12  Mr. Vachani on behalf of Power Friday evening.  We had just
13  recently deposed him so we couldn't submit it earlier.
14          They paid their users in order to gain access to
15  those users' accounts and send Power's commercial e-mail
16  messages to try and recruit people to the Power website.
17          THE COURT:  Did you miss a step?  Because, as I
18  understood your opponent's argument, they might have paid the
19  users, but what they paid the users to do was to have the users
20  initiate.
21          So what I heard from you just now was they paid the
22  users for access and Power initiated.  Which is it?
23          MR. CHATTERJEE:  It is Power that initiated it, Your
24  Honor.  The declaration --
25          THE COURT:  No, no.  I gave you two choices.  So one
```

1  would be to pay the users to initiate.  The other would be

2  to -- I'm not sure how the pay gets involved in that, but for

3  Power to initiate.  So I was trying to understand which you

4  were arguing.

5         **MR. CHATTERJEE:**  Correct.  Yes, Your Honor.  So I am

6  arguing that Power initiated the message under the statutory

7  definition of the term "initiate."

8         When Power says to their users, we will pay you -- in

9  other words, we will procure your services to send our e-mail

10 message or our commercial message, like a Facebook

11 invitation --

12        **THE COURT:**  So it is the first?  In other words, they

13 procure the services of the user; namely, they pay the users to

14 send -- to create the event and use the Facebook software to

15 send the invite?

16        **MR. CHATTERJEE:**  It's a little more complicated than

17 that, Your Honor.  Power wrote software.  That software would

18 log in to Facebook through a user account.  That software would

19 then send an event invitation.  And this was all done by Power.

20        All Power did with respect to the Facebook user is

21 they said, Can we use your user account to do that?  And we

22 will pay you to send these event invitations.

23        And this is all detailed in the declaration of the

24 Larry Melling, who analyzed the source code, the only evidence

25 in this case about how that software works.

```
 1          But Power is the entity that caused the event

 2   invitations to be sent through Facebook user accounts.  And

 3   they paid their users for the right to send those event

 4   invitations.

 5          THE COURT:  Now, let me pause.

 6          Is there anything that Mr. Chatterjee just said to

 7   which you would say that's incorrect?

 8          MR. FISHER:  Yes, I would say --

 9          THE COURT:  What exactly?

10          MR. FISHER:  -- the procurement theory, Your Honor,

11   is a complete red herring.

12          THE COURT:  No, no.  What did he say that's

13   incorrect?

14          MR. FISHER:  I'm sorry, I couldn't -- I was focused

15   on his argument about procuring the --

16          THE COURT:  What did he say that was incorrect?  What

17   fact did he say that was -- I'm trying to get to how --

18          MR. FISHER:  That Power initiated these e-mails is

19   certainly --

20          THE COURT:  That was his conclusion.  What fact -- I

21   was told that Power wrote the software.  That was a fact.

22   That's something --

23          MR. FISHER:  Power created a browser through which

24   one could access the Facebook website.

25          THE COURT:  Did it write software, yes or no?
```

1        **MR. FISHER:**  Absolutely.

2        **THE COURT:**  All right.  And did the software allow

3 them to log in through the user account?

4        **MR. FISHER:**  Through a Facebook user account, yes.

5 It allowed users to access the Facebook website.

6        **THE COURT:**  All right.  And then using that software,

7 did Power send an event --

8        **MR. FISHER:**  No.

9        **THE COURT:**  -- invitation?  All right.

10        So what about that is incorrect?

11        **MR. FISHER:**  Power would send -- Power users would

12 send the event invitation.

13        **THE COURT:**  So what does that mean factually, that

14 the Power users would send?

15        In other words, individual users would log on to

16 their computer and create the event, or was there some

17 automated process by which the software that was created would

18 mimic the user doing it and it would be sent?

19        Was this a series of people doing it or something

20 that was set up through the computer?

21        **MR. FISHER:**  Each individual user had to authorize

22 the creation of an event.  And there was code in the software

23 that allowed the user to click some buttons and to create an

24 event.

25        **THE COURT:**  All right.

1            **MR. FISHER:**  But it was all done with the permission

2    of the user.

3            **THE COURT:**  Let me go back over here.  So do you

4    disagree with that, that the way it operate factually is that

5    Power created the software, but each individual user had to go

6    into the system to create individual events?

7            **MR. CHATTERJEE:**  No, that's not true, Your Honor.

8            **THE COURT:**  Okay.

9            **MR. CHATTERJEE:**  And there's no evidence, absolutely

10   none, that they submitted that said that.

11           **THE COURT:**  All right.  So how do I decide a motion

12   for summary judgment?  I thought these were cross motions to

13   which there was no disagreement over the facts.  So I'm trying

14   to figure out how it operates.

15           **MR. FISHER:**  Your Honor --

16           **MR. CHATTERJEE:**  Your Honor, it's very simple.  In

17   the evidence we submitted Friday, Mr. Vachani, in the 30(b)(6)

18   deposition, said the software is the best evidence of how the

19   system work.

20           Larry Melling, who is our expert, came in and put

21   forward affirmative evidence describing how that software

22   worked, going line by line through the sub routines on that

23   code that described how Power did it in the exact way I

24   described it to you.  The evidence is unrefuted, so there is no

25   issue of fact.

1        They can come in here now and say they disagree with

2    that, but there is no evidence, none, that says the software

3    operated any differently than the way Mr. Melling articulated.

4        **THE COURT:**  All right.  Let me pause.  So what would

5    be the fact that would contradict that?

6        **MR. FISHER:**  The fact -- there is not a fact that

7    contradicts that.  I think we're in agreement about how it

8    works.  There's no dispute that there was a process by which

9    Power users could create these events.  But they were done with

10   the explicit permission of the Power users.  It could not be

11   done without the Power users authorizing.

12        Your Honor, we included in our brief screen shots

13   that showed exactly how the system worked.  And I think if the

14   Court looks at those, it's very basic and very simple --

15        **THE COURT:**  Why doesn't Power show up at all in the

16   event e-mail?

17        **MR. FISHER:**  I think Power does, Your Honor.

18        **THE COURT:**  Where?

19        **MR. FISHER:**  It says the host is Power.

20        **THE COURT:**  Where?

21        **MR. FISHER:**  Right in the middle of the e-mail, it

22   says, Host:  Power.

23        **THE COURT:**  Oh.  So that is supposed to be Power.com?

24        **MR. FISHER:**  Yes, I believe so, Your Honor.

25        **THE COURT:**  That's the only reference to Power in

1   this?

2            **MR. FISHER:**  Yes.  I believe if you click on the --

3            **THE COURT:**  So they are hosting the reunion, they're

4   not hosting the e-mail.

5            **MR. FISHER:**  I don't know if they -- yes.  I mean, I

6   think, Your Honor, if a user was to click on the link down

7   below the information about the event, that would lead you to

8   more information about Power.  I don't know.  And that's not in

9   evidence, Your Honor, but that's my speculation.

10           **THE COURT:**  So why does it -- why is Facebook on this

11  at all?

12           **MR. FISHER:**  I have no earthly idea, is the answer to

13  that, Your Honor.

14           **THE COURT:**  Say again?

15           **MR. FISHER:**  I have no earthly idea why Facebook

16  cares about this.

17           **THE COURT:**  No, no, no, I didn't ask you why they

18  care about it.  Why does Facebook appear in the event?

19           Why isn't this a Power event where Power is

20  soliciting its users?  Because you said these are Power users.

21  So these are Power users, also who are Facebook users, sending

22  out an event that is to the benefit of Power, correct?

23           **MR. FISHER:**  That's correct, Your Honor.

24           **THE COURT:**  All right.  So why does Facebook appear

25  in it at all?

1          **MR. FISHER:**  The answer to that is because that's how

2    Facebook designed the system.  Facebook created this system by

3    which e-mails go out, and they designed it down to the -- every

4    aspect of that was created by Facebook, not Power.

5          **THE COURT:**  The alternative would be for Power to

6    create its own e-mail list and send it directly, correct?

7          **MR. FISHER:**  They could have done that.

8          **THE COURT:**  All right.  So what it chooses to do is

9    to use the Facebook system for its benefit.  Power chooses to

10   use the Facebook system for its benefit.

11         **MR. FISHER:**  There was no way for Power to create its

12   own e-mail invitations within the Facebook --

13         **THE COURT:**  Why not?  You had the users, and the

14   users had the e-mail addresses of their friends.  Why couldn't

15   they simply list those?

16         **MR. FISHER:**  Because Facebook is a closed system that

17   doesn't allow its users to use its system in that manner.

18         **THE COURT:**  I didn't say use its system.  You want to

19   get to the e-mail address of the friends.  The users know their

20   friends.  They know their e-mail address.  Why can't they

21   simply give them to Power?

22         **MR. FISHER:**  They could have done that.  They didn't

23   do that, Your Honor.

24         **THE COURT:**  No --

25         **MR. FISHER:**  Facebook has a system that is created

1    for creating events, and it's a very simple process by which

2    one, with a few clicks on a keyboard, could send out these

3    kinds of invitations.  It's very common.  And hundreds of

4    millions of these are sent every day, whether it's somebody

5    who's having a party or somebody who has a business function

6    that is at issue.

7            Facebook is obviously so ubiquitous --

8            **THE COURT:**  All right.  Let me have you go back to

9    your argument.  I appreciate that I know almost enough about

10   the facts.  I did not hear you say that I could not rely on

11   this expert declaration as an explanation of how the system

12   operates.

13           And the question that it sounds like you need to

14   argue to the Court is, if it operates like that, does it

15   violate the statutes that are at issue here.

16           **MR. FISHER:**  Sure, and I'm happy to address that,

17   Your Honor.

18           **MR. CHATTERJEE:**  And, Your Honor, just to make sure

19   I've pointed you in the right direction, the Melling

20   declaration, paragraphs 3 and 17 to 35, describe in detail how

21   the event invitations work.

22           **THE COURT:**  All right.  So let's assume that -- and I

23   presume you are familiar with that declaration.  And so in

24   order to make this a purposeful argument under the standard for

25   summary judgment, I need to now go to statutory interpretation,

1   which is a matter of law.

2          And assuming that you agree with paragraphs 3 and 17

3   to 35, why doesn't that violate the federal and state laws that

4   are at issue here?

5          **MR. FISHER:**  Because, first of all, Power didn't do

6   anything.  It was Power users who did something and authorized

7   the e-mails to be sent.  And really -- really, there are two

8   steps here, Your Honor.

9          First, there's the creation of an event.  And I don't

10  think the creation of an event even falls with the CAN-SPAM

11  Act.  The e-mail is a separate part, and that's done completely

12  by Facebook.

13         And they have no control whatsoever what goes into

14  many aspects of this e-mail.  The return address, the name on

15  it, the signature line, the opt-out information at the bottom

16  of the e-mail; they have no control over it that.

17         And I don't think under CAN-SPAM -- they haven't

18  cited a single case under similar facts where a defendant has

19  been found liable under the CAN-SPAM Act.

20         Furthermore, Your Honor, there has been no showing

21  that anyone who got these e-mails was deceived or misled or

22  complained or was in any way harmed by receiving these e-mails.

23  They haven't put into evidence anything that shows that

24  somebody said, hey, Facebook, stop sending me these e-mails.

25         **THE COURT:**  Well, I don't know that the statute

```
 1  requires that.  In other words, you would argue that the

 2  statute, by the language of the statute, requires actual belief

 3  or some mental state on the part of the people who receive it.

 4  I don't see that.

 5       MR. FISHER:  No, but I think, Your Honor, that goes

 6  to the point that it's telling that -- the fact that nobody

 7  complained shows that people get these things all the time and

 8  they know they're coming from Facebook and they're part of the

 9  Facebook system.

10       THE COURT:  I invited you to focus on the statute.

11  If you tell me, Your Honor, the statute is important, that the

12  CAN-SPAM Act doesn't apply if it's a ubiquitous thing.  I don't

13  see that language, so that's why I'm inviting you to go to --

14  in other words, I see "initiate."

15       I see something where there's something called header

16  information as the source, destination, routing information.

17       Tell me that the source, destination and routing

18  information is not inaccurate in any way.  That's what I want

19  to hear.  I want to hear you argue to the language of the

20  statute and based upon the facts as set forth in the

21  declaration.

22       MR. FISHER:  I don't think there's a disagreement

23  about what the statute says, Your Honor.  I think the

24  disagreement here is on a couple things.  I don't think there's

25  any inaccuracy in these -- in the header information.  And
```

1  there's nothing wrong with what is in the header information,

2  and there's no violation therefore.

3          **THE COURT:**  What's the source?

4          **MR. FISHER:**  The source?

5          **THE COURT:**  What does that mean, the source?

6          **MR. FISHER:**  The source of the e-mail?

7          **THE COURT:**  The source as identified in the header

8  information.

9          **MR. FISHER:**  The source is the Facebook server.  The

10  source is Facebook.

11          **THE COURT:**  And so if anyone were to send something

12  through the Facebook server, the Facebook server becomes the

13  source as opposed to the person who initiates it.  The source

14  is always defined as the Internet service provider, the server,

15  the Internet service provider.  That's what I should say as a

16  matter of law.

17          **MR. FISHER:**  It's common sense, I think, Your Honor.

18          **THE COURT:**  No.  Just say yes, if that's what your

19  argument is.

20          **MR. FISHER:**  Yes.

21          **THE COURT:**  Because I'm going to tie you to arguments

22  of proposition.  Because if this is a motion for summary

23  judgment, the people who grade my papers are going to be

24  looking to see that I'm basing it on no dispute about facts but

25  only questions of law.

```
 1              And if you tell me that, under the statute, the
 2    source means the server, that's what I'll write down.  That's
 3    as your position.
 4              MR. FISHER:  That's my position, Your Honor.
 5              THE COURT:  All right.  And...
 6              MR. FISHER:  Or, more generally, the source is
 7    Facebook.
 8              THE COURT:  And then the Act further provides that
 9    the header information shall be considered materially
10    misleading if it fails to identify accurately a protected
11    computer used to initiate the message.
12              MR. FISHER:  And that really goes to the argument I
13    made earlier, Your Honor, that nobody was misled.  How can it
14    be materially misleading if nobody complained, nobody said,
15    Hey, Facebook, stop sending me this.  There's no evidence of
16    that.
17              THE COURT:  Well, it says "fails to identify the
18    protected computer used to initiate the message."
19              What protected computer was correctly identified as
20    used to initiate the message?
21              MR. FISHER:  Facebook's computer sent a message,
22    Facebook's server.
23              THE COURT:  Used to initiate the message.
24              MR. FISHER:  Yes.
25              THE COURT:  All right.  And so, again, the language
```

1   "used to initiate the message" always means the server of the

2   Internet service provider.

3           **MR. FISHER:**  Yes.

4           **THE COURT:**  All right.

5           **MR. FISHER:**  The other thing the statute requires,

6   Your Honor, is harm.  And there is no evidence whatsoever of

7   any harm to Facebook under either the CAN-SPAM Act or the two

8   other statutes, the Computer Fraud and Abuse Act or Penal Code

9   Section 502, that they also assert in their complaint.

10          The only evidence that Facebook has put in of harm is

11   two declarations.

12           **THE COURT:**  So you've gone to harm.  I'm still on the

13   definition of "initiate."

14          So then the other part is, under the statute, "would

15   impair the ability of an Internet service provider or a

16   recipient to identify, locate or respond to a person who

17   initiated the message."

18          So respond to the person who initiated, who would

19   that be under your argument?

20           **MR. FISHER:**  Doesn't the last line of the e-mail,

21   "Want to control which e-mails you receive from Facebook?" go

22   directly to that, Your Honor?

23           **THE COURT:**  I don't want to answer the questions.  I

24   want you to answer my question.

25          Who would you argue is the individual that is

1   referred to as "respond to a person who initiated the

2   electronic mail"?  Who is that referring to under the statutory

3   language?

4          MR. FISHER:  You would respond to Facebook.

5          THE COURT:  Well, I need a more general -- all other

6   cases Facebook might not be in it.  I'm trying to ask you a

7   statutory interpretation question.

8          Is that again to the server?

9          MR. FISHER:  Yes.

10          THE COURT:  Of the Internet service provider?

11          MR. FISHER:  Yes.

12          THE COURT:  All right.

13          MR. FISHER:  Is it all right if I move on to harm,

14   Your Honor?

15          THE COURT:  Well, I was going to go to the California

16   Penal Code, also involved here.

17          MR. FISHER:  My arguments on harm tie into both the

18   other statutes as well.

19          THE COURT:  And what's your position with respect to

20   California Penal Code Section 502?

21          MR. FISHER:  502 and the Computer Fraud and Abuse Act

22   are similar in terms of their scope and what they cover.  They

23   both require some showing that there was some sort of taking of

24   information from an unauthorized access.

25          We've already talked at some length that there was no

1  unauthorized access here.  Any access was done with the

2  permission of Power users who expressly provided their log-in

3  credentials.

4          In addition, there's no evidence of any sort of

5  taking at all.  The only information that Power ever took from

6  Facebook was information that did not belong to Facebook.  It

7  was Power users' personal information, their pictures, their

8  music, their contacts, things like that that users said they

9  could take.  There's no evidence whatsoever of anything having

10 been taken from Facebook.  No software --

11         **THE COURT:**  Well, the software that was created, why

12 was it necessary?

13         **MR. FISHER:**  Why was the software that was created

14 necessary?

15         **THE COURT:**  Why was the Power software necessary?

16         **MR. FISHER:**  The Power software was designed to allow

17 users who have multiple social networking accounts to look at

18 them all in one place.

19         So if a user had an account with Orchid, which is

20 Google's social networking system, as well as a Facebook

21 account and a Twitter account and all these other ones, they

22 could go to Power and they could access those accounts all in

23 one place and then share information between the various sites

24 all in one place.  That was what --

25         **THE COURT:**  All right.  But was there any feature of

1  the software that was necessary to circumvent protections that

2  Facebook built against that?

3          MR. FISHER:  Was there -- I'm sorry, Your Honor.

4  Would you rephrase that for me?  I didn't understand.

5          THE COURT:  Was there any aspect of the Power

6  software that was created to circumvent protections built into

7  the Facebook system to avoid that very process?

8          MR. FISHER:  Power's software had built into it the

9  capacity to switch from one IP address to another one if an IP

10 address were --

11         THE COURT:  My question called for a yes or no

12 answer.  Was there any aspect of the Power software that was

13 designed to circumvent Facebook's software or its system to

14 avoid this process that you're describing that Power created,

15 yes or no?

16         MR. FISHER:  No, Your Honor.

17         THE COURT:  No.  So there was no -- there was no

18 aspect of this that was circumventing technical or barriers

19 that were built into the code by Facebook, yes?

20         MR. FISHER:  It had the -- yes, Your Honor.  It had

21 the ability to switch from one IP address to another, but that

22 is not -- there's not evidence that that is -- that the purpose

23 was to --

24         THE COURT:  I didn't ask the purpose.  I asked

25 whether it circumvented.

1          **MR. FISHER:**  No, it was not designed to circumvent.

2          **THE COURT:**  Did it circumvent?

3          **MR. FISHER:**  As defined by this Court, I don't

4    believe so, no.

5          **THE COURT:**  So I've got to take your belief?

6          **MR. FISHER:**  No, Your Honor.

7          **THE COURT:**  So how do I learn whether or not --

8    what's the test for whether it circumvented?

9          **MR. FISHER:**  Your Honor looked at this issue at some

10   length in 2010, in connection with earlier motions that were

11   brought by the parties.

12         **THE COURT:**  So I can use that same process.

13         **MR. FISHER:**  Yes, I think you would use exactly the

14   same process.  And I think when Your Honor talked about

15   circumventing in the -- I believe it was July 2010 order, Your

16   Honor talked about circumventing in, okay, Facebook, if you

17   attempted to block Power and then they did something to get

18   around your block, okay, that can be a violation of the CFAA or

19   502.  I think that's what Your Honor intended by that.

20         **THE COURT:**  I wanted more information at that point.

21         **MR. FISHER:**  Yeah.  And at that time Facebook's

22   argument was that we're going to show you, Your Honor, that we

23   put up an IP block and then Power did something to get around

24   that.

25         They've now abandoned that theory, and now their

 1   theory is, well, when Power was designing its software,

 2   whenever that was -- 2006, 2007 -- that at that time they built

 3   into their software something that could get around some sort

 4   of hypothetical IP blocking that came up at some future time,

 5   some technical barrier that they had not even yet encountered.

 6   That's their argument now.

 7           **THE COURT:**  Maybe you're being adversarial in this.

 8   I understood that there were built into this Power software

 9   some switching of the IP address so that any attempt that could

10   be made to stop massive kinds of e-mails coming through

11   Facebook would be circumvented.

12           Maybe I'm not accurately describing it, but that's

13   what I'm trying to get you to speak to.

14           **MR. FISHER:**  It's -- the software had that ability to

15   switch IP addresses.

16           **THE COURT:**  Isn't that designed to circumvent?

17           **MR. FISHER:**  That is not a design to -- I don't think

18   there's any evidence that that was designed to circumvent.

19           **THE COURT:**  Does it circumvent?

20           **MR. FISHER:**  Just as we -- you know, your Honor, I

21   think that's a very common feature of software, so that if you

22   go to a website and it doesn't connect, the website is able to

23   switch over to another IP so that you're still able to connect.

24   I think that's something we all encounter every day when we use

25   software.

1          **THE COURT:**  How about if you're trying to block?

2          **MR. FISHER:**  How could Power have known in advance

3    that Facebook was going to attempt to block it and what

4    mechanism they would use?

5          **THE COURT:**  Maybe these are rhetorical questions, but

6    I don't intend to answer that.

7          I'm trying to get your position as to whether or not

8    that formed circumvention if you switched IP addresses in order

9    to avoid blocking a particular one.

10         **MR. FISHER:**  It certainly had the effect of getting

11   around the block, but the block was very weak.

12         And I don't think Your Honor wants to create a system

13   where someone who's writing a piece of software and then five

14   years later somebody tries to block the use of that software

15   and suddenly that becomes criminal liability under the Computer

16   Fraud and Abuse Act.

17         In the amicus brief submitted by the Electronic

18   Frontier Foundation, they talked about that sort of creating a

19   thought crime, that they talked about it as a way in which

20   somebody who's, you know, in their office right now writing a

21   piece of software has to anticipate what blocks are going to be

22   used and then worry about whether or not they're going to

23   someday be held liable under this statute even though they have

24   no idea how that software is going to be used or what kind of

25   blocks a company could use.  There is no way a person could

1  know that.  And to impose liability for that just seems

2  inconsistent with the Act.

3           And the Electronic Frontier Foundation has very

4  persuasive arguments on that point, and I'd ask Your Honor to

5  look at those.

6           On the harm issue, Your Honor, the evidence of harm

7  that's been put in by Facebook consists of two declarations.

8  One by somebody on the Facebook security team named Ryan

9  McGeehan.  And he talks about that what Power and its users did

10 created security vulnerabilities in the Facebook system, and he

11 talks about that their actions harmed -- potentially harmed

12 Facebook's goodwill.  I think that's all very vague and

13 unquantifiable and not very specific.

14          And the extent of what Mr. McGeehan says that he and

15 his team did was they had some meetings.  And I don't think

16 those harms are sufficient for a finding of liability or a

17 recovery of any sort of damages under the CAN-SPAM Act, under

18 the CFAA, or under Penal Code Section 502.  And certainly not

19 the $18 million that Facebook seeks under the CAN-SPAM Act.

20          The other harm identified by Facebook is it seeks to

21 recover its lawyer fees.  Its lawyer, Joseph Cutler, wrote a

22 cease-and-desist letter to Power and then initiated this

23 lawsuit.  And they now seek to recover those fees as part of

24 this lawsuit.

25          And, again, I think that's inconsistent with the

1   language of the CAN-SPAM Act and the case law that's

2   interpreted the Act, which talks about the ability to recover

3   under the Act for operational and technical costs that were

4   incurred as a result of the violation of the statute.

5        They haven't cited a case under the CAN-SPAM Act

6   where there is any sort of recovery of attorneys' fees for a

7   violation of the Act.

8        The CFAA and 502 are broader in their language about

9   what can be recovered -- I see I have a red light.  May I

10  continue, Your Honor?

11       **THE COURT:**  Finish your statement there.

12       **MR. FISHER:**  Sure.  The CFAA and 502 are broader in

13  their language regarding the costs that can be recovered, but

14  if you look at the legislative history -- and, again, the

15  Electronic Frontier Foundation's brief looked at it carefully

16  and showed, really, again, the purpose of those statutes is to

17  recover for things like repair costs, restoring data,

18  reprogramming a computer, lost computer time, those sorts of

19  things.  There's not really any sort of mechanism for

20  recovering attorneys' fees under that statute.

21       And it also allows a plaintiff to sort of manufacture

22  standing under the statute because it's very easy to run up

23  $5,000 in attorney time and a plaintiff who didn't like

24  somebody's access could simply hire a lawyer and in a few hours

25  they would have standing to assert a claim under the statute.

1              Thank you, Your Honor.

2              **THE COURT:**  Thank you, Counsel.

3              So although we have an earlier colloquy, I give to

4    you the same responsibility.  Assuming that what is described

5    in the declaration you refer to, I can take that as undisputed

6    facts.  What brings that conduct within the various statutes?

7              **MR. CHATTERJEE:**  Well, Your Honor, Mr. Melling's

8    declaration does actually say that it was Power that initiated

9    these commercial messages.

10             **THE COURT:**  Those are his conclusions.  The facts are

11   not his conclusion.  The facts are what actually happened.  And

12   so I'll have to separate out the conclusion from the factual

13   description of what took place.

14             **MR. CHATTERJEE:**  Understood, Your Honor.

15             So, Your Honor, you asked some very pointed questions

16   on the CAN-SPAM Act about who is the initiator.  And the way I

17   like to think about the "who is the initiator" question is if I

18   wanted to ask someone to stop sending me this particular form

19   of commercial message, could I do that?

20             In this case, Power was paying users to send

21   commercial messages.  Just as Your Honor asked, they were not

22   doing it on their own behalf.  Instead, they were hiding behind

23   the users to send these messages.

24             When another user received those messages, there was

25   no way for them to know -- and Your Honor actually asked

1   specific questions about those e-mail messages.  And you can

2   also look at the event invitations.  There was no way to know

3   that it originated with Power.

4        So if a user said, look, I don't want to see anymore

5   Power messages, they would have no way to know who to contact

6   to say, please, stop doing that.

7        **THE COURT:**  Well, you're using "user" in both ways.

8   So if a recipient wanted to --

9        **MR. CHATTERJEE:**  Let's use "sender" and "recipient."

10  That's a better way to refer to it, Your Honor.

11       So if a recipient of a message that was originated

12  from the Power website, using the Power technology, wanted to

13  tell Power to stop, they could not do that.

14       **THE COURT:**  Who is the statute designed to protect?

15       **MR. CHATTERJEE:**  The statute is defined to protect

16  both Internet services that could be misused in the way Power

17  misused the Facebook website as well as the recipient of the

18  e-mail messages.

19       But the standing that's conferred is specifically on

20  the ISPs to incentivize them to protect themselves, because it

21  requires that adversely affected language for the ISPs.  But it

22  is designed to prevent misuse of systems such as Facebook in

23  the way that Power did it.

24       **THE COURT:**  So if the ISP is the intended beneficiary

25  of the statute -- I understand that senders and recipients will

1    be affected, but the only standing here is given to the ISP.

2              MR. CHATTERJEE:  Correct, Your Honor.

3              THE COURT:  All right.  So if the ISP creates a

4    system of hosting events and allows users to use the system to

5    host those events, what is to prevent a user from being paid to

6    host an event?

7              MR. CHATTERJEE:  Your Honor, it's because the

8    statute, the CAN-SPAM statute -- there's two creatures.  One is

9    the terms of service which governs the relationship between a

10   website and its users.  But there's also the statute itself

11   under CAN-SPAM.  And if I may, I'll read you the definition of

12   "initiate."

13             THE COURT:  All right.

14             MR. CHATTERJEE:  So what the definition of "initiate"

15   says is, the term "initiate," when used with respect to

16   commercial electronic mail message, means to originate or

17   transmit such message, or to procure the origination or

18   transmission of such message.  That's the definition.

19             And what -- what Power did here is they paid their

20   users.  They procured the origination of the message from their

21   users.

22             THE COURT:  So it's really the latter part that I

23   should focus on.  In other words, my question was:  What is to

24   prevent a user from being paid to initiate these invites?  And

25   you believe that language does that?

1          **MR. CHATTERJEE:**  That language requires that if

2   you're going to pay the users to send a commercial e-mail

3   message for you, you have to identify that you're the actual

4   sender of the message.  So with respect to the event --

5          **THE COURT:**  Not the actual sender, you're the

6   procurer.  I guess it mixes both things.  In other words, if

7   there are two standards, sending and procuring someone else to

8   send, what does the statute say if you're using the latter

9   portion?

10          **MR. CHATTERJEE:**  That's right, Your Honor.  So under

11   the statute both the sender and the procurer are the initiators

12   of a commercial message.

13          **THE COURT:**  I thought it was "or."

14          **MR. CHATTERJEE:**  It is.  It is "or."

15          **THE COURT:**  So if you're in an "or" situation where

16   you've got just the person who's procuring someone else to send

17   it, what does the statute provide with respect to

18   identification?

19          **MR. CHATTERJEE:**  So what the statute provides is that

20   the -- the message that is sent has to identify who is the

21   procurer.  So in this case, if an event invitation --

22          **THE COURT:**  That literal language isn't there.

23   That's something you'd ask me to interpret from the statute.

24          **MR. CHATTERJEE:**  It is the way that the FTC has

25   interpreted the statute.  It is the way that the courts have

1   interpreted the statute.  And my reading of the statute, that's

2   what's required, Your Honor.

3           **THE COURT:**  All right.

4           **MR. CHATTERJEE:**  Because, otherwise, the statute

5   would have no teeth.  If a noncommercial entity could be bought

6   off to send a message, you would never be able to go to the

7   source of the problem and stop the message.

8           The whole point here is to be able to go to the

9   source of the commercial e-mail messages and get them to stop,

10  either from the ISP side, or if a user received an unsolicited

11  message, they need to be able to contact the originator.

12          **THE COURT:**  Well, your opponent points to the word

13  "Power" under host as the way you would know who was doing

14  this.  Why isn't that sufficient?

15          **MR. CHATTERJEE:**  Because it doesn't even identify a

16  website in the e-mail.  It just says Power.  If I received an

17  e-mail invitation and all it said was Power, I'd have no idea

18  who that was, where it was, whether that was the source or not.

19  It has no indication as to what that is.  It just uses the

20  naked word "Power."  It doesn't even say Power.com.

21          The key issue when you're talking about these

22  commercial e-mail messages is to be able to know who the source

23  of the message is, the person that's actually causing it to be

24  sent, and that includes the person procuring the message, and

25  to tell them to stop.

```
1            This e-mail message, as well as the event invitation
2   that's posted on the Facebook system, gave no indication as to
3   who the source of the message was, Power.com.
4            THE COURT:  So here's the -- here's the other aspect
5   of this that concerns the Court, and that is, this is not
6   unconnected to the users.  This is an attempt by one commercial
7   company to compete with another by inviting the users to use
8   the resources of their many websites, their many social
9   networking sites, to its advantage.
10           And it, therefore, is very different from Power
11  somehow sending directly to various users of Facebook and
12  MySpace or others -- I don't know quite the number that would
13  be involved here -- because, using the intermediary of a user,
14  you at least then don't have a uncontrollable audience that
15  you're sending it to.
16           You're actually only sending it to people who the
17  user decides, I would like to have my friends receive the
18  benefit of this because I'm receiving a benefit, a hundred
19  bucks if I can win the time and number of contests.  But that
20  removes it from other circumstances where it's totally
21  unconnected with the user.  Address that concern.
22           MR. CHATTERJEE:  Your Honor, actually that specific
23  type of issue has been addressed in case law as well.  And it's
24  actually considered a worse issue because it falsely puts a
25  stamp of approval that it's the user sending it, not Power.
```

1        It creates a misleading impression on the part of

2   users because it doesn't say that the user is being paid to

3   send these.  Instead, it kind of creates a degree of

4   association that otherwise wouldn't exist.

5        **THE COURT:**  Well, are they being paid or are they in

6   a contest?

7        **MR. CHATTERJEE:**  They are being paid.  If they -- if

8   they get a hundred users --

9        **THE COURT:**  That makes it a contest, doesn't it?

10       **MR. CHATTERJEE:**  Your Honor, if you look at the FTC

11   analysis of the CAN-SPAM Act, it's not a contest in the sense

12   that if people bring a hundred users, they get a hundred

13   dollars.

14       Even Mr. Vachani, in his 30(b)(6) deposition, which

15   we submitted on Friday, he said they were paying users to get

16   access to their user account and send these invitations.  You

17   cannot say that that is anything other than procurement.

18       They are procuring the users by -- they're procuring

19   new members on Power by paying existing Power users to get

20   access to the Facebook account.  That is -- that is exactly

21   what the statute says.  That's how -- that's how it has been

22   interpreted by the FTC.  That is how the case laws interpret

23   it.

24       And it gets aggravated by the fact that they created

25   a false degree of association by using the users.  It is true

1   that there are other CAN-SPAM cases that you just have a

2   general, broadcast-based e-mail to everyone in the world.  But

3   that does not change the nature of what the statute requires

4   and what creates a cause of action under the statute.

5           **THE COURT:**  How about the harm?

6           **MR. CHATTERJEE:**  Your Honor, as to the harm, they

7   admitted a number of things in their answer, including -- and

8   Your Honor found on our previous motion that we had put forward

9   the requisite amount of harm just by nature of their

10  admissions.

11          But we did put in additional evidence from Ryan

12  McGeehan that shows that we were adversely affected, as well as

13  the deposition of Joe Cutler, who is one of the lawyers that

14  was originally investigating Power's activities.

15          **THE COURT:**  It adversely affected the measure of

16  harm?

17          **MR. CHATTERJEE:**  So it's different, Your Honor, for

18  the CAN-SPAM Act than it is for 502C and 1030.  Fundamentally,

19  I think the underlying facts are the same, but the way the

20  statutes read are slightly different.

21          Adversely affected -- and the *Gordon vs. Ruchu Mundo*

22  case, goes in detail about what that means under the CAN-SPAM

23  Act, but, basically, if we are engaging in substantial efforts

24  to combat spam, or unsolicited commercial messages, we have to

25  engage in investigatory efforts to stop this sort of activity.

1    That is enough to constitute adversely affected.

2           I think that the facts underlying that and harm, for

3    502C and CFAA are fundamentally the same.  The statutes are

4    not -- are worded slightly differently, but the underlying

5    analysis doesn't change a whole lot.

6           **THE COURT:**  All right.  A final question for you.  I

7    see your time is coming to an end.  And I'll actually ask your

8    opponent the same question.

9           This feels to me as though, even if I were to be

10   persuaded to find on liability, I cannot find by way of summary

11   adjudication damages.

12          So if I were to find in your favor, what would be

13   undisputed evidence about whether I can come to a determination

14   of damages?

15          **MR. CHATTERJEE:**  So, Your Honor, on the damages

16   question under the CAN-SPAM Act, we have put in unrefuted

17   evidence as to the number of event invitations that were sent

18   through the Facebook system.  It was 60,000, a certain several

19   hundred beyond that.

20          The declaration of Larry Melling once again -- and

21   I'll keep pointing you back to that because they haven't

22   refuted it -- pointed to specific sub routines and databases

23   where -- the logging data of how many event invitations were

24   sent through the Power system.

25          During this litigation, the other side has destroyed

 1 the database that would connect that information.  And so the

 2 evidence we have right now is 60,100-something.  I forget the

 3 exact number of hundreds.

 4        What we ask Your Honor to do is, under the CAN-SPAM

 5 Act, to just apply the statutory maximum and the aggravating

 6 numbers because that is the only evidence there is.  They

 7 destroyed the rest.  And so we know that there's more.  We

 8 believe there's more.  But they destroyed that evidence.

 9        As to the damages under the -- under the 502C and

10 1030 causes of action, Your Honor, if you're going to make a

11 finding of liability, that may or may not be necessary for

12 damages, because, quite honestly, if we get $18 million under

13 the CAN-SPAM Act, my guess is we may never try the issue of

14 damages on the -- on the 502C and 1030 claims.  The damage

15 numbers there are considerably smaller.

16        **THE COURT:**  All right.

17        **MR. CHATTERJEE:**  If I can just add one final thing --

18        **THE COURT:**  Yes.

19        **MR. CHATTERJEE:**  -- to address going back to the

20 Larry Melling declaration, you had a colloquy about the

21 circumvention measures.  There is an exhibit, Exhibit 3 to my

22 declaration, where Mr. Vachani is asked specifically about the

23 blocking measures and their efforts to circumvent.

24        And he was asked, Did you actually circumvent

25 Facebook blocks?  Generally.

1              Here's what he said:

2              "It means that it is very difficult to block

3              up.  Facebook took what should have been a

4              standard measure, but we were able to easily

5              adjust and could have continued."

6         He admitted that he circumvented in reaction to the

7    Facebook measures, but we also know that he made a premeditated

8    act.  The documents that we submitted show the reason that this

9    proxy-rotating technology was developed was to evade detection

10   and to avoid blocks.

11        And Mr. Melling's declaration describes in detail how

12   the system was engineered from the very beginning to do that,

13   because they knew that Facebook and other websites wouldn't

14   want to give them access.  They knew that the terms of service

15   forbade it.  And they knew after Facebook sent a

16   cease-and-desist letter that Facebook was going to block them.

17   And so they preengineered a proxy rotation strategy.

18        Mr. Fisher can come in here and say, well, in the

19   abstract, you know, people might pre-engineer something and it

20   might have some pernicious consequences.  That is not what the

21   facts show here, Your Honor.

22        **THE COURT:**  Very well.  I have that in mind.  Thank

23   you very much, Mr. Chatterjee.

24        **MR. CHATTERJEE:**  Thank you, Your Honor.

25        **THE COURT:**  So the question I put at the end there

1   that I would have you respond to is whether I shouldn't treat

2   these as cross motions for summary judgment on liability only.

3           Even if I find liability one way or the other here,

4   don't I need a trial on damages?

5           **MR. FISHER:**  No, Your Honor, because I think we put

6   the evidence in, there's no harm.  Facebook hasn't been harmed

7   in any way.  And the Court doesn't -- the Court can decide

8   this.

9           **THE COURT:**  Okay.

10          **MR. FISHER:**  There's no harm.

11          **THE COURT:**  Well, sounds like both sides are saying I

12   don't need a trial on damages, so I'll take your word for it.

13          Thank you very much.  The matter is submitted.

14          **MR. FISHER:**  Thank you, Your Honor.

15          **MR. CHATTERJEE:**  Thank you.

16          (At 10:16 a.m. the proceedings were adjourned.)

17                      -   -   -   -

18                **CERTIFICATE OF REPORTER**

19          I certify that the foregoing is a correct transcript

20   from the record of proceedings in the above-entitled matter.

21   DATE:   Friday, January 27, 2012

22               s/b Katherine Powell Sullivan
                _____

23

24          Katherine Powell Sullivan, CSR #5812, RPR, CRR
                      U.S. Court Reporter

25