# EXHIBIT H

1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3           SAN FRANCISCO DIVISION

4


5
FACEBOOK, INC.,                )
6                              )
          Plaintiff,           )
7                              ) Case No.
vs.                            ) 5:08-cv-05780 JW (JCS)
8                              )
POWER VENTURES, INC., a        )
9 Cayman Island Corporation;   )
STEVE VACHANI, an individual; )
10 DOE 1, d/b/a POWER.COM,       )
DOES 2-25, inclusive,          )
11                             )
          Defendants.          )
12 _____)

13

14

15             CONFIDENTIAL

16

17        VIDEOTAPED DEPOSITION of POWER VENTURES,

18 INC.'S 30(b)(6) Designee STEVEN VACHANI taken on behalf

19 of Plaintiff, at Orrick, Herrington & Sutcliffe LLP, 405

20 Howard Street, 10th Floor, San Francisco, California

21 beginning at 9:13 a.m., Monday, January 9, 2012, before

22 CHERREE P. PETERSON, RPR, CRR, Certified Shorthand

23 Reporter No. 11108.

24

25

**BARKLEY**
Court Reporters

1      Q.    Is there any topic that's listed in Exhibit

2   188 -- and you can -- you can take a look through them

3   if you need to -- that you felt you were not able to

4   testify about?

09:29   5      A.    I feel I can testify on these topics.  I don't

6   know the level of specificity that you're going to go in

7   some of the technical details, so -- but I'm familiar

8   with all these subjects.  But there are definitely areas

9   that I was not specifically managing on a day-to-day

09:29   10   basis.  And if that were to come up, I'll let you know.

11      Q.    Okay.  Appreciate that.  And I'm going to try

12   and expedite that particular issue right now for you.

13   Hopefully if -- I think where this is going to go, it

14   will make it a lot easier.

09:29   15           We can mark that Exhibit 189.

16           (Plaintiff's Exhibit No. 189 marked for

17            identification.)

18      Q.    BY MR. CHATTERJEE:  Mr. Vachani, what I've

19   handed you as Exhibit 189 is a declaration that you

09:30   20   submitted in opposition to Facebook's motion to compel

21   documents.  Is this your signature at the bottom?

22      A.    Yes, it is.

23      Q.    And this -- this declaration was truthful and

24   accurate when you submitted it?

09:30   25      A.    Yes.

24

BARKLEY
Court Reporters

1      Q.    In the second paragraph you stated "Power has

2   already produced the actual source code it used to

3   access Facebook's website.  The source code as well as

4   the other documents Power has produced in this case such

09:30  5   as the PowerScript Training documents and PowerScript

6   Documentation Developer Manual show precisely how Power

7   accessed Facebook's website."  These "documents

8   constitute the best possible information Power has to

9   understand how Power accessed Facebook's website."

09:31  10      Do you see that?

11      A.    Yes.

12      Q.    Okay.  So that statement was accurate when you

13   made it?

14      A.    Yes.

09:31  15      Q.    Is it fair to say that the -- the actual

16   source code that Power has produced in this case is the

17   best evidence of what Power did and how it was doing it

18   with respect to the Facebook web site?

19          MR. FISHER:  Objection.  Vague.

09:31  20          THE WITNESS:  I believe we've provided

21   everything that we had available.  So -- so therefore

22   everything that was possibly available as we provided,

23   therefore that's the best that could be provided.

24          MR. CHATTERJEE:  Okay.  Could you read the

09:31  25   question back, please.

25

BARKLEY
Court Reporters

1   Facebook -- on the Facebook site.  There are two

2   different things.

3         And I'll give you a specific example.  There

4   exists in our database, for example, a thing that would

09:38  5   track messages sent by -- by -- if a -- if a user wanted

6   to send an invitation to a friend, for example.  This

7   code exists and even a database log exists.  But at that

8   time back in December whatever, we never sent a single

9   message.  So that -- that -- that thing was empty or,

09:38 10   you know, that -- but -- but the ability to send

11   messages existed.  Just because something exists doesn't

12   mean -- you know, at times I've seen that Facebook

13   has -- has made irresponsibly and sometimes incorrectly

14   statements saying that we did something because our code

09:38 15   -- because the capability existed.  And that's -- that's

16   what I'm trying to say.

17      Q.    Okay.  Move to strike as nonresponsive.

18         Mr. Vachani, is the statements made in

19   paragraph 2 accurate?

09:39 20         MR. FISHER:  Asked and answered.

21   Argumentative.

22         THE WITNESS:  So I'll read it again.  We have

23   produced the actual source codes.  That's correct, we

24   have produced the source code.  And the source code does

09:39 25   show how we accessed -- how we accessed the site, at

32

BARKLEY
Court Reporters

1    least.  So I think the statement is correct.

2       Q.    Okay.

3       A.    But you asked --

4       Q.    Hold on.  Okay.  I need you to answer my

09:39 5  questions.  I don't need you volunteering information.

6    We're going to be here for days if that happens.

7       A.    Okay.

8       Q.    That statement is correct?

9       A.    That statement is correct.

09:39 10      Q.    And it is accurate?

11      A.    It is accurate.

12      Q.    Is there any other information that I would

13   need beyond the things that you have said in paragraph 2

14   to know how Power accessed Facebook's web site?

09:39 15      A.    No.

16      Q.    Okay.  Let's go to the second issue.  I'm

17   going to talk about the event invitations that were sent

18   through the Facebook system.  Do you know what I'm

19   talking about when I refer to that?

09:40 20      A.    Yes, I do.

21      Q.    Okay.  Now, would the -- would the actual

22   source code that was used to -- to facilitate the

23   creation of those event invitations, would those be the

24   best possible information Power has to understand how

09:40 25   Power accessed Facebook's web site?

33

BARKLEY
Court Reporters

1    and they then post that on a wall.  It's pretty much

2    very similar type of -- type of action.  We -- we were

3    authorized by users who were using one of our apps to --

4    to create an event or to create a posting on -- on the

09:43  5    walls or event pages on Facebook and then completed

6    those actions at their -- at their request.

7         That's -- I'll finish.  I believe that's the

8    best way to answer the questions.  Because to go and say

9    all the possibilities of what exists in the source code

09:43 10    is -- is -- is completely inappropriate because there

11    are unlimited possibilities based on source code.

12         MR. CHATTERJEE:  Okay.  Let's mark this as

13    Exhibit 190.

14         (Plaintiff's Exhibit No. 190 marked for

09:44 15          identification.)

16    Q.    BY MR. CHATTERJEE:  Mr. Vachani, what I've

17    handed you marked as Exhibit 190 is Power Ventures'

18    supplemental responses to Facebook's interrogatory

19    certain numbers.  Do you see that?

09:44 20    A.    Yes.

21    Q.    If you look at the supplemental response to

22    interrogatory number 1, which is on page 2.

23    A.    Okay.

24    Q.    Oh.  Let me -- let me just ask you.  If you

09:44 25    look at the very last page.  I'm sorry.  It's the third

36

BARKLEY
Court Reporters

1    to last page.  There's a verification there.

2        A.    Okay.

3        Q.    And -- and -- and that's your signature on the

4    page?

09:45  5   A.    Yes.

6        Q.    You took efforts to ensure that the statements

7    in the interrogatory were truthful and accurate?

8        A.    Yes.

9        Q.    And is -- is there anything about these

09:45  10  interrogatories as best as you recall that -- that you

11   think was inaccurate or needed further detail to ensure

12   that they weren't misleading?

13       A.    To the best of my knowledge.  Obviously

14   there's a lot of information that goes on.  But to the

09:45  15  best of my knowledge these are correct.

16       Q.    Okay.  So in interrogatory number 1, the

17   statement asks "Describe in detail AND IDENTIFY the

18   process by which POWER accesses OR accessed the FACEBOOK

19   WEBSITE."  Do you see that?

09:45  20  A.    Yes.

21       Q.    And if you look in the supplemental response

22   in the second paragraph, Power referred to its source

23   code produced on 8-23-11 and 9-14-11.  Do you see that?

24       A.    Correct.

09:46  25  Q.    And it states "The source code is the primary

37

BARKLEY
Court Reporters

```
 1    source material, as it contains the exact functions and

 2    technical mechanisms through which Power accessed the

 3    Facebook Website."

 4         Do you see that?

 5    A.   Correct.

 6    Q.   Statement was truthful and accurate?

 7    A.   Yes.

 8    Q.   Okay.  And then you say, "Additionally, Power

 9    refers to documentation stored in Power's subversion

10    repository," "produced on 10/24/11."

11         Do you see that?

12    A.   Yes.

13    Q.   Okay.  Is there any particular reason you

14    didn't refer to any of the discussions you and I just

15    had about what aspects of Power's code may or may not

16    have been used in order to access the Facebook web site?

17         MR. FISHER:  Objection.  Vague.

18         THE WITNESS:  So ask the question again,

19    please.

20    Q.   BY MR. CHATTERJEE:  Okay.  Earlier today in

21    your testimony you said that there are some portions of

22    the code that were used and some portions of the code

23    that were not used in accessing the Facebook web site.

24    Correct?

25    A.   Correct.
```

09:46 5
09:46 10
09:46 15
09:46 20
09:47 25

38

BARKLEY
Court Reporters

1        Q.      The -- the -- the reason that I'm asking

2    about --

3        A.      Yeah.

4        Q.      -- this specific beginning part --

11:29  5        A.      Yeah.

6        Q.      -- is I didn't see a response --

7        A.      Yeah.

8        Q.      -- to this e-mail.

9        A.      Yeah.

11:29 10        Q.      So I'm -- I'm wondering what happened after

11    you sent this series of questions on August 23rd, two

12    thousand --

13        A.      Nothing.  He was too busy to -- to look

14    further.  He -- he was -- he just gave me this answer

11:29 15    that it looks like all the relevant and important stuff

16    -- what -- what you see here is the database is the

17    conversation that we had.

18        Q.      Okay.  So, for example, on the second

19    paragraph you say "Also, is the script for our creation

11:29 20    of events and for our power 100 campaign?  I would like

21    to discuss those scripts with you to get your thoughts

22    on them."

23        A.      Yeah.

24        Q.      My first question is did you ever talk to Mr.

11:29 25    Santos after sending this e-mail about the script for

105

BARKLEY
Court Reporters

1    creation of events and the Power 100 campaign?

2        A.    To the best of my recollection, he didn't have

3    the time to -- to do that.  But also to the best of my

4    recollection, I believe that you guys did have the time

11:29  5    to go through all those files and scripts and you know

6    better probably than Eric what's in there.

7        Q.    The code would be the best evidence of that?

8        A.    Yeah.  The code's the best evidence.  And he

9    just verified that he saw the most important stuff in

11:30  10    there, which is the database that's usually where --

11    what he told -- what I remember him -- he said that's

12    where you would find these, it's inside the database,

13    and that database has been fully provided to you.

14        Q.    All right.  And so why -- why were you -- why

11:30  15    did you want to discuss the scripts with -- with Mr.

16    Santos and get his thoughts on them?

17        A.    Well, as far as I understand face -- you guys

18    were asking a lot of questions.  So I wanted to educate

19    myself and understand as best as possible, you know, in

11:30  20    relation to this case what -- you know, what was in

21    there and -- and so I could be fully prepared to discuss

22    and answer questions that you guys are asking.

23        Q.    Was -- was that because Mr. Santos was more of

24    the -- the code writing technical expert than you?

11:30  25        A.    He would know more -- if -- if -- I could look

106

BARKLEY
Court Reporters

1    Q.    Do you recognize this document?

2    A.    I do not.  I mean, it's a -- I didn't -- I

3  haven't seen this e-mail at all in three years.  But

4  yeah, I do.

11:49   5    Q.    So this is an e-mail string between someone

6  named Joe Shapiro at USshow.com (verbatim) --

7    A.    Correct.

8    Q.    -- you and Eric Santos, correct?

9    A.    That's correct.

11:49  10    Q.    I also see a reference to Gloria at power.com.

11  Who is that?

12    A.    Gloria was a administrative assistant that

13  worked at the company.

14    Q.    In -- on the second page -- well, on the first

11:49  15  page you'd agree with me Mr. Shapiro contacted Mr.

16  Santos and cc'd you asking a -- a serious -- a series of

17  questions about -- about accessing other web sites

18  through IP addresses, right?

19    A.    Through -- relating to his Ushow, he was,

11:49  20  correct.

21    Q.    Mr. Santos in the response to this e-mail on

22  December 12th, 2008, stated "Generally some social

23  networks" "terms have a clause to forbidden theirs users

24  to use external tools not affiliated."  Do you see that?

11:50  25    A.    Correct.  Yes.

108

BARKLEY
Court Reporters

```
 1       Q.    At the time Mr. Santos was the chief

 2  technology officer of -- of Power, right?

 3       A.    Correct.

 4       Q.    And -- and is it fair to say that at that

 5  point in time the chief technology officer of Power

 6  recognized that some social networks did not allow

 7  external tools to access the social networking web

 8  sites?

 9       A.    Yes.

10            MR. FISHER:  Objection.  Vague.  Calls for

11  speculation.

12            THE WITNESS:  I believe it's fair to say that

13  sites have terms in their own terms and conditions that

14  have stated things relating to this.  That's correct.

15  Something that we've discussed many times in the past.

16       Q.    BY MR. CHATTERJEE:  And -- and at this point

17  in time Power knew that -- that Facebook's terms forbid

18  that, right?

19       A.    Facebook's terms forbid users.  That's

20  correct.

21       Q.    Now, Mr. Santos makes a comment here "You

22  should put more ips in your proxy" servers.  "We created

23  in our network a subnet only for proxy servers."

24            Do you see that?  Do you know what he was

25  talking about when he referred to putting more IPs in
```

11:50 (5)
11:50 (10)
11:50 (15)
11:51 (20)
11:51 (25)

109

BARKLEY
Court Reporters

1    always believed that and we were exploring in those ways

2    what would -- what we do if a user wants to get their

3    data.  And -- and this was a -- an exploration.

4         Q.   Let me establish some foundation around this,

12:07  5    Mr. Vachani.  You said in this instant message "we also

6    need to do some planning to make sure that we do it in a

7    way where we are not really detected," correct?

8         A.   That's correct.

9         Q.   And the reason that you said that was because

12:07 10    you didn't want web sites like Orkut to detect what you

11    were doing, right?

12         A.   Not to detect.  If -- if they attempted to

13    block, block the -- the sites, we wanted to understand

14    what are the issues.

12:07 15         Q.   And you wanted to be able to interfere with

16    their ability to block you, right?

17              MR. FISHER:  Objection.  Vague.

18    Argumentative.

19              THE WITNESS:  To interfere with their ability

12:07 20    to block, no.  I'm saying -- we -- this -- exactly what

21    it says here.  We had a -- we had a hypothetical

22    conversation about -- about the issues relating to data

23    extraction where users wanted to access their own data.

24         Q.   BY MR. CHATTERJEE:  And you knew that the web

12:07 25    sites that were housing that data wouldn't like what you

121

BARKLEY
Court Reporters

```
 1    were doing.

 2        A.    We didn't know --

 3              MR. FISHER:  Objection.  Calls for speculation

 4    --

 5              THE WITNESS:  We didn't know if they would

 6    like --

 7              THE REPORTER:  Okay.  Whoa.  I'm sorry.

 8    Please restate your --

 9              THE WITNESS:  We didn't know if they would

10    like it or not --

11              THE REPORTER:  I'm sorry.  Hold on.  Please.

12              MR. FISHER:  Vague.  Assumes facts not in

13    evidence.  Lacks foundation.  Incomplete hypothetical.

14    Argumentative.

15              THE WITNESS:  Okay.  We didn't -- we have no

16    idea what they were -- this is 2005.  But we know that

17    if -- if a user is -- obviously some sites and it turns

18    out Facebook that, you know, in the future was -- was

19    not Orkut.  It was -- you know, Facebook does not -- did

20    not want users to export their own data.  And while --

21    and we have always stated very publicly and clearly that

22    we believe that users, you know, do have rights to

23    access their data.  So we were exploring and

24    understanding what are the potential reactions that

25    sites could have.  This was a -- this was a hypothetical
```

12:08 (lines 15, 20, 25)

BARKLEY
Court Reporters

1      A.     I'm saying this is a conversation in 2005 that

2   had nothing to do with the -- with the Power technology

3   or the Power business.   It was an -- it was specifically

4   an exercise in user-generated access of their data and

12:10   5   data where they're importing data from other sites and

6   exploring the issues relating to that.   That's all it

7   was.

8      Q.     All right.   And in 2005 you knew that possibly

9   rotating IPs would be one way to avoid detection from

12:10  10   the web sites in exporting data, correct?

11      A.     I -- we was -- it was one of the many things

12   that were -- that were discussed in exploring what ways

13   that sites will access sites.

14      Q.     Okay.   Go to the next page top.   It says

12:10  15   "Steve says:  we need to plan this very carefully."

16          Do you see that?

17      A.     Yes.

18      Q.     What did you mean when you said that?

19      A.     Exactly this.   We need to -- we need to look

12:10  20   at every detail.

21      Q.     Why?

22      A.     I think the -- the same question here is that

23   we're -- we're look -- we're -- we were exploring every

24   detail of -- of -- of -- of importing data and

12:11  25   understanding that because some -- importing data is not

124

BARKLEY
Court Reporters

1    something that while it's a right and something that's

2    been established that users have the right to do, not

3    every site -- not every site wants users to -- to be

4    able to get their own -- access their data.  Obviously

12:11  5    Facebook being one of the greatest, you know, companies

6    that have traditionally been against -- been against

7    this publicly.  You know, users trying to access their

8    own data.  This is -- this is something that we -- we

9    always understood that, you know, just because it's --

12:11 10    it's correct and it's okay for users to access their own

11    data doesn't mean that every site will -- will allow

12    users to access their own data.

13        Q.    So you knew that the web sites may not like

14    having users access and export data?

12:11 15        A.    Historically importing data has never been --

16    has never -- many sites have always objected to it and

17    it -- and despite that fact, it has been going on for

18    ten years and been a commonly-accepted practice.

19        Q.    I understand that.  But you -- you understand

12:12 20    that even at the time you wrote this instant -- or the

21    portions of this instant message chat log that web sites

22    were often against exporting data from their web site to

23    another place?

24             MR. FISHER:  Objection.  Vague.  Calls for

12:12 25    speculation.

125

BARKLEY
Court Reporters

1          THE WITNESS:  I understood that.  And I also

2     understood that -- that's correct.

3          Q.    BY MR. CHATTERJEE:  Okay.  That's correct.

4     And so one of the things that you wanted to do was to

12:12   5     have multiple IP addresses to allow for the extraction

6     of data without the ability of those web sites to block

7     you; isn't that fair?

8          A.    If a user authorized that -- that, correct.

9     That's something we've -- we've always said.

12:12   10    Q.    Okay.  And -- and you said in -- in this chat

11    log "since we will only have one chance to do it."

12          What did you mean by "we will only have one

13    chance to do it"?

14          A.    I believe that we were -- we were just sharing

12:13   15    -- conversation that -- that accessing -- importing

16    data, you know, we wanted -- we wanted to do it right.

17    You know, we wanted to make sure that if a user wanted

18    to access their own data that they would be able to do

19    it.  That's basically that -- we understood that import

12:13   20    -- importing data is a sensitive -- is a sensitive

21    subject, despite the fact that we strongly believe its

22    the user's right.  And that's basically what this

23    discuss -- discussion was about.

24          Q.    Okay.  Farther down you say "lets" "plan on

12:13   25    getting the data grab done as soon as possible."

126

BARKLEY
Court Reporters

1      A.      I believe that on January 4th The New York

2   Times posted an article relating to the lawsuit.  And I

3   believe Michael Ross was asking a question about that.

4      Q.      If -- and this is -- the top is your response

12:23  5   to Mr. Ross, right?

6      A.      That's correct.

7      Q.      In -- in this e-mail you say "Facebook took

8   what should have been a standard measure...."

9              Do you see that?

12:23 10      A.      Yeah.

11      Q.      What are you referring to there?

12      A.      Let me see what he's asking.  So in any

13   situation in our system when the system cannot access

14   for whatever reason, one of the strategies -- one of the

12:23 15   things it does -- and this is as you -- as you've

16   already pointed out predates Facebook significantly.  It

17   automatically -- it updates the IP addresses and it

18   continues to try to access.  So a standard -- so if --

19   if for any reason a site, you know, blocked us -- you

12:24 20   know, it didn't -- it was not able to enter the site,

21   the system would -- would go through a range of things

22   to make sure, you know, it was able to access the site.

23   And so updating the IP address is one of those, one of

24   the many, many, many things that are built in our system

12:24 25   to -- to do.

BARKLEY
Court Reporters

1          MR. CHATTERJEE:  If we can mark this as 201.

2          (Plaintiff's Exhibit No. 201 marked for

3           identification.)

4    Q.   BY MR. CHATTERJEE:  The document that I've

12:24  5  given you marked as Exhibit 201 is a declaration you

6  submitted in this case on January 15th, 2010.

7    A.   Correct.

8    Q.   Do you recognize this document?

9    A.   Yes.

12:25 10    Q.   If you can look at paragraph 9 of the

11  declaration.  Let me know when you're done looking,

12  reading.

13    A.   Okay.

14    Q.   Okay.  The -- the standard measure that you

12:25 15  refer to in this e-mail to Michael Ross, is that -- is

16  that what's described in -- in paragraph 9 of Exhibit

17  2,000 -- Exhibit 201?

18    A.   I don't believe it's exactly the same because

19  every site has different -- different ways of

12:25 20  triggering.  For example, Google -- you know, Google has

21  blocks that are automatic that when there's too many --

22  too many things coming from a specific IP address on a

23  site, they have -- every site has different types of

24  measures that -- that are put in place and they're not

12:26 25  specifically related to -- to -- you know, to Power.

137

```
 1   They're -- and so one of our -- one of our standard
 2   things our system does when it access a site, it -- one
 3   of the things is it updates the IP address as a -- as
 4   a -- why -- why is it not being able to access this
 5   site.
 6       Q.    Right.  So --
 7       A.    So no, I don't think this is referring
 8   specifically, you know....  Here.  Let me read this
 9   again.  All -- all -- all I believe number 9 is talking
10   about is that face -- that according -- that Facebook
11   implemented -- that Facebook is saying that they
12   implemented measures to block users from accessing
13   Facebook.
14       Q.    Right.  So the technical measures that
15   Facebook implemented that you're talking about here in
16   the declarations, were those these standard measures
17   that you said Facebook took in Exhibit 200?
18       A.    I don't -- I don't know if these -- I think
19   those are -- here's -- let's see here.  Yeah,
20   Facebook -- what I say here, these -- I guess -- I don't
21   know if it's the same measures.  I honestly -- this is
22   -- but this is -- right here is referring to the fact
23   that users were not able to access the site.
24       Q.    And....
25       A.    And our system -- if the -- if it was unable
```

12:26  5
12:26 10
12:26 15
12:27 20
12:27 25

138

BARKLEY
Court Reporters

1    to access it, one of many things it would do, it would

2    up -- it would update the -- the IP address.

3        Q.    Right.  And so you -- you recognize that

4    Facebook took a measure to block access from the Power

12:27  5    web site?

6        A.    I think this issue has been, yes, has been

7    discussed before in the past.

8        Q.    You agree with that?

9        A.    Yes.

12:27  10        Q.    Okay.  And then in this e-mail you say we were

11    able to easily adjust.  What are you referring to there?

12        A.    I said our system -- system when it cannot

13    access a site for -- it goes -- it goes through a range

14    of checks and one of the things that it updates the IP

12:28  15    address.

16        Q.    So when -- when the IP -- if I use the term IP

17    blocking, do you know what that means?

18        A.    Yeah.

19        Q.    So when Facebook implemented IP blocking, what

12:28  20    you're talking about here is you had this technology

21    developed to use a different IP address?

22        A.    Right.  That's one of the many troubleshooting

23    measures of the system.  And this is predating Facebook.

24    It has nothing to do with -- for any reason it's not

12:28  25    accessing a site, it -- it -- it might -- it could be

139

BARKLEY
Court Reporters

           1   logical reasons.  There are sites that as you said -- as

           2   I said in the past, we've had -- we've dealt -- this

           3   issue was -- has gone on for -- updating IPs is a

           4   standard -- standard measure that the system does when

12:28      5   it cannot access a site.

           6       Q.    Right.  But when -- when Facebook put in place

           7   an IP blocking tool --

           8       A.    Yeah.

           9       Q.    -- Power then as part of its checks modified

12:29     10   its IP address in order to --

          11       A.    Well, Power -- Power's IP address --

          12             MR. FISHER:  Objection.  Assumes facts not in

          13   evidence.  Lacks foundation.

          14       Q.    BY MR. CHATTERJEE:  Let me -- let me finish

12:29     15   asking the question.  When Facebook put in place an IP

          16   blocking technology, the Power technology as part of its

          17   checks used a different IP address, correct?

          18       A.    Power has -- Power has many IPs.  As you've --

          19   as you've already established today, we've always had a

12:29     20   large range of IPs.  And the system will -- will

          21   continue to rotate IPs if -- if it cannot access a site.

          22       Q.    And that happens in this instance when

          23   Facebook blocked one IP address?

          24       A.    I'm assuming that -- that it happened, yes.

12:29     25             MR. CHATTERJEE:  Okay.  Let's mark this as

                                        140

BARKLEY
Court Reporters

```
 1      Q.    Was that sentence a truthful and accurate
 2   statement?
 3      A.    I believe --
 4      Q.    In light of what you just said with -- with --
12:32 5   with respect to Exhibit 200.
 6      A.    Sure.  I'm saying that our sys -- our system
 7   -- what I've said to you is that our system utilized
 8   many IP addresses and these IP addresses update and
 9   rotate on a regular basis.  If -- you know, as a
12:32 10  standard thing.  To say that we took a specific -- that
 11  it was specifically to circumvent and block, I mean that
 12  -- I believe that's a -- that's a -- that's a subjective
 13  conversation.  We -- we obviously, you know, have --
 14  have a system that rotates if it cannot access a site.
12:32 15  So this is -- this is right here --
 16     Q.    Was that statement truthful and accurate, yes
 17  or no?
 18     A.    So it says here "Nevertheless, Facebook's IP
 19  block was ineffective because it blocked only one" "IP
12:33 20  address" that had -- Power used.  It "did not block
 21  other IPs that Power was using in" its "normal course of
 22  business."  That's correct.
 23     Q.    Okay.  Was the first sentence "Power did not
 24  undertake any effort to circumvent that block, and did
12:33 25  not provide users with any tools to circumvent it."
```

143

BARKLEY
Court Reporters

1    Judge Spero's courtroom because he's not answering the

2    questions.

3           THE WITNESS:  Why am I not answering the

4    question?  I've answered the question.

12:43  5    Q.    BY MR. CHATTERJEE:  It's a very simple

6    question, which is after Facebook put in place the block

7    of the IP address could a Power user through the Power

8    browser access the Facebook web site through a different

9    IP address?

12:43 10    A.    Yes.  Well, the -- the -- the system --

11    Q.    Now --

12    A.    The system --

13    Q.    Hold on.

14           MR. FISHER:  Let him finish his answer.

12:43 15           THE WITNESS:  Go ahead.

16    Q.    BY MR. CHATTERJEE:  And that different IP

17    address was an IP address that Power provided?

18    A.    Which Power -- it was all -- it was -- it's --

19    not which Power provide -- you're using terminology.

12:43 20    It's -- it's -- it's a Power IP address.

21    Q.    Okay.

22    A.    It's an existing Power IP address.  They don't

23    provide the IP address.  It's a -- it's an address.

24    Q.    And before Facebook ever put in place a

12:43 25    blocking measure, Power had designed its system to do

154

BARKLEY
Court Reporters

1      Q.     I'm going to ask you the question one more

2   time.

3      A.     But I --

4      Q.     No.  Mr. Vachani, you can either answer it or

15:27  5   you can't.  If you can't answer it, tell me you can't

6   answer it.

7           You knew that the Facebook terms of service

8   did not allow Power users to access the Facebook web

9   site in the way Power wanted to do it; isn't that right?

15:28  10          MR. FISHER:  Objection.  Assumes facts not in

11  evidence.  Lacks foundation.  Argumentative.  Vague.

12          THE WITNESS:  And I would like to -- once

13  again, I would like to ask you the previous question,

14  can you repeat my answer?  I -- I'm not answering your

15:28  15  question yet.  I'm asking her to repeat the answer I

16  made to your previous question which was similar.

17          MR. CHATTERJEE:  Okay.  Let's take a break.

18  Tim, we're doing our meet and confer right now.

19          THE VIDEOGRAPHER:  We are going off the

15:28  20  record.  The time is 3:28 p.m.

21          (Whereupon a break was taken from 3:28 to

22           3:37.)

23          THE VIDEOGRAPHER:  We are back on the record.

24  The time is 3:37 p.m.

15:37  25          THE WITNESS:  So I previously wanted -- I

236

BARKLEY
Court Reporters

1    similar process where almost -- where -- where almost,

2    for example, Google has a clause that states in their

3    things that users cannot do it, but Facebook has

4    continued to do it.  And -- and I'll ignore these

15:40 5    things.

6          And I said about five minutes ago -- let me

7    finish, please.

8        Q.    BY MR. CHATTERJEE:  Finish.

9        A.    I said five minutes ago that terms and

15:40 10   conditions are created by -- by a site.  And the

11   decision -- the decision on -- on interpreting those

12   terms and conditions and how companies choose to respond

13   to their users have been and continue to be very

14   subjective.  Facebook has been very subjective, Power

15:40 15   has been very subjective, and there is no legal

16   precedent.  So we can have a discussion all day on this

17   issue.  But I've answered the question to you that I --

18   we are very familiar and have read Facebook terms and

19   conditions.

15:41 20       Q.    Okay.  Let's step back.  You said you've read

21   Facebook's terms and conditions.  That was prior to

22   accessing the Facebook web site as pursuant to the

23   December 2008 launch, correct?

24       A.    Yes.

15:41 25       Q.    Did you believe under your reading of the

239

BARKLEY
Court Reporters

1      A.     I'm not here to offer legal opinions.

2      Q.     Okay.  So don't go into legal precedence --

3      A.     Okay.

4      Q.     -- because that has nothing to do with your

15:51  5   testimony.

6      A.     Okay.

7      Q.     Okay?  Now, you noticed that Digsby was not

8   being blocked by Facebook, correct?

9      A.     Correct.

15:51  10     Q.     And you wanted to know why, correct?

11     A.     Yeah.

12     Q.     Your -- one of your concerns, among many

13  concerns that may have been the case, was that Facebook

14  might block you.  Whether or not it was rational or not,

15:51  15  you were worried about that?

16     A.     It's -- it's in the realm of possibilities.

17     Q.     And you were worried that Facebook might --

18  pardon me.  Let me start.

19           You were worried that Facebook might not like

15:52  20  what power.com was doing or was enabling its users to

21  do, right?

22     A.     As I said -- worry is probably not the right

23  word.  As I said that in the past exporting contacts is

24  something that nobody has ever, you know, liked when it

15:52  25  was they're the ones receiving it.  But it's some --

249

BARKLEY
Court Reporters

1       Q.      Okay.   And what does a production manager do?

2       A.      She was helping oversee the production of

3    products.

4       Q.      And in this e-mail dated April 24, 2009,

16:18 5    Juliane is -- is informing the three of you that Orkut

6    has blocked Power's IP.

7       A.      Correct.

8       Q.      Okay.   And then the second sentence that she

9    puts forward is that we are working to put the proxy on

16:18 10   Amazon.   Right?

11      A.      That's correct.

12      Q.      And Amazon is a web-based service that has

13   dynamically rotating IPs?

14      A.      We had a -- we had a solution on -- on Amazon

16:18 15   that -- we had different -- different levels of

16   solutions and were standard IPs and different --

17   different IP rotating banks.   This was part of our

18   solution and was already in place for a long time.

19      Q.      And Amazon was one of those rotating IP

16:19 20   things?

21      A.      Amazon was one of the places that -- that

22   rotated IPs, correct.

23      Q.      Okay.   Was that actually implemented?

24      A.      It was I think -- that solution was already --

16:19 25   already in place.   But I think, as you know, at this

275

BARKLEY
Court Reporters

```
 1      Q.    Could you translate that second sentence for
 2   me?
 3      A.    Sure.  I will prepare for a possible block on
 4   the part of Facebook.
16:22  5     Q.    What did you understand that to mean?
 6      A.    I believe that, as we've talked about
 7   previously, we understand that it's possible that
 8   Facebook, you know, may -- may -- either their system
 9   automatically or -- or obviously because at this point
16:22 10   we had also received a -- you know -- in other words,
11   there could be -- they could take actions to -- to try
12   to block -- to try to block Power.  So I think that was
13   -- that was what he was saying.
14      Q.    Was -- was there any particular reason that
16:22 15   Mr. Santos and you didn't prepare for that before
16   launching the -- the hundred by hundred by hundred
17   campaign?
18      A.    Well, we have many -- we have many things --
19   standard things in place.  But if they're -- I think
16:23 20   he's saying, well, we don't really know what.  We had
21   received a -- you know, a letter from Facebook I think
22   that day or the day before on December 1st or December
23   2nd.  I'm not sure if this was, you know, before or
24   after that.  I think it was -- it might have been -- I
16:23 25   think we may have received it on December 1st, if I'm
```

278

BARKLEY
Court Reporters

1    not mistaken.  I don't even know the issue.  But the

2    main thing is we -- we -- we didn't know what -- we

3    didn't really know what Facebook's reaction would be.

4        Q.    All right.  So if I understand you correctly,

16:23  5    by this point in time you had reviewed Facebook's terms

6    of service and you may have received a cease and desist

7    letter from Facebook?

8        A.    I think it was either this day or the day

9    after.  I'm not a hundred percent sure what day it was.

16:23 10        Q.    And around that time frame Mr. Santos stated

11    he'll prepare for a possible block by Facebook?

12        A.    Oh, he was -- he was trying to evaluate the

13    systems if -- if our -- if our system is unable to

14    access Facebook.

16:23 15        Q.    Was there any doubt in your mind when he said

16    that that Facebook was considering or may block Power

17    from accessing the Facebook web site in the way that it

18    did?

19            MR. FISHER:  Objection.  Vague.

16:24 20            THE WITNESS:  Obviously -- obviously they --

21    they had sent a -- a legal -- a legal threat.  They had

22    sent a legal threat.  So, I mean, there -- there --

23    there were definitely, you know, possibilities.

24        Q.    BY MR. CHATTERJEE:  So you knew that they

16:24 25    didn't feel that Power was authorized to be accessing

```
 1    Facebook in the way that Power was doing?

 2        A.    We knew that Facebook had -- Facebook had

 3    expressed, you know, their opinion that they -- that's

 4    correct.

 5            MR. CHATTERJEE:  We're getting to an easier

 6    part for a little while.   218.

 7            (Plaintiff's Exhibit No. 218 marked for

 8             identification.)

 9            THE WITNESS:  Okay.

10        Q.    BY MR. CHATTERJEE:  Okay.  The document I've

11    given you as Exhibit 218, what -- what is this document,

12    Mr. Vachani?

13        A.    What is this document?  This is a -- looks

14    like -- this looks like an e-mail from Facebook.

15        Q.    This is an e-mail that you received?

16        A.    This e-mail that I received.  I don't know if

17    this was a test e-mail or if this was from -- you know,

18    from Facebook.  I don't know that.  But it looks like it

19    was from Facebook.

20        Q.    And it was to you?

21        A.    Yep.

22        Q.    And then the subject line has "Ghostday

23    Leandro Abreu," A-b-r-e-u.

24        A.    Yeah.  This is an e-mail from Facebook.

25        Q.    And Leandro Abreu was -- we -- we talked about
```

16:24   5
16:25  10
16:25  15
16:25  20
16:26  25

1    Power browser works is it basically, it -- it's a

2    web-based browser, but it -- it can -- it can basically

3    have -- simulate or work similar to any of the major

4    browsers.  So when interacting with a site.  So it can

17:02  5    be in addition to -- it can be like -- it can work

6    with -- an internet explorer browser.  So it can have

7    compatibility when -- when -- it's a new type of browser

8    and it's just a feature inside our browser.

9        Q.    If you look at the first e-mail on the string,

17:02  10    one, two, three, four, five, you said "Users are

11    technically violating the terms and conditions of all

12    sites when they use contact book imports...."

13           Do you see that?

14        A.    Yep.

17:02  15        Q.    What did you mean when you said that?

16        A.    It's very simple.  So when you use Firefox and

17    if you give them -- if you -- Firefox asks you where you

18    can store your user name and password.  Technically

19    you're giving your user name and password to Firefox.

17:02  20    So technically Facebook could -- could sue Firefox for

21    doing that.  If you give your -- to Meebo and you give

22    your account as not through the Facebook Connect,

23    Facebook could say -- could go after -- or any -- any

24    site could say you're violating the terms and

17:03  25    conditions.

300

BARKLEY
Court Reporters

 1      Q.      I'm going to state it again.

 2      A.      Please.

 3      Q.      I want you to listen really carefully to it.

 4      A.      Okay.

17:05 5  Q.     Okay.  Prior to launching the hundred by

 6  hundred by hundred campaign, did you believe that users

 7  are technically violating the terms and conditions of

 8  all sites when they use contact book imports when they

 9  give their password to Firefox?

17:05 10         MR. FISHER:  Vague.  Calls for legal

 11  conclusion.  Assumes facts not in evidence.  Lacks

 12  foundation.  Go ahead.

 13         THE WITNESS:  I think my previous answer --

 14  and I'll answer it -- answer is technically based on --

17:05 15  now, this is my answer.  Is -- here.  Technically -- and

 16  that's why I use the word -- technically can be accused

 17  for violating the terms if they give their password to

 18  another site.  So that includes -- that answers your

 19  question and says not before or after I believe -- we

17:06 20  believe the same thing, so yes.

 21      Q.      BY MR. CHATTERJEE:  Your views are unchanged

 22  is my view.  Your -- your view of this statement was the

 23  same prior to the launch promotion as it was in January

 24  10th --

17:06 25         MR. FISHER:  Same objection.

303

BARKLEY
Court Reporters

1          THE WITNESS:  We believe -- we believe that --

2    that site -- yeah, that any site can say you're

3    technically violating their terms if they want to.

4    Whether you agree or disagree is then open to dispute.

17:06  5    That's what we've always, you know, agreed.

6          Q.    BY MR. CHATTERJEE:  Well, but that isn't what

7    you said here.  You said "Users are technically

8    violating the terms and conditions of all sites when

9    they use contact book imports."

17:06  10    A.    I'm telling you what the -- what the content

11    and what I meant -- what I meant -- what I believe and

12    mean by that is that technically -- what I mean by

13    technically means that if you want to get technical,

14    every -- every single site on the web is -- can be --

17:06  15    another site can claim the technicality on this issue.

16          Q.    Right.  Okay.

17          A.    That doesn't -- you know, that's all I said.

18    That's all it meant.

19          Q.    And -- and -- and so are you saying that you

17:07  20    meant something other than what you said here?

21          A.    No.  That's what I meant there.

22          Q.    And has this view -- has this -- in your view,

23    just to make sure the record's clear, your view has been

24    the same as to this issue since before the launch

17:07  25    promotion was ever put in place?

304

BARKLEY
Court Reporters

1    A.    My view is that -- my view -- to clarify, this

2  is what I mean here -- this -- I believe it's the same.

3  I don't believe my view has changed.  This was in

4  January of 2009.  So it was at a later point.  But I

17:07  5  believe it's the same, which is any -- any site can

6  technically make a claim that you're violating their

7  terms and then it has to be, you know, worked out.

8         MR. CHATTERJEE:  Let's mark this as Exhibit

9  224.

17:07 10         (Plaintiff's Exhibit No. 224 marked for

11          identification.)

12         THE WITNESS:  Okay.

13    Q.    BY MR. CHATTERJEE:  Do you -- do you know what

14  this document is?

17:08 15    A.    Yeah.  It's our home page.

16    Q.    Okay.  This was your home page at the time the

17  launch promotion was going on?

18    A.    That's correct, yes.

19    Q.    Okay.  And this Exhibit 224, who -- who -- who

17:08 20  created this graphic on -- on the front associated --

21  listing these different social networking web sites?

22    A.    We -- we did.  Power.

23    Q.    And let me just go through the various things

24  in this little star.

17:08 25    A.    Okay.

305

BARKLEY
Court Reporters

          1    they ask you -- they ask you if you want -- if you want

          2    to do it.  But then in the future, then they do the log

          3    in for you.  Because Firefox stores it on their -- on --

          4    on -- stores that information.  You authorize --

17:13     5       Q.    Is that stored on the Firefox servers or

          6    natively in your computer?

          7       A.    Well, Firefox has a -- a browser.  I don't

          8    know if they store it.  I know that most companies --

          9    every company has a different policy on that issue.

17:13    10    Meebo, for example, stores the passwords.  Firefox, I --

         11    since they have it on your -- on your browser, they can

         12    -- they can store it.  I don't know if they back it up.

         13    Every company's got a different policy on that.

         14       Q.    Okay.

17:13    15       A.    It's --

         16       Q.    So you -- you don't know how Firefox stores

         17    it?

         18       A.    No.  I know every company has a different

         19    policy.

17:14    20       Q.    Okay.  When -- when Power launch -- launched

         21    the launch promotion in 2008, did it -- did it have the

         22    money to pay people if they invited a hundred -- a

         23    hundred users?

         24       A.    We did pay -- we did -- we did people -- we

17:14    25    did pay people.  Yes.


                                   311

BARKLEY
Court Reporters

1      Q.    Mr. Santos is, correct?

2      A.    That's correct.

3      Q.    And as of March 29th, 2009, had the Power

4   users that had won the hundred by hundred by hundred

17:18  5   campaign been paid?

6      A.    I believe they were paid sometime in April.

7   And I believe that the terms and the conditions said

8   that we had -- you know, it was way within the time that

9   we had said that we would pay the users.

17:18 10      Q.    Okay.

11      A.    So they just wanted to clarify.  They don't --

12   this -- they were just getting -- naturally at this time

13   we were making priorities on where we want to pay costs

14   so that --

17:18 15      Q.    Was -- was there any particular reason why you

16   waited?

17      A.    Well, I think that we had fired many people at

18   that time and we had reduced costs.  So they wanted to

19   understand if this was going to be paid.  And I said

17:19 20   yes.  And the fact is it was paid.  It was made to be a

21   priority to be paid as we had planned.

22           MR. CHATTERJEE:  Let's mark this as 227.

23           (Plaintiff's Exhibit No. 227 marked for

24            identification.)

17:20 25           THE WITNESS:  Okay.

315

BARKLEY
Court Reporters

1    was our terms and conditions, then that's correct.

2        Q.    You don't recall any specific discussions

3    about that?

4        A.    I don't recall them.  But again, this is not

17:24 5    -- terms and conditions are usually not -- in most cases

6    they're -- they're ongoing, you know, things.

7        Q.    Right.  Do you recall any discussions about

8    power.com's terms of use and restrictions on users?

9        A.    I remember having -- I've had discussions on

17:24 10    the issue.  And you probably have e-mails.  If it was

11    anything that was really substantial, it would probably

12    be in an e-mail of my comments and thoughts on it.

13        Q.    So other than reflected in the e-mail, you

14    don't have any specific recollections?

17:25 15    A.    No, I don't have any specific recollections.

16    Right.

17        MR. CHATTERJEE:  I'm going to go down memory

18    lane again.  Exhibit 229.

19        (Plaintiff's Exhibit No. 229 marked for

17:25 20        identification.)

21        Q.    BY MR. CHATTERJEE:  So, Mr. Vachani, what I've

22    handed you as Exhibit 229 is a chat log between you and

23    somebody named Greg.

24        A.    Okay.

17:25 25    Q.    Do you know who Greg is?

319

BARKLEY
Court Reporters

```
 1      Q.    "we will have to have a clever ip rotating

 2   system and other techniques.  this is something we were

 3   just starting to think about."

 4         Let me start with who is the "we"?

17:32 5      A.    I don't know.  Whoever the technical guys --

 6   this is -- this is before Power.  I was working on --

 7   you know, so I was just -- I must have had some contract

 8   program guys that were just exploring -- we were just

 9   exploring technical ideas on data extraction.

17:32 10     Q.    And this hypothetical concept that you were

 11   developing you felt needed a clever IP rotating system?

 12     A.    Well, we were trying to figure out what are

 13   the different ways to export large amounts of data

 14   when -- you know, if a user says import my whole social

17:33 15   network into -- import my whole social network instead

 16   of just importing my contacts.  So this was again an

 17   academic exercise to -- like, think about all the

 18   different issues involved in exporting entire profiles

 19   with -- with photos and everything else.

17:33 20     Q.    Do you mean to suggest that the statement made

 21   there means something other than what it says?

 22     A.    What does it say?

 23     Q.    "we will have to have a clever ip rotating

 24   system and other techniques."

17:33 25     A.    Well, I think that was -- that was one of the
```

324

BARKLEY
Court Reporters

1       -- one of the ideas that -- you know, that we explored

2       is an IP rotating system is potentially one way to -- to

3       be able to access larger amounts of data.

4           Q.    Without being slowed down and blocked?

17:33  5           A.    Without being slowed down, correct.

6           Q.    Then if you turn to the third page, there's a

7       section that says "Steve says:  assuming the IP address

8       was dynamically changing, is the danger" that "pattern

9       that would be easily recognized?"

17:34 10          Do you see that?

11          A.    Yep.

12          Q.    Okay.  Could you explain to me what you meant

13      by that question?

14          A.    Yeah.  I think the whole -- the whole exercise

17:34 15      was to try to understand when you're dealing with

16      exporting large amounts of data what are -- I mean,

17      that's what the whole discussion was just are there --

18      what are the ways that you could -- you could address

19      this hypothetically.

17:34 20          Q.    And at least as early as 2005 you were aware

21      that one of the ways that you could try and address this

22      problem was by -- by dynamically rotating IP addresses?

23          A.    Yeah.  It says, as we've mentioned, we've --

24      we have built -- it's a way that has -- has proven to be

17:34 25      useful.

325

BARKLEY
Court Reporters

1          MR. CHATTERJEE:  230.

2          (Plaintiff's Exhibit No. 230 marked for

3          identification.)

4          THE WITNESS:  Okay.

17:36  5     Q.    BY MR. CHATTERJEE:  Who is Paul King?

6     A.    He was another technical person that I -- that

7    I -- on this exercise that I contacted.

8     Q.    If you look at the very end of this e-mail

9    string --

17:36 10     A.    Yep.

11     Q.    -- Mr. King tells you Orkut's -- "Orkut's

12   license agreement" expressly "forbids robots, so they

13   are onto it and may be" do -- "doing things to prevent

14   automated retrieval."

17:36 15          Do you see that?

16     A.    Okay.

17     Q.    Do you know if that was a true or untrue

18   statement?

19     A.    I have no idea.  I'm assuming that -- you

17:36 20   know, robots in general are -- are things that, you

21   know, some -- data -- data extraction and caching -- for

22   example, when Google goes and caches the web and does

23   sites, there have been -- for a long time their robots

24   would be blocked.  And Google over the years, you know,

17:36 25   they gained both legitimacy and gained -- created

326

BARKLEY
Court Reporters

1   standing alone isn't a robot.  But if I wrote a script

2   to move from IP address to one -- to another IP address

3   --

4        A.    If you wrote a script to do anything in a

17:39 5   site, you know --

6        Q.    That would be a robot.

7        A.    -- that could be considered -- so, as I said,

8   when Facebook goes and scrapes a site and takes the

9   stuff, that's a robot.  In my definition that's a robot

17:39 10  going as a robot script that's going and accessing

11  contacts with or without the permission of that site.

12       Q.    All right.  And so was -- would you

13  characterize the script that allowed for a dynamic

14  assignment of IP addresses that was implemented by Power

17:39 15  as a robot?

16       A.    No, that's not a robot.

17       Q.    Why not?

18       A.    That was a -- that's a system that just

19  updated IPs.  It wasn't going out and doing things on --

17:39 20  you know, a robot is -- is something that's going out on

21  a site and doing something.  Changing -- having an IP --

22  IP address update is not a -- is a -- is a different

23  system.  It's not a robot PowerScript.

24       Q.    Now, you say here in your -- in your response

17:39 25  to Mr. King "...our plans" is "to have rotating IP

329

BARKLEY
Court Reporters

1  addresses so we could have 10,000 or even more IP

2  addresses throughout the process."

3     A.    So in -- in this time in 2005, the whole

4  concept of rapid data -- data extraction or exporting --

17:40  5  again, this was a hypothetical exercise because no one

6  had ever exported -- people had exported context, but no

7  one had ever exported entire social -- social -- where

8  you could -- entire social graphs.  So this was again a

9  hypothetical exercise.  Because if you start growing

17:40  10  virally -- because if you are able to achieve this and

11  start growing even faster, what would be the issues that

12  you would have to face in dealing with the same type of

13  exports, but exporting as we -- you saw the exercise we

14  went to contact --

17:40  15     Q.    Right.  But this was the same sort of issue

16  where having rotating IP addresses was a tool that you

17  were considering using in order to avoid being blocked

18  or slowed down in the same way we discussed with those

19  other documents.

17:40  20     A.    To avoid -- as I -- it would be -- it would be

21  a way to -- to extract -- if a user said I want to

22  extract my data and that -- that was what the purpose

23  there was.  If a user says I want to import my whole

24  social network, what -- what are the technical issues

17:41  25  that would be encountered for a user wanting to access

|    |    |
|----|----|
| 1 | their whole social network.  Especially if -- you know, |
| 2 | if -- if, you know, if -- if -- if the site didn't allow |
| 3 | that much data to be extracted, even if the user wanted |
| 4 | it. |
| 17:41  5 | MR. CHATTERJEE:  This is Exhibit 231. |
| 6 | (Plaintiff's Exhibit No. 231 marked for |
| 7 | identification.) |
| 8 | THE WITNESS:  Okay. |
| 9 | Q.    BY MR. CHATTERJEE:  So this is an e-mail from |
| 17:41 10 | Eric Santos to you dated August 31st, 2006. |
| 11 | A.    Correct. |
| 12 | Q.    It appears that Orkut was blocking Power in |
| 13 | 2006? |
| 14 | A.    Power didn't exist.  This was -- this was the |
| 17:42 15 | -- we were playing around with a -- another -- another |
| 16 | -- just the concepts of accessing -- we were just -- |
| 17 | this is the beginnings of -- of -- of Power.  But the |
| 18 | earlier applications on -- on ways where users want to |
| 19 | -- we had different apps.  When they would access the |
| 17:42 20 | site the user would say I want to access by messaging |
| 21 | and send messaging apps or I want to create a browser |
| 22 | that browses.  And so he's commenting that irrelevant of |
| 23 | the -- irrelevant of what the application is, sites have |
| 24 | standard things in place that, you know, these are -- |
| 17:42 25 | these are kind of standard things when, you know -- |

331

BARKLEY
Court Reporters

1    break in -- break into.  So they're completely different

2    issues, but the -- but the issues might -- might, you

3    know, be related.

4        Q.    But -- but the idea of having dynamically

17:48  5    rotating IP addresses was something that was implemented

6    by Power before the launch promotion; is that fair?

7        A.    Yeah.  I mean, I think we've said this over

8    and over and over again that Power has -- Power already

9    had an automatic IP rotation system, as you can see, for

17:49 10    a long time back.  It wasn't a concept that appeared the

11    day of Facebook.  Obviously it was an issue that -- that

12    affected so many -- so many activities of our -- our

13    browser, our PowerScript language, our Power everything.

14    Because it was -- it was something very new and

17:49 15    innovative.

16            MR. CHATTERJEE:  Let's mark this as 233.

17            (Plaintiff's Exhibit No. 233 marked for

18             identification.)

19            THE WITNESS:  Okay.

17:50 20        Q.    BY MR. CHATTERJEE:  So do you recognize the

21    document that I just handed you --

22        A.    Yes.

23        Q.    -- that's marked Exhibit 232 (sic).  This is

24    an e-mail between you and Eric Santos --

17:50 25        A.    Correct.

337

BARKLEY
Court Reporters

1    is the only way to connect to Facebook.   Any other way,

2    we're going to, you know, threat -- threaten this

3    company.

4        Q.    So let me reframe the question then to be more

18:00  5    precise in that way.

6        A.    Sure.

7        Q.    Prior to the launch promotion, you knew that

8    Facebook's approach, their actual technical approach to

9    data portability was different than the approach and

18:00  10    views you had.

11        A.    That's correct, yes.

12        Q.    And you knew that they didn't -- would not

13    want Power encouraging data portability in the way that

14    it was approaching the Facebook web site?

18:01  15        A.    Actually, we had no idea because they made

16    public statements saying one thing.   Their actions

17    stated other things.   There was a lot -- it was a very

18    convoluted message that they had.

19        Q.    You knew that their actions indicated that

18:01  20    they did not want to allow for data portability --

21            MR. FISHER:   Objection.   Vague.

22        Q.    BY MR. CHATTERJEE:   -- other than through

23    Facebook Connect, correct?

24        A.    Actually, we didn't know.   We didn't know.   As

18:01  25    you just saw, we went through exercises and we saw other

346

BARKLEY
Court Reporters

1      A.    Google.  I'm just trying to go through the --

2   the main companies.  Twitter.  To my best of my

3   knowledge, no.  But again, I may be -- I may be missing

4   a minor one.

18:09  5      Q.    So we spent a fair amount of time talking

6   about dynamically associated IP addresses.

7      A.    Yes.

8      Q.    I think you said that technology was

9   implemented from the very beginning?

18:09 10     A.    Well, as you can see, it's the technology of

11  dynamic and rotating IPs was a conversation that was

12  part of our company's -- you know, built into our

13  core -- our core -- core technology from the -- you

14  know, from the beginning.  Obviously technologies

18:10 15  continue to evolve, continue to learn, continue to

16  become more dynamic.  And you can see we had very

17  extensive issues on scalability, on how you deal with,

18  you know, creating ground-breaking innovation.

19     Q.    I -- I -- I understand that.  Very limited

18:10 20  question.

21     A.    Okay.  Please.

22     Q.    The dynamically associated IP address --

23     A.    Yes.

24     Q.    -- that was something around from the

18:10 25  beginning?

352

BARKLEY
Court Reporters

1      A.     Yes.

2      Q.     Okay.  And the Amazon option to -- to -- to go

3   to them to have an unlimited number of IP addresses was

4   also implemented shortly -- shortly before the launch?

18:10  5      A.     It was -- it wasn't available in the

6   beginning.  It was -- you know, we had to work with many

7   different places.  Amazon later on, I don't know when,

8   they opened up the system where they had that -- their

9   web services.  When that -- that made -- that made --

18:10 10   that made that solution that we had already built just

11   more -- more robust.

12      Q.     Okay.  And -- and was that before or after the

13   launch promotion, if you know?

14      A.     I don't remember.

18:10 15      Q.     Okay.

16      A.     I don't know when it was.  Whenever Amazon

17   made it available, we started looking at it.

18      Q.     Other -- other than those two technical

19   solutions, was there anything else that Power did to

18:11 20   ensure that Power users could access the various social

21   networking web sites that -- that -- that were part of

22   power.com's architecture?

23      A.     Well, I'm -- I mean, I think in our -- our

24   browser, you know, we went through a lot of different

18:11 25   optimizations to make sure that our browser would be

353

BARKLEY
Court Reporters

```
1              DEPOSITION OFFICER'S CERTIFICATE

2                    (Civ. Proc. § 2025.520(e))

3    STATE OF CALIFORNIA        )
                                )     ss
4    COUNTY OF CONTRA COSTA     )

5

6         I, CHERREE P. PETERSON, hereby certify:

7         I am a duly qualified Certified Shorthand

8    Reporter, in the State of California, holder of

9    Certificate Number CSR 11108 issued by the Court

10   Reporters Board of California and which is in full force

11   and effect.  (Fed. R. Civ. P. 28(a)).

12        I am authorized to administer oaths or

13   affirmations pursuant to California Code of Civil

14   Procedure, Section 2093(b) and prior to being examined,

15   the witness was first duly sworn by me.  (Fed. R. Civ.

16   P. 28(a), 30(f)(1)).

17        I am not a relative or employee of any attorney

18   or counsel of any of the parties, nor am I a relative or

19   employee of such attorney or counsel, nor am I

20   financially interested in this action.  (Fed. R. Civ. P.

21   28).

22        I am the deposition officer that

23   stenographically recorded the testimony in the foregoing

24   deposition and the foregoing transcript is a true record

25   of the testimony given by the witness.  (Fed. R. Civ. P.
```

BARKLEY
Court Reporters

1    30(f)(1)).

2           Before completion of the deposition, review of

3    the transcript (XX) was (  ) was not requested.  If

4    requested, any changes made by the deponent (and

5    provided to the reporter) during the period allowed, are

6    appended hereto.  (Fed. R. Civ. P. 30(e)).

7

8    Dated: JANUARY 13, 2012

9

10

11                          _Cherree P. Peterson_

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BARKLEY
Court Reporters