# EXHIBIT 2

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3               SAN FRANCISCO DIVISION

4

5
   FACEBOOK, INC.,                )
6                                 )
             Plaintiff,           )
7                                 ) Case No.
   vs.                            ) 5:08-cv-05780 JW (JCS)
8                                 )
   POWER VENTURES, INC., a        )
9  Cayman Island Corporation;     )
   STEVE VACHANI, an individual;  )
10 DOE 1, d/b/a POWER.COM,         )
   DOES 2-25, inclusive,          )
11                                 )
             Defendants.          )
12 _____)

13

14

15                  CONFIDENTIAL

16

17          VIDEOTAPED DEPOSITION of POWER VENTURES,

18 INC.'S 30(b)(6) Designee STEVEN VACHANI taken on behalf

19 of Plaintiff, at Orrick, Herrington & Sutcliffe LLP, 405

20 Howard Street, 10th Floor, San Francisco, California

21 beginning at 9:13 a.m., Monday, January 9, 2012, before

22 CHERREE P. PETERSON, RPR, CRR, Certified Shorthand

23 Reporter No. 11108.

24

25

**BARKLEY**
Court Reporters

1              SAN FRANCISCO, CALIFORNIA

2                 JANUARY 9, 2012

3                   ---oOo---

4         BE IT REMEMBERED that set on Monday, the 9th

5    day of January, 2012, commencing at the hour of 9:13

6    a.m., at the office of Orrick, Herrington & Sutcliffe

7    LLP, 405 Howard Street, 10th Floor, San Francisco,

8    California, before me, Cherree P. Peterson, RPR, CRR,

9    CSR No. 11108, a Certified Shorthand Reporter,

10   personally appeared

11         POWER VENTURES, INC.'S 30(b)(6) Designee

12                 STEVEN VACHANI,

13   having been called as a witness by the plaintiff, who

14   having been sworn by me to tell the truth, the whole

15   truth and nothing but the truth, was thereupon examined

16   and testified as hereinafter set forth.

17                   ---oOo---

18         (Plaintiff's Exhibit No. 188 marked for

19          identification.)

09:13 20        THE VIDEOGRAPHER:  Good morning.  My name is

21   Lindsay Lewis.  I'm a certified legal video specialist

22   today for Barkley Court Reporters.  Barkley Court

23   Reporters is located at 222 Front Street, Suite 600, in

24   San Francisco, California.  Today is January 9th, 2012.

09:13 25   The time is 9:13 a.m.  We are located today at 405

                        9

BARKLEY
Court Reporters

1    finish a line of questioning.  Is that all right with

2    you?

3        A.    That's okay.

4        Q.    Okay.  So let's go ahead and get started.  I

09:18 5    put in front of you Exhibit No. 188.  Do you see that

6    document?

7        A.    Yes, I do.

8        Q.    This is a notice of deposition of Power

9    Ventures pursuant to Federal Rule of Civil Procedure

09:18 10    30(b)(6).  Do you understand that you are testifying

11    today as a corporate designee of Power Ventures as to

12    the topics that are listed in that notice?

13        A.    Yes, I do.

14        Q.    And you understand that the testimony you give

09:18 15    today is binding on Power Ventures as to the things that

16    -- the topics that are listed in those -- in the notice?

17        A.    Yes, I do.

18        Q.    Have you reviewed that notice?

19        A.    I have reviewed it.

09:18 20        Q.    Okay.  And did you do anything to prepare to

21    testify as the corporate designee of Power ventures?

22        A.    I have met with counsel today for about one

23    hour, from 8:00 a.m. to 9:00 a.m.

24        Q.    Anything else?

09:18 25        A.    Beyond -- I read this notices and I read

14

BARKLEY
Court Reporters

1    excerpts of previous depositions.

2        Q.     And whose other depositions?

3        A.     Which depositions did you -- did you provide

4    me?

09:19  5               MR. FISHER:  I can't --

6        Q.     BY MR. CHATTERJEE:  Testify to --

7               MR. FISHER:  What you know.

8        Q.     BY MR. CHATTERJEE:  Testify to the best of

9    your recollection.

09:19  10       A.     I believe I -- I saw -- I referenced Zak, Zak

11   Mandhro's deposition.

12       Q.     Anyone else?

13       A.     There was Zak Mandhro, Robert Pollock, and Ed

14   Niehaus.

09:19  15       Q.     Did you read all of the depositions --

16       A.     No.

17       Q.     -- or certain excerpts?

18       A.     I didn't even -- didn't read them, except I

19   read excerpts of one or -- of two of them.

09:19  20       Q.     So which ones did you read excerpts of?

21       A.     I read excerpts of Rob Pollock's and Zak

22   Mandhro's.

23       Q.     You didn't read any of Mr. Niehaus'?

24       A.     I didn't get around to it.

09:19  25       Q.     Okay.  Did you review any documents to prepare

15

BARKLEY
Court Reporters

1      for your deposition as a corporate designee?

2          A.      You're talking about recently or in the past?

3      I mean, in the past I have reviewed many of the

4      documents that have been exchanged of evidence.  But

09:20   5      nothing in the last few days.

6          Q.      Okay.  So my question was really, really

7      precise.  Was -- in preparation for your testimony as a

8      corporate designee, did you review any documents to

9      prepare yourself?

09:20  10          A.      I did not.

11          Q.      Okay.  Have you talked with Eric Santos during

12      the course of this litigation about how, for example,

13      the -- the PowerScript code operated?

14              MR. FISHER:  Objection.  Vague.

09:20  15              THE WITNESS:  Have I talked to him during this

16      investigation about how it operated?

17          Q.      BY MR. CHATTERJEE:  Correct.

18          A.      I've -- I've talked -- the answer is not

19      recently, but I've obviously in the past had many

09:20  20      conversations on -- on the PowerScript code with Eric.

21          Q.      What about within the past year?

22          A.      In the past year I have not talked about the

23      PowerScript code.  I've had very specific e-mails when

24      there have been in the past questions like where I've

09:21  25      asked him one or two questions when they've come up in

16

BARKLEY
Court Reporters

1   the case.  And some -- sometimes he's answered if he's

2   had the time.  Other times he has not answered.

3       Q.    Okay.  Other than reviewing excerpts of Mr.

4   Mandhro and Mr. Pollock's depositions, did you do

09:21  5   anything else to prepare to testify as the corporate

6   designee at Power Ventures?

7       A.    I -- I reviewed the -- the recent what do you

8   call it -- what do we refer -- the statements that have

9   been exchanged the last two months by Facebook.  And

09:21 10   they -- I -- I forget what we call them.

11      Q.    The summary judgment motions?

12      A.    The summary judgment motions, I have

13   reviewed -- reviewed those.

14      Q.    Okay.  So anything else?

09:21 15      A.    To my best recollection, no.

16      Q.    Okay.  So let's start with Mr. Mandhro.  What

17   did you review from Mr. Mandhro's depositions?

18      A.    I just glanced through the -- the transcript.

19      Q.    So there wasn't a specific excerpts you were

09:22 20   reading, you just kind of --

21      A.    I just glanced through it to see, you know,

22   the general line of questioning and discussions that

23   were discussed in that conversation.

24      Q.    Was there anything that you read in there that

09:22 25   you disagreed with?

17

BARKLEY
Court Reporters

1      A.      No.     What, that I -- not that I -- my best of

2   my recollection I had a very minimal time.   I was -- I

3   only received it in the last two days.   And I've been on

4   a flight for the last 48 hours due to huge flight

09:22   5   problems.   So I have not really had a significant time

6   to -- to review it in detail.

7      Q.      Are you prepared to testify as the corporate

8   designee today given the limited time you've had?

9      A.      I'm prepared, yeah.

09:22  10      Q.      And -- and you don't need to know anything

11   about what Mr. Mandhro said in order -- in order for you

12   to testify as the corporate designee?

13      A.      I've reviewed -- I reviewed that, Mr.

14   Mandhro's.   I have not reviewed Ed Niehaus'.   And Rob's,

09:22  15   I have more sparsely reviewed his.

16      Q.      But my question's a little simpler than that.

17      A.      Yeah.

18      Q.      Do you need to review those depositions in

19   order to feel that you are fully prepared to testify on

09:23  20   behalf of Power Ventures as to the topics we've

21   identified?

22      A.      I do not.

23      Q.      So without disclosing any privileged

24   conversations, why were you reviewing those to prepare

09:23  25   for your deposition?

18



1       A.      Yeah, I don't -- I don't believe it -- it was

2    tracked.  But I -- but I -- I believe that we -- there

3    was an e-mail on December 27th where it was actually an

4    exhibit.  I don't know if we have that.  I would just --

10:40  5    if we have that handy by any chance?

6       Q.      I -- I -- I don't.  But I just -- I'm just

7    trying to get a sense of --

8       A.      Yeah.

9       Q.      -- there was some information you were

10:40 10    tracking.  Was there any particular reason that -- that

11    Power was not tracking event invitations that were or

12    notifications that were sent?

13       A.      Event creations, I -- I -- I don't -- I don't

14    know the answer.  I think that we -- that there was a

10:40 15    question.  That's why I'd like to see since it was a

16    long time ago the -- this -- this conversation we've had

17    before.  And, in fact, upon having it even at that --

18    we've -- we've provided answers.  So if it would be good

19    to reference those, because I think this subject has

10:41 20    been discussed.

21       Q.      But whatever the answer was in that -- in that

22    e-mail correspondence is --

23       A.      Correct.

24       Q.      -- Power Ventures' position?

10:41 25       A.      That's correct.

64

BARKLEY
Court Reporters

1    Q.    -- did you -- did you track the numbers of

2    status updates that were placed on Facebook or event

3    notifications that were placed on Facebook?

4    A.    The -- the -- whatever -- if it was -- if it

10:47  5    was in the -- I believe it -- if it was tracked, we

6    would have -- we would have had it.  So I don't see any

7    e-mails referring to it and I don't see any -- any

8    statistics.  If we had an e-mail in the past that we

9    provided, then -- because it's obviously been three

10:47  10    years of questions.  I don't know specifically.  But to

11    the best of my knowledge, I don't -- I don't believe we

12    tracked status updates.  But I remember there was a

13    discussion on event creation and I don't -- I don't know

14    if you have that dialogue handy?

10:47  15    Q.    Yeah, I know what you're talking about.

16    A.    Yeah.

17    Q.    Let me --

18    A.    Yeah.  It would just probably be better just

19    to refer to that so I can refresh my memory.

10:47  20    Q.    I'm trying to just really narrow down the

21    issues here.

22    A.    Sure.

23    Q.    Do you have any knowledge as you sit here

24    today how many Facebook users received status updates

10:47  25    that discussed the hundred by hundred by hundred

71

Designee Steven Vachani, 30 (b) (6) - Confidential

BARKLEY
Court Reporters

1    promotion?

2        A.    I don't right -- I don't have that information

3    right now.

4        Q.    Okay.  If that information did exist at Power,

10:48  5    where would it exist?

6        A.    Where would it have existed?  I'd have -- I'd

7    need to get clarification on that.  I can -- on that

8    specific question I -- I could -- I could inquire and --

9    and ask if we haven't already covered that in the past.

10:48  10        Q.    Who -- who would you need to ask?

11        A.    I would actually try to go back to Leandro who

12    was -- it would be a favor.  He hasn't worked for the

13    company for a long time.  But he was one of the last

14    people.  I would try to --

10:48  15        Q.    Would that --

16        A.    -- see if -- see if that -- to find out how

17    that would have been tracked.  If -- but I believe we've

18    actually discussed this in the past though.

19        Q.    Right.  If that was tracked, would there be --

10:48  20    would it be reflected in the code?

21        A.    It would -- there's two things.  There's the

22    ability to track it and whether it was actually being

23    tracked.  So the code -- for example, on the database

24    there are tables that are referred to that we never

10:49  25    actually -- you know, sometimes you have code to be able

72

BARKLEY
Court Reporters

1    to track it.  But because of resources it's too -- too

2    -- it requires too much server power or too many things,

3    certain things are not turned on.  And that's -- that's

4    happened in many -- in many cases.

10:49  5          For example, as we've referred to on

6    November -- you know, on November 23rd we had changed

7    servers of 2008.  We had changed server companies that

8    week.  And afterwards we had disabled a lot of

9    functionality that we had previously had that was too --

10:49  10   too taxing.  So there might have been code that said

11   this could exist.  And this actually came up in some of

12   the conversations of Monte was trying to understand

13   why -- why on November 23rd after that there was no --

14   some -- some functionality.  This is well before we even

10:49  15   turned on Facebook.  We had -- we had changed servers

16   the week before we launched.  A lot of -- we were --

17   launched Facebook and many other things just because of

18   cost -- cost -- cost restrictions.

19       Q.    Right.  So to the extent that the information

10:50  20   existed --

21       A.    Yeah.

22       Q.    -- and was actually tracked, it would be

23   reflected in -- in the code.  There would be code

24   functionality that would enable it and then there would

10:50  25   actually be data in the database that was actually

73

BARKLEY
Court Reporters

1    tracked, right?

2        A.    There would be data in the data -- that's

3    correct.

4        Q.    Okay.  And we've referred generally to the

10:50 5    database.

6        A.    Yes.

7        Q.    Can you tell me what that was called or what

8    the file name of it was?

9        A.    I -- the file names you guys have -- have

10:50 10    reviewed everything that was there.  So you -- you guys

11    have probably -- your guys probably have better

12    knowledge of that than I do personally.  I mean, because

13    you guys -- probably the most -- recently analyzed it

14    the most.

10:50 15        Q.    Do you know if that database exists today?

16        A.    Everything -- everything that was -- we

17    provided everything that exists today to you guys.  And

18    as far as I understand, everything -- and again was --

19    everything -- you guys were able to find all files

10:50 20    except for a specific file that we -- we have that we've

21    discussed that was a -- a -- a log-in file of -- of

22    links of, like, pages visited, which I think that was

23    the -- that was the file that was 180 gigs that was

24    available for three years.  But on two -- in -- on

10:51 25    August 2011 was not able -- it was too large to transfer

74

BARKLEY
Court Reporters

1    during a -- because we were doing an internet transfer

2    of data.

3        Q.    And that -- that -- that 180 gig file, would

4    that have data associated with log-ins to Facebook?

10:51 5      A.    No.   That -- that would have -- that wouldn't

6    be storing log-ins to Facebook.   This was -- this was a

7    more general just like the page -- the pages visited.

8    So that's why it was so large.   It's like a -- so --

9        Q.    When you say "pages visited," what do you

10:51 10  mean?

11       A.    Our links.   So, like, if there's a -- you

12   know, a link on -- anything on -- as a user went

13   throughout Power it tracked, I believe.   It was a --

14   a -- a general thing of just their -- their -- their

10:52 15  click -- click flow I believe.   I don't know for sure,

16   but I believe it was links clicked on.

17       Q.    So with that, the Power browser -- I'll refer

18   to the Power browser.   You know what I mean when I refer

19   to that.

10:52 20      A.    Yeah.

21       Q.    It would have a number of different boxes

22   or -- I'll refer to them as boxes for the different

23   social networks it connected to?

24       A.    Correct.

10:52 25      Q.    Do you know what I'm referring to?

75

BARKLEY
Court Reporters

1    was available and accessed in whatever -- if anything,

2    it was referenced in any questions.  If -- I don't know

3    if that was specifically where -- but it was -- it was

4    -- it existed until that date, that's correct.

11:02 5        Q.    Okay.  And then following that you made the

6    decision to delete that database?

7        A.    Yeah.  As you can see, the dialogue there we

8    didn't have the time with -- to transfer it before our

9    servers would be shut off.  So they -- the decision was

11:02 10   transfer all the most valuable stuff and if we have time

11   and they're not shut off, do these two last.

12       Q.    Other than what's stated in this e-mail, do

13   you know specifically what was in the logger database?

14       A.    I do not know specifically.  This was why I

11:02 15  asked that question right there.

16       Q.    But other than what's stated here?

17       A.    I -- I do not know.

18       Q.    So as you sit here today, you don't know, for

19   example, if the logger database would track event

11:03 20  invitations sent through links to -- to Facebook users?

21            MR. FISHER:  Objection.  Vague.  Assumes facts

22   be in evidence.

23            THE WITNESS:  What I do --

24            MR. FISHER:  Lacks foundation.  Incomplete

11:03 25  hypothetical.

84

BARKLEY
Court Reporters

1          THE WITNESS:  What I do know is that questions

2     relating to the events and these things were asked by

3     Facebook and -- and truthfully answered to the best of

4     our knowledge for the previous three years would have

11:03  5     referenced and accessed whatever was available to us.

6     So the date that this was deleted, any question -- mass

7     amount of questions that were previously asked were

8     already asked.  And I don't know if it was referring to

9     this or not, but they were -- we had access to -- to

11:03 10     provide data to -- to requested questions in the

11     previous -- in the previous three years.

12          Q.   BY MR. CHATTERJEE:   Okay.   So if I understand

13     what you're saying correctly is if -- if that

14     information had been in the logger database, you would

11:03 15     have referred to it and provided that information

16     already?

17          A.    Correct.  But I don't know if we referred to

18     it or not.

19          Q.    Okay.

11:03 20          A.    So this was only on April 17th, three years.

21     And 2008 obviously is when we I think had the -- the

22     lawsuit.  You know, the first time that we interacted

23     with Facebook.

24          Q.    And if we wanted to test the accuracy of

11:04 25     whatever you investigated, we couldn't do that today

85

BARKLEY
Court Reporters

1    because whatever is in that logger database is no longer

2    available to us, right?

3              MR. FISHER:  Objection.  Vague.

4              THE WITNESS:  What we could -- what I could

11:04  5    find out -- what we could find out is I -- I could find

6    out more details on -- if -- I don't know if I could

7    ask.  I could try to inquire more details on -- on this

8    logger -- logger database, but that -- that file is no

9    longer available today.

11:04 10         Q.    BY MR. CHATTERJEE:  Right.

11         A.    It was available until April 17th.

12         Q.    And when you say "inquire," you would have to

13   ask Mr. Fernandes or -- and Eric Santos?

14         A.    I would basically -- yeah.  I would go and try

11:04 15   to -- to ask one of the original programmers to provide

16   further details on that file.

17         Q.    Yeah.  Or the code might say.

18         A.    Or the code -- the code might -- the code

19   might say.  I would probably go to them to get a

11:04 20   clear -- clear answer to that.

21         Q.    Did you ever ask whether the logger -- at the

22   time you were discussing all of this in November of 2011

23   -- well, it looks like April of 2011.  Scratch it.  Let

24   me start over.

11:05 25              In the April 2011 time frame when you were

86

BARKLEY
Court Reporters

1  social" networks will to try to block your access by

2  delayed server response or denied some service.

3          THE REPORTER:  Okay.  Repeat that, please.

4          THE WITNESS:  Delayed server response or

11:53  5  denied some service.  So, yeah, he -- I think he's just

6  saying here that in general more IPs in your proxy

7  server.  That's what -- exactly what it says in the

8  e-mail.

9          MR. FISHER:  Objection.  Vague.

11:53  10  Mischaracterizes the document.

11      Q.    BY MR. CHATTERJEE:  So we're -- we're going to

12  get back to this later.  But the idea of having multiple

13  rotating IP addresses to avoid efforts to block Power

14  Ventures is an idea that goes back to the founding of

11:53  15  Power in 2005, right?

16      A.    Not to block Power.  It's, as I said, there

17  are standard -- when you're accessing with a -- a site

18  having multiple IP addresses with a proxy is -- is a

19  standard procedure.  That's correct.  It goes -- it goes

11:53  20  back to the beginning.  It was not something that was

21  employed -- it's -- you know, for --

22      Q.    So -- so -- so --

23      A.    -- for Facebook.

24      Q.    This is a -- I'm going to ask a really, really

11:53  25  precise question.

Designee Steven Vachani, 30 (b) (6) - Confidential

BARKLEY
Court Reporters

1      A.      Okay.

2      Q.      Which is since 2005, one of the reasons that

3   Power Ventures wanted to employ multiple IP addresses is

4   because it would make it more difficult for a web site

11:54  5   to block Power Ventures from accessing their web site?

6   And she can read it back if it's not clear.

7            MR. FISHER:  Objection.  Vague.

8            THE WITNESS:  Okay.  So let me -- let me

9   answer the question.  Is it -- how -- when we started

11:54 10   building in 2006, everything that we were doing as a

11   company was new and innovative.  There were no -- there

12   were -- we didn't know what was going to be happening in

13   the internet.  We built a system that would -- we were

14   building a browser that was going to be interacting with

11:54 15   many sites.  There was not some specific agenda.  We --

16   we know that anything is possible.  So we built -- we --

17   we looked -- we wanted -- in -- in our -- in our effort

18   for our users to be able to access the sites that they

19   want to access freely, we -- we built in a range of -- a

11:54 20   range of mechanisms, one of those being that IP

21   addresses rotate.  Those blocks are not -- are -- are

22   many times automatic blocks that have nothing to do with

23   deliberate attempts to block.

24            In fact, most of those blocks historically

11:55 25   were not specifically intended at Power.  They were

112

BARKLEY
Court Reporters

1    automatic things because they didn't know what was

2    accessing their site.  And, in fact -- which a

3    conversation that we will probably get to later is that

4    we've actually had conversations with sites that just

11:55  5    wanted to under -- just came to us and said we'd like to

6    understand how your systems work.  And then later said,

7    oh, okay, great, we just didn't know if this was a

8    standard site that was user driven or if this was some

9    type of other type of, you know, foreign, you know,

11:55 10    hostile entity.

11           And most sites previously, with the exception

12    of Facebook, have come to the conclusion that, you know,

13    this was a user-generated activity.  So I think it's

14    very easy -- you have to look at this as this was a

11:55 15    standard thing that was operating and operating in a

16    friendly manner with many sites without a problem, you

17    know, where usually it was a matter of just discussions

18    with sites.  And that's the -- it is correct that this

19    is -- this -- this is a technique that was employed well

11:56 20    before Facebook and was utilized for, you know, two --

21    not three year -- two years, about two years previously

22    for as we were building out this system.

23           MR. CHATTERJEE:  Move to strike as

24    nonresponsive.  Could the court reporter read my

11:56 25    question back, please.

113

BARKLEY
Court Reporters

1          (Whereupon the record was read as requested.)

2          THE WITNESS:  Okay.  So, as I said, the -- I

3    answered the question, I believe.  Is that many sites

4    have standard responses to -- to entities that they do

11:57 5   not under -- which they have not interacted before,

6    especially when they have high traffic.  And so this was

7    initially built with -- with that purpose, understanding

8    that -- and, in fact, I -- I believe the Electronic

9    Frontier Foundation has answered this question even more

11:57 10  articulately in the past.  And rather than try you to,

11   you know, answer it again, I think that you should refer

12   to our previous responses on this.

13         MR. CHATTERJEE:  Move to strike as

14   nonresponsive.  I'm going to ask you one more time.  I'm

11:57 15  going to ask the court reporter to read it back.  If

16   there's anything ambiguous about my question, I want you

17   to tell me.

18         But could the court reporter read my question

19   back one more time.  You aren't answering my question,

11:57 20  Mr. Vachani.

21         MR. FISHER:  He's answering the question,

22   Neel.

23         MR. CHATTERJEE:  Go ahead and read it back.

24         (Whereupon the record was read as requested.)

11:58 25        THE WITNESS:  I would ask you to read back my

114

BARKLEY
Court Reporters

1    previous answers that I've already stated.

2        Q.    BY MR. CHATTERJEE:  Okay.  So beyond what

3    you've said, you're not changing your answer?

4        A.    That's correct.

11:58  5        Q.    You cannot answer that question with a yes or

6    a no?

7        A.    I've answered it.  I've answered it as best as

8    I can.

9        Q.    Okay.  So can you answer it with a yes or a no

11:58  10   or not?

11             MR. FISHER:  Asked and --

12             THE WITNESS:  I've answered --

13             MR. FISHER:  -- answered.  Argumentative.

14             THE WITNESS:  I've answered the question.

11:58  15            MR. FISHER:  Let's move on.

16             MR. CHATTERJEE:  Okay.  So let's mark this as

17   Exhibit 199 I think.

18             (Plaintiff's Exhibit No. 199 marked for

19              identification.)

11:59  20       Q.    BY MR. CHATTERJEE:  Before we go through the

21   depths of this e-mail, Mr. Vachani, this is a, I

22   believe, an instant chat log between you and someone

23   named Abi, A-b-i.

24        A.    Yeah.  First of all, this is -- this is --

11:59  25   this e-mail predates by a factor of almost a year and a

115

BARKLEY
Court Reporters

```
 1   misleading in your submission to the court under oath in

 2   paragraph 11?

 3       A.    No.

 4             MR. FISHER:  Objection.  Argumentative.

 5       Q.    BY MR. CHATTERJEE:  That's truthful and

 6   accurate?

 7       A.    Yes.  That's exactly what it says.

 8       Q.    So when -- when Power accessed the Facebook

 9   web site, I believe your testimony has been it would be

10   only at the direction of a user, correct?

11       A.    The user chose to access the site, correct.

12       Q.    So isn't it fair to say that when a user is

13   accessing Facebook through the power.com web site,

14   anything that's being done to do that is a tool that the

15   user is using?

16             MR. FISHER:  Objection.  Vague.  Assumes facts

17   not in evidence.  Lacks foundation.

18             THE WITNESS:  It's -- it's a vague statement.

19       Q.    BY MR. CHATTERJEE:  How do you reconcile the

20   statement in Exhibit 200 where you say "we were able to

21   easily adjust" with your unequivocal statement in

22   paragraph 11 that "Power did not take any effort to

23   circumvent that block..."?

24             MR. FISHER:  Objection.  Argumentative.

25             THE WITNESS:  So I -- I've stated this already
```

145

BARKLEY
Court Reporters

1  and I'll state it again.  Power -- the -- as it states

2  right here, "Facebook's IP block was ineffective because

3  it blocked only one" "IP address" and "did not block

4  other IPs...."  So the statement -- you -- you're trying

12:35  5  to take the full statement of number 11 where we clarify

6  that -- that Facebook did have an IP block and why --

7  and so we were truthfully saying it was ineffective

8  because it only blocked one.  And that's why users were

9  able to continue to access the site.  So we're not

12:35  10  hiding the fact that our -- that our -- that we utilized

11  an IP rotating database.  We've given you access to our

12  server code that states this and -- and we're saying

13  here.  So if you -- if -- and so our -- our -- our

14  interpretation of this and our -- our belief is that if

12:36  15  the -- if this is -- this is -- this was always a

16  standard part of our business and it -- we don't -- we

17  don't see anything wrong -- we don't see anything wrong

18  that if a user is coming to our site and the system

19  updates in order to access it.

12:36  20      Q.    BY MR. CHATTERJEE:  Move to strike as

21  nonresponsive.  I'm not asking whether you see something

22  right or wrong.

23      A.    Okay.

24      Q.    Let me just ask it a real simple way.

12:36  25      A.    Okay.

146

BARKLEY
Court Reporters

1    Q.    Did power.com through its rotating IP address

2    approach circumvent the block that Facebook put in place

3    or not?

4    A.    That's where for you -- I think we've stated

12:36  5    in -- in -- in statement 11 our opinion on this issue.

6            MR. CHATTERJEE:   Would you read the question

7    again, please, Madam Court Reporter.

8            (Whereupon the record was read as requested.)

9            THE WITNESS:   And I'll read this answer again.

12:36  10   "Nevertheless, Facebook's IP block was ineffective

11   because it blocked only one outdated IP address" and

12   Power used and did not block other I --

13           THE REPORTER:   I'm sorry.

14           THE WITNESS:   Sorry.

12:37  15           THE REPORTER:   Blocked only one data IP

16   address?

17           THE WITNESS:   "...blocked only one outdated IP

18   address" that "Power had used, and did not block other

19   IPs that Power was using in" its "normal course of

12:37  20   business."

21    Q.    BY MR. CHATTERJEE:   Okay.

22    A.    I -- I'm repeating what was stated in number

23   11 in answering your question.

24    Q.    The -- the -- the problem is paragraph 11 is a

12:37  25   declaration that you submitted to the court.

147

BARKLEY
Court Reporters

1    A.    Yeah.

2    Q.    That isn't a question you were asked.

3          Read the question again --

4    A.    Okay.

12:37    5          MR. CHATTERJEE:   -- Madam Court Reporter.

6          (Whereupon the record was read as requested.)

7          THE WITNESS:   And I'm saying that number 11 --

8    I'm repeating that again.   Face -- that -- that's my

9    answer.   It's what we've already stated in this

12:37    10    statement.

11    Q.    BY MR. CHATTERJEE:   Why can't you answer my

12    question with a yes or no?

13          MR. FISHER:   Objection.   Argumentative.

14          THE WITNESS:   I've just answered it.

12:37    15          MR. FISHER:   Objection.   Argumentative.

16          THE WITNESS:   I've answered it more -- more

17    descriptively and I've actually reinstated the same

18    statement that I've -- that I've said here in this -- in

19    this testimony.

12:37    20    Q.    BY MR. CHATTERJEE:   You haven't.   Because the

21    way that this question is answer it -- is answering it

22    is you're saying there's a specific block that's put up

23    and there wasn't a preexisting technology.   Right?

24    That's the assumption in this -- in this statement.

12:38    25          My question is when the block was put up, did

148

BARKLEY
Court Reporters

1   Power Ventures circumvent it or not?

2            MR. FISHER:  Objection.  Argumentative.

3   Vague.  Mischaracterizes prior testimony.

4            THE WITNESS:  I --

12:38  5        MR. FISHER:  Mischaracterizes his declaration.

6            THE WITNESS:  I think the statement already

7   answers the question.  And if you don't -- if you

8   disagree, then you disagree.

9     Q.   BY MR. CHATTERJEE:  Were you lying to your

12:38 10  investor when you said you were able to easily adjust?

11           MR. FISHER:  Objection.  Argumentative.

12   Mischaracterizes the exhibit.

13           THE WITNESS:  I'm saying to you that -- that

14   -- that the block was ineffective because it blocked

12:38 15  only one address.  And I've also said to you -- said to

16   you that our system, you know, all -- this is a standard

17   feature in our system that if it cannot access it

18   automatically, it automatically tries again.  So if

19   you -- if you want to -- we've -- that's what we've

12:38 20  always said.  It's not -- it's exactly what we said in

21   this statement, that we use multiple IP addresses.  We

22   have said that.  And finally, there have been arguments

23   in the past we've -- where we've discussed this issue in

24   our -- in our -- in our thoughts and what we've done.

12:39 25    Q.   BY MR. CHATTERJEE:  Okay.  So the rotating IP

149

BARKLEY
Court Reporters

1    approach was -- one of the purposes was to allow for

2    access when a web site blocked you, right?

3        A.    The rotating IP address just -- it's a

4    standard thing.  If it cannot access a site it -- it --

12:39  5  it tries again with another IP address.  It doesn't know

6    what the reason.  It's a standard feature that -- and

7    that's what we say here "Facebook's" "block was

8    ineffective because it blocked only one outdated IP

9    address Power used, and did not block other IPs that

12:39  10  Power was using in" its "normal course of business."  I

11   mean, I've answered this question many times already.

12   And I'm -- and it's the same statement that we made

13   here.

14       Q.    All right.  Did Power's rotating IP addresses

12:39  15  allow a Power user to access the Facebook web site

16   despite the fact that Facebook had implemented a block?

17            MR. FISHER:  Objection.  Vague.

18            THE WITNESS:  I'll answer it again.

19   Facebook's IP block -- this answers the question right

12:39  20  there.  It -- it obviously says it was ineffective and

21   therefore the user accessed the site because it only --

22   it only blocked one IP address that Power had used and

23   did not block other IPs that Power was using in its

24   normal course of business.

12:40  25           MR. CHATTERJEE:  Madam Court Reporter, please

150

BARKLEY
Court Reporters

1    read the question back.

2              (Whereupon the record was read as requested.)

3              THE WITNESS:  I think I've answered the

4    question.  I mean, I've answered the question already.

12:40    5              MR. FISHER:  Asked and answered.

6              MR. CHATTERJEE:  You didn't.  You read your

7    declaration.  That question's different.

8              MR. FISHER:  That's --

9              THE WITNESS:  I've -- I've -- I've given you

12:40   10    the same answer.  That's the same answer.

11         Q.    BY MR. CHATTERJEE:  Is it a yes?

12         A.    I've answered it.  I don't need to -- I've

13    answered it -- I've answered the question.

14         Q.    Let me -- let me put it this way.

12:40   15         A.    And I've kept it consistent with the same

16    answer that we --

17         Q.    Let me put it this way.  After Facebook

18    implemented a block -- you're with me so far?  Facebook

19    did implement a block.  You know that, right?

12:40   20         A.    And that's what -- we -- we said that today.

21         Q.    I don't care whether you think --

22         A.    Facebook's -- Facebook's IP block was

23    ineffective.  So therefore the answer -- you've -- this

24    question's already been answered in my declaration and

12:41   25    I've repeated it about four times.

151

BARKLEY
Court Reporters

1     Q.    So you know that Facebook implemented a block,

2  correct?

3     A.    I think we've answered that question.

4     Q.    Did you know that Facebook implemented a

12:41  5  block --

6     A.    Did I know?

7     Q.    -- in 2008?

8     A.    Or did our system -- did I know?  Our system,

9  as I've said, it cannot access a site.  So it -- it

12:41 10  updated.  It used another IP address to access it.  So

11  you can interpret that however.  We've -- we've already

12  stated this.

13     Q.    So Power system knew that Facebook was not

14  allowing access from that IP address?

12:41 15     A.    I'm sorry.  I've answered this -- I've

16  answered this question already.

17     Q.    Did Power system know that Facebook was not

18  allowing access from an IP address?  Yes or no?  It's

19  not a difficult question, Mr. Vachani.

12:41 20     A.    And I've answered this.  I think -- I think

21  our statement's already addressed this.  And I'm -- and

22  I'm repeating the same answer.

23     Q.    I'm trying to break it down into smaller

24  components --

12:41 25     A.    Okay.

BARKLEY
Court Reporters

1    Q.    -- so I can understand your testimony.

2    A.    Okay.

3    Q.    Did Power's system know that Facebook had

4  implemented a block to a particular IP address?

12:42  5    A.    Look, Power -- what Power system knew, that it

6  was not -- that it was not accessing the site.   And as I

7  said multiple times, our system when it cannot access a

8  site it automatically uses -- it uses other IPs in the

9  system that we have been using in our -- in our business

12:42  10  and it accesses the site.

11    Q.    And after that block was in place, Power users

12  were given the ability to access Facebook through a

13  different IP address, correct?

14    A.    I think I've answered that question already.

12:42  15    Q.    Is it a yes?

16    A.    Again, I don't -- I don't need to answer yes

17  or no.   I've answered it.   I've answered it exactly the

18  way we've answered it in the past.   And I've --

19    Q.    So could -- could they access it?

12:42  20    A.    You can -- you can interpret that as -- as how

21  you want to interpret that.   Again, if you want me to

22  read this, I'll repeat this again.

23         MR. CHATTERJEE:   Okay.   So, Tim, we're going

24  to have a meet and confer after this.   And I'm going to

12:42  25  ask the court to have a deposition of Mr. Vachani in

153

BARKLEY
Court Reporters

1    forward to their personal address?

2        A.    No.   I mean, there -- there was a server.

3    But, I mean, I say everyone -- how they accessed it was

4    in different ways.

13:57  5        Q.    Okay.   But that server, would it house the

6    e-mails that people received as part of the business or

7    would it just forward things on?

8        A.    I -- I don't know how it was exactly work.

9    But I believe that, you know, there was -- everyone had

13:57 10    a different way of accessing their -- their e-mails.

11    That's all I know.   And all the people -- like I -- I

12    accessed mine through Yahoo! and Eric would access

13    through, you know, his own.   Everybody accessed on their

14    own.

13:57 15        Q.    So if that server did have e-mails between

16    people at Power that didn't include you, that would be

17    on the backup?

18        A.    I mean, yeah, it would be on the backup.

19        Q.    Okay.   And if it isn't there, then --

13:58 20        A.    Yeah.   Whatever -- whatever we have is in the

21    backup.

22        Q.    Okay.

23        A.    I mean, I don't know the technical details on

24    how these things were -- were working, so.

13:58 25        Q.    And if -- is it Power's view that an -- an

                                171

1    e-mail sent to a power.com employee that was then

2    forwarded to a personal account, who -- whose e-mail is

3    that?  Is that the employee's e-mail or is it Power's

4    e-mail?

13:58  5           MR. FISHER:  Objection.  Vague.  Calls for a

6    legal conclusion.

7         Q.    BY MR. CHATTERJEE:  Do you follow me?

8         A.    Yeah.

9         Q.    I can give you a concrete example.

13:58  10        A.    Yeah.

11        Q.    If Eric Santos e-mailed Bruno Carvalho with

12   some sort of business instruction --

13        A.    Yeah.

14        Q.    -- and it went to their personal e-mail --

13:58  15        A.    Yeah.

16        Q.    -- through the server architecture, who would

17   be the owner of that e-mail?

18        A.    Well, I'll --

19             MR. FISHER:  Same objections.

13:59  20             THE WITNESS:  I'll answer it another way that

21   -- more practically.  That we were a small company.  So

22   if I look at the ten people that I personally

23   communicated with most regularly and think about each of

24   them, you know, I mean, from a practical standpoint --

13:59  25   although this doesn't answer your question -- almost --

172

BARKLEY
Court Reporters

1    almost any e-mail, you know, there -- that all the

2    people that are involved in this situation have -- have

3    pretty much been -- you know, they're -- they're -- they

4    had -- they had their own solution.  So I don't know who

13:59  5    own.  I mean, we had -- if they had access.  If they

6    chose to copy one person in Power, then obvious -- it's

7    accessible.  And so that's from practical purposes

8    anything that was copied to me or anything that was

9    copied to Eric or -- or Rob or Zak or all these key

13:59  10    people that were in the company, you know, they were all

11    essentially preserved.

12        Q.    BY MR. CHATTERJEE:  Right.  But if -- let's --

13    let's say that -- that there was an e-mail that went to

14    a person's personal e-mail account through the

13:59  15    forwarding tool on the servers and it had a bunch of

16    power.com business information, was the employee who

17    received that e-mail free to go and use that information

18    however they wanted outside of Power?

19        MR. FISHER:  Objection.  Vague.  Calls for a

14:00  20    legal conclusion.  Incomplete hypothetical.

21        THE WITNESS:  In -- in theory, no.  I mean,

22    they're not supposed -- they -- they -- when they sign,

23    when they join the company, they sign saying that

24    everything -- their -- their employment contracts, which

14:00  25    I believe you've seen some, you know, have references

173

BARKLEY
Court Reporters

1      A.     It's more than 50.

2      Q.     Okay.  Somewhere between 50 and 60?

3      A.     Again, I don't -- I don't know if that's

4    relevant, the numbers.  And they're -- they're changing,

14:52  5    but....

6      Q.     Give me an estimate.

7      A.     It's above 50.  I mean, it's I guess I don't

8    --

9      Q.     Are any of the investors in Serendipity the

14:52 10    same as investors in Power Ventures other than you?

11      A.     At this point, no.

12      Q.     Why would you offer Mr. Santos an employment

13    contract where he'd be employed by both Serendipity

14    Ventures and OpenWeb?

14:52 15      A.     Because Eric obviously has played -- played a

16    crucial role in building the Power technology.  And if

17    Serendipity is going to invest, I'd like to see, you

18    know, him apply his experience and knowledge there.  But

19    we also believe Eric's -- knowing Eric and having worked

14:52 20    with him for many years and believe that he has much

21    greater potential and capacity and would like to see him

22    also contribute to both -- you know, to both -- both

23    entities.

24            MR. CHATTERJEE:  Let's mark this as Exhibit

14:53 25    208.

204

BARKLEY
Court Reporters

1          THE WITNESS:  I don't know if they told me

2     that it was a standard provision.  But I didn't -- I

3     didn't write this.  But, you know, I have seen a lot of

4     terms and conditions.  And, you know, I'm not saying I'm

15:20  5     an expert on them but, you know, this seemed -- seemed

6     reasonable and, you know, seemed -- seems very standard

7     and reasonable.

8          Q.    BY MR. CHATTERJEE:  And the last paragraph on

9     the third page says "By logging in to our site the user

15:20 10     is agreeing to and accepting the conditions stated in

11     these Terms of Use."

12          Do you see that?

13          A.    Yes.

14          Q.    And was it Power's intention to require its

15:21 15     users to comply with the terms of service that -- that

16     it had with its users?

17          A.    The terms of service that we had with our

18     users?

19          Q.    Correct.

15:21 20          A.    No.  I -- I think as you can say that, you

21     know -- I mean, you can -- you can respond maybe this

22     way.  Sites, including Facebook, explicitly violate

23     terms and conditions of other sites and have done that

24     by scraping other sites for other years.  And does that

15:21 25     mean that Facebook is intending, you know, to violate --

                                228

BARKLEY
Court Reporters

1  they violated terms and conditions.  Google has an

2  explicit clause that -- that -- that Facebook and many

3  other sites -- that Facebook has explicitly scraped data

4  from sites against their terms and conditions.  The fact

15:21  5  is these are -- this has been happening for years.  And

6  there's -- it's common sense that there's some things

7  that while there's no legal precedence or no legal laws

8  on these issues, including the issue of terms and

9  conditions, which I think there was already a ruling on

15:22  10  this, you know, in -- in our case itself about -- about

11  the terms and conditions, which I'm sure you're familiar

12  with.

13          Again, I think you're -- to try to get --

14  nitpick a terms and conditions that was written --

15:22  15  it was to be overarching and say naturally I think sites

16  historically use common sense and they -- they make

17  their own subjective decisions if they feel something --

18  you know, something -- that's -- that's -- each side has

19  that right.  And I believe Facebook -- you know,

15:22  20  obviously -- that doesn't make it right, but they have

21  the right to -- you know, Facebook has the right to, you

22  know, to cancel accounts of users if they want to cancel

23  accounts of users.

24      Q.    That's not my question, Mr. Vachani.

15:22  25      A.    What's your question?

229

BARKLEY
Court Reporters

1      Q.      In that paragraph --

2      A.      Yes.

3      Q.      -- did power.com intend to hold its users to a

4   terms of use by asking them to accept the conditions

15:22  5   stated in them?

6      A.      Well, we -- we have a terms -- we have a terms

7   and conditions.  To hold -- as I said --

8      Q.      You wanted them to comply, right?

9      A.      We wanted them to comply.  But we also like --

15:23  10   like Facebook, like Google, and others, there's common

11   sense put in -- there's common sense things that have no

12   legal precedent, that have not been defined, that are --

13   that are -- that are -- that are not easily -- they're

14   not -- don't have precedence yet.

15:23  15      Q.      Move to strike as nonresponsive.

16              Mr. Vachani, isn't it true that when you had

17   users on the power.com web site, you asked them to

18   accept obligations under a term of use?

19      A.      Okay.  I already answered this question.

15:23  20      Q.      Is the answer yes or no?

21      A.      I've answered the question.

22      Q.      Is the answer yes or no?

23      A.      Can you repeat what I said to him and -- and

24   strike that as my answer?

15:23  25      Q.      That's not an answer.  Mr. Vachani, I'm asking

230

BARKLEY
Court Reporters

1    you a very specific question.

2         A.    And I've answered the question.  I've said to

3    you that --

4         Q.    I am going to have a meet and confer --

15:23  5         A.    -- that --

6         Q.    Mr. Vachani --

7         A.    Listen to me.

8         Q.    Wait.  I'm going to have a meet and confer

9    with your counsel at the end of today.

15:23 10         A.    Okay.

11         Q.    We are going to send a letter to Judge Spero,

12    okay, if we don't -- if you don't -- if you refuse to

13    answer my questions.  And I will ask him to either

14    appoint a special master or to have you sit in the

15:24 15    witness stand and answer my questions with him calling

16    the balls and strikes there.

17              Very simple question.  Did you ask Power users

18    to accept a terms of use restriction?

19              MR. FISHER:  Objection.

15:24 20              THE WITNESS:  I've already told you.

21              MR. FISHER:  Asked and answered.

22    Argumentative.

23              THE WITNESS:  I've already told you the

24    answer.

15:24 25         Q.    BY MR. CHATTERJEE:  Is it yes or no?

231

BARKLEY
Court Reporters

1          MR. FISHER:  Assumes facts not in evidence.

2          THE WITNESS:  -- are you referring to?

3          MR. FISHER:  Incomplete hypothetical.

4          THE REPORTER:  Okay.  Whoa.  Whoa.  Whoa.

15:25 5  Everybody's talking over each other.

6          THE WITNESS:  What law are you referring to?

7      Q.    BY MR. CHATTERJEE:  Sure.   It's very simple.

8   There's a terms of service that you knew restricted the

9   user's ability in using the Facebook web site, correct?

15:25 10         MR. FISHER:  Assumes facts not in evidence.

11  Lacks --

12         THE WITNESS:  That's not the law.

13         MR. FISHER:  -- foundation.  Argumentative.

14         THE WITNESS:  Facebook terms and conditions is

15:25 15  not a law.  You're a lawyer.  You understand that.

16  Neel, come on.

17         MR. CHATTERJEE:  Go back and read the

18  question, Madam Court Reporter.

19         Answer my question, Mr. Vachani.  Not the

15:25 20  question you want to hear.

21         THE WITNESS:  I've said to you Facebook's

22  terms and conditions is not a law.  And you also are

23  familiar with the -- with the case that --

24      Q.    BY MR. CHATTERJEE:  Mr. Vachani, you are not

15:25 25  answering my question.

233

BARKLEY
Court Reporters

1      A.      What is your question?

2              MR. CHATTERJEE:  Could you read it back, Madam

3      Court Reporter.  Shall I ask it again?  It might be

4      simpler that way.

15:25   5          THE REPORTER:  Well, I can kind of piece it

6      together.  I mean, people are talking on top of each

7      other.

8      Q.      BY MR. CHATTERJEE:  Mr. Vachani, you knew the

9      Facebook terms of service did not allow users to access

15:26  10      the Facebook web site in the way that Power wanted to

11      access the web site, correct?

12             MR. FISHER:  Objection.  Assumes facts not in

13      evidence.  Lacks foundation.  Incomplete hypothetical.

14      Vague.  Calls for legal conclusion.

15:26  15              THE WITNESS:  I repeat what he said and I am

16      going to hold to that.

17              MR. CHATTERJEE:  Would you read the question

18      back, please.

19              (Whereupon the record was read as requested.)

15:26  20              THE WITNESS:  And I think I already answered

21      that question.  Do you want to read -- read when I

22      responded when he asked it the first time back?

23      Q.      BY MR. CHATTERJEE:  First time I asked the

24      question that way, Mr. Vachani.

15:26  25      A.      No.  But, well -- can you -- can you repeat

234

BARKLEY
Court Reporters

1    the answer I -- I made to my previous question back to

2    Neel?  The one that was asked differently?  Would you be

3    able to repeat that?

4        Q.     Why don't you answer my question.

15:27  5        A.     I'm asking her -- I'm asking if she can repeat

6    the answer.

7        Q.     I get to ask the questions here, Mr. Vachani.

8    Can you answer my question?

9        A.     And I get to also ask her to repeat it so I

15:27 10    can clarify what I said.

11        Q.     You can have her read my question --

12        A.     So I would like -- I would like --

13        Q.     Mr. Vachani, it's my deposition.  I ask you

14    questions, you give answers.  That's the way this works.

15:27 15        A.     I gave an answer.  Okay?  And I'm asking -- I

16    also have the right to ask her to repeat what I just

17    said here.  So will you please just stay relaxed and let

18    me ask this -- let me ask her to repeat that.  And then

19    I will lis -- and then if appropriate I will -- I will

15:27 20    either repeat the same answer or I will -- I will make a

21    change.  Okay?

22        Q.     Can you answer my question or not?

23        A.     Yes.  But can I -- can I ask her to repeat

24    what she recorded from what I just said?  I have the

15:27 25    right to do that, don't I?

235

BARKLEY
Court Reporters

1      Q.      I'm going to ask you the question one more
2  time.
3      A.      But I --
4      Q.      No.  Mr. Vachani, you can either answer it or
15:27  5  you can't.  If you can't answer it, tell me you can't
6  answer it.
7              You knew that the Facebook terms of service
8  did not allow Power users to access the Facebook web
9  site in the way Power wanted to do it; isn't that right?
15:28  10         MR. FISHER:  Objection.  Assumes facts not in
11  evidence.  Lacks foundation.  Argumentative.  Vague.
12             THE WITNESS:  And I would like to -- once
13  again, I would like to ask you the previous question,
14  can you repeat my answer?  I -- I'm not answering your
15:28  15  question yet.  I'm asking her to repeat the answer I
16  made to your previous question which was similar.
17             MR. CHATTERJEE:  Okay.  Let's take a break.
18  Tim, we're doing our meet and confer right now.
19             THE VIDEOGRAPHER:  We are going off the
15:28  20  record.  The time is 3:28 p.m.
21             (Whereupon a break was taken from 3:28 to
22              3:37.)
23             THE VIDEOGRAPHER:  We are back on the record.
24  The time is 3:37 p.m.
15:37  25             THE WITNESS:  So I previously wanted -- I

236

BARKLEY
Court Reporters

1    asked if I -- if it was possible for her to read back my

2    answer so I could listen to what -- what she recorded

3    for the previous answer, which you were not satisfied

4    with, so I can hear it and -- and then think about your

15:37  5    question again.  Can I do that?

6              MR. CHATTERJEE:  Read my question back,

7    please, Madam Court Reporter.

8              THE WITNESS:  Not the question.  I've asked

9    her to read back --

15:38  10         Q.    BY MR. CHATTERJEE:  The answer's no.  Answer

11    my question, Mr. Vachani.  Are you going to answer it or

12    not?

13         A.    Let me ask a question.  I don't know who --

14    who creates the rules here.  I'm -- previously when I

15:38  15    had a question and I wanted to hear something, I was

16    allowed to.  How come I'm not allowed to now?

17         Q.    The rules, Mr. Vachani, are very simple.  I

18    ask a question, you give an answer.

19         A.    And I'm not -- I'm now allowed -- you're

15:38  20    saying that I am not allowed to ask her to repeat?

21         Q.    You -- you will have a chance to review your

22    deposition afterwards and make any changes you think are

23    appropriate.  You've chosen not to do that with respect

24    your 2011 deposition, even though there are clear errors

15:38  25    in it.

237

BARKLEY
Court Reporters

1   similar process where almost -- where -- where almost,

2   for example, Google has a clause that states in their

3   things that users cannot do it, but Facebook has

4   continued to do it.  And -- and I'll ignore these

15:40 5   things.

6           And I said about five minutes ago -- let me

7   finish, please.

8       Q.    BY MR. CHATTERJEE:  Finish.

9       A.    I said five minutes ago that terms and

15:40 10   conditions are created by -- by a site.  And the

11   decision -- the decision on -- on interpreting those

12   terms and conditions and how companies choose to respond

13   to their users have been and continue to be very

14   subjective.  Facebook has been very subjective, Power

15:40 15   has been very subjective, and there is no legal

16   precedent.  So we can have a discussion all day on this

17   issue.  But I've answered the question to you that I --

18   we are very familiar and have read Facebook terms and

19   conditions.

15:41 20       Q.    Okay.  Let's step back.  You said you've read

21   Facebook's terms and conditions.  That was prior to

22   accessing the Facebook web site as pursuant to the

23   December 2008 launch, correct?

24       A.    Yes.

15:41 25       Q.    Did you believe under your reading of the

BARKLEY
Court Reporters

1   terms and conditions of Facebook's web site that the

2   access that Power was engaging in was a violation of the

3   terms of service or was it allowed by the terms of

4   service?

15:41   5          MR. FISHER:  By "you," do you mean him in his

6   individual capacity now, Neel?

7          MR. CHATTERJEE:  I will start there.

8          THE WITNESS:  Do I believe in my individual

9   capacity that is a violation of what?  Of the Facebook

15:41   10  terms and service?

11     Q.   BY MR. CHATTERJEE:  Yeah.  Let me state it a

12  different way.  Did you believe that the -- that the

13  terms of service of the Facebook agreement authorized

14  Power users to access the Facebook web site in the way

15:42   15  the Power system operated?

16          MR. FISHER:  Objection.  Vague.  Calls for a

17  legal conclusion.  You may answer.

18          THE WITNESS:  And I think I've answered this

19  previously and today.  Is that as part of our analysis

15:42   20  we've looked at not only Facebook -- and this is -- I'm

21  not a lawyer and -- but I'm telling you, you asked me

22  personally.  In part of our analysis we looked at

23  Facebook's previous conduct in addressing this issue

24  with many other sites and their blatant violation of --

15:42   25  of terms of conditions on -- and exacting data, we

240

BARKLEY
Court Reporters

1    looked at the industry as a whole, and we saw no -- no

2    precedent for -- you know, on these issues and therefore

3    felt that if it was an issue, this is something that

4    would be determined -- and it has been determined by the

15:42  5    courts.   Finally, I -- I believe --

6        Q.    BY MR. CHATTERJEE:   Okay.   There -- there

7    might be some confusion in my question.

8        A.    Okay.

9        Q.    I'm not asking about anything other than the

15:42  10    terms of service.   Just that standing alone.

11        A.    Okay.

12        Q.    Was there any concern in your mind when you

13    read that terms of service that the way Power wanted to

14    access the Facebook web site would be a violation of

15:43  15    Facebook's terms of service?

16             MR. FISHER:   Objection.   Vague.   Calls for a

17    legal conclusion.

18             THE WITNESS:   I would agree calls -- you're

19    asking for a legal conclusion that I'm not able to --

15:43  20        Q.    BY MR. CHATTERJEE:   I'm just asking you for

21    whether there was any concern in your mind, not whether

22    there's a legal violation.

23        A.    Concern is irrelevant.   You know, this is --

24    you're asking me --

15:43  25        Q.    Mr. Vachani, it is not a matter of you to

241

BARKLEY
Court Reporters

1    determine relevance or not.

2             Was there a concern in your mind or not?

3    A.     Was there a concern?

4             MR. FISHER:  Same objections.  Argumentative.

15:43 5          THE WITNESS:  I think our company's actions

6    speak for themselves.  Because, you know, I'm -- I was

7    the CEO of the company.  And the company -- the company

8    made a -- made a -- made a decision which I've already

9    articulated, testified, and -- and I've also -- we've

15:43 10   also had years -- we've had years of discussions on this

11   issue, we've had court rulings on this issue, and you

12   continue to ask the same question which I think we're --

13   we're -- you know --

14   Q.    BY MR. CHATTERJEE:  It's because you're not

15:43 15 listening to my question.  I'm going to move on.

16   A.    I am listening to my question.

17   Q.    You aren't.  We're going -- Mr. Vachani --

18           MR. FISHER:  There's no point to arguing about

19   this.  Go to the next question.

15:43 20  Q.    BY MR. CHATTERJEE:  -- we're going to go to

21   court over this.  We're going to have these questions

22   answered.

23   A.    Do you mind asking the question one more time?

24   Q.    You're not answering them now.  No.  I'm --

15:44 25 I'm done.  I've asked it ten times.  You don't want to

242

Designee Steven Vachani, 30 (b) (6) - Confidential

BARKLEY
Court Reporters

```
 1   exhibit, 219.
 2                 (Plaintiff's Exhibit No. 219 marked for
 3                  identification.)
 4                 THE WITNESS:  Okay.  Go ahead.
16:30  5   Q.      BY MR. CHATTERJEE:  What is this document?
 6   A.      This is a -- a screen shot.  I don't know if
 7   this is a mock screen shot or whatever, but of -- of how
 8   the campaign for 100 would look like.  I think this is
 9   probably a mock screen shot.
16:31 10   Q.      It's a mock?  So it's not an actual one?
11   A.      I don't -- I don't know the difference.  I
12   mean, I -- I would have received -- you know, when we
13   were launching the campaign they would -- they would
14   most likely have sent to -- you know, we had previews of
16:31 15   what it would look like.  But this is -- this is more or
16   less the general way that it would look -- that it would
17   look -- that it would like.
18   Q.      And if you look in the middle of the page
19   there's a section that says e-mails.
16:31 20   A.      Yep.
21   Q.      And there's a little Facebook logo.  Do you
22   see that?
23   A.      Yes.
24   Q.      I think you said earlier that you couldn't
16:31 25   send e-mails to Facebook users.  Why is it in that box?
```

285

BARKLEY
Court Reporters

1      A.      Our future -- I believe -- there are two

2    explanations for this.   One is it was our intention in

3    the future to -- to send Facebook messages even if it

4    was not a -- we, in fact, even built a thing in the

16:32  5    database which you guys referred to that was -- we have

6    never -- we have not used.   But to be able to -- so I

7    think our intention in the future was going to be to --

8    to send private messages instead of e-mails.   If a

9    person wanted to communicate, send a message -- if they

16:32 10    wanted to send an invitation to a friend instead of an

11    e-mail, they could send it as a private message box.

12    And we built a -- a database.

13      Q.      You built a tool for that?

14      A.      A tool for that.   I don't know -- I don't know

16:32 15    -- I believe we never -- never used it.   So this was --

16    but the second is if we already had -- there were very

17    small amount of users.   But if a user has already had

18    the e-mail address because it was either manually

19    entered or a user manually put the e-mail address in or

16:32 20    they had the e-mail address because it corresponded with

21    an e-mail in Orkut, I think we also had the ability to

22    cross -- cross-reference when an e-mail address was not

23    from Orkut but it was given to us by -- so I think --

24    but I don't -- I don't believe any of those were ever

16:32 25    actually put into action if I -- to the best of my

286

BARKLEY
Court Reporters

1  recollection.

2      Q.    Which one of these would you click on, if any,

3  if you wanted to do the event invitations through

4  Facebook?

16:33  5      A.    This -- this was not -- the event invitation

6  was not -- this is not from this page, this part here.

7      Q.    This was a separate form?

8      A.    It was a -- it was either -- I think you --

9  you could either go create an event and there was also

16:33  10  a -- a separate banner which said create an event on

11  Facebook where the user said I want to create an event

12  or I want to post a status update.

13      Q.    Is that the one where there were, like,

14  several boxes --

16:33  15      A.    Yeah.  I believe you guys -- yeah -- have

16  that -- that -- that image.

17      Q.    And do you know what the default was?  Did the

18  default have all of the boxes checked or some of them

19  checked?

16:33  20      A.    I don't.  But I -- but I know that the user --

21  there was a box saying create an event.

22      Q.    Okay.

23          (Plaintiff's Exhibit No. 220 marked for

24           identification.)

16:35  25      Q.    BY MR. CHATTERJEE:  And again we've attached a

287

BARKLEY
Court Reporters

1    messaging is an equally-important communication channel.

2    So we wanted to give our users the right and the

3    opportunity, if they want to, to also be able to send

4    messages to Facebook mailboxes.  And that was part off

16:37  5    our intention.  We built a database scheme up, you know,

6    for that, but I -- I don't believe that we ever got

7    around to that.

8         Q.    Was -- was it important at all that it be the

9    users that were sending these messages instead of Power?

16:37 10         A.    Well, users -- when you -- if you're familiar

11    with the way that -- that -- if a -- user-generated

12    invitations typically work on Facebook, on Google,

13    everything else, you typically -- you basically are

14    shown a list.  On hi5 --

16:37 15         Q.    Right.  And I'm not talking about how the

16    technology works.

17         A.    Yeah.  But I was talking about generally the

18    way they work, you're basically able to choose friends

19    to send to and you have different options.

16:37 20         Q.    Right.

21         A.    And so it was really --

22         Q.    But I'm not -- I'm not talking about how the

23    users felt.

24         A.    Okay.

16:37 25         Q.    I'm asking was it important to Power that the

289

BARKLEY
Court Reporters

```
 1              DEPOSITION OFFICER'S CERTIFICATE

 2                  (Civ. Proc. § 2025.520(e))

 3    STATE OF CALIFORNIA       )
                                )
                                )      ss
 4    COUNTY OF CONTRA COSTA    )

 5

 6         I, CHERREE P. PETERSON, hereby certify:

 7         I am a duly qualified Certified Shorthand

 8    Reporter, in the State of California, holder of

 9    Certificate Number CSR 11108 issued by the Court

10    Reporters Board of California and which is in full force

11    and effect.  (Fed. R. Civ. P. 28(a)).

12         I am authorized to administer oaths or

13    affirmations pursuant to California Code of Civil

14    Procedure, Section 2093(b) and prior to being examined,

15    the witness was first duly sworn by me.  (Fed. R. Civ.

16    P. 28(a), 30(f)(1)).

17         I am not a relative or employee of any attorney

18    or counsel of any of the parties, nor am I a relative or

19    employee of such attorney or counsel, nor am I

20    financially interested in this action.  (Fed. R. Civ. P.

21    28).

22         I am the deposition officer that

23    stenographically recorded the testimony in the foregoing

24    deposition and the foregoing transcript is a true record

25    of the testimony given by the witness.  (Fed. R. Civ. P.
```

Designee Steven Vachani, 30 (b) (6) - Confidential

BARKLEY
Court Reporters

1   30(f)(1)).

2           Before completion of the deposition, review of

3   the transcript (XX) was (  ) was not requested.   If

4   requested, any changes made by the deponent (and

5   provided to the reporter) during the period allowed, are

6   appended hereto.   (Fed. R. Civ. P. 30(e)).

7

8   Dated: JANUARY 13, 2012

9

10

11              _Cherree P. Peterson_

12

13

14

15

16

17

18

19

20

21

22

23

24

25

360

BARKLEY
Court Reporters