# EXHIBIT A

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                 SAN JOSE DIVISION

4

5    FACEBOOK, INC.              :

6              Plaintiff,        :

7                                :

8         v.                     :

9                   :

10   POWER VENTURES, INC. d/b/a:

11   POWER.COM, a California    :

12   corporation; POWER          :        Case No.

13   VENTURES, INC. a Cayman     :     5:08-CV-05780

14   Island Corporation, STEVE :        JW (HRL)

15   VACHANI, an individual;    :

16   DOE 1, d/b/a POWER.COM, an:

17   individual and/or business:

18   entity of unknown nature; :

19   DOES 2 through 25,         :

20   inclusive, individuals     :

21   and/or business entities   :

22   of unknown nature,         :

23              Defendants.      :

24   _____

25        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

                           1

BARKLEY
Court Reporters

1        Videotaped Deposition of STEVEN VACHANI

2  taken on behalf of the Plaintiff at the offices of

3  BURSOR & FISHER, P.A., 369 Lexington Avenue, New

4  York, New York, on Wednesday, July 20, 2011,

5  commencing at 9:47 in the forenoon before PATRICIA

6  MULLIGAN CARRUTHERS, a Certified Court Reporter and

7  Notary Public of the State of New Jersey and Notary

8  Public of the State of New York.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2

BARKLEY
Court Reporters

09:47 1                    THE VIDEOGRAPHER:  I'm the video

09:48 2   operator, Peter Ledwith of Barkley Reporting.

09:48 3   Today's date is July 20th, 2011.  The time is 9:47

09:48 4   a.m. We're here at the offices of Bursor and Fisher

09:48 5   located at 369 Lexington Avenue, New York, New York

09:48 6   to take the videotaped deposition of Steve Vachani

09:48 7   in the matter of Facebook, Inc., v. Power Ventures,

09:49 8   Inc., in the Northern District of California.

09:49 9   Counsel, please, identify themselves whom they

09:49 10  represent.

09:49 11                  MR. COOPER:  Monty Cooper of the

09:49 12  law firm Orrick, Herrington & Sutcliff representing

09:49 13  the plaintiff Facebook, Inc.

09:49 14                  MR. BURSOR:  Scott Bursor from

09:49 15  Bursor & Fisher from the -- for the defendant Steve

09:49 16  Vachani and Power Ventures.

17  S T E V E N   V A C H A N I,

18           2425 B Channing Way 216,

19           Berkeley, California  94704,

20           having been first duly sworn according

09:50 21          to law, testifies as follows:

09:50 22                  (Whereupon, there is a discussion

23  held off the record.)

24                  THE VIDEOGRAPHER:  9:49, off the

09:50 25  record.

7

09:52 1   you meet with anyone to prepare for today's

09:52 2   deposition?

09:52 3          A.       Just my counsel.

09:52 4          Q.       All right.  Without telling me the

09:52 5   content of anything you said with your counsel, can

09:52 6   you tell me approximately how long you met with

09:52 7   your counsel?

09:52 8          A.       For approximately one hour.

09:53 9   Hour-and-a-half, 8:30 I came in today.

10         Q.       Okay.

09:53 11         A.       And we spent about one hour.

09:53 12         Q.       All right.  So your preparation

09:53 13  for today's deposition occurred before today's

09:53 14  deposition.

09:53 15         A.       That's correct.

09:53 16         Q.       Did you discuss this deposition

09:53 17  with anybody else before today?

09:53 18         A.       No.

09:53 19         Q.       So you didn't discuss the fact you

09:53 20  were having this deposition with any co-workers?

09:53 21         A.       I informed one co-worker that --

09:53 22  that I was having this deposition and my counsel.

09:53 23         Q.       Who's the co-worker you informed

09:53 24  that you were having the deposition?

09:53 25         A.       This is a former co-worker, I just

10

BARKLEY
Court Reporters

09:53  1    mentioned Eric Santos.

09:53  2          Q.        And then is Mr. Santos a former

09:53  3    co-worker of Power or some other entity?

09:53  4          A.        Of Power.

09:53  5          Q.        By the way, throughout the day I

09:53  6    may refer to Power, and when I do, I would ask you

09:53  7    to understand I'm referring both to Power Ventures,

09:54  8    Inc., and the Web site power.com.  Do you

09:54  9    understand that?

09:54 10          A.        Yes.

09:54 11          Q.        And if there's in any point in

09:54 12    which you feel you should clarify that an answer

09:54 13    would apply only to perhaps the corporate entity

09:54 14    not the Web site, I would ask that you -- let you,

09:54 15    me, and your counsel know that.  Do you understand?

09:54 16          A.        Yes.

09:54 17          Q.        And that would also work the other

09:54 18    way, if a referenced answer refers to -- I may

09:54 19    refer to Power referring to the Web site, but if

09:54 20    you feel that would be incorrect, I would ask you

09:54 21    to tell me that as well.  All right?

09:54 22          A.        Yes.

09:54 23          Q.        Can you, at a high-level, give me

09:54 24    an overview of your education?

09:54 25          A.        Sure.  I graduated from UC

11

BARKLEY
Court Reporters

10:04  1          A.        Legally, no.  As I mentioned at

10:04  2   the moment, any new activities that I'm pursuing,

10:04  3   I'm pursuing under this entity, so I'm currently

10:04  4   engaged in conversations with -- with people.

10:04  5          Q.        And when did you join Power?

10:04  6          A.        Power was founded in -- It was

10:04  7   2006 is when our -- our primary activities started.

10:04  8   We incorporated Power, I believe it was, if I'm not

10:04  9   mistaken, late 2006 and -- but the activities

10:05 10   started previously as a start-up, we started

10:05 11   working on it.

10:05 12          Q.        Were you one of the creators of

10:05 13   Power?

10:05 14          A.        I was the founder of the company.

10:05 15          Q.        Now, when you say it was

10:05 16   incorporated in 2006 but started before then, was

10:05 17   it started under the Web site title www.power.com?

10:05 18          A.        No.  It was originally -- When we

10:05 19   originally started it, there was no Web site.  It

10:05 20   was a -- Like many startups we were -- we were

10:05 21   working on a core, you know, product idea, and

10:05 22   later the name power.com came about in 2007.  I

10:05 23   believe we acquired the domain in 2007.

10:05 24          Q.        Who helped -- Besides yourself,

10:05 25   who helped create Power.com.  You used the --

21

BARKLEY
Court Reporters

10:05 1          MR. COOPER:  Let me strike that.

10:05 2      Q.     You used the word "we"?

10:06 3      A.     Yes.

10:06 4      Q.     Who are you referring to when you

10:06 5  state --

10:06 6      A.     I referred to our technology team.

10:06 7  Eric Santos was our CTO and there were a collection

10:06 8  of other technical programmers that worked on the

10:06 9  team.  I couldn't name all the names right now, but

10:06 10 obviously that grew to -- that continued to grow as

10:06 11 the company grew, but it started with Eric Santos

10:06 12 as the CTO.

10:06 13     Q.     What technical programmers can you

10:06 14 recall whose name that you recall?

10:06 15     A.     I -- There was literally almost a

10:06 16 hundred people at the company at its peak.  At the

10:06 17 time, you know, when we -- you know, started

10:06 18 interacting with Facebook so it was almost a

10:06 19 hundred people, so I don't think --

10:06 20     Q.     Can you recall any names?

10:06 21     A.     Yeah.  I mean, do you want me to

10:06 22 go through all -- all hundred?

10:06 23     Q.     Do you know all 100?

10:06 24     A.     I don't know all 100, no.

10:06 25     Q.     Who were the primary program --

22

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

BARKLEY
Court Reporters

| | | |
|---|---|---|
| 10:06 | 1 | MR. COOPER:   Strike that. |
| 10:06 | 2 | Q.        Going back to the foundation of |
| 10:06 | 3 | power.com, was it you and Mr. Santos alone or were |
| 10:07 | 4 | there others involved with the creation of the Web |
| 10:07 | 5 | site? |
| 10:07 | 6 | A.        I was the -- the sole founder of |
| 10:07 | 7 | the company and I employed Eric Santos as a -- with |
| 10:07 | 8 | the company.  He was the first technical programmer |
| 10:07 | 9 | and -- He was the first technical programmer. |
| 10:07 | 10 | There were nontechnical individuals that were |
| 10:07 | 11 | involved with the company also. |
| 10:07 | 12 | Q.        All right.  Who were those |
| 10:07 | 13 | nontechnical -- |
| 10:07 | 14 | A.        Felipe Herrera. |
| 10:07 | 15 | MR. BURSOR:  You've got to slow |
| 10:07 | 16 | down. |
| 10:07 | 17 | A.        Felipe Herrera, H-E-R-R-E-R-A. |
| 10:07 | 18 | Q.        What was his role? |
| 10:07 | 19 | A.        He was a corporate development. |
| 10:07 | 20 | He was the other key person at the company. |
| 10:07 | 21 | Q.        Did you have a chief financial |
| 10:07 | 22 | officer? |
| 10:07 | 23 | A.        The chief financial -- There was |
| 10:07 | 24 | no chief financial officer.  There were individuals |
| 10:07 | 25 | in that role, but not with that title. |

23

BARKLEY
Court Reporters

10:13 1   have reflected the corporate structure of the

10:13 2   company.

10:13 3          A.      Correct.

10:13 4          Q.      Do you have any documents that

10:13 5   reflect the employees and their roles?

10:13 6          A.      Yeah.

10:13 7          Q.      And what type of documents are

10:13 8   those?

10:13 9          A.      Those would be standard employment

10:13 10  contracts, and NDAs, and standard proprietary

10:13 11  invention agreements.

10:13 12         Q.      Do you have any document that,

10:13 13  like, provides a table of the roles of the

10:13 14  employees and who their supervisors are?

10:13 15         A.      I could -- I would -- I could find

10:13 16  that.

10:13 17         Q.      Is power.com still operating?

10:13 18         A.      The company is still operational.

10:13 19         Q.      How many employees are there

10:13 20  currently?

10:13 21         A.      There are currently no -- no

10:13 22  employees for the company.

10:13 23         Q.      Are you the sole --

10:14 24         A.      I'm the sole person at the company

10:14 25  right now.

25

BARKLEY
Court Reporters

| | | | |
|---|---|---|---|
| 10:15 | 1 | A. | No. |
| 10:15 | 2 | Q. | Did it formerly? |
| 10:15 | 3 | A. | Yes, did it. |
| 10:15 | 4 | Q. | Where did it formerly operate out |
| 10:15 | 5 | | of? |
| 10:15 | 6 | A. | It was based in -- in the city of |
| 10:15 | 7 | | Rio de Janeiro was the primary offices, and there |
| 10:15 | 8 | | was secondary offices we had in Salvador.  It's in |
| 10:15 | 9 | | Brazil, also. |
| 10:15 | 10 | Q. | Is that a short name for it -- |
| 10:15 | 11 | A. | No.  It's the city. |
| 10:15 | 12 | Q. | And where was the company -- Where |
| 10:15 | 13 | | is the company incorporated? |
| 10:15 | 14 | A. | It's incorporated in Cayman |
| 10:15 | 15 | | Islands and in the United States. |
| 10:15 | 16 | Q. | Where in the US? |
| 10:15 | 17 | A. | Delaware. |
| 10:15 | 18 | Q. | Do you pay a Delaware franchise |
| 10:16 | 19 | | tax annually? |
| 10:16 | 20 | A. | Yes, we do. |
| 10:16 | 21 | Q. | Pay any type of franchise tax in |
| 10:16 | 22 | | the Cayman Islands? |
| 10:16 | 23 | A. | Yeah.  There are -- There are |
| 10:16 | 24 | | taxes paid.  Correct. |
| 10:16 | 25 | Q. | From where is the revenue |

27

BARKLEY
Court Reporters

10:23  1    Power?

10:23  2            A.       I believe it was approximately

10:23  3    three years.

10:23  4            Q.       And how long did Mr. Bacelar.

10:23  5            A.       Approximately three years.  I

10:23  6    don't know the exact dates.

10:23  7            Q.       Can you -- Do you have an

10:23  8    approximation of when they left Power?

10:23  9            A.       Probably 2009 or 2000 -- late

10:23  10   2009.  I'm guessing.

10:23  11           Q.       And you indicated Mr. Santos is no

10:23  12   longer working at --

10:23  13           A.       That's correct.

       14           Q.       -- at Power?

10:23  15           A.       He's no longer working at Power.

10:23  16           Q.       When did Mr. Santos cease to work

10:23  17   at Power?

10:23  18           A.       About one-and-a-half years ago.

10:23  19           Q.       Did anybody succeed Mr. Santos in

10:23  20   the role of supervising programming --

10:23  21           A.       No.

10:23  22           Q.       How long was -- How long did it

10:24  23   take for Mr. Santos and/or Mr. Santos and his

10:24  24   programmers to develop any type of code that was

10:24  25   functional as a Web site power.com?

                              34

BARKLEY
Court Reporters

11:03  1  two forms, either it was done through E mail or
11:03  2  there would be text documents that would -- that
11:03  3  would -- If in some products there would be -- that
11:03  4  required more definition, there would be more
11:03  5  formal requirement documents that would be in the
11:03  6  form of a text form.  That's correct.
11:03  7          Q.      All right.  So some of the
11:03  8  development and functionality was described in
11:03  9  internal E mails amongst the employees?
11:03  10         A.      Correct.
11:03  11         Q.      Is that -- Are those E mails
11:03  12 indexed anywhere?
11:03  13         A.      Typically when -- during the
11:03  14 declarations, I went through every E mail that
11:03  15 related to Facebook and I believe all those were
11:03  16 provided to -- in the declarations, provided to our
11:03  17 lawyer.
11:03  18         Q.      I understand we'll get to the
11:04  19 product issues, but all I'm asking about are all
11:04  20 the E mails that were ever generated describing the
11:04  21 functionality of PowerScript, are they maintained
11:04  22 anywhere anymore?
11:04  23         A.      They are maintained I would -- in
11:04  24 my E mailbox.
11:04  25         Q.      Would -- What E mail service was

61

BARKLEY
Court Reporters

11:04  1     used internally at power.com for -- for discussions

11:04  2     amongst employees?

11:04  3              A.        It was -- Well, our -- on Power

11:04  4     domain but it would be so it would on -- on the

11:04  5     servers.

11:04  6              Q.        For instance, did you use Outlook?

11:04  7              A.        Yes.   Some people used Outlook,

11:04  8     some people used different services, but Outlook

11:04  9     was the primary -- primary service.   Each

11:04  10    individual had their own E mail platform.   For

11:04  11    example, I used Web-based E mail where I received

11:04  12    everything in my Yahoo E mail.

11:04  13             Q.        Were the E mails sent intra--

11:04  14    intra, I-N-T-R-A company so that they only went to

11:04  15    other employees in the company?

11:04  16             A.        They would go to -- It was not --

11:05  17    It would go to whoever was copied on the E mail.

11:05  18             Q.        Were those E mails backed up

11:05  19    anywhere?

11:05  20             A.        I believe they were backed up on

11:05  21    our servers.

11:05  22             Q.        Okay.   And those are the servers

11:05  23    that were hosted by IWEB and Amazon.com.

11:05  24             A.        That's correct.

11:05  25             Q.        And is that backup information

62

BARKLEY
Court Reporters

11:05  1    still available to you through your site that

11:05  2    you're currently hosting on a monthly basis?

11:05  3          A.      Everything was instructed to be

11:05  4    copied there, and so I'm assuming that it's all

11:05  5    there.  I haven't looked at it individually

11:05  6    personally, but I made a backup of everything.

11:05  7          Q.      Now, you also said some

11:05  8    documentation relating to coding was maintained in

11:05  9    text form?

11:05 10          A.      Yes.  Some products -- Some

11:05 11    products -- Text form meaning an electronic file.

11:05 12    If -- If a product required -- Usually, in the

11:05 13    early stages of a -- of a product, later on, as it

11:05 14    evolved, a lot was done informally by E mails.

11:05 15          Q.      And those text files are they also

11:06 16    still available to you?

11:06 17          A.      They would be in my E mailbox if

11:06 18    they -- if they're available.

11:06 19                  MR. COOPER:  I can do this one of

11:06 20    two ways.  The Northern District typically --

11:06 21    there's a rule that says we're to try and do depo

11:06 22    exhibits consecutively.  I believe the last one

11:06 23    ended on six.  We can start at seven.  However, if

11:06 24    there's any concern about confusion with that, I

11:06 25    often just start, like, say at 100 so we'd have

63

BARKLEY
Court Reporters

01:30  1    where the conversations on those existed, but yes.

01:30  2    There are specific scripts like Get photo that, you

01:30  3    know, that are -- that are -- that we've discussed

01:30  4    and talked about and that are available.  I mean,

01:30  5    if you want to prove that we were -- we were

01:30  6    getting photos or getting contents, I think we've

01:30  7    said it many times that we are -- that's what our

01:30  8    -- that's what our users are asking us to do to

01:30  9    access their information.

01:31 10         Q.        All right.  But that code was not

01:31 11    produced by you.  Correct?

01:31 12                  MR. BURSOR:  We would stipulate

01:31 13    the source code has not been produced.

01:31 14         A.        Yeah, we've already stipulated

01:31 15    it's not been produced.

01:31 16         Q.        Nor -- And the only technical

01:31 17    documentation you suggest was developed in

01:31 18    conjunction with that source code are the two

01:31 19    documents I put in front of you, 100 and 101?

01:31 20         A.        This is the foundation of how

01:31 21    every PowerScript is created.

01:31 22         Q.        Right.  And you indicated there

01:31 23    were 100 employees at Power at the height of its --

01:31 24         A.        That's correct.  Yes.

01:31 25         Q.         -- operation?

134

BARKLEY
Court Reporters

01:39   1   that are stored on --

01:39   2          A.      I trusted Eric to search for

01:39   3   himself.  I requested him and then he's pretty

01:39   4   good.

01:39   5          Q.      Did you oversee his search?

01:39   6          A.      I was very explicit in my request.

01:39   7   I don't need to -- to look over his shoulder, you

01:39   8   know.  I asked him, you know, to look and he

01:39   9   provided it.

01:39  10          Q.      Mr. Santos is currently residing

01:39  11   in Brazil?

01:39  12          A.      That's correct.

01:39  13          Q.      Do you know if -- Do you know if

01:40  14   Mr. Delgado searched for E mails?

01:40  15          A.      I requested from -- I requested

01:40  16   for Eric to contact anyone that he -- any E mails

01:40  17   that he would have been involved in, so in general,

01:40  18   if -- if any E mail that Eric -- that Mr. Delgado

01:40  19   was writing, he would have copied Eric on it,

01:40  20   because in our protocol of our company, he was his

01:40  21   manager so anything related to the project would

01:40  22   have gone through Eric; so while I didn't -- I

01:40  23   didn't go into every detail because I know that it

01:40  24   was common practice to copy your manager on E mails

01:40  25   on a product or project that you're working on.

141

BARKLEY
Court Reporters

03:44  1   other priorities obviously before that.

03:44  2             Q.        At any time, do you recall Power

03:44  3   expending revenue for marketing surveys to see what

03:44  4   -- what features that users of the Power site might

03:45  5   like?

03:45  6             A.        No, we didn't.  We already -- We

03:45  7   -- We didn't spend money to do marketing surveys.

03:45  8   We looked -- We had a lot of -- We had enough data

03:45  9   from our current users of what was working and we

03:45  10  looked at the sites.  We didn't really get to that

03:45  11  point.  We turned on just a basic test of Facebook,

03:45  12  as I said, for a few weeks.  We didn't even get to

03:45  13  that point where they had -- were able to implement

03:45  14  all the next generation of features.

03:45  15            Q.        Do you have a recollection how

03:45  16  fast after its creation Power got to 100 employees?

03:45  17            A.        Yeah.  In about one year.  There

03:45  18  were about a hundred employees grown in a year.  In

03:45  19  the year of 2007 from the -- basically from the

03:45  20  beginning to the end, essentially we grew to -- we

03:45  21  added about a hundred employees.

03:45  22            Q.        At the time Facebook launched, did

03:45  23  you still have about 100 employees?

03:45  24            A.        When Facebook launched we had

03:45  25  about 100 employees.  That's correct.

                              232

BARKLEY
Court Reporters

03:46   1          Q.        How long after the launch of

03:46   2    Facebook --

03:46   3                     MR. COOPER:  Strike that.

03:46   4          Q.        Did there come a point where Power

03:46   5    didn't have sufficient revenue to pay employees?

03:46   6          A.        The issue was not revenues because

03:46   7    it was investment, and the Facebook lawsuit

03:46   8    actually, you know, definitely had a very big

03:46   9    impact on -- on our company's ability to raise

03:46   10   money and also on the ability to potentially open

03:46   11   up our platform to developers because it created a

03:46   12   huge -- huge problem for -- huge problem for us and

03:46   13   with investors fears.  It was very disruptive.

03:46   14         Q.        Do you know when approximately

03:46   15   Power ran out of the ability to use investment

03:46   16   capital to pay its employees?

03:47   17        A.        Well, the company continued to --

03:47   18   I mean -- I guess, you can say we ran out when the

03:47   19   company -- a few months ago when we completely ran

03:47   20   out, but we obviously dramatically reduced our

03:47   21   resources in 2008.  And in 2009 we had

03:47   22   significantly less spent 2008, 2009 during the time

03:47   23   of the lawsuit started.

03:48   24        Q.        Do you ever recall speaking to the

03:48   25   New York Times about this lawsuit?

233

BARKLEY
Court Reporters

04:39  1    on the top of Exhibit Number 106?

04:39  2            A.         Yes.

04:39  3            Q.         Do you see it's January 13, 2009?

04:39  4            A.         Yes.

04:39  5            Q.         As of January 13, 2009, did Power

04:39  6    still have the ability to locate a script that was

04:39  7    used in conjunction with the launch promotion?

04:39  8            A.         If it existed, yes.

04:39  9            Q.         Do you know if at any time Power

04:39  10   had in place what is known as a litigation hold

04:39  11   instructing employees not to destroy documents

04:39  12   after this case was filed?

04:39  13           A.         We never -- We didn't destroy any

04:39  14   documents after that -- anything -- destroy

04:39  15   anything after this case started.

04:39  16           Q.         Then does that mean the

04:39  17   PowerScript should still exist?

04:39  18           A.         What I know is PowerScripts are

04:39  19   dynamic script's that are constantly updated, so I

04:40  20   don't know what exists for this.

04:40  21           Q.         If you go back to Exhibit 106 --

04:40  22   First of all, was any instruction ever given to

04:40  23   employees not to destroy any documentation relating

04:40  24   to the Facebook program?

04:40  25           A.         Not to -- We don't -- It's not our

                                    271

BARKLEY
Court Reporters

04:40  1    standard practice to destroy anything, so there's

04:40  2    not -- Since we don't actively destroy something,

04:40  3    there's no need to tell them not to destroy it.  We

04:40  4    don't have any policy for destroying -- destroying

04:40  5    our documents.

04:40  6            Q.       And that includes your

04:40  7    PowerScripts?

04:40  8            A.       Well, PowerScripts, I believe, are

04:40  9    dynamic things.  There was no policy saying change

04:40  10   -- preserve an earlier version of that.  I don't

04:40  11   know how the -- The PowerScripts are like HTML

04:40  12   changes.  They're very similar to making an HTML

04:40  13   change.

04:40  14           Q.       Do you know when the promotion

04:40  15   shown on Exhibit 103 exist -- when it lasted from?

04:41  16           A.       That lasted from December of 2008

04:41  17   -- Was that eight?  Yes.  December of 2008 until

04:41  18   2000 -- I guess -- like the -- January -- Well,

04:41  19   Facebook -- It lasted well beyond Facebook, so it

04:41  20   probably lasted until about March or April, but

04:41  21   Facebook was only alive for four weeks, five weeks.

04:41  22           Q.       I'm sorry.  At that time in that

04:41  23   timeframe is when Power was sued by Facebook.

04:41  24   Correct?

04:41  25           A.       That's correct.

272

BARKLEY
Court Reporters

04:52  1                    MR. BURSOR:  You've answered the

04:52  2      question.

04:52  3            Q.        Do -- Did -- As of December 1st,

04:52  4      2008, did Power employ internal general counsel?

04:52  5            A.        We had a person internally that is

04:52  6      a lawyer and reviewed these -- these documents when

04:53  7      requested.

04:53  8            Q.        Who is that individual?

04:53  9            A.        That was Filipe.

04:53 10            Q.        Filipe Herrera is a lawyer?

04:53 11            A.        Yes.

04:53 12            Q.        Is he a lawyer in the United

04:53 13      States?

04:53 14            A.        He's not a lawyer in the United

04:53 15      States.

04:53 16            Q.        He's licensed under Brazil?

04:53 17            A.        He's -- Yeah.  An experienced

04:53 18      international lawyer licensed under Brazil.

04:53 19            Q.        Did you have any attorney who was

04:53 20      responsible for reviewing documents to comply with

04:53 21      the United States law?

04:53 22                    MR. BURSOR:  Just hold on a

04:53 23      second.  Did you have any attorney who was

      24      responsible for reviewing documents for compliance

      25      with United States law?

                              282

BARKLEY
Court Reporters

06:07 1        A.        Not all, but we -- I don't believe

06:07 2    as many people use their -- like myself use their

06:07 3    Web mail account.  As long as they were -- We

06:07 4    didn't enforce strict guidelines on how to use your

06:07 5    e-mail address.  They were given e-mail addresses

06:07 6    and they configured it accordingly.  You'll notice

06:07 7    that mine mostly come from steve@stevevachani.com.

06:07 8            (Whereupon, Exhibit 114 is marked

06:08 9    for identification by the reporter.)

06:08 10        Q.        Mr. Vachani, I've put in front of

06:08 11   you a December 25th, 2008, E mail from you to

06:08 12   Mr. Santos and someone name Bruno Carvalho at

06:08 13   corp.power.com.  Who is Mr. Carvalho?

06:08 14        A.        He worked on Eric's team.

06:08 15        Q.        Was he involved in any way in

06:08 16   integrating Facebook with Power?

06:08 17        A.        He's not a programmer.

06:08 18        Q.        What's his function?

06:08 19        A.        He would help with some of the

06:08 20   product ideas with Eric.

06:08 21        Q.        What was his employee -- specific

06:08 22   employee role at Power?

06:08 23        A.        He was -- He would help with

06:08 24   product definition and ideas.

06:08 25        Q.        Did you inquire of him to search

338

BARKLEY
Court Reporters

06:08  1   his E mails?

06:08  2            A.        Yes, I did.

06:08  3            Q.        Where is Mr. Carvalho now?

06:08  4            A.        He's in Brazil.

06:08  5            Q.        When did Mr. Carvalho leave Power?

06:08  6            A.        Same time as they -- He was part

06:08  7   of the last batch of 2010 beginning of 2010.

06:08  8            Q.        Was he involved in the evaluation

06:09  9   of Facebook Connect before December 1st, 2008?

06:09 10            A.        He would have been -- him and --

06:09 11   It would have been the other person that Eric would

06:09 12   have consulted more on the idea side and the

06:09 13   strategy side, product strategy side rather than --

06:09 14   he wouldn't be programing.  He's not a programmer.

06:09 15            Q.        Was he involve with marketing?

06:09 16            A.        He's the product -- he reported to

06:09 17   Eric so, yeah.  Product marketing was driven by

06:09 18   product, so Bruno would be the guy that would be

06:09 19   Eric would consult, you know, with product ideas.

06:09 20            Q.        Did Mr. Carvalho locate any E

06:09 21   mails that he forwarded to you?

06:09 22            A.        I sent everything that I had from

06:09 23   Bruno including this E mail, this might have even

06:09 24   -- this one I think I sent, but I did contact Bruno

06:09 25   also.

                            339

BARKLEY
Court Reporters

C E R T I F I C A T I O N

I, PATRICIA MULLIGAN CARRUTHERS, a

Certified Shorthand Reporter and Notary Public of

the State of New Jersey and a Notary Public of the

State of New York, do hereby certify that prior to

the commencement of the examination the witness was

sworn by me to testify as to the truth, the whole

truth, and nothing but the truth.

I do further certify that the foregoing is

a true and accurate transcript of the testimony as

taken stenographically by and before me at the

time, place, and on the date hereinbefore set

forth.

I do further certify that I am neither of

counsel nor attorney for any party in this action

and that I am not interested in the event nor

outcome of this litigation.

_____
Patricia Mulligan Carruthers, CSR
Certificate No. XI00780
Notary Public of the State of New York
Notary Public of the State of New Jersey

Dated:  JULY 27, 2011


My commission expires October 28, 2015     (N.J.)
My commission expires December 21, 2013    (N.Y.)

361