# EXHIBIT 2

```
 1                  UNITED STATES DISTRICT COURT
 2                NORTHERN DISTRICT OF CALIFORNIA
 3                     SAN FRANCISCO DIVISION
 4
 5
    FACEBOOK, INC.,                  )
 6                                   )
             Plaintiff,              )
 7                                   ) Case No.
    vs.                              ) 5:08-cv-05780 JW (JCS)
 8                                   )
    POWER VENTURES, INC., a          )
 9  Cayman Island Corporation;       )
    STEVE VACHANI, an individual;    )
10  DOE 1, d/b/a POWER.COM,          )
    DOES 2-25, inclusive,            )
11                                   )
             Defendants.             )
12  _____)
13
14
15                          CONFIDENTIAL
16
17         VIDEOTAPED DEPOSITION of POWER VENTURES,
18  INC.'S 30(b)(6) Designee STEVEN VACHANI taken on behalf
19  of Plaintiff, at Orrick, Herrington & Sutcliffe LLP, 405
20  Howard Street, 10th Floor, San Francisco, California
21  beginning at 9:13 a.m., Monday, January 9, 2012, before
22  CHERREE P. PETERSON, RPR, CRR, Certified Shorthand
23  Reporter No. 11108.
24
25
```

2

```
                1    A.    Yeah.  We gave e-mail -- power.com e-mail
                2    addresses to most of our people because it was a nice
                3    name to include on -- this was giving Andreas a Power
                4    address.
        13:51   5    Q.    And Eric Santos also had one?
                6    A.    Yeah.  Well, I -- at that time every -- we
                7    gave -- we gave Power addresses to almost anyone that
                8    was a shareholder.  Some used it, some didn't.
                9    Q.    So if I wanted to find an e-mail from Eric
        13:51  10    Santos to Rob Pollock where you weren't cc'd, where
               11    would I look to get that e-mail?
               12    A.    Well, Rob -- Rob -- you'd have -- you'd have
               13    to ask Rob -- Rob Pollock, you know.  I mean, it was --
               14    those -- those e-mails were all -- they were no -- there
        13:52  15    was no like -- at this -- for most of the stage of the
               16    company, it was the way that you have access to each
               17    other's e-mail boxes.
               18    Q.    So there was no centralized e-mail repository?
               19    A.    There wasn't.
        13:52  20    Q.    Okay.  And -- and was it basically a
               21    technology where someone could have a power.com e-mail
               22    address but it would forward --
               23    A.    It was forward to their -- exactly.
               24    Q.    Forward to a personal --
        13:52  25    A.    Forwarded to --
```

165

1          THE REPORTER:  Okay.  Let him finish, please.
2      Q.   BY MR. CHATTERJEE:  And it would forward to a
3  personal e-mail account?
4      A.   Yeah.
13:52  5      Q.   For everybody?
6      A.   Some people accessed -- everyone had different
7  ways to access their Power.  I mean, some people had
8  their own servers.  You know, everyone had their own --
9  their own way of accessing their e-mail.
13:52  10     Q.   But there was no centralized place at Power
11  where those e-mails were maintained?
12     A.   Not that I know of, I mean, that we -- that we
13  utilized.  I mean, I -- I know I personally utilized my
14  e-mail through -- through the box that I gave you access
13:52  15  to.
16     Q.   Right.  But your e-mail address typically says
17  steve@stevevachani.com and not power.com.
18     A.   Yahoo! makes it harder to do your from.  A lot
19  of the people use them.  On their desktop they can --
13:53  20  because, like, Google and some others make it easier to
21  be able to put your e-mail there.
22     Q.   Okay.
23     A.   And I -- also I guess I had been using that so
24  long, I just -- I -- I -- I think my BlackBerry, you
13:53  25  know, it would -- it would send.  But all the send would

166

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | not necessary as we....                                            |
|       | 2  | Q.   So when this lawsuit was filed, did you e-mail                |
|       | 3  | the various power.com members and ask them to preserve             |
|       | 4  | documents?                                                         |
| 13:54 | 5  | A.   Did I e-mail?  I mean, you have my e-mails,                   |
|       | 6  | so.  I mean, I don't -- I don't think there was a --               |
|       | 7  | there was no law -- there was no law -- there was a -- I           |
|       | 8  | mean, I -- I don't know what -- what -- what we said to            |
|       | 9  | them, but it would be -- it would be my -- everything is           |
| 13:54 | 10 | in my e-mail.                                                      |
|       | 11 | Q.   Do you recall ever instructing the power.com                  |
|       | 12 | employees not to -- not to destroy documents?                      |
|       | 13 | A.   It's our standard policy no one -- not to                     |
|       | 14 | destroy documents.  No one's -- as far as I know, no               |
| 13:55 | 15 | one's -- no one's taken any direct effort to destroy               |
|       | 16 | documents.                                                         |
|       | 17 | Q.   Did -- but my question's really precise.  When                |
|       | 18 | the litigation was filed did you send out a reminder or            |
|       | 19 | tell anyone not to destroy documents?                              |
| 13:55 | 20 | A.   Which?  You mean the Facebook litigation?                     |
|       | 21 | Q.   Yeah.                                                         |
|       | 22 | A.   No, I didn't.                                                 |
|       | 23 | Q.   Okay.  And was there any particular reason why                |
|       | 24 | you didn't do that?                                                |
| 13:55 | 25 | A.   There was no -- it was just a standard --                     |

```
         1  instructions were made, you have access to my e-mails.
         2  And you -- you've seen if there are anything -- no one
         3  has ever been instructed to destroy anything.  And as
         4  far as I understand, everybody's, you know --
13:56    5       Q.   BY MR. CHATTERJEE:  Right.  My question's
         6  different.  Not no one's been instructed to destroy.
         7  Were people instructed to make sure that they preserved?
         8       A.   No one -- I don't believe anyone was
         9  instructed, you know, either way.  But if there's an
13:56   10  e-mail otherwise -- to the best of my recollection, no.
        11       Q.   Was there a written corporate policy that
        12  employees were given as part of training or otherwise
        13  that said what you said earlier that people aren't
        14  supposed to get rid of documents or e-mails?
13:56   15       A.   We -- there was some corporate policies.  And
        16  I don't know if those -- I don't know what -- what --
        17  what -- how formal they were.  There were corporate
        18  policies when the -- when the company was in that stage.
        19       Q.   Okay.
13:57   20       A.   But I don't know if there was something
        21  specific on that issue.  No one -- none of us had ever
        22  been through -- I don't think anyone's ever discussed a
        23  lawsuit.  The lawsuit had never been part of that.
        24       Q.   I'm not sure I'll ask this question artfully.
13:57   25  So people had a power.com e-mail address which would
```

170

Designee Steven Vachani, 30 (b) (6) - Confidential

BARKLEY
Court Reporters

1  forward to their personal address?
2     A.   No.  I mean, there -- there was a server.
3  But, I mean, I say everyone -- how they accessed it was
4  in different ways.
5     Q.   Okay.  But that server, would it house the
6  e-mails that people received as part of the business or
7  would it just forward things on?
8     A.   I -- I don't know how it was exactly work.
9  But I believe that, you know, there was -- everyone had
10 a different way of accessing their -- their e-mails.
11 That's all I know.  And all the people -- like I -- I
12 accessed mine through Yahoo! and Eric would access
13 through, you know, his own.  Everybody accessed on their
14 own.
15    Q.   So if that server did have e-mails between
16 people at Power that didn't include you, that would be
17 on the backup?
18    A.   I mean, yeah, it would be on the backup.
19    Q.   Okay.  And if it isn't there, then --
20    A.   Yeah.  Whatever -- whatever we have is in the
21 backup.
22    Q.   Okay.
23    A.   I mean, I don't know the technical details on
24 how these things were -- were working, so.
25    Q.   And if -- is it Power's view that an -- an

171

1  e-mail sent to a power.com employee that was then
2  forwarded to a personal account, who -- whose e-mail is
3  that?  Is that the employee's e-mail or is it Power's
4  e-mail?
13:58  5            MR. FISHER:  Objection.  Vague.  Calls for a
6  legal conclusion.
7       Q.   BY MR. CHATTERJEE:  Do you follow me?
8       A.   Yeah.
9       Q.   I can give you a concrete example.
13:58 10       A.   Yeah.
11       Q.   If Eric Santos e-mailed Bruno Carvalho with
12  some sort of business instruction --
13       A.   Yeah.
14       Q.   -- and it went to their personal e-mail --
13:58 15       A.   Yeah.
16       Q.   -- through the server architecture, who would
17  be the owner of that e-mail?
18       A.   Well, I'll --
19            MR. FISHER:  Same objections.
13:59 20            THE WITNESS:  I'll answer it another way that
21  -- more practically.  That we were a small company.  So
22  if I look at the ten people that I personally
23  communicated with most regularly and think about each of
24  them, you know, I mean, from a practical standpoint --
13:59 25  although this doesn't answer your question -- almost --

172

1   almost any e-mail, you know, there -- that all the
2   people that are involved in this situation have -- have
3   pretty much been -- you know, they're -- they're -- they
4   had -- they had their own solution.  So I don't know who
13:59  5   own.  I mean, we had -- if they had access.  If they
6   chose to copy one person in Power, then obvious -- it's
7   accessible.  And so that's from practical purposes
8   anything that was copied to me or anything that was
9   copied to Eric or -- or Rob or Zak or all these key
13:59  10  people that were in the company, you know, they were all
11  essentially preserved.
12       Q.    BY MR. CHATTERJEE:  Right.  But if -- let's --
13  let's say that -- that there was an e-mail that went to
14  a person's personal e-mail account through the
13:59  15  forwarding tool on the servers and it had a bunch of
16  power.com business information, was the employee who
17  received that e-mail free to go and use that information
18  however they wanted outside of Power?
19            MR. FISHER:  Objection.  Vague.  Calls for a
14:00  20  legal conclusion.  Incomplete hypothetical.
21            THE WITNESS:  In -- in theory, no.  I mean,
22  they're not supposed -- they -- they -- when they sign,
23  when they join the company, they sign saying that
24  everything -- their -- their employment contracts, which
14:00  25  I believe you've seen some, you know, have references

173

1  to, you know, ownership and data and everything else
2  that they state.  So there's a certain level of -- we're
3  probably not large enough to have implemented really
4  rigid, you know, well-defined systems at that level.
5  But, you know, we -- they were pretty -- the employment
6  contracts state, you know, we own -- we own all the
7  stuff.  The standard stuff that are in most employment
8  contracts.
9      Q.   BY MR. CHATTERJEE:  Okay.  Let's go to Exhibit
10 2 -- 203.  On the second page this is -- this is an
11 e-mail from you to a whole bunch of people that April
12 30th, 2009.
13     A.   Yep.
14     Q.   Do you see that?
15     A.   Yeah.
16     Q.   At the very bottom of the page there's number
17 5.  It says "Our new US Launch scheduled in July."
18     A.   Yeah.
19     Q.   What -- what was the US-based launch going to
20 be?
21     A.   We had -- we had considered, you know, just
22 making -- starting to more -- to more aggressively push
23 our -- the Power site.  And we had also talked about,
24 you know, potentially turning back -- Facebook back on,
25 which we decided not to do.

174

```
 1                DEPOSITION OFFICER'S CERTIFICATE
 2                     (Civ. Proc. § 2025.520(e))
 3    STATE OF CALIFORNIA     )
                              )  ss
 4    COUNTY OF CONTRA COSTA  )
 5
 6           I, CHERREE P. PETERSON, hereby certify:
 7           I am a duly qualified Certified Shorthand
 8    Reporter, in the State of California, holder of
 9    Certificate Number CSR 11108 issued by the Court
10    Reporters Board of California and which is in full force
11    and effect.  (Fed. R. Civ. P. 28(a)).
12           I am authorized to administer oaths or
13    affirmations pursuant to California Code of Civil
14    Procedure, Section 2093(b) and prior to being examined,
15    the witness was first duly sworn by me.  (Fed. R. Civ.
16    P. 28(a), 30(f)(1)).
17           I am not a relative or employee of any attorney
18    or counsel of any of the parties, nor am I a relative or
19    employee of such attorney or counsel, nor am I
20    financially interested in this action.  (Fed. R. Civ. P.
21    28).
22           I am the deposition officer that
23    stenographically recorded the testimony in the foregoing
24    deposition and the foregoing transcript is a true record
25    of the testimony given by the witness.  (Fed. R. Civ. P.
```


1  30(f)(1)).

2          Before completion of the deposition, review of

3  the transcript (XX) was ( ) was not requested.  If

4  requested, any changes made by the deponent (and

5  provided to the reporter) during the period allowed, are

6  appended hereto.  (Fed. R. Civ. P. 30(e)).

7

8  Dated: JANUARY 13, 2012

                    _Cherree P. Peterson_