**EXHIBIT A**

1                    UNITED STATES DISTRICT COURT

2                 NORTHERN DISTRICT OF CALIFORNIA

3                      SAN JOSE DIVISION

4

5     FACEBOOK, INC.              :

6                    Plaintiff,   :

7                                 :

8          v.                     :

9

10    POWER VENTURES, INC. d/b/a:

11    POWER.COM, a California     :

12    corporation; POWER          :        Case No.

13    VENTURES, INC. a Cayman     :        5:08-CV-05780

14    Island Corporation, STEVE  :         JW (HRL)

15    VACHANI, an individual;     :

16    DOE 1, d/b/a POWER.COM, an:

17    individual and/or business:

18    entity of unknown nature;   :

19    DOES 2 through 25,          :

20    inclusive, individuals      :

21    and/or business entities    :

22    of unknown nature,          :

23                    Defendants.  :

24    _____

25          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        Videotaped Deposition of STEVEN VACHANI

2  taken on behalf of the Plaintiff at the offices of

3  BURSOR & FISHER, P.A., 369 Lexington Avenue, New

4  York, New York, on Wednesday, July 20, 2011,

5  commencing at 9:47 in the forenoon before PATRICIA

6  MULLIGAN CARRUTHERS, a Certified Court Reporter and

7  Notary Public of the State of New Jersey and Notary

8  Public of the State of New York.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    A P P E A R A N C E S:

2

3    ORRICK, HERRINGTON & SUTCLIFFE, LLP

4    1000 Marsh Road

5    Menlo Park, California  94025-1015

6    (650) 614-7375

7    BY:  MONTY M.F. COOPER, ESQ.

8         mcooper@orrick.com

9    Attorneys for the Plaintiff Facebook, Inc.

10

11   LAW OFFICES OF SCOTT A. BURSOR

12   369 Lexington Avenue, 10th Floor

13   New York, New York  10017-6531

14   (212) 989-9113

15   BY:  SCOTT A. BURSOR, ESQ.

16        scott@bursor.com

17   Attorney for the Defendants Power Ventures, Inc.

18

19   Present:

20          Peter Ledwith, Videographer

21

22

23

24

25

```
 1              I N D E X
 2
 3   WITNESS                          PAGE
 4   STEVEN VACHANI
 5   By Mr. Cooper                     8
 6
 7
 8
 9           E X H I B I T S
10   NUMBER     DESCRIPTION          PAGE
11   100   PowerScript Documentation   64
12         Document Version 2.1
13         (Bates Nos. POWER 2011.02.03.000004-022)
14   101   PowerScript Training dated June 2007   70
15         (Bates Nos. POWER 2011.02.03.0000023-067)
16   102   Declaration of Steve Vachani   123
17         (No Bates No.)
18   103   Screen Shot of Power.com Web site   125
19         (Bates Nos. FBPOWER00136)
20   104   The New York Times Power.com   234
21         Article dated 12-01-08
22         (No Bates No.)
23
24
25
                                    Page 4
```

```
 1        E X H I B I T S (continued)
 2   NUMBER       DESCRIPTION        PAGE
 3   112   E mail dated 12-15-08      326
 4         from J. Cutler to S. Vachani
 5         (No Bates No.)
 6   113   E mail dated 12-17-08      332
 7         from S. Vachani to F. Herrera
 8         (No Bates No.)
 9   114   E mail dated 12-25-08      338
10         from S. Vachani to E. Santos
11         (Bates Nos. POWER 2011.02.03.0000086)
12   115   E mail Thread dated 12-26-08   340
13         from E. Santos to S. Vachani
14         (Bates Nos. POWER 2011.02.03.0000074-77)
15   116   E mail Thread dated 12-26-08   353
16         from S. Vachani to F. Herrera
17         (No Bates No.)
18   117   E mail dated 2-06-09       354
19         from S. Vachani to E. Santos
20         (Bates Nos. POWER 2011.02.03.0000072-73)
21   118   E mail dated 12-30-08      358
22         from S. Vachani to E Santos
23         (Bates No. POWER 2011.02.03.0000068)
24
25
                                    Page 6
```

```
 1        E X H I B I T S (continued)
 2   NUMBER       DESCRIPTION        PAGE
 3   105   The New York Times Power.com   240
 4         Article dated 1-02-10
 5         (No Bates No.)
 6   106   First Amended Complaint    252
 7         (No Bates No.)
 8   107   Exhibit A to the First Amended   274
 9         Complaint
10         (No Bates No.)
11   108   Letter dated 12-01-08      289
12         from J. Cutler to L. Power
13         (Bates Nos. POWER 2011.02.03.000001-003)
14   109   E mail dated 12-01-08      307
15         from S. Vachani to F. Herrera
16         (Bates Nos. POWER 2011.02.03.0000089-090)
17   110   Power Ventures, Inc.'s Responses to   314
18         Facebook, Inc.'s First Set of
19         Interrogatories
20         (No Bates No.)
21   111   E mail dated 12-12-08      317
22         from S. Vachani to J. Cutler
23         (No Bates No.)
24
25
                                    Page 5
```

```
 1        THE VIDEOGRAPHER:  I'm the video
 2   operator, Peter Ledwith of Barkley Reporting.
 3   Today's date is July 20th, 2011.  The time is 9:47
 4   a.m. We're here at the offices of Bursor and Fisher
 5   located at 369 Lexington Avenue, New York, New York
 6   to take the videotaped deposition of Steve Vachani
 7   in the matter of Facebook, Inc., v. Power Ventures,
 8   Inc., in the Northern District of California.
 9   Counsel, please, identify themselves whom they
10   represent.
11        MR. COOPER:  Monty Cooper of the
12   law firm Orrick, Herrington & Sutcliff representing
13   the plaintiff Facebook, Inc.
14        MR. BURSOR:  Scott Bursor from
15   Bursor & Fisher from the -- for the defendant Steve
16   Vachani and Power Ventures.
17   S T E V E N   V A C H A N I,
18        2425 B Channing Way 216,
19        Berkeley, California  94704,
20        having been first duly sworn according
21   to law, testifies as follows:
22             (Whereupon, there is a discussion
23   held off the record.)
24        THE VIDEOGRAPHER:  9:49, off the
25   record.
                                    Page 7
```

1        THE VIDEOGRAPHER:  9:49, on the
2    record.
3    EXAMINATION BY MR. COOPER:
4        Q.     Good morning, Mr. Vachani.  My
5    name is Monte Cooper.  I represent the plaintiff
6    Facebook, Inc.  Have you ever had your deposition
7    taken before today?
8        A.     No.
9        Q.     I'm just going to go very quickly
10   over some ground rules which are to help everybody
11   involve not just me but your own counsel and the
12   court reporter.
13       A.     Sure.
14       Q.     First of all, you realize you're
15   being recorded both on paper and by video.
16       A.     Correct.
17       Q.     For purposes of the paper record,
18   all of us in here would appreciate it if you would
19   try and consciously if there's a yes-or-no answer
20   to say yes or no and not uh-huh or uh-huh or words
21   that often can be misconstrued if they're written
22   down as opposed to us being able to understand it
23   live.
24       A.     Sure.
25       Q.     The second thing is I would ask

Page 8

1    you to always wait to hear my full question before
2    responding because the court reporter won't want us
3    to speak over one another and I'll try to do the
4    same courtesy to you.
5        A.     Okay.  That's okay.
6        Q.     And another one is also always --
7    Before you begin to answer, give your counsel one
8    moment.  He will, from time to time, interject
9    objections.  Unless he instructs you not to answer,
10   though, after his objection you are to, in fact,
11   answer the question to the best of your ability.
12   Do you understand that?
13       A.     Yes.
14       Q.     All right.  And as part of same
15   process, I would ask that you think through your
16   answer to try and make certain you understand the
17   question being asked to you and if there's any
18   clarification you need, you can always ask me
19   again.  Do you understand?
20       A.     Yes, yes, I do.
21       Q.     Now, are you under any medication
22   or any disability that would impair your ability to
23   give truthful or clear answers today?
24       A.     No.  I am not.
25       Q.     Before today, did you do -- did

Page 9

1    you meet with anyone to prepare for today's
2    deposition?
3        A.     Just my counsel.
4        Q.     All right.  Without telling me the
5    content of anything you said with your counsel, can
6    you tell me approximately how long you met with
7    your counsel?
8        A.     For approximately one hour.
9    Hour-and-a-half, 8:30 I came in today.
10       Q.     Okay.
11       A.     And we spent about one hour.
12       Q.     All right.  So your preparation
13   for today's deposition occurred before today's
14   deposition.
15       A.     That's correct.
16       Q.     Did you discuss this deposition
17   with anybody else before today?
18       A.     No.
19       Q.     So you didn't discuss the fact you
20   were having this deposition with any co-workers?
21       A.     I informed one co-worker that --
22   that I was having this deposition and my counsel.
23       Q.     Who's the co-worker you informed
24   that you were having the deposition?
25       A.     This is a former co-worker, I just

Page 10

1    mentioned Eric Santos.
2        Q.     And then is Mr. Santos a former
3    co-worker of Power or some other entity?
4        A.     Of Power.
5        Q.     By the way, throughout the day I
6    may refer to Power, and when I do, I would ask you
7    to understand I'm referring both to Power Ventures,
8    Inc., and the Web site power.com.  Do you
9    understand that?
10       A.     Yes.
11       Q.     And if there's in any point in
12   which you feel you should clarify that an answer
13   would apply only to perhaps the corporate entity
14   not the Web site, I would ask that you -- let you,
15   me, and your counsel know that.  Do you understand?
16       A.     Yes.
17       Q.     And that would also work the other
18   way, if a referenced answer refers to -- I may
19   refer to Power referring to the Web site, but if
20   you feel that would be incorrect, I would ask you
21   to tell me that as well.  All right?
22       A.     Yes.
23       Q.     Can you, at a high-level, give me
24   an overview of your education?
25       A.     Sure.  I graduated from UC

Page 11

5 (Pages 8 to 11)

**Page 12**

1 Berkeley and undergraduate degrees in political
2 science and a minor in business administration.
3         MR. BURSOR:  Just a moment.
4     A.     I'll repeat that.  I graduated
5 from UC Berkeley and a undergraduate degree in
6 political science and business -- a minor in
7 business administration.
8         Q.     Have you taken any graduate level
9 courses?
10    A.     Courses, yes, but no formal
11 graduate degree.
12        Q.     All right.  What courses have you
13 taken graduate level and where?
14    A.     Business class -- Business courses
15 at UC Berkeley while I was an undergraduate.
16        Q.     So you took graduate level
17 business courses while you were still an
18 undergraduate?
19    A.     I believe I took one or two.
20        Q.     When did you graduate from the
21 University of California?
22    A.     I graduated in 1996.  I believe
23 that was the official time.
24        Q.     Mr. Vachani, do you have any
25 skills in computer programming?

**Page 14**

1         THE WITNESS:  Okay.  No problem.
2     Q.     Have you ever actually written any
3 software code for any of the companies you've
4 worked for?
5     A.     I have not.
6     Q.     You mentioned that you're familiar
7 with C Pascal and HTML?
8     A.     Yes.
9     Q.     Are you familiar with PHP?
10    A.     Yes.  I'm familiar with PHP.
11    Q.     How about MySQL?
12    A.     I -- What level of familiarity?
13 I'm familiar with them in terms of managing
14 products and asking intelligent questions, but I
15 cannot write code at that level.
16    Q.     That's effectively what I was
17 trying find out is if you would be able to code in
18 MySQL?
19    A.     I could not.
20    Q.     All right.  Are you familiar with
21 Cplus Plus?
22    A.     I'm familiar, but I could not -- I
23 could not code in any of those.
24    Q.     All right.  How about Java?
25    A.     I'm familiar with it, again,

**Page 13**

1     A.     Yes, I do.
2     Q.     All right.  What -- What
3 programming languages are you familiar with?
4     A.     My own programming skills are --
5 are limited, but I am familiar with C Pascal and
6 HTML.
7     Q.     When you say you're "familiar
8 with" can you give me an understanding of what you
9 mean by "familiar with"?
10    A.     Well, I -- I interact with -- I've
11 been interacting with programmers and developers,
12 building products for almost 15 years, and so I --
13 as a manager I -- I'm able to ask questions and
14 answers and ask intelligent questions, but I'm not
15 a -- a skilled programmer by profession.
16        MR. BURSOR:  I'm sorry to
17 interrupt, but you're going very fast.  There's
18 no -- There's no pause between his questions and
19 your answers, so --
20        THE WITNESS:  No problem.
21        MR. BURSOR:  -- I just -- It
22 hasn't been a problem as of yet --
23        THE WITNESS:  Okay.
24        MR. BURSOR:  -- but I don't want
25 it to get out of control.  Slow down a little bit.

**Page 15**

1 having worked as a product manager, but I could not
2 code in any of this.
3     Q.     And how about Perl?
4     A.     I'm familiar -- familiar with it
5 again, but no -- no programming experience.
6     Q.     Are you familiar with the term
7 "script" as it's used in computer programming?
8     A.     Yes.
9     Q.     All right.  What would your
10 understanding of a script be?
11    A.     A script is a -- an auto -- it's
12 something that you instruct a -- a computer to do
13 something.
14    Q.     Have you ever been involved in the
15 development of any types of scripts?
16    A.     Personally?
17    Q.     Yes.
18    A.     I mean, I've been involved as a
19 product manager.  Not as a programmer or coder.
20    Q.     Okay.  In the level --
21    A.     Project manager -- as a CEO
22 leading products.
23    Q.     As a CEO or as a project manager --
24    A.     Yes.  That's correct.
25    Q.     -- working with scripts, what

1 languages have the scripts been written in that
2 you're familiar with?
3      Q.      PHP, Perl, Java, HTML.  HTML, of
4 course are not scripts, but they're -- they
5 interact with programs PHP and also C Sharp.
6      Q.      Following your graduation in 1996
7 from the University of California, can you tell me
8 what companies you work for?
9      A.      Sure.  I was the founder and CEO
10 of Qool.com, Qool Media.
11      Q.      Is that spelled with a "Q" as --
12      A.      A "Q," that's correct.  And I was
13 -- I founded Serendipity Ventures which is a
14 holding company that has experimented with a wide
15 range of products both in the form of investments
16 and also in the form of development and incubation
17 of projects and finally Power -- Power Ventures.
18      Q.      What was your role with Qool
19 Media?
20      A.      I was the CEO of the company.
21      Q.      From what timeframe, if you know?
22      A.      From 1997 until -- It was
23 previously Net Prospect and then changed the name
24 to Qool later on.
25      Q.      Were you involved with the

Page 16

1 formation of the company?
2      A.      Yes, I was.
3      Q.      Was it formed in 1997?
4      A.      I don't recall the exact formation
5 date, but when I started working on it, in other
6 words, like start-ups, the actual formation date
7 and the date we started might have a slight
8 difference in time.
9      Q.      Were you CEO the entire time you
10 were at Qool Media?
11      A.      For most -- Not the entire time,
12 no.  I moved on I think in -- in 2000 -- if I'm not
13 mistaken, I believe it was 2002.
14      Q.      Okay.  What type of business was
15 Qool Media?
16      A.      It was an advertising -- Online
17 advertising business that also engaged consumers in
18 a -- in a type of online auctions and collection of
19 points like a mileage program and also an online
20 advertising network.
21      Q.      Were you involved in any of the
22 development of the -- the code that would be
23 operated by the Web site for its Internet auction?
24      A.      The same level of involvement as a
25 product manager or defining the scope and defining

Page 17

1 the products and kind of the product visionary, but
2 never as an actual coder.
3      Q.      Was Qool Media privately or
4 publicly owned?
5      A.      Privately.
6      Q.      How -- Approximately how many
7 employees did it have when you first started?
8      A.      When we first started it was zero.
9 I founded the company and that was -- it grew from
10 there, of course.
11      Q.      When you left the company, how
12 many employees did it have?
13      A.      The company I believe had about 25
14 to 30.
15      Q.      Is Qool Media still in operation?
16      A.      It's not in operation today.
17      Q.      Was it sold to anyone?
18      A.      The assets were sold off and some
19 of the products were sold in 2003.
20      Q.      Do you know who purchased -- what
21 -- who or what company purchased them?
22      A.      It was basically -- I do not
23 remember.  I was not with the company at that time.
24 I left one year earlier.
25      Q.      Serendipity Venture is a venture

Page 18

1 capital firm?
2      A.      It's a holding company that I used
3 for a wide range of activities.
4      Q.      When did you join Serendipity?
5      A.      Originally, I created -- I created
6 Serendipity.  It's a company I founded and it was
7 created -- incorporated in 2006 and also it was --
8 I first incorporated it in 2004 so it was
9 reincorporated as a corporation and LLC.
10      Q.      So you incorporated Serendipity
11 when you were still at Berkeley?
12      A.      No.  This was 2000.
13      Q.      Oh, I'm sorry.  I misunderstood.
14      A.      Yeah, it was ten years later.
15      Q.      Is Serendipity still in existence?
16      A.      Yeah.  It's a holding company.
17 That's what I use for activities outside of Power.
18      Q.      Does Serendipity produce any type
19 of product?
20      A.      It doesn't.  It's -- It's a
21 holding company for -- for investments that I may
22 make or for new -- new projects that are unrelated
23 to Power.
24      Q.      Does Serendipity, itself, invest
25 in any company?

Page 19

1      A.      Yes.

2      Q.      Is it a California LLC?

3      A.      No.  Delaware.

4      Q.      Qool Media, where was it located?

5      A.      It was located in California and

6  New York.

7      Q.      And Serendipity, where is its

8  headquarters?

9      A.      It's in New York, New York.

10     Q.      Then how long -- My understanding

11 from your answers are that you're still operating

12 Power -- or Serendipity?

13     A.      Correct.  It's a personal holding

14 company that I own almost 99 -- a hundred percent.

15     Q.      Are there any other employees of

16 Serendipity?

17     A.      At this stage, no, but I am in the

18 process of hiring -- hiring employees in the

19 future.

20     Q.      Now, you said that it's an LLC?

21     A.      It's an LLC and also a

22 corporation.  It's both.

23     Q.      Are there any other managers that

24 are, in addition to yourself, that are part of the

25 LLC?

                                    Page 20

---

1      A.      Legally, no.  As I mentioned at

2  the moment, any new activities that I'm pursuing,

3  I'm pursuing under this entity, so I'm currently

4  engaged in conversations with -- with people.

5      Q.      And when did you join Power?

6      A.      Power was founded in -- It was

7  2006 is when our -- our primary activities started.

8  We incorporated Power, I believe it was, if I'm not

9  mistaken, late 2006 and -- but the activities

10 started previously as a start-up, but we started

11 working on it.

12     Q.      Were you one of the creators of

13 Power?

14     A.      I was the founder of the company.

15     Q.      Now, when you say it was

16 incorporated in 2006 but started before then, was

17 it started under the Web site title www.power.com?

18     A.      No.  It was originally -- When we

19 originally started it, there was no Web site.  It

20 was a -- Like many startups we were -- we were

21 working on a core, you know, product idea, and

22 later the name power.com came about in 2007.  I

23 believe we acquired the domain in 2007.

24     Q.      Who helped -- Besides yourself,

25 who helped create Power.com.  You used the --

                                    Page 21

---

1              MR. COOPER:  Let me strike that.

2      Q.      You used the word "we"?

3      A.      Yes.

4      Q.      Who are you referring to when you

5  state --

6      A.      I referred to our technology team.

7  Eric Santos was our CTO and there were a collection

8  of other technical programmers that worked on the

9  team.  I couldn't name all the names right now, but

10 obviously that grew to -- that continued to grow as

11 the company grew, but it started with Eric Santos

12 as the CTO.

13     Q.      What technical programmers can you

14 recall whose name that you recall?

15     A.      I -- There was literally almost a

16 hundred people at the company at its peak.  At the

17 time, you know, when we -- you know, started

18 interacting with Facebook so it was almost a

19 hundred people, so I don't think --

20     Q.      Can you recall any names?

21     A.      Yeah.  I mean, do you want me to

22 go through all -- all hundred?

23     Q.      Do you know all 100?

24     A.      I don't know all 100, no.

25     Q.      Who were the primary program --

                                    Page 22

---

1              MR. COOPER:  Strike that.

2      Q.      Going back to the foundation of

3  power.com, was it you and Mr. Santos alone or were

4  there others involved with the creation of the Web

5  site?

6      A.      I was the -- the sole founder of

7  the company and I employed Eric Santos as a -- with

8  the company.  He was the first technical programmer

9  and -- He was the first technical programmer.

10 There were nontechnical individuals that were

11 involved with the company also.

12     Q.      All right.  Who were those

13 nontechnical --

14     A.      Felipe Herrera.

15             MR. BURSOR:  You've got to slow

16 down.

17     A.      Felipe Herrera, H-E-R-R-E-R-A.

18     Q.      What was his role?

19     A.      He was a corporate development.

20 He was the other key person at the company.

21     Q.      Did you have a chief financial

22 officer?

23     A.      The chief financial -- There was

24 no chief financial officer.  There were individuals

25 in that role, but not with that title.

                                    Page 23

**Page 24**

```
 1        Q.    All right.  Who were in that role?
 2        A.    Let me just try to refresh my
 3   memory.  At that early stage, there were
 4   subcontracted services that we used for financials,
 5   but I cannot recall the name at this point of the
 6   people, but I would be happy to dig up more
 7   information on that.
 8        Q.    At any time, since power.com has
 9   been created, have you had any -- any type of
10   documentation that reflects the corporate structure
11   of the company?
12        A.    Yes.
13        Q.    What type of documentation
14   reflects the corporate structure of the company?
15        A.    Standard incorporation documents
16   that are -- when corporations are created.
17              (Whereupon, a recess is taken.)
18              THE VIDEOGRAPHER:  10:08, off the
19   record.
20              (Whereupon, a recess is taken.)
21              THE VIDEOGRAPHER:  It's 10:12.  On
22   the record.
23        Q.    Before we went off the record
24   Mr. Vachani, you were identifying corporate
25   documents, the incorporation documents that would
```

**Page 25**

```
 1   have reflected the corporate structure of the
 2   company.
 3        A.    Correct.
 4        Q.    Do you have any documents that
 5   reflect the employees and their roles?
 6        A.    Yeah.
 7        Q.    And what type of documents are
 8   those?
 9        A.    Those would be standard employment
10   contracts, and NDAs, and standard proprietary
11   invention agreements.
12        Q.    Do you have any document that,
13   like, provides a table of the roles of the
14   employees and who their supervisors are?
15        A.    I could -- I would -- I could find
16   that.
17        Q.    Is power.com still operating?
18        A.    The company is still operational.
19        Q.    How many employees are there
20   currently?
21        A.    There are currently no -- no
22   employees for the company.
23        Q.    Are you the sole --
24        A.    I'm the sole person at the company
25   right now.
```

**Page 26**

```
 1        Q.    How long has it been operating
 2   only as a sole proprietorship?
 3        A.    It's not a sole proprietorship.
 4   It's a corporation, but we don't employ -- have any
 5   employed people at the moment.
 6        Q.    For how long has it been operating
 7   as a corporation with you as its sole employee?
 8        A.    For over one year.
 9        Q.    Power.com generating any revenue
10   currently?
11        A.    No.  The -- Obviously, the core
12   value is its IP in technology.
13              MR. BURSOR:  Okay.  Steve you
14   answered the question, and then you just started
15   talking.  Just say things that weren't called for
16   by the question, so please concentrate on the
17   questions.
18              THE WITNESS:  Okay.
19        Q.    What are -- What assets currently
20   exist within power.com or Power Ventures?
21        A.    When you say "assets" you refer --
22   I would assume the -- the IP of the company is the
23   core asset.
24        Q.    Does it -- Does the company
25   operate out of any location?
```

**Page 27**

```
 1        A.    No.
 2        Q.    Did it formerly?
 3        A.    Yes, did it.
 4        Q.    Where did it formerly operate out
 5   of?
 6        A.    It was based in -- in the city of
 7   Rio de Janeiro was the primary offices, and there
 8   was secondary offices we had in Salvador.  It's in
 9   Brazil, also.
10        Q.    Is that a short name for it --
11        A.    No.  It's the city.
12        Q.    And where was the company -- Where
13   is the company incorporated?
14        A.    It's incorporated in Cayman
15   Islands and in the United States.
16        Q.    Where in the US?
17        A.    Delaware.
18        Q.    Do you pay a Delaware franchise
19   tax annually?
20        A.    Yes, we do.
21        Q.    Pay any type of franchise tax in
22   the Cayman Islands?
23        A.    Yeah.  There are -- There are
24   taxes paid.  Correct.
25        Q.    From where is the revenue
```

```
 1   generated that franchise taxes are paid?
 2        A.    I'm sorry?
 3        Q.    From what --
 4        A.    In the Cayman Islands.
 5        Q.    No.  I mean from what assets
 6   within Power Ventures are they?
 7        A.    The power.com Web site.
 8              MR. BURSOR:  Steve, you've got to
 9   slow down.  You've got to wait for his question to
10   be finished and paused.
11        Q.    Did Power Ventures maintain any
12   type of accounting records?
13        A.    Yes, we do.
14        Q.    Where are they maintained?
15        A.    They're in the United States.
16        Q.    Where in the US?
17        A.    There was -- I believe that it was
18   an accounting firm that did the most recent
19   financial records in the US.  A California firm.  I
20   wasn't directly involved in that.
21        Q.    What firm is it?
22        A.    I do not recall the name offhand
23   but I can provide that.  It was a small firm in
24   California.
25        Q.    Is it in Northern California?
```
Page 28

```
 1   today's depo?
 2        A.    Yes.
 3        Q.    In preparing for today's
 4   deposition, did you review any documentation?
 5              MR. BURSOR:  Just answer yes or no
 6   without disclosing --
 7        A.    Yes.
 8        Q.    Did you review any documents
 9   outside the presence of your counsel that you used
10   to refresh your recollection about events?
11        A.    No.
12        Q.    Did you review any documents with
13   counsel that you helped -- that you used to help
14   refresh any recollection of events?
15        A.    Yes.
16        Q.    To the extent that the documents
17   helped to refresh your recollection, what documents
18   were those?
19        A.    The previous declarations.
20        Q.    By "previous declarations" are you
21   referring to declarations you filed in conjunction
22   with pleadings in this case?
23        A.    Yes.
24        Q.    Okay.  Did you review any other
25   documents that were intended to help refresh your
```
Page 30

```
 1        A.    Yes.
 2        Q.    Berkeley?
 3        A.    In that -- In that area.  I think
 4   in the -- in the San Francisco area.  It was very
 5   straightforward.
 6              MR. BURSOR:  You just did it
 7   again.  You answered the question and you started
 8   talking about something that you just wanted to
 9   talk about.  Just listen to the questions, pause
10   for a moment and then answer the question.
11              THE WITNESS:  Okay.
12              MR. BURSOR:  And then stop
13   talking.
14        Q.    Mr. Vachani, I'm -- What other
15   types of records reflect accounting and financial
16   information at Power Ventures that you know of
17   besides these that are in the accounting firm's
18   possession?
19        A.    This is the only information.
20        Q.    I want to go back to a couple of
21   things --
22        A.    Sure.
23        Q.    -- from the beginning.  You said
24   you met with your counsel for one-and-a-half hours
25   approximately this morning in preparation for
```
Page 29

```
 1   recollection about events?
 2        A.    No.  You're referring today in the
 3   -- in the last hour-and-a-half?
 4        Q.    Yes.
 5        A.    No.
 6        Q.    Did you refer -- review any
 7   documents before today that you helped use to
 8   refresh your recollection?
 9        A.    I'm not sure if I understand that
10   question completely.
11        Q.    Okay.  In anticipation of today's
12   deposition --
13        A.    Okay.
14        Q.    -- did you review any documents
15   that you were using to help recall events so that
16   you would be prepared for today's deposition to
17   answer some questions?
18        A.    No.
19        Q.    You indicated Eric Santos was the
20   first programmer that you worked with at
21   power.com?
22        A.    Yes.
23        Q.    When did Mr. Santos become
24   involved in assisting you in the development of
25   power.com?
```
Page 31

1    A.    I believe it was in -- in
2  mid-2006.
3    Q.    How did you meet Mr. Santos?
4    A.    I discovered some other work that
5  he had done on the Internet.  Just looking -- I was
6  reviewing resumes of technical programmers and I
7  encountered him.
8    Q.    What work were you aware
9  Mr. Santos had done on the Internet before?
10    A.    He had worked at a large
11  technology company in Brazil previously.  It was
12  one of the largest technology companies that did
13  contracts for the, you know, for the US government
14  -- I mean, for the Brazilian government and big
15  telecom companies.
16    Q.    What company was that?
17    A.    The Brazil, Bank of Brazil and
18  other -- I'm not sure of the corporate clients that
19  they worked for, but they -- they were large --
20  large projects for banks and telecom companies and
21  government.
22    Q.    I'm sorry.  What company was
23  Mr. Santos working for?
24    A.    Oh.  It was called Unitech and
25  Braxis.  Unitech, so it's U-N-I-T-E-C-H.

Page 32

1    Q.    I don't know Portuguese.
2    A.    It's one of -- It's a very
3  respected company in Brazil.
4    Q.    How long did -- was it -- Or
5  besides Mr. Santos, who was the other initial
6  people you worked with to help develop power.com
7  that you recall?
8    A.    So there was a -- I don't recall
9  the names of the people because -- Eric was
10  directly managing those individuals, but I -- I
11  remember Danilo and Carlos are the two kind of
12  other individuals I remember.
13    Q.    Was Danilo's last name?
14    A.    Delgado, D-E-L-G-A-D-O and Carlos
15  B-A-C-E-L-A-R.
16    Q.    Can you say that again?
17    A.    Yeah, Carlos B-A-C-E-L-A-R.
18    Q.    Is that pronounced like Bacelar?
19    A.    Yes.
20    Q.    What were their roles?
21    A.    They were programmers.
22    Q.    And you indicated Mr. Santos was
23  responsible for hiring them?
24    A.    Yes.
25    Q.    How long did Mr. Delgado work at

Page 33

1  Power?
2    A.    I believe it was approximately
3  three years.
4    Q.    And how long did Mr. Bacelar.
5    A.    Approximately three years.  I
6  don't know the exact dates.
7    Q.    Can you -- Do you have an
8  approximation of when they left Power?
9    A.    Probably 2009 or 2000 -- late
10  2009.  I'm guessing.
11    Q.    And you indicated Mr. Santos is no
12  longer working at --
13    A.    That's correct.
14    Q.    -- at Power?
15    A.    He's no longer working at Power.
16    Q.    When did Mr. Santos cease to work
17  at Power?
18    A.    About one-and-a-half years ago.
19    Q.    Did anybody succeed Mr. Santos in
20  the role of supervising programming --
21    A.    No.
22    Q.    How long was -- How long did it
23  take for Mr. Santos and/or Mr. Santos and his
24  programmers to develop any type of code that was
25  functional as a Web site power.com?

Page 34

1    A.    Are you talking about to develop
2  the original --
3    Q.    Yes.
4    A.    I believe it was -- I could be --
5  I'm just estimating here, but it was approximately
6  nine months, and about, you know nine -- Nine
7  months I would say approximately.
8    Q.    This was beginning in
9  approximately 2007?
10    A.    2006.
11    Q.    2006?
12    A.    Yeah.
13    Q.    Did anybody have responsibility
14  for marketing at power.com?
15    A.    I was the primary person that
16  oversaw marketing.
17    Q.    Were there any others who you
18  supervised?
19    A.    Yes.  Yes, there were.
20    Q.    Can you recall names of those
21  individuals?
22    A.    Well, Eric -- Eric was more of a
23  type of chief -- chief operating officer so he
24  also -- Since in our company, marketing was driven
25  by product, so marketing was a function of the

Page 35

11 (Pages 32 to 35)

1    product group.
2         Q.    So Eric Santos had a lot of
3    marketing responsibility?
4         A.    Yeah, because it was driven by
5    product.
6         Q.    Anybody else?
7         A.    There were members of the team.
8    There were almost a hundred people in the company.
9    He was my primary interact person I interacted with
10   on both product and marketing issues.
11        Q.    How about advertising?
12        A.    We didn't employ any advertising.
13   It was all organic growth.
14        Q.    What type of -- When you --
15        MR. COOPER:  Strike that.
16        Q.    You say it took approximately nine
17   months beginning in 2006 to develop the original
18   code to make power.com operational?
19        A.    Correct.
20        Q.    Did power.com employ any type of
21   source revision protection for its source code for
22   the site?
23        A.    "Source revision protection," what
24   do you mean by that?
25        Q.    A safe source so you would know

1    precisely which versions of the code and when the
2    revisions occurred?
3         A.    Those were done internally.  It's
4    not any kind of outside service.
5         Q.    Where was the code maintained?
6         A.    On our servers.
7         Q.    Where were the servers operated
8    from?
9         A.    From -- They were -- IWEB in
10   Canada.
11        Q.    I-W --
12        I-W-E-B in Canada.
13        Q.    Where in Canada is IWEB server
14   cluster?
15        A.    Also Amazon.  We also use a lot of
16   their services -- Web services.
17        Q.    You're talking about Amazon.com?
18        A.    Amazon Web services, yeah, which
19   is Amazon.com.
20        Q.    And that's in Washington.
21   Correct?
22        A.    Seattle, yes, I believe.
23        Q.    Did you have -- Did you have
24   service agreements with both IWEB and Amazon.com?
25        A.    Yes.

1         Q.    Where are those?  Where would you
2    maintain copies of those service agreements?
3         A.    At this stage, it would be in
4    my -- in my E mailbox.
5         Q.    Are you still maintaining code on
6    the servers in either IWEB or Amazon.com?
7         A.    At this point, I -- I've made
8    copies of and maintained it on a small place,
9    storage space.
10        Q.    Is that your own personal laptop?
11        A.    No.  It's on a server.
12        Q.    Okay.  Where is the server
13   located?
14        A.    I don't know the location.  It's
15   in the United States company I believe and --
16        Q.    Do you have a service agreement
17   with --
18        A.    It's a standard online agreement.
19   We pay a credit card every month.
20        Q.    Okay.  Would you be able to,
21   obtain a copy of that agreement?
22        A.    It's a terms and conditions on the
23   site that you agree when you sign up, but they give
24   a credit card, yes.
25        Q.    Okay.  Do you have any

1    documentation reflecting where the code is stored?
2         A.    I have the E mails that the --
3    interaction with the site.  There's no physical
4    documentation.
5         Q.    What e-mail accounts do you use to
6    maintain the business of power.com?
7         A.    Right now, I use
8    steve@stevevachani.com.
9         Q.    Okay.  Do you ever use any other
10   e-mail accounts like Gmail?
11        A.    Vachani@yahoo.com.  Those are my
12   primary two accounts and they both are in the same
13   -- same mailbox on Yahoo.
14        Q.    Are the credit card payments to
15   this online storage service made out of your own
16   personal accounts, personal finances?
17        A.    They're under a hundred dollars
18   right now and they're put on credit cards.
19        Q.    How long did Power maintain its
20   code on servers associated with IWEB's cluster?
21        A.    It was up until about four months
22   ago.
23        Q.    Okay.  And how long did Power
24   employ Amazon.com for hosting of its Web services?
25        A.    I believe for -- I don't -- I

1    cannot answer exactly, but my estimate is that over
2    one year.  One to two years.
3         Q.    What were those years?
4         A.    This would have been 2009, 2010,
5    if I'm not mistaken and -- and 2008 -- 2008, '9,
6    '10, so approximately three years.
7         Q.    In the case of IWEB, when did you
8    start using them?
9         A.    IWEB we started using them -- I
10   cannot recollect exactly but if you give me second
11   I can figure out the date.  It was in 2007 that we
12   started working with IWEB.  I don't know the exact
13   date.
14        Q.    So you had -- In the period 2008
15   to 2010, you had co-hosting by both Amazon.com and
16   IWEB simultaneously?
17        A.    Correct.
18        Q.    Okay.  And how long have you been
19   using this online company you can't recall its name
20   that you are currently having --
21        A.    Three months.  It's a small --
22   small company.  I just chose in a day just to store
23   all our information.
24        Q.    Did you just simply transfer the
25   code from IWEB to the small company?

Page 40

1         A.    That's correct.  It was much more
2    cost effective.
3         Q.    Before IWEB, was the code hosted
4    on any other servers in either Brazil or somewhere
5    else?
6         A.    There were smaller -- smaller
7    server companies and we moved to IWEB when we
8    were -- as we started to grow.
9         Q.    You don't recall the names of the
10   smaller servers that you were using back then?
11        A.    I don't recall the names --
12        MR. BURSOR:  Steve, let him finish
13   the question.  The court reporter cannot -- she
14   can't get.  Could you just read back the question,
15   please?  And when she's finishes reading, just
16   pause and answer the question.
17        (Whereupon, the last question is
18   read back by the reporter.)
19        A.    That's correct.  They were small
20   companies that were primarily -- that -- that were
21   used on a regular basis as we were growing.
22        Q.    Was Mr. Santos responsible for
23   choosing the server companies that you were using?
24        A.    Him and team members of his.
25        MR. BURSOR:  Steve.  You've got to

Page 41

1    slow down.
2         A.    Okay.  It was team members.
3    Either Eric or members of his team.
4         Q.    What language was used to write
5    the code for Power.com in its original form?
6         A.    C Sharp.
7         Q.    Did it remain C Sharp throughout
8    its history?
9         A.    That's correct.
10        Q.    Is any portion of code written in
11   HTML?
12        A.    Yes.
13        Q.    Any portion written in PHP?
14        A.    I don't believe so.
15        Q.    What portion is written in HTML?
16        A.    Correct.  I believe the writing is
17   in PHP scripts, but I'm not sure.
18        Q.    Is C Sharp used to be the primary
19   code to write the code that hosts the Web site
20   www.power.com?
21        A.    The core technology was built with
22   C Sharp, a Microsoft platform.
23        Q.    And what was written in HTML?
24        A.    I believe scripts.  A lot of HTML
25   scripts were written in HTML, and of course, Web

Page 42

1    sites that supported the core product.
2         Q.    By that, you're talking about URLs
3    that would be --
4         A.    Yeah.  Power.com.
5         MR. BURSOR:  Steve, please let him
6    finish the question.
7         THE WITNESS:  Okay.
8         MR. BURSOR:  Slow down.
9         Q.    Do you know what I meant by "URL"?
10        A.    Yes.
11        Q.    Did you have -- Did a user have to
12   register with power.com to employ its services?
13        A.    Yes.
14        Q.    Okay.  In registering with
15   power.com, the registration information was
16   maintained in a database.  Correct?
17        A.    Yes.
18        Q.    What language was the database
19   written in?
20        A.    Microsoft SQL.  It's the Microsoft
21   SQL.
22        Q.    So C Sharp would be the written on
23   to the Microsoft platform.  Correct?
24        A.    That's correct.
25        Q.    But the database, because you were

Page 43

**Page 44**

1  written on a MS platform, had to use MySQL?
2      A.    It wasn't -- It wasn't necessary,
3  but we used Microsoft database I believe as our
4  primary database.  If there were changes were made,
5  I cannot a hundred percent confirm that because I
6  wasn't involved on every level of that on a
7  day-to-day basis.
8      Q.    Is power.com still operated off of
9  the MS platform?
10     A.    Yes.  We did not change that
11 platform.
12     Q.    Okay.  And by "MS" you understand
13 I was referring to Microsoft?
14     A.    Microsoft, yes.
15     Q.    Is the database still maintained
16 through MySQL?
17     A.    I think it's MS SQL if I'm not
18 mistaken.
19     Q.    Okay.
20     A.    MySQL is a open source.  So it's
21 Microsoft SQL.
22     Q.    Okay.
23     A.    Just to be clear, there may --
24 there may have been use of both MySQL or MS SQ on
25 different applications, but I cannot say exactly.

**Page 45**

1      Q.    But you're confident that one of
2  the two, the open source MySQL or Microsoft
3  platform MS SQL, was used for database functions
4  with respect to the use of the power.com Web site?
5      A.    That is correct, yes.
6      Q.    And one of those two platforms
7  would be where you would find the data reflecting
8  registration information.
9      A.    Yes.
10     Q.    Are those also the two databases
11 that would reflect passwords that were used --
12     MR. COOPER:  Strike that.
13     Q.    First of all, does it require a
14 password for a registered user to enter the
15 power.com Web site?
16     MR. BURSOR:  Could you just read
17 back that question, please.
18     (Whereupon, the last question is
19 read back by the reporter.)
20     A.    Yes.
21     Q.    Where would the registration --
22 Where would the password information for a
23 registered user of the power.com Web site be
24 maintained in a data base?
25     A.    Those would be stored securely in

**Page 46**

1  our -- our data base.
2      Q.    Your database being either the MS
3  SQL or MySQL database?
4      A.    Yes.
5      Q.    Was that database maintained on
6  the same host servers as the www.power.com Web
7  site?
8      A.    I -- They were maintained at IWEB
9  or Amazon, but how they were partitioned and
10 distributed they utilized, you know, standard
11 processes that companies use to store data securely
12 and separate them.  You know, we employed a whole
13 range of similar best and issue practices in
14 storing that data, but they were with IWEB and
15 Amazon.
16     Q.    And that they're currently with
17 this online --
18     A.    Yeah, it's currently in a -- in a
19 backup format with this online company.
20     Q.    Can anybody still register with
21 power.com?
22     A.    No.  The site is not online right
23 now.
24     Q.    Okay.  How long has it not been
25 online?

**Page 47**

1      A.    It's been three months.
2      Q.    Approximately May?
3      A.    Yeah, the exact date, but it was
4  three or four months.  I believe it was actually
5  April when it was off, taken offline.
6      Q.    Was there any business reason why
7  it was taken offline?
8      A.    Yes.  Because -- We just took it
9  off because it was not financially -- Financially,
10 at this stage we didn't have the resources to
11 maintain it.
12     Q.    You just used the word "we."  Who
13 are you referring to besides yourself?
14     A.    I took the -- the server company.
15 I could not maintain the cost of the servers.
16     Q.    But three to four months ago you
17 were still the only person operating the site?
18     A.    That's correct.
19     Q.    Does Mr. Santos have any
20 interaction with the site anymore?
21     A.    He does not.  I occasionally will
22 call him for advice on things that I cannot answer.
23 He's a resource for me if I have question that I
24 can't solve on my own.
25     Q.    Power Ventures is a private.

1   Correct?

2       A.      That's correct.

3       Q.      Are you an investor in -- Do you

4   have any shares in Power --

5       A.      Yeah.  I'm the largest

6   shareholder.

7       Q.      Okay.  Does Mr. Santos still have

8   any shares -- or was Mr. Santos ever an investor in

9   Power Ventures?

10      A.      He was not an investor.  He was an

11  employee.

12      Q.      Who are the other investors in --

13  current investors in power.com or Power Ventures.

14  I'm sorry.

15      A.      The current -- You mean

16  shareholders?

17      Q.      Yes.

18      A.      Some -- Draper Fisher Jurvetson, a

19  venture capital firm in California.  It's the

20  largest and primary investor.

21      Q.      Are the remaining investors in

22  Power Ventures coming?  Do they -- Are they like

23  Draper and are venture capitalists?

24      A.      Draper was the only venture

25  capital firm.

---

1       Q.      Were any other individuals besides

2   yourself associated with the operation of the Web

3   site investors in Power Ventures?

4       A.      When you say "any individuals."

5   As I mentioned, the company employed up to a

6   hundred people at its peak.

7       Q.      Were any of those hundred people

8   also investors in --

9       A.      Investors.  I'm sorry.  The

10  employees?

11      Q.      Yes.

12      A.      There were.  There were individual

13  investors besides Draper Fisher but there was no --

14  employees were not investors.

15      Q.      Okay.  Earlier you said the

16  primary asset remaining of the company is IP?

17      A.      That's correct.

18      Q.      What IP are you referring to?

19      A.      Referring to the core power --

20  Power technology.

21      Q.      Would that be the code?

22      A.      That would be the code and all the

23  components of the code.

24      Q.      And when you refer to "components"

25  what do you mean?

---

1       A.      The PowerScript as we refer to it

2   is our core language for developing the site and

3   our Power browser.

4       Q.      What is the Power browser?

5       A.      That's a browser that users use to

6   browse the Internet.  It's a Web-based browser.

7   When they log into Power, they can browse -- they

8   can browse through sites.

9       Q.      It's a browser in the same

10  sense that, for instance, Netscape or --

11      A.      Correct.  But it's Web-based.

12  It's similar to that.  It's a browser that it can

13  use to browse sites.  Browse, like, different sites

14  including Facebook.

15      Q.      What language is that browser in?

16      A.      It was written in C Sharp.

17      Q.      What language is Power script

18  written in?

19      A.      C Sharp.  Just to be clear, there

20  obviously may be other technical languages and

21  decisions used that I was not aware of, but that's

22  the primary, core language.

23      Q.      Okay.  Are there any other assets

24  that you consider part of the IP besides the core

25  source code, Power script and Power browser?

---

1       A.      I can't recall all the assets that

2   the company may have offhand, but those are the

3   ones that come to mind, you know, right off bat --

4   off the top of my head.  Obviously, the company was

5   growing.  It was, at its peak, quite large.  I

6   mean, large meaning a hundred people and there were

7   many projects taking place within the company, and

8   so I -- but those are the ones -- those are the

9   primary ones that I recall.

10      Q.      Was there a period of time when

11  power.com was beta testing?

12      A.      What would you refer as beta

13  testing because I know that's a very broad term.

14  People can be in beta testing for a long time.

15      Q.      Was there a period of time when

16  power.com was made available only to individuals on

17  a permission-base so it could be tested for bugs?

18      A.      I think it was always publicly

19  available, but it was not promoted heavily.

20      Q.      So there wasn't any period of time

21  when you had to have specific rights to access the

22  site.

23      A.      During the development stage, in

24  that 6 to 9 months, that would be -- there would

25  have been a beta period that was employed at that

1    time.  I can't recall exactly the dates on that,
2    but before we publicly released it we would
3    obviously have private access internally.
4    **Q.**    **When was it publicly released?**
5    **A.**    So just -- power.com and -- and
6    PowerScript was the -- those were the two names
7    that we -- we utilized.
8    **Q.**    **Did you say "PowerScript"?**
9    **A.**    Yeah.  Well, yeah, Power --
10   power.com.
11    **Q.**    **Script.**
12    **A.**    Script is the language that we
13   used.
14    **Q.**    **That's one word.  Correct?**
15    **A.**    Yes.
16    **Q.**    **Do you know what an application**
17   **developer is?**
18    **A.**    Yes.
19    **Q.**    **All right.  Was power.com ever**
20   **made available to application developers to create**
21   **applications?**
22    We did not make -- We were
23   intending to make it available.  That was part of
24   the company's business plan, but we never reached
25   that stage.

Page 52

---

1    **Q.**    **Did it ever test application**
2   **development programming?**
3    **A.**    We -- We created applications
4   internally on -- on our system and we intended to
5   open that up to let other people build these
6   similar applications in the future but never did
7   test it.
8    **Q.**    **Where were those applications --**
9   **Where was the code for those applications compiled?**
10    **A.**    All internally.
11    **Q.**    **And so would that code also reside**
12   **on either the IWEB or Amazon.com Web during the**
13   **period it was being compiled?**
14    **A.**    Yes.
15    **Q.**    **Does that code still exist?**
16    **A.**    Yes.
17    **Q.**    **What applications were developed**
18   **internally?**
19    **A.**    So the -- the way -- Power was a
20   platform and we developed a range of value-added
21   services for users to use on their sites very
22   similar to the way that people develop applications
23   for social networks, we were -- we created a
24   platform that allowed us to create apps. on top of
25   -- to interact with different Web sites.

Page 53

---

1    **Q.**    **What are the value-added services**
2   **you just referred to?**
3    **A.**    So there were apps. -- apps. such
4   as -- I'm trying to think offhand.  Most one -- The
5   one with the browse your -- browse your different
6   sites.  We had drop-down menus that allowed you to
7   interact with -- with multiple sites simultaneously
8   so you could access your data on multiple sites at
9   the same time, so while you were on one site you
10   could access your own data on other sites.  That
11   was the core value that people used, the ability to
12   access all their sites simultaneously.
13    **Q.**    **Was that application made**
14   **available to the public at any time?**
15    **A.**    Well, all the users, every --
16   every user at power.com had access to those
17   services.
18    **Q.**    **So that particular application**
19   **existed from the beginning.**
20    **A.**    Yes.  There were a wide range of
21   services that access your data, accessing your
22   photos, accessing your personal contacts,
23   et cetera.
24    **Q.**    **Was that function maintained**
25   **through the ordinary browser or was it maintained**

Page 54

---

1   through PowerScript?
2    **A.**    Well, it takes place in the
3   browser, but these are -- the apps -- the
4   applications were programed in PowerScript.
5    **Q.**    **So --**
6    **A.**    PowerScript was a language we
7   built on top of C Sharp, so it was a C Sharp-based
8   language.
9    **Q.**    **So the C Sharp was the choice of**
10   **the programming language to maintain power.com but**
11   **the applications were built in PowerScript on top**
12   **of it also in C Sharp?**
13    **A.**    Yes.  Correct.  That was the
14   underlying language.
15    **Q.**    **Was any of that -- Was any form --**
16   **portion of PowerScript written in PHP?**
17    **A.**    I believe so.  I don't know
18   exactly the details of that but there were -- I
19   believe that were PHP scripts.
20    **Q.**    **What documentation reflects how**
21   **the -- First of all, going back, what documentation**
22   **exists that reflects how the power.com Web site**
23   **itself functioned?**
24    **A.**    We have documentation relating to
25   PowerScript that -- that discusses its whole

Page 55

1  functionality and capabilities.  That was
2  continually updated and growing as the -- as the
3  product grew.
4      Q.    Well, let's start -- I'll get to
5  PowerScript, but --
6      A.    Okay.
7      Q.    -- my understanding is you said
8  that the Web site itself as a platform was built
9  on, C -- written in C Sharp as power.com.
10      A.    Well, the Web site was HTML.  HTML
11  and PHP and C Sharp was the core technology for the
12  PowerScript language and the Power browser which
13  were our core, kind of, IP components.  Naturally,
14  in -- in products there are a range of Web-based
15  products that interact with the site and those
16  were -- those typically written in HTML, PHP
17  and other more, I guess, higher level languages.
18      Q.    You understand what Web
19  programming is.  Correct?
20      A.    Yes.
21      Q.    All right.  So the Web site are
22  www.power.com as many Web sites are written in
23  HTML.  Correct?
24      A.    Yes.
25      Q.    All right.  And that's because

1  HTML is just a popular language for creating a Web
2  site itself.  Correct?
3      A.    Yes.  And of course, Java scripts
4  and other types of -- Java -- Java scripts and
5  flash and other types of languages used to support
6  with the HTML.
7      Q.    What documentation reflects the
8  technical details associated with the www.power.com
9  Web site and the HTML coding on which it is based?
10      MR. BURSOR:  Could you read that
11  back?
12      (Whereupon, the last question is
13  read back by the reporter.)
14      A.    So like many companies, we have
15  standard product development documents
16  specifications and requirements, and so there was a
17  standard product development process utilized to
18  create new products.  So there would -- the would
19  have been on going interactions referring to a
20  product development, a product requirements
21  documents.
22      Q.    Do you know what a software
23  development kit is?
24      A.    Yes.
25      Q.    Did power.com ever develop

1  software development kits?
2      A.    We were developing it.  We never
3  released it publicly, but that was part of our big
4  intention at the company was to open up our -- our
5  platform which was the real potential of the
6  company.
7      Q.    Okay.  Where -- Are there any
8  copies of these software development kits still in
9  existence?
10      A.    We never released any -- any
11  software development kits to developers.
12      Q.    Did you release them internally?
13      A.    We have PowerScript documents
14  internally that we do have available.  Correct.
15      Q.    Do you have any other documents
16  that reflect the functionality of, for instance,
17  the Web site itself?
18      A.    Yeah.  There would -- There would
19  be power -- PowerScript was an ongoing evolution,
20  and it was continual updated to a kind of a core --
21  a core manual and documents on how to build --
22  build and write and develop in PowerScript.  There
23  would also be product specification or requirements
24  documents that may -- that may have existed in some
25  products.

1      Q.    Where are -- would that
2  documentation exist today?
3      A.    That would be in my E mailbox.
4      Q.    Would it exist where else?
5      A.    It's possible.  The other -- The
6  other people like Eric who I interacted with would
7  also have it, but I can't -- I don't know if he has
8  maintained -- but I have -- Everything I have -- I
9  have everything in my E mailbox.
10      Q.    All right.  So you have an E
11  mailbox that maintains all the technical
12  documentation that was ever generated by the
13  company?
14      A.    I can't say if everything was in
15  there, but anything that I was copied on typically
16  was there.  And second, if it's not there, it would
17  be in the -- in this backup where I installed
18  stuff.  We copied everything on the servers.
19      Q.    When you say you copied everything
20  on to the servers --
21      MR. COOPER:  Strike that.
22      Q.    At any time during the creation or
23  during the operation of power.com, did it maintain
24  any sort of data files that included, for instance,
25  tech files describing the technical features of the --

1    A.    Those would be requirements
2  documents, our specification documents and the
3  answer is yes.
4    Q.    And are those maintained in backup
5  form on the server that you referenced earlier?
6    A.    I -- I believe they were either
7  maintained on the servers or they're maintained in
8  my -- in my E mailbox.
9    Q.    Were they indexed at the company?
10   A.    I have -- would have to refer to
11  Eric to find out exactly how those were managed.
12       THE VIDEOGRAPHER:  10:52, off the
13  record.  End of Tape 1.
14       (Whereupon, a recess is taken.)
15       THE VIDEOGRAPHER:  11:01 on the
16  record.  Beginning of Tape 2.
17   Q.    Mr. Vachani, before the break I
18  asked if any of the software development
19  documentation that was in text form as opposed to
20  code form was maintained in the indexed form while
21  at power.com.  Do you recall that question?
22   A.    Yes.
23   Q.    And you indicated you weren't
24  certain one way or the other as I understood?
25   A.    I think what I said was there were

Page 60

1  two forms, either it was done through E mail or
2  there would be text documents that would -- that
3  would -- If in some products there would be -- that
4  required more definition, there would be more
5  formal requirement documents that would be in the
6  form of a text form.  That's correct.
7    Q.    All right.  So some of the
8  development and functionality was described in
9  internal E mails amongst the employees?
10   A.    Correct.
11   Q.    Is that -- Are those E mails
12  indexed anywhere?
13   A.    Typically when -- during the
14  declarations, I went through every E mail that
15  related to Facebook and I believe all those were
16  provided to -- in the declarations, provided to our
17  lawyer.
18   Q.    I understand we'll get to the
19  product issues, but all I'm asking about are all
20  the E mails that were ever generated describing the
21  functionality of PowerScript, are they maintained
22  anywhere anymore?
23   A.    They are maintained I would -- in
24  my E mailbox.
25   Q.    Would -- What E mail service was

Page 61

1  used internally at power.com for -- for discussions
2  amongst employees?
3    A.    It was -- Well, our -- on Power
4  domain but it would be so it would on -- on the
5  servers.
6    Q.    For instance, did you use Outlook?
7    A.    Yes.  Some people used Outlook,
8  some people used different services, but Outlook
9  was the primary -- primary service.  Each
10  individual had their own E mail platform.  For
11  example, I used Web-based E mail where I received
12  everything in my Yahoo E mail.
13   Q.    Were the E mails sent intra--
14  intra, I-N-T-R-A company so that they only went to
15  other employees in the company?
16   A.    They would go to -- It was not --
17  It would go to whoever was copied on the E mail.
18   Q.    Were those E mails backed up
19  anywhere?
20   A.    I believe they were backed up on
21  our servers.
22   Q.    Okay.  And those are the servers
23  that were hosted by IWEB and Amazon.com.
24   A.    That's correct.
25   Q.    And is that backup information

Page 62

1  still available to you through your site that
2  you're currently hosting on a monthly basis?
3    A.    Everything was instructed to be
4  copied there, and so I'm assuming that it's all
5  there.  I haven't looked at it individually
6  personally, but I made a backup of everything.
7    Q.    Now, you also said some
8  documentation relating to coding was maintained in
9  text form?
10   A.    Yes.  Some products -- Some
11  products -- Text form meaning an electronic file.
12  If -- If a product required -- Usually, in the
13  early stages of a -- of a product, later on, as it
14  evolved, a lot was done informally by E mails.
15   Q.    And those text files are they also
16  still available to you?
17   A.    They would be in my E mailbox if
18  they -- if they're available.
19       MR. COOPER:  I can do this one of
20  two ways.  The Northern District typically --
21  there's a rule that says we're to try and do depo
22  exhibits consecutively.  I believe the last one
23  ended on six.  We can start at seven.  However, if
24  there's any concern about confusion with that, I
25  often just start, like, say at 100 so we'd have

Page 63

1   Exhibit 1 through 6, and then the plaintiff starts
2   at 100 so there's not a fear of overlap, whichever
3   you prefer.
4          MR. BURSOR:  However you want to
5   do it.
6          MR. COOPER:  Why don't we start at
7   100 because that gives greater flexibility.
8          MR. BURSOR:  Okay.
9          (Whereupon, Exhibit 100 is marked
10  for identification by the reporter.)
11     Q.   Mr. Vachani, I placed in front of
12  you what's been marked as Exhibit -- depo Exhibit
13  100 --
14     A.   Correct.
15     Q.   -- which is --
16         MR. BURSOR:  Hold on a second.
17  Please let him finish the question.  You're
18  constantly interrupting him.  You have to let him
19  finish the question.  There has to be a pause,
20  think about what the question is, and then answer
21  the question.
22     Q.   I put in front of you a document
23  titled "PowerScript Documentation" and if you see
24  in the lower right-hand corner, there is what is
25  known as a Bates number that's Power 2011.02.03.4.

1   Do you see that?
2     A.   Yes.
3     Q.   Do you know what a Bates number
4  is?
5     A.   I do not.
6     Q.   Okay.  It's a legal term.  And I'm
7  just -- You may hear me from time to time refer to
8  the Bates number.  Always look down in the
9  right-hand corner.  It will have the number and
10  it's typically the page that I refer to in the
11  Bates range.  All right?  So you see this one
12  begins with a Bates number of 4, the final number
13  is 4.
14     A.   Yes.
15     Q.   And if you go to the last page you
16  see it goes through 22?
17     A.   Yes I see that.
18     Q.   And it's titled "PowerScript
19  Documentation, Document Version 2.1."
20     A.   Yes.
21     Q.   All right.  Have you seen this
22  document before today?
23     A.   Yes.
24     Q.   All right.  Is this one of the
25  types of documents you were referring to that were

1   text-based that describe code functions of any of
2   the code used to operate the power.com Web site?
3     A.   Yes.
4     Q.   If you turn to the second page,
5  you'll see a revision history?
6     A.   Yes.
7     Q.   And you see there are three
8  versions that are listed?
9     A.   Yes.
10     Q.   With descriptions of the changes
11  that were made?
12     A.   Yes.
13     Q.   Do you know who prepared this
14  document?
15     A.   This was a collective document of
16  different -- different developers in the company.
17     Q.   Okay.  Were you involved with the
18  preparation of this document?
19     A.   I didn't personally write it, but
20  I -- I reviewed it.  I don't know every single
21  thing that's in here.
22         MR. BURSOR:  Just -- I'm going to
23  note for the record that this document is
24  designated highly confidential attorneys' eyes
25  only, and I'm going to -- Since we're discussing

1   this document in the deposition, I'm going to
2   designate the transcript at that same level of
3   confidentiality under the protective order.
4         MR. COOPER:  That's fine.
5     Q.   Do you see on Page -- the second
6  page it says there was a version 1.0 on April 25th,
7  2007, that says, "Document created"?
8     A.   On the first page?
9     Q.   Yes.
10     A.   Yes.
11     Q.   Do you know if that -- if copies
12  of that version 1.0 still exist?
13     A.   I could -- I'm pretty sure, yes, I
14  could -- If I could through my E mail, I could
15  locate that.
16     Q.   All right.  And below it is
17  another version 2.0 created on April 29, 2007,
18  which it says, "Layout adjustment and new commands
19  added"?
20     A.   Yes.
21     Q.   Do you know if a copy of version
22  2.0 still exists?
23     A.   Yes.  It would exist.
24     Q.   And would you be able to recover
25  it?

1      A.      Yes.
2      Q.      And then --
3      A.      I -- I believe -- I don't see any
4  reason I wouldn't be able to recover.
5      Q.      And then the last version given is
6  2.1 which is May 31st, 2007, and it indicates
7  document modifications.  Correct?
8      A.      Yes.
9      Q.      And that's this version, the
10  version in front of you is a version 2.1.  Correct?
11      A.      Correct.
12      Q.      Do you know if there were later
13  versions?
14      A.      I don't know if there were.  I --
15  I could -- I could check.
16          MR. BURSOR:  You've answered the
17  question.
18      Q.      Would you be able to obtain copies
19  of later version if they exist?
20      A.      Yes.
21      Q.      Did you search for later versions?
22      A.      Yes.
23      Q.      Were you available to locate any?
24      A.      This is the most recent that I
25  located in the text format.

Page 68

1  itself?
2      A.      They would be reflected in the
3  software.  That's correct.
4      Q.      Earlier I was asking if you had
5  ever heard of like source save or a functionality
6  that covers the versions of codes.  Do you recall
7  my asking?
8      A.      Yes.
9      Q.      Would -- Would -- You weren't sure
10  if that type of security --
11      A.      I don't know if -- what -- what
12  exactly what was used internally.  I wasn't
13  involved in that level --
14      Q.      Okay.
15      A.      -- of management.
16      Q.      But to the best of your knowledge
17  do you have all versions of the power source code
18  as -- PowerScript code as it was actually --
19      A.      To the best of my knowledge, yes.
20          (Whereupon, Exhibit 101 is marked
21  for identification by the reporter.)
22      Q.      Mr. Vachani, I put in front of you
23  as Exhibit 101 a document that begins with the
24  Bates number 23 and goes through Bates number 67.
25  Do you see this document?

Page 70

1      Q.      Did you personally produce this
2  document in this dep. -- in this litigation?
3      A.      I personally produced it, yeah.
4      Q.      To your knowledge, was PowerScript
5  ever revised in functionality after April 31st,
6  2007?
7      A.      They would be ongoing, you know,
8  adjustments and changes.  Not of all that are
9  formally documented.
10      Q.      And the change that occurred after
11  April -- after May 31st, 2007, based on your
12  earlier statements would be reflected in an E mail
13  conversation -- or an E mail --
14      A.      If there were -- There's two --
15  There's two levels.  There's an E mail or there
16  might be just bug fixes and adjustments that are
17  not, you know, that are not even, you know,
18  noticeable -- not even made minor changes.
19      Q.      Do you know if any changes
20  occurred to PowerScript between May 31st, 2007, and
21  December 1st, 2008?
22      A.      I would assume that there were,
23  yes.
24      Q.      And were some of those -- Would
25  those changes also be reflected in the software

Page 69

1      A.      Yes, I do.
2      Q.      Is this a document you've seen
3  before today?
4      A.      Yes, I have.
5      Q.      And is this a document you
6  produced in this litigation personally?
7      A.      Yes.  I did.
8      Q.      Is this another example of
9  technical documentation relating to PowerScript
10  that was in text form that you were able to locate
11  on the backup server or on the servers that are
12  currently hosting the site?
13      A.      Yes.  I located this from -- from
14  my E mail.  This is a training document.  Not a --
15  a programming documentation.
16      Q.      Okay.
17      A.      So it builds on top of this.
18      Q.      So the printing document doesn't
19  actually provide any information about the software
20  itself in terms of how it actually --
21      A.      That's in --
22          MR. BURSOR:  Object to form.
23  Object to form.
24      Q.      Does the PowerScript training
25  reflect how PowerScript was actually implemented

Page 71

**Page 72**

1 by, the training document in front of you how --
2 implement -- reflect how PowerScript was
3 implemented on the power.com Web site?
4   A.   Yes.  This is -- This was done to
5 train programmers inside the company on how to use
6 PowerScript to write Power apps.
7   Q.   What are Power apps?
8   A.   Those were earlier the value-added
9 services that users had to interact with their
10 sites.
11   Q.   Do the training materials actually
12 show how the power apps. functioned that were
13 actually developed?
14   A.   They -- Basically, they provide on
15 how to -- on how to create them, the functions and
16 the capabilities, what's possible.
17   Q.   Right.  Earlier you said
18 PowerScript is written in C Sharp.  Correct?
19   A.   C Sharp was the core -- the core
20 -- the core language.
21   Q.   And parts of it may have been --
22   A.   In XML or HTML I think maybe
23 that --
24   Q.   -- in other code languages like
25 PHP, XML, or HTML?

**Page 73**

1     MR. BURSOR:  Please read back the
2 full question.
3       (Whereupon, the last question is
4 read back by the reporter.)
5     MR. BURSOR:  Could you -- Part --
6 That's only half the question now.  We've got to
7 get the whole question read.  Steve, you've got to
8 let him finish the questions.
9     MR. COOPER:  Actually, reading it
10 that is the question.
11     MR. BURSOR:  Could you just read
12 the question?
13       (Whereupon, the last question is
14 read back by the reporter.)
15     THE WITNESS:  And also --
16     MR. BURSOR:  Could you just ask
17 the question again?
18   Q.   You say that C Sharp was the code
19 language for PowerScript?
20   A.   I said C Sharp, XML, HTML, Java
21 JavaScript were all used -- utilized.  The extent
22 of how they were utilized and which is more or
23 less, I can't specifically tell you.
24   Q.   Does the PowerScript training
25 documentation show me the -- the applications

**Page 74**

1 themselves that were actually employed by --
2   A.   I have not looked at this document
3 in awhile.
4   Q.   Please, take a moment and look
5 through it and tell me if you believe -- I'm
6 talking about the training manual first.
7   A.   Sure.
8   Q.   And you can take as much time as
9 is necessary.
10   A.   Okay.
11     MR. BURSOR:  And the question is:
12 Does it reflect what apps. were developed?
13     MR. COOPER:  Actually developed
14 using PowerScript by power.com.
15     MR. BURSOR:  So the question is:
16 What apps. -- The question is:  Does this document
17 reflect what apps. were developed using the
18 PowerScript?
19     MR. COOPER:  By power.com, yes.
20     MR. BURSOR:  I think that question
21 can be answered yes or no in the first instance.
22 Am I right about that?
23     MR. COOPER:  Yes.
24   A.   Okay.  I've reviewed it.
25     MR. BURSOR:  Do you have the

**Page 75**

1 question in mind.
2     THE WITNESS:  Can you repeat the
3 question?
4     MR. COOPER:  Can you read it back?
5       (Whereupon, the last question is
6 read back by the reporter.)
7   A.   This reflects the programming
8 foundation that were used to create these apps.
9 That's correct.
10   Q.   Creates the programming
11 foundation, it doesn't reflect any particular
12 application that actually was developed.
13   A.   Well, the actual content of a
14 specific app. just like it was built to do a
15 specific purpose but this is -- the programming
16 functionality was built on this PowerScript.
17   Q.   Would you agree this document
18 doesn't even tell the programmer that -- that the
19 PowerScript is operated through C Sharp?
20   A.   It doesn't -- It doesn't tell.
21 That's a low level language.  It's not -- not
22 necessarily we created -- that's one level lower.
23   Q.   So the only way I would know how
24 the PowerScript was actually implemented by
25 power.com would be to look at the code itself.

1    Correct?

2        A.    Actually, this -- this is pretty

3    clear on what's possible.  I don't, honestly don't

4    think that the -- the core level is like -- it's

5    one level below.  This tells exactly how you can

6    apply any developer who is creating any application

7    for -- that's interacting with the users is using

8    this.

9        Q.    When you say "this tells you how

10   any developer can use" what basis do you say that

11   based on your own programming experience?

12           MR. BURSOR:  Slow down.  Just let

13   him finish the question.  Please read the question

14   back.

15           (Whereupon, the last question is

16   read back by the reporter.)

17           MR. BURSOR:  Object to form.  You

18   can answer.

19       A.    Okay.  So what I know is that all

20   -- all of our developers who were creating Power

21   apps.  Power apps. are these functionalities or

22   features that -- the user interacts and that

23   involve everything that any user may have done

24   where this was the primary manual and this is --

25   this is -- what they use to learn PowerScript and

Page 76

1    "Get"?

2        A.    That's correct.

3        Q.    Do you know what a Get function is

4    in HTML?

5        A.    Yes.  I'm not a -- I wouldn't say

6    I know every extent of it, but I know it's getting

7    something from a calling something.

8        Q.    Is one of the functions that Get

9    is, is to obtain data from another URL?

10       A.    From another URL?  Yeah.  If --

11   Get -- Get information from a user's account on

12   another site.

13       Q.    And in the context that's being

14   shown on Page 40, an exemplary rule action of read

15   is directed toward the Web site www.orkut.com.  Do

16   you see that?

17       A.    Correct.

18       Q.    That is an exemplary function of

19   how PowerScript can be used to employ a Get command

20   to obtain data from the Web site www.orkut.com.

21   Correct?

22       A.    This is one function.

23       Q.    Isn't it true that Get commands

24   have many forms of -- or --

25           MR. COOPER:  Strike that.

Page 78

1    the language on what it can do on whatever that may

2    be -- whatever those apps.  May be.

3        Q.    All right.  This document does not

4    say whatever those apps. are, does it?

5        A.    This document doesn't say those

6    apps. but the code would not say what the apps. --

7    apps. -- Apps. are at the creativity of the

8    developer -- of the developer.  In this case, the

9    developer were our programmers creating apps. using

10   PowerScript.  Just to be clear, in any programming

11   language there are many layers you can go down.

12   Microsoft created a language which then other

13   people developed on top of it.  We don't need to go

14   and get Microsoft's source code to know, you know,

15   what -- what we can do you know with -- with -- the

16   -- the end tools.  They provide a training document

17   or other types of manuals on how to use their

18   language and so I believe that that lower level is

19   completely -- you know, it's not necessary to know

20   how to create a power app.

21       Q.    Go to Page 40.

22       A.    Sure.

23           MR. BURSOR:  Bates Number 40.

24       Q.    Yeah.  Bates Number 40.  Do you

25   see that it has a discussion of a function called

Page 77

1        Q.    Isn't it true can you use a Get

2    command to obtain many forms of data from another

3    URL?

4        A.    You can get stuff that's publicly

5    available or that a user authorizes -- access into

6    their account.  There's only two ways that I know.

7        Q.    All right.  And isn't it true this

8    document only tells you that you can use a Get

9    command.  It does not show you how Get commands

10   were actually implemented by PowerScript?

11       A.    "How they were implemented,"

12   meaning can you clarify that?

13       Q.    How Get commands actually were

14   used in applications to obtain data from other Web

15   sites.

16       A.    I'm not sure I understand.  I

17   mean, if -- it's -- This document clarifies the

18   ways that -- I mean, I just read it through it

19   briefly again.  Ways that users will -- I'm sorry.

20   -- developers can access and get those documents,

21   how it -- how it actually gets -- Actually, it does

22   describe, I believe, in the beginning here.  Is

23   that -- We're basically -- It's -- It's based on

24   rules and variables and the on the second -- on

25   Page 26 it -- I mean, it -- it describes the

Page 79

22 (Pages 76 to 79)

1    process that on -- how we -- how we access the

2    sites.  Obviously, I -- I don't know -- I don't

3    know what you're trying to imply.  I don't

4    understand the question completely.  I apologize.

5       Q.    If you go to Page -- the page I

6    was just showing you --

7       A.    Yup.

8       Q.    The Get command ends with an ID

9    number in the parameter directed to Orkut.  Do you

10    see that?

11       A.    Correct.

12       Q.    And it's followed by a rule

13    correct?

14       A.    Yes.

15       Q.    The ID number would conform to a

16    user ID associated with somebody at the orkut.com

17    Web site.  Correct?

18       A.    That's correct.

19       Q.    And the rule would specify a rule

20    inside PowerScript that was employed to use that ID

21    somehow within the PowerScript.  Correct?

22       A.    Yes.

23       Q.    And that rule could be any number

24    of rules that were developed by the application

25    developer.  Correct?

Page 80

---

1       A.    Typically, the Get commands are

2    very specific.  They emulate something that a user

3    could already do, so it creates -- That's the core

4    of PowerScript is that anything that's being -- at

5    a basic level -- anything that a user could do, it

6    can do on behalf of the user and emulate the user.

7    That the -- I mean, everything -- everything here

8    is built around that core concept so, therefore, I

9    don't think there's any -- I don't -- I don't see

10    any -- anything that you -- you -- Maybe I -- Maybe

11    I am missing something.

12       Q.    Let me just go back.  You agree

13    that the ID number conformed to some sort of

14    identification of a specific user at orkut.com?

15       A.    That's an ID number of our user in

16    our data -- I think in our database or our users --

17    When a user registers they -- they -- their ID

18    number is -- they also authorize their ID Number

19    which we store so we know their page.

20       Q.    Okay.  Look at -- Do you know what

21    the Get command here actually is exemplary of

22    doing?

23       A.    In this -- In this specific it's

24    to go to another site and access something that has

25    been told to -- told to do.

Page 81

---

1       Q.    Correct.  And it's going to the

2    Web site Orkut.com.  Correct?

3       A.    Yes.

4       Q.    And the function Read is designed

5    to obtain information.  Correct?

6       A.    Correct publicly-available

7    information or information that a user has

8    authorized us access into their account.

9       Q.    And the UID equals sharp ID sharp

10    sign means that this is a user ID that is

11    identified already by Power.  Correct?

12       A.    Yeah, the user has given us in the

13    past they've -- when they register they authorize

14    us access to their accounts they -- which also

15    includes their ID numbers for their page of where

16    their information is stored.

17       Q.    And then the rule that follows

18    will be some function that will be directed to the

19    Orkut Web site in conjunction with that user ID.

20    Correct?

21       A.    He would say, "Get my photos from

22    my site and bring them to another site.  I would

23    like to access my photos," and then copy them to

24    another -- another location, for example.

25       Q.    Okay.  And --

Page 82

---

1       A.    That would be an example of an

2    application.

3       Q.    What I'm pointing out is while it

4    tells you that you can build a rule into this Get

5    function, it doesn't tell me what rules were

6    actually ever built by -- by power.com, does it?

7       A.    The source code wouldn't -- I

8    don't believe would tell you -- it wouldn't tell

9    you the specific applications that were built.

10       Q.    But the source code for

11    power.PowerScript, as created by the developers

12    would.  Correct?

13       A.    Created by developers you're

14    referring to outside developers or --

15       Q.    No.  I'm talking power.com

16    developers.

17       A.    I apologize.  I'm trying to make

18    sure I'm clear -- clearly understand your question.

19    But the source code is -- it's one level below this

20    Get, this Get command, but what we're doing on the

21    actual site is -- is explicitly defined in these

22    Get commands.  Then, you know, the source code for

23    how we create the Get command is what is going on

24    in C Sharp, so that's why it's one -- it's one

25    level below.  That's why it was referred to as

Page 83

---

1    Microsoft creates some kind of script language to
2    utilize the actual details -- script source code of
3    how they create those languages.  I believe less --
4    less important.  That -- That doesn't have anything
5    to do with the applications that we're actually
6    using to access the sites.  Those are, in fact --
7    are much more transparent on the front end.
8    **Q.**    **When you say "one level below,"**
9    **what do you mean by "one level below"?**
10    A.    What I mean is these Get commands
11    and this language, the PowerScript language, it's
12    built on a -- C Sharp is the programming language
13    along with other -- that we built this language on.
14    **Q.**    **When you say you "built this**
15    **language on" --**
16    A.    The script language.
17    **Q.**    **All right.  And then how was**
18    **PowerScript actually programmed itself at**
19    **power.com?**
20    A.    It was programmed utilizing --
21    Well, it was programmed in C Sharp.
22    **Q.**    **Where are those programs today?**
23    A.    Those programs are on our servers,
24    source code.
25    **Q.**    **Do those -- Do you know what**

Page 84

---

1    comments are?
2    A.    Comments.  Referring to the code?
3    **Q.**    **Yes.**
4    A.    Yeah.
5    **Q.**    **And do you know whether your**
6    **programmers ever included comments with their**
7    **PowerScript applications?**
8    A.    I would assume there were comments
9    in there.
10    **Q.**    **And you would assume that because**
11    **it's an important and common function of -- of**
12    **programming.  Correct?**
13    A.    Yes.
14    **Q.**    **And how would I know what comments**
15    **existed describing the functionality other than to**
16    **look at the code?**
17    A.    The functionality, the
18    functionality of the Get command.  In other words,
19    the -- Do you know what the Get command does, but
20    what it actually did on the sites that's
21    completely, you know, transparent.  You don't need
22    to access that -- that level below to -- I don't
23    believe -- It doesn't tell you anything about the
24    actual applications.
25    **Q.**    **When you say I don't need to know**

Page 85

---

1    **that, what -- what technical experience are you**
2    **basing that on?**
3    A.    I'm just giving you my -- my -- my
4    opinion based on -- I understand that we're -- The
5    context of this conversation is to understand how
6    we accessed sites and what was happening.  Is that
7    correct?
8    **Q.**    **Yes.**
9    A.    So what was happening, the rules,
10    the actions and definitions are designed by
11    PowerScript.  Knowing the ingredients of the -- the
12    -- A C Sharp code that created the Get command in
13    PowerScript, I don't understand how that -- that
14    changes anything on what we were doing on the -- on
15    the Facebook site or any site for that -- Orkut or
16    any other site that we're accessing.  I mean, it's
17    all written in the -- in the PowerScript code what
18    it's doing, get this photo, move this photo to
19    another site.  This is all -- all completely
20    available in the -- in the level of the -- of the
21    -- the app. level of creating these apps. we called
22    it.  We refer to anything written in PowerScript as
23    an app.
24    **Q.**    **When you say "available,"**
25    **available where?**

Page 86

---

1    A.    What?
2    **Q.**    **You just said it's all available.**
3    **Where is it available?**
4    A.    Well, this would be available in
5    the features that are on the site, so if there was
6    a -- an E mail on, a feature.  Like, where do I
7    want to put photos?  Those would be -- Those would
8    be written in a power -- in a power app. not in the
9    source code.
10    **Q.**    **All right.  But --**
11    A.    Those would be stored on our
12    servers.
13    **Q.**    **All right.  Let me ask a different**
14    **way.  The ID number that's reflected on Page 40 --**
15    A.    Yes.
16    **Q.**    **That ID would be associated with a**
17    **database entry on -- in your code.  Correct?**
18    A.    That would be a database entry
19    that was given by either the user or user providing
20    access to his account where we -- we took the URL
21    or the ID number.
22    **Q.**    **And that ID number would then be**
23    **placed in an MSQL database.  Correct?**
24    A.    That's correct.
25    **Q.**    **And that MSQL database would**

Page 87

---

24 (Pages 84 to 87)

1    interact with the PowerScript so that the
2    PowerScript and the MSL database knew which
3    registered users were having parameters directed to
4    it.  Correct?
5         A.    We would know which user.  We
6    would know which accounts they have registered
7    inside the service saying these are -- these are
8    all the accounts that want to be access.
9         Q.    So that isn't transparent from the
10   site at all, is it?
11        A.    From the site?
12        Q.    Yes.
13        A.    Well, it's transparent -- what --
14   it's transparent what URLs you are accessing.  I
15   mean, if you go -- if you go to sites, you can see
16   the URLs that are being accessed.  Obviously, you
17   cannot see the individual database.  Individual ID
18   numbers that we store in our database.
19        Q.    And nor could they know usage.
20   Correct?
21        A.    Usage of -- What do you mean by
22   "usage"?
23        Q.    The number of times a user signed
24   into your Web site.
25        A.    That would be stored in our logs.

Page 88

1    For example, when you get a photo or get something,
2    a spider can -- it can perform actions that it's
3    instructed to do on another site.
4         Q.    Right.  And the spider functions
5    are inherently only reflected in the software code.
6    Correct?
7         A.    The spider functions meaning what
8    -- what -- what the functionality is like.  Like to
9    get in the -- the thing it can do when it's on,
10   when it's on our site?
11        Q.    Yes.
12        A.    Actually, I believe most of the
13   functions are defined in -- in these documents, in
14   this PowerScript documentation.  They can be new
15   functions created.  I believe it's -- Let me just
16   review this for a second.  Yeah.  If you go through
17   the documents you'll see it refers to a lot of
18   rules and -- and possible -- and possible functions
19   that -- that we can create and how we create them.
20   Obviously, that wouldn't be in the code.  If there
21   were new functions created on top of this, it would
22   be one level above not one level below.  In other
23   words, if we created a new -- a new function or new
24   variable, so the rules set variable rule read
25   there.  We know those are -- We can create, of

Page 90

1         Q.    That's internal and not
2    transparent to the outside world.  Correct?
3         A.    That's correct.
4         Q.    Nor would --
5         MR. COOPER:  Strike.
6         Q.    You said earlier you know what --
7    you knew what an automated script was.  Correct?
8         A.    I don't know what your definition
9    is, but I -- I know what a script is -- I have my
10   definition of a script.
11        Q.    And there are many ways to code
12   automated scripts on the Web.  Isn't that true?
13        A.    Yes.  Typically, they're written
14   with script languages.
15        Q.    PowerScript could even be
16   programmed in different ways.  Correct?
17        A.    PowerScript is a script language
18   at its -- at its core.
19        Q.    Do you know what a spider is?
20        A.    Yes.  I do.
21        Q.    What is your understanding of a
22   spider?
23        A.    A spider is something that is
24   directed often by a script language to go and
25   access another site and gather -- can be to get --

Page 89

1    course, new functions, but, again, that's just --
2    that's building on top of -- on top -- in
3    PowerScript.
4         Q.    Do you know who my client is
5    Facebook.  Correct?
6         A.    Yes.  I do.
7         Q.    Did -- Did there ever come a time
8    that Power used PowerScript to access the Facebook
9    site?
10        A.    Yes.  At the instruction of our
11   users who said -- who wanted to log in to the site.
12   That's -- Because that's the -- for our browser and
13   our apps. are using the script so, yeah, that is
14   correct.
15        Q.    Okay.  When did Power first start
16   developing a script to access the Facebook site?
17        A.    I believe, if I'm not mistaken, it
18   was around in late 2007.  Let me just make sure
19   it's right -- the dates.  What was the date that
20   the -- we had the first interaction -- the legal --
21   It was December 1st, 2000 -- Do you remember the
22   date that --
23        Q.    I'm not here to answer questions.
24   I'm asking you, if you know.
25        A.    If you give me a second, I can --

Page 91

| | |
|---|---|
| 1 I can tell you because I know -- Give me one | 1 training PowerPoint presentation was ever updated |
| 2 second. | 2 after June 2007? |
| 3 THE WITNESS: Scott, do you know | 3 A. Formally, I don't -- I don't |
| 4 the date when we -- It was December 2007 when we | 4 believe it was, but I -- if there was I could -- I |
| 5 were interacting, the first interactions with | 5 could get any additions to it. |
| 6 Facebook started. | 6 Q. Do you have -- Just your own |
| 7 MR. COOPER: Let me try and | 7 recollection -- |
| 8 rephrase it a different way. | 8 A. Yeah. |
| 9 A. It was approximately about six | 9 Q. -- do you have a recollection |
| 10 months before that date. | 10 whether power started developing a PowerScript |
| 11 Q. That's exactly what I was going to | 11 application to access the Facebook Web site before |
| 12 ask. If you can recall where it was relative to | 12 or after this June 2007 date -- |
| 13 when you started -- | 13 A. It was after this. That's |
| 14 A. It was probably three -- four to | 14 correct. After this. |
| 15 six months before that -- before that date. We | 15 Q. Now going to Exhibit 100 the |
| 16 launched it -- our interaction with Facebook I | 16 PowerScript documentation I showed you earlier. |
| 17 believe it was in December 2007, if I'm not | 17 Its revision date was 5-31, 2007. Correct? |
| 18 mistaken. | 18 A. Correct. |
| 19 Q. Now, Exhibit 101 the Power | 19 Q. All right. And then given that |
| 20 training, the PowerScript training -- | 20 that's before June 2007, would it be fair to say |
| 21 A. I apologize. I'm -- Can you just | 21 that the PowerScript application also was developed |
| 22 correct the date -- | 22 after May 31st, 2007 -- |
| 23 MR. BURSOR: Hold on a second. | 23 A. Yes. It was -- |
| 24 We've got to have questions and answers and it's | 24 MR. BURSOR: Please. |
| 25 got to happen more slowly and there's got to be a | 25 Q. -- to access the Facebook site? |
| Page 92 | Page 94 |

| | |
|---|---|
| 1 pause after the question so that you can think | 1 MR. BURSOR: Please read the |
| 2 about the question and frame a responsive answer | 2 question back. You've got to wait. You've got to |
| 3 and there also has to be a pause, if I need to | 3 wait until the question is done. Just don't talk |
| 4 object -- | 4 when he's talking. Okay? Just wait for him. |
| 5 A. Okay. | 5 Q. Is it fair to say that the |
| 6 MR. BURSOR: Right now, you're | 6 application that was developed by Power using |
| 7 interrupting me. So just relax. Just relax. | 7 PowerScript to access the Facebook site was |
| 8 Listen to the questions. Pause. Then answer the | 8 developed after this particular 5-31, 2007, |
| 9 question. | 9 PowerScript documentation? |
| 10 THE WITNESS: Okay. | 10 A. Yes. It was developed using -- |
| 11 MR. BURSOR: So, sorry Monty. | 11 using PowerScript commands and functionality |
| 12 Just go ahead with the next question. | 12 defined here. |
| 13 Q. Mr. Vachani, would you look at | 13 Q. So is it fair to say there will |
| 14 Exhibit 101 again? | 14 not be any reference to Facebook in the PowerScript |
| 15 A. Sure. | 15 documentation? If you need to look at the |
| 16 Q. The PowerScript training. On the | 16 documentation -- |
| 17 first page it gives a date of June of 2007? | 17 A. Yes. That's correct. |
| 18 A. That's correct. | 18 Q. Is it also fair to say there will |
| 19 Q. This was PowerPoint was it not? | 19 be no reference to Facebook in the PowerScript |
| 20 A. This was what? | 20 training information? |
| 21 Q. This was a PowerPoint presentation | 21 A. That's correct. It's just a |
| 22 was it not? | 22 standard site. Facebook is just one of a thousand |
| 23 A. This is, yes, sir. That's | 23 sites on the Web. It's no different to us. |
| 24 correct. | 24 Q. Facebook -- So the PowerScript |
| 25 Q. Do you know if this particular | 25 application that was actually developed by Power |
| Page 93 | Page 95 |

1    using PowerScript, the precise get -- the --
2          MR. COOPER:  Strike that.  Let me
3    restate it.  It's awful.
4          Q.     PowerScript, in order to obtain
5    any information about Facebook users, would use
6    among other commands a Get command.  Correct?
7          A.     Correct.
8          Q.     All right.
9          A.     The same Get commands defined
10   here.
11         Q.     Okay.  What the parameters of what
12   was obtained using that Get command, though, would
13   only be described in the software code itself.
14   Right?
15         A.     The parameters of what they're
16   obtained is defined by saying Get photo.  I mean,
17   there are a few core things that you're accessing,
18   photos, contact -- you know, get my -- get stuff --
19   get something that's on my -- my site, and so we
20   were working with Orkut which is a competing social
21   network and we -- everything that we did on
22   Facebook is creating the same -- the same -- We use
23   the same rules and methodologies for any site that
24   we interact with, any one of many sites, Twitter,
25   hi5, and a collection of other social networks that

Page 96

1    were -- that were live on our system.  So we don't
2    refer to any of them in particular.  Orkut was the
3    most prominent one.  You'll see some examples are
4    using Orkut, but anything defined here you can just
5    replace Facebook.  It's the same -- It's the same
6    method -- We don't do anything specific for
7    Facebook, so everything provided here is -- is
8    exactly what we would use for any one of the,
9    almost ten sites that we interacted with.
10         Q.     Does Orkut have friends list?
11         A.     Yes.
12         Q.     Did it in June of 2008?
13         A.     Yes.
14         Q.     Does hi5 have friends list?
15         A.     Yes.
16         Q.     Are they called friends list?
17         A.     I don't know what they
18   specifically call them, but we would refer to them
19   as the same terminology in our system.
20         Q.     Does Orkut refer to its friends
21   list as friends?
22         A.     I don't know what they refer to
23   them as, but we -- we -- Internally, we refer to it
24   as a friends list, I think, or whatever it's in the
25   document.

Page 97

1          Q.     Does Myspace have friends list?
2          A.     They have friends list, yes.
3          Q.     Do they refer to them as friends?
4          A.     I don't know what they -- what
5    they have -- I would assume they call them friends.
6          Q.     Do you know if all the social
7    networks use the same terminology to describe the
8    content that is made available to their user?
9          A.     What terminology they use and what
10   terminology we use internally is irrelevant.  It's
11   what it's actually doing.  It's getting friends
12   list.  If they want to call it pals or something
13   else, it doesn't change our, you know, our -- what
14   we have here.  It's just a -- It's a -- It's doing
15   the same thing.
16         Q.     All right.  If you want to
17   initiate a communication through the Web site, for
18   instance, www.facebook.com, is there a function in
19   the PowerScript that permits that communication to
20   occur?
21         A.     If a user is validly logged into
22   their account with full capability and they want --
23   they want to send a message to a friend, they --
24   they can send a message to a friend just like they
25   can -- just like on Facebook sends messages to

Page 98

1    billions of friends that are instructed by the
2    users.  Facebook has been doing that for -- for a
3    long time.
4          Q.     Whose system is sending the
5    message, Facebook or Power's in that situation?
6          A.     Facebook.
7          Q.     All right.  How is Facebook
8    instructed to send the message?
9          A.     The user is instructing the
10   message to be sent.
11         Q.     How is the user instructing the
12   message to be sent when they're logged into the
13   www.power.com Web site.
14         A.     It's a browser.  Power.com is a --
15   is a -- for practical purposes, it's a browser just
16   like Explorer.  Obviously, it's a different -- It's
17   a Web page browser, so it's a browser within a
18   browser, but you -- they're -- they're logged into
19   Facebook.  They're using Facebook site.  They're on
20   the Facebook site and they're interacting with
21   Facebook just as they do on a day-to-day basis.
22   Just like if you turned on your browser and then
23   you go to Facebook, you're using the browser and
24   then you still go to Facebook.  The best way to
25   think is Power browser is the way that they're

Page 99

27 (Pages 96 to 99)

1    accessing.  It was their browser of choice in that
2    moment.
3         Q.    Is -- Is the user --
4              MR. COOPER:  Strike that.
5         Q.    When they are registered with
6    power.com, they are -- their registration ID is
7    associated with Power.  Correct?
8         A.    With Power and all of the accounts
9    that they register and provide access to that the
10   user authorizes us to access.
11        Q.    But Power recognizes the user ID
12   that Power assigns to it in its database.  Correct?
13        A.    Power has an ID and in some cases
14   it -- it uses the IDs -- Power ID is a unique ID
15   and then it accesses the accounts that the user has
16   registered.
17             MR. BURSOR:  You guys are both
18   killing the court reporter.  You're pretty
19   terrible.  Monty, you're not doing a great job
20   either.  So just -- just don't talk over each
21   other.  She's going crazy.
22        A.    Sorry.
23        Q.    Well, I'll make, on the record
24   right now, my strongest objection.  The problem
25   here is you have not given me the documents I

1              MR. COOPER:  Let's just do it in
2    10 minutes.  It will be exactly in 10 minutes.
3    I've been monitoring on my --
4              MR. BURSOR:  I'm not trying to --
5    I'm not trying to criticize anyone.  She's going
6    crazy.
7         Q.    Mr. Vachani, when a user is logged
8    into the power.com Web site, the registration ID
9    recognized by Power at that moment is the one it
10   assigns to the user.  Correct?
11        A.    It's recognized with that plus the
12   accounts that the user has registered on the
13   service.  So if they have registered and said here
14   I'm authorizing you and giving you access putting
15   in my Facebook account information, that can then
16   be accessed.  That's equivalent to on Facebook if a
17   user says, "I want to access my Yahoo account," and
18   dozens of other sites Facebook accesses where the
19   users give their user name and password, that's the
20   same -- similar methodology.
21        Q.    The ID though is logged into a
22   database where those other registration IDs exist.
23   Correct?
24        A.    The ID -- Each user has a unique
25   ID in our database.  That's correct.

1    really need to show him to ask the questions.  I'm,
2    at the break, willing to talk to you about ways we
3    might be able to meet an accomodation on that and
4    not inconvenience the witness, but I am going to
5    say a lot of the problems you are identifying have
6    come from the fact that we don't have the software.
7    And despite the witness' objections to it, it is
8    clearly necessary to ask many of the questions I
9    need to ask.
10             MR. BURSOR:  Let me just -- You
11   know, I don't agree with any of that, but whatever
12   the problem is, you know, that you perceive in
13   terms of lacking documents should not affect the
14   rate of speed that either one of you speak at, so
15   just slow that down and don't talk over each other.
16             MR. COOPER:  It does in this
17   sense.  If I had the documentation to point the
18   witness to, it would be much easier for him to
19   answer the questions simply and slowly.
20             MR. BURSOR:  Just try and slow it
21   down.  Okay?  We don't need to have a debate about
22   the documents.  Just slow it down.  And you
23   shouldn't be talking unless you're answering the
24   question so just stop with the interrupting.  And
25   is this a good time for a break or --

1         Q.    And their Facebook ID, for
2    instance, is a variable associated with the
3    power.com ID.  Correct?
4         A.    They would have given their user
5    name, their user name and password to Facebook
6    which the user has authorized and wants to store
7    with us in a secure manner.  That's correct.
8         Q.    But my question was:  In your
9    database, the users' Facebook ID will be referenced
10   as a variable associated with the user ID of the
11   power.com Web site.  Correct?
12        A.    It would be referred to -- Yes.
13   Some unique ID and then their Facebook.  Usually,
14   it's their log in user name and password.
15        Q.    And the log in information is also
16   simply a variable associated with the power.com ID
17   of that user.  Correct?
18        A.    The log in information is a
19   combination of that unique ID and the information
20   that they have uniquely shared saying this is my
21   user name and password for Facebook when they log
22   in.
23        Q.    Okay.
24        A.    So both of those pieces of
25   information.

1  Q.  So when the user logs into
2  power.com, the user ID associated with that user in
3  your database recognizes the registration
4  credentials in its own database that go to
5  Facebook.  Correct?
6      A.  That's correct.  The user said
7  this is my Facebook user name and password.  I
8  would authorize you to access that on my behalf.
9      Q.  And then you just said "access on
10 my behalf."  It's actually the power.com Web site
11 that makes the connection to Facebook.  Correct?
12     A.  Well, the user is the one -- Yeah.
13 It gives that and then accesses it.  It's very
14 similar if he's on Facebook and he says access my
15 other site, Facebook then accesses it on behalf of
16 the user at their instruction.  It's exact same,
17 you know, methodology.
18     Q.  But it is the power.com Web site
19 that is actually contacting Facebook.  Correct?
20     A.  Yes.  Well, it's the -- they're --
21 they're at Power.  They're inside power.com sites
22 so they're instructing Power to get or access
23 information.
24     Q.  Do you consider Google to be a
25 browser?

Page 104

1      A.  Google crawl or Google?
2      Q.  Google crawl would be a fine
3  example.
4      A.  Google crawl is a browser.  It's a
5  -- a -- I guess, it's a Web browser, yeah.
6      Q.  You don't need to be registered to
7  use Google crawl, do you?
8      A.  That's correct.  Although, they do
9  Firefox and Chrome encourage users to register so
10 they can provide better value and services and many
11 other users are registered.
12     Q.  But it's not required.  Correct?
13     A.  It's not required.
14     Q.  That's also true with Netscape.
15 Correct?
16     A.  That's correct.
17     Q.  And it's also true with Microsoft.
18 Correct?
19     A.  Correct, but there are other
20 browsers that do require users to register.
21 They're different services.
22     Q.  Now, when a user is logged into
23 Power and accessing the Facebook Web site it's
24 doing so as a registered user.  Correct?
25     A.  That's correct.

Page 105

1      Q.  And that registration number will
2  then be also associated with an IP address.
3  Correct?
4      A.  What do you mean "an IP address."
5  The user or --
6      Q.  Of the power.com Web site.
7      A.  Sure.  Can you repeat the
8  question?
9      Q.  A user is logged into the
10 power.com Web site.  Correct?  You understand --
11     A.  Yes.
12     Q.  At that time, because the user is
13 registered with power.com and logged into
14 power.com, it will be assigned a IP address that is
15 associated with power.com.  Correct?
16     A.  It's not assigned.  IP addresses
17 are dynamic and coming from Amazon and there's
18 thousands of them and it's not something that we
19 say -- It's a dynamic process.
20     Q.  It's a dynamic process, but it's
21 still the dynamic process will associate an IP
22 address that it recognizes the URL where the user
23 is contacting Power Facebook from?
24     A.  Each session that could be a
25 different IP address.  It doesn't -- It's not

Page 106

1  something that's consistent so it's not stored in
2  the IP address.  It's a -- That's a dynamic number,
3  of which there are billions of IPs.
4      Q.  But power.com is associated with
5  -- has a range of IP addresses associated with --
6      A.  A large amount of them.  That's
7  correct.
8      Q.  And one of those IP addresses will
9  always be reflected however the dynamic assignment
10 occurs as the address that's contacting Facebook.
11 Correct?
12     A.  That's correct.
13     Q.  And that's because the user isn't
14 contacting Facebook through its own registration
15 page but through yours.  Correct?
16     A.  Well, I guess if you log into an
17 ISP and you contact Facebook -- Most users have an
18 ISP they -- comes from a dynamic -- from an ISP
19 which is changing, so I'm not sure I understand the
20 difference but, they're logged in for different
21 contexts.  They're logged into Power.  It's not an
22 ISP but it's a service, it's a Web-based service so
23 therefore they would -- it would be seeing one of
24 the many Power -- Power IP addresses.  Does that
25 answer your question?

Page 107

29 (Pages 104 to 107)

1   Q.   Yes.
2   A.   It would see it.
3   Q.   And that IP address is assigned
4   because the user is registered at the time they log
5   in to Power.  Correct?
6   A.   What do you mean "assigned"?
7   Q.   The IP address -- The user logs
8   into power.com.  Correct?
9   A.   That's correct.
10   Q.   And because it operates at that
11   point, as you say, like a browser with registration
12   credentials the user's IP address will then reflect
13   one of the range of IP addresses associated with
14   power.com?
15   A.   So first of all, it's not -- it's
16   not always required to -- have to log in.  There
17   are some sites like in social networks like
18   Facebook require a user to log in because they need
19   to have the credentials that they've authorized to
20   log in, but if you were going to Google, for
21   example, Google doesn't require a log in to use
22   their systems, so if -- but if the Power -- When
23   the Power browsers, like Google, it wouldn't
24   require a user to be logged in in theory.
25   Q.   But I'm asking only in the context
Page 108

1   of Power contacting Facebook.
2   A.   Okay.  Yes.  They must be logged
3   in.
4   Q.   How does Power at that point
5   create a connection to Facebook?
6   A.   When -- Two ways.  Well, the user
7   has given their account information to Facebook and
8   said, "I would" -- basically authorizing access to
9   Facebook on behalf of the user and when they browse
10   to Facebook, meaning they click on the "I want to
11   go to Facebook" button, so they go to Facebook and
12   now they can -- they're -- they're utilizing
13   Facebook inside our browser.
14   Q.   But how is Power able to access
15   Facebook when the user does that?
16   A.   Power has -- Well, the Power
17   browser is accessing the site and -- and
18   PowerScripts -- PowerScripts that are written,
19   PowerScripts that are for specific functionalities
20   are accessing the site.
21   Q.   The Power browser that is
22   accessing the site is controlled by Power.
23   Correct?
24   A.   That's correct.
25   Q.   And the code is controlled by
Page 109

1   Power.  Correct?
2   A.   Those are PowerScripts that are --
3   that are being employed by the, you know, by in the
4   apps. that they're utilizing inside Power.
5   Q.   The PowerScripts are running on
6   top of the browser.
7   A.   On top of the Power browser?
8   Q.   Yes.
9   A.   They're inside the Power browser
10   so while they function together while they're
11   browsing through sites.
12   Q.   And how -- When you say "inside
13   the browser" what do you mean by "inside"?
14   A.   Inside the Power browser.  So
15   they've logged in to Power -- Power browser and
16   decided I'm going to access Facebook and other
17   sites using the Power browser.
18   Q.   And by "inside" does that mean
19   that two different sets of code are operating
20   simultaneously?
21   A.   It means that the Power -- that
22   Power browser and the PowerScript are -- are -- are
23   operating, but those are all -- every -- most of
24   the actions are built on PowerScript commands that
25   we've defined which are the types of commands you
Page 110

1   see represented in these documents.
2   Q.   So the Power browser will have --
3   The source code for the Power browser will
4   incorporate the command functions associated with
5   the PowerScript functions?
6   A.   Correct.
7   Q.   So there will be an integrated set
8   of commands set on one set of software?
9   A.   It's based in PowerScript.
10   Q.   And that will be reflected in one
11   version of source code associated with the
12   power.com Web site.  Correct?
13   A.   Yes.
14   MR. COOPER:  With that, we can
15   take the break.
16   THE VIDEOGRAPHER:  12:01, off the
17   record.  Ends of Tape 2.
18   (Whereupon, a luncheon recess is
19   taken.)
20   THE VIDEOGRAPHER:  It is 1:05 on
21   the record, beginning of Tape 3.
22   Q.   Mr. Vachani, before the break I
23   was asking questions about how a user on power.com
24   connects to Facebook.  I want to ask -- Earlier
25   this morning you indicated that the engineers who
Page 111

1    began to prepare the code to connect power.com to
2    Facebook began about six months you thought before
3    Facebook contacted you about with reservations.
4    Correct?
5         A.    That's when we basically started
6    looking at adding Facebook to the one of the sites
7    that people could integrate into the service.
8         Q.    Can you recall what software --
9    the names of the software programmers associated
10   with the development process to connect power.com
11   to Facebook?
12        A.    Well, of course, Eric was leading
13   this and it would have been Danilo or Carlos.
14        Q.    That's Eric Santos?
15        A.    Yes.
16        Q.    You think it also may have been --
17        A.    Well, it would have been Eric.
18   Eric would be the primary person. He's the -- This
19   was an important, you know, new site, so we -- he
20   was -- he was driving all the decisions for that.
21        Q.    But with -- Is it Danielle, A-L,
22   or Danielle, _I-E-L-L-E?
23        A.    Danilo, D-A-N-I-L-O.
24        Q.    Is that a man?
25        A.    Yes.

                              Page 112

1         Q.    Mr. Delgado may have also been
2    involved?
3         A.    Yes. That is Danilo Delgado and
4    then Carlos Bacelar.
5         Q.    Can you think of anybody else who
6    is involved with developing code --
7         A.    I'm sure there were other
8    engineers involved. I just -- My interaction was
9    primarily with Eric so -- Those are the two that I
10   know would have -- beyond Eric that would have been
11   involve with the code.
12        Q.    What documents were generated as
13   part of the development process?
14        A.    The documents I'm guessing. If
15   there were any, they would be -- it would either be
16   E mails that just talking about -- Actually, if I'm
17   not mistaken, in the declarations there were
18   E mails provided or relating to all the
19   conversations that took place relating to Facebook.
20   There weren't a lot because Facebook, you have to
21   understand that Facebook is just one of the many,
22   many, sites and it doesn't have -- for us the
23   features, functionality. We just looked at it and
24   used PowerScript to connect with the site, so I
25   don't think -- there wouldn't have been huge

                              Page 113

1    conversation, and I believe they were already
2    provided in the declaration. There were copies of
3    E mails specifically relating to Facebook.
4         Q.    Do you know if the E mails that
5    are with the declaration relate to the creation of
6    this --
7         A.    Yes. I believe they were relating
8    -- there was not much. Literally, there was, okay,
9    we want to do the same stuff we're doing with
10   Orkut. Do it. It's not a rocket science for --
11   for us. A new site because we already had done --
12   been doing this with so many -- almost every --
13   every other site -- We've been working with every
14   other site. Facebook was the last one that we
15   added. So it was really -- There was nothing new
16   on Facebook that didn't already exist on any of the
17   other sites that have been -- that have been
18   operating with millions of users.
19        Q.    And would the code reflect the
20   development process?
21        A.    Which code?
22        Q.    The code that is associated with
23   the application to connect --
24        A.    Well, there would be a
25   PowerScript. It's -- It's called -- It's a

                              Page 114

1    PowerScript that was written in relation to using
2    the commands that are referenced in this document
3    which are get photos, get friends, these type of
4    things, you know, that would basically interact
5    with the site in the same way we're interacting
6    with -- in the same way we were interacting with
7    other sites.
8         Q.    But there are different ways you
9    can get photos. Correct?
10        A.    No. Actually, it's pretty much
11   the same thing. You log into a site you go to the
12   photo. You click on the photo with a mouse, you
13   copy photos. Actually, very -- almost the exact
14   same process.
15        Q.    The copying functionality though
16   is written in the code?
17        A.    It's written in the PowerScript.
18   It's just PowerScript using the commands that are
19   in this document.
20        Q.    The commands are automated?
21        A.    The commands are automated. It
22   says get -- Log in, get this photo. As you see in
23   our document, it just emulates the user doing this.
24   It's the same as -- you know, it's just a -- just
25   doing what the user could already do. That's the

                              Page 115

                              31 (Pages 112 to 115)

1 core of our system.  Nothing that we're doing is
2 something that a user couldn't already do.
3     **Q.    Facebook social design is**
4 **different than Orkut social design.  Correct?**
5     A.    That's just a different, get
6 script -- it's the same command.  Get -- Log in go
7 to the -- go -- go and get this photo.
8     MR. BURSOR:  You still no pauses
9 between his question and your answer.  Just slow it
10 down.
11     **Q.    But my question is the social**
12 **design of Facebook is different than the social**
13 **design of Orkut.  Correct?**
14     MR. BURSOR:  Pause now answer.
15     A.    The social design -- There are
16 very minor differences in the overall user
17 experience.  I mean, yes, you have to go to a
18 different page but that's -- Again, that's just a
19 -- It's a PowerScript command which is go to this
20 page instead of go -- go to this page, get the
21 photo.  It's not that -- It's not -- It's not --
22 Social design is actually the same.  It's just
23 different -- What I mean is the concept of getting
24 the photo.  The page that it's on obviously is a
25 different page but we're using the same

        Page 116

1 main site.
2     **Q.    What was the function of**
3 **www.powerscrap, S-C-R-A-P, dot com?**
4     A.    It's the same as power.com.  Exact
5 same basically.  It's just another site that they
6 access features.
7     **Q.    What features were available on**
8 **PowerScrap?**
9     A.    Same features as Power.
10     **Q.    Why did you have two different Web**
11 **sites?**
12     A.    Well, it's just to -- Power was --
13 Originally, when we -- before we looked at -- we
14 had -- many different names of power, and then we
15 -- the Power name was a much better name so we
16 consolidated everything with power.com instead of
17 having to come up with power date -- power each
18 app.
19     **Q.    Did PowerScrap utilize**
20 **PowerScript?**
21     A.    Yes.  All of our -- Every
22 application with power utilizes PowerScript to be
23 written.
24     **Q.    How did Power first access the**
25 **Facebook site?**

        Page 118

1 PowerScript.  The same command you see in this
2 document.
3     **Q.    Do you have to reformat because**
4 **different social designs have different coding**
5 **functionality?**
6     A.    We emulate what the user would do
7 if they were going to that site, so the script --
8 the PowerScript that's written will be written
9 based on -- based on the interaction with that
10 site.  It is unique to that site, but again, it's
11 just a script, a PowerScript.  It doesn't --
12 Nothing in the underlying code of PowerScript
13 changes to -- changes between what we did in -- on
14 one site and another site.  I mean, we use the same
15 -- similar set of commands.  In other words, it's
16 the same as the programming language -- the
17 programming language that's used across hundreds of
18 different programs.  It still stays the same.
19     **Q.    You've referred to both PowerScrap**
20 **and PowerScript.  What is PowerScrap?**
21     A.    PowerScrap was -- There was a
22 collection of sites with the name power that we
23 would brand power date, power whatever.  We would
24 always test out different -- have different sites
25 with names, but power.com was the holding -- the

        Page 117

1     A.    Meaning -- Can you rephrase the
2 question?  Clarify the question.
3     **Q.    In order to develop -- In order to**
4 **employ PowerScript in developing --**
5     MR. COOPER:  Strike that.
6     **Q.    In order to develop PowerScript,**
7 **how did Power access the site to know what**
8 **functions to include?**
9     A.    We would go to facebook.com and
10 look at the site.
11     **Q.    Who's "we"?**
12     A.    Eric, the programmers.  We type in
13 Facebook.com and go to the site and look at it.
14     **Q.    And how did you log in?**
15     A.    We log in with our -- We have an
16 account on Facebook, so the -- whoever -- If there
17 was a user -- either we log in with an account
18 Facebook.
19     **Q.    What account?**
20     A.    I don't know.  A user -- They
21 would log in what with account that they had, so
22 Eric would log in with his account.
23     **Q.    What records exist reflecting when**
24 **Power logged into Facebook to review its features?**
25     A.    I don't know if there's any

        Page 119

1    records.  It's just -- They were all -- Most of the
2    people are users on Facebook, so they have access
3    to go into Facebook.  It's a publicly available
4    site.
5         Q.      Did you use a registration name of
6    the individual every single time?
7         A.      Yeah.
8         Q.      Did you ever create a registration
9    name for Power to access the Facebook site?
10        A.      I don't know.  I think that the
11   people use their individual Facebook accounts.
12        Q.      Do you know?
13        A.      I don't know.  I think that -- I
14   believe that Eric would have logged in with his
15   account.
16        Q.      Again, do you know?
17        A.      Do I know what?
18        Q.      Do you know how he logged in?
19        A.      He typed in his user name and pass
20   ward and then he went to the site.
21        Q.      My question, though, is do you
22   know whether or not Power created a
23   registration to access the site so that you could
24   help develop the code?
25        A.      No.  We use -- a user -- It always

Page 120

1         A.      There were other sites that were
2    higher priorities.  It was not a -- We also were
3    just -- It was just on our list that this is the
4    site.  It's not that we spent six months on
5    Facebook.  It probably only took a few days to
6    actually develop the Facebook -- I don't know how
7    many -- I don't if maybe you -- A typical power --
8    We call it a Power site.  A Power site is a term we
9    use where we've written PowerScript a script to
10   interact with a site and that can take -- that
11   actually -- That actual process is probably can be
12   a one month process, you know, and it's not their
13   to priority.  There's so many sites that they are
14   interacting with.
15               MR. BURSOR:  You've got to slow
16   down a little bit.  There's still -- There's no
17   space between you and him.  You're trying to fill
18   silence with noise.  Just slow it down.  You were
19   done.  It's his turn.
20        Q.      What documents exist that reflect
21   the development process for the PowerScript?
22        A.      I believe that the documents were
23   provided to you.  The E mails interaction where
24   they -- I think there was actually a specific
25   E mail in the declaration which we provided which

Page 122

1    go through a user account that exists, so it's
2    either a -- If it's a person, a programmer, he
3    would log in -- he would log into the site and
4    just -- He logs in to access his account.
5         Q.      Right.  What records exist about
6    when the programmers access the Facebook site to
7    ascertain what functions to use?
8         A.      What records?  There would be no
9    record.  I mean, they're just logging in like on a
10   day-to-day basis to the site.  They have accounts
11   and they log in.
12        Q.      Did the programmers ever E mail
13   each other about how they were -- how they were
14   deciding what features to employ in the PowerScript
15   for Facebook?
16        A.      The features that we offered on
17   Facebook were the same, very -- actually, very --
18   very limited.  As you know, we only -- we were only
19   alive for -- on Facebook for a very short period of
20   time and we turned on the same functionality that
21   we already had on all the other sites.  Facebook
22   was a very -- very -- you know, just one of many
23   sites.
24        Q.      Why did it take six months to
25   develop the PowerScript for Facebook if you had --

Page 121

1    actually just talked about one E mail I think that
2    talked about the site.  That was probably -- I
3    requested and that's what was provided to me.  Do
4    you have copies of the E mail?
5               MR. BURSOR:  Just answer the
6    questions.
7               THE VIDEOGRAPHER:  1:18, off the
8    record.
9               (Whereupon, Exhibit 102 is marked
10   for identification by the reporter.)
11              THE VIDEOGRAPHER:  1:18, on the
12   record.
13        Q.      Mr. Vachani, I'm putting in front
14   of you a Declaration of Steve Vachani in Support of
15   Defendants' Opposition to Facebook's Motion For
16   Judgement on the pleadings.  Would you turn to the
17   final page?
18        A.      Sure.
19        Q.      Is that your signature?
20        A.      Yes.
21        Q.      Do you recall making this
22   declaration?
23        A.      Yes.  I do.
24        Q.      Would you turn to Paragraph 2?
25        A.      Sure.

Page 123

1    Q.    Well, first of all --
2          MR. COOPER:  Strike that.
3    Q.    Will you turn to the
4    second-to-last page?
5    A.    Sure.
6    Q.    And do you see at the bottom it
7    says you've made the declaration under penalty of
8    perjury?
9    A.    Yes.  I do.
10   Q.    Okay.  So to the best of your
11   knowledge, the facts set forth in the declaration
12   were true when you set them down?
13   A.    That's correct.
14   Q.    Now, turn to Paragraph 2.
15   A.    Okay.
16   Q.    Do you see where it says, "During
17   a roughly two-month period, from December of 2008
18   through January of 2009, Power offered Facebook
19   users a different and potentially superior browser
20   through which they could access their Facebook
21   accounts to copy, update, and port their own, "User
22   Content"?
23   A.    That's correct.
24   Q.    What user content were you
25   referring to?

Page 124

1    A.    Your photos and your -- Content.
2    Your photos and your contacts.  So your friends in
3    particular.  Those are the most commonly accessed
4    data.
5    Q.    There's a second sentence that
6    says, "'User content' includes photos, profiles,
7    messages, notes, text, information, music, video,
8    advertisements, listings, and other content that
9    users can upload, publish, or display on the
10   Facebook site?
11   A.    That is correct.
12   Q.    How was the -- How was user
13   content emulated on the Power site?
14   A.    It wasn't emulated.  It was --
15   We're a browser, so the user was on Facebook
16   accessing -- Like, he was in his browser and he
17   went to -- he went to Facebook.  He was looking at
18   his own content, data, inside our browser.  And
19   second, when he's on the main Power Page, it's
20   passing that information -- he's pulling that
21   content to a central page.
22         (Whereupon, Exhibit 103 is marked
23   for identification by the reporter.)
24   Q.    Mr. Vachani, I put in front of you
25   Exhibit 103, a screen shot taken from the power.com

Page 125

1    Web site.
2    A.    Correct.
3    Q.    Does this look like a profile that
4    existed on power.com sometime in December or
5    January -- December 2008 or January 2009?
6    A.    Yes.
7    Q.    Do you see there is a list of
8    categories called, "My Friends"?
9    A.    That's correct.
10   Q.    All right.  Do you see that there
11   is an individual Carina?
12   A.    Yes.  I do.
13   Q.    There's a logo next to her.  Do
14   you see that?  Her name.
15   A.    That's an Orkut logo.
16   Q.    Next to Carina, there is an
17   individual named Carlos.  Correct?
18   A.    Yes.
19   Q.    And there is a Facebook logo next
20   to his name.  Correct?
21   A.    That's correct.
22   Q.    How in your database did power.com
23   know to identify a picture from Carlos as
24   associated with Facebook?
25   A.    This is dynamic.  Everything here

Page 126

1    it's being accessed on Facebook because the user
2    has opened up access to his account.
3    Q.    Right.  How does Power know to
4    emulate that photograph on Power through its own
5    browser?
6    A.    It's passed -- The browser is
7    accessing that and the user is able to view
8    multiple sites, photos from multiple sites
9    dynamically and simultaneously.
10   Q.    The photograph has been
11   reformatted to be presented on Power though.
12   Correct?
13   A.    That's his -- That's the photo.
14   It's being passed through.  That is correct.
15   Q.    But it's being reformatted so that
16   it can be -- it can be imaged in the context of "My
17   Friends" on power.com.  Correct?
18   A.    Yes.
19   Q.    How would Facebook know what
20   information was parsed so that you could reformat
21   that photograph on power.com?
22   A.    How would they know what
23   information?  It's a photo.  There's -- There's
24   just a photo there as you can see.  Photo and the
25   name.  There's no other information.

Page 127

1      Q.      However, the photograph had to
2   have been parsed to have been displayed on
3   power.com.
4      A.      It was passed through, yeah.  It
5   was passed through and parsed, but the photo is the
6   same photo.
7      Q.      Where would Facebook be able to
8   see how you parsed their data on the power.com Web
9   site?
10      A.      How we parsed it?
11      Q.      Yes.
12      A.      We -- We -- A PowerScript goes to
13   the site, accesses it and passes it through, so
14   it's using a PowerScript that's doing that, so the
15   functionality that makes that possible is described
16   in this document.
17      Q.      And the Get command that does that
18   can vary in many different ways if the parses
19   information.  Correct?
20      A.      Actually, a get photo is pretty
21   straightforward.  You access a site, you get a
22   photo and you pass it through.
23      Q.      However, the way it was actually
24   done is reflected in the code.
25      A.      It's just a different PowerScript.

                                      Page 128

1   It's reflected in a -- in a PowerScript command.
2   You're right.  You can write get it, but go to --
3   go there, click on this page.  It's -- It's a
4   PowerScript.  You are correct.
5      Q.      And that PowerScript is developed
6   specifically with commands directed towards the
7   Facebook content.  Correct?
8      A.      That is correct.  Not just
9   Facebook.  To all -- To all the sites that the user
10   has authorized us access.
11      Q.      But because of the -- the social
12   design of Facebook and how it codes its own site,
13   will vary from how other sites are coded.  Specific
14   commands have to be directed towards Facebook.
15   Correct?
16      A.      I'm not sure I understand -- I
17   mean, the -- the difference -- Yes, it's a
18   different layout, but it's the same -- the same
19   framework, meaning you log in, you go to your photo
20   page, you click on the photo.  It's a very -- It's
21   very similar if not almost the same -- on all the
22   other sites.  There's very little -- Of course,
23   it's unique.  You might have to go to a different
24   route to get there, but those are just a --
25   literally a two-second adjustment on a PowerScript.

                                      Page 129

1   Two seconds or whatever.  Very simple adjustment.
2      Q.      All adjustments would be reflected
3   in the source code.  Correct?
4      A.      No.  The source code of what?
5      Q.      The source code for the
6   PowerScript directed to the Facebook site?
7      A.      No, of course not.  We're talking
8   about -- You're talking about a set -- a
9   PowerScript.  A source code of a -- of a language.
10   That's like saying that Microsoft source code of
11   their language is affected by the programs that
12   people are writing using that.  It has nothing to
13   do with it.  Of course, it's using it, but it
14   doesn't change.
15      Q.      You write comments into the
16   script.  Correct?
17      A.      You write comments into the
18   script?
19      Q.      PowerScript is written in source
20   code.  Correct?
21      A.      Yes.
22      Q.      And in that source code you
23   admitted earlier there will be comments?
24      A.      There would be comments, but they
25   wouldn't be relating to Facebook in particular.

                                      Page 130

1   They would be relating to a Get photo command, and
2   as it's clearly defined in our document on how
3   PowerScript works it emulates -- the core of
4   language is that it emulates what a user can
5   already do.  So that's -- I mean, it doesn't change
6   -- We're just emulating a different command using a
7   PowerScript.  The source code has nothing -- would
8   not have changed, you know, relating to Facebook.
9   It's using the same commands.
10      Q.      How can I be certain of that
11   without seeing the source code?
12      A.      How can you be certain of that
13   without seeing the source code?
14      Q.      Yes.
15      A.      I mean, we've presented to you --
16   we've presented to you pretty clear documentation
17   on how PowerScript works and how these commands
18   work being more than open on sharing our
19   documentation on the script on how you create a
20   function.  I mean, it's -- Nothing changes in the
21   underlying PowerScript that, you know, between one
22   site to another site.  It's just a -- It's just a
23   different script, so trying to access the language
24   that you use to create the script is -- doesn't --
25   doesn't change anything.

                                      Page 131

1    Q.    Then why have you not produced the
2  PowerScript source code itself?
3         MR. BURSOR:  We -- You're not
4  required to answer that question.  We set forth our
5  objections in the response to the document request
6  and in response to your motion to compel.
7  Actually, it wasn't down through motion to compel,
8  it was join report whatever the form was required
9  by the judge's standing order, but that's not --
10  that's not an appropriate deposition question.  He
11  didn't produce the source code for the reasons
12  stated in the objections.
13     Q.    Did you search for source code?
14     A.    Did I search for source code?
15     Q.    Yes.
16         MR. COOPER:  Let me strike that.
17     Q.    Do you recall receiving a -- an
18  indication that you were to search for documents
19  relevant to this lawsuit?
20     A.    Yes.
21     Q.    Did -- At any time, did you search
22  for source code related to how Power integrated
23  Power with Facebook in response to those document
24  requests?
25     A.    Yes.  I searched for every E mail,

1  and conversation, and document that we were
2  relating to the Facebook PowerScript.
3     Q.    Did you produce the PowerScript
4  itself?
5     A.    We provided all the -- all the
6  conversations that were -- that were related to
7  that.
8     Q.    But you did not provide the script
9  itself.  Correct?
10     A.    We have not provided any of our
11  source code.
12     Q.    And the source code is actually
13  how Power integrated Facebook with its own
14  functionality.  Correct?
15     A.    The commands.  The Get commands
16  such as Get photo, et cetera.
17     Q.    But the precise combination of Get
18  commands --
19     A.    Correct.
20     Q.    -- or post or parses are in the
21  source code and not in these high level functional
22  documentation.  Correct?
23     A.    Well, in the E mails you are --
24  you are.  You are correct.  There are E mails
25  where we -- which we provided whatever existed

1  where the conversations on those existed, but yes.
2  There are specific scripts like Get photo that, you
3  know, that are -- that are -- that we've discussed
4  and talked about and that are available.  I mean,
5  if you want to prove that we were -- we were
6  getting photos or getting contents, I think we've
7  said it many times that we are -- that's what our
8  -- that's what our users are asking us to do to
9  access their information.
10     Q.    All right.  But that code was not
11  produced by you.  Correct?
12         MR. BURSOR:  We would stipulate
13  the source code has not been produced.
14     A.    Yeah, we've already stipulated
15  it's not been produced.
16     Q.    Nor -- And the only technical
17  documentation you suggest was developed in
18  conjunction with that source code are the two
19  documents I put in front of you, 100 and 101?
20     A.    This is the foundation of how
21  every PowerScript is created.
22     Q.    Right.  And you indicated there
23  were 100 employees at Power at the height of its --
24     A.    That's correct.  Yes.
25     Q.    -- operation?

1         MR. BURSOR:  Let him finish.
2     A.    Yes.
3     Q.    If -- How many of those employees
4  were employed in the -- in the -- to the best of
5  your knowledge as programmers?
6     A.    Probably about 40.
7     Q.    So approximately 40 percent of
8  your employees were programmers?
9     A.    That's correct.  Programming
10  related.
11     Q.    If -- If, in fact, all these
12  functions were identical, why did you need 40
13  programmers to consistently develop new programs?
14     A.    We were -- We were -- we're not --
15  Our business did not revolve around Facebook.  We
16  were a very well-funded, venture funded company
17  building a very -- a very unique and technology
18  platform programming language and other components
19  on something that, you know, was -- that was having
20  and would continue to have a major impact on the
21  future of the Internet.
22     Q.    Did you maintain employee records
23  related to, like, time that was spent by employees
24  on projects?
25     A.    No.  I mean, I wouldn't say we

Page 136

```
1   have formal records, but we could obviously -- we
2   know what people were working on.
3        Q.    And how did you know what people
4   were working on, just word of mouth?
5        A.    The managers manage their
6   employees and they know what -- they know what
7   people are working on and they assign tasks and
8   those are E mails.  What we did is we searched all
9   E mails and conversations related to Facebook which
10  was a very, very, minute part of our overall
11  business.
12       Q.    How did you search -- What was
13  your search methodology for E mails?
14       A.    I searched -- I took every term
15  relating to Facebook and PowerScript and
16  conversations that related to the Power -- the
17  PowerScript for Facebook.  I don't know the exact
18  terms I searched.  I searched all terms.  The
19  second thing I did is I went -- I went to that
20  period of time and I went through every single.  I
21  scanned down every single E mail to see if I had --
22  if I had possibly missed any E mails in the search
23  in the standard search just to see -- to be
24  thorough.  I, then, went to the people that I knew
25  that were involved with that like Eric and
```

Page 137

```
1   requested them to -- to provide me any kind of
2   E mails that were relating to the subject of the
3   PowerScript for Facebook, and basically in good
4   faith, I -- I pushed to get everything that was
5   available and provided those to you.  Obviously,
6   there could be, you know, it could be more stuff
7   but we made a best -- best -- good faith -- best
8   faith effort to provide everything.
9        Q.    When you say you searched for
10  E mails, did you use keyword searches?
11       A.    As I said, a combination.  First,
12  I looked at everything in that date period just one
13  by one manually and scanned down to see if there
14  were any messages.  The second thing I did is I
15  searched the name of Facebook, PowerScript, and
16  anything that I thought was related to -- that
17  would be related to Facebook to find conversations
18  on the subject on the development.  They were --
19  And then provided those to you.
20       Q.    When you say you searched E mails,
21  were you searching your own in box?
22       A.    I searched my in box and I also
23  requested, you know, from the individuals that were
24  involved.
25       Q.    Okay.  How did you employ a
```

Page 138

```
1   keyword search on your in box?
2        A.    In Yahoo which is where I -- where
3   my E mail is they have a search -- a search
4   functionality where you can search any -- You know,
5   if you're familiar with the Yahoo mail, I used
6   their search functionality, and as I said, then I
7   went to the sent box and the in box of all E mails
8   around that period and also scanned through those
9   E mails without individually -- went down the list
10  of all the E mails that looked like they might be
11  relevant, so I did a combination of a search and
12  also a review of E mails in that period.
13       Q.    What's the period you searched?
14       A.    I actually searched everything
15  from -- I did a -- an entire four years first, but
16  the individual E mails I searched over a -- You
17  know, I think that whole -- that whole period from
18  the six-month period until, I guess, January or
19  February of 2008.  Actually, I searched afterwards,
20  too, but the primary activity relating to Facebook
21  was in the November, December, January, February of
22  2007 and 2008, but I did search before and after,
23  too, to see if there was other stuff.
24       Q.    The E mails you searched, are they
25  only the E mails that are on your own -- are on
```

Page 139

```
1   your own computer?
2        A.    None of them are on my computer.
3   They're all on -- Every E mail was on Yahoo.  Yahoo
4   is where I had all my Power E mails, and I accessed
5   all my E mail in my Yahoo Web mail.
6        Q.    Did you search backup systems?
7        A.    There is no backups of my E mails.
8   All of them -- every -- Every E mail I've sent or
9   received it comes -- it comes through Yahoo, so
10  that is my E mail.
11       Q.    So --
12       A.    That is -- Every E mail that I've
13  ever received for Power since I -- I've been using
14  that Yahoo account before I started Power and
15  that's been my interface all my E mail.
16       Q.    What e-mail accounts were
17  Mr. Santos using to discuss development of the
18  Facebook PowerScript application with his
19  programers?
20       A.    Most likely it would be Eric at
21  power.com.  He does have a personal E mail which on
22  rare occasion, but it might have come -- it most
23  likely came from Eric at power.com.  There may be
24  an E mail or two that came from eric@ericsantos.net
25  which is his personal E mail, but in general,
```

1    people use their company E mail to send E mails and
2    in the records, you know, most of them were Eric.
3    I don't know what was sent, but those are the two
4    E mails that he would most likely have used.
5        Q.    Did you search -- First of all,
6    are those -- is that -- are E mails on that
7    power.com e-mail address still available on the
8    servers that are being hosted to this day?
9        A.    I have -- I would have to verify
10   that.  I -- I haven't looked directly, but I made a
11   backup of everything that was there.
12       Q.    When you say you "haven't looked"
13   does that mean you didn't search to see if there
14   were E mails on that system?
15       A.    Didn't need to.  I have every
16   E mail that I ever received or sent was -- I have
17   access to on my Yahoo account.
18       Q.    Were you copied on every E mail
19   that every employee of Power ever --
20       A.    No.  And that's why I also went to
21   Eric, you know, Eric -- because he was -- he was --
22   asked him for E mails.  Typically, you know, if --
23   if there was E mails that were secondary he would
24   have been copied on them.
25       Q.    But you didn't search the E mails

Page 140

1    that are stored on --
2        A.    I trusted Eric to search for
3    himself.  I requested him and then he's pretty
4    good.
5        Q.    Did you oversee his search?
6        A.    I was very explicit in my request.
7    I don't need to -- to look over his shoulder, you
8    know.  I asked him, you know, to look and he
9    provided it.
10       Q.    Mr. Santos is currently residing
11   in Brazil?
12       A.    That's correct.
13       Q.    Do you know if -- Do you know if
14   Mr. Delgado searched for E mails?
15       A.    I requested from -- I requested
16   for Eric to contact anyone that he -- any E mails
17   that he would have been involved in, so in general,
18   if -- if any E mail that Eric -- that Mr. Delgado
19   was writing, he would have copied Eric on it,
20   because in our protocol of our company, he was his
21   manager so anything related to the project would
22   have gone through Eric; so while I didn't -- I
23   didn't go into every detail because I know that it
24   was common practice to copy your manager on E mails
25   on a product or project that you're working on.

Page 141

1        Q.    Do you know if Mr. Bacelar
2    searched for E mails?
3        A.    I would have to ask Eric to --
4    exactly his specific -- his specific procedure that
5    he used.  I cannot clarify the micro-details of how
6    they did that.  What I do know is I -- Eric, based
7    on the best of my knowledge, would have been copied
8    on -- on relevant E mails relating to product
9    decisions since he's -- since he's the -- he's the
10   core person behind that.
11       Q.    Do you know how often Power purged
12   E mails or old E mails while you were -- it was
13   operating the --
14       A.    We do not -- We do not purge
15   E mails.
16       Q.    Do you know if Power backed up --
17       A.    We backed it up on our servers but
18   the backups I have not looked at them personally,
19   so I cannot say what they -- what they looked like.
20       Q.    But to the best of your knowledge,
21   they still exist?
22       A.    I backed up everything that's on
23   the servers, so I -- but I don't know -- E mail
24   servers, you know, I don't know how they were done,
25   but I do know, as I mentioned, that Eric has access

Page 142

1    to all his E mails and all E mails that, to the
2    best of my knowledge, you know, any relevant
3    E mails relating to Facebook which there were not
4    that many.  As I said, this is a very minor part of
5    our business.  I mean, in terms of technical
6    resources, Facebook was a very important site so
7    we obviously -- But since we had already built the
8    core structure and the core platform, adding
9    Facebook was not a major change in strategy.  It
10   was just another site to add.
11       Q.    Are there any documentations that
12   reflect -- First of all, what precise search terms
13   did you use in searching your Yahoo e-mail account?
14       A.    I think I've answered that to the
15   best of my knowledge already.
16       Q.    The one I heard was Facebook.
17       A.    No.  I think I said I searched
18   every E mail that had any discussion of the word
19   Facebook in it between our employees, and then I
20   also searched PowerScript, and then PowerScript
21   with Facebook, and then related terms I can't
22   remember every -- every micro-term.  But as I
23   mentioned, I also went through that period of time
24   and looked at E mails.
25       Q.    When you say "looked at E mails"

Page 143

1   **how long did you take looking at E mails?**
2       A.      I -- I probably spent several
3   hours.  I don't know exactly how much time.
4   Several hours to go through all the E mails that
5   were relevant to the combination of the initial
6   searches and then going through that date period.
7   I would estimate like a few hours, but I cannot
8   remember -- I wasn't counting my time.
9       Q.      **When did this happen?**
10      A.      When it was requested.  In the
11  declarations.  Around that time period.
12      Q.      **Do you know if you searched, for**
13  **instance, the letters F-B?**
14      A.      Did I search the letters F-B?
15      Q.      **Yes.**
16      A.      I believe I did.
17      Q.      **Do you know?**
18      A.      I -- I searched Facebook and I
19  probably -- I would be happy to do another search
20  again, but I believe I searched for F-B because
21  that's a terminology that -- Although, we don't use
22  that terminology internally, I've searched -- I
23  searched quite a lot of terms that day.  As I
24  mentioned, I went through every individual --
25  Irrelevant of the searching, I went through every

Page 144

1   executives that, you know, and individuals that
2   came.  As I mentioned, there were over a hundred
3   people in the company and there were people with
4   manager titles and if -- if -- if it becomes
5   appropriate and whatever, I'm sure we'd -- we'd be
6   happy to provide, you know, based on what's
7   appropriate.
8           MR. BURSOR:  Just answer the
9   questions.  The question was:  Were there people --
10      A.      Yes.  There were -- There were
11  other people with titles.
12      Q.      **Was there ever any document**
13  **created that showed the corporate structure like a**
14  **pyramid?**
15      A.      Yes.
16      Q.      **Do -- Was any such document**
17  **created for about the period 2008?**
18      A.      Yes.
19      Q.      **Returning to Exhibit 102 --**
20      A.      Which one is 102?
21      Q.      **Your declaration.**
22      A.      Okay.
23      Q.      **Do you see Paragraph 3 referring**
24  **to user content?  It says, "Though Facebook does**
25  **not assert any ownership over this user content,**

Page 146

1   E mail in that period, so if I had missed something
2   in a search term, I would have found it in my
3   manual search by date.  I mean, again, it's
4   possible.  Anything's possible, but I did -- I made
5   my best effort to -- to search and provide
6   everything.
7       Q.      **In 2008 did -- did Power have**
8   **identified officers of the company?**
9       A.      Yes.
10      Q.      **Who were they?**
11      A.      They were Eric Santos, myself, and
12  Filipe Herrera.
13      Q.      **How do you spell that last name?**
14      A.      H-E-R-R-E-R-A.  That's the most
15  significant individuals.
16      Q.      **What was Mr. Herrera's role?**
17      A.      Corporate development and --
18  Corporate development.
19      Q.      **Did anybody else have a corporate**
20  **title?**
21      A.      There were -- I don't know what --
22  officer as, you know, there's different levels.
23  There were people that participate at the board
24  level and those were -- those are the individuals
25  that were most involved, but there were many

Page 145

1   Facebook does attempt to prevent users from copying
2   it-to make it difficult for users to port their
3   user content to other Web sites?
4       A.      That's correct.  Where is that?
5   I'm sorry.
6       Q.      **That's Paragraph 3.**
7       A.      Facebook makes it difficult to --
8   That's correct.  Yes.
9       Q.      **What did you -- What functions did**
10  **you -- were you referring to when you said, "Make**
11  **it difficult for users to port their user content**
12  **to other Web sites"?**
13      A.      As you know, Facebook deliberately
14  -- You might not know.  Would deliberately turns
15  all the e-mail addresses of the users into images
16  and therefore makes it extremely difficult for a
17  user -- If they want to copy and paste their e-mail
18  addresses, they would literally have to handwrite
19  them which makes it very difficult for a user, you
20  know, to take his own data outside of the site.
21      Q.      **And do you know if that also makes**
22  **it difficult for an automated script to image or**
23  **capture that image for purposes of incorporating it**
24  **another site?**
25      A.      Yeah.  We never accessed the

Page 147

1 e-mail addresses of the users.  We never touch
2 those.
3      Q.     How did you parse out that data?
4      A.     We can't even -- It was not
5 something that we even pursued because it was not
6 -- we didn't want -- they didn't go after the
7 e-mail addresses of the friends.
8      Q.     How did you know that Facebook
9 used an image of the --
10      A.     Anybody can go to the site log in
11 and see that they use an image.  It's, like, if you
12 put your mouse over an e-mail address, you can see
13 that it's an image.  I don't know what they do
14 today.  But I think today they -- they have a
15 different -- they've changed their procedures, but
16 at that time, they -- they made it extremely
17 difficult for a user to copy and paste his own
18 e-mail addresses.
19      Q.     Was any attempt ever made to see
20 if there was a way to incorporate Facebook's e-mail
21 addresses into the database for Power?
22      A.     If it was available -- We would
23 have loved to have done that actually, because
24 it's, as you know, Facebook -- Facebook's primary
25 growth came from doing this with every other site

                                      Page 148

1 with the E mail.  I don't -- I will double-check on
2 that, but I don't believe we did, although we -- we
3 -- would like to have because our users desperately
4 requested this.  I mean, one of the main values of
5 our services was I want to be able to abrogate all
6 my contacts in one place, and so it would have been
7 something we would have willingly and -- done and
8 had we continued to grow, I think it would be
9 something we would welcome doing.
10      Q.     All right.  Do you know, again, if
11 any attempt what -- even if it was unsuccessful,
12 was ever made to capture that information to users.
13      A.     I don't know offhand, but I would
14 be happy to check on that.
15      Q.     Do you know what documentation
16 would -- What type of documentation was typically
17 created by Power that would reflect one way or the
18 other --
19      A.     It would have been -- It would
20 have been in the E mails that we sent because
21 everything relating to the conversation -- that
22 would have -- That wasn't even a feature, so it
23 wouldn't have got beyond a conversation in E mail.
24      Q.     You say that users wanted that
25 feature.  How do you know users wanted that

                                      Page 150

1 on the Web.  They were the only site on the
2 Internet that does not make the E mails publicly
3 available.  In fact, I think every single other
4 competitor has publicly made this something that
5 users can access.  Facebook was the only one that
6 deliberately, you know, made aggressive measures to
7 stop -- stop users from accessing their data.
8      Q.     And do you show the e-mail
9 addresses of individuals who port their data from
10 other Web sites to Power?
11      A.     Yes.  We do because the users have
12 access to it and it was -- you know, easier to --
13 It was a standard thing that they could access and
14 the sites make it actually -- Every other site
15 makes it available to -- to access your e-mail
16 addresses and port them and they even have a port
17 command that if the user wants to, on their own, go
18 and take it download their address book.
19      Q.     Do you know if any attempt was
20 ever made to figure out a way to capture the e-mail
21 addresses available on Facebook's Web site for use
22 by Power?
23      A.     Our users requested this and we --
24 but we didn't -- we never -- I have to confirm, but
25 I -- I don't believe we -- launched any feature

                                      Page 149

1 feature?
2      A.     One of our primary messages for
3 our sites is being able to access all your sites in
4 one place and all your content, and accessing was a
5 core feature of our system as you can see where you
6 have access to all your contents and contacts, and
7 so this was a major value proposition for our
8 millions of users who came to use our Power browser
9 and Power service.  So that's why we believe it was
10 a valuable feature.
11      Q.     Do you recall any users contacting
12 Power to specifically request that their e-mail
13 addresses be made available --
14      A.     It was always a feature since the
15 beginning for all the other sites, so you had
16 access to your contacts, and so it was nothing to
17 make available.  It was already a functionality and
18 feature of our site for a year before we launched
19 Facebook.
20      Q.     Do you recall complaints being
21 made to Power that users could not access their
22 e-mail addresses from Facebook?
23      A.     We were only on Facebook for a
24 matter of weeks.  A couple weeks, so we -- we did
25 our -- we provided our users access to their --

                                      Page 151

1   They did access.  They did have full access to
2   their contacts in Facebook.  If you go here, they
3   had full access.  They could -- they could click on
4   that and write messages so we gave our users
5   incredible functionality with their Facebook users
6   with -- with -- to communicate with -- you know, to
7   see their contacts on Facebook.
8       Q.      But my question was:  Do you
9   recall one way or the other if there were
10  complaints --
11      A.      There were no complaints that I
12  know of -- that we know of.
13      Q.      Well, I'm just wondering you said
14  users desperately wanted that E mail --
15      A.      I didn't.
16              MR. BURSOR:  Let him finish.
17      Q.      What I understood, you used the
18  words "desperately wanted" the function to use --
19  to show their e-mail addresses, and I just wanted
20  to know if that -- if you were referring to
21  complaints that power.com --
22      A.      Let me -- Let me rephrase that.
23  The desperately was -- was an opinion based on a
24  subjective opinion based on the value of our
25  service.  Knowing that our users, you know, one of

1   our main value propositions was, you know, our core
2   message was all your -- all your -- everything in
3   one place that we -- I made that assumption, so I'm
4   not at liberty to know the opinions of every single
5   one of our users.
6       Q.      Did Power have any function that
7   permitted users to make specific requests for
8   additional features?
9       A.      Yeah.  We had message boards.  We
10  had chat rooms.  We had, you know, basically places
11  where people could interact in forums and obviously
12  tell us -- give us comments on feedback.
13              MR. BURSOR:  Take a break.
14              THE VIDEOGRAPHER:  1:53, off the
15  record.
16              (Whereupon, a recess is taken.)
17              THE VIDEOGRAPHER:  1:59, going on
18  the record.
19      Q.      Mr. Vachani, returning to Exhibit
20  103 -- 102 your declaration --
21      A.      Sure.
22      Q.      You referred to the specific
23  example of the fact that e-mail addresses on
24  Facebook are imaged as one of the difficulties for
25  -- one of the ways that Facebook, quote, makes it

1   -- make it difficult for users to port their user
2   content to other Web sites?
3       A.      Yes.
4       Q.      Do you know of any -- Were you
5   referring to any other methodology -- any other
6   features at Facebook that you were thinking of
7   makes it difficult for users to port their user
8   content to other Web sites?
9       A.      That was the primary one -- I
10  cannot think of another one offhand, but I'm sure
11  if I -- Yeah.  That's the one that that was the
12  most obvious.  The second thing -- I apologize.
13  There is one other thing.  Is that they -- Unlike
14  all the other sites on the Web, they didn't provide
15  a feature or functionality that allowed you to
16  import your -- your contact -- your photos, contact
17  data, and other things at that time.  So that's the
18  second thing.
19      Q.      Did they permit contact -- Are you
20  familiar with something called Facebook Connect?
21      A.      Yes, I am.
22      Q.      Do you know if in 2008 Facebook
23  Connect was available to users?
24      A.      It was --
25      Q.      Or to application developers?

1       A.      It was available in 2008.
2       Q.      And using Facebook Connect, could
3   you upload content to other Web sites?
4       A.      Could not.  You could not take out
5   content, no.  You could access -- access content
6   but you could not port content, say, "I want to
7   take this content and move it to another place."
8   You could not do that.
9       Q.      And was there any reason -- did --
10  Before Power launched its Facebook PowerScript
11  feature, did it ever consider using Facebook
12  Connect as a mechanism to connect Power?
13      A.      Yes.  In fact, we launched -- we
14  considered it in the beginning, but the
15  functionality was extremely limited to -- in
16  particular did not provide data portability to the
17  user which is ownership and control of their data
18  and we, therefore, took the same services that we
19  had been offering and had been successful with
20  other social networks and offered that to Facebook
21  users also.
22      Q.      Why was it important to Power to
23  have the data available on its Web site as opposed
24  to just having the connection?
25      A.      I don't know what that question is

1  relevant.  There was a feature that users -- it was
2  made available to users and they used it to access
3  their own data and content.
4       Q.    All right.  But you previously
5  indicated that the Power site operated like a
6  browser?
7       A.    That was one of the -- one of the
8  components of our -- of our -- of our Power site
9  was the browser.  It's not the only component.
10      Q.    All right.  So the -- one of the
11 other components was the ability to import data
12 from the Web sites into an aggregated site that
13 could be used by the user.
14      A.    The ability to import and have
15 more control -- ownership and control of your own
16 data.  That's correct.
17      Q.    And returning to Exhibit 103, the
18 screen shot --
19      A.    Yes.
20      Q.    -- one example of content that
21 was imported that I referenced was the photographs
22 that individuals made available on Facebook, for
23 instance.  Correct?
24      A.    If they directed -- wanted their
25 photos imported, they could.  That's correct.

1  identification of Carlos on Exhibit 103 as -- is as
2  a -- one of Luana Almeirda's friends.  Correct?
3       A.    It's one of who?
4       Q.    The profile is for someone named
5  Luana Almeirda.  Correct?
6       A.    That's correct.
7       Q.    So Carlos was a friend of hers on
8  Facebook.  Correct?
9       A.    That's correct.
10      Q.    And do you know if Power created
11 an automatic -- automated script to import the
12 identities of friends of people who are --
13      MR. COOPER:  Strike that.
14      Q.    Do you know if Power developed an
15 automated script that would import the identities
16 of Facebook friends from Facebook for users that
17 were registered with Power?
18      A.    They have an aggregated list of
19 their friends, so, yes, if the user requested it,
20 that was one of the features that was offered that
21 I would like to access -- import my contacts.  As
22 you know, Facebook offers this same functionality.
23 In fact, it's one of the biggest ways they built
24 their company utilizing the same functionality,
25 accessing your contacts on other sites.

1       Q.    But in order to have that feature
2  made available on Power, you needed more than
3  Facebook Connect as I understand your --
4       A.    That's correct.  We -- We needed
5  the user's authorization and permission.  That's
6  the foundation of everything that Power did is that
7  it was -- the users authorization and permission
8  for doing what the user can already do.  Nothing
9  we're doing is something that the user can already
10 do.  There's no other way to access it.  Access
11 this data.
12      Q.    Okay.  Well, you say there's no
13 other way that the user could have accessed the
14 data.  They could have connected directly to
15 Facebook.
16      A.    No.  I'm saying they cannot access
17 -- I'm saying there's no other way for us, for
18 Power to access this data.  Actually, as I
19 mentioned, portability was not -- is not -- not a
20 feature made available.  In fact, there are large
21 amounts of public criticism, bloggers and other
22 people who have written on this subject about
23 Facebook's inability -- not providing this, so it's
24 not something that Power alone was aware of.
25      Q.    Was another one -- Well -- The

1       Q.    Do you know if that automated
2  script that would import the friends identification
3  and image would also search for friends of friends?
4       A.    What do you mean, friends of
5  friends?  Would it go to their friends?
6       Q.    Yes.
7       A.    No.
8       Q.    Okay.  Are you aware on Facebook
9  that if you have -- that Facebook permits as a
10 setting that you can look at the profiles of those
11 who are your friends and their friends as well?
12      A.    Can you repeat that question?
13      Q.    Are you aware of whether or not on
14 Facebook, if I have you friended you Steve Vachani,
15 that I can actually see the profiles of your
16 friends who are not listed as mine?
17      A.    I think if the user -- If the user
18 authorizes that, I believe Facebook allows the user
19 to do that.
20      Q.    Do you know if the automated
21 script that would import the Facebook information
22 that's shown in my friends on Power employed a
23 spider program as you described it earlier?
24      A.    I believe it used a similar
25 program that Facebook uses to -- Well, similar

1    script where it accesses your contacts, now --

2    accessing the contacts, but we didn't go -- We

3    didn't have access to e-mail addresses of the user,

4    so we -- we wouldn't be able to communicate with

5    them even if we wanted to.

6        Q.    But my question is very simple.  I

7    just wanted to know the automated script that was

8    employed by Power --

9        A.    Correct.

10       Q.        -- did it have the ability to

11   search for friends of any user that was a member of

12   Power?

13       A.    Are you asking did it or did it

14   have the ability?

15       Q.    Did it.

16       A.    Well, a user -- we can do anything

17   that a -- If a user has the ability in a browser of

18   course it could, but there was -- what use would it

19   be to us.

20       Q.    Let me restate it.  Did -- What

21   you said that was similar to a spider, did that

22   functionality search for profile information in

23   order to import it into Power, that's all.

24       A.    If a user wanted to access their

25   friends' list, it could get the friends' list and

Page 160

---

1    make it available to them either on Power, or while

2    they were on another site they could access their

3    friends list all their friends from all their

4    sights.

5        Q.    Do you know if the PowerScript

6    that was developed for searching Facebook for that

7    type of functionality had a specific name inside

8    Power?

9        A.    It would be -- No.  It wouldn't

10   have a specific name.  It's just a get friends --

11   it would be a get friends list, get friends.

12       Q.    Well, let me restate it a

13   different way.  Did Power ever use for the total --

14           MR. COOPER:  Strike that.

15       Q.    Power's spiders or spiderlike

16   aggregation scripts could pull more than just

17   photographs if the content was something that Power

18   wanted displayed.  Correct?

19       A.    Anything that the user provided

20   access and authorization to their account, so if

21   they wanted to get any information from their page,

22   we believe that they own their data and they can --

23   they can freely take their data out of the site.

24       Q.    And all I'm wondering is because

25   the PowerScript permitted multiple context for

Page 161

---

1    contacting other Web sites, when it was importing

2    data, did it have a specific name, like, say,

3    importer?

4        A.    No.  It would be just get friends

5    I believe is the terminology we use.

6        Q.    Okay.  Was that across all

7    platforms, you used the same terms "get friends" or

8    did you say, like, Orkut get friends?

9        A.    It would be -- I think the get --

10   you can look in the documents we provided to you.

11   I think it's, if I'm not mistaken it's a -- Let me

12   see here if I'm correct.  Somewhere along the way

13   there was a Get.  I think it's even more general

14   even saying obtain the text of a tag.  Obtain the

15   text between two values.  It's a generic command,

16   and then it's just specifically to get -- which is

17   defined in the documents that we provided to you.

18       Q.    Turning to Exhibit 102, your

19   declaration --

20       A.    Yes.  Yes.

21       Q.        -- Paragraph 5 refers to "Power's

22   browser provides users with utilities that allow

23   them to copy their own user content for purposes of

24   updating it and making it portable to other sites

25   without copying other elements of the Facebook Web

Page 162

---

1    site."  Do you see that first sentence?

2        A.    Yes.

3        Q.    What are the utilities you're

4    referring to in that sentence?

5        A.    Provides users with utilities?

6    That's the tool to get -- get your friends and

7    aggregate your friends, or get your photos and

8    aggregate your photos.  So I think the data

9    portability tools, as we refer to them, is a core

10   premise that we were offering users, the ability to

11   own and control your data and port your data

12   wherever you would like.

13       Q.    All right.  Is that a -- Are those

14   utilities PowerScript and Power browser?

15       A.    Those are inside.  Those are built

16   with PowerScript and implemented while the user is

17   inside the Power browser.

18       Q.    The utility that was used to copy

19   elements of the Facebook Web site have a unique

20   name inside Power, if you know?

21       A.    The only things we're accessing

22   were their contacts or photos.

23       Q.    Was there a title, for instance,

24   Facebook utility or something like that?

25       A.    Not that I know of.  I mean, it

Page 163

1   was -- most likely be -- I don't know the answer to
2   that.  I would guess it would be something like get
3   -- You can check in the E mails.  You have all the
4   E mails, so you can see the references of what we
5   -- whatever we used to described them.
6        Q.     What elements of the Facebook Web
7   site were not copied you're referring to?
8        A.     I just know what we did -- what we
9   did copy.  The things that -- Photos of friends and
10  contacts, so I guess everything else.  I mean,
11  again, we've -- we've listed in these documents
12  what we -- what we did, so if I missed -- if I'm
13  forgetting something right now, it's in this
14  declaration.  So I -- Because it's a lot of
15  micro-details, so please excuse me if -- if I miss
16  something, but it's -- I believe these declarations
17  are pretty -- pretty clear.
18       Q.     Did you -- Do you know if messages
19  were copied?
20       A.     Messages that -- Their messages
21  from Facebook?
22       Q.     Yes.
23       A.     We did not copy the messages, but
24  we let them access their messages.
25       Q.     All right.

Page 164

1   in one place, those features we have some
2   functionality that was on a centralized page, but
3   as -- more than 90 percent or at least 80 percent,
4   a very large percentage of the time the user was on
5   Facebook inside the Power browser.  So we didn't
6   really need to -- didn't -- only when it was
7   something that added huge value and convenience to
8   the user that they requested or requested meaning
9   that they used the feature.
10       Q.     For the parts that were in the
11  context that were reformatted by Power --
12       A.     I don't think I used the word
13  "reformatted," but that's your word.
14       Q.     Well, for the parts that were
15  parsed by Power that would be a reformatted,
16  wouldn't you agree?
17       A.     Passing through data, you're
18  accessing in real time and like a -- like your mail
19  is pretty -- I don't -- I don't know what you call
20  that but it's -- That's what we were doing.  We
21  were accessing your photos dynamically or you could
22  selectively say, "I want to import my photos," so
23  you can interpret that however you want to.
24       Q.     All right.  In order to understand
25  how it was by dynamically being accessed at any

Page 166

1        A.     So it's like when you log in and
2   you access your E mail on many different sites
3   through different tools and you can read your
4   E mail, so we allowed users to access their and
5   read their messages in one box.
6        Q.     And again, as with the -- with the
7   photograph that required reformatting of the
8   Facebook site to permit that to be used --
9        A.     Not necessarily reformatting
10  the -- It's just accessing it and passing it
11  through it.  There is, I guess you can say a
12  parsing, but it's pretty -- pretty straightforward.
13  It's you're reading a message.  Your own message so
14  there's not really any -- there's no substantive
15  change.
16       Q.     But at the parsing it is then
17  necessarily parsed by Power so that it's accessible
18  on the Power site.  Correct?
19       A.     You're accessing -- In most cases
20  you're on Facebook, so 80, 90 percent of the user
21  experience of our stuff the user is actually inside
22  of Facebook just accessing his stuff.  There are a
23  few features that are -- where there -- like,
24  contacts where I want to access all my contacts in
25  one place or I could access data or all my photos

Page 165

1   given time, I would need to see the precise code.
2   Correct?
3        A.     The PowerScript actually explains
4   how that's done.  It's in this document that we've
5   given you.
6        Q.     All right.  Go to page -- Look at
7   Exhibit 100, the PowerScript Documentation.
8        A.     Yes.
9        Q.     All right.  And go to 3.6, "Rule
10  'Database'"?
11       A.     3.6.  Okay.
12       Q.     All right.
13       A.     Page 13?
14       Q.     Yes.  Do you see there's a
15  reference to a command for database connection?
16       A.     Yes.  I do.
17       Q.     In the context of when someone was
18  logged into Facebook, what was the database
19  connection command as it related to Facebook?
20       A.     So let me just read this for a
21  second.
22            MR. BURSOR:  What page are we
23  looking at?
24            MR. COOPER:  Bates Number 16.
25            So what's your question?

Page 167

44 (Pages 164 to 167)

1    Q.    All right.  You have to -- You had
2    the ability to create a database connection between
3    the sites that are connected to Power in your My --
4    or your MS SQL database?
5    A.    Into our -- That is correct, yes.
6    Q.    What was the -- What command was
7    associated with that database connection with
8    respect to Facebook information?
9    A.    There would be a PowerScript that
10   -- that would -- Let's just see what it says here.
11   In general, there would be a PowerScript that would
12   say, "Access this information."  Do you want to
13   access it or do you also want to -- Like, contacts
14   or photos.  Do you want to import this information
15   and that would be -- Those are just different
16   PowerScripts.
17   Q.    What PowerScripts were used
18   with -- specifically with Facebook?
19   A.    I believe we covered that already,
20   but access your contacts and your -- your friends
21   and your photos were the two most prominent and
22   messages, also.  In fact, let's just go to the page
23   here.  Friends, updates, also.
24           MR. BURSOR:  Your looking at
25   Exhibit 103.

1    A.    Yeah.  So you have messages.  You
2    can see some of the cata -- friends, on Exhibit
3    103.  My friends, my updates, my messages and my
4    profile.  Those are the most -- Those are the ones
5    that were most used by users.
6    Q.    And for each of those attributes,
7    there had to be a variable associated with it in
8    your -- in your MSQL database.  Correct?
9    A.    What do you mean the variables.
10   There was just a standard PowerScript command
11   saying, "get photo," and it would go -- It would
12   emulate the user going and getting their own photo
13   at the direction of the user.
14   Q.    All right.  But "emulate" means it
15   would go into the MySQL database, look into a
16   table, associate it with the idea of a user, and
17   pick out a variable associated with, for instance,
18   a photo.  Correct?
19   A.    In most cases, this information
20   was accessed dynamically from Facebook because we
21   were a browser and provided our users access to
22   their sites, so he was saying, "I want to look at
23   this information on my page," so it was not even --
24   it's not a database.  It was nothing of a database.
25   It was just a PowerScript command that was going

1    there and then accessing it.  Let me finish.  If
2    they wanted to import something and said, "I want
3    to import these photos," then the command would
4    also say, "Not only access it, but port it --
5    import this -- import this photo," and then it
6    would store -- store that photo in the database.
7    Q.    Right.  So even though you said,
8    "In most instances they were accessing
9    dynamically," you also had instances in which the
10   user would import the information straight into
11   Power.  Correct?
12   A.    As we've covered several times,
13   importing contacts, importing photos, these were
14   standard functionalities that we offered just like
15   Facebook offers importing contacts and other import
16   functionalities and every other site on the Web
17   offers importing.  It's a pretty standard feature
18   on the Internet.
19   Q.    Okay, but my question is:  You had
20   variables set up to associate the particular
21   contacts being imported with your own database and
22   user ID.  Correct?
23   A.    It was, as I said earlier, get
24   friends, get photos.  Those were the terminology
25   that we used.

1    Q.    In order for me to see
2    specifically how those variables were imported and
3    stored, I'd have to see the database.  Correct?
4    A.    Actually, it's described in this
5    document.  It says, "Get" -- What you want to get
6    and describe the variable.  Nothing -- It would not
7    be -- It says right there.  Everything I believe is
8    in there.
9    Q.    Well, the next rule that is
10   included is spider.database connection.  Correct?
11   A.    Let's see.  Okay.
12   Q.    And that database connection is
13   directed to the MSQL database.  Correct?
14   A.    This is a -- Let's see here.
15   Value equals server equals name, so it's a user ID
16   and the password, so this is -- That's correct.
17   Information that the user has put into the
18   database.
19   Q.    And then the database has the
20   ability to download through a spider function
21   aggregate data that's available on the Facebook
22   page.  Correct?
23   A.    PowerScripts can be written to
24   import -- We'll use the word "import" since that's
25   the standard terminology that most people use on

1  the Web. -- importing or porting data was a
2  feature that was made available. If a user chose
3  to import it, that would be a PowerScript that
4  would execute that command and move it into the
5  database.
6        Q.      And how would I know how many
7  times a user who accessed Facebook used the
8  function dynamically versus how many times it was
9  done through the spider importation methodology?
10       A.      First of all, how is that -- is
11 that relevant?
12       Q.      It's my question.
13       A.      How many types?
14       Q.      Yes.
15       A.      Well, first of all, you can take
16 the -- I can give you an estimate. We can look at
17 the total amount of accesses of users that we had
18 in Facebook which was really small. I think that
19 we've previously given you the amount of users that
20 actually accessed Facebook because it was up for a
21 very small period of time. And then we would --
22 There's two ways to do it. We could then look at
23 kind of our averages and give you a general
24 estimate. Otherwise, we know time spent -- We
25 could make some estimates. The numbers are pretty

Page 172

1  Orkut registered users were using Power?
2        A.      Yes.
3        Q.      So you -- And that was because
4  that type of information can be logged into your
5  database.
6        A.      Yeah. We know all the sites that
7  our users have registered in the system. That is
8  correct.
9        Q.      And you also know what -- the time
10 they are registered with Power. Correct?
11       A.      We know when the user registered
12 with Power and, I guess, we know their -- their --
13 their log-ins. That's correct.
14       Q.      And that -- that information
15 remains or does it? Does that information remain
16 on the documentation on the servers --
17       A.      I don't know if it's still
18 available because those were -- but we have
19 provided those macro-level numbers on those when
20 they were requested previously. Obviously, they're
21 extremely small since Facebook was only up on our
22 site for a few weeks and before we voluntarily took
23 it down.
24       Q.      Do you know how the PowerScript
25 that was used to access the Facebook site for data

Page 174

1  -- are very small over all since we had so -- so
2  few users. I think less than one percent of our
3  entire user base were Facebook users, so Facebook
4  was a -- from our perspective, a relatively small
5  -- It was growing obviously, but at the time we
6  were on there, it was not a -- it was a small -- a
7  very small amount, but if you want to get into the
8  micro-number, I mean, we could make best guess
9  estimates and try to give you our estimates on
10 those; and if it was really relevant, I don't know
11 what else we could do.
12       Q.      Did you ever log the amount of
13 Facebook users that were accessing your site?
14       A.      I believe we provided --
15              THE WITNESS: Have we provided --
16       A.      What have we provided? We
17 provided the information that we were able to
18 access if I'm not mistaken, but I haven't -- been
19 awhile since we provided this information, so I
20 don't know.
21       Q.      Do you know just offhand if, as a
22 general practice, Power logged the number of users
23 of any given Web site at any given time on Power?
24       A.      Yes.
25       Q.      So for instance, you knew how many

Page 173

1  collection was used before Facebook was made
2  available to actual Power users?
3        A.      What do you mean? For data
4  collection?
5        Q.      In the importer function we're
6  talking about.
7        A.      Yes.
8        Q.      Do you know how your programmers
9  were using it before Facebook was actually made
10 available on the Power site?
11       A.      How they were using it, they were
12 using it in a very similar way that Facebook
13 when -- when a user says, "I want to access my
14 contact on another site," as -- I think it's called
15 the friend finder feature on Facebook. They would
16 give their user name and password. They would
17 authorize the access of their contacts and then
18 they would import those contacts, so that's pretty
19 much a -- pretty similar methodology. We gave --
20 We went one step further and allowed them to view
21 all their contacts in one place so they could not
22 only access it -- import it, but we made it
23 visually easy to communicate with your contacts.
24 So we went -- We took that similar feature one step
25 further.

Page 175

1    Q.    I only am just curious at a very
2  practical level how your developers developed the
3  import directed to Facebook in the period of time
4  before it was made active.
5    A.    We didn't -- as -- Importing
6  Facebook, we didn't do much with Facebook. Our
7  functionality for Facebook was pretty standard.
8  You could browse through the site. You could get
9  your friends, get your photos and the other
10  information that you see there and it was --
11  it's -- PowerScript was a very robust and powerful
12  language, at least in our opinion, and it was very
13  -- it was just a -- It was a very simple process
14  for us to extend it to not only Facebook, but to
15  any site.
16    Q.    Were you copied on all the
17  documentation relating to beta testing as it would
18  be to make sure that you had it set up so that the
19  data tables for --
20    MR. COOPER:  Strike that.
21    Q.    You had to decide what variables
22  would be set up in your MSQL database to reflect
23  content that was downloaded from Facebook.
24  Correct?
25    A.    Yeah, but I could easily give you

Page 176

1  it was -- Typically, I would guess it was all --
2  all -- all of the information there. All of the
3  profile information, so I don't -- I don't know why
4  -- I don't know what specifically you're trying to
5  ask.
6    Q.    Different sites still have
7  different functions made available to their users.
8  Correct?
9    A.    Yes.
10    Q.    All right. For instance, Facebook
11  makes events available to their users?
12    A.    Correct.
13    Q.    Who would test at Power whether or
14  not you could download the information -- Who would
15  set up the variable associated with the event that
16  would be downloaded from Facebook into your MSQL
17  database?
18    A.    Well, it's most likely be Eric,
19  Danilo, or Carlos if they were working on that if
20  they were there.
21    Q.    And do you know how they accessed
22  Facebook before it was made available on the Power
23  site. Did they use their own Facebook accounts or
24  did they use somebody else's?
25    A.    They used their own accounts.

Page 178

1  that information. I mean, it's -- Go ahead with
2  your question.
3    Q.    You agree you have to do that,
4  that it's required in order to have the information
5  available without a user who's registered with
6  Facebook. Correct?
7    A.    Yes.
8    Q.    And that data also had to be
9  contextually available through importation
10  functionality in PowerScript even if that wasn't
11  the normal way that you collected. Correct?
12    A.    Correct.
13    Q.    All I'm wondering is, in order to
14  set up those tables and in order to ensure the
15  importer was collecting the data on -- from
16  Facebook as Facebook had elected to format itself,
17  who tested that?
18    A.    Let me just make sure I understand
19  your question correctly. There are profile data
20  that tell me if I'm answering it. There are
21  profile data such as name -- I don't know. Sex,
22  other types of things that are publicly available
23  on your page, and if you wanted to -- if the user
24  wanted to import or move that data to our site, you
25  want to know which variables we accessed? I mean,

Page 177

1    Q.    And once they used the automated
2  script, whose account was used to put in motion to
3  automate the script?
4    A.    They would use their accounts and
5  then users would -- would use their accounts.
6    Q.    All right.
7    A.    They've authorized everyone --
8  Every access was authorized by the user who
9  provided access. In the case of them, they were
10  the user and they authorized access to their own
11  account, so I would guess the answer is the -- the
12  user who's logging in and consciously saying, "I
13  want to access this information."
14    Q.    How did Power let its users know
15  when Facebook was made available as a feature that
16  users could download information?
17    A.    We updated our page and let -- let
18  them know that Facebook is now available. Updates
19  on the page, banners, users on the site.
20    Q.    Did Power ever have pop-up
21  promotions available made available on the site to
22  solicit new members?
23    A.    On our site? Yes.
24    Q.    Can you describe what pop-up's you
25  recall?

Page 179

1     A.    If we -- If we had -- In general,
2   a pop-up would be when a user logs in to Power, so
3   they come to Power and they log in.  We say we have
4   a new feature and it pops up and they close the
5   window.  It's a standard advertising functionality
6   that you see in hundreds or thousands of sites,
7   pop-ups.
8         Q.    Do you know who was responsible
9   for creating the code for the pop-ups that were
10  related to solicitations?
11        A.    I know that Eric was the
12  responsible manager.  I don't every, but I would
13  guess it would be someone on Eric's team.  I don't
14  know the person that handle advertising.
15        Q.    Do you know offhand how particular
16  solicitations were --
17              MR. COOPER:  Strike that.
18        Q.    Was there somebody in marketing
19  who was responsible for coming up with the ideas
20  how to solicit new members?
21        A.    All -- All marketing was driven by
22  product similar to many other tech companies.  Eric
23  oversaw marketing the product.  In our view,
24  they're the same thing.  Marketing or product
25  driven decision.

Page 180

1         Q.    Do you know if there were
2   documents reflecting Power's ideas being bantered
3   about describing how they could get new members?
4         A.    Yes.  I believe we provided those
5   to you.
6         Q.    Do you know -- How many documents
7   do you believe you provided to Facebook
8   approximately?
9         A.    I think it was -- not -- less -- I
10  don't know.  It was less than ten, I believe.
11        Q.    The -- And how often were
12  marketing schemes discussed internally at Power, if
13  you know?
14        A.    How often?  They would be in
15  conversations, like, we'd have -- we -- meetings.
16  There would be conversations if anything became
17  relevant or useful.  There would be -- Most of them
18  were e-mail discussions, so e-mail discussions
19  would be where most of conversations took place,
20  but obviously they were also verbal conversations.
21        Q.    Do you know if any particular
22  discussions ever occurred relating to soliciting
23  members from Facebook?
24        A.    Soliciting members from Facebook?
25  What do you mean?

Page 181

1         Q.    To join -- To join Power.
2         A.    We didn't have access to -- The
3   users could invite their friends.  So that was a
4   feature that -- One of our promotions in our
5   features was that you could invite your friends to
6   join, invite your friends on Facebook to join, and
7   so people could -- they could make promotions so
8   they could create events around -- around a power
9   creativity around Power.  So we gave our user -- We
10  encourage our users, in fact, to bring their
11  friends in the same way that Facebook encourages
12  its users to bring their friends from other sites.
13  But we employed same tactics that are used by --
14  similar tactics where you invite your friends, so
15  we did use invite friends features and promotions.
16        Q.    If you go back to Exhibit 103, you
17  see various -- "Displayed a Launch Promotion" in
18  the upper left-hand corner?
19        A.    Yup.
20        Q.    It says, "First 100 people who
21  bring 100 new friends to power.com earn $100?
22        A.    Yes.
23        Q.    Is that an example of a pop-up
24  that was made available on the site that was
25  designed to encourage new users to the site?

Page 182

1         A.    I don't know if this was a pop-up.
2   You can see it was prominently displayed on the
3   front page.  That's not more than that, it's not a
4   pop-up.  I think the terminology is not pop-up it's
5   an ad -- In fact, it's a prime-placed ad on the
6   home page.
7         Q.    Do you know whose idea it was for
8   this particular promotion?
9         A.    That was mine.
10        Q.    Do you know when you came up with
11  it?
12        A.    While I was sleeping.  I just
13  thought a hundred, hundred, hundred was a good
14  idea.
15        Q.    All right.  And when you clicked
16  on the Number 100, what would happen?
17        A.    It gave you a chance to -- to
18  select which friends you wanted to -- to, I guess,
19  invite to -- to join -- to join Power.
20        Q.    All right.  And was that -- Would
21  you agree that, as reflected on Exhibit 103, that
22  particular promotion was made available at the time
23  that you were connected to Facebook?
24        A.    Yes.  It was.
25        Q.    And if you clicked on 100 people,

Page 183

1    you would be invited to ask your friends to join
2    power.com?
3        A.    No.  You would have the option to
4    invite your friends to join just like you have the
5    option on Facebook to invite your friends to join
6    Facebook and every other site on the Internet, and
7    if they did, if they reach a hundred friends that
8    joined, they would earn $100.
9        Q.    And if you accepted the feature
10   that came up saying would you -- it said something
11   like, "Would you like to invite your friends to
12   Power"?
13       A.    Yes.
14       Q.    If you hit "yes" or "I agree" --
15       A.    Yes.
16       Q.    -- how -- what -- what
17   automation would occur at that point?
18       A.    So first of all, you have to
19   remember that 99 percent of our users were not --
20   were not using -- were not using Facebook.  They
21   were users on other sites, so we actually -- I
22   guess you could say we were actually a big source
23   of providing users to Facebook in Brazil.  In fact,
24   as -- I guess you could say it was a gift, but we
25   -- we brought a large amount of Orkut users to

Page 184

1    one were obviously the friends that the user had
2    already put in the system.
3        Q.    The promotion itself had to have
4    an attribute created for it in the MSQL database.
5    Correct?
6        A.    Yes.  That's correct.
7        Q.    And that attribute would then be
8    assigned to anybody who clicked on the promotion.
9    Correct?
10       A.    What do you mean "the attribute"?
11       Q.    Well, if someone clicked on the
12   promotion, their user name would then be assigned
13   to the attribute associated with the promotion.
14   Correct?
15       A.    If they selected to invite a
16   friend, they could send an invitation to that
17   friend.
18       Q.    That's not what I'm talking about.
19   The minute that -- Let's say I'm Ms. Almeirda who's
20   being shown on the screen shot.
21       A.    Okay.
22       Q.    If Ms. Almeirda clicks on the
23   launch promotion --
24       A.    Yes.
25       Q.    -- she would have received a --

Page 186

1    Facebook, so that's where a lot of our promotions
2    were -- Because our users already, as you know,
3    have -- Prior to having Facebook, we had millions
4    of users who have hundreds of friends already in
5    the system, and that represented 99 percent of our
6    contacts in our system.  Facebook was a very small
7    part of this world.  At that time, obviously it's a
8    much larger site today but in our world, in our
9    growth it was -- it was introduced later.  So we
10   were encouraging our friends -- our users to go and
11   register at Facebook and become Facebook users.
12   Because in our -- in our view, the more social
13   networks that users were using, the more value it
14   would be to, you know, to aggregate different
15   sites.  So we encouraged users to sign up for
16   Facebook.  In fact, we're giving free marketing to
17   Facebook.  So to answer your question, a lot of
18   these users -- You could see all your friends from
19   all your sites and say, "Hey.  Join Facebook when
20   you're at Facebook."  That was a big part of our
21   promotions.  That was the largest part of our
22   promotions.  And then, of course, if they have
23   friends that are already using Facebook -- Facebook
24   and they wanted to invite their friends to come use
25   Power, that's the smaller part.  But the biggest

Page 185

1    a response that said, "Would you like to invite your
2    friends to join Power?"
3        A.    She's shown -- She's shown her
4    friends and she's say -- Yes.  Would you like to
5    invite -- Which friends do you want to invite to
6    join.
7        Q.    And was it the default to click
8    all friends?
9        A.    Was it the default?  You have the
10   text here.  I don't know what the system was, but
11   it's -- You can go look and see.  I don't have the
12   screen shots there.
13       Q.    Do you remember, as you sit here
14   today, whether or not the default was to invite all
15   friends?
16       A.    I don't.  But in most cases the
17   default either is, depends on the sites.  I think
18   at least two-thirds or half -- I don't know.
19   Typically, give you the default to invite all your
20   friends and they -- but I don't remember or have
21   that offhand.
22       Q.    And because this promotion says
23   it's for the first 100 people who bring 100 new
24   friends to Power --
25       A.    That's correct.

Page 187

49 (Pages 184 to 187)

```
 1        Q.    -- that -- would I be correct that
 2   the promotion had to have it's own MSQL -- a
 3   database attribute was set up specifically for the
 4   promotion so you would populate it with the users
 5   who were --
 6        A.    Well, actually, no, because
 7   invitation of friends is a standard feature from
 8   the beginning of our site and all other sites.  So
 9   we already know how many friends were doing that.
10   We just said, you know, they're just noted now if
11   somebody received, reach a hundred we would be --
12   so it really didn't change -- the functionality of
13   inviting friends and recording that is a standard
14   functionality of -- Facebook, in fact, has -- I
15   think I'm the top inviter of friends on Facebook
16   to -- of my friends.
17        Q.    I'm not asking --
18        A.    I understand.
19        Q.    I'm asking very simply, in order
20   to be certain you knew who was entitled to the 100
21   dollars, you have to set up a database table that
22   identified who was participating in the -- in the
23   promotion.  Correct?
24        A.    Actually, it was a lot simpler
25   than that.  We're dealing with 100 people and
```

Page 188

```
 1   technically it was -- it was much easier just to
 2   manually look and I believe -- We can see how many
 3   friends people invited so -- and then we just
 4   manually took those people out.  I think they were
 5   -- When we provided it, I think there might have
 6   been 30 or 40 people that achieved it, so it was
 7   literally just looked on the list of people who
 8   invited friends to Power who had more than a
 9   hundred.
10        Q.    All right.  But when say, "looked
11   on the list" you were looking in a database table.
12   Correct?
13        A.    Yeah.  We went to our database.
14   Importing friends is a -- is a feature.  It's a --
15   It's a -- As I mentioned many times, it's one of
16   our features on our site.
17        Q.    And in order to see how the
18   promotion was set up in terms of identification of
19   those who were participating in it, I'd need to see
20   the database.  Correct?
21        A.    To see the -- Every single user on
22   our site has the option to invite friends.  Who
23   achieved a hundred, I can tell you.  I don't know
24   the number but it was 30 something friends, so I
25   received -- that reached a hundred friends, so I
```

Page 189

```
 1   can tell you that every single user of our site had
 2   the ability to invite friends.  And if -- if some
 3   of them reached a hundred, which was obviously not
 4   an easy task to reach, they would -- they would win
 5   this award, so I think only 30 something people
 6   reached it, if I -- if I remember correctly.
 7        Q.    All right.
 8        A.    So I don't know if that answers
 9   your question correctly.
10        Q.    What data was -- Whether it was
11   automately or manually viewed, what data was
12   viewed in order to determine who had invited 100
13   friends to join Facebook?
14        A.    Well, it's -- In the same -- When
15   any site creates an import or invitation, when a
16   friend registers because of your invitation, you
17   know this is -- This is a feature that was in our
18   site, always in our site.  We know how many friends
19   were invited.  We know how many friends were
20   converted.  Just as Facebook publicly displays it
21   on their site and every other site does that.  So
22   we just looked and saw the people that were above
23   the hundred on that date, and we -- and we -- and
24   we gave them a hundred dollar check.
25        Q.    And when you say you looked, you
```

Page 190

```
 1   looked in the database.  Correct?
 2        A.    We looked in our database,
 3   correct.  And we provided the numbers, I believe,
 4   on that promotion to you guys.
 5        Q.    When somebody clicked on the
 6   launch promotion and they were given, like you to
 7   invite your friend" --
 8        A.    That's correct.
 9        Q.    -- and they hit yes, at that
10   point the importer, as we've been calling it, would
11   automatically contact all friends on Facebook to
12   invite them to --
13        A.    Let's be clear.  We don't have
14   access to any friends' e-mail addresses, so there
15   was not a single E mail sent by Face -- by Power
16   for -- We have e-mail addresses for friends on
17   other sites, but on -- so we -- If they wanted to
18   invite, as I said 99 -- well over 90 percent of our
19   users were Orkut users and Orkut friends and had
20   friends from other sites where they -- on sites
21   that allowed their E mails, but Facebook didn't --
22   didn't allow E mails, otherwise, we would have been
23   happy to send an invitation to those friends to
24   invite them; so that was not available for us for
25   Facebook.
```

Page 191

**Page 192**

Q. At this point, I haven't even talked about E mail. All I meant is at the point at which someone said yes they'd like to invite their friends, the database would then recognize, using its importer function and the idea of the registered user Power, who the friends were. Correct?

A. It would show you a list of all your friends, yes, from your friends list.

Q. And the invitation to join was then automatically forwarded to those friends whether through E mail if you're on Orkut or some other way on Facebook. Correct?

A. A user had to say, "I want to invite this friend," so it's -- An authorized user said, "Yes, these are my friends, and these are the friends I want to invite to this site." That is correct.

Q. All right. And at that point, an automated script would contact whatever friends were identified. Correct?

A. Depends on -- So if the friend was a non-- Facebook did not provide E mails. If the friend was, like, on another site and they had the E mail, they could -- they could send on E mail

Page 192

**Page 193**

invitation. As I said, we never -- never sent a single E mail invitation to Facebook friends. If they were on Facebook, they could -- they could communicate and go tell those friends and say -- try to get -- encourage them, call them, whatever they wanted to do to come in join.

Q. All I'm asking is that it was an automated script that would make that choice whether it be E mail --

A. I don't know what you mean "by automated script." By automated script do you mean the same like Facebook has an automated script that goes to other sites, takes all the data out, brings it back and invites those friends? Is that what you mean by that?

Q. I'm talking about Power.

A. I'm trying to understand what you mean by "automated script."

Q. Yes and Power --

A. So you're referring to the same type of script. That's what I'm asking.

Q. Again, let me just -- You agreed that the -- there was an attribute set up for this promotion in the database. Correct?

A. There was no unique attribute. It

Page 193

**Page 194**

was just -- We already have -- We already have a standard thing where we can see how many friends came to Power because of a friend because every friend has a unique link that they can pass to their friends. So if I -- if I want to write to my friends and say, "Hey, come join Facebook," and I write an E mail. I can post that link and then they click on that link, they get credit for them joining. So we already -- Since we know how many -- how many friends came as a result of that user promoting, you know, telling their friends whether he called them on the phone and said, "Use this code," or whether he e-mailed them, or whether he -- whatever ways that he communicates with his own friends.

Q. How did you know that the communication was in conjunction with the promotion?

A. Anybody during that time was -- Anybody that got to hundred was -- was in the promotion, so it didn't matter. Everyone in our database I was eligible.

Q. If someone invited 100 friends to Power, but didn't join in the promotion, are you saying you gave them the 100 --

Page 194

**Page 195**

A. Yeah. Anybody who got to a hundred.

Q. All right. For somebody who clicked on the launch promotion and -- Well, first of all, who was responsible for manually reviewing the database to determine who were the 37 or so you say were eligible?

A. I don't know. It would probably have been someone on Eric's team. I don't know the person.

Q. You didn't do that manual review?

A. I didn't personally do it, but I know -- I think I signed the checks or at least -- I don't know. Whatever we send out it was, like, 20, 30 people, whatever the number was.

Q. Do you, as you sit here today, know how the database was set up in order to recognize who was eligible for this award?

A. I think I've already answered. Every single person in our database was eligible. Anybody who acquired a hundred friends that came as a result of them receiving -- received this.

Q. How -- In your database, what particular parameter told you, Power, who -- just the name of the parameter?

Page 195

1  A.   Every friend, when they -- they
2  have a link, when they invite friends just like --
3  When you send -- When you tell a friend, there's a
4  unique link that you can give to your friends.
5  Say, "Here, use this link when you join."  If they
6  use that link, whether it came from -- whatever was
7  the invitation that a user sent to their friends,
8  they would get credit for that because of the
9  unique identifier.
10  Q.   And that unique -- that link, as
11  you are putting it, was a URL.  Correct?
12  A.   Yeah.  URL is the -- the primary
13  way that this is physically done.  We provided our
14  users with a URL.
15  Q.   All right.  And in the case, for
16  instance, of somebody who contacted Orkut, that
17  link would be embedded in an E mail sent to Orkut
18  saying, "I would like you to join me on Power."
19  A.   It would be whatever way the user
20  wants to communicate with their friend.  They could
21  send on E mail.  They can -- They can call them on
22  the phone and say use this URL.  They can -- I
23  mean, there's -- They could go to them in a chat
24  room and say, "Go use this.  Click on this link."
25  In Microsoft messenger on their instant messenger,

Page 196

1  Q.   Now, a moment ago you said, for
2  instance, when you contacted Orkut as a participant
3  in this promotion, Power provided the URL link and
4  the rest of the content in the invitation.
5  Correct?
6  A.   We give them the link.  How they
7  wanted to -- Whether they wanted us to send an
8  invitation, which is a pretty standard process, or
9  whether they wrote there, I mean, it's up to the
10  user.  We gave them a lot of choices.
11  Q.   And if -- if Power contacted the
12  friends that were identified, it was through an
13  automated script.  Correct?
14  A.   If Power contacted and they said
15  -- Well, if it was a friend that they already had
16  put the -- you know, the e-mail address in the
17  system and they wanted to send them an invitation,
18  as I said, not a single Facebook user, you know,
19  was contacted in that manner, but if it was other
20  site that was made available, we did.  We would
21  send out an E mail on their behalf if that is -- as
22  I said if it was a -- You know, it really depends
23  on the friend.  They could choose.  They have many
24  way's to contact them.
25  Q.   Do you know if there was a way

Page 198

1  copy their friends and say, "Sign up with this
2  link."  They were unlimited ways that people can
3  communicate with their friends.
4  Q.   All right.  But the link was
5  provided in the communication by Power.  Correct?
6  A.   The link was given -- Power
7  provided a link to our users to encourage them to
8  invite their friends.
9  Q.   And did Power also prepare the
10  script that was included with that invitation?
11  A.   I think, yeah, we provided them --
12  we provided them a script, yeah.  As every single
13  -- As Facebook does and everybody else does.
14  Q.   Now, in the case of Facebook, you
15  say that Facebook didn't permit you to contact
16  through E mails?
17  A.   What do you mean "Facebook doesn't
18  permit"?  Facebook did -- It has nothing to do with
19  permitting it.  We wanted -- If we wanted to -- We
20  just didn't have access to the E mails because
21  Facebook -- If we wanted to, we could have -- We
22  didn't get to that, but we would be happy to build
23  a feature that imported your E mail contacts, but
24  we didn't -- we didn't do that.  We never got to
25  that point.

Page 197

1  that you could determine how many Facebook
2  registered users were contacted as part of this
3  promotion?
4  A.   Facebook registered users?
5  Meaning if they were contacted -- In what manner?
6  If they happened -- If they were contacted at Orkut
7  and they happened to have an account on Facebook
8  but were not contacted through -- through the help
9  of Facebook?
10  Q.   No.  I'm talking about were there
11  individuals at Facebook contacted on the Facebook
12  -- through the Facebook system --
13  A.   Yes.
14  Q.   -- as a result of this promotion?
15  A.   Yes.  Of course.
16  Q.   Is there a way to determine how
17  many were contacted?
18  A.   Well, we could do -- If you take a
19  few minutes, we can probably figure out -- It's
20  obviously very small, but -- Because the Facebook
21  users were so small, but let's think about -- So
22  people created events on Facebook, so promoting it,
23  because our users were -- You know, some of them
24  created events saying, "Come on Facebook," about
25  come and joining, they created messages.  They

Page 199

1    sent -- I really don't know, but I mean, what I can
2    tell you is how many total, you know, users --
3    Well, if we had -- I'm trying to think about this.
4    We could probably go through an exercise to try to
5    figure out the amount.  It was not a large amount,
6    but I'm guessing in the ten -- the amount of people
7    that might have -- that might have had some
8    interaction might have been in the tens -- in the
9    tens -- in the tens of thousands maybe.  When I say
10   "interaction" meaning they might have seen an
11   event.  They might have been contacted over the
12   phone.  They might have been, you know, told them
13   in person -- I'm just -- I'm extrapolating.  I have
14   no idea.  I know that the total amount of users
15   that signed up for Facebook, so this is the maximum
16   it could be, I think, were -- I don't remember
17   this.  I think it might have been 30 something.  I
18   don't know the number of how many users actually
19   were registered who integrated their Facebook
20   account, so it couldn't be any more than that.  I
21   think it represented less than one percent of our
22   overall users.  I don't know.  I don't know that
23   number.
24        Q.    What documentation at Power exists
25   that would tell me that number?

                                          Page 200

1         A.    I believe --
2              THE WITNESS:  Did we provide this
3    number to them?
4              Do you mind if I check here and
5    see?
6         Q.    Why don't we -- It's five of
7    three.  It's got to be close --
8         A.    If it was available, I believe
9    that was already in your questions.
10             MR. COOPER:  Can we go off the
11   record?  Let me go for a couple more questions and
12   then the tapes going to end in seven minutes.
13        Q.    Mr. Vachani, would one of the ways
14   to determine the number of Facebook users whoever
15   used the power.com site would be to look at
16   database.  Correct?
17        A.    I believe we provided these
18   numbers to you already though.  But, yeah, we could
19   access our database and do a query and try to tell
20   -- and tell you this, but I would be happy -- I
21   think I even provided -- We may have even provided
22   that already to you but I'm happy to give that
23   information to you.
24        Q.    Because the launch promotion had
25   an attribute set up in the database by your own

                                          Page 201

1    admission, you could also calculate the number of
2    times the launch promotion was launched by somebody
3    who has a registered Facebook account.  Correct?
4         A.    Actually, no.  I think you changed
5    my words.  What I said is that every single user in
6    our system has the ability to invite friends and we
7    can, therefore, see -- such a small amount of users
8    that reached over a hundred that we could just go
9    in and see how many people who have brought a
10   hundred friends, so the promotion was a
11   marketing -- marketing promotion.  The actual
12   viewing of that was just looking at converted
13   friends.
14        Q.    Let me put it -- Did you calculate
15   the -- For somebody who clicked on launch
16   promotion, you indicated a default would come up
17   indicating that it would ask if they wanted to
18   invite their friends to join power.com, and part of
19   this promotion in the default was to invite all
20   friends.  Correct?
21        A.    I didn't say that.  I said, "I
22   don't know what the default was here."  You made
23   that -- You made that assumption.  What I know is
24   that we provided a list of friends, and I know that
25   most sites -- I don't know what we specifically did

                                          Page 202

1    at that time, but I know it's usually standard, you
2    know, more common to have a default to invite all
3    your friends.  I think Facebook does that, in fact.
4         Q.    Setting aside what the default
5    was, as part of the invitation, would list the
6    friends that could be contacted?
7         A.    That's correct.
8         Q.    And that would list the friends
9    who were available as friends on Facebook.
10   Correct?
11        A.    I believe so, yes.
12        Q.    And for the friends who were
13   contacted on Facebook, an invitation to join Power
14   would then be set if the person had that person
15   selected as, "Yes.  I would like them to be
16   invited"?
17        A.    Yeah.  If they could communicate
18   to invite them, they would be invited.
19        Q.    And earlier you said that however
20   the mechanism was, whether it was events or E mails
21   for other Web sites or whatever -- setting aside
22   the telephone call, if it was in a text-based
23   communication --
24        A.    Yes.
25        Q.    -- Power would provide the text

                                          Page 203

1 and the URL link to Power as part of that
2 communication so --
3 　　　　A.　　Yes.
4 　　　　Q.　　-- so the friends would know
5 where to go to be invited.  Correct?
6 　　　　A.　　We would provide them text that
7 they could use.  Correct.  Of course.
8 　　　　Q.　　And the list of friends was
9 recovered from the database and the variables that
10 were associated with friends with that user ID?
11 　　　　A.　　Every -- I think -- Every user --
12 One of our core features is you can access all your
13 friends and create a friends list.  So, yes, I
14 mean, you have a friends list and you can select
15 from your aggregated friends list who you want to
16 invite.
17 　　　　Q.　　Now, earlier you said while most
18 people contacted their Web site dynamically inside
19 the browser, the functionality existed to have the
20 automation available on through the PowerScript
21 also contact the Web sites.  Correct?
22 　　　　A.　　What do you mean?
23 　　　　Q.　　In other words, you -- In order to
24 obtain -- user content, for instance, from Web
25 sites, you could use the automated script available

Page 204

1 friend.  They could create an event or they could
2 go and, I guess, take that link up and paste it and
3 write an E mail to their friend.
4 　　　　Q.　　Was one of the ways that Power was
5 able to make the invitation available to Facebook
6 users is that the PowerScript would set up an event
7 on Facebook on behalf of the user who had clicked
8 on --
9 　　　　A.　　If the user authorized for the
10 creation of the event, yes.
11 　　　　Q.　　And if the -- How did the -- How
12 did Power know it was to set up an event as opposed
13 to any other way of communicating --
14 　　　　A.　　Because the user said, "Create an
15 event for me," so user authorized the creation of
16 an event.
17 　　　　Q.　　Was that made available on the
18 promotion -- on the pop-up that made -- would come
19 up --
20 　　　　A.　　That was -- As I said, if you
21 clicked that, that was one of the options that the
22 user had an option to create an event.
23 　　　　Q.　　What other options did the user
24 have?  We can take a break here.
25 　　　　THE VIDEOGRAPHER:  It's 3:01.  Off

Page 206

1 through PowerScript to download --
2 　　　　A.　　That's what any importer does.
3 When you use an importer, you're -- you're
4 basically authorizing a script to go to another
5 site and access certain data.  So, like, when
6 Facebook -- as your Facebook import you authorize a
7 script written by Facebook to go to another site,
8 take that data, bring it back, and then Facebook
9 sends an invitation on behalf of the user.  That's
10 the same process that we go through.  That is
11 correct.
12 　　　　Q.　　And in the invitation that was
13 then sent as part of the launch promotion to a
14 Facebook user, how would the Power site know what
15 function or what feature on Facebook to populate
16 the invitation to?  In other words, how would it
17 know to send it to an event or say an instant
18 message or whatever medium of communication?
19 　　　　A.　　Well, Facebook doesn't have
20 instant message.  You know, a user can go and -- If
21 a user wanted to manually click on a friend and
22 say, "Hey," I don't believe even they had Facebook
23 chat at that time, so there wasn't even -- I don't
24 think it was a feature, so we didn't even interact
25 with that.  They could write a message to their

Page 205

1 the record, Tape 4.
2 　　　　(Whereupon, a recess is taken.)
3 　　　　THE VIDEOGRAPHER:  3:13, on the
4 record.  Beginning of Tape 5.
5 　　　　Q.　　Mr. Vachani, just before the break
6 you indicated that in the instance of Facebook
7 being contacted by Power --
8 　　　　MR. COOPER:  Strike that.
9 　　　　Q.　　That in the instance in which a
10 friend of somebody who had indicated their interest
11 in participating in the launch promotion, the
12 friend was on Facebook, that one option that was
13 available to contact that friend was events.  Do
14 you recall that before the break saying?
15 　　　　A.　　I believe creating an event.
16 　　　　Q.　　Do you recall what the other
17 options were?
18 　　　　A.　　I don't offhand, but I think they
19 provided a link where they could -- So everyone was
20 given a unique link so they could go do whatever
21 they want with that link, write E mails to friends,
22 call on the phone, whatever so that was -- When
23 they clicked, they were made available a link, and
24 I think that maybe send in a message so Facebook --
25 While they can't send an E mail, they can send a

Page 207

54 (Pages 204 to 207)

1    message to friends on Facebook, so they could
2    message their friend.  So if the user said, "I want
3    to send a message, private message," they could
4    send a private message to their friend, if I'm not
5    mistaken.
6         Q.    Let me -- Any other options?
7         A.    I don't remember offhand, but
8    those are the -- I think the primary ones, but
9    obviously they had -- they had a link that they
10   could use whatever way they wanted to.  They could
11   create an event -- create an event, send a message.
12   Those are the ones I could think of off hand, but I
13   believe whatever details on this were also provided
14   in the past in the previous declarations.
15        Q.    In the case of providing a link,
16   in what way was the link displayed on Facebook?
17        A.    When the user is provided a link
18   on Power, and they can copy and paste and do
19   whatever they want to -- to go promote that link.
20        Q.    I see.
21        A.    So just as any invitation process
22   on sites.  You give a unique link which has your
23   unique identifier in it, so if someone signs up
24   from that link you -- you get credit for it.
25        Q.    And that link would be the URL to

Page 208

1    contacted through Facebook to let them know?
2         A.    I think if someone creates an
3    event, whatever he way they do that, Facebook has
4    standard ways that they contact -- I think it comes
5    on your wall.  It also may -- It contacts -- You
6    can choose friends that want to be invited to an
7    event.
8         Q.    But the automated script that
9    Power used to create the event would know what
10   friends would be listed as part --
11        A.    These would need to indicate which
12   friends they want to invite to the event.  It's
13   been a long time, so I don't know the exact details
14   of micro-promotion, whatever, but I -- but I --
15   Logically, I believe they can select the friends
16   they want to -- want to invite.
17        Q.    When you say you don't know the
18   details of the promotion, what documentation would
19   reflect the details of promotion.
20        A.    I think we've already provided the
21   details previously.  I think it was in an E mail or
22   it was in a declaration.  I don't know but there
23   have been quite a lot of questions on this.
24   There's been questions on this in the past.
25             THE WITNESS:  Do you happen to

Page 210

1    Power --
2         A.    Those would be the URL to -- to
3    Power.  They can register.  Once they come to
4    Power, they can register their Facebook account.
5         Q.    In the case of creating an event,
6    did Power provide the promotional language the way
7    it did with E mails to other sites?
8         A.    I think it's standard in all
9    things.  You always provide suggested text or text
10   whatever.
11        Q.    Did Power's automated script
12   create the event?
13        A.    I believe that the authorizer,
14   they just say, "Create this event for me."  They
15   could do that for them, yeah.
16        Q.    And how did -- Power's automated
17   script would create an event and contact all
18   friends through that event --
19        A.    It doesn't contact friends.
20   Events are something you post and then you just
21   create an event.  I don't think -- I think that's
22   -- I'm not sure exactly.  I believe events you can
23   only create them.
24        Q.    But the event -- Friends that are
25   friends of those who create the events are

Page 209

1    have a copy of the other declaration.
2             MR. BURSOR:  Just answer the
3    questions.
4         Q.    Do you recall E mail traffic
5    inside Power amongst any of the individuals
6    associated with the promotion discussing it with
7    respect to the Facebook?
8         A.    I don't -- I think whatever
9    E mails -- whatever E mails they were, they were
10   provided to you.
11        Q.    Were the details of how the
12   automated script contacted Facebook to set up an
13   event something that were under the -- under the
14   management of Mr. Santos?
15        A.    The E mails for what?  You mean
16   the actual -- Yeah.  Under the management of
17   Mr. Santos, but I directed that.  I was the one,
18   since I created this promotion idea, I passed on
19   that information.
20        Q.    Who prepared the text that was
21   sent to, first of all, users that did have e-mail
22   addresses?
23        A.    I don't know, but -- I don't know
24   who created the text.
25        Q.    Do you know who provided the text

Page 211

1    that was sent to Facebook --
2         A.    Usually --
3              MR. BURSOR: Objection. Vague and
4    ambiguous.
5         Q.    Do you know who created the text
6    that was prepared through the automated script that
7    was sent by Power to Facebook users?
8              MR. BURSOR: Objection. Vague and
9    ambiguous. Assumes facts not in evidence. Lacks
10   foundation. You can answer.
11        A.    I'm repeating what he said.
12   Objecting. It's vague and ambiguous.
13             MR. BURSOR: I objected. If you
14   can understand it, you can answer it.
15        Q.    Mr. Vachani, as I said at the
16   beginning, your attorney has the right to interject
17   actions unless he instructs you not to answer --
18        A.    Okay.
19        Q.    Let me -- One of the ways that you
20   said that Facebook users would be contacted for
21   this promotion was the Power user could say they
22   wanted to participate and contact friends to create
23   an event?
24        A.    Correct.
25        Q.    And you said the automatic script

Page 212

1    -- the automated script created by Power would, in
2    fact, create an event on Facebook?
3         A.    If the user authorized it and
4    indicated they wanted to do that. That's correct.
5         Q.    As part of the creation of that
6    event, was text included as part of event set up --
7         A.    They were shown texts just like
8    standard practice. They were shown it and
9    authorized it.
10        Q.    And that text included the same
11   link to the URL to Power?
12        A.    I would assume it has the link in
13   it, yes.
14        Q.    The E mails that you said were
15   sent to users of, like, Orkut that had e-mail
16   addresses available on your site?
17        A.    Correct.
18        Q.    To the best of your knowledge --
19   And you said the link itself was one way that you
20   would be allowed to contact users. Correct?
21        A.    Well, you could take the link and
22   pass the link. It's -- You provide them a unique
23   link and they can go to messenger and copy that
24   link and say, "Hey, go sign up for -- for Power."
25        Q.    Do you know if that URL had an ID

Page 213

1    associated with it that indicated that it was
2    promotional -- on -- a unique ID on the Power site
3    that indicated to Power --
4         A.    There's nothing unique. It's just
5    -- Our promotion -- That was an extra complication
6    that was not necessary. It's just total -- Any
7    invitations -- Any referrals that came in during
8    that period qualified.
9         Q.    Do you know if that was the way it
10   was done or your programmers were good enough to
11   set up a unique idea --
12        A.    Well, it's not about good enough.
13   It was just a matter of research allocation. Why
14   would you -- There's no need -- There was -- We --
15   You know, the people we can see how many -- the top
16   hundred -- hundred people and the people that were
17   -- We could do a query and say, you know, how many
18   people -- We just did a database query at that time
19   and looked how many referrals came in.
20        Q.    Just so I'm clear, you're not the
21   one who did the review of the database. Correct?
22        A.    I didn't do it. I would have
23   requested it though. I would have been the one who
24   said, either myself or Eric.
25        Q.    Do you know one way or another

Page 214

1    whether or not any type of ID was set up with the
2    URL link that tied to the promotion?
3         A.    I don't know in particular, but,
4    as I said, it -- The logic that we use -- And I
5    remember that. -- was that we just look at how
6    many referrals came in as a result of -- as a
7    result of the unique ID, so it's not a -- whether
8    it's a promotion -- It was during that time period.
9    That simplified the product development
10   significantly.
11        Q.    If somebody -- If two people had
12   the same friend, how would you know which one
13   deserved credit for promoting the person to come to
14   Power?
15        A.    It's the one who registers first
16   from the link. It depends on which link they enter
17   the site from. It has the unique identifier of the
18   referring user.
19        Q.    And that unique identifier would
20   be stored in your MSQL database?
21        A.    The -- Every user has a UID, a
22   unique user ID number, so that's correct.
23        Q.    But if two Orkut friends have the
24   exact same friend who then joins Power, how do you
25   know that that friend joined Power as a result of

Page 215

56 (Pages 212 to 215)

**Page 216**

1    one friend over the other?

2         A.    Because they click on the link and

3    it has the user ID of the referring user.

4         Q.    Okay.  And that referring user ID

5    would be incorporated as one of the variables in

6    the MSQL database?

7         A.    Every user has a variable that

8    shows how many -- how many invitations have been

9    converted into successful -- if someone came from

10   that link and entered the site and...

11        Q.    And that same ID, for instance,

12   then on Facebook would also permit you to know if

13   two -- two different people with the same friend on

14   Facebook entered from a -- an event that one or the

15   other was responsible for creating?

16        A.    I'm sorry?

17        Q.    In the same way, if two friends

18   with the same Facebook friend, if that Facebook

19   friend joined, you would know from that same URL as

20   embedded in the event friend?

21        A.    We would just know that someone

22   came from this URL.  Where they came from and how

23   they came, we don't know.  We just know that they

24   came from that unique link.  The user could have

25   distributed it in many ways.

**Page 217**

1         Q.    You said a third way, in addition

2    to providing a link and an event invitation, that

3    users on Facebook could be invited to join in Power

4    through this promotion, was through private

5    messages.

6              MR. BURSOR:  Can you read that

7    back, please?

8              (Whereupon, the last question is

9    read back by the reporter.)

10             MR. COOPER:  I believe the answer

11   was yes.  He did answer.

12             MR. BURSOR:  You've got to wait

13   until he finishes the question, okay?  Please.

14   You've got to wait.  You've got to slow down.

15        A.    Can you clarify that again?  I was

16   interrupted so clarify that question again.  I

17   think the question was interrupted, so if you could

18   repeat that question and I will re-answer it

19   because I think --

20        Q.    Well, I did answer my questions,

21   Mr. Vachani.

22        A.    Okay.  If you could just repeat

23   that last question, that would be great.

24        Q.    In the circumstance where someone

25   was contacted through a private message as part of

**Page 218**

1    the promotion to join Power, how was the private

2    message created, if you know?

3         A.    I don't -- I don't remember, but

4    I'll -- offhand, but there are only two ways to

5    create messages.  One, is you can manually go and

6    write the message.  Second, is the way that Power

7    and Facebook and everybody else -- If a user says,

8    "I want to send a message," they can authorize a

9    message to be sent on their behalf and authorize

10   that.  So those are the two ways, and I would guess

11   that -- I can't confirm this, but I would guess we

12   used both of those methods.

13        Q.    With respect to automation --

14        A.    Yes.

15        Q.    -- how did -- If somebody clicked

16   -- I take it there were three options that the user

17   could identify how friends could be contacted, one

18   create an event, one link, create a link and one

19   create a message?

20        A.    They can copy and paste the link

21   and/or send a message.

22        Q.    If the individual hit send a

23   message, would Power's automated script then

24   contact the friends of the individual indicating

25   that was their preferred way of contacting Facebook

**Page 219**

1    friends?

2         A.    If they selected these friends and

3    said, "Send a message," if that was there, we would

4    happily do it because that's -- I don't know --

5    It's been a few years since we did that promotion,

6    but that would be -- that would be the way it would

7    be done.  You would -- They would say, for example,

8    on Facebook when you want to invite a friend,

9    Facebook gives you a list of all your friends.

10   They're usually prechecked and then when you say,

11   "Yes."  Facebook writes a message to those people,

12   so we, in general, follow standard practice.  So

13   while I don't remember offhand, those are -- I

14   guess that's what we did.

15        Q.    Do you know if the automated

16   scripts that were used in conjunction with this

17   promotion are amongst the source code you still

18   have copies of?

19        A.    Automated scripts?  I would have

20   to check.  I assume if it was a script, yes.

21        Q.    Do you know if these automated

22   scripts were part of your PowerScript?

23        A.    It's using PowerScript.  It's --

24   What the PowerScript would say is get -- I've told

25   you what -- It would basically say, "Get E mail,"

1  and then it would say -- it would instruct send a
2  message and it would go and do that.  So it was
3  just using PowerScript, standard PowerScript
4  commands.  You know, we did -- As I've said, we
5  have -- we did send messages that were authorized
6  by the users, and when appropriate, we used
7  PowerScript to send those messages -- to facilitate
8  sending those messages.  And when appropriate, we
9  used standard PHP scripts which are -- When you
10 send E mail messages, there -- usually there are
11 other types of scripts, so it may not always have
12 been a PowerScript.  It may have been whatever the
13 most appropriate way to do what the user requested
14 us to do.
15     Q.     And the proposed text that would
16 be used with the automated script would be embedded
17 in the code too.  Right?
18     A.     In the code?
19     Q.     Let me restate it.  The
20 PowerScript would instruct whatever function
21 contacted the relevant Web site whether it be
22 Facebook or Orkut, whatever English or Portuguese,
23 or whatever text, to include in that communication.
24 Correct?
25     A.     I believe you guys already have

Page 220

1  copies of the -- of the E mails -- I mean, of the
2  script, so it was in -- I believe there are screen
3  shots, so you have -- you already have that
4  information.  It was not -- It was the same --
5  Whatever was in the actual screen shots that you
6  guys had access to have been given already.
7     Q.     But my question was simply, you
8  would agree that that language is actually also
9  reflected in the code.
10    A.     I don't know how that language is
11 put in, but it would be -- it would be accessing
12 some -- some -- some language that starts
13 somewhere.
14    Q.     Are you aware of a practice of
15 programmers to identify who is responsible for
16 creating elements of code?
17    A.     Yes.
18    Q.     Do you know if in the source code
19 that -- or in the PowerScript, for instance, the
20 source code implementing PowerScript there are
21 reflections of what programmers were developed
22 particular aspects of it?
23    A.     The guys -- In relation to
24 Facebook, I believe that Danilo and Carlos were the
25 guys that worked on that, so it would be -- or

Page 221

1  Eric, but that's -- I don't know how it's
2  documented.  I wasn't actively involved in that
3  day-to-day process.
4     Q.     And are you even sure that the
5  three individuals you just mentioned are the
6  exhaustive list of programmers who worked on the
7  Facebook code?
8     A.     As I said earlier, those are the
9  people that came to my mind.  We had a large --
10 large group of people.  If a guy needed favor,
11 whatever, and he asked something, that was a
12 micro-decision left to the team.
13    Q.     In 2008 was Power in any way
14 generating revenue from its Web site?
15    A.     Yes.
16    Q.     How was it generating revenue?
17    A.     Ad revenues.
18    Q.     Would those be pop-up ads?
19    A.     It would be all kinds.
20    Q.     Can you give me a list of ads
21 you're talking about?
22    A.     Standard IAB, Interactive
23 Advertising Bureau formats for advertising.
24    Q.     And was the primary way you
25 generated revenue click-throughs.  Do you know what

Page 222

1  I mean by "click-through"?
2     A.     We were not actively selling ads
3  at that time.  We were -- You know, we were focused
4  more on building our platform, so there was very
5  nominal revenues in the company at that time.  In
6  fact, we probably earned less than 10 -- It would
7  be very, very, small amounts.
8     Q.     How were you able to pay your
9  employees?
10    A.     We were a venture capital funded
11 company.  Essentially, capital funded.
12    Q.     In 2009, how much revenue, if you
13 can estimate, did the company still have?
14    A.     Probably less than -- 2009
15 probably -- one to $300,000 of revenue for the
16 whole year.
17    Q.     How about 2008?
18    A.     Probably similar.  I don't know
19 the exact number.  It's under -- It would be a few
20 hundred thousand dollars at the most for the entire
21 company for the whole year, and probably 99 percent
22 of that was generated from Orkut, so maybe less
23 than one percent of that -- I don't know the exact
24 number, but I would say that if you -- A simple way
25 we could get this exact number, but if we took,

Page 223

1  like, 300,000 so maybe 1 to $3,000 of revenue were
2  generated.  Maybe even less than that, related to
3  Facebook, $1,000, $2,000, and that's probably
4  overestimating of total revenues that might have
5  been generated from Facebook because it was such a
6  small amount.  And then the amount earned -- We had
7  millions of users on the other sites so it would be
8  -- it would be so minuscule.  Probably, I'm
9  guessing, 1 to $3,000, but I would be happy to run
10  a calculation and exercise.
11        MR. BURSOR:  Just answer the
12  questions.  Don't volunteer to do work.  Okay?
13  You've done that several times.  Just yes,
14  question, you give an answer.  Not I'm happy to do
15  this or I'm happy to do that.  We'll discuss that
16  separately.
17        Q.    The Facebook -- In 2008 did you
18  have demographics as to how many users were
19  accessing the site from particular countries?
20        A.    Yes.
21        Q.    Did you have demographics how many
22  users were accessing the site through particular
23  social networks?
24        A.    Yes.
25        Q.    Earlier -- And correct me if I'm

Page  224

1  from, so it was not a high priority.
2        Q.    Alexa is another Web site?
3        A.    Metrics Web site which shows
4  independent of our site log in daily and see the
5  traffic for the week or the last week, and it's --
6  it's a measurement site.
7        Q.    Do you know if inside Power
8  E mails were sent amongst employees reflecting the
9  information being gleaned from Alexa?
10        A.    Also we have Google Analytics.  So
11  Google Analytics is something we had that is --
12  That's the second.  That's where we -- Internally
13  it shows you what percentage come from the US of
14  your total traffic, and so that's the other place
15  where we used to see it.  It's Google tracking
16  every user that comes into your site and tells you
17  basic demographic data, what browser they used,
18  what age, et cetera.  So that was the -- another --
19  That was the most accessed way to know this
20  information.
21        Q.    Did -- Do you know, as you sit
22  here today, approximately what total number of
23  users Power had in 2008?
24        A.    In 2008 -- You mean right at the
25  time we --

Page  226

1  wrong.  -- I understood from one of your answers
2  you said Brazil and India were your two largest
3  countries.
4        A.    That's correct.
5        Q.    What percentage, if you're able to
6  estimate, of your users were made up of users in
7  the United States of one or the other social
8  networks?
9        A.    I think it was like around under
10  five -- under five percent of our total users.  I
11  don't -- We could find that information.
12        Q.    Where would the information about
13  the number -- or the demographics of the users
14  exist still?
15        A.    Well, we could query our database
16  and find out -- because we have -- We know our
17  demographics of our users.
18        Q.    In 2008, were you making such
19  queries?
20        A.    We -- We used Alexa, also.  Alexa
21  was our primary.  It was just easier.  It was not
22  such a relevant fact to us because we knew that
23  over 90 percent or more were coming from India and
24  Brazil, so I believe Alexa showed under five
25  percent.  That's where I referred to that number

Page  225

1        Q.    Let me narrow that instead of
2  using a full year.  If you know, do you know
3  approximately how many users you had -- Power had
4  in December of 2008?
5        A.    Talking about registered users or
6  monthly?
7        Q.    Registered --
8        A.    Because --
9        Q.    Let me restate it.  That's a valid
10  question.  In December of 2008 do you have -- as
11  you sit here today, do you have an approximate
12  number of registered users of Power that existed
13  worldwide?
14        A.    I believe we made a public
15  announcement.  It was around 5 to 6 million that
16  existed in that time, and I -- Yeah.  Yeah.
17        Q.    In December 2008, do you have an
18  understanding how many of that population were
19  registered Facebook users?
20        A.    I believe it was under $30,000 --
21  30,000 users, but I don't -- would have -- I would
22  have to double confirm that.
23        Q.    Does that information exist, as I
24  understand it, in the data -- The database can be
25  queried for that information?

Page  227

59 (Pages 224 to 227)

1     A.    I believe that information was
2 provided in previous requests. Something of that
3 nature. I'm not a hundred-percent sure, but I
4 guess we could try to run it, a database query.
5     Q.    Regardless of whether it was
6 provided previously, a database query would obtain
7 that information. Correct?
8     A.    Yes.
9     Q.    Would a same sort of query
10 identify the total number of Facebook users that
11 ever used -- registered --
12     MR. COOPER: Strike that.
13     Q.    Would the same sort of database
14 query identify the number of registered Power users
15 that were also Facebook members over time?
16     A.    "Over time," what do you mean by
17 that.
18     Q.    However long Facebook was made
19 accessible to Power users?
20     A.    Facebook was made accessible for
21 approximately -- You know, the dates, but
22 approximately one month more or less -- a little
23 more than a month, like five weeks, and then,
24 again, we launched with Facebook Connect working
25 with -- we launched with Facebook Connect for a few

Page 228

1 was the same time period I've given you earlier.
2     Q.    And this was six-month period
3 over -- before Facebook actually was launched on
4 power.com?
5     A.    There may have been verbal -- As I
6 said, most of the activity took place in the -- in
7 the three months -- at the end of 2007. The last
8 three months of the year that's when all the
9 activity and conversations focused on Facebook. I
10 believe the launch date was -- was November 30th or
11 December 1st that we turned Facebook on, so it
12 would have been the two to three months before that
13 where the most conversations took place.
14     Q.    In December 2007, do you know what
15 the largest social network in the world was?
16     A.    That would be Facebook or Myspace.
17     Q.    And was Power operating publicly
18 not as a public company but the Web site for Power
19 operating on the Web in December of 2007?
20     A.    Yes.
21     Q.    Were the -- Were there discussions
22 internal at Power as early as December of 2007 of
23 including Facebook on -- as a Web site that would
24 be included in your social aggregation?
25     A.    What point?

Page 230

1 days, and then -- before Facebook took it down. So
2 I don't -- I don't know the -- the answer to that,
3 but I think it was -- I think it was around 30 --
4 the number that rings my -- that my memory, is
5 around 30,000 users that registered their Facebook
6 accounts.
7     Q.    In December 2008, were you aware
8 of what was the largest social network in the
9 world?
10     A.    I believe it was -- it was either
11 Myspace or Facebook or -- Yeah. Myspace or
12 Facebook.
13     Q.    Was it important -- Did, at any
14 time, you recall discussions internal at Power that
15 Power's management deemed it important to be able
16 to aggregate Facebook on its site because it was
17 one of the two largest social networks in the
18 world?
19     A.    It was extremely important for us
20 for our future.
21     Q.    When did those discussions begin?
22     A.    Those discussions began right
23 around the time -- In that six-month period,
24 basically we made the decision that adding Facebook
25 would be something that we wanted to do, and so it

Page 229

1     Q.    December 2007.
2     A.    Well, we launched -- We were
3 already live. Right? Sorry. That was 2000 -- Let
4 me clarify the date -- I'm confusing the year here.
5 What -- We launched Facebook -- whether it was -- I
6 want to make sure I'm talking about the correct
7 year.
8     Q.    Let me help you out rather than
9 asking me what dates. I'm trying to get what you
10 recall. Whatever date you recall launching
11 Facebook, a year earlier, do you know if Facebook
12 was one of the two largest social networks on the
13 Web?
14     A.    It was always one of the three
15 largest from very early point. I don't know when
16 they passed Orkut, but I think -- I don't know the
17 answer when they passed Orkut.
18     Q.    Do you have a recollection of
19 internal discussions at Power, more than a year
20 before launching Orkut, of any sense that it was
21 important that Facebook be incorporated into your
22 application server?
23     A.    It was always important. When it
24 became a priority that's when we -- It was
25 obviously the time we launched it. There were

Page 231

1    other priorities obviously before that.
2        Q.    At any time, do you recall Power
3    expending revenue for marketing surveys to see what
4    -- what features that users of the Power site might
5    like?
6        A.    No, we didn't.  We already -- We
7    -- We didn't spend money to do marketing surveys.
8    We looked -- We had a lot of -- We had enough data
9    from our current users of what was working and we
10   looked at the sites.  We didn't really get to that
11   point.  We turned on just a basic test of Facebook,
12   as I said, for a few weeks.  We didn't even get to
13   that point where they had -- were able to implement
14   all the next generation of features.
15       Q.    Do you have a recollection how
16   fast after its creation Power got to 100 employees?
17       A.    Yeah.  In about one year.  There
18   were about a hundred employees grown in a year.  In
19   the year of 2007 from the -- basically from the
20   beginning to the end, essentially we grew to -- we
21   added about a hundred employees.
22       Q.    At the time Facebook launched, did
23   you still have about 100 employees?
24       A.    When Facebook launched we had
25   about 100 employees.  That's correct.

Page 232

1        Q.    How long after the launch of
2    Facebook --
3              MR. COOPER:  Strike that.
4        Q.    Did there come a point where Power
5    didn't have sufficient revenue to pay employees?
6        A.    The issue was not revenues because
7    it was investment, and the Facebook lawsuit
8    actually, you know, definitely had a very big
9    impact on -- on our company's ability to raise
10   money and also on the ability to potentially open
11   up our platform to developers because it created a
12   huge -- huge problem for -- huge problem for us and
13   with investors fears.  It was very disruptive.
14       Q.    Do you know when approximately
15   Power ran out of the ability to use investment
16   capital to pay its employees?
17       A.    Well, the company continued to --
18   I mean -- I guess, you can say we ran out when the
19   company -- a few months ago when we completely ran
20   out, but we obviously dramatically reduced our
21   resources in 2008.  And in 2009 we had
22   significantly less spent 2008, 2009 during the time
23   of the lawsuit started.
24       Q.    Do you ever recall speaking to the
25   New York Times about this lawsuit?

Page 233

1        A.    Speaking to them about the
2    lawsuit.  I believe they -- As it became public,
3    there were -- there were -- there were
4    conversations with many press including the New
5    York Times.
6        Q.    Do you know who Clair Cain Miller
7    is?
8        A.    Yes.
9        Q.    How do you know her?
10       A.    I believe she was the one who
11   wrote the article, if I'm not mistaken.
12       Q.    Do you recall how -- Do you recall
13   articles in the New York Times then being written
14   about this lawsuit?
15       A.    I do, yes.
16       Q.    Do you recall if you spoke to
17   Ms. Miller about the lawsuit as part of her
18   preparing those articles?
19       A.    We had different -- We had an
20   article that was -- that came out before the
21   lawsuit that was around December 1st, and then
22   there were -- I think there were one -- there may
23   have been one or two additional articles that came
24   out much smaller at alater point.
25             (Whereupon, Exhibit 104 is marked

Page 234

1    for identification by the reporter.)
2        Q.    Before -- I want to make sure I
3    may have given your counsel the wrong -- which date
4    is this on yours?
5              MR. BURSOR:  December 1, 2008.
6        Q.    Mr. Vachani, can you tell me --
7        A.    Yes.  December 1 --
8              MR. BURSOR:  Can I see that?
9        Q.    Mr. Vachani, is this one of
10   articles that you were just referring to that
11   Ms. Miller wrote for the New York Times that you
12   spoke to her about?
13       A.    Yes, it is.
14       Q.    There's an reference in the second
15   paragraph to Esther Dyson.
16       A.    Yes.
17       Q.    Who is -- Do you know who
18   Ms. Dyson is?
19       A.    Yes.
20       Q.    Is she an investor in Power?
21       A.    She is an investor, yes.
22       Q.    Is she still an investor to this
23   day?
24       A.    She's not -- She still --
25   Obviously, the investment is still there.  I don't

Page 235

1    know what the question means.
2        Q.    I meant does she have shares --
3        A.    She has shares in the company,
4    yes.
5        Q.    Do you see in the second to the
6    last paragraph, there is a statement: "The site
7    already has five million registered users, three of
8    whom visit each month"?
9        A.    Yes.
10       Q.    And it attributed to you to saying
11   that.
12       A.    Yes.
13       Q.    To the best of your knowledge, was
14   that an accurate reflection of the number of users
15   as Power as of December 1st, 2008?
16       A.    I would have to verify the exact
17   number, but as you know, metrics there's a range,
18   whole bunch of different terminology, but that's
19   about correct, but I would need to be clear on what
20   those metrics -- There are specific ways to
21   organize metrics and unique users, unique
22   registered users, people who logged in, people who
23   never -- came to the site but never went past the
24   first page which is actually a larger -- large
25   percentage of those users.

Page 236

1        Q.    How is that information logged at
2    Power?
3        A.    Google Analytics.
4        Q.    Is it stored anywhere at Power?
5        A.    Google Analytics.
6        Q.    The Google -- The searches or the
7    Analytics done on Google Analytics are stored even
8    on the Power system?
9        A.    I believe we log into Google.
10       Q.    Do you know if that information
11   still exists to this day?
12       A.    I have to check -- confirm that it
13   still exists.  I haven't logged in in a long time,
14   but it -- I don't know how far back Google --
15   Google keeps that information so I can't answer
16   that.
17       Q.    All right.
18       A.    If Google has it, then we have it.
19       Q.    After you a did a Google Analytics
20   analysis did you share that information -- results
21   with others in your company?
22       A.    Everybody -- Most of the key
23   management had access to the Google Analytics
24   account.
25       Q.    I guess, all I'm asking is:  Was a

Page 237

1    document generated by somebody in the key
2    management and then circulated to everybody?
3        A.    Not specifically on that number,
4    but we -- That information everyone knew our
5    numbers.  They had access to the Analytics account,
6    the Google Analytics account.
7        Q.    Who would typically run the Google
8    Analytics for you?
9        A.    Anybody.  Everybody had an
10   account.  I think everybody in the company had
11   access to because it was the same shared account.
12   I don't know if every single person, but all the --
13   For practical purposes there were no secrets in the
14   Analytics, so it wouldn't have been anything that
15   -- There were no secrets.
16       Q.    Could you go to the second page?
17       A.    Sure.
18       Q.    Do you see the fourth paragraph
19   from the bottom says, "Most of the time power.com
20   displays the user social networking pages without
21   charging them, keeping the original
22   advertisements"?
23       A.    Yes.
24       MR. BURSOR:  Objection.  Object to
25   form.  Misstates it.

Page 238

1        Q.    If I misread the sentence, do you
2    see where it says, "most of time power.com displays
3    the user's social networking pages without changing
4    them, keeping the original advertisements"?
5        A.    Yes.  I see that.
6        Q.    I'm sure your counsel is right
7    that I misstated it.  Then it says, "But in some
8    instances, users can read and respond to a message
9    received at one of those sites without actually
10   visiting the site"?
11       A.    That's correct.
12       Q.    Were both of those sentences
13   accurate?
14       A.    Not completely, but -- because
15   there are some things that are out of context
16   there, but as we've said before, this -- this
17   pretty much -- This home page?
18       Q.    You're looking at 103?
19       A.    Exhibit 103.  Sorry.  Has
20   functionality that users can see photos, friends,
21   et cetera, on the Power page and they've authorized
22   us to access other sites, so the extent that is
23   true is that this is the home page where they log
24   in that's -- that's a Power page.
25       Q.    Okay.

Page 239

62 (Pages 236 to 239)

1      A.    So I think that's --
2      Q.    **Is it true that a user of Power**
3 **could log in -- could read and respond to a message**
4 **received at one of the sites aggregated on Power**
5 **without actually visiting the site?**
6      A.    Yes.
7      Q.    **And in those instances, the**
8 **advertisements that are associated with the social**
9 **network would not be reflected on the Power site?**
10      A.    Right.  Same with E mail, if I
11 access my Yahoo E mail from a pop server.
12      Q.    **Did any of the social networks**
13 **that were aggregated on Power ever complain about**
14 **that fact?**
15      A.    Not that fact, no.
16      Q.    **To your knowledge, nobody ever**
17 **complained that the advertising --**
18      A.    No.
19      Q.    **Okay.**
20      A.    Sorry.
21      Q.    **After the lawsuit you said**
22 **Ms. Miller wrote another article?**
23      A.    I believe she may have.  She wrote
24 another article, yes.
25            (Whereupon, Exhibit 105 is marked

Page 240

1      A.    I don't recall.  I talked to quite
2 a lot of press at that time.
3      Q.    **Do you recall ever talking to any**
4 **of press through E mails about the Facebook**
5 **lawsuit?**
6      A.    Yes.
7      Q.    **Do you know if you produced any of**
8 **those E mails?**
9      A.    I don't think -- I don't believe I
10 produced the press articles.  I don't believe they
11 were relevant.
12      Q.    **Do you recall how Facebook first**
13 **contacted you?**
14      A.    First contact was a -- a
15 combination of an E mail and I think a formal
16 notice they sent by E mail.  It was a Facebook
17 counsel -- their -- I forgot the name of the
18 company that was prior to our -- You probably
19 remember which one.
20      Q.    **Do you know an individual name Lee**
21 **Power?**
22      A.    Yes.
23      Q.    **Who's Mr. Power?**
24      A.    The original owner of the
25 power.com domain and the current owner of the

Page 242

1 for identification by the reporter.)
2      Q.    **Mr. Vachani, I've put in front of**
3 **you as Exhibit 105 a January 2nd, 2009, article**
4 **from the New York Times.com that says, "Facebook is**
5 **no Friend of Power.com."**
6      A.    Yes.
7      Q.    **And is this the article that you**
8 **were recalling Ms. Miller wrote later after Exhibit**
9 **104?**
10      A.    She wrote it on January 2nd.
11      Q.    **And this was about almost one**
12 **month to the day after the earlier article.**
13      A.    Correct.
14      Q.    **Do you see that there was a**
15 **statement updated 6:27 p.m. added to the response**
16 **from Steve Vachani, founder of power.com?**
17      A.    Yes.
18      Q.    **Do you recall talking to**
19 **Ms. Miller about the content that's set forth in**
20 **Exhibit 105?**
21      A.    Vaguely, but I obviously gave her
22 -- She asked some questions and I gave her some
23 answers.
24      Q.    **Do you recall if your answers were**
25 **done by E mail, by phone or some other medium?**

Page 241

1 domain.
2      Q.    **Has he ever had any role in the**
3 **operation of power.com?**
4      A.    No.
5      Q.    **Is the sole relationship to**
6 **power.com the ownership of the domain name?**
7      A.    Yes.
8      Q.    **Is he an investor --**
9      A.    He's not an investor, but he
10 received some shares when -- for providing the
11 domain.  That was part of the compensation.
12      Q.    **Was Mr. Power ever contacted by**
13 **you about this lawsuit?**
14      A.    Was he contacted by me?
15      Q.    **Yes.**
16      A.    Well, he received, as his name was
17 listed as the owner, he received correspondence,
18 some correspondence also, and whatever
19 correspondence he would just immediately pass it on
20 to me and that's all he ever did.  Usually, the
21 same correspondence he received was also being sent
22 to me.
23      Q.    **Did you purchase the power.com**
24 **domain name from Mr. Power?**
25      A.    We had a -- a lease option that

Page 243

1    was -- it was a long-term purchase, so we had the
2    irrevocable rights to own it once it was fully paid
3    off.
4          **Q.**    **How did you first meet Mr. Power?**
5          A.    I was looking for the domain
6    power.com and I saw he was the owner.
7          **Q.**    **Was this in 2006 then?**
8          A.    This was when we acquired the
9    domain I think in 2000 -- I believe we acquired it.
10   At the end of 2006 we acquired the domain, if I'm
11   not mistaken.
12         **Q.**    **I'm only basing on the timeframes**
13   **you said for when power --**
14         A.    The domain name.  The domain was
15   acquired, either -- I don't remember the exact date
16   but it was probably around the end 2006, if I
17   remember correctly.
18         MR. BURSOR:  Please, try to have a
19   question, and then a pause, and then an answer.
20   You're talking over.
21         **Q.**    **In December 1st, 2008 --**
22         A.    Yes.
23         MR. BURSOR:  Please.  Please.
24   Please.  Please.  Just let him finish.
25         **Q.**    **I understood from your earlier**

1    **answers that you had approximately 100 employees,**
2    **power.com did?**
3         A.    On December 1st, 2008?
4         **Q.**    **Yes.**
5         A.    Approximately, yes.
6         **Q.**    **Besides yourself, were any of**
7    **those employees involved in discussions with**
8    **Facebook about integration of Facebook Web site?**
9         A.    At what point?
10         **Q.**    **In December 2008?**
11         A.    Yes.  There were -- I was leading
12   the discussions.  I led all those discussions with
13   Facebook.  There were quite extensive discussions
14   going -- going on about integration, creating the
15   schedule.  We actually, as a courtesy, had -- had
16   offered to try -- to try working with Facebook
17   Connect as least as a first measure, although it
18   was not necessary, so there was a conversation
19   going on.
20         **Q.**    **Who were the other employees who**
21   **were involved in the discussions?**
22         A.    Eric Santos was the primary
23   person.  I don't remember who else.  There were
24   other people that were in the conversations.
25         **Q.**    **Were any of your investors**

1    **involved?**
2         A.    We obviously discussed the subject
3    with -- We would have discussed it with -- DFJ was
4    the primary person that we would have discussed it
5    with.
6         **Q.**    **You're referring to Draper --**
7         A.    Draper Fisher Jurvetson, DFJ.
8         **Q.**    **Who at DFJ did you discuss with?**
9         A.    Simon Olson and Andreas
10   Stavropoulos.  Simon Olsen, those were -- Simon was
11   the most actively involved in the company.  Simon
12   Olsen, he was the primary contact with DFJ.
13         **Q.**    **In December 2008, did you have a**
14   **board of directors?**
15         A.    Yes.
16         **Q.**    **Was Mr. Olson on the board of**
17   **directors?**
18         A.    Yes.  He was.
19         **Q.**    **Was -- I know -- I believe it's**
20   **pronounced Stavropoulos?**
21         A.    Yes.
22         **Q.**    **Was he on the board of directors?**
23         A.    Yes.  He was.
24         **Q.**    **Who else was on the board of**
25   **directors?**

1         A.    Just to be clear, December 2008, I
2    believe, only Simon was on the board on that date.
3    Andreas was on the board, but I think on that date
4    Simon was the only one on the board from DFJ.
5         **Q.**    **Do you know when Mr. Stavropoulos**
6    **became a member of the board?**
7         A.    He was a member earlier.  In two
8    -- He became a member, I think, at the end of 2007.
9    That's at the time that Simon and Andreas -- They
10   were both from DFJ when they came in with their
11   investment.
12         **Q.**    **Did Mr. Stavropoulos leave the**
13   **board?**
14         A.    Simon was the only representative
15   at that time, I believe, on the board.
16         **Q.**    **Was Ms. Dyson ever a member of the**
17   **board?**
18         A.    Never.
19         **Q.**    **Was anybody else that I have not**
20   **named ever members of the board?**
21         A.    At that time?  Let me just think
22   who was on the board.  I think there was -- Let me
23   think.  I think -- No.  At that time in December I
24   believe on that date, December 2008, I think that I
25   need -- I think that it was Simon -- Simon Olson

1    was a member, but in December 2008.
2          Q.     Okay.  Mr. Stavropoulos had
3    already left the board?
4          A.     That's correct.
5          Q.     Was he -- You indicated they were
6    both still actively involved in discussions about
7    the Facebook issue, though?
8          A.     Well, he's -- Simon was more
9    involved because he was a board member and he was
10   the one.  He was actually on the ground in Brazil
11   and closer to our office and spent a lot more time
12   in the office and in the DFJ office in Brazil.
13         Q.     DFJ has offices in Silicon Valley?
14         A.     Correct.
15         Q.     Do you know if Mr. Stavropoulos
16   with the Silicon Valley office?
17         A.     Yes.  He is.
18         Q.     Do you know if Mr. Olson is?
19         A.     He's with the Brazil -- He was
20   with the Brazil office.  He currently -- He's
21   He's not -- He's not there anymore.  He's with
22   Google now.
23         Q.     He's actually on the board of
24   directors of Google?
25         A.     No.  He's -- He's working at

                                       Page 248

1    Google now.
2          Q.     Do you know in what function?
3          A.     In a business development role.
4          Q.     Was anyone besides you,
5    Mr. Stavropoulos, and Mr. Olson ever a member of
6    the board of directors of Power?
7          A.     Previously?  Yes.
8          Q.     Who?
9          A.     Chris Matchet (phonetic) was a
10   board member earlier.  I don't know the date that
11   he left.
12         Q.     Was Mr. Matchet also at Draper?
13         A.     No.  He was an earlier investor in
14   the angel round of investors.
15         Q.     There was an angel round of
16   investment as well as a Class A round of
17   investments?
18         A.     It was all part of -- It converted
19   into the series A, but it came in earlier and had
20   other coverage almost one year earlier.
21         Q.     Was anybody else ever a member of
22   the board of directors?
23         A.     Let me think.  At any time in the
24   history?
25         Q.     Yeah.

                                       Page 249

1          A.     There were other board members,
2    but I'm just trying to -- substantial
3    involvement -- The ones that I remember is Chris
4    Matchet.  In the early days when we were forming
5    the company there may have been some -- I don't
6    remember exactly, but there may have been another
7    angel investor on the board, but it was very early.
8          Q.     Was there -- Did anyone join the
9    board of directors besides you -- Did anyone join
10   you and Mr. Olson as a member of the board of
11   directors after January 1st, 2009?
12         A.     To my best of my recollection, no.
13   But I need to -- Let me take that back.  I believe
14   there might have been one of the employees on the
15   board.  Eric joined the board.
16         Q.     Eric Santos?
17         A.     I don't know when -- I don't
18   remember the exact details of the date.
19         Q.     But you are referring to
20   Mr. Santos?
21         A.     I don't know if he was -- So there
22   was a Brazilian entity, so he was a -- The holding
23   entity was the Cayman entity, and I believe --  I
24   don't know if Eric was on the Cayman board, but he
25   was in Brazil because he was one of our -- He was

                                       Page 250

1    another representative -- He was the director for
2    the -- for the subsidiary.
3          Q.     What is the status of subsidiary?
4          A.     It no longer -- no longer -- it's
5    no longer -- I mean, it's still active but it's
6    just like the other company -- They're both active,
7    but they still exist, but they have -- still have
8    operations.  I mean, there's no -- Correct.  There
9    are no day-to-day operations for these entities at
10   this point.
11         Q.     What is the name of the Brazilian
12   Power entity?
13         A.     Power Communicas.
14         Q.     How much of the operation of the
15   Web site was under the responsibility of that
16   entity?
17         A.     Nothing.  The entire -- Well, the
18   -- It was just -- That's just with a local
19   operating company in Brazil, so it had no ownership
20   -- has no ownership in any of entities.
21         Q.     Did it have any relation to
22   power.com at all?
23         A.     Yeah.  Well, it's owned by
24   power.com, so it's just -- it's a local operating
25   company for operations for things in Brazil, but

                                       Page 251

```
 1   it's 100 percent owned by the Power -- Power
 2   ventures.
 3        Q.      Was it in a way responsible for
 4   the hosting of power.com?
 5        A.      No.
 6        Q.      When you say "operations" I just
 7   want to know --
 8        A.      I mean, the people, the
 9   employment.  A lot of local employees.
10        Q.      Like human resources issues?
11        A.      The people that were working in
12   Brazil.  They were -- Except for certain
13   executives, most of the people were -- their
14   contracts were with the Brazilian entity.
15             (Whereupon, Exhibit 106 is marked
16   for identification by the reporter.)
17        Q.      Mr. Vachani, I put in front of you
18   the first amended complaint that's been file in
19   this case.
20        A.      Yes.
21        Q.      Have you ever seen this document
22   before today?
23        A.      Yes, I have.
24        Q.      Would you turn to Page 12.
25   Actually, I'm sorry.  Can you turn to Page 13?
```
                                        Page 252

```
 1        A.      Ask the question again.
 2        Q.      Earlier I asked you -- Earlier we
 3   discussed that there are three ways Facebook users
 4   could be contacted using the power automated script
 5   when an -- when someone indicated they wanted to
 6   invite their friends to join power.  Correct?
 7        A.      Yes.
 8        Q.      And one of the ways was by setting
 9   up an event.  Correct?
10        A.      Yes.
11        Q.      And you indicated that the
12   automated script would include the language that
13   would then be used as part of the event
14   notification as well as a link.  Correct?
15        A.      Yes.
16        Q.      All I'm asking you is, to the best
17   of your knowledge, is the language that exists
18   between lines 9 and 20 on -- in Paragraph 70 of the
19   first amended complaint language that you believe
20   was used as part of that automated script?
21             MR. BURSOR:  Objection.  Vague,
22   ambiguous.  Assumes facts not in evidence.  Lacks
23   foundation.  Compound.  If you can understand the
24   question, you can answer.
25        A.      I do understand the question, but
```
                                        Page 254

```
 1   That will be fine.  Do you see Paragraph 70?  There
 2   is an example of an invitation from Facebook event
 3   master.
 4        A.      Yes.
 5        Q.      Is the content that is between
 6   Lines 9 and 20 that's shown in Paragraph 70 of the
 7   first amended complaint, is that the example of the
 8   event language you said earlier that we had that
 9   you said we had copy of?
10             MR. BURSOR:  Objection.  Vague,
11   ambiguous.  Assumes facts not in evidence.  Lacks
12   foundation.  You can answer.
13        A.      I can't answer that question.
14        Q.      Earlier you said that you believed
15   Facebook had an example of the language that was
16   employed by the automated script, or that the
17   language that was included in the automated script
18   that would set up an event as part of promotion the
19   $100 promotion.  Do you recall telling me that?
20             MR. BURSOR:  Objection.
21   Mischaracterizes prior testimony.  Assumes facts
22   not in evidence.  Lacks foundation.
23        A.      Take that advise.
24             MR. BURSOR:  You can answer.  If
25   you can understand the question, you can answer.
```
                                        Page 253

```
 1   I think that is incorrect.  If you can look at
 2   this, this E mail was written by Facebook.  This
 3   E mail has nothing -- has -- nothing from Power.
 4   It's when a user creates an event they, as you can
 5   see, what the date and all those things set by the
 6   user and the title, "Bring 100 friends and win 100
 7   bucks," the user is -- has -- has -- you know,
 8   authorized, put that information in.  This is not
 9   an E mail sent by Power.
10        Q.      All right.  Is the event
11   notification reflected here an event that was
12   prompted through the Facebook system as a result of
13   the creation of an event by Power?
14             MR. BURSOR:  Hold on.  Please read
15   that back.
16             (Whereupon, the last question is
17   read back by the reporter.)
18             MR. BURSOR:  Objection.  Vague,
19   ambiguous.  Assumes facts not in evidence.  Lacks
20   foundation.  If you can understand the question,
21   you can answer it.
22        A.      I understand the question but --
23   Repeat the question.  I want to make sure.
24        Q.      Let me ask you this.  Was the --
25   Did the automated script that was employed to
```
                                        Page 255

1 create an event as part of $100 promotion use the
2 language, "Bring 100 friends and 100 bucks"?
3         MR. BURSOR: Hold on a second.
4 Objection. Vague, ambiguous. Assumes facts not in
5 evidence. Lacks foundation. If you could clarify
6 whether you're referring to PowerScript or Facebook
7 script, that might help clear up some of the --
8         MR. COOPER: I asked specific -- I
9 will say it again. Was the language, "Bring 100
10 friends and win 100 bucks," language that was used
11 in the Power automated script when it set up the
12 event on Facebook?
13         MR. BURSOR: Objection. Vague,
14 ambiguous. Assumes facts not in evidence. Lacks
15 foundation. Listen to the question carefully, and
16 if you can understand it, you can answer it.
17     A.     Bring 100 friends and 100 bucks
18 was our -- our tag line, so -- but I don't --
19 whether the user entered that in on their own or
20 whether they -- they put this. I cannot say from
21 this -- from looking at this, but that was the
22 language that we suggested to users to use. But
23 many users changed the language, too, and put other
24 language in those events, so I can't -- This is one
25 example of a user creating an event. I cannot say

Page 256

---

1 campaign and the suggested text and promotion that
2 we encourage our users to promote in any kind of
3 promotion they made in the acquisition of and
4 invitation of friends.
5     Q.     Where would I find documentation
6 reflecting precisely what language was suggested
7 that users use with Facebook events?
8     A.     That would have been on the -- the
9 power -- on this page. On the page after they
10 clicked on this promotion, so it came up with a
11 page --
12     Q.     Talking about Exhibit 103?
13     A.     I don't know if that page -- Does
14 it exist?
15     Q.     I'm asking if you're talking about
16 Exhibit 103.
17     A.     I'm talking about this page. I
18 don't know if there's an exhibit.
19     Q.     You're pointing to Exhibit 103?
20     A.     Exhibit 103, I'm sorry. So if
21 they clicked on that, there was a page that they
22 went to.
23     Q.     And --
24     A.     Gave them those options.
25     Q.     Where, if at all, does that

Page 258

---

1 what -- you know, how this was specifically created
2 because they -- they had -- they could have created
3 this event and the language was -- That was the tag
4 line we were promoting, but I do not know if this
5 was specifically -- this specific E mail or if they
6 copied and pasted it if they did whatever. But
7 what I do know is, this was an event where the user
8 specifically authorized us and said -- either
9 created this event manual or specifically
10 authorized us to create this event.
11         MR. COOPER: We've got to go off
12 the record.
13         THE VIDEOGRAPHER: It's 4:15. Off
14 the record. End of Tape 5.
15         (Whereupon, a recess is taken.)
16         THE VIDEOGRAPHER: 4:22, on the
17 record. Beginning of Tape 6.
18     Q.     Before the break you indicated
19 that, "Bring 100 friends and win 100 bucks" was the
20 tag line but you couldn't say for sure how the --
21         MR. COOPER: Strike that.
22     Q.     Before the break, you indicated
23 that "Bring 100 friends and win 100 bucks" was the
24 tag line employed by Power. Correct?
25     A.     That was the tag line of the

Page 257

---

1 information exist today?
2     A.     I don't know if it exists today
3 because the site's been down for a long time.
4     Q.     Would it exist in the source code
5 for the automated script?
6     A.     No. That wouldn't -- that -- The
7 images and everything, it wouldn't -- that's not --
8 I'm confusing the term "source code," so you're
9 talking about the PowerScript not the source code
10 of Power because it's two different things.
11     Q.     Would it exist in the PowerScript?
12     A.     I don't -- PowerScript's were
13 dynamic and changed regularly. They were kind of
14 like HTML on a site, it's unlike source code. They
15 were dynamically changed, so I don't know the
16 answer, you know. It could have been updated on a
17 weekly basis so the -- PowerScript is like an HTML,
18 so it's not documented formally like source code,
19 but -- sorry.
20     Q.     Did the language ever exist in
21 PowerScript?
22     A.     I can verify that that is the
23 language that we used. Whether -- You know, I
24 think that's what you want to know. That's the tag
25 line that we used for this promotion so that would

Page 259

1  be the language that we suggested to users, and so --
2      Q.    How would I find out whether the
3  individual Nik referenced in Page 13 or PowerScript
4  set up the event itself?
5      A.    So let me open that again.  What
6  page was that.
7      Q.    Page 13?
8      A.    Okay.  So I can tell you Nik
9  that's Facebook put that in, so this E mail, just
10  to be clear, was written by Facebook, sent by
11  Facebook, and was everything here was -- was done
12  by Facebook.  Facebook inserted -- This is a
13  Facebook E mail, so everything in this -- All the
14  links in this E mail are from Facebook.  There's no
15  power link in this E mail because we had nothing to
16  do with this and the only thing -- The tag line,
17  "Bring 100 friends, 100 bucks," is the only thing
18  here that that I know that we -- That's our
19  suggested text, and a user when they create an
20  event they -- they're able to put a title for their
21  event.
22      Q.    Does the suggested text that was
23  used in creating Facebook events by PowerScript
24  exist?
25      A.    I don't know if it exists.

Page 260

1  application PowerScript application?
2      A.    The actual language?
3      Q.    Yes.
4      A.    Was -- That was -- That phrase
5  "Bring 100 friends, 100 bucks" was created by me.
6      Q.    Do you know if the remainder of
7  any text that was employed in suggested text in
8  private messages that were used on Facebook as a
9  result of automated script were prepared by you?
10      MR. BURSOR:  Could you read that
11  back, please?
12      (Whereupon, the last question is
13  read back by the reporter.)
14      MR. BURSOR:  Objection.  Vague,
15  ambiguous.  Assumes facts not in evidence.  Lacks
16  foundation.  You can answer.
17      A.    Repeat the question one more time.
18      Q.    You earlier indicated private
19  messages were one of the ways that the automated
20  script would permit somebody using this campaign to
21  contact friends on Facebook.
22      A.    Okay.  So to be clear --
23      Q.    Yes or no.
24      A.    I want to clarify.  Earlier I said
25  that could be one of the ways that someone could

Page 262

1      Q.    Okay.  Do you know if the text
2  that was suggested for private messages by the
3  automated script from Power exists as part of
4  PowerScript?
5      A.    I don't know if that exists today
6  because it was three or four years ago.
7      Q.    Do you know how the PowerScript
8  applications were stored by Power while it was
9  operational?
10      A.    How they were stored?
11      Q.    Yes.
12      A.    I believe that it's similar to --
13  to an -- I think a lot of this was done in XML.
14  HTML, XML references or -- where it pulled the
15  text, so I don't know how that was done.  I don't
16  know the source of where those offhand.
17      Q.    Do you know how many versions of
18  PowerScript you have available to you in stored
19  form to this day?
20      A.    I don't know offhand, but I'm sure
21  we have quite a lot of PowerScripts that are
22  available.
23      Q.    Do you know where, if at all, I
24  would be able to find out who was responsible for
25  creating the language that was used in the

Page 261

1  send it.  I honestly don't know if we actually ever
2  used private messages.  It was a long time ago.  To
3  my recollection, I don't -- I don't remember us
4  sending private messages, but it was definitely
5  something we -- we discussed, but I don't know if
6  we actually ever got to employing that method.
7  It's been a long time since that happened.  It's
8  possible that users took suggested text and wrote
9  messages to friends and if -- I don't remember if
10  we actually employed that technique, but it's
11  something we obviously would have been happy to do
12  because if the user authorized us to do it, I just
13  don't remember if we actually did it.
14      Q.    Looking at Exhibit 103, the launch
15  promotion --
16      A.    Yup.
17      Q.    -- who prepared the PowerScript
18  that is reflected in that launch promotion?
19      A.    It could have been Carlos or
20  Danilo.
21      Q.    What documentation shows how that
22  launch promotion was implemented on power.com?
23      A.    It was either -- It was either a
24  verbal, "Hey, use this text," in a meeting, said,
25  "Hey, this is the text you should use," and they

Page 263

68  (Pages 260 to 263)

1    took it or there was an E mail.  I don't know.
2        Q.    But you see the box, "Launch
3    Promotion."  Correct?
4        A.    Yes.
5        Q.    That is a feature that is made
6    available to the power.com user through the
7    power.com Web site.  Right?
8        A.    Yes.
9        Q.    None of the aggregated social
10   networks prepared the contents shown in that
11   promotional box.  Correct?
12       A.    Right.
13       Q.    Where would I find documentation
14   showing me how that launch promotion was
15   implemented on power.com?
16       A.    So it either was in a meeting that
17   we had where I said, "Hey, this is the text you
18   want to use for this promotion," and they would
19   have noted it down, or it would have been an E mail
20   that was sent saying, "Use this text."  One of
21   those two.  I don't know which one it was because
22   we had weekly meetings where we discussed ideas and
23   this was -- this was an idea that I had come up
24   with.  So many times I would share my idea.  I
25   would say, "Eric, use this text.  This is a

Page  264

1    -- just a standard HTML, XML -- HTML, Java script
2    page written by our team, so there's -- Because
3    this is actually -- They're on the front page right
4    now on this promotion.  This is someone's -- just
5    logged into power.com.  This is the first page they
6    come to.
7        Q.    And the PowerScript that would be
8    implemented when somebody pressed on the 100 in URL
9    that's embedded in this block, where does that
10   exist today, if at all?
11       A.    If it exists it would be on -- Let
12   me be clear.  This -- This -- This promotion, this
13   image, and this text that has nothing to do with
14   PowerScript.  This is just a HTML.  When they click
15   it and they arrive on the page, that's just
16   standard HTML.  If they, at that point, copy and
17   send a message, that's a user taking that and going
18   and sending a message.  So the only -- If -- If
19   they said go -- I authorize you to create an event
20   for me, that would be a PowerScript that would do
21   that.
22       Q.    And where would that PowerScript,
23   where would I find how that PowerScript was
24   functionally implemented today?
25       A.    That's a dynamic -- That's a

Page  266

1    promotion."  So either it was that or it was an
2    E mail.  I don't know which one it was.
3        Q.    Again, I'm not talking about the
4    text.  I'm talking about the actual function of
5    bringing up this block, this functional block.
6        A.    This is an HTML code.  It's just a
7    standard HTML that would access an image.
8        Q.    Where would the information
9    showing how that image was linked to the text exist
10   if at all at power.com?
11       A.    They would exist in our -- I don't
12   -- Since this is an HTML code, it would exist in
13   our site, the HTML code and if it -- if there was
14   -- if there was a call to a -- a text, it would
15   come from a content management -- from a content
16   management access.  I don't know exactly how they
17   managed content, but it was -- it was not -- That
18   content is usually not stored in a source -- the
19   actual content.  There could be a call to the
20   content and that would be in the PowerScript.
21       Q.    And that's because the underlying
22   -- the browser embeds the underlying script for
23   PowerScript.  Correct?
24       A.    The browser has nothing to do with
25   this -- this message -- This message here is just a

Page  265

1    dynamic type of thing.  I don't know if it would
2    even exist.  It's not even a level of programming.
3    It's a level of accessing language.  As I
4    mentioned, power -- PowerScripts are kind of like
5    -- are like HTML changes, if it existed it would be
6    on our server on our backup, if it existed.
7        Q.    How would you search for that
8    script if you were to --
9        A.    I would request it -- I would
10   probably call Eric and I would say, "Can you help
11   me locate this script?"  And if it existed.  I
12   believe, in fact, at the time, I asked for scripts
13   that might exist, and I don't know if they even
14   exist today, the scripts, PowerScripts at that
15   level were not something we kept as code.  So a lot
16   of PowerScripts, because they were not used any
17   further, they were just updated unlike -- They were
18   less -- They were less like core technology changes
19   which is the underlying stuff in C Sharp which is
20   more the functionality of the language, so --
21   either it exists on our -- our backups or it
22   doesn't exist anymore today.
23       Q.    Do you know if anybody has
24   searched to determine whether that PowerScript
25   exists?

Page  267

1    A.    I have requested the PowerScripts
2  that I could get access to, but I don't know how
3  extensive the search has been done.
4    Q.    And how did you ask for that
5  access?
6    A.    Just -- Sorry.  I want to finish
7  that last question.  I believe, though, in our
8  declarations I have clarified and also today
9  clarified what we did.  So if you're wanting --
10  looking for some code to reverify what I said
11  verbally, I would be happy to -- I understand.  I
12  just want to clarify if that's what you're looking
13  for us to provide code to confirm what I've said to
14  you that we already did today.  Is that what you're
15  asking?
16    Q.    I'm asking if anybody has ever
17  searched for that code.
18    A.    I don't know if anybody has ever
19  searched for that code.
20    Q.    Can you verify whether you have
21  ever searched for that code?
22    A.    I wouldn't have searched for that
23  code.  I think what I did do is I requested Eric to
24  get me -- if there are any PowerScripts available
25  relating to Facebook, get them for me and I believe

Page 268

---

1  he was not able to locate any PowerScripts.  So to
2  answer your original question, while -- while I
3  cannot verify a hundred percent, I believe, that
4  there are no PowerScripts that exist for
5  Facebook -- for the Facebook site today because it
6  was -- it was a dynamic thing that we, you know,
7  used and didn't use any further.
8    Q.    Do you know where Mr. Santos
9  searched?
10    A.    I know I would have gone into the
11  servers and searched our servers where all of our
12  PowerScripts are stored the ones that were active.
13  It hasn't been an active PowerScript for years so
14  it's most likely not even existed.  It doesn't
15  exist anymore.
16    Q.    Do you know that for a fact?
17    A.    I do not know that for a fact.
18    Q.    Do you know if Mr. Santos searched
19  for a fact?
20    A.    I know that I asked him to get, to
21  find, to look for any PowerScript that existed and
22  he didn't find it.  I don't know how extensively he
23  looked, but I did ask him if he had any
24  PowerScripts relating to Facebook.
25    Q.    Mr. Santos is not current employee

Page 269

---

1  of company?
2    A.    He is not.
3    Q.    You did not supervise the search
4  did you?
5    A.    When I asked him he was an
6  employee of the company.
7    Q.    When did you ask him?
8    A.    Whenever --
9    THE WITNESS:  When was this
10  requested?
11    MR. BURSOR:  I'm not under oath.
12  You are.
13    A.    Whenever it was requested.
14    Q.    So Mr. Santos was a custodian of
15  the company at the time that you --
16    A.    Let's be clear.  He's a large --
17  He's a shareholder in the company.  Whether he was
18  getting paid at that time, I don't know because I
19  don't know the date.  In my mind, if I call him and
20  I need -- I ask him for something, he tries to
21  help.  So he'll go -- He would go do it whether
22  he's getting a salary or not is different than an
23  employee.  He's a -- He's a co-founder of the
24  company.
25    Q.    Mr. Vachani, do you see the date

Page 270

---

1  on the top of Exhibit Number 106?
2    A.    Yes.
3    Q.    Do you see it's January 13, 2009?
4    A.    Yes.
5    Q.    As of January 13, 2009, did Power
6  still have the ability to locate a script that was
7  used in conjunction with the launch promotion?
8    A.    If it existed, yes.
9    Q.    Do you know if at any time Power
10  had in place what is known as a litigation hold
11  instructing employees not to destroy documents
12  after this case was filed?
13    A.    We never -- We didn't destroy any
14  documents after that -- anything -- destroy
15  anything after this case started.
16    Q.    Then does that mean the
17  PowerScript should still exist?
18    A.    What I know is PowerScripts are
19  dynamic script's that are constantly updated, so I
20  don't know what exists for this.
21    Q.    If you go back to Exhibit 106 --
22  First of all, was any instruction ever given to
23  employees not to destroy any documentation relating
24  to the Facebook program?
25    A.    Not to -- We don't -- It's not our

Page 271

1   standard practice to destroy anything, so there's
2   not -- Since we don't actively destroy something,
3   there's no need to tell them not to destroy it.  We
4   don't have any policy for destroying -- destroying
5   our documents.
6       Q.      And that includes your
7   PowerScripts?
8       A.      Well, PowerScripts, I believe, are
9   dynamic things.  There was no policy saying change
10  -- preserve an earlier version of that.  I don't
11  know how the -- The PowerScripts are like HTML
12  changes.  They're very similar to making an HTML
13  change.
14      Q.      Do you know when the promotion
15  shown on Exhibit 103 exist -- when it lasted from?
16      A.      That lasted from December of 2008
17  -- Was that eight?  Yes.  December of 2008 until
18  2000 -- I guess -- like the -- January -- Well,
19  Facebook -- It lasted well beyond Facebook, so it
20  probably lasted until about March or April, but
21  Facebook was only alive for four weeks, five weeks.
22      Q.      I'm sorry.  At that time in that
23  timeframe is when Power was sued by Facebook.
24  Correct?
25      A.      That's correct.

Page 272

1       Q.      And it was sued, in part, because
2   of Facebook's allegations relating to how its
3   launch promotion was employed.  Correct?
4       A.      I don't know what Facebook made
5   allegations to is right there.
6       Q.      Earlier you said that Facebook is
7   responsible for sending the E mail notification
8   about the invite.
9       A.      Yeah.  That was sent by Facebook
10  servers.
11      Q.      But Facebook's E mail servers
12  would not send the invite, but for the initiation
13  of the event.  Correct?
14      A.      A user has to authorize -- A user
15  has to create an event for Facebook to do that and
16  a user has to log in with their user name and
17  password and do this, so Facebook authorizes its
18  users to create events as part of their -- That's
19  the relationship Facebook has with its users.
20      Q.      You indicated some of the events
21  are set up through the automated scripted?
22      A.      No.  What I indicated is that
23  users -- users created these events.  Whether the
24  user authorized -- whether they authorized an agent
25  to go do it for them or they did it, it's the same

Page 273

1   thing.  It's initiated by the user, that's what we
2   know.
3       Q.      The automated script, though, is
4   operated by power.com?
5       A.      It's a -- An automated script for
6   PowerScript, are initiated by users and executed by
7   power.com in the same way that an exporter is
8   initiated by user and managed by the site that's
9   doing it on behalf of the user.  Did you get that?
10  Yes.
11          (Whereupon, Exhibit 107 is marked
12  for identification by the reporter.)
13      Q.      Mr. Vachani, Exhibit 107 is
14  Exhibit A to the first amended complaint that was
15  106.  Have you seen this document before today?
16      A.      What is this document I'm looking
17  at?
18      Q.      Exhibit A to the first amended
19  complaint.
20      A.      Is this the Facebook Terms and
21  Conditions?
22      Q.      Yes.
23      A.      I have -- Vaguely -- I've seen
24  this before, yes.  I don't know if I've seen this
25  specific version.  I've read the Facebook Terms and

Page 274

1   Conditions previously.
2       Q.      As of December 1st, 2008, had you
3   read the Terms and Conditions that were available
4   on the Facebook Web site?
5       A.      I didn't read it all a hundred
6   percent, but we had read -- people in our company
7   had read it.
8       Q.      So who in your company had read it
9   -- if anybody?
10      A.      It would have been myself -- I
11  believe -- I do remember reading it.  Filipe would
12  have also read it.
13      Q.      Mr. Herrera?
14      A.      Yes.  I would have asked was there
15  anything relevant in the terms.  He would have been
16  the person I talked to.
17      Q.      Could you turn to Page 4?
18      A.      Sure.
19          MR. BURSOR:  Are you using the
20  page numbers at the top?
21          MR. COOPER:  Yes.  I'm sorry if
22  that wasn't clear.
23      Q.      Mr. Vachani, your counsel made a
24  good point.  I'm referring to the page numbers in
25  the upper right-hand corner.  You see the one that

Page 275

1  says Page 415?

2      A.    Yes.

3      Q.    Can you read the first bullet

4  point to yourself and tell me when you've finished?

5      A.    The first bullet point?  Yes.

6            Okay.

7      Q.    As of December 1st, 2008, do you

8  know one way or another whether anybody at Power

9  had read that particular provision in the Facebook

10 Terms of Service?

11     A.    Yes.

12     Q.    Had you read it?

13     A.    Yes.

14     Q.    All right.  Did you have an

15 understanding whether power.com enabled users to

16 registered users to violate the Terms of Service?

17     A.    I don't understand how a message

18 that a user wants to send to another friend --

19 First of all, it's an unsolicited message: and

20 second, I don't understand what this Terms and

21 Conditions has anything to do with -- with -- I

22 don't understand how the relevance to the

23 questions.

24     Q.    Did you have an understanding

25 whether or not power.com to enabled its registered

Page 276

---

1  and not only Facebook but the entire Internet, that

2  what we were doing definitely has a pretty strong

3  grounds to be value.  Obviously, there's no legal

4  precedent whatsoever anywhere that exists relating

5  to this issue, so that's why I don't understand

6  what this discussion is about.

7      Q.    Mr. Vachani, whether you

8  understand what it's about, my question is simply

9  did Power have an understanding whether it was

10 enabling registered users of Power to violate the

11 Terms of Service of Facebook?

12     A.    Let me be clear.  You specifically

13 asked about unsolicited communications and we did

14 not send any unsolicited E mails or communications.

15 Neither did our users.  If our users wanted to send

16 a message to their friend, they have the right to

17 send a message or authorize the sending of a

18 message.  This is a -- This is something that's

19 commonplace and used by every site including

20 Facebook as a core part of their business.  That's

21 why I don't understand why we're talking about

22 unsolicited communications.

23     Q.    Mr. Vachani, again, I asked simply

24 -- you don't need to even look at the any of the

25 bullet points.  Did power.com, as of December 1st,

Page 278

---

1  users to violate this provision of the Terms of

2  Service?

3      A.    Power.com first of all -- our --

4  Let me be clear.  I don't understand.  This talks

5  about unsolicited communications and Power never

6  participated in any type of unsolicited

7  communications: and second, this is not a

8  relationship that -- Power does not have Terms and

9  Conditions with Facebook, so we do not -- This

10 Terms and Conditions is not relevant to Power.

11     Q.    All right.  Was that your position

12 that you had reached as of December 1st, 2009 --

13 2008.  I'm sorry.

14     A.    Well, what we -- what we concluded

15 is that Facebook for four years built its entire

16 company against the will of -- against a similar

17 process where almost -- For example, Google has a

18 clause that states in their thing that users cannot

19 do it, but Facebook built billions of dollars of

20 value using -- taking messages and sending messages

21 against the terms and policy of Google and dozens

22 of other sites, so our conclusion was that if,

23 Facebook has been doing this for -- for three,

24 four, five years, building their entire company

25 most of their growth for this obviously, you know,

Page 277

---

1  2008, have an understanding whether it was

2  permitting registered users of Facebook to violate

3  the Terms of Service of Facebook?

4      A.    I don't know -- I'm not at liberty

5  to say what -- what's a violation of Facebook's

6  terms and we -- As I already stated, we did not

7  participate in sending any kind of unsolicited

8  users and our users were sending messages to their

9  own friends, so I don't understand if a user sends

10 a message to their friend how that's unsolicited

11 and how that has anything to do with this

12 terminology.

13     Q.    Would you look at the third bullet

14 point?

15     A.    Yeah.

16     Q.    You see where it says -- if you

17 read the -- It starts with, "In addition, you agree

18 not to use the service or site to," and then the

19 third bullet point is, "use automated scripts to

20 collect information from or otherwise interact with

21 the service or the site."

22           THE WITNESS:  Scott, is this even

23 relevant to the conversation?  I don't -- I don't

24 understand.

25           MR. BURSOR:  Why don't we just get

Page 279

---

Page 280

```
 1   the question read back and then just answer the
 2   question.
 3        A.     So what's the question?
 4               (Whereupon, the last question is
 5   read back by the reporter.)
 6               MR. BURSOR:  Is the question:
 7   Does he see that in the agreement?
 8               MR. COOPER:  Yeah, that's all I
 9   asked.
10               MR. BURSOR:  Yeah, so do you see
11   that -- do you see that --
12        A.     I see that in the agreement.
13               MR. BURSOR:  Yeah, so then you've
14   answered the question.
15        A.     Okay.  Yeah, I see that in your
16   agreement.
17        Q.     Have you read that language as of
18   December 1st, 2008?
19        A.     Yes.  I had read it many times.
20        Q.     Had anybody else at power.com read
21   that language as of December 1st, 2008?
22        A.     I don't know if they read it.  It
23   was my job to read it and I think Filipe probably
24   read it.  Those are the two people that I know.
25        Q.     As of December 1st, 2008, had you
```

Page 281

```
 1   had internal discussions in Power about whether or
 2   not your service would enable registered users of
 3   Power to violate Facebook Terms of Service.
 4               MR. BURSOR:  Give me that question
 5   back, please.
 6               (Whereupon, the last question is
 7   read back by the reporter.)
 8               MR. BURSOR:  So you can answer
 9   that question yes or no only with respect to
10   discussions that you may have had with people other
11   than your lawyers.
12               THE WITNESS:  Okay.
13               MR. BURSOR:  So I know you had
14   internal lawyers at Power.  Don't -- Don't discuss
15   communications with your lawyers.  If you discussed
16   it with anyone else inside Power, the answer is
17   yes.  If not, the answer is no.
18        A.     Repeat the question then.
19               (Whereupon, the last question is
20   read back by the reporter.)
21               MR. BURSOR:  The answer is yes or
22   no only as to communications with people other than
23   your lawyers.
24        A.     To the best of my recollection
25   specifically related to Facebook, no.  We've --
```

Page 282

```
 1               MR. BURSOR:  You've answered the
 2   question.
 3        Q.     Do -- Did -- As of December 1st,
 4   2008, did Power employ internal general counsel?
 5        A.     We had a person internally that is
 6   a lawyer and reviewed these -- these documents when
 7   requested.
 8        Q.     Who is that individual?
 9        A.     That was Filipe.
10        Q.     Filipe Herrera is a lawyer?
11        A.     Yes.
12        Q.     Is he a lawyer in the United
13   States?
14        A.     He's not a lawyer in the United
15   States.
16        Q.     He's licensed under Brazil?
17        A.     He's -- Yeah.  An experienced
18   international lawyer licensed under Brazil.
19        Q.     Did you have any attorney who was
20   responsible for reviewing documents to comply with
21   the United States law?
22               MR. BURSOR:  Just hold on a
23   second.  Did you have any attorney who was
24   responsible for reviewing documents for compliance
25   with United States law?
```

Page 283

```
 1               MR. COOPER:  Yes.
 2               MR. BURSOR:  Objection.  Vague,
 3   ambiguous.  Assumes facts not in evidence.  Lacks
 4   foundation.  Calls for legal conclusion and I think
 5   that seeks privileged information, so don't answer
 6   that question.  Do you want to clarify that?
 7   Review what documents?
 8               MR. COOPER:  Just as of -- I was
 9   talking about any including non-privilege like
10   corporate filings or that.
11        Q.     Let me do it -- You said that
12   Power was set up as a Delaware venture or Delaware --
13        A.     A Cayman company.  Cayman Islands
14   company.
15        Q.     And then I understood --
16        A.     There's a subsidiary that deals
17   with only things that have to do with the US which
18   is almost -- almost no -- We have almost very
19   little things, so the US company which is owned 100
20   percent by the Cayman company that has some
21   interaction, if we have any kind of contracts or
22   things that require a US entity to be involved, but
23   it was not -- it's not our -- It's just a
24   subsidiary company.
25        Q.     Did -- As of December 1st, 2008,
```

```
 1    had Power engaged any United States counsel to
 2    advise it on legal matters?
 3         A.    We had our counsel was at that
 4    time.
 5              MR. BURSOR:  The answer is yes or
 6    no.
 7         A.    On that specific issue?
 8         Q.    Just as legal counsel.
 9         A.    We had legal counsel in the United
10    States, yes.
11         Q.    Can you tell me the identity of
12    the firm?
13              MR. BURSOR:  Just the firm name.
14         A.    Skadden, Arps.
15         Q.    Was any attorney at Skadden, Arps
16    responsible for handling United States legal
17    matters for -- for Power?
18              MR. BURSOR:  Just the name.  Well,
19    yes or no was there an attorney.
20         A.    I'm saying that --
21              MR. BURSOR:  Just yes or no, was
22    there an attorney at Skadden.
23         A.    I want to clarify that a
24    year-and-a-half earlier when we were starting the
25    company, we reviewed these issues and actually did
```
                                            Page 284

```
 1    a legal review of these general issues, not
 2    relating to Facebook but the issue of Terms and
 3    Conditions, issues of precedence and we consulted
 4    both international attorneys and -- also
 5    attorneys that gave us opinions and advices --
 6    advice on this issue.
 7         Q.    Again, your counsel was correct.
 8    All I want to know is --
 9              MR. BURSOR:  Just answer the
10    question as asked.
11         Q.    -- if there was an attorney at
12    Skadden, Arps who was responsible for generally
13    handling the legal matters in the United States for
14    Power?
15         A.    If requested.
16         Q.    Who was that individual?
17              MR. BURSOR:  Just his name.
18         A.    There were multiple people.  Which
19    -- Which person handle that.  There were five or
20    six people that worked with Power.
21         Q.    Was it Skadden, Arps lawyers in
22    New York or elsewhere or both?
23         A.    In the Bay Area but also in New
24    York had some participation.  Henna was one of the
25    lawyers.  Henna Ahmad, but I don't know if she's --
```
                                            Page 285

```
 1    I think she was one of the lawyers, but I could --
 2    Yeah.
 3         Q.    All right.  All I'm just asking if
 4    you can recall the name of lawyers who handle --
 5    I'm not even asking any specific legal matter --
 6         A.    We did have counsel in the United
 7    States, and at a later point Wilson Sonsini was our
 8    lawyer after we moved from Skadden to Wilson
 9    Sonsini.
10         Q.    Who at Wilson Sonsini?
11         A.    I apologize.  It was -- The
12    interactions were not extensive with those
13    companies.
14         Q.    Besides Mr. Herrera, did you ever
15    have any discussions with anybody at Power about
16    Facebook's Terms of Service?
17         A.    It would be with Eric.
18         Q.    Eric Santos?
19         A.    Eric and Filipe were the two
20    primary people that I would consult on these
21    issues.
22         Q.    Okay.  So Filipe --
23         A.    Not on -- Primarily Filipe.
24         Q.    Mr. Herrera, my understanding --
25    Was he listed as general counsel by Power?
```
                                            Page 286

```
 1         A.    He was not general counsel.  Our
 2    general counsel was Skadden, Arps and later was
 3    Wilson Sonsini.
 4         Q.    Was Mr. Filipe, did he ever, I'm
 5    not talking specifically about this case, did you
 6    ever rely on Mr. Filipe for legal advice about
 7    issues that specific to United States law?
 8              MR. BURSOR:  Just answer yes or
 9    no.  Did you rely on --
10         A.    The woman who gave us the original
11    advice on this issue was from Skadden, Arps --
12              MR. BURSOR:  Steve.  Steve.  The
13    question is:  Did you get legal advice from Phillip
14    Herrera on US legal issues?  Yes or no.  Just
15    answer yes or no.  That's all.
16         A.    Can I just clarify when fill --
17    The advice was given by US counsel to Filipe, he
18    would consult our US counsel when there were
19    issues --
20              MR. BURSOR:  Then the answer is
21    yes.
22              THE WITNESS:  He would manage our
23    relationship with the lawyers.
24              MR. BURSOR:  So the answer is yes.
25         A.    Yes.  That is correct, but the
```
                                            Page 287

```
 1      advice was passed on.
 2             MR. BURSOR:  Okay.  But the answer
 3      was yes.  So try to focus in on --
 4      A.      I just wanted to make a
 5      clarification.
 6      Q.      At any time on or after December
 7      1st, 2008, were you informed by anybody at Facebook
 8      that they believed power.com was enabling its users
 9      to violate its Terms of Service?
10      A.      Yes.  In 2008, December 2008.
11      Q.      Who contacted you to advise you as
12      much?
13      A.      The name is right here.  The guy
14      at Perkins Coie, Joseph Cutler.
15      Q.      When were you contacted?
16      A.      I believe it was December 1st or
17      December 2nd.  I don't know the exact date, but it
18      was in the first week of December.
19      Q.      In the context -- Before
20      Mr. Cutler contacted you, had you had any other
21      communications with anybody at Facebook?
22      A.      No.  We did not.
23      Q.      And by Facebook, I'm talking about
24      Facebook corporate.  Not somebody on the Web site.
25      A.      Nothing formal that I can
```
                                          Page 288

```
 1      A.      No.  From Facebook.  I received an
 2      E mail from Mr. Cutler.
 3      Q.      Did you receive the E mail or the
 4      letter from Facebook first?
 5      A.      The E mail.
 6      Q.      Did the E mail include this
 7      letter?
 8      A.      Yes.  This was sent on December
 9      1st, if I remember correctly.
10      Q.      All right.  Going back to Exhibit
11      107, could you turn to Page 9 of 107.  Do you see
12      the bottom of Page 9 there's a discussion of
13      Facebook Connect?
14      A.      Yes.
15      Q.      As of December 1st, 2008, had
16      Power ever evaluated whether they could use
17      Facebook Connect to connect the Power site or
18      integrate the Power site with Facebook?
19      A.      Extensively.
20      Q.      All right.  And do you recall how
21      long that evaluation lasted?
22      A.      I don't remember, but we
23      definitely talked about it, looked at it, and I
24      made a conclusion that it did not in any way.  It
25      would not in any way enable the functionality that
```
                                          Page 290

```
 1      remember.  We might have met Facebook people, but
 2      -- but no formal communications related to Power.
 3             (Whereupon, Exhibit 108 is marked
 4      for identification by the reporter.)
 5      Q.      Mr. Vachani, I'm showing you a
 6      Exhibit 108, a December 1st, 2008, letter from
 7      Joseph Cutler to Lee at Power.  Have you seen --
 8      A.      Yes.
 9      Q.      Have you seen this document before
10      now?
11      A.      Yes.
12      Q.      Mr. Power is the individual who
13      you indicated was the owner of the domain name
14      power.com originally?
15      A.      Yes.  He looked up the domain and
16      saw his name, so he would have.
17      Q.      All right.  Is this the first
18      communication you -- Is this what you were
19      referring to is your first communication you
20      receive from Facebook?
21      A.      Yes.  To the best of my knowledge
22      this is the first communication.
23      Q.      Do you know how you received this
24      letter from Mr. Power -- First of all, did you
25      receive this letter from Mr. Power or Facebook?
```
                                          Page 289

```
 1      our users were expecting from us.
 2      Q.      When did these -- How were these
 3      -- First of all, who were you referring to that we
 4      discussed this when you --
 5      A.      Typically, it would be in a weekly
 6      meeting.  It would probably come up on the agenda,
 7      Facebook Connect, and Eric would usually lead this.
 8      He probably would have looked at -- with his team
 9      he would have evaluated and played with Facebook
10      Connect to see what they could do and what its
11      capable in evaluating stuff and would have reported
12      on this at a meeting, at a weekly meeting.
13      Q.      Who participated in these weekly
14      meetings?
15      A.      It would be members of program --
16      members of the -- Typically, it would be management
17      but if there was a specific person other than
18      management that was necessary such as a member of
19      the team, we would -- they would come in and
20      consult on an issue.
21      Q.      Let me be clear.  Did you
22      participate in these weekly meetings?
23      A.      In many of them.  Not all of them.
24      Q.      Who do you recall besides yourself
25      and Mr. Santos?
```
                                          Page 291

```
 1        A.    Filipe would be.
 2        Q.    Anybody else?
 3        A.    Probably -- There were
 4  participants that came for specific parts of the
 5  meetings, so it would have been on this issue.  I
 6  would have probably just consulted with Eric and
 7  Filipe.  I don't remember.  It was -- We had weekly
 8  meetings.  We had members of management there.
 9  There would be other managers of the company.
10        Q.    Can you tell me who you recall
11  were other managers in the company besides --
12        A.    I'm trying to think who were the
13  key officers at that time.  Egore was a business
14  development director, but I don't even know if he
15  was at the company at that time.
16        Q.    Who's Egore?
17        A.    Egore was one of the early -- the
18  head of business development.
19        Q.    What's his last name?
20        A.    Barenboym, B-A-R-E-N-B-O-Y-M.  He
21  was not even at the company at that time, so I
22  scraped that.  He was an earlier member of the
23  company.
24        Q.    Mr. Barenboym?
25        A.    Yes.  But he was not a member of
```
Page 292

```
 1  the management on that date at that time.
 2        Q.    When was he a member of
 3  management?
 4        A.    In 2007.
 5        Q.    Can you recall anybody else who
 6  was a member of management?
 7        A.    At our most senior management
 8  level, I mean, there's different levels of managers
 9  in the company, that's why I'm trying to understand
10  what -- if you're referring to the senior -- chief
11  -- the chief managers because we had, you know, a
12  second layer of managers that I didn't interact too
13  much with, but there were many of those.
14        Q.    Do you recall any names period?
15        A.    Yeah.  Of course.
16        Q.    All right.
17              MR COOPER:  Well, let me strike
18  that.
19        Q.    Do you recall any names period
20  besides you, Mr. Santos, Mr. Herrera talked about
21  Facebook Connect?
22        A.    Oh.  That talked about Facebook
23  Connect?  No.  No other manager that I -- that I
24  directly talked to.  No.
25        Q.    You mentioned that there was an
```
Page 293

```
 1  agenda for these weekly meetings?
 2        A.    There would typically be some kind
 3  of agenda.
 4        Q.    Would that be a written document
 5  circulated amongst management?
 6        A.    Yes.  At that time, yeah.
 7        Q.    Do you know if those agendas still
 8  exist?
 9        A.    I don't know if they still exist,
10  but I do -- I can tell you that Facebook Connect
11  was not -- it was definitely not at a high level --
12  It's something we reviewed.  It definitely wouldn't
13  have been on an agenda item.  It might have come up
14  in a discussion.
15        Q.    Earlier you said you had discussed
16  Facebook Connect extensively --
17        A.    We discussed it technically, like,
18  technical discussions about it.  Not about -- It
19  wouldn't have been a major issue in these meetings.
20  I would have basically said to Eric, "I need you to
21  go play around," probably off line.  "Eric, I need
22  you to go -- you and your team to evaluate Facebook
23  Connect, what it's capable and if it's possible to
24  -- what we can and can't do with it."
25        Q.    Did you search for these agendas
```
Page 294

```
 1  when you produced documents in this case?
 2        A.    They're not electronic.  This
 3  would typically be somebody put it on a word thing
 4  and then distributed an electronic copy and it was
 5  a very informal agenda, if there was even a agenda.
 6  It was no formal process for that.
 7        Q.    When you searched earlier, did you
 8  search with key words for text documents that were
 9  attached to any E mails?
10        A.    Those are included in -- Those get
11  included.  When you do a search on Yahoo, it
12  searches text documents.
13        Q.    Did you search for on the -- the
14  -- whether or not there were simply store copies of
15  these agendas that were not attached to E mails?
16        A.    They would have come up in the
17  message -- All agendas?  Most agendas I would say
18  are typically -- If they were relevant, they would
19  be sent out in E mails, so when I searched the
20  E mails with anything related to Facebook they
21  could have come up -- they would have come up in
22  the E mail searches for the most part.
23        Q.    How did you find the documents
24  related to PowerScript?
25        A.    I searched for things that were
```
Page 295

1    with PowerScript or I searched with the word
2    "Facebook."  Specifically, relating to this issue
3    as I told you earlier, I went through -- Actually,
4    I went through all the E mail also of that time
5    period, and I also searched the word "Facebook."  I
6    also searched the word "PowerScript" and I also
7    searched a range of other terms that I thought were
8    related to this issue.
9         Q.      You indicated nobody -- that it
10   was not the policy to destroy documents at -- at
11   Power.
12        A.      That's correct.
13        Q.      Where were those documents stored?
14        A.      Any document that was sent
15   electronically is still in my E mailbox.
16        Q.      What if it wasn't sent
17   electronically?
18        A.      If it wasn't sent electronically,
19   -- There's -- I don't know which -- They're -- For
20   the most part, I would say most of our
21   communications were sent electronically, but if
22   somebody prepared, for example, a -- a Word
23   document and never sent it out to anyone, which I
24   don't think happened very often, and then there
25   would be no way to locate that.

                                    Page 296

1    and many people -- E mail was the preferred form of
2    communication in the company.
3         Q.      And did you -- Again, did you
4    search any of the word "system" documents to see if
5    there were any materials --
6         A.      Every document that I've ever
7    reviewed that I can -- To the best of my knowledge,
8    was usually E mailed to me, you know.  That was --
9    because I was not always -- I was moving -- I was
10   moving between traveling a lot, and in general, the
11   -- People would E mail it to me, so it would be my
12   E mailbox and I've searched that entire E mail box.
13        Q.      How far back does your E mail box
14   go back?
15        A.      It goes back to well before Power
16   was started.
17        Q.      Was any type of request sent out
18   to all employees of Power that they maintain
19   records of everything related to the development of
20   the Facebook integration?
21        A.      No.
22        Q.      So none of the employees were any
23   inform instructed to maintain their records?
24        A.      No.  They were not.
25        Q.      So -- what was -- For how much

                                    Page 298

1         Q.      Where were employee records stored
2    at Power when they were in their own personal
3    possession?
4         A.      If they were in their own personal
5    possession, they would be on the laptop, but if
6    they were shared documents they would be on our --
7    on our servers.
8         Q.      If -- Did you use word "system" at
9    Power?
10        A.      We used a -- We had a -- We had a
11   -- We had a shared server for documents that were
12   appropriate that were in -- in intercompany
13   discussions.
14        Q.      Did you search this -- Is this
15   word "system" still stored anywhere --
16        A.      I personally, whenever somebody
17   wanted me to review something, I would get it in my
18   E mailbox because I just preferred that, so I would
19   always request that to be sent to my E mail.  So
20   if, there was anything related to Facebook or these
21   other issues, it would have been in my E mailbox.
22   Also, because that was my personal practice and
23   preference if people if they had a document -- I
24   personally never -- never used that -- the shared
25   stuff -- shared -- put it on the servers very often

                                    Page 297

1    longer after December -- or January 1st, 2009, did
2    Power have approximately 100 employees?
3         A.      It was shortly after that they we
4    cut -- cut the team significantly in the first --
5    within -- within like two months, and this was just
6    -- this was -- just a time when companies were
7    cutting staff significantly just because of the
8    available resources were a lot lower.
9         Q.      When did Mr. Delgado leave the
10   company?
11        A.      He was with the company until --
12   until I guess you'd say -- till the end of 2009.
13        Q.      Sometime near the --
14        A.      Probably the end of 2009, maybe
15   early 2010.
16        Q.      How long was Mr. Bacelar with the
17   company?
18        A.      I think they were probably there
19   until the end of 2009 and maybe the first two or
20   three months of 2010.
21        Q.      How long was Mr. Herrera there?
22        A.      The same.  Those are all around
23   the same time when we kind of -- They were all with
24   the company for the -- for the longest period from
25   the start to finish.

                                    Page 299

Page 300

```
 1        Q.    And then you said Mr. Santos was
 2   with the company up until the company defaulted --
 3        A.    No.  The company -- We were -- He
 4   was with -- It was all around the same time in the
 5   first three months of 2010 when we kind of
 6   dramatically reduced staff further.
 7        Q.    I'm sorry.  I thought Mr. Santos
 8   was one of the last people to leave the company?
 9        A.    What I said earlier is he left the
10   company, but he's -- he's a founder and someone
11   that -- that keeps continuing to consult and
12   advise, but he was not employed by the company
13   after -- after 2000 -- 2010 is when we
14   dramatically, you know, reduced the remainder of
15   our staff.
16        Q.    Did there ever come a point in
17   time when you made a business decision before
18   December 1st, 2008, that you would not employ
19   Facebook Connect to integrate with Facebook with
20   Power?
21              MR. BURSOR:  Can you read that
22   back.
23              (Whereupon, the last question is
24   read back by the reporter.)
25        A.    Yes.
```

Page 301

```
 1        Q.    Do you know how long before
 2   December 1st, 2008, that business decision was
 3   made?
 4        A.    It was most likely made around
 5   three months earlier.
 6        Q.    Do you have any idea if there were
 7   any E mails reflecting that decision?
 8        A.    I don't, but I remember -- I do
 9   remember the conversation with Eric you know, late
10   at night, where we basically said can Facebook
11   Connect -- can we do with Facebook Connect and the
12   advice and recommendation was there was -- Facebook
13   Connect would not -- would not support -- it does
14   not support data portability, does not support most
15   of the functionality that we -- that we were -- we
16   were doing at that time.
17        Q.    Do you know if there's any
18   documentation reflecting the decision not to employ
19   Facebook Connect before December 1st, 2008.
20        A.    I don't believe there's any
21   documentation.  I believe it was a pretty -- pretty
22   simple decision I asked Eric.  I said, "Can this --
23   Can this -- Can we work with Facebook Connect," and
24   he said -- He gave me a very clear no.  He said
25   there's nothing -- it's completely useless for --
```

Page 302

```
 1   Not useless, but most of the functionality -- A
 2   large part of the core functionality, specifically
 3   data portability, which is the core of our business
 4   giving users ownership and control of their data,
 5   was not something that Facebook Connect supported.
 6        Q.    The password information
 7   associated with Facebook is stored on Power when a
 8   user registers and is a member of Power?
 9        A.    Yeah.  At the user's authorization
10   and they give us their passwords and that's what
11   enables us to maintain persistent access to their
12   accounts.
13        Q.    And that's also true with their
14   user ID?
15        A.    That's correct.
16        Q.    And that's stored --
17        A.    Our database.
18        Q.    What precautions are taken to make
19   that database secure?
20        A.    I -- We employ a whole -- wide
21   range of -- I don't know -- I can't tell you
22   offhand because that was someone else, but it was a
23   -- you know, we followed best -- you know, industry
24   best practices on storing our database, and we
25   never had a breach to the best of my knowledge of
```

Page 303

```
 1   our database.
 2        Q.    Was any -- Were there ever any
 3   complaints by social networks that that use of
 4   storage was not secure enough for privacy reasons?
 5        A.    We had conversations with -- with
 6   social networks where they -- where we -- where we
 7   kind of reassured them that what our intent was,
 8   what we were doing with it.  It was more out of
 9   courtesy.  Obviously, wasn't required to, but we
10   always practiced a very open policy.  If, you know,
11   if there was questions we would try to do it, and
12   we would take suggestions just as we did with
13   Facebook.  We welcomed and encouraged their
14   suggestions, as you can see in the E mail.  It's
15   trying to tell us best practices and offered a
16   whole wide range of solutions to Facebook just as
17   we did on other sites.  How to try to cooperate
18   with them.
19        Q.    Do you know if any site, Facebook
20   or otherwise, ever blocked or indicated they were
21   blocking access to their site as a result of
22   concerns that the storage of password information
23   was insecure?
24        A.    Blocking?  No.  But we did have
25   conversations where they -- where they gave us
```

1   suggestions and recommendations and wanted to
2   understand better our processes just for their --
3   for their own business.
4        Q.     Did Myspace ever block access to
5   registered users of Facebook to its site?
6        A.     Myspace actually didn't -- They
7   contacted us, not legally, but in a more standard
8   method, and said, "Hey, we would like you to do
9   this," and we actually -- they presented a very --
10  a very clear solution, which we thought was great.
11  So we voluntarily took it and updated it and had
12  many positive meetings with them and found -- found
13  solutions that worked.  It was only Facebook that,
14  you know, took a very different approach than every
15  other site.
16       Q.     Did, at any point, in time block
17  -- Myspace block on the IP address --
18       A.     Not that I know.  We voluntarily
19  took Myspace off because it never got to that
20  point.  They had a conversation with us.  They
21  explained what their -- what their issues were and
22  we -- we showed them and we came up with, a whole
23  range of solutions that were positive and we
24  actually agreed to implement them.
25       Q.     What was Myspace's issues that you

Page 304

1   say they were --
2        A.     They just wanted to understand,
3   you know, the protocols we follow for storing user
4   names and passwords, and we -- we showed them.  And
5   then they also gave some -- They brought their
6   privacy expert who -- who made suggestions on other
7   things we could do and we actually -- we had an
8   ongoing conversations with them related to that.
9   There was never any kind of legal threat or any
10  kind of discussions.  It was just a -- These are
11  the things that concern us.  We just want -- We
12  want to know -- When I say, "concerns," we want to
13  make sure that, we just want to understand best the
14  practices you guys are using and these are our
15  suggestions.
16       Q.     What were the -- the specific
17  issues they identified with storage of passwords
18  and user information they wanted you to address?
19       A.     They didn't actually want us to
20  address anything.  They just told us what the
21  practices that they liked to see, you know,
22  followed and we actually then -- then actually came
23  up with the discussion to -- to work with -- you
24  know, to have conversations with -- they were --
25  they were pretty actually widely published

Page 305

1   protocols on data portability that even Facebook,
2   although they don't support it, have publicly
3   stated they support it.  We just reviewed some of
4   those protocols and verified that this is something
5   that with them, and we voluntarily took it off
6   while we -- while we started to work on -- on
7   better ways -- on -- on new ways to work with them.
8        Q.     What specific changes were made to
9   the storage of password information as a result of
10  your discussions?
11       A.     We didn't --
12            MR. BURSOR:  Let him finish the
13  question.  Please.
14       Q.     What, if any, specific changes
15  were made to the security of the storage of
16  passwords or log in information as a result of your
17  discussions with Myspace?
18       A.     Actually, there were no -- There
19  were no changes made.  They never -- It never
20  became a priority for them, and we both kind of
21  just continued on with our business.  We just had
22  some -- you know, some discussions and we -- we
23  voluntarily took it off for a while while we -- we
24  looked if there was anything more we could do and
25  we presented some solutions.  We went back and

Page 306

1   forth but there was nothing conclusive that came
2   up.  It was just a -- as far as what we were do.
3        Q.     Does that mean no changes were
4   ever made?
5        A.     There were no changes that were
6   ever made and implemented.
7            (Whereupon, Exhibit 109 is marked
8   for identification by the reporter.)
9        Q.     Mr. Vachani, this is a -- I've put
10  in front of you an E mail that appears to have been
11  dated December 1st, 2008, from you to Mr. Herrera
12  and Mr. Santos.  Do you see this?
13       A.     Correct.
14       Q.     Now, in the context of this E mail
15  -- and it's two pages.  If you looked on the first
16  page, there's a E mail from Mr. Cutler to Mr. Her
17  -- Mr. Lee?
18       A.     Yup.
19       Q.     And then there's a short E mail
20  from Mr. Lee to you.  Do you see that at the top?
21       A.     That's correct.
22       Q.     The E mail that's on the first
23  page, is this an E mail in response to the fact
24  that you had received a copy of the cease and
25  desist letter?

Page 307

**Page 308**

```
 1        A.    Yes.  I had already received it
 2  before Mr. Power sent it to me.
 3        Q.    All right.  You say in the first
 4  sentence, "We need to prepare and think carefully
 5  how to transform this into an opportunity for
 6  Power"?
 7        A.    Yes.
 8        Q.    Why did you think it was an
 9  opportunity for Power to receive a cease and desist
10  notice.
11        A.    First of all, it was an
12  opportunity for dialogue with Facebook on this
13  issue because previously, you know, we were not
14  able to have any kind of dialogue on this issue.
15  So first of all, I saw it as an opportunity to
16  speak with Facebook and engage them, and if you
17  look at E mails that were sent immediately
18  afterwards, we -- we -- we insisted and persisted
19  to have conversations with people at Facebook to
20  see how to address this in the same way we had with
21  other -- with other companies.  And I also -- As
22  you can see, I looked at other sites that dealt
23  with that issue, and obviously it was clear that
24  Facebook was, at that point, going to try to, you
25  know, they were not cooperating so we were
```

**Page 309**

```
 1  obviously preparing for that and we did.
 2        Q.    Just a couple questions and we'll
 3  continue after the break, but you indicate that you
 4  will talk to your friends at Nevo.  Do you see that?
 5        A.    Yes.
 6        Q.    Nevo is an open source site
 7  related to aggregation of IMs?
 8        A.    Nevo is an aggregation of IMs.
 9  That's correct.
10        Q.    And it operates on a Linux basis,
11  doesn't it?
12        A.    I don't know what it operates on
13  but they were abrogating Facebook and I think later
14  on it came up with a solution with Facebook.
15        Q.    Who were your friends at Nevo you
16  were referring to?
17        A.    That's how the CEO I think -- Some
18  of the CEOs some of the other people there.  I
19  don't remember.  It was a long time ago.
20        Q.    What are their names?
21        A.    I don't remember the CEO's name
22  anymore but he was -- they were a DFJ company, so
23  first thing I talked to was our -- I think our VC
24  at DFJ.  DFJ were also board members at Nevo.
25        Q.    It was it Mr. Olson you talked to?
```

**Page 310**

```
 1        A.    No.  Draper Fisher were board
 2  members, so I think I reached out to Mr. Olson
 3  and/or Andreas and said, "Hey, I just want to --
 4  Can you -- Can you help make an introduction to
 5  Nevo?"  I don't remember exactly.  I think it was a
 6  conversation we had and they -- they facilitated a
 7  conversation with Nevo.
 8        MR. COOPER:  We'll go off the
 9  record.
10        THE VIDEOGRAPHER:  5:23, off the
11  record.  End of Tape 6.
12        (Whereupon, a recess is taken.)
13        THE VIDEOGRAPHER:  5:34, on the
14  record.  Beginning of Tape 7.
15        Q.    Before the break, I asked if you
16  could recall who the friends of Nevo were and you
17  said Andreas --
18        A.    DFJ --
19        Q.    Let me finish.  And I understood
20  you said it was the CEO whose name you could not
21  recall and that it actually was Andreas or Olsen
22  who contacted Nevo initially?
23        A.    No.  I believe I contacted Simon
24  and also talked to Andreas.  There was probably
25  some conversation that I had with them and I said,
```

**Page 311**

```
 1  "Can you -- you know, who should I talk to at
 2  Nevo?"  And they said, "I'll talk to the CEO," who
 3  I actually know already.  I met him at other DFJ
 4  events.  We have a CEO gathering every year with
 5  all the DFJ companies in Palo Alto, so I had known
 6  him.  I went to the DFJ guys first just to involve
 7  them in that specific introduction.
 8        Q.    Simon is Simon Olson?
 9        A.    Simon Olson.  He was most likely
10  the person -- I don't remember exactly -- What
11  exactly I said that day, but I just asked for their
12  advice and to also contact Nevo since I knew they
13  had gone through a similar conversation on the
14  similar.
15        Q.    So it's clear you don't recall the
16  name of the CEO at Nevo?
17        A.    I don't recall the name offhand.
18  I know he's someone -- He's a Facebook friend.  I
19  see him once a year.  I just -- I can get you his
20  name in a second.
21        Q.    Did you contact him by phone, by
22  E mail or --
23        A.    If I remember correctly, we --
24  they -- it was -- they gave very little -- I think they
25  just -- comments.  They just said -- I think they
```

1  told us who they talked to at Facebook, so I think
2  if I remember correctly I have to check, but I
3  believe that he told me someone at Facebook, but
4  Facebook made it -- Joseph Cutler made it very
5  clear that he will not in any way introduce --
6  introduce anyone at Facebook to talk to us to have
7  any kind of conversation on this, so --
8       Q.    But very simply do you have -- How
9  did you contact Nevo?  Was it by phone or E mail?
10      A.    I believe it was by phone.
11      Q.    Did you have one conversation --
12      A.    One conversation.  I don't even
13  remember what the -- I honestly it was nothing --
14  nothing came of it, so I don't remember if there
15  was any advice or whatever.  I think -- I don't
16  even remember because I remember seeing the Nevo's
17  CEO, but if we talked it was something -- nothing
18  came of it besides, you know, just that this is who
19  they had worked with.
20      Q.    And do you know how long your
21  conversation with the individual or individuals at
22  Nevo lasted?
23      A.    I do not.  I vaguely remember -- I
24  remember the conversation about contacting Nevo and
25  did make an effort to, but I don't -- I don't

Page 312

1       A.    Yes.
2       Q.    Did you have multiple discussions
3  with Eric Santos and Filipe Herrera about those
4  arguments or did you have --
5       MR. COOPER:  Strike that.
6       Q.    Did you have any conversations
7  that are not recorded in E mails or anything with
8  Mr. Herrera and Mr. Santos --
9       A.    The conversation of log in
10  credentials and president -- long before Facebook
11  is something that we had already addressed, so as
12  you can see, my message there says this is
13  something with a lot of precedent.  Everybody was
14  getting credentials for years.  Scraping is also
15  something -- So it wasn't even an issue.  It's
16  something -- It was so standard that we just we
17  found it absurd and we were -- that's why it was
18  not -- and that we -- make sure that they would
19  make such a response to something that was such a
20  standard practice in the industry including the
21  practice that Facebook practiced, so we expected it
22  to get lots of attention because of the fact it was
23  so hypocritical.
24      (Whereupon, Exhibit 110 is marked
25  for identification by the reporter.)

Page 314

1  remember any substantial conversation.
2       Q.    All right.  Do you know -- The
3  second sentence of Exhibit 109 says, "Eric we need
4  to be prepare for Facebook to try and to block us
5  and the turn this into a national battle that gets
6  us huge attention"?
7       A.    Yes.
8       Q.    Why did you think Facebook was
9  going to block you?
10      A.    Obviously, they sent this letter
11  to us saying very clearly it was -- I thought it
12  was absurd, but that -- nonetheless that they were
13  trying to do this, but it was clear that that's
14  what they would do.
15      Q.    By what the way, do you remember
16  the name of the Facebook individual that Nevo
17  suggested you talk to?
18      A.    I do not recall it right mow.
19      Q.    Do you know if it was the same Sam
20  O'Rourke?
21      A.    That name sounds familiar, but I
22  don't -- I know I've heard that name.
23      Q.    Why did you -- The third sentence
24  says, "We need to address the scraping argument and
25  the soliciting log in credentials"?

Page 313

1       Q.    Mr. Vachani, I put in front of you
2  defendant Power Venture responses to Facebook's
3  Inc.'s First Set of Interrogatories.  Have you seen
4  this document before today?
5       A.    Yes I have.
6       Q.    All right.  Will you just turn to
7  the last page.  Is that your signature?
8       A.    Yes.  It is.
9       Q.    Interrogatory 17 asks for "Power
10  users to describe in detail the process by which
11  Power users registers for the Power Web site
12  including but not limited to any information given
13  to Power users regarding Power services."  Do you
14  see that on Page 8?
15      A.    Yes.
16      Q.    And then the response is,
17  "Pursuant to Federal Rules Civil Procedure 33(d),
18  Power refers to Power's terms of use and privacy
19  and policy available at www.power.com"?
20      A.    Yes.
21      Q.    How would I obtain a copy of the
22  Terms of Service today?
23      A.    I could -- You would request it
24  from me, if you don't already have it.
25      Q.    How would I receive a copy of the

Page 315

1 privacy policy?

2     A.    Just request it from me if you

3 don't already have it.

4     Q.    Were there multiple versions of

5 the privacy policy developed at Power?

6     A.    There may have been minor changes,

7 but it's pretty -- I don't believe -- I believe it

8 was pretty standard.

9     Q.    Was there multiple versions of the

10 terms of use provided by Power?

11     A.    It was pretty straightforward

12 standard first time.  I don't know -- There are

13 always updates made to policies.

14     Q.    Do you know when Power first

15 created the Terms of Service?

16     A.    When we first turned on, so it was

17 back in 2007.

18     Q.    Did Power have an Internet user

19 bill of rights?

20     A.    Yes.

21     Q.    Who was responsible for preparing

22 it?

23     A.    Well, I was leading that.  There

24 were other individuals -- Actually, quite a few

25 people that I involved in that.  It was about eight

Page 316

1 or nine people that I interacted including people

2 from our -- from our both our communications

3 people, PR people, our, you know, Eric, myself and

4 some on the individuals.  I remember there was a

5 whole room of people.

6     Q.    Who developed the Terms of

7 Service?

8     A.    The Terms of Service was Filipe

9 led that together with whatever resources he -- He

10 worked legal counsel in the US and with other

11 places with our different counsel.

12     (Whereupon, Exhibit 111 is marked

13 for identification by the reporter.)

14     Q.    Mr. Vachani, I've put in front of

15 you as Exhibit 111 an E mail from you to Joseph

16 Cutler.  Do you see this document?

17     A.    Yes.

18     Q.    And it copies Mr. Herrera and Eric

19 Santos.

20     A.    Yes.

21     Q.    When I see -- First off, a couple

22 things.  I notice you write in English to

23 Mr. Santos and Mr. Herrera in the ones I've seen?

24     A.    Yes.

25     Q.    I've seen Mr. Santos reply in

Page 317

1 Portuguese back to you?

2     A.    Yes.

3     Q.    Was that the standard that you

4 would write in English typically and they would

5 Mr. Santos would respond in Portuguese?

6     A.    When I was communicating on

7 certain issues of highest sensitivity like -- or

8 official issues, Filipe speaks perfect English and

9 Eric does not -- Eric understands, he reads English

10 really well, but he does not speak English, so I

11 would typically -- and he does not write English,

12 so he would typically write in Portuguese.  I speak

13 both languages fluently and so there's Filipe and

14 Eric are --

15     Q.    But Mr. Santos, to the best of

16 your understanding, was able to understand your

17 English in writing?

18     A.    In writing, yes.

19     Q.    Okay.

20     A.    I mean, obviously he doesn't

21 understand it at the same level, but he understands

22 English in writing.

23     Q.    Was this the first communication

24 you had with -- Exhibit 111 is a December 12, 2008,

25 E mail from you to Mr. Cutler at Perkins Coie.  Was

Page 318

1 this first communication back to Facebook after you

2 received the cease and desist letter?

3     A.    I believe I had a phone call with

4 him and this was my first written communication

5 with him.

6     Q.    When -- To the best of your

7 knowledge and phone call, is that reference if the

8 first sentence where it says in regards to our

9 discussion on Wednesday?

10     A.    Yeah.  I think we had a phone call

11 and I told him I would -- I would take this back

12 and respond back to him.  It was very open and we

13 had a very good I guess productive first call and

14 as I told him I would follow up the following week

15 I did.

16     Q.    How long did it take for you to

17 prepare this response to Mr. Vachani -- I mean, to

18 Mr. Cutler?

19     A.    Well, you can look at the date we

20 had the call and then you can look at the day I

21 sent this, so that's -- I don't know which

22 Wednesday that was if it was Wednesday week

23 earlier.  I don't know -- I don't remember the date

24 of the call but it looks like our call was on

25 Wednesday, so either that was two days later or

Page 319

1    nine days later.

2         Q.    In the -- In the first -- There's

3    a bullet point Number 1 that says, "We will

4    implement Facebook Connect on our main log in page

5    and work with the capability of Facebook Connect

6    for the log in to our site."  Do you see that?

7         A.    Yes.

8         Q.    When was the decision made between

9    December 1st and December 12th that led you to

10   write that statement?

11        A.    -- After I talked with Joseph, I

12   went back.  I discussed the possibilities and we

13   decided we would make a good-faith effort with

14   Facebook to -- to explore and understand how we

15   could use Facebook Connect and at least try it.  It

16   was -- Obviously, we wanted to make a good-faith

17   effort there.

18        Q.    Between December 1st and December

19   12th, did you have one of your weekly meetings with

20   your management team?

21        A.    I don't know if it was a weekly

22   meeting, but I definitely discussed this issue with

23   Eric and Filipe and with anyone else that would

24   have been relevant on this case.

25        Q.    Would those discussions be

Page  320

1    reflected in the agendas that were prepare?

2         A.    No.  Most of our meetings were not

3    -- you know, were not formal meetings.  Especially

4    with Eric and Filipe.  I didn't -- We had formal

5    meetings but this kind of stuff -- What would

6    happen -- just -- We would have a conversation.

7    I'd say, "Let's talk about this and the E mails,

8    every E mails took place I've sent you."

9         Q.    As of December 12th, did you

10   believe that the dispute with Facebook might gain

11   power national attention?

12        A.    We believed if Facebook continued

13   to insist on this absurdity it -- you know, this

14   hypocrisy it would make them -- it would definitely

15   gain a lot of attention when somebody who built

16   their entire company on this is then asking someone

17   else not to do it.

18        Q.    Then what prompted as of December

19   12th Power to believe that it would implement

20   Facebook Connect instead of continuing its former

21   practice?

22        A.    Our goal was not to create

23   national attention.  Our goal was to try to work

24   with Facebook as you can see by all the

25   communications it was -- we -- we had responded

Page  321

1    immediately.  We had open communication and even

2    came back with a solution.  Obviously, our

3    business, you know, this is something that had a --

4    It was affecting our business and we wanted to --

5    you know, we were being -- they were -- Facebook

6    was being pretty aggressive as they have been on

7    this issue and we decided let's make an effort to

8    try -- just like we've done with on the companies

9    and been successful.

10        Q.    Do you see the second bullet point

11   says, "We will delete any Facebook friend

12   information we currently have"?

13        A.    Yes.

14        Q.    Did that happen?

15        A.    Yes, it did.

16        Q.    When?

17        A.    I don't know the date, but it

18   happened once we were no longer working with --

19   there was a time at some point a conversation with

20   Eric -- Mr. Cutler.  I think it was in late

21   February, but I don't remember when.  There was

22   some point when we verified certain thing with him

23   that we had done.

24        Q.    As of December 12, 2008, could

25   Power access the Facebook site?

Page  322

1         A.    Yes.  We were -- We were live all

2    the way until we voluntarily took it down once --

3    once the communications once it broke down we made

4    a decision that we'll voluntarily take it down and

5    we'll implement Facebook Connect anyway, even

6    though Facebook was being very, you know, difficult

7    to work with we said -- we made the decision that

8    we'll go ahead and implement Facebook Connect.  It

9    was not going to happen -- it was not a simple --

10   We realized that it was not going to happen in a

11   simple way, but we did take it down and we launched

12   Facebook Connect which you're probably aware of

13   that we did turn on Facebook Connect.

14        Q.    Did fate Facebook block access to

15   its site?

16        A.    To what?

17        Q.    At any point, did you become aware

18   that Facebook was attempting to block access from

19   Power to the site?

20        A.    I don't know if they were --

21   Obviously, we expected that they would but he we

22   also know that our system doesn't get blocked

23   because there's nothing -- there's nothing it's

24   technically doing.  It's just users accessing the

25   site so that it can't really be blocked.  The

Page  323

1  system can't be -- you can't -- Unless you want to
2  block your users from entering your site, Power's
3  technology is just implementing -- just emulating
4  what users are wanting to do, so there was no
5  really conversation about whether they were going
6  to be blocked.  We know that they would try, but we
7  also know that it was built to -- it would not be
8  blockable.
9       Q.      You see in the final page there's
10 a reference, second page, "We did study Digsby and
11 others and saw the changes they made to their UI to
12 implement Facebook Connect"?
13      A.      Yes.
14      Q.      Do you know what Digsby is?
15      A.      Digsby was a company that Facebook
16 was aggressively threatening legally that was
17 aggregating accounts.
18      Q.      Do you know if -- When you say "we
19 did study Digsby" what study was made of Digsby?
20      A.      We evaluated what they -- what
21 they originally did and then how they implemented
22 Facebook Connect and just to -- because we knew at
23 that time it was a -- one of the many, many, sites
24 that Facebook was threatening.
25      Q.      Is there any document reflecting

Page  324

1       A.      I don't believe we did.  But I --
2  there was a company -- I can't remember who we
3  talked to, but I have to remember there was one
4  other company.  I don't remember if it was Digsby
5  or the -- It was another company that they were
6  threatening at that time that I just -- I -- it was
7  a mail -- They were aggregating accounts, also.  I
8  think they were in Colorado.  That's all I
9  remember.
10      Q.      You don't recall the name of the
11 company?
12      A.      I don't recall offhand.  It might
13 have been Digsby, but I think it was -- I don't
14 believe it was Digsby.  I think it was one of
15 Digsby's competitors.
16              (Whereupon, Exhibit 112 is marked
17 for identification by the reporter.)
18      Q.      I put in front of you an E mail
19 from Joseph Cutler to you cc'ing othera at Perkins
20 Coie and also cc'ing Mr. Vachani and Mr. Herrera.
21 Do you see that?
22      A.      Yes.
23      Q.      Was this the response from
24 Mr. Cutler to your E mail of December 12th?
25      A.      Yes.

Page  326

1  this study of Digsby?
2       A.      No.  Just went up there and looked
3  at it.  I looked at it.  Eric looked at it and
4  said, "Oh, these -- this is what's possible with
5  Facebook Connect."  We looked at it and we -- just
6  to get some ideas.  Part of it -- We did make a
7  compromise actually in good faith with Facebook.
8  We realized that many of our, a lot of our
9  functionality including data portability would not
10 be possible, but we decided that, you know, let's
11 -- let's make a good-faith effort to work with
12 Facebook to come up with a solution, implement
13 Facebook Connect and then continue to work and try
14 to innovate.  As I referred to earlier, this would
15 be an opportunity to engage Facebook to try to have
16 a productive dialogue and we made our best effort
17 to do this.
18      Q.      Digsby implemented Facebook
19 Connect.  Correct?
20      A.      Yes.
21      Q.      And you'd already evaluated
22 Facebook Connect before December 12th --
23      A.      Yes.
24      Q.      -- 2008.  Correct?  Do you know if
25 you talked with anybody at Digsby?

Page  325

1       Q.      Do you see where it says,
2  "Meanwhile, as you may know, Facebook has taken
3  technical measures to limit the interaction between
4  power.com and its network at this time"?
5       A.      Yes.
6       Q.      Do you know what technical
7  measures are being referred to there?
8       A.      I don't.
9       Q.      Do you know if Facebook ever
10 instituted an IP block Facebook -- on power.com's
11 IP addresses?
12      A.      Power.com has hundreds of IP
13 addresses and they rotate so it would have -- it
14 would have refreshed -- Normally as we do, we had a
15 whole database, hundreds maybe even more IP
16 addresses.
17      Q.      Does power.com employ proxy
18 servers?
19      A.      We had proxy servers, yes.
20      Q.      Were some of those hundred of IP
21 addresses the IP addresses of --
22      A.      They were Amazon actually --
23 because Amazon it refreshes IPs and there were many
24 other -- We had a bank of, you know -- of proxies
25 it was around -- constantly updating IPs.

Page  327

1     Q.     My question was:  Were any of the
2   IPs addresses you were referring to that power.com
3   employed proxy servers.  IP addresses or IP proxy
4   servers?
5     A.     For -- I believe -- What do you
6   mean by "proxy servers."
7     Q.     Would they be servers that would
8   employ a different IP address than the IP address
9   which was contacting them?
10    A.     The -- Amazon as they're aware was
11  one of the primary sources of the IP addresses, and
12  Amazon has a wide range.  It's pretty dynamic
13  because they have in the cloud we were implementing
14  there -- we were utilizing Amazon cloud along with
15  four other different sources of -- There was a
16  pretty wide range of IPs in our system.
17    Q.     Where would the documentation
18  exist that shows me what IP addresses were employed
19  by Power as of December 17, 2008?
20    A.     I believe IP addresses are dynamic
21  and constantly changing.  It wouldn't be something
22  we would document.
23    Q.     IP addresses also are assigned in
24  ranges.  Correct?
25    A.     I believe so.  I don't know

Page 328

1   exactly how they are.
2     Q.     What documents, if any, that you
3   are aware of would tell me what IP ranges were
4   being used by power.com to -- to access Web sites
5   in December of 2008?
6     A.     I honestly don't know the answer
7   to that.
8     Q.     Do you know if PowerScript was
9   ever implemented in such a way that it would
10  reconfigure the IP -- or that it would contact an
11  IP address and have -- of a proxy server and have
12  the proxy server contact the relevant Web site?
13    A.     We worked -- The way Power system
14  worked is it would update IP addresses.  If it's
15  not -- It would update IP addresses regularly.
16    Q.     Did it update IP addresses through
17  the use of contacts with proxy servers?
18    A.     I don't know the answer to that.
19    Q.     What documentation would give me
20  the answer for that?
21    A.     That wouldn't be in documentation.
22  What I do know is that we had a large bank of IP
23  addresses and it had been operating for more than a
24  year before -- We worked with Facebook, so it was
25  pretty standard protocol our system how it worked.

Page 329

1     Q.     However, something has to instruct
2   an IP address to be assigned.  Correct?
3     A.     That's correct.
4     Q.     And that can be instructed through
5   a dynamic call set in the code in the HTML.
6   Correct?
7     A.     Amazon was one of the primary
8   sources of IPs and then there were at least four or
9   five others -- I think there were multiple other
10  server companies that we also worked with.
11    Q.     Now, earlier you said the site was
12  hosted on Amazon or IWEB?
13    A.     That's correct.
14    Q.     The other servers that had IP
15  addresses --
16    A.     Yes.
17    Q.     -- is it safe to say they were
18  proxy servers that were contacted through one of
19  your two hosting servers and then further contact
20  the relevant Web sites?
21    A.     I honestly don't know what, if
22  any, were other -- I believe there were others that
23  we used I don't know how we used them.
24    Q.     Do you know who would know that
25  answer?

Page 330

1     A.     I could find that out from Eric --
2   I could find that out from Eric.
3     Q.     Do you know if it was ever a
4   function that was actually set out as a -- or a
5   remote procedure call, for instance, in your
6   PowerScript or in your actual underlying HTML?
7     A.     So what I know is that IPs -- IP
8   addresses are -- If there was ever a reason it was
9   not working, one of the first troubleshooting thing
10  the system would do would be to update the IP
11  addresses because on the Internet there's a hundred
12  different reasons why IP addresses get changed and
13  blocked, and it was something we learned early on
14  when building our system.
15    Q.     Were you aware whether Facebook
16  implemented any system to prevent the term "power"
17  from being even a term that could be used to -- in
18  events?
19    A.     That could what?
20    Q.     That -- Whether the term "power"
21  could be made a term that could be used in an event
22  notification?
23    A.     Well, I believe it was used -- you
24  saw the -- talking about the events creating that
25  event?

Page 331

85 (Pages 328 to 331)

1      Q.      Let me restate it.  Do you know if
2  at any time after December 1st, 2008, Facebook took
3  preventive measures so that the very word "power"
4  would be a term that was blocked from use in
5  content on its site?
6      A.      I believe -- I don't know when it
7  happened, but I think it was much later they --
8  which was -- got some Media attention about it that
9  they actually didn't want people discussing power,
10  using the word power on their site.
11      Q.      Do you know how that was
12  accomplished?
13      A.      They put a -- I don't know, but I
14  think this happened -- If I'm not mistaken, it
15  happened many, many, months -- Well, after the time
16  we were even working with Facebook, but I don't --
17  I have no idea.  I think it was discovered like a
18  year later.  That's when it was discovered.  I
19  don't remember when.
20          (Whereupon, Exhibit 113 is marked
21  for identification by the reporter.)
22      Q.      Mr. Vachani, I've put in front of
23  you Exhibit 113, an E mail dated December 17th,
24  2008, from you to Mr. Herrera and Mr. Perkins.  Do
25  you see that?

Page 332

1  E mail.  I had a lot more interaction with people
2  outside the company and I just though it was more
3  professional.
4      Q.      Do you see in this E mail of
5  December 17th it says, "I just finished a meeting
6  with our team"?
7      A.      Yes.
8      Q.      Is there any documentation
9  reflecting the discussions at that meeting?
10      A.      Not that I know of.
11      Q.      It then says, "They have changed
12  the priorities of our product team to begin a
13  complete reintegration of Facebook with Facebook
14  Connect."
15      A.      Yes.
16      Q.      Then it says, "They are putting
17  together a detailed product plan and studying
18  intensively how to get the maximum innovation
19  through Facebook Connect"?
20      A.      Yes.
21      Q.      Was the detail product plan ever
22  completed?
23      A.      I believe there was an E mail that
24  I sent to you guys which when I -- "Detailed" is a
25  very vague term but basically what they were doing

Page 334

1      A.      Yes.
2      Q.      By the way, is Power -- Is the
3  e-mail address associated with Mr. Herrera at
4  powerinc.net was that an e-mail address assigned to
5  employees by Power?
6      A.      That's correct, yes.
7      Q.      Did you ever use that e-mail
8  address?
9      A.      I never -- I always used -- I
10  actually sent most of my E mails from
11  steve@stevevachani.com and some from
12  steve@power.com.
13      Q.      Do you know which address
14  Mr. Santos typically used?
15      A.      I always sent to Eric at power.com
16  or eric@ericsantos.com.  I sometimes copied both of
17  those.
18      Q.      Who else besides Mr. Herrera would
19  use powerinc.net as an e-mail address?
20      A.      It's the same -- It's the same --
21  power.com and Power Inc., were the same.  Same like
22  they came from the same place, but he -- I think he
23  -- it's just the way on your from some people, some
24  people -- some people used powerinc.net.  I
25  personally always preferred to use power.com in my

Page 333

1  is evaluating what -- what was possible with
2  Facebook Connect and we were -- our goal of that
3  was to push the limit and really be an innovator
4  with Facebook and that began in good faith with
5  Facebook to try to create something that we could
6  create as a foundation to bill a relationship to
7  strengthen our relationship with Facebook going
8  order and I don't know -- whatever we produced I
9  think it was an E mail or they send to me these are
10  the thing that we'll do.
11      Q.      Mr. Herrera, when you say "they"
12  -- First of all, who is the team you're referring
13  to?
14      A.      I'm referring to Eric and his
15  team, but two people as I pointed out Carlos and
16  din nil low, but there were other members on the
17  team.  Those are the two that I know that he may
18  have worked most closely with on this.
19      Q.      When you say "they are putting
20  together a detail product plan," who is the "they"?
21      A.      Eric.
22      Q.      Anybody else?
23      A.      Eric would work with his team to
24  -- to get whatever questions he needed answered and
25  what that means -- what detailed product in our --

Page 335

1    we were very informal company.  If, you know, Eric
2    explained to me what he was doing.  He was very
3    good at executing something and he didn't need a
4    lot of direct, it was one of his strengths and so
5    he presented me what he was going to do.  Sounded
6    good and told me also realistically when it could
7    be complete the.
8    **Q.**    **Mr. Herrera and Mr. Santos were**
9    **communicating on the power.com E mail system.**
10    **Correct?**
11    A.    Typically -- Because they were the
12    same office, both of them didn't really travel so
13    they communicated by E mail but they were in the
14    same office so myself, I travel more so sometimes I
15    -- when I was not in the office it would be E mail.
16    **Q.**    **Earlier you said, though, you**
17    **simply asked Mr. Herrera to do a search of his**
18    **E mails to find --**
19    A.    I asked both Filipe, Eric both to
20    do the E mail.
21    **Q.**    **And you didn't do a search of**
22    **power.com E mails that are stored on the system you**
23    **still have it in place.  Correct?**
24    A.    I told you I searched every single
25    E mail.

Page 336

1    A.    Not all, but we -- I don't believe
2    as many people use their -- like myself use their
3    Web mail account.  As long as they were -- We
4    didn't enforce strict guidelines on how to use your
5    e-mail address.  They were given e-mail addresses
6    and they configured it accordingly.  You'll notice
7    that mine mostly come from steve@stevevachani.com.
8    (Whereupon, Exhibit 114 is marked
9    for identification by the reporter.)
10    **Q.**    **Mr. Vachani, I've put in front of**
11    **you a December 25th, 2008, E mail from you to**
12    **Mr. Santos and someone name Bruno Carvalho at**
13    **corp.power.com.  Who is Mr. Carvalho?**
14    A.    He worked on Eric's team.
15    **Q.**    **Was he involved in any way in**
16    **integrating Facebook with Power?**
17    A.    He's not a programmer.
18    **Q.**    **What's his function?**
19    A.    He would help with some of the
20    product ideas with Eric.
21    **Q.**    **What was his employee -- specific**
22    **employee role at Power?**
23    A.    He was -- He would help with
24    product definition and ideas.
25    **Q.**    **Did you inquire of him to search**

Page 338

1    **Q.**    **Did you search E mails that were**
2    **between Mr. Herrera and Mr. Santos on which you**
3    **were not copied?**
4    A.    I -- I -- First of all, there were
5    very few communications -- It's -- In general,
6    Filipe and Eric, when they had communications,
7    because it was an interdepartment communication
8    they would copy me on it, but I asked both of them
9    to go through their E mails and provide me anything
10    related to Facebook.
11    **Q.**    **But you didn't search the E mails**
12    **that are available on Power system yourself if you**
13    **weren't cc'd on them?**
14    A.    As I told you earlier, I asked
15    them specifically to search and provide me all
16    E mails that were relating to the Facebook.
17    **Q.**    **So that means you asked**
18    **Mr. Herrera and Mr. Santos but you didn't do that**
19    **search yourself.**
20    A.    I don't have access to their
21    E mail.
22    **Q.**    **Does -- Do you have access to all**
23    **of employees' E mails that were ever served through**
24    **the e-mail system of power.com through the backup**
25    **that exists on this site that you currently have?**

Page 337

1    his E mails?
2    A.    Yes, I did.
3    **Q.**    **Where is Mr. Carvalho now?**
4    A.    He's in Brazil.
5    **Q.**    **When did Mr. Carvalho leave Power?**
6    A.    Same time as they -- He was part
7    of the last batch of 2010 beginning of 2010.
8    **Q.**    **Was he involved in the evaluation**
9    **of Facebook Connect before December 1st, 2008?**
10    A.    He would have been -- him and --
11    It would have been the other person that Eric would
12    have consulted more on the idea side and the
13    strategy side, product strategy side rather than --
14    he wouldn't be programing.  He's not a programmer.
15    **Q.**    **Was he involve with marketing?**
16    A.    He's the product -- he reported to
17    Eric so, yeah.  Product marketing was driven by
18    product, so Bruno would be the guy that would be
19    Eric would consult, you know, with product ideas.
20    **Q.**    **Did Mr. Carvalho locate any E**
21    **mails that he forwarded to you?**
22    A.    I sent everything that I had from
23    Bruno including this E mail, this might have even
24    -- this one I think I sent, but I did contact Bruno
25    also.

Page 339

1    Q.    Do you see you asked what is the
2   status of Facebook Connect?
3    A.    Yes.
4    Q.    All right.  Did you get an answer
5   to that?
6    A.    I believe that he told me
7   initially they -- they told me that -- It was
8   continued -- Obviously, I wanted to -- I think they
9   told me it would take until, you know, properly
10  implement it with what we were doing would take
11  another month.  That's what -- That was what the
12  answer was that unfortunately not going to be ready
13  by this time.  You know, we're doing our best to --
14  we're doing our best but can he cannot have it
15  ready by December 26.  It was not realistic.  That's
16  what their response was to me.
17        (Whereupon, Exhibit 115 is marked
18  for identification by the reporter.)
19    Q.    Mr. Vachani, I've put in front of
20  you an E mail dated or an E mail train the last of
21  which E mail is dated December 26, 2008, from you
22  to Steve -- to yourself -- Eric Santos to you.
23    A.    Yes.
24    Q.    Do you see that?
25    A.    This is with the actual numbers

Page 340

1   that people using Facebook.
2    Q.    All right.
3    A.    Because you asked earlier.  I told
4   you earlier I sent you an E mail.  This is the
5   E mail that has the exact numbers of Facebook
6   users.
7    Q.    Below that is an E mail from
8   someone named Elmo Cruz to Mr. -- to Mr. Santos
9   and Bruno Carvalho.  Who is Mr. Cruz?
10   A.    It was another person on Eric's
11  team.  He obviously had about 40, 45 -- 40 some
12  people.
13   Q.    Do you know what Mr. Cruz did --
14   A.    He was on the programming team.
15   Q.    Was he involve in integrating
16  Facebook Connect with power?
17   A.    He was probably called in to help
18  with some of the evaluation, but he was not a core
19  programmer on that team.
20   Q.    Did you contact Mr. Cruz to locate
21  E mails?
22   A.    I didn't need to contact because
23  any E mails that Elmo would have had, would have
24  been with Eric so Eric would have given it to me.
25  There wouldn't be any other communication because

Page 341

1   Eric would have specifically asked him for an
2   opinion and he would have given it to Eric and
3   either copied me or given it to Eric.
4    Q.    And Mr. Cruz copies Mr. Santos and
5   Mr. Carvalho but cc's three other people.  Do you
6   see that?
7    A.    He cc'd, yeah, Carolina and
8   Juliane.
9    Q.    Who is Carlos Bacelar?
10   A.    I gave you his name.  That's
11  Carlos, one of the two people that I gave you
12  earlier.  The programmer.
13   Q.    And then Carolina Fialho?
14   A.    She's another person similar role
15  to Bruno.  She was probably consulted on this
16  conversation.  They obviously would have had some
17  kind of just -- They were solicited to give ideas.
18  Obviously, once -- once we made the decision we
19  were going to implement Facebook Connect, we took
20  it a lot more seriously and the people that worked
21  on the Facebook Connect we had more -- more people
22  that contributed on that because we really wanted
23  to show Facebook that, you know, we -- we can do
24  something.  We'll do the best we can and we made it
25  a really high priority, at that point, so these

Page 342

1   were some of the people that were consulted in the
2   company to give product ideas on what was possible
3   with Facebook Connect and to do the best possible
4   -- to make the best possible effort to work with
5   Facebook.
6    Q.    Do you see another Juliane
7   Conceicao?
8    A.    Yes.
9    Q.    Who is she?
10   A.    She worked also with that team.
11  With that team she was one of the coordinator.
12   Q.    Was she a programmer?
13   A.    She was a coordinator.  Project
14  coordinator.  Helped coordinate tasks, not -- She
15  didn't make project decisions and she didn't
16  program.  She was a project manager, coordinator
17  for many of the programs that helped Eric and Eric
18  to organize and manage the tasks.
19   Q.    Do you know if Ms. Fialho's
20  E mails were searched?
21   A.    As I mentioned Eric -- any E mails
22  that these would have happen would have been with
23  Eric and Eric provided me all the E mails.
24   Q.    All right.  Do you know if
25  Ms. Conceicao's E mails were searched?

Page 343

Page 344

```
 1        A.    She reported to Eric so any
 2   communication would have been with Eric.
 3        Q.    You're making that assumption?
 4        A.    I know that all -- I asked him
 5   that and Eric -- I know that was protocol in the
 6   company if, you know, because that would be the
 7   person she would communicate with and Eric -- I
 8   know that all E mails with Juliane and Eric --
 9   there's no 100 percent guaranty of course, but
10   that's the best of my knowledge.
11        Q.    The language of the E mail from
12   Mr. Santos to you is in Portuguese.
13        A.    Yes.
14        Q.    Does he indicate one way or
15   another whether Power has 22,000 total users that
16   enter the power.com Web site through Facebook?
17        A.    Yes.  So he -- he probably had one
18   of these -- one of these people conduct a database
19   query, so answering your question from before and
20   he confirmed that there were 22,000 users that
21   entered, you know, from Facebook and that we have
22   11,000 users that actually registered a Facebook
23   account.
24        Q.    Is that registered or linked?
25        A.    That linked their Facebook account
```
Page 344

```
 1   that means they actually became -- other ones may
 2   have entered -- these are entered and how many
 3   people actually linked their account.
 4        Q.    So you had a total of 33,000 users
 5   as of December 26 using Facebook and power.com?
 6        A.    That had at least one interaction.
 7        Q.    Does he indicate in Portuguese you
 8   have an average of 700 users logging into power.com
 9   using a Facebook count?
10        A.    He says per day there are 700
11   users that -- that are using power that actually --
12   that also have a Facebook account.
13        Q.    And that was as of December 26?
14        A.    That's correct.
15        Q.    And that -- Does he also say that
16   in the month of December 2008 you had 43,000 users
17   that logged on using a Facebook account?
18        A.    Yes.  Thirty-three thousand, plus
19   the 10.  I guess, that's where the 43 came from.
20        Q.    What is the final sentence say in
21   Portuguese?  Are you able to translate it?
22        A.    He said based on these numbers --
23   Okay.  Basically, what do you want me to do.
24   That's -- I asked him because he knew that was the
25   day I originally -- Do we want to wait until we --
```
Page 345

```
 1   we turn this off or do you want to, you know -- do
 2   you want to have an interruption during this period
 3   or do you not?  That was basically what he was
 4   saying.
 5        Q.    Is it possible to translate that
 6   sentence as, "Based on this data, we should --
 7   should we remove Facebook from the air"?
 8        A.    No.  It's a question he's asking
 9   me what should we do.
10        Q.    I know.  I said --
11        A.    He was definite -- He was actually
12   -- He didn't see the -- the -- Personally, he
13   didn't see the reason to remove it, but I was -- I
14   was the one saying that we should be as cooperative
15   as possible with Facebook.  It's just good practice
16   as long as they're being reasonable and as you can
17   see by the E mails that I sent, there were so many
18   efforts that I made with Facebook to, you know, to
19   try to update them on our progress.  This was a --
20   on trying to integrate with Facebook Connect.
21        Q.    Can you turn to the second page?
22        A.    Yes.
23        Q.    Does he, again, provide numbers of
24   users of primary Facebook account?
25        A.    He provides -- Yes.  It says the
```
Page 346

```
 1   number of users with the account then the number of
 2   users with -- that have -- that have added Facebook
 3   accounts.
 4        Q.    It's 22,525?
 5        A.    He says that's what -- Yeah.
 6   Those are the number of -- of Facebook users that's
 7   their primary log in and then the other one.  It's
 8   their secondary, so they have a Facebook account
 9   linked.
10        Q.    11,576?
11        A.    That's correct.
12        Q.    And then he gives a Roman --
13   numeral three using a primary Facebook account by
14   date?
15        A.    Yes.  Total per day on those
16   dates.
17        Q.    Then Number 4, does he say, "We
18   had 43,412 logins from primary Facebook accounts in
19   December and 5,515 in November"?
20        A.    That's correct.
21        Q.    And then Number 5 he's referring
22   to the -- He does not have that information.
23   Correct?
24        A.    Yes.  That's correct.
25        Q.    And that's in response to your
```
Page 347

1   E mail on the next page asking what are the average
2   number of users a day with secondary Facebook
3   account that access Power.  Correct?
4       A.    That's correct.
5       Q.    How would you translate the next
6   sentence?
7       A.    Which one?
8       Q.    The one following "We do not have
9   that information"?
10      A.    Okay.  So -- In relation -- Let me
11  read it first.  Okay.  So he's saying to me in
12  relation -- the possibility to just remove Facebook
13  that the log in for Facebook on our site is not --
14  Basically, he's saying it's not simple.  Not
15  something you can just do in a day, even though I
16  wanted him to do it in a day like many CEOs do, but
17  the changes that are -- that are made they -- they
18  just will not work with this possibility.  If you
19  want to go with this option, we need to basically
20  change everything on the site.  If you want to go
21  with the -- In other words, if you want to
22  implement Facebook Connect.  It's not something we
23  can have up in a day.  It's -- We're going to have
24  to do a whole new site.
25      Q.    He's talking about moving only the

Page 348

1   It would cause significant harm to the company both
2   in terms of public reputation and other types of
3   things, and he was asking what -- if we do this,
4   what do you want us to say on the front page.  So
5   if we remove it, we need to put a message up that
6   tells our users.
7       Q.    Does the final sentence of this
8   E mail from Mr. Cruz refer to Carlos doing an
9   analysis?
10      A.    No.  He says, "In relation to the
11  dates, the -- the expected date for Carlos to
12  finish, yeah, finish his analysis of Item 1 is this
13  Monday, the 29th.  Only after this can we give you
14  a full -- a full estimate on the dates for items 2
15  and 3."
16      Q.    And if you go to the next page
17  that's in referred to Items 1, 2 and 3 in your own
18  E mail to Elmo.  Correct?
19      A.    No.  Eric's E mail to Elmo.  That
20  was a -- That's an E mail --
21      Q.    Wait.  You're right.  That's not
22  -- that's Eric --
23      A.    In general, I wouldn't have had
24  communication with someone -- a level below Eric.
25  I would have communicated with Eric and he would

Page 350

1   log in from the primary Facebook accounts.
2   Correct?
3       A.    The login is basically the primary
4   way that somebody can log in with their Facebook
5   account.
6       Q.    And doesn't he say that you would
7   need to alter the site once again?
8       A.    You would need to -- basically
9   create a whole new -- You can't just change it in
10  one day.  To do a Facebook Connect, it's completely
11  new integration.
12      Q.    So is he referring to an earlier
13  alteration to the site.  Do you know?
14      A.    No.  He's talking about -- This is
15  the debate on whether we should use Facebook
16  Connect or not and what's the -- you know, can we
17  do -- can we create something useful to our users
18  or is it not.  I was basically asking him, as I
19  referred earlier, what are your -- these are the
20  things -- Tell me what's going on, and this was his
21  response.  Let me read the rest of it.  He's saying
22  if we do remove it, he was strongly against,
23  thought it would have caused great damage to our
24  company.  One of his things with Eric is that he
25  thought if we removed it, it would basically stop.

Page 349

1   communicate to me.
2       Q.    That's a December 25th E mail
3   that's reflected on Page 2 from Eric Santos to
4   Bruno Carvalho and Elmo Cruz?
5       A.    Yes.  They were working on
6   Christmas Day.
7       Q.    And that's the part of the E mail
8   message that begins with the word "Elmo" at the
9   bottom of Page 3.  Correct?
10      A.    I'm sorry.
11      Q.    That's the -- the 1, 2, and 3 he's
12  referring to in his final sentence is in response
13  to 1, 2, and 3 that begins with word "Elmo" on
14  the second page -- on the third page.  Let me put
15  it this way, do you see on the Bates number Page
16  76?
17      A.    Yes.
18      Q.    There is, "Elmo, Preciso que voce
19  me confirme."
20      A.    Yes.
21      Q.    It's the 1, 2 and 3 that follow
22  that, that he's referring to in his final sentence?
23      A.    Yes.  I believe so.  Let's see
24  here.  I need you to confirm a date for these
25  activities.  So he's saying -- What he's saying is

Page 351

1    these are three -- three things I need you to do

2    and please give me a date so I can tell Steve

3    basically on when we can -- when I can get this

4    information.

5         Q.    Number 1 is referring to an

6    **analysis of the resources that can be maintained on**

7    **power.com using Facebook Connect.  Correct?**

8         A.    That's correct.  He wanted to

9    analyze all of our resources and see what would we

10   need to be able to implement Facebook Connect so

11   they went to -- I would say we're taking this

12   pretty seriously.

13        Q.    Number 2 is a new interface for

14   **log in utilization.  Correct?**

15        A.    Yes.  That's correct.  To create a

16   new interface with -- Once you -- If you're going

17   to put Facebook Connect, there's a different UI and

18   user experience that you have to go through, so

19   that's correct.

20        Q.    And then there's a reference to a

21   **PowerPoint as being created to present to the**

22   **Facebook team.  Correct?**

23        A.    I think he requested some kind of

24   a Power Point or some kind of presentation on the

25   user experience.

Page 352

1        Q.    Do you know if that PowerPoint was

2    **ever created?**

3        A.    I don't know if it was ever

4    created, but we obviously created the site and we

5    did launch with Facebook Connect, so they --

6    somehow or other they figured out what they were

7    going to do and it was launched.  We did launch

8    Facebook Connect.

9        Q.    Number 3 he's talking about the

10   **prediction of changes of power.com to support the**

11   **new infrastructure.  Correct?**

12        A.    Exactly.  So what would be needed

13   to support this new infrastructure.  Correct.

14        (Whereupon, Exhibit 116 is marked

15   for identification by the reporter.)

16        Q.    Mr. Vachani, I put in front of you

17   **in the e-mail chain that on the front page includes**

18   **a December 26, 2008, E mail from you to Mr. Herrera**

19   **and Mr. Cutler.  Do you see that?**

20        A.    Yes. I do.

21        Q.    Was this the E mail you prepared

22   **in response to the information you received**

23   **following Mr. Santos' communications, a number of**

24   **users, Facebook?**

25        A.    After I got a full analysis, which

Page 353

1    is what -- what resources would be necessary to do

2    this, what it would take, when it would happen, you

3    know, the amount of users and the growth and all

4    the different questions, you know.  I basically had

5    to make a final decision and this E mail reflects

6    the -- you know, our best efforts to address the

7    issue that, you know -- Our business could not

8    handle an interruption in the service and,

9    therefore, we were -- we were requesting them to be

10   as you put in here to be, to give us until January

11   30th to do a proper integration and letting them

12   know that we -- while we may expect it, now, that

13   we've done our full analysis, this is what it's

14   realistically going to take.

15        Q.    And did you prepare this E mail on

16   **your own or did you have help?**

17        A.    I prepared it on my own.

18        (Whereupon, Exhibit 117 is marked

19   for identification by the reporter.)

20        A.    Obviously, I got a lot of feedback

21   from a lot on their opinions and thoughts.

22        Q.    With respect to Exhibit 116, when

23   **you say you got feedback from a lot of people, did**

24   **you solicit their thoughts on precise language you**

25   **were going to send to Mr. Cutler?**

Page 354

1        A.    No.  I wrote that.  I got their

2    opinions on irrelevant stuff, as you can see, with

3    Eric.  I -- I asked -- I wanted to understand

4    what's possible, what's feasible, can we create

5    something useful and valuable to the user which is

6    obviously our most important priority as for what

7    we were building.  And based on -- on all the

8    feedback I got from Eric and his feedback that he

9    got accordingly, that was -- this was -- this was

10   the culmination of that.  The conclusion that I

11   made.

12        Q.    Before we go to 117 very quickly

13   **the first -- At the bottom of the first paper of**

14   **your December 26, 2008, E mail there's a reference**

15   **to, "Furthermore, we are about to launch a new**

16   **solution which will pass Facebook ads inside of all**

17   **Facebook content which is displayed outside of**

18   **Facebook."**

19        A.    Yup.

20        Q.    Did that ever -- Did that solution

21   **ever get developed?**

22        A.    Well, we didn't even -- we didn't

23   -- we never continued with Facebook, since we were

24   -- we -- we had already -- What our goal was in --

25   part of our cooperation with Facebook was we were

Page 355

1  going to launch Facebook Connect.  Therefore,
2  everything is within -- is already addressed and
3  then, you know, we were working on new and
4  innovative ideas to -- to grow with Facebook.  That
5  was our intention.  We really -- as I think -- I
6  hope it's clear to you, as we -- is that we were
7  genuinely interested in trying to make something
8  work with Facebook but also could not harm, you
9  know.  This was a courtesy.  Something we were
10  doing in good faith.  It was definitely not
11  something we felt obligated to do.
12      Q.     Do you know if that -- that
13  solution was ever developed, though?
14      A.     No.  Because we didn't get to that
15  part.  We actually developed -- Let me take that
16  back.  We developed a range of -- this was not to
17  Facebook, but these were never -- a range of ways
18  to address this as an industry-wide, and we talked
19  about creating a new product line that would
20  actually address, take it one step further and
21  innovate this together with Facebook so they could
22  have alternatives to Facebook Connect, but work in
23  cooperation with them.  And so there were -- there
24  were a range of conversations and there may have
25  even been -- this was not directly related to

Page  356

1  Facebook, but there may have been a presentation
2  that we -- where we presented some ideas but they
3  didn't want to hear it.  I don't think we had the
4  opportunity to ever share it with Facebook, but we
5  did -- did create it.
6      Q.     Can I see 117?
7            MR. COOPER:  If I can have yours
8  back.
9            (Whereupon, there is a discussion
10  held off the record.)
11      Q.     Mr. Vachani, I've put in front of
12  you an E-mail I believe is December 30th, 2008.
13      A.     December 30th?  No.  This is
14  February 6th.
15      Q.     Okay.
16      A.     February 6th, 2009.
17      Q.     All right.  There's, again, a --
18  Do you know if, as of December 6 -- February 6,
19  2009, you've had terminated access to Facebook?
20      A.     As you know, we terminated it
21  voluntarily on January 2nd.  This was the launch of
22  face -- As we told Facebook we would do, we said
23  that we would launch our Facebook Connect version
24  and we would have it ready by, by January 30th
25  and we did launch that and within Facebook's rules

Page  357

1  and they -- they, they disconnected it anyway.  And
2  they actually came up with something and basically
3  tried to force us into something really un-- force us
4  into doing some things that were not -- really
5  found to be really repulsive.
6            (Whereupon, Exhibit 118 is marked
7  for identification by the reporter.)
8      Q.     Mr. Vachani, I've put in front of
9  you Exhibit 118, a December 30th, 2008 E-mail.  Do
10  you see that?
11      A.     Yes.
12      Q.     And it says, "I have decided that
13  we temporarily and immediately remove Facebook from
14  Power until we complete Facebook Connect and until
15  we complete our new solution to offer Facebook."
16      A.     Yes.
17      Q.     Did that happen?
18      A.     Yes.  Of course.  Take it down.
19      Q.     Did you take the Facebook site
20  down on December 30th?
21      A.     I believe we took it down on
22  January 2nd.
23      Q.     And was it ever reput up?
24      A.     We put it with Facebook Connect.
25      Q.     From when?

Page  358

1      A.     It was around the end of --
2  beginning of February.
3      Q.     All right.  How long did it stay
4  up as Facebook Connect?
5      A.     Several days.
6      Q.     But not the whole month of
7  February?
8      A.     Facebook disconnected it and then
9  came up with a whole bunch of new things they
10  wanted us to do that had nothing to do with the
11  product.  They were business things that they were
12  tying together with that.
13      Q.     In terms of December 30th, E-mail,
14  there's a reference to Power 100 campaign.  Do you
15  see that?
16      A.     Yes.
17      Q.     Is that the -- Is that the
18  campaign to offer $100 for 100 new friends?
19      A.     Yes.  We stopped the 100 campaign
20  from Facebook and we removed -- we removed that.
21  That's correct.
22            MR. COOPER:  That -- I believe I
23  have no further questions.
24            MR. BURSOR:  Okay.  Deposition is
25  concluded.

Page  359

```
 1        THE VIDEOGRAPHER:  This concludes
 2   the deposition of Steve Vachani.  The time is 8:35
 3   -- 6:35.  Sorry.  End of Tape 7.  Off the record.
 4
 5        (Whereupon, the deposition is
 6   concluded at 6:35 p.m.)
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 360

```
 1                    JURAT
 2
 3        I, STEVEN VACHIANI, do hereby
 4   certify that I have read the foregoing transcript
 5   of my testimony taken on July 20, 2011, and have
 6   signed it subject to the following changes:
 7
 8   PAGE   LINE           CORRECTION
 9
10
11
12
13
14
15
16
17
18
19
20   DATE:
21
22   Sworn and subscribed to before me on this     day
23   of
24
25   NOTARY PUBLIC
```

Page 362

```
 1            C E R T I F I C A T I O N
 2
 3        I, PATRICIA MULLIGAN CARRUTHERS, a
 4   Certified Court Reporter and Notary Public of the
 5   State of New Jersey and a Notary Public of the
 6   State of New York, do hereby certify that prior to
 7   the commencement of the examination the witness was
 8   sworn by me to testify as to the truth, the whole
 9   truth, and nothing but the truth.
10        I do further certify that the foregoing is
11   a true and accurate transcript of the testimony as
12   taken stenographically by and before me at the
13   time, place, and on the date hereinbefore set
14   forth.
15        I do further certify that I am neither of
16   counsel nor attorney for any party in this action
17   and that I am not interested in the event nor
18   outcome of this litigation.
19
20        Patricia Mulligan Carruthers, CCR
         Certificate No. XI00780
21        Notary Public of the State of New York
         Notary Public of the State of New Jersey
22
23   Dated: JULY 27, 2011
24
     My commission expires October 28, 2015.   (N.J.)
25   My commission expires December 21, 2013.  (N.Y.)
```

Page 361