**EXHIBIT B**

```
 1                    UNITED STATES DISTRICT COURT

 2                  NORTHERN DISTRICT OF CALIFORNIA

 3                    SAN FRANCISCO DIVISION

 4

 5

    FACEBOOK, INC.,                  )

 6                                   )

             Plaintiff,              )

 7                                   ) Case No.

    vs.                              ) 5:08-cv-05780 JW (JCS)

 8                                   )

    POWER VENTURES, INC., a          )

 9  Cayman Island Corporation;       )

    STEVE VACHANI, an individual;    )

10  DOE 1, d/b/a POWER.COM,          )

    DOES 2-25, inclusive,            )

11                                   )

             Defendants.             )

12  _____ )

13

14

15                    CONFIDENTIAL

16

17         VIDEOTAPED DEPOSITION of POWER VENTURES,

18  INC.'S 30(b)(6) Designee STEVEN VACHANI taken on behalf

19  of Plaintiff, at Orrick, Herrington & Sutcliffe LLP, 405

20  Howard Street, 10th Floor, San Francisco, California

21  beginning at 9:13 a.m., Monday, January 9, 2012, before

22  CHERREE P. PETERSON, RPR, CRR, Certified Shorthand

23  Reporter No. 11108.

24

25
```

```
 1                    A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFF:

 4        ORRICK, HERRINGTON & SUTCLIFFE LLP

          1000 Marsh Road

 5        Menlo Park, California 94025

          BY:  I. NEEL CHATTERJEE, ESQ.

 6             MORVARID METANAT, ESQ.

          (650) 614-7400

 7        nchatterjee@orrick.com

          mmetanat@orrick.com

 8

     FOR THE DEFENDANTS POWER VENTURES, INC. & STEVE VACHANI:

 9

          BURSOR & FISHER, P.A.

10        1990 N. California Boulevard, Suite 940

          Walnut Creek, California 94596

11        BY:  L. TIMOTHY FISHER, ESQ.

          (925) 300-4455

12        ltfisher@bursor.com

13   THE VIDEOGRAPHER:

14        LINDSAY LEWIS

15

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X
2
3       EXAMINATION BY:                              PAGE
4           MR. CHATTERJEE                            10
5                        ---oOo---
6
                          E X H I B I T S
7
        PLAINTIFF'S
8       EXHIBIT NO.          DESCRIPTION             PAGE
9           188   Plaintiff Facebook, Inc.'s Amended
                  Notice Of Deposition Of Defendant
10                Power Ventures, Inc. Pursuant To
                  Fed.R.Civ.P. 30(b)(6), 14 Pages        9
11
            189   Declaration Of Steve Vachani In
12                Support Of Defendants' Opposition To
                  Facebook, Inc.'s Motion To Compel
13                Production Of Documents, 2 Pages       24
14          190   Defendant Power Ventures, Inc.'s
                  Supplemental Responses To Facebook,
15                Inc.'s Interrogatories Nos. 1, 2, 3,
                  7, 13, 14, 15, 19, 20 And 21.
16                13 Pages                               36
17          191   12-14-08 E-mail To Steve Vachani From
                  Bruno Carvalho Re: Dados Da Campanha,
18                With Certified Translation, 3 Pages    50
19          192   Total De Logins Spreadsheet, With
                  Certified Translation, 3 Pages         52
20
            193   4-17 & 4-24 E-mail Strings Re:
21                Update?, With Certified Translation,
                  5 Pages                                79
22
            194   2-11-09, 2-12-09, 2-13-09, 11-23-10 &
23                11-24-10 E-mail String Re: 100x100x100
                  Campaign, With Certified Translation,
24                5 pages                                92
        //(Cont.)
25      //

E X H I B I T S  (Cont.)

PLAINTIFF'S
EXHIBIT NO.        DESCRIPTION                    PAGE

195  12-25-08 & 12-26-08 E-mail String Re:
     Facebook ** Importante, 2 Pages       96
196  8-21-11 E-mail String Re: Shared File:
     Power-com_source-code.zip, With
     Certified Translation, 3 Pages         100
197  8-23-11 E-mail String Re: Backup Of
     Power Servers, With Certified
     Translation, 5 Pages                   103
198  12-11-08 & 12-12-08 E-mail String Re:
     UShow & Power, 4 Pages                 107

199  7-18-05 Chat Re: Discussion With Abi,
     7 Pages                                115
200  1-4-09 E-mail String Re: Technical
     Question, 1 Page                       135

201  Declaration Of Steve Vachani In
     Support Of Defendants' Opposition To
     Facebook Inc.'s Motion For Judgment On
     The Pleadings Pursuant To Fed. R. Civ.
     P. 12(C) Or, In The Alternative,
     Partial Summary Judgment Of Liability
     Under California Penal Code § 502(c),
     6 Pages                                137
202  Declaration Of Steve Vachani In Support
     Of Defendants' Opposition To Facebook's
     Motions For Partial Summary Judgment On
     Count 1 (Can-Spam Act, 15 U.S.C § 7704)
     And Under California Penal Code § 502
     And The Computer Fraud And Abuse Act,
     18 U.S.C. § 1030, 5 Pages              141
203  4-30-09 & 5-1-09 E-mail String Re:
     Update And New Executive Summary
     Business Presentation Attached,
     4 Pages                                164
//(Cont.)
//

Page  5

E X H I B I T S  (Cont.)

PLAINTIFF'S
EXHIBIT NO.        DESCRIPTION                    PAGE

214  5-22-09 E-mail String To Eric Santos
     From Andre Fernandes Re: Custos
     Atuais, 1 Page                         265

215  1-7-09 E-mail String Re: Hi5 -
     Bloquelo De Ips, 1 Page                267
216  4-24-09 E-mail To Eric Santos, Steve
     Vachani, Bruno Carvalho From Juliane
     Conceicao Re: Bloquelo Do Orkut,
     1 Page                                 274

217  12-2-08 E-mail String Re: Biggest
     Problem About Power.com In The USA Is
     That Is (sic) Doesn't (sic) Really
     Work Yet, 1 Page                       277
218  3-12-09 E-mail To Steven Vachani From
     Facebook Re: Ghostday Leandro Abreu
     Invited You To The Event "Bring 100
     Friends And Win 100 Bucks!"....
     1 Page                                 280
219  Power.com Page For User Nicole Packer
     - FBPOWER00062, 1 Page                 285

220  11-26-08 E-mail To Bruce Carvalho From
     Eric Santos Re: 100x100x100 Campaign,
     With Certified Translation, 3 Pages    287

221  Power Technology And Architecture
     Overview, 8 Pages                      293
222  7-21-08 & 7-22-08 E-mail String Re:
     Res, 4 Pages                           295

223  1-10-09 E-mail String Re:
     RickLatona.com: A Question From,
     3 Pages                                298

224  Power.com Sign In Page - FBPOWER00113,
     1 Page                                 305
//(Cont.)
//

Page  7

E X H I B I T S  (Cont.)

PLAINTIFF'S
EXHIBIT NO.        DESCRIPTION                    PAGE

204  9-13-11 E-mail String Re: IMPORTANTE:
     Preciso De Seu Endereco/Telefone Para
     Enviar Um Convite Especial Para O
     Super Aniversario Da Shanti, 3 Pages   185
205  10-20-11 E-mail String Re: First Look:
     The Web"s (sic) Most Amb...
     (readwriteweb.com), With Certified
     Translation, 5 Pages                   191

206  10-10-11 & 10-29-11 E-mail String Re:
     Greplin, 3 Pages                       193
207  8-7-11, 8-14-11, 8-17-11 & 10-8-11
     E-mail String Re: Proposal To Join
     Serendipity Brazil As CTO And
     President And COO Of Power Ventures,
     With Certified Translation, 12 Pages   199
208  Serendipity Ventures Brasil, LLC
     October 8th, 2011 Employment
     Agreement, 7 Pages                     205
209  11-26-08 E-mail String Re: Resignation
     From The Board Of Directors Of Power
     Ventures, 2 Pages                      211
210  8-29-09 E-mail String Re: Facebook
     Answer Date, 1 Page                    220

211  Untitled Power.com
     Requirements/Privacy Document &
     Untitled Power.com Terms Of Use
     Document, 4 Pages                      223
212  11-28-08 & 11-29-08 E-mail String Re:
     Important: Please Download Digsby And
     Add Facebook Account.  They Install
     App On Facebook Page, With Certified
     Translation, 3 Pages                   243
213  12-1-08 Release: Power.com Introduces
     Social Inter-networking To The World,
     7 Pages                                255

Page  6

E X H I B I T S  (Cont.)

PLAINTIFF'S
EXHIBIT NO.        DESCRIPTION                    PAGE

225  11-10-08, 11-27-08 & 12-1-08 E-mail
     String Re: Campaign Rules, With
     Certified Translation, 5 Pages         313

226  3-29-09 E-mail String Re: Payment Of
     100x100x100 Campaign, With Certified
     Attachment, 3 Pages                    314

227  5-14-09 & 5-15-09 E-mail String Re:
     First Republic, 2 Pages                315
228  Power.com Terms Of Use Last Updated:
     May 26-09 With Track Changes, 6 Pages  316

229  8-11-05 Chat Re: Discussion With Greg,
     4 Pages                                319
230  9-12-05 E-mail String Re: More On
     Orkut..., 2 Pages                      326

231  8-31-06 E-mail To
     Steve@stevevachani.com From
     Ericsantos.net@gmail.com Re: Bloqueio
     Pelo Orkut, 1 Page                     331
232  11-9-06 E-mail String Re: Options:
     Multiple IP Addresses For Servers,
     1 Page                                 333
233  4-13-07 & 4-5-07 E-mail String Re:
     PowerScrap E Google, 2 Pages           337

234  Power.com Presentations - Niehaus
     Production 00303 - 00420, 118 Pages    340
     ---oOo---

Page  8

1          SAN FRANCISCO, CALIFORNIA
2               JANUARY 9, 2012
3               ---oOo---
4          BE IT REMEMBERED that set on Monday, the 9th
5    day of January, 2012, commencing at the hour of 9:13
6    a.m., at the office of Orrick, Herrington & Sutcliffe
7    LLP, 405 Howard Street, 10th Floor, San Francisco,
8    California, before me, Cherree P. Peterson, RPR, CRR,
9    CSR No. 11108, a Certified Shorthand Reporter,
10   personally appeared
11        POWER VENTURES, INC.'S 30(b)(6) Designee
12               STEVEN VACHANI,
13   having been called as a witness by the plaintiff, who
14   having been sworn by me to tell the truth, the whole
15   truth and nothing but the truth, was thereupon examined
16   and testified as hereinafter set forth.
17               ---oOo---
18        (Plaintiff's Exhibit No. 188 marked for
19          identification.)
20        THE VIDEOGRAPHER:  Good morning.  My name is
21   Lindsay Lewis.  I'm a certified legal video specialist
22   today for Barkley Court Reporters.  Barkley Court
23   Reporters is located at 222 Front Street, Suite 600, in
24   San Francisco, California.  Today is January 9th, 2012.
25   The time is 9:13 a.m.  We are located today at 405

Page 9

1    Howard Street on the 10th floor in San Francisco,
2    California.  This videotaped deposition of Power
3    Ventures, Inc. is taken today on behalf of the
4    plaintiffs in the case captioned Facebook, Inc. versus
5    Power Ventures, Inc. et al., case number 5:08-cv-05780
6    JW.
7          Will counsel for the parties please identify
8    themselves now for the record.
9          MR. FISHER:  Timothy Fisher for Power and
10   Steve Vachani.
11         MR. CHATTERJEE:  Neel Chatterjee for Facebook.
12   And also with me is Bahar, B-a-h-a-r, Metanat,
13   M-e-t-a-n-a-t, for Facebook.  And both of us are with
14   the Orrick firm.
15         THE VIDEOGRAPHER:  Thank you.  The court
16   reporter will now swear in the witness.
17         THE REPORTER:  Raise your right hand, please.
18         (Whereupon the witness was placed under oath.)
19         EXAMINATION BY MR. CHATTERJEE
20   Q.    Good morning, Mr. Vachani.  We've met I think
21   once before.
22   A.    Yes.
23   Q.    It's nice to see you.  You understand you're
24   under oath today?
25   A.    Yes, I do.

Page 10

1    Q.    Is there anything that would impede your
2    ability to testify truthfully and accurately today?
3    A.    No.
4    Q.    Have you reviewed your previous deposition
5    since it was -- when it was taken I think in July of
6    2011?
7    A.    I have seen it and reviewed it.
8    Q.    And is -- I can't remember off the top of my
9    head, did you make any changes to that deposition?
10   A.    I think we probably should review it one more
11   time, because we've never had a chance to go through it
12   in depth.  But I have seen it.
13        MR. FISHER:  He's asking you a different
14   question.
15        THE WITNESS:  Okay.
16        MR. FISHER:  He's asking --
17        THE WITNESS:  I reviewed it.
18        MR. FISHER:  -- if any changes have been made
19   to the deposition.
20        THE WITNESS:  I don't believe any changes have
21   been made to the deposition at this point.
22   Q.    BY MR. CHATTERJEE:  As you sit here today do
23   you recall anything about your previous testimony that
24   you want to change or that you believe is inaccurate?
25   A.    I don't.  But I would like to reserve the

Page 11

1    right to review it one more time with -- while I'm out
2    here with Tim on this trip.  Is my -- hopefully before
3    the case.
4    Q.    And -- and you understand that we are -- we
5    are taking your testimony here.  Should you make any
6    substantive changes to that transcript, we reserve the
7    right to seek further deposition of you as well as to
8    comment upon any of those substantive changes at trial?
9    A.    I understand.  I'm not saying that I have any
10   changes, but I just want to reserve that right and so --
11   and to review it one more time.
12   Q.    I have one question out of curiosity from it.
13   Not -- not -- not terribly, terribly relevant, but I saw
14   references in the transcript to something called nevo,
15   n-e-v-o.  And you were talking about aggregation of
16   instant messages and things like that in your
17   deposition.
18   A.    Nevo or Meebo?
19   Q.    I was about to ask you.  Were you referring to
20   Meebo --
21   A.    I would assume it's Meebo.  I don't know what
22   nevo is.
23   Q.    So one thing I'm going to do is I'm going to
24   remind you of one of the instructions from your previous
25   deposition.  It's really, really important for clarity

Page 12

1    of the record for you to let me finish my question and
2    for you to answer the question after I've completed it.
3    And it's okay if you pause a little bit.  And I will
4    pause when I'm done with my question.  The reason for
5    that is the deposition will take a lot longer if -- if
6    we talk over each other.  Because I'm going to work
7    really hard to make sure the record is very, very clear
8    here on a number of the issues.  Is that all right with
9    you?
10       A.  That's okay.
11       Q.  And I'm going to assume that if I ask a question
12   and you answer it that you understand the question.  You
13   don't find it ambiguous.  So if -- if there is something
14   about my question that's not clear to you, will you let
15   me know if -- if there's something ambiguous about it?
16       A.  Yes.
17       Q.  I have a pretty rigid formula for depositions,
18   which is a little bit different than your one that you
19   took with Monte.  I will break within an hour to an hour
20   and 15 minutes pretty regularly, unless there's a
21   specific line of questioning I want to finish.  This is
22   not an endurance test.  If you need to take a break for
23   a biological purpose or just because you're getting
24   tired, let me know and I'll try to honor that.  The only
25   time I might be a little less flexible is if I need to

<div align="center">Page 13</div>

1    finish a line of questioning.  Is that all right with
2    you?
3        A.  That's okay.
4        Q.  Okay.  So let's go ahead and get started.  I
5    put in front of you Exhibit No. 188.  Do you see that
6    document?
7        A.  Yes, I do.
8        Q.  This is a notice of deposition of Power
9    Ventures pursuant to Federal Rule of Civil Procedure
10   30(b)(6).  Do you understand that you are testifying
11   today as a corporate designee of Power Ventures as to
12   the topics that are listed in that notice?
13       A.  Yes, I do.
14       Q.  And you understand that the testimony you give
15   today is binding on Power Ventures as to the things that
16   -- the topics that are listed in those -- in the notice?
17       A.  Yes, I do.
18       Q.  Have you reviewed that notice?
19       A.  I have reviewed it.
20       Q.  Okay.  And did you do anything to prepare to
21   testify as the corporate designee of Power ventures?
22       A.  I have met with counsel today for about one
23   hour, from 8:00 a.m. to 9:00 a.m.
24       Q.  Anything else?
25       A.  Beyond -- I read this notices and I read

<div align="center">Page 14</div>

1    excerpts of previous depositions.
2        Q.  And whose other depositions?
3        A.  Which depositions did you -- did you provide
4    me?
5            MR. FISHER:  I can't --
6        Q.  BY MR. CHATTERJEE:  Testify to --
7            MR. FISHER:  What you know.
8        Q.  BY MR. CHATTERJEE:  Testify to the best of
9    your recollection.
10       A.  I believe I -- I saw -- I referenced Zak, Zak
11   Mandhro's deposition.
12       Q.  Anyone else?
13       A.  There was Zak Mandhro, Robert Pollock, and Ed
14   Niehaus.
15       Q.  Did you read all of the depositions --
16       A.  No.
17       Q.  -- or certain excerpts?
18       A.  I didn't even -- didn't read them, except I
19   read excerpts of one or -- of two of them.
20       Q.  So which ones did you read excerpts of?
21       A.  I read excerpts of Rob Pollock's and Zak
22   Mandhro's.
23       Q.  You didn't read any of Mr. Niehaus'?
24       A.  I didn't get around to it.
25       Q.  Okay.  Did you review any documents to prepare

<div align="center">Page 15</div>

1    for your deposition as a corporate designee?
2        A.  You're talking about recently or in the past?
3    I mean, in the past I have reviewed many of the
4    documents that have been exchanged of evidence.  But
5    nothing in the last few days.
6        Q.  Okay.  So my question was really, really
7    precise.  Was -- in preparation for your testimony as a
8    corporate designee, did you review any documents to
9    prepare yourself?
10       A.  I did not.
11       Q.  Okay.  Have you talked with Eric Santos during
12   the course of this litigation about how, for example,
13   the -- the PowerScript code operated?
14           MR. FISHER:  Objection.  Vague.
15           THE WITNESS:  Have I talked to him during this
16   investigation about how it operated?
17       Q.  BY MR. CHATTERJEE:  Correct.
18       A.  I've -- I've talked -- the answer is not
19   recently, but I've obviously in the past had many
20   conversations on -- on the PowerScript code with Eric.
21       Q.  What about within the past year?
22       A.  In the past year I have not talked about the
23   PowerScript code.  I've had very specific e-mails when
24   there have been in the past questions like where I've
25   asked him one or two questions when they've come up in

<div align="center">Page 16</div>

| | |
|---|---|
| 1  the case.  And some -- sometimes he's answered if he's | 1    A.  No.  I just -- I was not preparing for the |
| 2  had the time.  Other times he has not answered. | 2  deposition.  I was reviewing them because they were |
| 3    Q.  Okay.  Other than reviewing excerpts of Mr. | 3  available. |
| 4  Mandhro and Mr. Pollock's depositions, did you do | 4    Q.  Okay. |
| 5  anything else to prepare to testify as the corporate | 5    A.  It was not specifically to prepare for this |
| 6  designee at Power Ventures? | 6  deposition.  I had seen -- seen what was available I had |
| 7    A.  I -- I reviewed the -- the recent what do you | 7  not seen before, and I out of curiosity was just |
| 8  call it -- what do we refer -- the statements that have | 8  reviewing to see what new data might be available. |
| 9  been exchanged the last two months by Facebook.  And | 9    Q.  So just -- just to make this clear.  To the |
| 10  they -- I -- I forget what we call them. | 10  extent you reviewed Mr. Mandhro's deposition, you don't |
| 11    Q.  The summary judgment motions? | 11  recall anything that -- that you read there that you |
| 12    A.  The summary judgment motions, I have | 12  disagreed with? |
| 13  reviewed -- reviewed those. | 13    A.  Actually, that -- there were things in there |
| 14    Q.  Okay.  So anything else? | 14  that I would like to spend more time in, but I don't -- |
| 15    A.  To my best recollection, no. | 15  to -- to review as I thought that the line of |
| 16    Q.  Okay.  So let's start with Mr. Mandhro.  What | 16  questioning -- I can't remember specifically because it |
| 17  did you review from Mr. Mandhro's depositions? | 17  was so quickly.  But it would be -- after further review |
| 18    A.  I just glanced through the -- the transcript. | 18  there may be some -- some issues on there that I have to |
| 19    Q.  So there wasn't a specific excerpts you were | 19  discuss with counsel.  We have not had the chance to. |
| 20  reading, you just kind of -- | 20  So I'd like to reserve the right to, you know, review |
| 21    A.  I just glanced through it to see, you know, | 21  that in more detail. |
| 22  the general line of questioning and discussions that | 22    Q.  So your answer is right now you don't know? |
| 23  were discussed in that conversation. | 23    A.  I don't know. |
| 24    Q.  Was there anything that you read in there that | 24    Q.  Okay.  And what about with respect to Mr. |
| 25  you disagreed with? | 25  Pollock's deposition, anything from your short review |
| Page 17 | Page 19 |

| | |
|---|---|
| 1    A.  No.  What, that I -- not that I -- my best of | 1  there that you recall reviewing that you disagree with? |
| 2  my recollection I had a very minimal time.  I was -- I | 2    A.  I think there may be things that I need to get |
| 3  only received it in the last two days.  And I've been on | 3  clarification from counsel on those before answering |
| 4  a flight for the last 48 hours due to huge flight | 4  that question. |
| 5  problems.  So I have not really had a significant time | 5    Q.  Okay.  As you sit here today, is there |
| 6  to -- to review it in detail. | 6  anything that you recall from reviewing Mr. Pollock's |
| 7    Q.  Are you prepared to testify as the corporate | 7  deposition? |
| 8  designee today given the limited time you've had? | 8    A.  My review was too limited to -- to be able |
| 9    A.  I'm prepared, yeah. | 9  to respond to that.  I did -- I believe that there were |
| 10    Q.  And -- and you don't need to know anything | 10  comments -- some comments in there that I -- that -- |
| 11  about what Mr. Mandhro said in order -- in order for you | 11  that were based on things that he had limited knowledge |
| 12  to testify as the corporate designee? | 12  of and that he was pushed to answer that I need to |
| 13    A.  I've reviewed -- I reviewed that, Mr. | 13  review in more detail to -- and talk with counsel. |
| 14  Mandhro's.  I have not reviewed Ed Niehaus'.  And Rob's, | 14    Q.  And what were those? |
| 15  I have more sparsely reviewed his. | 15    A.  I -- there were -- it was just -- it was |
| 16    Q.  But my question's a little simpler than that. | 16  literally too quickly to specifically -- I'd like to |
| 17    A.  Yeah. | 17  actually take the time at some point to -- to ask -- to |
| 18    Q.  Do you need to review those depositions in | 18  ask -- to ask questions to counsel on that. |
| 19  order to feel that you are fully prepared to testify on | 19    Q.  But as you sit here today, you're unaware of |
| 20  behalf of Power Ventures as to the topics we've | 20  any specific things that Mr. Pollock said? |
| 21  identified? | 21    A.  As I have read -- I have not read 90 -- 80 |
| 22    A.  I do not. | 22  percent of that document. |
| 23    Q.  So without disclosing any privileged | 23    Q.  So you don't know? |
| 24  conversations, why were you reviewing those to prepare | 24    A.  So I don't know is the answer. |
| 25  for your deposition? | 25    Q.  Okay.  And same answer with respect to Mr. |
| Page 18 | Page 20 |

1    Niehaus, you don't know whether or not there's anything
2    in his testimony that -- that -- that you as a corporate
3    designee of Power Ventures might disagree with?
4        A.    At this point, no.  I -- if after further
5    review, that could change.
6        Q.    Okay.  How long ago did you review the summary
7    judgment motions?
8        A.    Those were in the last -- in the last -- in
9    the last month.
10       Q.    Can you tell me anything specifically that you
11   recall -- well, first of all, were you reviewing those
12   in order to deal with the oppositions or the positions
13   taken by Power Ventures in order to prepare for this
14   depo?
15       MR. FISHER:  And I'm going to caution you not
16   to disclose the content of any communications you had
17   with counsel regarding those papers.
18       THE WITNESS:  I just was reviewing them to --
19   to review conversations that had taken place and what we
20   had -- finally were delivering.
21       Q.    BY MR. CHATTERJEE:  And you submitted
22   declarations both in support of Power Ventures and your
23   personal motions as well as an opposition?
24       A.    Correct.
25       Q.    You reviewed those carefully?

Page 21

1    point, the last question that you just asked, which was
2    the Facebook thing, I think that the one thing that I
3    found was just a lot -- there's a lot of information and
4    there seemed to be, you know, many -- many different
5    references to things that I think have been at time --
6    times, you know, twisting information that hopefully
7    will be, you know, clarified, you know, as this
8    case progresses I think there were many case -- times
9    that Facebook has in their things stretched or, you
10   know, twisted information that were not exactly things
11   that I've said.  But I -- again, because of the amount
12   of details and everything else, I don't think that
13   that's something that I'm prepared to go into the
14   details today.
15       Q.    Okay.  So -- so -- so listen really carefully
16   to my question.
17       A.    Okay.
18       Q.    And I know this is hard and it's not a
19   normal --
20       A.    Yeah.
21       Q.    -- process.  My question was, was there
22   anything in the summary judgment motion's papers that
23   you were reviewing in order to prepare to testify on the
24   topics in the notice?
25       A.    No.

Page 23

1        A.    Yes, I did.
2        Q.    You ensured their accuracy?
3        A.    I did.
4        Q.    And were those done to the best of your
5    recollection or do you actually believe the facts in
6    there to be true?  There's a difference.
7        A.    I believe them to be true.
8        Q.    Okay.  With respect to the -- the -- the
9    motions for summary judgment, was -- do you recall
10   anything specific from those motions as to Facebook's
11   positions that you disagreed with?
12       A.    That I disagreed with?
13       Q.    Correct.
14       MR. FISHER:  I'm going to object as vague.
15   Calling for a legal conclusion.
16       THE WITNESS:  I think it's a lot of -- we're
17   dealing with a lot of details and a lot of facts in this
18   case.  And to try to answer that with dealing with
19   literally, I don't know, hundreds, maybe thousands, it
20   would be too difficult to answer that.
21       Q.    BY MR. CHATTERJEE:  Okay.  Is there anything
22   that was submitted in the -- in the summary judgment
23   motion that you -- you felt you needed to review to
24   prepare for your deposition today on these topics?
25       A.    So what I just -- in the last -- on the last

Page 22

1        Q.    Is there any topic that's listed in Exhibit
2    188 -- and you can -- you can take a look through them
3    if you need to -- that you felt you were not able to
4    testify about?
5        A.    I feel I can testify on these topics.  I don't
6    know the level of specificity that you're going to go in
7    some of the technical details, so -- but I'm familiar
8    with all these subjects.  But there are definitely areas
9    that I was not specifically managing on a day-to-day
10   basis.  And if that were to come up, I'll let you know.
11       Q.    Okay.  Appreciate that.  And I'm going to try
12   and expedite that particular issue right now for you.
13   Hopefully if -- I think where this is going to go, it
14   will make it a lot easier.
15       We can mark that Exhibit 189.
16       (Plaintiff's Exhibit No. 189 marked for
17       identification.)
18       Q.    BY MR. CHATTERJEE:  Mr. Vachani, what I've
19   handed you as Exhibit 189 is a declaration that you
20   submitted in opposition to Facebook's motion to compel
21   documents.  Is this your signature at the bottom?
22       A.    Yes, it is.
23       Q.    And this -- this declaration was truthful and
24   accurate when you submitted it?
25       A.    Yes.

Page 24

8 (Pages 21 to 24)

1    Q.   In the second paragraph you stated "Power has
2    already produced the actual source code it used to
3    access Facebook's website.  The source code as well as
4    the other documents Power has produced in this case such
5    as the PowerScript Training documents and PowerScript
6    Documentation Developer Manual show precisely how Power
7    accessed Facebook's website."  These "documents
8    constitute the best possible information Power has to
9    understand how Power accessed Facebook's website."
10       Do you see that?
11   A.   Yes.
12   Q.   Okay.  So that statement was accurate when you
13   made it?
14   A.   Yes.
15   Q.   Is it fair to say that the -- the actual
16   source code that Power has produced in this case is the
17   best evidence of what Power did and how it was doing it
18   with respect to the Facebook web site?
19       MR. FISHER:  Objection.  Vague.
20       THE WITNESS:  I believe we've provided
21   everything that we had available.  So -- so therefore
22   everything that was possibly available as we provided,
23   therefore that's the best that could be provided.
24       MR. CHATTERJEE:  Okay.  Could you read the
25   question back, please.

Page  25

1    Q.   If the code operated one way and your
2    testimony or your recollection was that it operated a
3    different way, isn't it fair to say that the code is a
4    better indicator of how the software worked than your
5    recollection?
6        MR. FISHER:  Objection.  Vague.  Assumes facts
7    not in evidence.
8        THE WITNESS:  The code provides rules on how
9    things can be done.  There could be scripts that are
10   written.  There -- there could be actions by -- there's
11   so many -- there are layers and levels in the -- in any
12   type of code.  So that's what I'm saying.  The code is
13   -- it is what it is.
14   Q.   BY MR. CHATTERJEE:  So let me ask you, what
15   did you mean in your declaration when you said "Those
16   documents constitute the best possible information Power
17   has to understand how Power accessed" the "Facebook's
18   website"?
19   A.   Exactly what we said there.
20   Q.   Explain it to me.  Because now you're running
21   away from that statement.
22   A.   I'm not running away --
23       MR. FISHER:  Objection.  Argumentative.
24       THE WITNESS:  I'm not running away from that
25   statement.  I'm saying that the code -- that -- that

Page  27

1        (Whereupon the record was read as requested.)
2        THE WITNESS:  All I can -- as I said, we've
3    provided everything that's avail --
4    Q.   BY MR. CHATTERJEE:  I'm not asking a discovery
5    question --
6    A.   Yeah.
7    Q.   -- Mr. Vachani.
8    A.   Okay.
9    Q.   I'm asking the question of is the source
10   code --
11   A.   Yeah.
12   Q.   -- the best evidence of what Power Ventures
13   did with respect to the Facebook web site?
14       MR. FISHER:  Objection.  Vague.
15       THE WITNESS:  I don't -- I don't know.  I
16   don't know the answer if the source code is the best
17   evidence.  That's a -- I think a subjective opinion.
18   Q.   BY MR. CHATTERJEE:  Okay.  So let me -- I'll
19   -- let me explore that a little bit.
20   A.   Sure.
21   Q.   In your deposition that Mr. Cooper took, you
22   characterized the way that some of the Power Ventures
23   software worked.  You recall testifying generally about
24   that?
25   A.   Yes.

Page  26

1    existed and it provides -- you can interpret that as
2    best as you want.  We provided you code, the company's
3    code.  We've provided everything that -- that's
4    available.
5    Q.   BY MR. CHATTERJEE:  Okay.
6    A.   And I have answered every question in the past
7    in previous statements.  So what I've said in those
8    previous statements I -- I stand by.
9    Q.   Okay.  So let me ask it again.  If your
10   testimony differ from what the actual source code used
11   to access Facebook's web site shows --
12   A.   Yes.
13   Q.   -- which one of those two is the best possible
14   information Power has to understand how Power accessed
15   Facebook's web site?
16       MR. FISHER:  Objection.  Vague.  Assumes facts
17   not in evidence.  Incomplete hypothetical.
18   Argumentative.  Asked and answered.
19       THE WITNESS:  I think this, again, you're
20   getting into hypothetical statements here.  We've
21   provided the code.  You know what it does.  I've told
22   you in the past what it does.  I've answered many
23   questions and many answers on this.  I don't know what
24   -- what you're trying to --
25   Q.   BY MR. CHATTERJEE:  What I'm trying -- what

Page  28

9 (Pages 25 to 28)

1   I'm trying to understand is if there's an inconsistency
2   between the two.  Is --
3        A.   Can you clarify?  Is there any inconsistency
4   with what?
5        MR. FISHER:  Let him finish his question.
6        Q.   BY MR. CHATTERJEE:  If there's an
7   inconsistency between the two.  And I'll give you an
8   example.
9        A.   Okay.  Please.
10       Q.   For example, if there is an automated
11  authentication process that -- that existed in the Power
12  Ventures code base, the code actually implemented that,
13  and you had testified that there was no such
14  functionality, which one of those is -- is the best
15  evidence of how Power accessed Facebook's web site?
16       MR. FISHER:  Objection.  Assumes facts not in
17  evidence.  Lacks foundation.
18       THE WITNESS:  So let me --
19       MR. FISHER:  Incomplete hypothetical.  Vague.
20       THE WITNESS:  Let me clarify.  If -- if a
21  source -- if the ability to do something exists in the
22  code, it doesn't mean that something was actually done.
23  The -- you know, for example, there exists many
24  functions that could record, you know, actions or
25  things, but they may have never been utilized.  In fact,

Page 29

1   every -- we've provided code.  But I'm -- but what your
2   statements today are trying -- at least the way I
3   understand your questions, you're trying to imply that
4   this would -- that what's in the code means that is
5   something that we did on Facebook's site.  That's --
6   those are two different things.  It may be the best way.
7   But what -- what we've done on the Facebook site in fact
8   has been answered in all our -- in depositions,
9   questions, answers, over the last three years.  So....
10       Q.   BY MR. CHATTERJEE:  So I'm just asking a
11  simple question --
12       A.   Okay.
13       Q.   -- Mr. Vachani.  You made a statement in this
14  declaration.  "Those documents constitute the best
15  possible information Power has to understand how Power
16  accessed Facebook's website."  That statement was true,
17  correct?
18       A.   That statement is true.
19       Q.   Okay.  And now you're also saying that there
20  are aspects of Power's code base that may not have been
21  used by Power.  Is that fair?
22       A.   I'm saying that there are -- when you have
23  code, there are unlimited possibilities in what you can
24  -- those -- what you actually do with it.  That doesn't
25  mean everything in our code was -- was utilized on the

Page 31

1   most of the things that -- that are in the code doesn't
2   mean that they were actually done.  And so I think to
3   try to imply that because something is in the code it --
4   that it has anything to do with Facebook or access to
5   Facebook.  And that's probably a better answer to what
6   I'm trying to say is you're trying to -- it seems that
7   what you're trying to say, you're trying to say that
8   because something exists in our ability in the code to
9   do it that it somehow has -- means that it -- that these
10  things were done.  And that's why actions or activities
11  are different than what might be possible in the source
12  code.
13       Q.   BY MR. CHATTERJEE:  So what you're saying is
14  -- is if you look at the last sentence of your
15  declaration where you said "Those documents constitute
16  the best possible information Power has to understand
17  how Power accessed Facebook's website," was that
18  statement then inaccurate because the code may or may
19  not have actually been implemented or used?
20       MR. FISHER:  Objection.  Mischaracterizes
21  prior testimony.  Argumentative.
22       THE WITNESS:  No.
23       MR. FISHER:  Vague.
24       THE WITNESS:  It says the best possible -- I'm
25  talking how it accessed the web site.  We've provided

Page 30

1   Facebook -- on the Facebook site.  There are two
2   different things.
3        And I'll give you a specific example.  There
4   exists in our database, for example, a thing that would
5   track messages sent by -- by -- if a -- if a user wanted
6   to send an invitation to a friend, for example.  This
7   code exists and even a database log exists.  But at that
8   time back in December whatever, we never sent a single
9   message.  So that -- that thing was empty or,
10  you know, that -- but -- but the ability to send
11  messages existed.  Just because something exists doesn't
12  mean -- you know, at times I've seen that Facebook
13  has -- has made irresponsibly and sometimes incorrectly
14  statements saying that we did something because our code
15  -- because the capability existed.  And that's -- that's
16  what I'm trying to say.
17       Q.   Okay.  Move to strike as nonresponsive.
18       Mr. Vachani, is the statements made in
19  paragraph 2 accurate?
20       MR. FISHER:  Asked and answered.
21  Argumentative.
22       THE WITNESS:  So I'll read it again.  We have
23  produced the actual source codes.  That's correct, we
24  have produced the source code.  And the source code does
25  show how we accessed -- how we accessed the site, at

Page 32

**Page 33**

1    least.  So I think the statement is correct.
2    **Q.  Okay.**
3    A.  But you asked --
4    **Q.  Hold on.  Okay.  I need you to answer my**
5    **questions.  I don't need you volunteering information.**
6    **We're going to be here for days if that happens.**
7    A.  Okay.
8    **Q.  That statement is correct?**
9    A.  That statement is correct.
10   **Q.  And it is accurate?**
11   A.  It is accurate.
12   **Q.  Is there any other information that I would**
13   **need beyond the things that you have said in paragraph 2**
14   **to know how Power accessed Facebook's web site?**
15   A.  No.
16   **Q.  Okay.  Let's go to the second issue.  I'm**
17   **going to talk about the event invitations that were sent**
18   **through the Facebook system.  Do you know what I'm**
19   **talking about when I refer to that?**
20   A.  Yes, I do.
21   **Q.  Okay.  Now, would the -- would the actual**
22   **source code that was used to -- to facilitate the**
23   **creation of those event invitations, would those be the**
24   **best possible information Power has to understand how**
25   **Power accessed Facebook's web site?**

**Page 34**

1        MR. FISHER:  Objection.  Vague.  Assumes facts
2    not in evidence.
3        THE WITNESS:  Again, I believe source --
4    source code says what you're able to do.  It -- it says
5    what you're able to do.  Statements that have been --
6    questions that have been asked about what we've done I
7    believe in depositions and other statements that we've
8    provided in the past have provided more detail on that.
9    But source code does not necessarily tell you what was
10   done.  It -- it tells you what you're able -- what --
11   what -- it tells you the rules that -- the rules that --
12   what -- what is possible.
13       MR. CHATTERJEE:  Okay.  The court reporter
14   read my question back, please.
15       (Whereupon the record was read as requested.)
16       THE WITNESS:  So I would say the answer is
17   yes, together with the questions that you -- the -- that
18   have been answered in depositions under -- under oath
19   and have been provided to you in the past.
20   **Q.  BY MR. CHATTERJEE:  As you're sitting here**
21   **today can you identify what functionality in the Power**
22   **code was not used with respect to accessing Facebook's**
23   **web site or sending event invitations?**
24   A.  There's a large amount of code, and I
25   cannot -- I cannot answer to you what was used and what

**Page 35**

1    was not used.  But if you have a specific question, I
2    would be happy to answer those -- those questions -- the
3    question today.
4    **Q.  So can you tell me what they are to the best**
5    **of your recollection?**
6        MR. FISHER:  Objection.  Asked and answered.
7        THE WITNESS:  So you want to know that if we
8    -- ask the question again.
9    **Q.  BY MR. CHATTERJEE:  Okay.  To the best of your**
10   **you recollection, what functionality in the Power code**
11   **was not used with respect to accessing Facebook's web**
12   **site or sending event invitations?**
13   A.  I cannot tell you what was not used, but I can
14   tell you what was used.  Because what's not used
15   there's -- as I said, source code provides endless
16   possibilities.  But it's better to say what we did do.
17   I think you're -- it's --
18   **Q.  Okay.  Tell me what you did do.**
19   A.  Users authorized us to create an event for
20   them to promote -- to promote the -- a Power -- a Power
21   event.  And they authorized us and we acted on those
22   instructions and created an event very similar to --
23   I'll give you when a user is inside an app on Facebook,
24   like FarmVille, and they say I'd like to create --
25   create an activity or whether ads on my wall or an event

**Page 36**

1    and they then post that on a wall.  It's pretty much
2    very similar type of -- type of action.  We -- we were
3    authorized by users who were using one of our apps to --
4    to create an event or to create a posting on -- on the
5    walls or event pages on Facebook and then completed
6    those actions at their -- at their request.
7        That's -- I'll finish.  I believe that's the
8    best way to answer the questions.  Because to go and say
9    all the possibilities of what exists in the source code
10   is -- is -- is completely inappropriate because there
11   are unlimited possibilities based on source code.
12       MR. CHATTERJEE:  Okay.  Let's mark this as
13   Exhibit 190.
14       (Plaintiff's Exhibit No. 190 marked for
15        identification.)
16   **Q.  BY MR. CHATTERJEE:  Mr. Vachani, what I've**
17   **handed you marked as Exhibit 190 is Power Ventures'**
18   **supplemental responses to Facebook's interrogatory**
19   **certain numbers.  Do you see that?**
20   A.  Yes.
21   **Q.  If you look at the supplemental response to**
22   **interrogatory number 1, which is on page 2.**
23   A.  Okay.
24   **Q.  Oh.  Let me -- let me just ask you.  If you**
25   **look at the very last page.  I'm sorry.  It's the third**

1     to last page.  There's a verification there.
2        A.   Okay.
3        Q.   And -- and -- and that's your signature on the
4     page?
5        A.   Yes.
6        Q.   You took efforts to ensure that the statements
7     in the interrogatory were truthful and accurate?
8        A.   Yes.
9        Q.   And is -- is there anything about these
10    interrogatories as best as you recall that -- that you
11    think was inaccurate or needed further detail to ensure
12    that they weren't misleading?
13       A.   To the best of my knowledge.  Obviously
14    there's a lot of information that goes on.  But to the
15    best of my knowledge these are correct.
16       Q.   Okay.  So in interrogatory number 1, the
17    statement asks "Describe in detail AND IDENTIFY the
18    process by which POWER accesses OR accessed the FACEBOOK
19    WEBSITE."  Do you see that?
20       A.   Yes.
21       Q.   And if you look in the supplemental response
22    in the second paragraph, Power referred to its source
23    code produced on 8-23-11 and 9-14-11.  Do you see that?
24       A.   Correct.
25       Q.   And it states "The source code is the primary

1        Q.   Okay.  Is there any particular reason you
2     didn't put that in the interrogatory response as to the
3     portions that weren't used?
4        MR. FISHER:  Objection.  Vague.
5     Argumentative.
6        THE WITNESS:  So I think that there are -- I
7     said this already earlier.  I said there are unlimited
8     possibilities with code.  Just be -- you create rules
9     that you can do unlimited things.  This might be the
10    best source to understand what is possible.  And that's
11    why we've stated this here.  And, you know, this is the
12    best source that we can provide for you to understand
13    our code, what we can do and -- but if you want to know
14    what was specifically done, a source -- you know, that
15    -- that's not -- that's not in a document.  We did not
16    -- there are also depositions that we've also clarified.
17       Q.   BY MR. CHATTERJEE:  Okay.
18       A.   Which we have referred to.
19       Q.   Where in this interrogatory response do you
20    refer to any deposition testimony?
21       A.   I'm not referring to.  Those -- those exist
22    and are on file.
23       Q.   Mr. Vachani, where in this interrogatory do
24    you refer to any deposition testimony?
25       MR. FISHER:  Objection.  Argumentative.  Asked

1     source material, as it contains the exact functions and
2     technical mechanisms through which Power accessed the
3     Facebook Website."
4        Do you see that?
5        A.   Correct.
6        Q.   Statement was truthful and accurate?
7        A.   Yes.
8        Q.   Okay.  And then you say, "Additionally, Power
9     refers to documentation stored in Power's subversion
10    repository," "produced on 10/24/11."
11       Do you see that?
12       A.   Yes.
13       Q.   Okay.  Is there any particular reason you
14    didn't refer to any of the discussions you and I just
15    had about what aspects of Power's code may or may not
16    have been used in order to access the Facebook web site?
17       MR. FISHER:  Objection.  Vague.
18       THE WITNESS:  So ask the question again,
19    please.
20       Q.   BY MR. CHATTERJEE:  Okay.  Earlier today in
21    your testimony you said that there are some portions of
22    the code that were used and some portions of the code
23    that were not used in accessing the Facebook web site.
24    Correct?
25       A.   Correct.

1     and answered.
2        THE WITNESS:  I don't believe we referred to
3     deposition testimony in this file.
4        Q.   BY MR. CHATTERJEE:  Okay.  You said in
5     response on this interrogatory that you verified "The
6     source code is the primary source material, as it
7     contains the exact functions and technical mechanisms
8     through which Power accessed the Facebook website."
9     Correct?
10       A.   That's correct.
11       Q.   You didn't talk about an entire infinite range
12    of possibilities, did you?
13       A.   Nope.
14       Q.   You talked about this is the way that Power
15    accessed the Facebook web site in the response, correct?
16       A.   Correct.
17       Q.   Was it right or wrong what you answered in
18    this question?
19       MR. FISHER:  Argumentative.  Asked and
20    answered.
21       THE WITNESS:  What I'm saying is this is
22    correct.  All I said is that in the source code there
23    are many possibilities that are things that are capable
24    of doing that we did not do.  That's all I was saying.
25       Q.   BY MR. CHATTERJEE:  Is Power Ventures willing

1  to live with the statement that it made here in this
2  interrogatory response as the exclusive evidence of how
3  Power accessed or accessed the Facebook web site?
4      MR. FISHER: Argumentative. You don't have to
5  answer that question. Move on, Neel.
6      THE WITNESS: I'd like to move on.
7      Q. BY MR. CHATTERJEE: Is there anything about
8  this answer you want to change?
9      A. I would -- I think we can move on.
10     Q. I think you need to answer the question, Mr.
11 Vachani. Is there anything about this interrogatory
12 response that you want to change as you sit here today?
13     MR. FISHER: Argumentative.
14     Q. BY MR. CHATTERJEE: You're here as a designee
15 for the corporation.
16     A. That's correct.
17     Q. Is this an accurate statement or not?
18     A. This is an accurate statement.
19     MR. FISHER: Asked and answered.
20     Q. BY MR. CHATTERJEE: Is there anything else in
21 this response that you want to add?
22     MR. FISHER: Asked and answered.
23     THE WITNESS: I don't think --
24     MR. FISHER: Argumentative.
25     THE WITNESS: -- there's nothing else that I

Page 41

1  conclusion.
2      Q. BY MR. CHATTERJEE: So beyond what the answer
3  here, is there any information that I would need to
4  figure out the process by which Power accessed or access
5  Facebook web site?
6      MR. FISHER: Objection. Argumentative. Asked
7  and answered.
8      THE WITNESS: I've -- what I've said today is
9  that I believe that -- whether the -- the depositions
10 were referred to. Questions have been asked to clarify
11 source code. I -- I think that clarification or further
12 detail on source code and our site have been asked in
13 previous depositions. And I think logically that those
14 things have been asked to get either clarification and
15 they're often referencing source code or referencing
16 actions. And I believe that -- that our depositions are
17 also a source of data. So if --
18     Q. BY MR. CHATTERJEE: So --
19     A. If -- let me finish, please. So if you -- if
20 want -- if you believe that making a reference to say
21 that those -- those could provide further detail, you're
22 welcome. I -- I -- I would be okay with you making that
23 -- that reference.
24     Q. I'm -- I'm not -- I'm not being asked to do
25 anything here. I'm just asking you as the corporate

Page 43

1  need -- there's nothing else that I need to add here.
2      Q. BY MR. CHATTERJEE: Okay. So if I'm looking
3  at the documents and the things that are referred in
4  here, this is the process by which Power accessed or
5  access the Facebook web site, correct?
6      MR. FISHER: Asked and answered.
7  Argumentative.
8      THE WITNESS: This -- this is the -- the code
9  that -- that -- this is the primary code that we -- that
10 any actions that were taken were done. I've said that
11 already. This --
12     MR. CHATTERJEE: Could you read the question
13 back, please.
14     (Whereupon the record was read as requested.)
15     THE WITNESS: This is the primary source
16 material. Source code is the primary source material.
17 That's what it says right here. That's what we've --
18 we've already stated.
19     Q. BY MR. CHATTERJEE: Right. And you understand
20 that when your counsel designated things pursuant to
21 Federal Rule of Civil Procedure 33(d), that means that
22 we can figure out what was actually done as well as you
23 can. Do you understand that's what it means?
24     A. I understand.
25     MR. FISHER: Objection. Calls for a legal

Page 42

1  designee as to accuracy. Is there anything about this
2  interrogatory response that needs to be changed to
3  ensure a full, complete, and accurate response to
4  interrogatory number 1?
5      MR. FISHER: Asked and answered.
6      THE WITNESS: Do you mind if I refer to my
7  counsel for any -- any clarification of this?
8      Q. BY MR. CHATTERJEE: I'd like you to answer it.
9      A. But do you mind? Can I take a moment to refer
10 to counsel?
11     Q. I'd like to you to answer it. You can have a
12 conversation with your counsel. If you need to change
13 it later, you can.
14     A. Well, I'd prefer to speak to counsel.
15     Q. I want you to answer the question. Is there
16 anything about the interrogatory response --
17     A. Am I allowed to speak to my counsel?
18     Q. You can during a break. But I -- remember
19 what I said before --
20     A. Can I -- can I take --
21     Q. I need you --
22     A. Can I take a break?
23     Q. I want you to finish and answer the question.
24 Is there anything about interrogatory number 1 and the
25 response that you think needs to be changed as you sit

Page 44

1    here right now?

2        A.   So, Neel, let me -- let me ask this again.  I

3    believe that you're trying to get a clarification that

4    I -- I'm not a legal expert.  And I don't know how my

5    depositions and -- and a specific supplement response

6    relate together.  And I'm not an expert and I don't want

7    to make a statement that's incorrect.  So I would -- I

8    would ask you again, I'd like to take a five-minute

9    break --

10       Q.   All right.

11       A.   -- and refer to my counsel.

12       Q.   Let's do it.

13            THE VIDEOGRAPHER:  We are going off the

14   record.  The time is 9:52 a.m.

15            (Whereupon a break was taken from 9:52 to

16            9:56.)

17            THE VIDEOGRAPHER:  We are back on the record.

18   The time is 9:56 a.m.

19            (Whereupon the record was read as requested.)

20            THE WITNESS:  No.  I believe I stand by this.

21       Q.   BY MR. CHATTERJEE:  If you can take a look at

22   interrogatory number 7.  Is that statement and the

23   response interrogatory number 7 complete and accurate?

24       A.   Yes.

25       Q.   Is there anything about that response that's

Page 45

1        Q.   BY MR. CHATTERJEE:  Well, it says "The person

2    responsible for Power's conduct in this regard was its

3    Chief Executive Officer, Steve Vachani."  I mean, you

4    Steve Vachani.

5        A.   Well, a CEO normally has -- is the final --

6    final accountability and responsibility in which the

7    standard -- standard way a CEO is responsible.

8        Q.   Okay.  To kind of close the loop on -- on the

9    code issue, if you had testified that certain

10   functionality existed with respect to kind of Power's

11   mechanisms for accessing the Facebook web site and we

12   found no code that actually does that, would -- would

13   the code be the best evidence or would your recollection

14   be the best evidence?

15            MR. FISHER:  Objection.  Vague.  Assumes facts

16   not in evidence.  Lacks foundation.  Incomplete

17   hypothetical.

18            THE WITNESS:  I guess it's hypothetical.  But

19   I -- the code -- the code is what it is.

20       Q.   BY MR. CHATTERJEE:  And -- and -- and is it

21   possible that you might just because of the passage of

22   time, you might be remembering incorrectly?  And if

23   there's nothing that supports it in the code, that the

24   code would be the best evidence of whether that

25   functionality actually existed or not?

Page 47

1    missing in order for us to determine the process by

2    which Power accessed or provide Power user with means to

3    access the Facebook web site?

4        A.   No.

5        Q.   Okay.  As to the actions taken with respect to

6    the source code, the very last sentence of interrogatory

7    number 7 says "The person responsible for Power's

8    conduct in this regard was its Chief Executive Officer,

9    Steve Vachani."

10            Do you see that?

11       A.   Where?

12       Q.   It's the very last sentence in response to

13   interrogatory number 7.

14       A.   Correct.  Yes.

15       Q.   And so with respect to the way that the --

16   the -- the Power Ventures source code worked and the

17   exact functions and technical mechanisms, those --

18   you're responsible for -- for all of that, correct?

19       A.   I'm responsible as the CEO of the company.

20       Q.   And -- and -- and -- and even though you

21   didn't write the code, you are personally responsible

22   for however that code operated?

23            MR. FISHER:  Objection.  Vague.

24            THE WITNESS:  What do you mean by "personally

25   responsible"?

Page 46

1            MR. FISHER:  Objection.  Vague.  Assumes facts

2    not in evidence.

3            THE WITNESS:  I --

4            MR. FISHER:  Lacks foundation.  Incomplete

5    hypothetical.

6            THE WITNESS:  The -- the code is as we've

7    stated the best reference point.  But naturally some --

8    if clarification is needed, sometimes the managers or

9    CEO, or other executives can provide better

10   clarification on something.  And I think that they -- as

11   I've stated earlier today, code is obviously the best --

12   best source to ask.  But usually -- you know, you have

13   to look at each specific case.  And -- and that's where

14   you've had opportunities.  And I think over the last

15   three years on -- on many, many numerous occasions the

16   code, actions, and everything have been discussed at

17   length and in detail.  But the code is obviously, you

18   know, as we've stated, the best source to -- you know,

19   as a primary source.

20       Q.   BY MR. CHATTERJEE:  Do you agree with me that

21   the -- the PowerScript source code was used to run the

22   Power 100 campaign from the power.com web site?

23            MR. FISHER:  Objection.  Vague.  Assumes facts

24   not in evidence.

25            THE WITNESS:  PowerScript source code?

Page 48

14 (Pages 45 to 48)

1    Q.   BY MR. CHATTERJEE:  Correct.
2    A.   I mean, in what -- what aspect of the
3    campaign?
4    Q.   The -- the -- the form that users filled out
5    as well as the -- the code was used in order to access
6    the Facebook web site and then create the event
7    invitations.
8         MR. FISHER:  Objection.  Vague.  Assumes facts
9    not in evidence.  Lacks foundation.
10        THE WITNESS:  A script was -- was created that
11   was -- a script that was -- you know, whether we --
12   let's say whether PowerScript or script.  A script that
13   was when users authorize -- users authorize the creation
14   of an event and -- and the script was created to -- to
15   -- to complete that -- that activity.
16   Q.   BY MR. CHATTERJEE:  Who created that script?
17   A.   That script was created by Power.
18   Q.   Okay.  And I used the term source code.  Was
19   what was confusing you was because it's what you would
20   refer to as a script rather than as a source code?
21   A.   Maybe the terminology is different.  You know,
22   source code, you know, there's different levels of
23   programming.  And script programming ultimately if
24   that's -- you know, any script that was completed on the
25   Facebook site was naturally created by Power.  Whether,

Page 49

1    A.   Sure.
2    Q.   To the extent you need assistance, we've
3    executed some tools to give translations.
4    A.   Okay.
5    Q.   But to the extent they're inaccurate, you
6    know, you could always evaluate.  Is there any -- who is
7    Bruno Carvalho?
8    A.   He was a marketing manager and marketing
9    product manager.
10   Q.   Okay.  Is he still affiliated with Power in
11   any way?
12   A.   He is not.
13   Q.   How long was he with Power?
14   A.   He was probably 2007, 2008, two thousand....
15   Three years.
16   Q.   Okay.  So he was with --
17   A.   Approximately.
18   Q.   With the company for about three years?
19   A.   I don't know the exact time.
20   Q.   The subject line says "dados da campanha"?
21   A.   Yes.
22   I might be pronouncing it incorrectly.
23   A.   Yeah.
24   Q.   What does that mean?
25   A.   Statistics of the campaign.

Page 51

1    you know, that's -- that's much more --
2    Q.   So if I -- if I used the word code to describe
3    scripts and source code, would we be on the same page if
4    I --
5    A.   Yes.
6    Q.   -- if I use that term?
7    A.   That's okay.
8    Q.   You're comfortable with that?
9    A.   I'm comfortable with that.
10        MR. CHATTERJEE:  Let's mark this as Exhibit
11   191.
12        (Plaintiff's Exhibit No. 191 marked for
13        identification.)
14   Q.   BY MR. CHATTERJEE:  So, Mr. Vachani, what --
15   what I've done -- and you'll see this from time to time
16   today, which is going to be a little bit different from
17   previous deposition exhibits we've used.  In some
18   instances we have obtained certified translations of
19   documents.
20   A.   Okay.
21   Q.   And you'll see on the second page that there's
22   a -- a certified translation of the document.  There are
23   other circumstances that due to the -- the pressure of
24   time we haven't gotten certified translations, and I may
25   ask you to translate specific things.

Page 50

1    Q.   And -- and do you know what campaign Mr.
2    Carvalho is referring to there?
3    A.   I believe this was a -- to the best of my
4    recollection, there was -- there was questions that were
5    asked about the campaign.  And it might have even been
6    related to Facebook had asked some questions about how
7    many users had accessed the site.  And I have to see --
8    I thought there was an e-mail that went with this.  I
9    don't see any content here.
10   Q.   We'll -- we'll -- we'll get to that in a
11   minute.
12   A.   Yeah.  That's why it would be better to see
13   that so I could make sure.  Because it's been a long
14   time.  This is from 2008.
15   Q.   Why don't I --
16   A.   If you -- if you have the statistics that
17   would provide a reference.
18        MR. CHATTERJEE:  Let's make this Exhibit 192.
19        THE WITNESS:  The only reason I said there
20   were two -- two different discussions around statistics
21   at that time.
22        (Plaintiff's Exhibit No. 192 marked for
23        identification.)
24   Q.   BY MR. CHATTERJEE:  Do you recognize the
25   document I've given you as Exhibit 192?

Page 52

15 (Pages 49 to 52)

1    A.   I do.

2    Q.   Okay.  Is that the Excel spreadsheet that's

3    referred to in the attachments line of Exhibit 191?

4    A.   You're telling me -- I've seen this document.

5    I believe this is it.  Is this the attachment that --

6    that was printed from it?

7    Q.   Yes.

8    A.   Okay.  Then that's -- then that's correct.

9    Q.   And just so the record's clear, what do you --

10   without -- putting my representation aside, what do you

11   understand this document to be?

12   A.   Do you mind if I take a look at it?

13   Q.   Sure.

14   A.   It's been a long time.  Do you mind if I go

15   online and just see the e-mail that requested this

16   e-mail at that date?

17   Q.   Sure.  We can take a five-minute break.

18   A.   Yeah.  I just want to make sure, because it's

19   -- there was many different campaigns going on.

20   Q.   That's fine.

21   A.   And just want to be accurate.

22   Q.   Yeah.  No.  You're 30(b)(6).  If you need to

23   confirm something, we'll take a break so you can take a

24   look.  Let's go off the record.

25        THE VIDEOGRAPHER:  We are going off the

Page 53

1    record.  The time is 10:08 a.m.

2        (Whereupon a break was taken from 10:08 to

3        10:28.)

4        THE VIDEOGRAPHER:  We are back on the record.

5    The time is 10:28 a.m.

6        THE WITNESS:  Great.  Thank you, Neel, for

7    letting me get a reference point on this.  I went back

8    to the e-mails at that time, also tried to understand

9    what this was in reference to.  So -- go ahead.

10   Q.   BY MR. CHATTERJEE:  Let me -- let me ask the

11   question first.

12   A.   Sure.  Please.

13   Q.   Exhibit 192 is a spreadsheet of some sort --

14   A.   Yep.

15   Q.   -- that refers to "total de logins."  Do you

16   see that?

17   A.   Yes.

18   Q.   What is Exhibit 192?

19   A.   So 190 -- this is a campaign summary

20   although -- and there are two e-mails that go with this,

21   one that you have here and one other e-mail that I

22   found here that's referring to this.  This is -- these

23   are statistics relating to our overall invitations

24   campaign that was going on at that time.  Not relating

25   to Facebook, but relating to the entire site, of which

Page 54

1    Facebook -- although previously I think we've

2    established -- although these numbers you can refer to

3    in that Facebook was a -- was a very, very, very, very

4    small part of our overall user base and our overall

5    activity.  So this -- this -- this side here refers to

6    the Power site.  I'm happy to go into more details on

7    there.

8    Q.   When you say it "refers to the Power site,"

9    what do you mean?

10   A.   The power.com site.  So these are people that

11   logged -- logged -- logged in.  And then on our Power

12   site we were -- that's where we were doing a campaign

13   where we were saying to our users on Power, hey, you --

14   promoting this campaign.  Most -- most of the promotion

15   was on that site, on the Power site.  And there were

16   various ways to -- to promote them.  One was they could

17   play -- play a game where they could choose friends and

18   it was an entertainment forum that was on the Power

19   site.  This had nothing to do with Facebook.  There were

20   scraps which also have nothing to do with the Power

21   site.  That's an Orkut feature called scraps.  If you

22   see, we always refer to scraps.

23        THE REPORTER:   I'm sorry.  Slow down a little

24   bit, please.

25        THE WITNESS:  Sorry.  Scraps are a feature on

Page 55

1    Orkut.  So this is just referring to the global campaign

2    as a whole.

3    Q.   BY MR. CHATTERJEE:  Okay.  And when you say

4    "the global campaign," do you mean the hundred by

5    hundred campaign?

6    A.   Our global invitation campaign and -- as a

7    whole.  Which the hundred by hundred was a incentive

8    promotion to help further encourage users to -- you

9    know, to bring friends to Power.

10   Q.   So -- so when they're -- this is a spreadsheet

11   that basically tracks from December 2, 2008, to December

12   11 --

13   A.   Yes.

14   Q.   -- 2008, the -- the campaign that Power

15   Ventures had to try to get users to join the web site?

16   A.   This was a test campaign that we did test --

17   testing the -- this promotion was a hundred by hundred.

18   And this is in relation to the hundred by hundred, which

19   was the promotion tool being used to -- to push the --

20   this campaign that was.

21   Q.   Okay.  And were there -- was there any other

22   -- was there any other campaign that -- that this

23   spreadsheet was covering other than the hundred by

24   hundred?

25   A.   From what I can see, I believe this is

Page 56

1 relating to the hundred by hundred.  That was -- since
2 everything -- every invitation as a matter in whatever
3 way was being tracked, you know, as how many -- how many
4 new friends joined the site.  The hundred by hundred was
5 kind of over encompassed the invitations during that
6 period.  So they're inter -- they're all interrelated.
7 Since any -- any invitation sent in any form, whether a
8 user sent out an e-mail -- a lot of users took, like,
9 when you provide a link to the user and the user goes
10 and they send out e-mails, and they -- they created
11 e-mails which they sent to their own friends.  Others
12 played -- played a game that we had that -- on this --
13 on our site where they could choose friends inside the
14 game and say I want to invite this friend.  So there
15 were many different ways on -- on the Power site.
16    Q.   And the choose friends feature, that would be
17 taking the friends data, exporting it from a particular
18 social network to Power, and then there would be a
19 friends list?
20    A.   No.  Typically on -- users have a -- a total
21 friends list which includes their friends from Orkut,
22 their friends from any social network.  So they have an
23 aggregated friends list.
24    Q.   Right.
25    A.   And they also have their e-mail address book

Page 57

1 which they can see friends and choose friends from their
2 e-mail address -- address book.  These are the typical
3 ways to access friends lists.
4    Q.   Okay.  Now, do you know how the statistics
5 on -- on this spreadsheet Exhibit 192 were obtained?
6    A.   These were obtained from -- most -- I don't
7 know -- let me -- let me think about that question a
8 second.  Usual -- from -- from best of my recollection
9 when a request was made this -- this was -- was obtained
10 from our data -- from our database.  We would basically
11 look in the database and see -- or Google Analytics.
12 Basically what I'm looking at here is an e-mail on
13 December 16th from Bruno.  It says we -- he's
14 referring -- he's referring to the hundred by hundred
15 campaign.  And he's referring to a spreadsheet that's
16 similar to -- basically this has the same -- same
17 numbers.  That's how I was able to get a reference
18 point.  Because this e-mail --
19    Q.   And what does Mr. Carvalho say in that e-mail?
20    A.   So he's saying we're seeing an increase in the
21 results on the hundred by hundred campaign and here --
22 here are some new actions to optimize this campaign.
23 Here below is an attachment until yesterday with
24 analytics -- and he's saying the analytics from 12-5 to
25 12-9 are problematic, so let's ignore those dates on

Page 58

1 these -- on these, because they're not -- they may not
2 be fully accurate.  But the other ones, you know, just
3 kind of to give a general trend of seeing them -- our
4 invitation campaign.
5    Q.   Now, you refer to a database that existed in
6 order to build these statistics in this spreadsheet.
7    A.   Correct.
8    Q.   Do you recall saying that?
9    A.   That -- that -- I was -- I don't know.  I'm
10 assuming that this was -- it would go to a database to
11 get this data, correct.
12    Q.   So there -- there -- there was some sort of
13 database that -- that Power Ventures maintained --
14    A.   Correct.
15    Q.   -- that would track this information?
16    A.   That would track total -- I believe it was the
17 Google Analytics.  The Google Analytics is where he's
18 referring to -- first of all, the Google Analytics is
19 how many -- showed us how many log-ins and everything.
20 And the Google Analytics usually accessed the database
21 to provide the total log-ins.
22    Q.   And what about the conversion?  There's this
23 "conversao."
24    A.   Okay.  So first of all, this is how many
25 people participated in some kind of invitation from the

Page 59

1 total -- total log-ins in the site.  So out of 63,000
2 people that logged in, 1.53 percent participated in some
3 kind of invitation.  Some kind of invitation on the
4 Power site.
5    Q.   Okay.  So if you go down there's a section --
6    A.   Just to take this one step.  So previously I
7 think we've -- there -- there have been some numbers,
8 for example, specific to -- to Facebook where it might
9 have had 6,000 or 5,000.  This conversion is not
10 relating to Facebook.  It's relating to the total
11 log-ins.
12    Q.   Right.  We'll -- we'll get there.
13    A.   Okay.
14    Q.   Actually, let me just ask the question.  Is
15 there -- was there a way to know to the best of your
16 recollection which of the invitations that were sent
17 were to Facebook as opposed to some other social
18 network?
19    A.   Nothing was sent -- what do you -- you're
20 saying sent on -- so first of all, as you --
21    Q.   Let me give you an example.
22    A.   Okay.  Please.
23    Q.   If you look at -- so I have a certified
24 translation.
25    A.   Yes.

Page 60

17 (Pages 57 to 60)

1   Q.   I'll do the English version.
2   A.   Sure.
3   Q.   As long as -- are you comfortable that the
4   translation on the total log-ins page is an accurate
5   translation of --
6   A.   Yes.
7   Q.   Okay.  So there's a -- a -- a section that
8   says "Amount of users who sent invitations."  Do you see
9   that?
10  A.   Yes.
11  Q.   And it lists each day a number of users who
12  sent invitations on any given day.  Do you see that?
13  A.   That's correct.
14  Q.   Okay.  Is there a way to know whether those
15  users who sent invitations sent them through Facebook or
16  some other social network?
17  A.   So the answer is there are -- there are
18  certain log -- hold on a sec.  Let me -- let me clarify
19  this so I can make sure I answer this correctly.  What
20  they talk about here is the type of invitations that
21  were sent also.  And I believe there's this -- in order
22  to fully answer this, you have to look at this other
23  file which I can -- I'm happy to show you here.  Which
24  is the same spreadsheet, but it's got -- it's called
25  statistics of the hundred by hundred by hundred

Page 61

1   didn't have a script working at that time.  We had --
2   able to create events and we had the ability to post
3   status updates, but we did not have the functionality to
4   send messages at that time.
5       So the answer is all messages sent as far as
6   direct e-mails were not sent -- there was not a single
7   direct e-mail sent through Facebook, because we didn't
8   even have that functionality available at that time.  We
9   were trying -- we were actually working on an e-mail
10  server to launch later on where we could have a more
11  traditional e-mail invitation campaign.
12  Q.   So let's -- let's -- let's break that down a
13  little bit.
14  A.   Please.
15  Q.   One of the things you mentioned was the
16  functionality to be able to create an event on Facebook.
17  A.   Correct.
18  Q.   Was that tracked in any way on these
19  spreadsheets or otherwise by Power Ventures?
20  A.   As far as my best of my recollection, it
21  wasn't.  And I haven't seen -- I don't -- I don't -- I
22  think that we had an e-mail exchange where we -- do
23  you -- do you have that e-mail?  I sent it a long time.
24  Q.   Yeah, I'm just -- I'm just asking to the best
25  --

Page 63

1   campaign.  It was sent on -- do you have that by any
2   chance?  It says called (not English) hundred by hundred
3   (not English).  It says --
4   Q.   BY MR. CHATTERJEE:  What does that mean?
5   A.   It's a -- the campaign hundred by hundred
6   starting to give results.  And this was sent two days --
7   Q.   I think you said December 16th.
8   A.   December 16th, yeah.  And this was on December
9   14th.  And it had the same file called statistics, but
10  it was presented in a different format.  And had
11  slightly more detail.  That's the one I'm looking at
12  right here.
13  Q.   It did break it down on a per social
14  network?
15  A.   What it -- what it actually breaks it down is
16  the type of invitation sent.  So it says they were
17  scraps.  Scraps were sent -- scraps are only on Orkut.
18  So they would be empty on -- for Facebook.  And then the
19  game, it says the game here, and then e-mails.  E-mails
20  were sent by users.  So those -- since we didn't have a
21  e-mail server working at that time, these were users
22  that went out and sent e-mails, took the link and sent
23  e-mails.  And so therefore -- but the simple answer is
24  as far as I understand there was never a single message
25  sent on Facebook because we didn't have e-mails and we

Page 62

1   A.   Yeah, I don't -- I don't believe it -- it was
2   tracked.  But I -- but I -- I believe that we -- there
3   was an e-mail on December 27th where it was actually an
4   exhibit.  I don't know if we have that.  I would just --
5   if we have that handy by any chance?
6   Q.   I -- I -- I don't.  But I just -- I'm just
7   trying to get a sense of --
8   A.   Yeah.
9   Q.   -- there was some information you were
10  tracking.  Was there any particular reason that -- that
11  Power was not tracking event invitations that were or
12  notifications that were sent?
13  A.   Event creations, I -- I -- I don't -- I don't
14  know the answer.  I think that we -- that there was a
15  question.  That's why I'd like to see since it was a
16  long time ago the -- this -- this conversation we've had
17  before.  And, in fact, upon having it even at that --
18  we've -- we've provided answers.  So if it would be good
19  to reference those, because I think this subject has
20  been discussed.
21  Q.   But whatever the answer was in that -- in that
22  e-mail correspondence is --
23  A.   Correct.
24  Q.   -- Power Ventures' position?
25  A.   That's correct.

Page 64

18  (Pages 61 to 64)

1    Q.   Okay.  And the only reason I ask that question
2  is --
3    A.   Yeah.
4    Q.   -- whatever that answer is --
5    A.   Yeah.
6    Q.   -- it is.
7    A.   It is.
8    Q.   You're standing by it, you're not going to
9  change it?
10   A.   Yeah.  I just need to -- the reason I would
11 like to see it is at that time I -- I remember that
12 there were some things that were not clear.  And I would
13 just -- it would be helpful if we have -- I could even
14 take a minute and just look for that e-mail just to --
15   Q.   Go ahead.
16   A.   Just to be a hundred -- just because we're
17 trying to get everything, make sure there's no
18 misunderstandings today.
19   Q.   I just want to make sure one thing's really
20 clear.  So Exhibit 192 --
21   A.   Yeah.
22   Q.   -- those statistics that are on Exhibit 192,
23 none of that activity was on Facebook?
24   A.   No.  It's not saying -- this -- this is
25 global.  So if -- if a Facebook -- if a -- see,

Page 65

1    A.   So that --
2    Q.   But my question, Mr. Vachani, is this -- this
3  spreadsheet is...
4    A.   Oops.  Sorry.
5    Q.   ...is that the activity that's identified on
6  Exhibit 192?
7    A.   Yes.
8    Q.   Was any of the activity that's listed here
9  activity that would have occurred by using the Facebook
10 system?
11   A.   So....
12   Q.   What I understood your --
13   A.   Yeah.
14   Q.   -- previous testimony to say is that the
15 answer to that's no.
16   A.   Let me -- let me clarify.  Let me clarify.  If
17 a user -- say a Power user almost -- I don't know the
18 exact, but I'd say over 99 percent of our users were
19 Orkut users first who then add -- and then some -- some
20 users out of the Facebook account later.  So then the
21 second thing is if they sent an e-mail, it was a link
22 that they took and they sent an e-mail to friends to
23 invite them.  So it wouldn't have happen directly on the
24 Facebook site.  It might have been -- they might have
25 got the link from their -- you know, while they were

Page 67

1  remember, our -- our users logged into Power.  And this
2  is using our Power browser.  So they were inside our
3  Power browser.  At that point they -- a very small
4  percentage of our users had connections to Facebook as
5  one of the sites that was connected to Facebook.  So if
6  to say that --
7    Q.   No.  No.  Hold on.  Listen --
8    A.   Some of these users would be face -- would
9  be -- also have accounts on Facebook.
10   Q.   Right.  But listen to my question really
11 carefully.
12   A.   Correct.
13   Q.   I think you already said that you didn't have
14 the functionality -- Power Ventures did not have the
15 functionality to send e-mail invitations directly to
16 Facebook users.
17   A.   Yeah.  The first reason is that Facebook
18 doesn't make e-mails -- at that time the Facebook did
19 not make the e-mails available of the user.  So it was
20 impossible to be able to send an e-mail --
21   Q.   So --
22   A.   -- to a user.  So that was the first reason.
23 Orkut, on the other hand, allowed you to export the list
24 and then say, invite friends.
25   Q.   All right.

Page 66

1  browsing.  They were inside Power.  But where they got
2  the link, it was given to them by Power.  You know, so
3  they might have been inside Facebook while they got it,
4  but it was not a Facebook functionality.
5    Q.   Right.  So if you look at the -- the
6  spreadsheet --
7    A.   Yes.
8    Q.   -- it says "Amount of users who sent
9  invitations."
10   A.   Correct.
11   Q.   Do you see that?
12   A.   Yes.
13   Q.   And -- and then the next one says "Total
14 invitations sent (e-mail)."
15   A.   Correct.
16   Q.   It's your testimony that none of those
17 invitations would have been things that were sent
18 through the Facebook system or by using the Facebook
19 system?
20   A.   That's correct.
21   Q.   Okay.
22   A.   And the reason -- the reason I understand this
23 and I could be -- is that from my best of my
24 recollection, Facebook did not have e-mail addresses of
25 the users available for us to access, so we could not

Page 68

**Page 69**

```
 1   have sent e-mails.  The only way the users could get the
 2   e-mails were from the Orkut list, which they could
 3   extract that list and then import and send users and
 4   also other sites.
 5       Q.   Right.  And so one of the functionalities that
 6   I have in mind is you have a Facebook page, correct?
 7       A.   Correct.
 8       Q.   And on your Facebook page there's an ability
 9   for me to send a message.  I can click on a button?
10       A.   Correct.
11       Q.   And it has an e-mail-like functionality?
12       A.   Correct.
13       Q.   You know what I'm talking about?
14       A.   Yes.
15       Q.   This -- this spreadsheet didn't track those
16   types of messages?
17       A.   It did track messages sent.  Sent messages.
18   But I -- it's -- but I -- but I -- as I remember, to the
19   best of my recollection, Facebook messages were not a
20   feature yet that we -- we were looking into that, where
21   to send messages.  But I don't -- we did -- we did not
22   get to that yet, because it was too -- it was something
23   that when we launched we were not ready with that
24   functionality.  We were evaluating users being able to
25   say I want to send a message through Facebook because
```

**Page 70**

```
 1   e-mails were not available.  But to the best of my
 2   recollection, the reason there's no statistics on that.
 3   In fact, if you look in our database in the logs that I
 4   wrote -- you guys referred to, there's even a field
 5   where it talks about messages sent on Facebook, and it's
 6   empty.  It's empty because no messages were sent.  In
 7   Monte's e-mail he had actually requested trying to
 8   understand why it was empty and he -- he didn't -- he
 9   was trying -- he didn't -- he wasn't sure what to imply.
10   I did look up on it.  It was empty because we had never
11   used that functionality.
12       Q.   And that's the private messaging feature?
13       A.   The private message.  It's called -- I think
14   it's called Facebook private message or something like
15   that.  And in the log it's empty because we had never --
16   we had never used that functionality.  And scraps are
17   the same thing.  Facebook -- scraps are wall messages.
18       Q.   Right.
19       A.   I believe that we never also got around --
20   according to our -- at least the best of our what we can
21   review, that we didn't -- I don't think that we sent --
22   put messages on walls either.  The only two that we
23   worked with were status updates and event creation.
24       Q.   And --
25       A.   On Facebook.
```

**Page 71**

```
 1       Q.   -- did you -- did you track the numbers of
 2   status updates that were placed on Facebook or event
 3   notifications that were placed on Facebook?
 4       A.   The -- the -- whatever -- if it was -- if it
 5   was in the -- I believe it -- if it was tracked, we
 6   would have -- we would have had it.  So I don't see any
 7   e-mails referring to it and I don't see any -- any
 8   statistics.  If we had an e-mail in the past that we
 9   provided, then -- because it's obviously been three
10   years of questions.  I don't know specifically.  But to
11   the best of my knowledge, I don't -- I don't believe we
12   tracked status updates.  But I remember there was a
13   discussion on event creation and I don't -- I don't know
14   if you have that dialogue handy?
15       Q.   Yeah, I know what you're talking about.
16       A.   Yeah.
17       Q.   Let me --
18       A.   Yeah.  It would just probably be better just
19   to refer to that so I can refresh my memory.
20       Q.   I'm trying to just really narrow down the
21   issues here.
22       A.   Sure.
23       Q.   Do you have any knowledge as you sit here
24   today how many Facebook users received status updates
25   that discussed the hundred by hundred by hundred
```

**Page 72**

```
 1   promotion?
 2       A.   I don't right -- I don't have that information
 3   right now.
 4       Q.   Okay.  If that information did exist at Power,
 5   where would it exist?
 6       A.   Where would it have existed?  I'd have -- I'd
 7   need to get clarification on that.  I can -- on that
 8   specific question I -- I could -- I could inquire and --
 9   and ask if we haven't already covered that in the past.
10       Q.   Who -- who would you need to ask?
11       A.   I would actually try to go back to Leandro who
12   was -- it would be a favor.  He hasn't worked for the
13   company for a long time.  But he was one of the last
14   people.  I would try to --
15       Q.   Would that --
16       A.   -- see if -- see if that -- to find out how
17   that would have been tracked.  If -- but I believe we've
18   actually discussed this in the past though.
19       Q.   Right.  If that was tracked, would there be --
20   would it be reflected in the code?
21       A.   It would -- there's two things.  There's the
22   ability to track it and whether it was actually being
23   tracked.  So the code -- for example, on the database
24   there are tables that are referred to that we never
25   actually -- you know, sometimes you have code to be able
```

**Page 73**

```
 1   to track it.  But because of resources it's too -- too
 2   -- it requires too much server power or too many things,
 3   certain things are not turned on.  And that's -- that's
 4   happened in many -- in many cases.
 5        For example, as we've referred to on
 6   November -- you know, on November 23rd we had changed
 7   servers of 2008.  We had changed server companies that
 8   week.  And afterwards we had disabled a lot of
 9   functionality that we had previously had that was too --
10   too taxing.  So there might have been code that said
11   this could exist.  And this actually came up in some of
12   the conversations of Monte was trying to understand
13   why -- why on November 23rd after that there was no --
14   some -- some functionality.  This is well before we even
15   turned on Facebook.  We had -- we had changed servers
16   the week before we launched.  A lot of -- we were --
17   launched Facebook and many other things just because of
18   cost -- cost -- cost restrictions.
19   Q.   Right.  So to the extent that the information
20   existed --
21   A.   Yeah.
22   Q.   -- and was actually tracked, it would be
23   reflected in -- in the code.  There would be code
24   functionality that would enable it and then there would
25   actually be data in the database that was actually
```

**Page 74**

```
 1   tracked, right?
 2   A.   There would be data in the data -- that's
 3   correct.
 4   Q.   Okay.  And we've referred generally to the
 5   database.
 6   A.   Yes.
 7   Q.   Can you tell me what that was called or what
 8   the file name of it was?
 9   A.   I -- the file names you guys have -- have
10   reviewed everything that was there.  So you -- you guys
11   have probably -- your guys probably have better
12   knowledge of that than I do personally.  I mean, because
13   you guys -- probably the most -- recently analyzed it
14   the most.
15   Q.   Do you know if that database exists today?
16   A.   Everything -- everything that was -- we
17   provided everything that exists today to you guys.  And
18   as far as I understand, everything -- and again was --
19   everything -- you guys were able to find all files
20   except for a specific file that we -- we have that we've
21   discussed that was a -- a -- a log-in file of -- of
22   links of, like, pages visited, which I think that was
23   the -- that was the file that was 180 gigs that was
24   available for three years.  But on two -- in -- on
25   August 2011 was not able -- it was too large to transfer
```

**Page 75**

```
 1   during a -- because we were doing an internet transfer
 2   of data.
 3   Q.   And that -- that -- that 180 gig file, would
 4   that have data associated with log-ins to Facebook?
 5   A.   No.  That -- that would have -- that wouldn't
 6   be storing log-ins to Facebook.  This was -- this was a
 7   more general just like the page -- the pages visited.
 8   So that's why it was so large.  It's like a -- so --
 9   Q.   When you say "pages visited," what do you
10   mean?
11   A.   Our links.  So, like, if there's a -- you
12   know, a link on -- anything on -- as a user went
13   throughout Power it tracked, I believe.  It was a --
14   a -- a general thing of just their -- their -- their
15   click -- click flow I believe.  I don't know for sure,
16   but I believe it was links clicked on.
17   Q.   So with that, the Power browser -- I'll refer
18   to the Power browser.  You know what I mean when I refer
19   to that.
20   A.   Yeah.
21   Q.   It would have a number of different boxes
22   or -- I'll refer to them as boxes for the different
23   social networks it connected to?
24   A.   Correct.
25   Q.   Do you know what I'm referring to?
```

**Page 76**

```
 1   A.   Yeah.
 2   Q.   And if I were to click on the box that said
 3   Facebook when that functionality existed --
 4   A.   Yeah.
 5   Q.   -- would that be the type of link that would
 6   then be registered in this 180 gig file?
 7   A.   I don't -- I don't know the answer to that.
 8   Because what I understand, it was just the general --
 9   like there was -- there's -- there's an e-mail where I
10   specifically asked Eric -- I think it was -- no, not
11   Eric -- Leandro about -- about what this -- this file
12   was before -- when -- when we were having to deal with
13   transferring it.  And I said this is -- we're not going
14   to have the capability to transfer this file.  What's
15   this in this file.  And he said -- and the two things
16   that he referred that it has nothing to do with the
17   operations of the site and it -- it's just a -- it's
18   just a tracking links clicked on.  So links clicked on,
19   you know, I -- I'm not sure.  It's --
20   Q.   You don't know exactly what that means?
21   A.   I don't know what that -- what that exactly
22   means.
23   Q.   Okay.
24   A.   But what I do know is that that's not --
25   that's not a database file.  That's -- that's not --
```

1  that's not a database file.  It's a log file.  So it has
2  -- when we refer to the database and things we access in
3  the database, that wouldn't -- that file is not a
4  database file.
5      Q.   And so the -- the -- the -- the database file,
6  that has been preserved?
7      A.   Well, that -- it's been preserved and
8  statistics have been provided as far as registered users
9  on Facebook.  We've provided pretty extensive statistics
10  on how many users registered to Facebook and -- and
11  things like in the past.  And you guys have those on
12  file.
13      Q.   And -- and to the extent that there's evidence
14  of event notifications being sent through Facebook, it
15  would be in that database file?
16      A.   Well, the database file would track how many
17  users registered to Facebook and I believe also if --
18  because that -- how many users activated a Facebook -- a
19  Power face -- an account on Facebook through Power.
20  That's -- that's what it would track.  And I -- the
21  other thing regarding to event, I think it's best to
22  refer to the previous conversations, because I think
23  that was addressed in the past.
24      Q.   Okay.  And whatever those statements were,
25  that's the testimony of Power Ventures?

1      A.   I'd have -- I'd like to look at those, but I
2  believe that was the testimony that we've -- we've made
3  in the past, that's correct.
4      Q.   All right.  Does Power -- other than you, do
5  you know if -- if Power Ventures intends to offer any
6  other witness for trial?
7      A.   Other witness for....  Are you talking about
8  in the future?
9      Q.   Yes.
10          MR. FISHER:  I'm going to instruct you not to
11  answer on the grounds that goes into attorney work
12  product and attorney-client conversation.
13          THE WITNESS:  So I can't answer that at this
14  point.
15      Q.   BY MR. CHATTERJEE:  Is Eric Santos going to
16  testify at trial?
17      A.   To the best of my knowledge --
18          MR. CHATTERJEE:  I'll ask you, Tim.
19          MR. FISHER:  I don't believe so.
20          MR. CHATTERJEE:  Okay.  It's important because
21  we've served a notice.  You guys have said he's not, and
22  we need to know that.  Because if he's not testifying at
23  trial, that's material.  We can talk about that offline.
24          MR. FISHER:  Yeah, let's do that.
25          THE WITNESS:  As far as I know, he's not even

1  -- he's not available.  So I haven't talked to him.
2  He's not -- we have no intention right now to try to,
3  you know, locate him to be in at trial.
4          MR. CHATTERJEE:  What number are we on, 193?
5          THE REPORTER:  193.
6          (Plaintiff's Exhibit No. 193 marked for
7  identification.)
8      Q.   BY MR. CHATTERJEE:  Unlike some of the other
9  ones, we have a certified translation.
10      A.   Yeah, this is the e-mail I was just referring
11  to.
12      Q.   Okay.  So let me just ask you so the record's
13  clear.  Document number 193, what is this?
14      A.   So this -- on April 24th, 2011, as you know,
15  that was -- that was the month when we were -- we had
16  made the decision to remove Power.com, you know, off --
17  take it offline.  And at that -- you know, it was a
18  cost-cutting measure.  And we also had -- were not in a
19  position to make payments on our servers and we were --
20  we didn't know how many days -- it was already past the
21  date to be removed so -- to be shut off.  And so we had
22  went to a -- we were going through a process of trying
23  -- of backing up everything on another server.  And the
24  way -- the only way to back it up was had to be
25  transferred so -- through the internet.  So it was a

1  very long, long process that would take weeks.  And so
2  this was the -- this was at the -- towards the end of
3  that backup process.
4          And I had sent an e-mail to Eric letting him
5  know.  You know, he wasn't involved in the backup.  He
6  wasn't working for the company.  But I was informed that
7  there were two files that were too large to transfer.
8  They were just in the time that we had and it would have
9  taken a week.  And, you know, it just -- so I would then
10  sent an e-mail to Eric -- he had told me what -- I had
11  already asked them, but just as a second opinion to make
12  sure, you know, that these were not any way needed or
13  valuable to our future.  I sent to Eric if -- I think I
14  sent this e-mail to Eric.  We are backing everything up
15  at Power.  We might lose PowerLogger and PowerFriends.
16  Is this okay.
17          And Eric responds, I believe -- I believe the
18  site will function just fine -- fine without these two
19  services.  They were just plug-ins.  They're not core to
20  the site.
21      Q.   Were all the discussions about PowerLogger --
22  or about Logger and PowerFriends, were they all done
23  through e-mail or were they verbal --
24      A.   They were all e-mail.
25      Q.   Okay.  I'm going to ask you a couple

**Page 81**

1    foundational questions.  Who is Andre Fernandes?

2    A.   Andre was the server -- he was the server

3    manager.  Like I -- previously was the server manager.

4    At this time he was not working for the company.  But I

5    had basically paid him a little to try to help -- help

6    me do this conversion.  Previously he was the guy

7    responsible for the all the server management and the --

8    the head operations -- server operations.

9    Q.   For Power?

10   A.   For Power.  And -- previously.  But at this

11   time he wasn't.  I had just contacted him to help me

12   with that backup since he was a guy that knew this best.

13   Q.   There's a reference in this e-mail to

14   Ghostday.  Do you see that?

15   A.   That's Leandro.

16   Q.   And what's Leandro's last name?

17   A.   I don't remember offhand, but I -- I can -- I

18   can -- I don't remember offhand, but I can get it for

19   you.

20   Q.   And was Leandro a Power --

21   A.   He was previously a programmer at Power also.

22   So these are the two guys that helped me with that

23   backup when I needed that backup in April as a -- I

24   basically contacted them and they -- they -- they were

25   working other jobs, but they were doing this in the --

**Page 82**

1    in the evenings for me.

2    Q.   Okay.  If you go to the -- the last page of

3    the translated e-mail, there's an e-mail from Andre

4    Fernandes to you where it says "Steve, Only two files

5    have not yet been copied.  The files are two databases:"

6    A.   Yeah.

7    Q.   "Logger and PowerFriends."

8    A.   Yeah.

9    Q.   Okay.  So can you tell me what -- what did you

10   understand the logger database to be?

11   A.   So as you can see in my e-mail, after he -- he

12   said that I -- I asked -- I asked Leandro what -- what

13   this is -- what -- what do these two files do, and

14   Leandro responded the purpose of the PowerLogger is to

15   log access to the web site and to specific links, for

16   example, how many people clicked on a given link in the

17   nav bar or any button you want to know about.  And

18   PowerFriends is the -- is completely unrelated

19   application which was on Orkut.

20   Q.   And -- and describe what the PowerFriends app

21   is.

22   A.   That was an app.  So, as you know, Power was a

23   company that was creating apps for social networks while

24   -- while -- with our Power platform.  And PowerFriends

25   was an app that we created for -- for Orkut.  So it had

**Page 83**

1    -- it was inside of -- it was an Orkut app.  So it had

2    nothing to do -- it was completely unrelated.  It was

3    launched about a year earlier I think or six months.

4    Q.   But there was a functionality that Power

5    Ventures had that worked not only on Orkut but was used

6    to work on other web sites as well?

7    A.   Yeah.  Well, worked on many sites.  Orkut was

8    our largest -- user base was on Orkut.  So that's why we

9    refer to -- a lot of our biggest innovations were on

10   Orkut just because that's where our largest user base

11   was.

12   Q.   Right.  So here it says is the basis of the

13   Orkut app PowerFriends.

14   A.   Correct.

15   Q.   Is it your testimony that that Orkut app was

16   only used on Orkut?

17   A.   Yes.  That -- that app was only used on Orkut

18   and it was a much earlier time than even -- we're not

19   even involved in Facebook.  So the -- the PowerFriends

20   app is completely irrelevant to any discussions

21   whatsoever, you know, I think, relating to Facebook.

22   It's a --

23   Q.   As of April 17th, 2011, the logger database

24   existed?

25   A.   It existed on the -- yeah, on the server.  It

**Page 84**

1    was available and accessed in whatever -- if anything,

2    it was referenced in any questions.  If -- I don't know

3    if that was specifically where -- but it was -- it was

4    -- it existed until that date, that's correct.

5    Q.   Okay.  And then following that you made the

6    decision to delete that database?

7    A.   Yeah.  As you can see, the dialogue there we

8    didn't have the time with -- to transfer it before our

9    servers would be shut off.  So they -- the decision was

10   transfer all the most valuable stuff and if we have time

11   and they're not shut off, do these two last.

12   Q.   Other than what's stated in this e-mail, do

13   you know specifically what was in the logger database?

14   A.   I do not know specifically.  This was why I

15   asked that question right there.

16   Q.   But other than what's stated here?

17   A.   I -- I do not know.

18   Q.   So as you sit here today, you don't know, for

19   example, if the logger database would track event

20   invitations sent through links to -- to Facebook users?

21        MR. FISHER:  Objection.  Vague.  Assumes facts

22   be in evidence.

23        THE WITNESS:  What I do --

24        MR. FISHER:  Lacks foundation.  Incomplete

25   hypothetical.

1    THE WITNESS:  What I do know is that questions

2  relating to the events and these things were asked by

3  Facebook and -- and truthfully answered to the best of

4  our knowledge for the previous three years would have

5  referenced and accessed whatever was available to us.

6  So the date that this was deleted, any question -- mass

7  amount of questions that were previously asked were

8  already asked.  And I don't know if it was referring to

9  this or not, but they were -- we had access to -- to

10 provide data to -- to requested questions in the

11 previous -- in the previous three years.

12    Q.  BY MR. CHATTERJEE:  Okay.  So if I understand

13 what you're saying correctly is if -- if that

14 information had been in the logger database, you would

15 have referred to it and provided that information

16 already?

17    A.  Correct.  But I don't know if we referred to

18 it or not.

19    Q.  Okay.

20    A.  So this was only on April 17th, three years.

21 And 2008 obviously is when we think had the -- the

22 lawsuit.  You know, the first time that we interacted

23 with Facebook.

24    Q.  And if we wanted to test the accuracy of

25 whatever you investigated, we couldn't do that today

Page 85

1  because whatever is in that logger database is no longer

2  available to us, right?

3     MR. FISHER:  Objection.  Vague.

4     THE WITNESS:  What we could -- what I could

5  find out -- what we could find out is I -- I could find

6  out more details on -- if -- I don't know if I could

7  ask.  I could try to inquire more details on -- on this

8  logger -- logger database, but that -- that file is no

9  longer available today.

10    Q.  BY MR. CHATTERJEE:  Right.

11    A.  It was available until April 17th.

12    Q.  And when you say "inquire," you would have to

13 ask Mr. Fernandes or -- Eric Santos?

14    A.  I would basically -- yeah.  I would go and try

15 to -- to ask one of the original programmers to provide

16 further details on that file.

17    Q.  Yeah.  Or the code might say.

18    A.  Or the code -- the code might -- the code

19 might say.  I would probably go to them to get a

20 clear -- clear answer to that.

21    Q.  Did you ever ask whether the logger -- at the

22 time you were discussing all of this in November of 2011

23 -- well, it looks like April of 2011.  Scratch it.  Let

24 me start over.

25    In the April 2011 time frame when you were

Page 86

1  discussing the logger database with Leandro and Mr.

2  Fernandes, did you ever discuss whether information

3  related to event invitations or status updates on

4  Facebook were included in PowerLogger?

5     A.  I -- I didn't ask that, those specific

6  questions.  As you can see, you know, the question -- I

7  asked -- what I know is that we were -- were obviously

8  -- the question right at that time was do we lose the

9  entire -- we're backing up, this is our last chance to

10 back up whatever exists, and these -- these were the

11 lowest two priorities.  So I -- only thing I -- that was

12 the only thing I needed to know is make sure you

13 transfer our core database users, etcetera, and these

14 are the last -- in order of priority, these were the

15 last two to transfer.

16    Q.  In making sure that you were transferring

17 them, what were your primary concerns?

18    A.  My primary -- well, my primary concern was

19 obviously that we have our core -- as our core -- in

20 order of priority, our core user base, core IP and

21 everything and core functionality that's essential for

22 the site and operation to run, to make sure that those

23 were transferred.  And, you know, so that if we -- if

24 and when we need to re -- turn this back on or -- or

25 operate this site, we could -- we could do that in the

Page 87

1  future.  And then obviously these two files, you know,

2  because they were anomalies and so large, the logical

3  decision was finish -- finish transferring the core

4  stuff, otherwise it makes everything else, you know,

5  completely -- you're not -- you won't be able to even

6  use the site in the future.

7     Q.  So is it fair to say, if I hear you right,

8  that your primary focus was to make sure that -- that

9  the Power technology could still be operable if you

10 relaunched?

11    A.  Well, my primarily functionality was to get --

12 my primary purpose was to get everything backed up.  You

13 know, it was just like a -- it was to get the entire

14 thing backed up.  But as you can see, after -- the first

15 time I was made aware of this was -- I mean, my -- my

16 assumption up until April 17th was that everything,

17 hundred percent, had been instructed to be backed up so

18 it wasn't even anything for me to think about.  It was

19 being backed up.

20    And that -- and on April 17th I was informed

21 that everything had been backed up except these two --

22 this is a decision I had made or any -- because I

23 assumed everything would be backed up.  I had made every

24 effort, obviously, to do that.  And on April 17th I was

25 informed that these are the remaining two files.  So it

Page 88

1     was not even a decision about which is more important.
2     I didn't -- I didn't choose that.  This is the logical
3     way that it happened when I -- you know, under an
4     instruction to back everything up.  On April 17th I was
5     told that these two files exist and it was unlikely, you
6     know -- and I said just -- and you can see I ask how
7     long would it take to finish these two.
8          Q.    Right.  But my -- my question's really simple,
9     Mr. Vachani.
10         A.    Yeah.
11         Q.    Which is why was your objective to back it up?
12    Why would you do that?
13         A.    Well, it's logical.  I wanted to back
14    everything that possibly existed.  I didn't want to lose
15    anything.  I mean, there's no reason to lose any files.
16         Q.    And for what purpose?
17         A.    I mean, it's our core -- our company's core
18    IP.  Why would we -- you know, I mean, we have every
19    obligation -- you know, we wanted to keep -- obviously,
20    you know, if you're trying to ask that -- if you're
21    trying to ask or trying to back it up for the Facebook
22    case for every -- we were trying to back up everything
23    for every purpose.  And that was the -- that was the
24    instruction, back everything up.
25              And -- and for two weeks started the at the

Page 89

1     beginning of April -- it took several weeks.  I don't
2     know the exact amount of time.  And on April 17th is
3     when I was informed that the backup is almost complete.
4     These are the two files that are missing.  And I was --
5     I was worried because I knew that the server would be
6     shut off any day -- any day now -- now.
7          Q.    Right.  So on April 17th, 2011, in this e-mail
8     you say, "We are backing everything at power.  We might
9     lose power logger and power friends.  Is this okay?"  Do
10    you see that?
11         A.    This is e-mail sent to Eric, who was not
12    involved in the backup.  He didn't even know that was
13    going on.
14         Q.    Right.
15         A.    I just -- when I was told that -- when I was
16    told that we might lose this I consulted -- I tried -- I
17    contacted Eric and said, hey, Eric, just this is a real
18    simple favor, can you just tell me these two files.
19         Q.    Yes.  So my question is what did you mean "Is
20    this okay?"  Like, what were you getting at when you
21    asked that question?
22         A.    Well, I just wanted to know as, you know, what
23    -- as a technical -- Eric was a technical manager.  His
24    purpose is -- his purpose is to tell me technically if this
25    is -- if this is going to destroy the site or make it --

Page 90

1     you know, make it usable.  So "Is this okay?" means is
2     the site still going to be able to be usable.
3     Because -- because we're probably going to lose these
4     files.  I don't think I have a choice.  And so I was
5     just trying to understand what -- what our damages would
6     be.
7          Q.    It was an operational question --
8          A.    Yes.
9          Q.    -- will the system still work?
10         A.    Correct.
11         Q.    If we lose these two.
12         A.    Yeah.  The benefit -- whether -- whatever the
13    priority is completely irrelevant.  As I said, my
14    instruction was back everything up.  And that up until
15    April 17th it was my understanding that everything would
16    be backed up.  Naturally, you know, things happen
17    beyond -- beyond my control.
18         Q.    Other than Mr. Santos, did you -- did you
19    consult with anybody else about losing these two sets of
20    files?
21         A.    Leandro and Andre, you saw my messages there.
22    Those were the only three people that I consult -- that
23    I -- that I consulted.
24              MR. CHATTERJEE:  Okay.  Let's mark this as
25    Exhibit 193?  Or 4?

Page 91

1              THE REPORTER:  4.
2              MR. CHATTERJEE:  4.
3              (Plaintiff's Exhibit No. 194 marked for
4              identification.)
5          Q.    BY MR. CHATTERJEE:  Mr. Vachani, just so it's
6     clear, that December 16th e-mail that you referred to --
7          A.    Yes.
8          Q.    -- that had the spreadsheet, is it all right
9     if we access your e-mail account pursuant to our
10    agreement and just try and find that document?
11         A.    Yeah.  I mean, I can also forward it to you.
12         Q.    Go -- go ahead and forward it.
13         A.    I'll just forward you a simplified.  That way
14    you don't have to go --
15         Q.    That way we can -- and we'll -- we'll -- we'll
16    deal with that after the lunch break.
17         A.    That way I can....  Okay.  So where should I
18    send it to?
19              MS. METANAT:  M.  M --
20              THE WITNESS:  Is that N or?
21              MS. METANAT:  M, as in Mary.
22              THE WITNESS:  M, as in Mary.
23              MS. METANAT:  M, as in Mary, e-t --
24              THE WITNESS:  So two Ms?
25              MS. METANAT:  Yes.

Page 92

25 (Pages 89 to 92)

```
 1        THE WITNESS:  Okay.
 2        MS. METANAT:  E-t-a-n-a-t@Orrick.com.
 3        THE WITNESS:  So it's m-m-e-t-a-n-a-t?
 4        MS. METANAT:  Correct.
 5        THE WITNESS:  @Orrick.com?  Okay.  I just sent
 6   you that e-mail.
 7        MS. METANAT:  Thank you.
 8        Q.   BY MR. CHATTERJEE:  The document that I've
 9   given you that's marked Exhibit 194.
10        A.   Oh, here it is.  Okay.
11        Q.   Do you see that?
12        A.   Yes.
13        Q.   This is a set of e-mail correspondence between
14   you and Mr. Carvalho dated about November 23rd, 2010.
15        A.   Yeah.
16        Q.   Do you see that?
17        A.   Yes.
18        Q.   I have a couple questions --
19        A.   Sure.
20        Q.   -- related to this.  Mr. Carvalho at the
21   bottom of the e-mail on the first page says "Steve,
22   yesterday 25 people reached 100 friends ... I think
23   until 13 march we have 30 ."
24        A.   Correct.
25        Q.   And it says "The system checks automatically
```
Page 93

```
 1   eache (sic) friend invited" "but we're checking manually
 2   too."  Do you see that?
 3        A.   Correct.
 4        Q.   Were -- were these -- was this discussion
 5   about Facebook and sending the hundred by hundred by
 6   hundred campaign through Facebook?
 7        A.   This had nothing to do -- this has to do with
 8   the overall campaign.  As you know, 90 -- probably 99
 9   percent of all activity of everything with Power was
10   outside of Facebook.  So, you know, that in general --
11   because I think we saw, like, our total user base was --
12   I don't know.
13        Q.   Five million or something?
14        A.   I think our registered user base was at that
15   time, you know, 6, 7-something million.  And there were
16   a few -- I think a few thousand -- you have the exact
17   numbers -- that had a Facebook.  And even those users
18   were primarily Orkut users.  So their Facebook usage was
19   extremely limited.  They were just discovering Facebook.
20   So this is -- this is the overall users.  Most of those
21   friends and most of those users -- just to be -- this is
22   logical since most of our users were Orkut users and all
23   their friends were -- were Orkut users.
24        Logically -- you can confirm this -- probably
25   even if they had created an Orkut -- a Facebook account
```
Page 94

```
 1   in result of this campaign -- because at that time
 2   Facebook -- you know, Facebook and Orkut crossover was
 3   really, really small.  You know, that's changed as of
 4   today.  But so this just refers to the total amount of
 5   people.  And so I'm guessing that probably all 30 of
 6   these people were Orkut users that achieved this.  Just
 7   that -- I -- I mean, in fact --
 8        Q.   But that's a guess?  You don't know?
 9        A.   We can -- we can -- yeah, I mean, we can find
10   out.  But yeah, I mean, that's obviously --
11        Q.   So you --
12        A.   I'm just guessing logically based on the fact
13   that it would be very -- achieving a hundred friends
14   was -- was an extremely difficult task.  You know, to
15   get a hundred friends to, you know -- whether it's
16   Facebook friends inviting friends to Facebook or
17   whatever, you know, it takes a lot of work.  So that's
18   what I'm saying.  It's just knowing the -- the amount of
19   users.  It's very unlikely that any of these users
20   were -- you know, were not Orkut users.
21        MR. CHATTERJEE:  Let's mark this as Exhibit
22   195.
23        THE WITNESS:  This is the e-mail I was
24   referring to earlier which -- statistics e-mail I think
25   that was sent on December 26th.
```
Page 95

```
 1        MR. CHATTERJEE:  Yeah.  Let's mark this as
 2   Exhibit 195.
 3        (Plaintiff's Exhibit No. 195 marked for
 4         identification.)
 5        Q.   BY MR. CHATTERJEE:  After you take a look at
 6   Exhibit No. 195, let me know.
 7        A.   Okay.  Yeah, I'm looking at it.  Is there a
 8   question that you have on this?
 9        Q.   What is this document?
10        A.   So this is a document that was on -- Facebook
11   had actually sent us -- we were -- we were -- as you
12   know, after this -- the conversations with Facebook's
13   legal team started, we had regular conversations that
14   were fairly open and transparent conversations about --
15   you know, which you're most likely familiar with all the
16   conversations that took place at that time.
17        One of the questions that Facebook at that
18   time asked us is obviously this information was fresh
19   and we had fresh access to the database.  They had asked
20   us to know how many users.  This was in reference to --
21   to questions from Facebook.
22        And we -- we went through a process with our
23   guys asking them -- actually, I asked Eric and then if
24   you can see just the -- the dialogue here, I'll just
25   recount it so I don't miss a detail here.  On December
```
Page 96

Page 97

```
 1   25th I sent an e-mail to Eric saying that we were --
 2   that we were -- regarding taking Facebook offline.  Then
 3   Eric sent -- and I -- and I communicated the range with
 4   him to get a range of questions that you asked.  Do you
 5   have a translation of this?
 6       Q.    I -- I -- I -- I have a rough translation.
 7       A.    So then Eric sent this e-mail to Bruno and
 8   Elmo, copied also to a few others.  And he said that
 9   we're probably going to take off on these days, take
10   Facebook off the air, and Steve would like some
11   statistics to know -- you know, before he makes, you
12   know, this decision, this final decision.  And is it
13   possible to -- you know, to get this information.  The
14   number of users with a Facebook account, the number of
15   users with a -- a Facebook account and who have Orkut --
16   Orkut users who register for Facebook, the number of
17   log-ins per day from the people with primary -- whose
18   primary account is face -- so the primary -- primary
19   accounts that are Facebook.  And secondary refers to
20   Orkut users that added a Facebook account.  And then --
21   and then the number five was the number of users with
22   the -- with the secondary Facebook who access each day.
23       Q.    Okay.
24       A.    And then --
25       Q.    So let me ask you a few questions about this.
```

Page 98

```
 1       A.    Yeah.
 2       Q.    This is -- this is the e-mail -- you had
 3   referred to a December 16th, 2008, document.
 4       A.    No.
 5       Q.    Was it actually December 26th?
 6       A.    No.  December 16 is the e-mail I just sent
 7   to -- to you.
 8       Q.    Okay.  So this is --
 9       A.    I also referred to this e-mail earlier when
10   you -- when we talked about statistics.  Specific
11   statistics.  This is what I -- one of the reasons I said
12   that you guys have asked very detailed questions
13   relating to Facebook and users on multiple occasions
14   over the last two, three years, and we have on every
15   occasion provided this data.  This is why --
16       Q.    Got it.
17       A.    -- on April 11th, you know, I don't think
18   there was anything new to be discovered.
19       Q.    So where -- where this log-ins primary account
20   with Facebook, these numbers that are listed on
21   differing days in December 2008 --
22       A.    Yeah.  So this is saying that there were a
23   total of --
24       Q.    Hold on.  Hold on.  Let me ask my question.
25   Where did you get -- do you know where that data came
```

Page 99

```
 1   from?
 2       A.    That would have come from our database.
 3       Q.    And would that have come from the logger
 4   database or something else?
 5       A.    I don't know the answer, but I would -- no.
 6   It would -- it would have come from the registered user
 7   database.  We would have went into our -- our registered
 8   user database.
 9       Q.    And why do you believe that?
10       A.    Because if I refer -- remember correctly, they
11   -- that's where we store -- logger just stores, like,
12   raw data.  It would have -- like, really raw data.  The
13   registered user database stores specific data like --
14   like this or accounts.  Because I remember accessing
15   this account many times when asking questions in
16   previous conversations.  So when I -- on a regular basis
17   I would ask specific questions.  And I -- I know that
18   this was -- this was the database that would go into the
19   database, the actual database, not into the log -- the
20   log file.
21       Q.    Okay.
22       A.    You can see that we had about -- about 500
23   users a day that were primary Facebook users that were
24   accessing Facebook at that time.  Five hundred, 600.
25             MR. CHATTERJEE:  Okay.  Let's -- let's mark
```

Page 100

```
 1   this as Exhibit 196.
 2             (Plaintiff's Exhibit No. 196 marked for
 3             identification.)
 4       Q.    BY MR. CHATTERJEE:  Do you recognize this
 5   document?
 6       A.    Yes, I do.
 7       Q.    Okay.  In this e-mail you asked Eric Santos to
 8   tell you what appears to be included in the source code
 9   he sent you and what is not there.
10       A.    Correct.
11       Q.    Why did you do that?
12       A.    So on August 21st we -- we had already made a
13   complete backup on the 11th of -- or back in April which
14   was on this AsaDrive, A-s-a, Drive.  I had an
15   additional backup just in case anything ever happened to
16   AsaDrive.
17             You know, I -- I had contacted Eric -- I was
18   just -- I said Eric, is there anything that you might
19   have -- anything Eric would have would have already been
20   there.  But I was -- I had worries that if -- if for any
21   reason we lost the AsaDrive, I wanted to know if Eric
22   had another backup and I was going to -- and that's why
23   I was asking him what he had.  So the good news is we
24   didn't lose the AsaDrive, although I was not 100 percent
25   confident in that.  And so I -- this is this
```

1   conversation.

2        And since we still had the AsaDrive this --

3   this -- this request, although was kind of useless

4   because it -- it was superceded by all the information

5   that's on the AsaDrive.  This was just me asking Eric do

6   you happen to have some backups of the source code.  You

7   know, worst-case scenario.  Because that -- that was the

8   only place I had the -- the backup.  So I was trying to

9   find out if I had another backup that Eric might have

10  had on his own, you know, available to him in some way.

11       Q.   So if -- if you look at Mr. Santos' response,

12  he says he -- he said that he sent you all the Power

13  code minus the database scripts, the system

14  configurations, documentation, and the data of the

15  databases.

16       A.   Correct.

17       Q.   And does that comport with your recollection

18  that that's what was included in the source code he sent

19  you?

20       A.   He -- he said that to me.  I didn't do

21  anything with that e-mail.  Because it was just a -- I

22  wanted to have -- I wanted to have in my e-mail a -- a

23  backup of whatever he thought was latest if anything

24  were ever to happen to the complete backup that we made

25  with AsaDrive.  So this was more a -- just a

Page 101

1   precautionary measure in the event that something

2   happened with AsaDrives.

3        Q.   So when did he send you the source code?  I

4   thought the source code was maintained.

5        A.   Yeah, source code was maintained.  As I said,

6   this was really not -- this is not such a relevant

7   e-mail.  This was just I -- I -- I was -- I was

8   concerned and worried that I only had one backup, so I

9   just was curious what Eric might have had if -- if that

10  somehow disappeared or -- or as you know, we had -- it

11  took us a long time even to get -- because it was such

12  -- so much data there.

13       Q.   Right.  But my -- my question is very, very --

14       A.   Yeah.

15       Q.   -- simple.  In this e-mail you say "...can you

16  tell me what appears to be included in the source code

17  you sent me...."

18       A.   So Eric --

19       Q.   What -- what is it that he sent you?

20       A.   So Eric had kept some specific parts of the

21  core, most vital parts of the source code independent of

22  the backup that he had on his local -- on the local

23  drive.  And he didn't have every single extensive file

24  that ever existed which was on the main backup.  This is

25  what he had.  So he didn't have -- because those other

Page 102

1   files are really large, the stuff that you -- you have

2   already had access to.  So this was what Eric also had

3   as an additional backup at that time.  And I sent -- I

4   asked Eric to send me everything that he had, you know,

5   also.  And of course this file you guys have access to,

6   you know, in -- in the e-mail.  I'm sure you made a copy

7   of this file.

8        Q.   All right.  So -- so basically you were just

9   asking what he had in his own personal possession?

10       A.   Yeah.  That's correct.

11       Q.   Okay.

12       A.   That's all this was.

13            MR. CHATTERJEE:  197.

14            (Plaintiff's Exhibit No. 197 marked for

15            identification.)

16       Q.   BY MR. CHATTERJEE:  After you read it, let me

17  know.

18       A.   Okay.  I've read it.

19       Q.   Okay.  If you look at the -- there's a

20  certified translation on this.  If you look at the --

21  the -- the -- the top e-mail, in other words the last

22  e-mail on the string, it starts with "Can you look in

23  there to see if the Powerscript for Facebook is in

24  there?"

25       A.   Yep.

Page 103

1        Q.   Do you see that?

2        A.   Correct.

3        Q.   Why were you asking Mr. Santos to figure out

4   if the PowerScript for Facebook was in the backup?

5        A.   Because I believe at that time we were having

6   conversations with Facebook and they were asking

7   questions.  And I was trying to provide the most

8   accurate possible answers.  And Eric -- Eric was someone

9   that -- so I wanted him -- I -- I could look in there at

10  the database, but I wanted him to also tell me, you

11  know, just to help me better understand what was in

12  there.  I mean, I -- I just -- you saw what I did on --

13  I backed up everything that existed.  This was just

14  trying to get from Eric more detail -- whatever details

15  I could get, you know, on -- on -- on there.

16       Q.   Okay.

17       A.   And obviously this were the conversations that

18  we were having with Facebook at that time.

19       Q.   And did Mr. Santos do that?

20       A.   I believe with his limited time what he did,

21  he just said -- well, you saw his answer.  He says here

22  from what I can see is -- is that all the -- the

23  database is in the backup and -- and to, you know, have

24  a hundred percent certainty, I would need to, you know,

25  download and analyze with --

Page 104

1  Q.   The -- the -- the reason that I'm asking
2  about --
3      A.   Yeah.
4  Q.   -- this specific beginning part --
5      A.   Yeah.
6  Q.   -- is I didn't see a response --
7      A.   Yeah.
8  Q.   -- to this e-mail.
9      A.   Yeah.
10     Q.   So I'm -- I'm wondering what happened after
11 you sent this series of questions on August 23rd, two
12 thousand --
13     A.   Nothing.  He was too busy to -- to look
14 further.  He -- he was -- he just gave me this answer
15 that it looks like all the relevant and important stuff
16 -- what -- what you see here is the database is the
17 conversation that we had.
18     Q.   Okay.  So, for example, on the second
19 paragraph you say "Also, is the script for our creation
20 of events and for our power 100 campaign?  I would like
21 to discuss those scripts with you to get your thoughts
22 on them."
23     A.   Yeah.
24     Q.   My first question is did you ever talk to Mr.
25 Santos after sending this e-mail about the script for

1  creation of events and the Power 100 campaign?
2      A.   To the best of my recollection, he didn't have
3  the time to -- to do that.  But also to the best of my
4  recollection, I believe that you guys did have the time
5  to go through all those files and scripts and you know
6  better probably than Eric what's in there.
7      Q.   The code would be the best evidence of that?
8      A.   Yeah.  The code's the best evidence.  And he
9  just verified that he saw the most important stuff in
10 there, which is the database that's usually where --
11 what he told -- what I remember him -- he said that's
12 where you would find these, it's inside the database,
13 and that database has been fully provided to you.
14     Q.   All right.  And so why -- why were you -- why
15 did you want to discuss the scripts with -- with Mr.
16 Santos and get his thoughts on them?
17     A.   Well, as far as I understand face -- you guys
18 were asking a lot of questions.  So I wanted to educate
19 myself and understand as best as possible, you know, in
20 relation to this case what -- you know, what was in
21 there and -- and so I could be fully prepared to discuss
22 and answer questions that you guys are asking.
23     Q.   Was -- was that because Mr. Santos was more of
24 the -- the code writing technical expert than you?
25     A.   He would know more -- if -- if -- if I could look

1  at a lot of things.  But naturally I wanted to get -- if
2  I could get any additional data, I wanted to be as
3  prepared as possible to provide as much data to you
4  guys.
5      THE VIDEOGRAPHER:  Counsel, five minutes of
6  tape.
7      MR. CHATTERJEE:  Okay.  Why don't we go ahead
8  and take a -- a short break while we change the tape.
9      THE VIDEOGRAPHER:  This ends videotape number
10 one in the continuing deposition of Power Ventures, Inc.
11 The time is 11:30 a.m. on January 9th, 2012, and we are
12 off the record.
13     (Whereupon a break was taken from 11:30 to
14     11:44.)
15     THE VIDEOGRAPHER:  This begins videotape
16 number two in the continuing deposition of Power
17 Ventures, Inc.  The time is 11:44 a.m. on January 9th,
18 2012, and we are back on the record.
19     MR. CHATTERJEE:  98?
20     THE REPORTER:  Correct.
21     (Plaintiff's Exhibit No. 198 marked for
22     identification.)
23     Q.   BY MR. CHATTERJEE:  After you've reviewed the
24 document, Mr. Vachani, let me know.
25     A.   Have you seen this?  Okay.

1      Q.   Do you recognize this document?
2      A.   I do not.  I mean, it's a -- I didn't -- I
3  haven't seen this e-mail at all in three years.  But
4  yeah, I do.
5      Q.   So this is an e-mail string between someone
6  named Joe Shapiro at USshow.com (verbatim) --
7      A.   Correct.
8      Q.   -- you and Eric Santos, correct?
9      A.   That's correct.
10     Q.   I also see a reference to Gloria at power.com.
11 Who is that?
12     A.   Gloria was a administrative assistant that
13 worked at the company.
14     Q.   In -- on the second page -- well, on the first
15 page you'd agree with me Mr. Shapiro contacted Mr.
16 Santos and cc'd you asking a -- a serious -- a series of
17 questions about -- about accessing other web sites
18 through IP addresses, right?
19     A.   Through -- relating to his Ushow, he was,
20 correct.
21     Q.   Mr. Santos in the response to this e-mail on
22 December 12th, 2008, stated "Generally some social
23 networks" "terms have a clause to forbidden theirs users
24 to use external tools not affiliated."  Do you see that?
25     A.   Correct.  Yes.

Page 109

```
 1       Q.   At the time Mr. Santos was the chief
 2   technology officer of -- of Power, right?
 3       A.   Correct.
 4       Q.   And -- and is it fair to say that at that
 5   point in time the chief technology officer of Power
 6   recognized that some social networks did not allow
 7   external tools to access the social networking web
 8   sites?
 9       A.   Yes.
10            MR. FISHER:  Objection.  Vague.  Calls for
11   speculation.
12            THE WITNESS:  I believe it's fair to say that
13   sites have terms in their own terms and conditions that
14   have stated things relating to this.  That's correct.
15   Something that we've discussed many times in the past.
16       Q.   BY MR. CHATTERJEE:  And -- and at this point
17   in time Power knew that -- that Facebook's terms forbid
18   that, right?
19       A.   Facebook's terms forbid users.  That's
20   correct.
21       Q.   Now, Mr. Santos makes a comment here "You
22   should put more ips in your proxy" servers.  "We created
23   in our network a subnet only for proxy servers."
24            Do you see that?  Do you know what he was
25   talking about when he referred to putting more IPs in
```

Page 110

```
 1   your proxy server?
 2       A.   I believe that our system has -- has always
 3   had lot -- had a large range of IPs.  That's just a --
 4   that just a standard system.  In general we had been
 5   operating for years before we -- this date.  And when
 6   you have a high-traffic site that's dealing with
 7   browsers, proxies, independent of the site, this -- this
 8   is a standard -- standard practice that we -- we had
 9   implied -- we had put in a place with our browser
10   interacting the site over the previous two years.
11            Sometimes, as he refers to, there are standard
12   blocks of sites that just they don't know if it's a --
13   you know, if it's a user or if it's a -- a -- you know,
14   some other kind of hacking tool.  So, you know, when I
15   say "hacking tool," meaning things that are not related
16   to Power.  These are things that -- like spiders that
17   Google sends out to sites that accesses stuff.  And
18   there are many different types of servers.  So in
19   general what -- I think he's just saying that -- what
20   he -- what he said here, that as a general issue you
21   should put more IPs in your proxy server.
22       Q.   Because it's hard to block them?
23       A.   I think it -- as you -- if you read the
24   specific thing here, "You should put more ips" -- "If
25   you have" -- "If you have a high traffic, probably these
```

Page 111

```
 1   social" networks will to try to block your access by
 2   delayed server response or denied some service.
 3            THE REPORTER:  Okay.  Repeat that, please.
 4            THE WITNESS:  Delayed server response or
 5   denied some service.  So, yeah, he -- I think he's just
 6   saying here that in general more IPs in your proxy
 7   server.  That's what -- exactly what it says in the
 8   e-mail.
 9            MR. FISHER:  Objection.  Vague.
10   Mischaracterizes the document.
11       Q.   BY MR. CHATTERJEE:  So we're -- we're going to
12   get back to this later.  But the idea of having multiple
13   rotating IP addresses to avoid efforts to block Power
14   Ventures is an idea that goes back to the founding of
15   Power in 2005, right?
16       A.   Not to block Power.  It's, as I said, there
17   are standard -- when you're accessing with a -- a site
18   having multiple IP addresses with a proxy is -- is a
19   standard procedure.  That's correct.  It goes -- it goes
20   back to the beginning.  It was not something that was
21   employed -- it's -- you know, for --
22       Q.   So -- so -- so --
23       A.   -- for Facebook.
24       Q.   This is a -- I'm going to ask a really, really
25   precise question.
```

Page 112

```
 1       A.   Okay.
 2       Q.   Which is since 2005, one of the reasons that
 3   Power Ventures wanted to employ multiple IP addresses is
 4   because it would make it more difficult for a web site
 5   to block Power Ventures from accessing their web site?
 6   And she can read it back if it's not clear.
 7            MR. FISHER:  Objection.  Vague.
 8            THE WITNESS:  Okay.  So let me -- let me
 9   answer the question.  Is it -- how -- when we started
10   building in 2006, everything that we were doing as a
11   company was new and innovative.  There were no -- there
12   were -- we didn't know what was going to be happening in
13   the internet.  We built a system that would -- we were
14   building a browser that was going to be interacting with
15   many sites.  There was not some specific agenda.  We --
16   we know that anything is possible.  So we built -- we --
17   we looked -- we wanted -- in -- in our -- in our effort
18   for our users to be able to access the sites that they
19   want to access freely, we -- we built in a range of -- a
20   range of mechanisms, one of those being that IP
21   addresses rotate.  Those blocks are not -- are -- are
22   many times automatic blocks that have nothing to do with
23   deliberate attempts to block.
24            In fact, most of those blocks historically
25   were not specifically intended at Power.  They were
```

1    automatic things because they didn't know what was
2    accessing their site.  And, in fact -- which a
3    conversation that we will probably get to later is that
4    we've actually had conversations with sites that just
5    wanted to under -- just came to us and said we'd like to
6    understand how your systems work.  And then later said,
7    oh, okay, great, we just didn't know if this was a
8    standard site that was user driven or if this was some
9    type of other type of, you know, foreign, you know,
10   hostile entity.
11       And most sites previously, with the exception
12   of Facebook, have come to the conclusion that, you know,
13   this was a user-generated activity.  So I think it's
14   very easy -- you have to look at this as this was a
15   standard thing that was operating and operating in a
16   friendly manner with many sites without a problem, you
17   know, where usually it was a matter of just discussions
18   with sites.  And that's the -- it is correct that this
19   is -- this -- this is a technique that was employed well
20   before Facebook and was utilized for, you know, two --
21   not three year -- two years, about two years previously
22   for as we were building out this system.
23       MR. CHATTERJEE:  Move to strike as
24   nonresponsive.  Could the court reporter read my
25   question back, please.

Page 113

1        (Whereupon the record was read as requested.)
2        THE WITNESS:  Okay.  So, as I said, the -- I
3    answered the question, I believe.  Is that many sites
4    have standard responses to -- entities that they do
5    not under -- which they have not interacted before,
6    especially when they have high traffic.  And so this was
7    initially built with -- with that purpose, understanding
8    that -- and, in fact, I -- I believe the Electronic
9    Frontier Foundation has answered this question even more
10   articulately in the past.  And rather than try you to,
11   you know, answer it again, I think that you should refer
12   to our previous responses on this.
13       MR. CHATTERJEE:  Move to strike as
14   nonresponsive.  I'm going to ask you one more time.  I'm
15   going to ask the court reporter to read it back.  If
16   there's anything ambiguous about my question, I want you
17   to tell me.
18       But could the court reporter read my question
19   back one more time.  You aren't answering my question,
20   Mr. Vachani.
21       MR. FISHER:  He's answering the question,
22   Neel.
23       MR. CHATTERJEE:  Go ahead and read it back.
24       (Whereupon the record was read as requested.)
25       THE WITNESS:  I would ask you to read back my

Page 114

1    previous answers that I've already stated.
2    Q.   BY MR. CHATTERJEE:  Okay.  So beyond what
3    you've said, you're not changing your answer?
4    A.   That's correct.
5    Q.   You cannot answer that question with a yes or
6    a no?
7    A.   I've answered it.  I've answered it as best as
8    I can.
9    Q.   Okay.  So can you answer it with a yes or a no
10   or not?
11       MR. FISHER:  Asked and --
12       THE WITNESS:  I've answered --
13       MR. FISHER:  -- answered.  Argumentative.
14       THE WITNESS:  I've answered the question.
15       MR. FISHER:  Let's move on.
16       MR. CHATTERJEE:  Okay.  So let's mark this as
17   Exhibit 199 I think.
18       (Plaintiff's Exhibit No. 199 marked for
19        identification.)
20   Q.   BY MR. CHATTERJEE:  Before we go through the
21   depths of this e-mail, Mr. Vachani, this is a, I
22   believe, an instant chat log between you and someone
23   named Abi, A-b-i.
24   A.   Yeah.  First of all, this is -- this is --
25   this e-mail predates by a factor of almost a year and a

Page 115

1    half power.com and the company and has nothing to do
2    with the company Power.
3    Q.   Okay.  Who's Abi?
4    A.   Abi was a -- a guy that -- on the internet
5    that I had -- that I had met.
6    Q.   Had you hired him or were you working with him
7    in some way?
8    A.   I believe I just had a conversation with him
9    about -- we were having conversations just learning
10   about things on the internet.  This was a year and a
11   half before Power was founded.
12   Q.   And were you discussing anything with Abi
13   about extracting data from the Orkut web site?  You can
14   read the e-mail if you want.
15   A.   I have to read this here.  Okay.  I've read
16   it.
17   Q.   Okay.  So generally speaking, what is this set
18   of instant messages back and forth about?
19   A.   So this is a -- about data extraction.
20   Q.   And data extraction for what purpose?
21   A.   This was for -- this was an exercise that we
22   discussed on -- this -- way before Power was started.
23   It was just a discussion on how -- ways -- ways that
24   that data could be extracted from sites that -- that --
25   that were publicly, you know, accessible on the

Page 116

1    internet.

2    **Q.   Okay.**

3    A.   Where you could go to a site that there's

4    information that -- it has nothing to do with anything

5    with the Power technology.  It predates Power by about a

6    year and a half, two years.  And it was an exploration

7    of just how sites store data and everything else.

8    **Q.   All right.  If you can go to the fourth page,**

9    **about halfway down it says "Steve says:  you understand**

10    **the basic flow.  A user will receive a standard**

11    **invitation from a friend" --**

12    A.   Yep.

13    **Q.   -- "when they click on the invitation, they**

14    **arrive on a page with a short description and prompting**

15    **them to enter" "Orkut user name and password."**

16    **Do you see that?**

17    A.   Correct.

18    **Q.   Okay.  And -- and who -- what -- what were you**

19    **outlining here?  What was the business idea?**

20    A.   So the discussion were if I -- if I was to

21    invite a friend, they were basically looking at -- okay.

22    So right now, as you know, Facebook is probably the

23    world largest scraper historically.  Has scraped

24    billions of profiles and grew using this tactic for

25    years where --

Page 117

---

1    **Q.   Mr. Vachani --**

2    A.   I'm --

3    **Q.   -- stop.**

4    A.   Listen to me.

5    **Q.   Stop.  Answer my question.**

6    A.   I'm -- I'm -- I'm giving you a context.  Would

7    you listen to me?

8    **Q.   I'm going to go to Judge Spero if this keeps**

9    **happening and I'm going to insist that we do the**

10    **deposition in his courtroom with him sitting there**

11    **because you're not answering my question.**

12    A.   I'm answering your --

13    **Q.   My question is -- my question is what was the**

14    **business model.**

15    A.   You asked for a context.  And I'm trying to --

16    **Q.   I did not ask for context, Mr. Vachani.**

17    A.   You asked what was the business model and I'm

18    giving you a context that a user-generated invitations

19    was something that we -- was acted on social networks.

20    And we're exploring way -- the discussion here were --

21    was hypothetical conversations to explore on -- on ways

22    to increase the invitation conversion rates in a way

23    where you can -- if the user gives the affirmation to

24    make it easier to invite friends.  This is what the

25    conversation was discussing.  And I was saying -- you

Page 118

---

1    were asking the business model.  The business model was

2    that user-generated exporting of -- of -- of contact

3    lists or other ways is a -- is a -- is a very commonly

4    accepted practice that we were looking at new

5    innovations.  And this was -- this was a very early

6    exploration of -- of different things and what --

7    what -- what would happen.  This was -- this has nothing

8    -- this is -- that's what this conversation was about.

9    **Q.   Okay.  So if you go to the second page, about**

10    **halfway down there's a reference "Abi says:  when we**

11    **will be going to startfeatching (sic) profiles."**

12    **Fair to say he probably meant fetching**

13    **profiles?**

14    A.   Fetching profiles.

15    **Q.   Were you discussing with Abi the idea of**

16    **fetching profiles from the Orkut web site?**

17    A.   So we were discussing the idea of a user says

18    here's my user and password, yes.  And then Greg --

19    basically discussing creating a more advanced exporting

20    feet -- functionality feature.

21    THE REPORTER:  Okay.  Slow down just a moment.

22    "Basically..."

23    THE WITNESS:  We were discussing a way to

24    create more powerful user-generated exporting

25    functionality very similar to -- and that's why I

Page 119

---

1    referred to Facebook and other social networks, because

2    that was the inspiration.  That they currently -- you

3    give your user name and password, you go and you fetch

4    profiles.  And we were looking at ways to -- to not only

5    fetch, you know, e-mail addresses, but where you can

6    fetch an entire profile and export profiles.  So I was

7    exploring the subject of -- of -- of exporting profiles.

8    **Q.   BY MR. CHATTERJEE:  That was something similar**

9    **to what Power Ventures ultimately did, right?**

10    A.   It was a one -- exporting data is one -- was

11    one function -- one -- one functionality of -- of -- of

12    something.  And this is....

13    **Q.   And in 2005 you told Abi "we" "need to do some**

14    **planning to make sure that we do it in a way where we**

15    **are not really detected," correct?**

16    A.   I said that we are -- that we would do it in a

17    way -- I wanted to know what -- what are the types of

18    things that will happen in data extraction.  Because as

19    you know, we have said this clearly and for the last

20    three years that we believe that users have the right to

21    export -- to own and control their own data and export.

22    This is not a secret.  And this is exactly all this --

23    this conversation is saying that while other sites may

24    not agree that user may -- a user has the right to

25    own -- own and control their own data with -- we have

Page 120

---

**Page 121**

```
 1   always believed that and we were exploring in those ways
 2   what would -- what we do if a user wants to get their
 3   data.  And -- and this was a -- an exploration.
 4      Q.   Let me establish some foundation around this,
 5   Mr. Vachani.  You said in this instant message "we also
 6   need to do some planning to make sure that we do it in a
 7   way where we are not really detected," correct?
 8      A.   That's correct.
 9      Q.   And the reason that you said that was because
10   you didn't want web sites like Orkut to detect what you
11   were doing, right?
12      A.   Not to detect.  If -- if they attempted to
13   block, block the -- the sites, we wanted to understand
14   what are the issues.
15      Q.   And you wanted to be able to interfere with
16   their ability to block you, right?
17           MR. FISHER:  Objection.  Vague.
18   Argumentative.
19           THE WITNESS:  To interfere with their ability
20   to block, no.  I'm saying -- we -- this -- exactly what
21   it says here.  We had a -- we had a hypothetical
22   conversation about -- about the issues relating to data
23   extraction where users wanted to access their own data.
24      Q.   BY MR. CHATTERJEE:  And you knew that the web
25   sites that were housing that data wouldn't like what you
```

**Page 122**

```
 1   were doing.
 2      A.   We didn't know --
 3           MR. FISHER:  Objection.  Calls for speculation
 4   --
 5           THE WITNESS:  We didn't know if they would
 6   like --
 7           THE REPORTER:  Okay.  Whoa.  I'm sorry.
 8   Please restate your --
 9           THE WITNESS:  We didn't know if they would
10   like it or not --
11           THE REPORTER:  I'm sorry.  Hold on.  Please.
12           MR. FISHER:  Vague.  Assumes facts not in
13   evidence.  Lacks foundation.  Incomplete hypothetical.
14   Argumentative.
15           THE WITNESS:  Okay.  We didn't -- we have no
16   idea what they were -- this is 2005.  But we know that
17   if -- if a user is -- obviously some sites and it turns
18   out Facebook that, you know, in the future was -- was
19   not Orkut.  It was -- you know, Facebook does not -- did
20   not want users to export their own data.  And while --
21   and we have always stated very publicly and clearly that
22   we believe that users, you know, do have rights to
23   access their data.  So we were exploring and
24   understanding what are the potential reactions that
25   sites could have.  This was a -- this was a hypothetical
```

**Page 123**

```
 1   conversation about -- about these issues.
 2      Q.   BY MR. CHATTERJEE:  So what you're saying is
 3   "we also need to do some planning to make sure that we
 4   do it in a away" that "we are not really detected" meant
 5   that it was hypothetical, not that there was actually a
 6   concern that someone might block you?
 7           MR. FISHER:  Objection.  Asked and answered.
 8           THE WITNESS:  We had no idea what would
 9   happen.  And all we know -- we know for -- I'll try to
10   give you context again.  When -- when Facebook accesses
11   sites and pulls data, they -- they may -- there were --
12   there were situations where sites have standard
13   automatic blocks.  I don't know what Facebook -- how
14   Facebook, you know, continued to access, but they
15   continued to pull data.  So it's -- it's -- it's
16   understood that -- that sites, you know, have -- have --
17   have not always liked users to import their own data.
18   But it's also understood that for the last -- the last
19   few years it has been happening and it has been a
20   standard practice.  So --
21      Q.   BY MR. CHATTERJEE:  Mr. Vachani, do you mean
22   to suggest that the statement "we also need to do some
23   planning to make sure that we do it in a way where we
24   are not really detected" means anything other than what
25   is said there?
```

**Page 124**

```
 1      A.   I'm saying this is a conversation in 2005 that
 2   had nothing to do with the -- with the Power technology
 3   or the Power business.  It was an -- it was specifically
 4   an exercise in user-generated access of their data and
 5   data where they're importing data from other sites and
 6   exploring the issues relating to that.  That's all it
 7   was.
 8      Q.   All right.  And in 2005 you knew that possibly
 9   rotating IPs would be one way to avoid detection from
10   the web sites in exporting data, correct?
11      A.   I -- we was -- it was one of the many things
12   that were -- that were discussed in exploring what ways
13   that sites will access sites.
14      Q.   Okay.  Go to the next page top.  It says
15   "Steve says:  we need to plan this very carefully."
16      Do you see that?
17      A.   Yes.
18      Q.   What did you mean when you said that?
19      A.   Exactly this.  We need to -- we need to look
20   at every detail.
21      Q.   Why?
22      A.   I think the -- the same question here is that
23   we're -- we're look -- we're -- we were exploring every
24   detail of -- of -- of -- of importing data and
25   understanding that because some -- importing data is not
```

1    something that while it's a right and something that's
2    been established that users have the right to do, not
3    every site -- not every site wants users to -- to be
4    able to get their own -- access their data.  Obviously
5    Facebook being one of the greatest, you know, companies
6    that have traditionally been against -- been against
7    this publicly.  You know, users trying to access their
8    own data.  This is -- this is something that we -- we
9    always understood that, you know, just because it's --
10   it's correct and it's okay for users to access their own
11   data doesn't mean that every site will -- will allow
12   users to access their own data.
13       Q.   So you knew that the web sites may not like
14   having users access and export data?
15       A.   Historically importing data has never been --
16   has never -- many sites have always objected to it and
17   it -- and despite that fact, it has been going on for
18   ten years and been a commonly-accepted practice.
19       Q.   I understand that.  But you -- you understand
20   that even at the time you wrote this instant -- or the
21   portions of this instant message chat log that web sites
22   were often against exporting data from their web site to
23   another place?
24           MR. FISHER:  Objection.  Vague.  Calls for
25   speculation.

Page 125

1           THE WITNESS:  I understood that.  And I also
2    understood that -- that's correct.
3        Q.   BY MR. CHATTERJEE:  Okay.  That's correct.
4    And so one of the things that you wanted to do was to
5    have multiple IP addresses to allow for the extraction
6    of data without the ability of those web sites to block
7    you; isn't that fair?
8        A.   If a user authorized that -- that, correct.
9    That's something we've -- we've always said.
10       Q.   Okay.  And -- and you said in -- in this chat
11   log "since we will only have one chance to do it."
12           What did you mean by "we will only have one
13   chance to do it"?
14       A.   I believe that we were -- we were just sharing
15   -- conversation that -- that accessing -- importing
16   data, you know, we wanted -- we wanted to do it right.
17   You know, we wanted to make sure that if a user wanted
18   to access their own data that they would be able to do
19   it.  That's basically that -- we understood that import
20   -- importing data is a sensitive -- is a sensitive
21   subject, despite the fact that we strongly believe its
22   the user's right.  And that's basically what this
23   discuss -- discussion was about.
24       Q.   Okay.  Farther down you say "lets" "plan on
25   getting the data grab done as soon as possible."

Page 126

1           Do you see that?
2        A.   Uh-huh.
3        Q.   What data grab were you talking about?
4        A.   I think at that time we were exploring their
5    -- what -- as our users where we were going to do a test
6    camp -- a test campaign and test on -- on -- basically
7    exploring data.  Importing -- building importers,
8    building new types of importers.  And very -- you know,
9    very similar to a comp -- this company that -- we were
10   looking at the concept of building importers.  That's
11   what this -- this conversation was about, looking at
12   building importers for different sites.  Similar to the
13   company that -- that Facebook bought.
14       Q.   Was this an activity that was being pursued by
15   Serendipity?
16       A.   No.  It was just a -- a -- an idea that --
17   Serendipity didn't exist at this time.
18       Q.   Okay.  Farther down you say "but we really
19   need to plan out the specifics of the launch and the
20   invitation to make sure we" "get the flow correctly."
21   Do you see that?
22       A.   Correct.
23       Q.   And what -- what launch was being referred to
24   there?
25       A.   This again was a -- was a hypothetical

Page 127

1    exploration of importing -- of -- of creating importers
2    for -- which -- which had nothing to do -- this predated
3    Power, but it had -- it was basically if -- if you're
4    going to do imports, the goal here was to see, you know,
5    the same thing -- the purpose of importing friends and
6    data is that it -- it creates -- it creates things that
7    are very viral.  And if you can achieve a higher
8    conversion rate in a -- when you're importing data and
9    collecting the users' invitations, you can get virality.
10   And so the goal here was -- it was -- it was a
11   hypothetical exploration on how to optimize conversion
12   rates when users are importing data.
13       Q.   So I'm going to go into more detail on this
14   later.  I just want to make sure this is clear.  Power
15   Ventures was founded to be a for profit business,
16   correct?
17       A.   It was -- correct.  Yes.
18       Q.   It wasn't an advocacy group?
19       A.   That's correct.
20       Q.   It wasn't a -- a public interest,
21   501(c)(3)-type of organization?
22       A.   Correct.
23       Q.   Its goal was to acquire a large number of
24   users and then develop a monetization strategy to make
25   money?

Page 128

34  (Pages 125 to 128)

1      A.   Power's -- Power's goals have obviously
2   changed over the -- over the years.  But Power's primary
3   goal, we were -- we were building a type of browser -- a
4   new type of browser to access the internet, we were
5   building a way to build apps on top of sites on the
6   internet.  We were building a range of technologies that
7   would let users access -- access all their information
8   on all sites and in a -- in a -- and allow them to
9   aggregate that.  We were building a wide range of
10  products and technologies.
11     Q.   Okay.  Going back to -- to Exhibit 198, this
12  is the conversation with Mr. Shapiro.
13     A.   Yep.
14     Q.   Is there any -- if you look at the top two
15  e-mails there's a -- you asked Gloria the admin to
16  arrange a time for you to chat by phone or meet in
17  person with Mr. Shapiro.  Do you see that?
18     A.   Uh-huh.  Yeah.
19     Q.   Why is it you wanted to meet with him in
20  person rather than just answer his questions through
21  e-mail?
22     A.   He wanted -- I met a new contact and we were
23  -- we just wanted to meet.  I mean, there's no -- that's
24  usually what happens when you meet people and discussing
25  business -- business strat -- business is you -- you

                                              Page 129

1   networks had tried to block you or any other web sites?
2      A.   I don't believe -- I don't believe I -- I
3   don't know -- I don't know, but I don't believe I
4   disclosed to him, you know, anything about private stock
5   in Power.
6      Q.   Okay.
7      A.   But that -- if there's an e-mail, I mean --
8      Q.   What about --
9      A.   If there's any other e-mail dialogue, I mean,
10  we can check.  We can check.  Whatever -- whatever I
11  said in e-mail would be there.
12     Q.   But what about -- I'm talking about live
13  outside of e-mail.
14     A.   Once again, I don't -- I don't know if I had
15  this meeting or not, but if -- if we looked at the date
16  here on Tuesday, I can probably -- probably try to see
17  where I was on that -- on Tuesday at 3:00 p.m.
18     Q.   So you don't have any recollections of any
19  discussions with Mr. Shapiro?
20     A.   I -- don't remember having anything meaning --
21  any meaningful conversations that came out of -- out of
22  this, but I -- I have no -- I have no idea what we
23  talked -- I don't even remember what Ushow does.  It was
24  some type of video project that he was working on.
25     Q.   So if Mr. Shapiro were to come in and testify

                                              Page 131

1   follow up and you -- and you -- if it seems interesting,
2   you meet -- you meet with the person.  I don't know what
3   -- I don't know what the --
4      Q.   This is the exact same time you were having a
5   dispute with Facebook, right?
6      A.   This was during the time we were launching --
7   we were launching power.com.  That's correct.
8      Q.   And Mr. Shapiro asked you some very specific
9   questions, I think three specific questions --
10     A.   Yep.
11     Q.   -- in the e-mail, right?
12     A.   That's correct.
13     Q.   Is there any particular reason you didn't
14  answer in the e-mail?
15     A.   No, not at all.
16     Q.   Okay.  Did you ever meet with him?
17     A.   I don't remember.  I mean, but you probably
18  can look at my e-mails that you pulled from -- I'm sure
19  you pulled every e-mail with -- with Mr. Shapiro.  I
20  don't remember the guy.  I mean, I was -- this was a
21  conversation I had.  I met dozens of people.  But I'm
22  sure I could look back and find -- and see if I ended up
23  meeting with him or not.
24     Q.   During this time frame do you remember telling
25  anyone, including Mr. Shapiro, whether any social

                                              Page 130

1   that you told him that the proxy servers was an
2   effective tool to evade detection to allow -- to avoid
3   blocking, you wouldn't have any reason to dispute that
4   right?
5           MR. FISHER:  Objection.  Vague.  Assumes facts
6   not in evidence.  Lacks foundation.  Incomplete
7   hypothetical.  Argumentative.
8           THE WITNESS:  As I said, I don't remember --
9   I -- I -- I only -- I remember this conversation as much
10  as what's -- what's here.  The content of what we -- if
11  we met or had a conversation, I -- I believe we did have
12  some -- had some kind of follow-up conversation.  I
13  don't remember the details of that conversation.
14     Q.   BY MR. CHATTERJEE:  Okay.
15     A.   If it was by phone or if it was -- it says I'm
16  available before 3:00 p.m. on Tuesday.  I think we must
17  have spoke on the phone.
18     Q.   If Mr. Shapiro were to come in and say that --
19  in answer to that second question that you had a
20  conversation with him --
21     A.   Yeah.
22     Q.   -- that said the -- the -- the subnet of proxy
23  servers was a strategy to avoid blocking, you wouldn't
24  have any reason to dispute that?
25           MR. FISHER:  Objection.  Vague.  Calls for

                                              Page 132

1 speculation. Assumes facts not in evidence. Lacks
2 foundation. Incomplete hypothetical.
3     THE WITNESS: Again, I -- it's a hypothetical
4 question. I don't know what -- what he would say. And
5 I -- I -- I've said to him what I've said to you already
6 in the past, that users being able to access a site --
7 you know, we've -- we've -- we've expressed our opinions
8 on -- on this -- on this issue of general issue of --
9     Q. BY MR. CHATTERJEE: Mr. Vachani, I'm asking
10 something real simple.
11     A. Okay.
12     Q. You met with Joe Shapiro.
13     A. Okay.
14     Q. If he came in and testified as to the
15 details --
16     A. I don't remember if I met with him or spoke to
17 him on the phone.
18     Q. Right. And if he testified as to the details
19 of what was said at that meeting, you have no
20 recollection that would be able to controvert what was
21 said at that meeting, correct?
22     MR. FISHER: Assumes facts not in evidence.
23 Lacks --
24     THE WITNESS: Yeah. No, I --
25     MR. FISHER: -- foundation. Incomplete

Page 133

1 hypothetical.
2     THE WITNESS: I'm sure if I -- I'm sure if
3 I --
4     MR. FISHER: It's vague.
5     THE WITNESS: I need to -- I need to -- I have
6 to remember what -- I have to refresh on this meeting.
7 It's been three years on a meeting that was not really
8 relevant, you know -- really relevant to -- to -- to our
9 company. It was a guy inquiring for his purposes about
10 general -- general things that -- about what he should
11 look for for creating a video site. So I don't remember
12 what specifically was -- but I'm sure since I looked
13 up -- remember who the guy was, look back at the stuff,
14 you know, I may remember more details of that meeting,
15 but at the moment I don't honestly remember extreme
16 details of that -- of that meeting or if it even took
17 place.
18     Q. BY MR. CHATTERJEE: What specific things would
19 you need to look at in order to refresh your
20 recollection?
21     A. I could go online first of all and see if I
22 did meet with him and see if I had -- do you have any
23 other e-mail dialogues that I had with him afterwards,
24 if any?
25     Q. I don't believe there are.

Page 134

1     A. So most -- most likely if there were no e-mail
2 dialogues, you know, we may have spoken briefly and I
3 probably didn't -- didn't speak to him afterwards. I
4 don't remember the -- I remember the -- the Ushow
5 company, I mean, like, very vaguely. But I got tons of
6 people that would contact me about business development
7 or business ideas on a regular basis.
8     Q. But as you sit here today you don't recall
9 anything about those discussions, right?
10     A. I don't recall, no.
11     MR. CHATTERJEE: Okay. Let's mark this as 1
12 -- 200.
13     (Plaintiff's Exhibit No. 200 marked for
14 identification.)
15     THE WITNESS: Okay.
16     Q. BY MR. CHATTERJEE: Okay. Who is Michael
17 Ross?
18     A. Michael Ross is a shareholder in the company.
19     Q. Okay. And is he -- is he a current
20 shareholder in Power Ventures?
21     A. I believe most -- most of the shareholders
22 with the exception of our series B still share --
23 several of our series B shareholders still own shares in
24 the company.
25     Q. What -- do you know what this e-mail is?

Page 135

1     A. I believe that on January 4th The New York
2 Times posted an article relating to the lawsuit. And I
3 believe Michael Ross was asking a question about that.
4     Q. If -- and this is -- the top is your response
5 to Mr. Ross, right?
6     A. That's correct.
7     Q. In -- in this e-mail you say "Facebook took
8 what should have been a standard measure...."
9     Do you see that?
10     A. Yeah.
11     Q. What are you referring to there?
12     A. Let me see what he's asking. So in any
13 situation in our system when the system cannot access
14 for whatever reason, one of the strategies -- one of the
15 things it does -- and this is as you -- as you've
16 already pointed out predates Facebook significantly. It
17 automatically -- it updates the IP addresses and it
18 continues to try to access. So a standard -- so if --
19 if for any reason a site, you know, blocked us -- you
20 know, it didn't -- it was not able to enter the site,
21 the system would -- would go through a range of things
22 to make sure, you know, it was able to access the site.
23 And so updating the IP address is one of those, one of
24 the many, many, many things that are built in our system
25 to -- to do.

Page 136

36 (Pages 133 to 136)

1      MR. CHATTERJEE:  If we can mark this as 201.

2      (Plaintiff's Exhibit No. 201 marked for

3   identification.)

4      Q.   BY MR. CHATTERJEE:  The document that I've

5   given you marked as Exhibit 201 is a declaration you

6   submitted in this case on January 15th, 2010.

7      A.   Correct.

8      Q.   Do you recognize this document?

9      A.   Yes.

10     Q.   If you can look at paragraph 9 of the

11  declaration.  Let me know when you're done looking,

12  reading.

13     A.   Okay.

14     Q.   Okay.  The -- the standard measure that you

15  refer to in this e-mail to Michael Ross, is that -- is

16  that what's described in -- in paragraph 9 of Exhibit

17  2,000 -- Exhibit 201?

18     A.   I don't believe it's exactly the same because

19  every site has different -- different ways of

20  triggering.  For example, Google -- you know, Google has

21  blocks that are automatic that when there's too many --

22  too many things coming from a specific IP address on a

23  site, they have -- every site has different types of

24  measures that -- that are put in place and they're not

25  specifically related to -- to -- you know, to Power.

1   They're -- and so one of our -- one of our standard

2   things our system does when it access a site, it -- one

3   of the things is it updates the IP address as a -- as

4   a -- why -- why is it not being able to access this

5   site.

6      Q.   Right.  So --

7      A.   So no, I don't think this is referring

8   specifically, you know....  Here.  Let me read this

9   again.  All -- all -- all I believe number 9 is talking

10  about is that face -- that according -- that Facebook

11  implemented -- that Facebook is saying that they

12  implemented measures to block users from accessing

13  Facebook.

14     Q.   Right.  So the technical measures that

15  Facebook implemented that you're talking about here in

16  the declarations, were those these standard measures

17  that you said Facebook took in Exhibit 200?

18     A.   I don't -- I don't know if these -- I think

19  those are -- here's -- let's see here.  Yeah,

20  Facebook -- what I say here, these -- I guess -- I don't

21  know if it's the same measures.  I honestly -- this is

22  -- but this is -- right here is referring to the fact

23  that users were not able to access the site.

24     Q.   And....

25     A.   And our system -- if the -- if it was unable

1   to access it, one of many things it would do, it would

2   up -- it would update the -- the IP address.

3      Q.   Right.  And so you -- you recognize that

4   Facebook took a measure to block access from the Power

5   web site?

6      A.   I think this issue has been, yes, has been

7   discussed before in the past.

8      Q.   You agree with that?

9      A.   Yes.

10     Q.   Okay.  And then in this e-mail you say we were

11  able to easily adjust.  What are you referring to there?

12     A.   I said our system -- system when it cannot

13  access a site for -- it goes -- it goes through a range

14  of checks and one of the things that it updates the IP

15  address.

16     Q.   So when -- when the IP -- if I use the term IP

17  blocking, do you know what that means?

18     A.   Yeah.

19     Q.   So when Facebook implemented IP blocking, what

20  you're talking about here is you had this technology

21  developed to use a different IP address?

22     A.   Right.  That's one of the many troubleshooting

23  measures of the system.  And this is predating Facebook.

24  It has nothing to do with -- for any reason it's not

25  accessing a site, it -- it -- it might -- it could be

1   logical reasons.  There are sites that as you said -- as

2   I said in the past, we've had -- we've dealt -- this

3   issue was -- has gone on for -- updating IPs is a

4   standard -- standard measure that the system does when

5   it cannot access a site.

6      Q.   Right.  But when -- when Facebook put in place

7   an IP blocking tool --

8      A.   Yeah.

9      Q.   -- Power then as part of its checks modified

10  its IP address in order to --

11     A.   Well, Power -- Power's IP address --

12     MR. FISHER:  Objection.  Assumes facts not in

13  evidence.  Lacks foundation.

14     Q.   BY MR. CHATTERJEE:  Let me -- let me finish

15  asking the question.  When Facebook put in place an IP

16  blocking technology, the Power technology as part of its

17  checks used a different IP address, correct?

18     A.   Power has -- Power has many IPs.  As you've --

19  as you've already established today, we've always had a

20  large range of IPs.  And the system will -- will

21  continue to rotate IPs if -- if it cannot access a site.

22     Q.   And that happens in this instance when

23  Facebook blocked one IP address?

24     A.   I'm assuming that -- that it happened, yes.

25     MR. CHATTERJEE:  Okay.  Let's mark this as

Page 141

```
 1    Exhibit 201.
 2         THE REPORTER:  202.
 3         MR. CHATTERJEE:  202.  Sorry.
 4         (Plaintiff's Exhibit No. 202 marked for
 5         identification.)
 6    Q.   BY MR. CHATTERJEE:  This is a declaration you
 7    submitted, Mr. Vachani, on December 12th, 2011.  Do you
 8    see that?
 9    A.   Yep.
10    Q.   It was truthful and accurate when you
11    submitted it to the court?
12    A.   Yes.
13    Q.   Okay.  Turn to paragraph 11.  Paragraph 11 you
14    say "Power did not undertake any effort to circumvent
15    that block, and did not provide users with any tools
16    designed to circumvent it."
17         Do you see that?
18    A.   Yes.
19    Q.   Was that statement truthful?
20    A.   "Power did not undertake any...."  Well, we --
21    as I said, our system -- our system was a a -- a
22    rotating -- addresses were -- we have a lot of IP
23    addresses.  So, I mean, this is a --
24    Q.   So -- so let me ask a question.  Was the use
25    of the rotating IP address a tool that Power used?
```

Page 142

```
 1    A.   This was -- this was a standard part of our
 2    system.
 3    Q.   Okay.
 4    A.   The IP addresses were -- were changing.  So I
 5    don't know how you -- what you want to -- what you want
 6    to call that.
 7    Q.   Okay.
 8    A.   You want to call that a tool or you want to
 9    call that -- I mean, it -- it -- it had -- it had been
10    part of our system, you know, for a long time.
11    Q.   Let's start with the basics.  That first
12    sentence of paragraph 11.
13    A.   Okay.
14    Q.   Was that a true statement?
15    A.   Again, I don't -- I don't know how to -- how
16    to interpret this.  This is saying that -- let me -- let
17    me -- let me answer this.
18    Q.   No.  Let's start with the beginning, Mr.
19    Vachani.
20    A.   Okay.
21    Q.   The first -- that's your testimony, right?
22    A.   Correct.
23    Q.   You know what you meant when you said it,
24    right?
25    A.   Yep.
```

Page 143

```
 1    Q.   Was that sentence a truthful and accurate
 2    statement?
 3    A.   I believe --
 4    Q.   In light of what you just said with -- with --
 5    with respect to Exhibit 200.
 6    A.   Sure.  I'm saying that our sys -- our system
 7    -- what I've said to you is that our system utilized
 8    many IP addresses and these IP addresses update and
 9    rotate on a regular basis.  If -- you know, as a
10    standard thing.  To say that we took a specific -- that
11    it was specifically to circumvent and block, I mean that
12    -- I believe that's a -- that's a -- that's a subjective
13    conversation.  We -- we obviously, you know, have --
14    have a system that rotates if it cannot access a site.
15    So this is -- this is right here --
16    Q.   Was that statement truthful and accurate, yes
17    or no?
18    A.   So it says here "Nevertheless, Facebook's IP
19    block was ineffective because it blocked only one" "IP
20    address" that had -- Power used.  It "did not block
21    other IPs that Power was using in" its "normal course of
22    business."  That's correct.
23    Q.   Okay.  Was the first sentence "Power did not
24    undertake any effort to circumvent that block, and did
25    not provide users with any tools to circumvent it."
```

Page 144

```
 1         Do you see that sentence?
 2    A.   Yeah.
 3    Q.   So was that statement truthful and accurate?
 4    A.   We're not giving users tools.  This was a --
 5    this was a -- our -- our system, as -- as it states in
 6    this -- in that same sentence, the block was ineffective
 7    because it blocked one -- one IP address Power used.  It
 8    did not block other IPs that Power was using in its
 9    business.  As you've established, Power had -- Power has
10    had many IP addresses.  We -- we continue to rotate
11    them.  It's a standard part of our business and it had
12    been for a long time well before Facebook.  So that's --
13    that's what this statement is saying.  We didn't -- we
14    didn't go out and create some new system just for
15    Facebook.  This was a standard part of our business that
16    if a browser was trying to access a site and it -- and
17    it would -- it would automatically -- it -- you know,
18    it's a standard thing.  For some reason it's not
19    accessing it, it had -- there was always many IP
20    addresses.  And that's what number 11 says.  It says
21    "Nevertheless, Facebook's IP block was ineffective
22    because it blocked only one" -- "one" "IP address Power
23    had used, and did not block other IPs that Power was
24    using in the" -- "in the normal course of business."
25    Q.   Did you attempt -- did you attempt to be
```

**Page 145**

1 misleading in your submission to the court under oath in
2 paragraph 11?
3    A.   No.
4         MR. FISHER:  Objection.  Argumentative.
5    Q.   BY MR. CHATTERJEE:  That's truthful and
6 accurate?
7    A.   Yes.  That's exactly what it says.
8    Q.   So when -- when Power accessed the Facebook
9 web site, I believe your testimony has been it would be
10 only at the direction of a user, correct?
11   A.   The user chose to access the site, correct.
12   Q.   So isn't it fair to say that when a user is
13 accessing Facebook through the power.com web site,
14 anything that's being done to do that is a tool that the
15 user is using?
16        MR. FISHER:  Objection.  Vague.  Assumes facts
17 not in evidence.  Lacks foundation.
18        THE WITNESS:  It's -- it's a vague statement.
19   Q.   BY MR. CHATTERJEE:  How do you reconcile the
20 statement in Exhibit 200 where you say "we were able to
21 easily adjust" with your unequivocal statement in
22 paragraph 11 that "Power did not take any effort to
23 circumvent that block..."?
24        MR. FISHER:  Objection.  Argumentative.
25        THE WITNESS:  So I -- I've stated this already

**Page 146**

1 and I'll state it again.  Power -- the -- as it states
2 right here, "Facebook's IP block was ineffective because
3 it blocked only one" "IP address" and "did not block
4 other IPs...."  So the statement -- you -- you're trying
5 to take the full statement of number 11 where we clarify
6 that -- that Facebook did have an IP block and why --
7 and so we were truthfully saying it was ineffective
8 because it only blocked one.  And that's why users were
9 able to continue to access the site.  So we're not
10 hiding the fact that our -- that our -- that we utilized
11 an IP rotating database.  We've given you access to our
12 server code that states this and -- and we're saying
13 here.  So if you -- if -- and so our -- our -- our
14 interpretation of this and our -- our belief is that if
15 the -- if this is -- this is -- this was always a
16 standard part of our business and it -- we don't -- we
17 don't see anything wrong -- we don't see anything wrong
18 that if a user is coming to our site and the system
19 updates in order to access it.
20   Q.   BY MR. CHATTERJEE:  Move to strike as
21 nonresponsive.  I'm not asking whether you see something
22 right or wrong.
23   A.   Okay.
24   Q.   Let me just ask it a real simple way.
25   A.   Okay.

**Page 147**

1    Q.   Did power.com through its rotating IP address
2 approach circumvent the block that Facebook put in place
3 or not?
4    A.   That's where for you -- I think we've stated
5 in -- in -- in statement 11 our opinion on this issue.
6         MR. CHATTERJEE:  Would you read the question
7 again, please, Madam Court Reporter.
8         (Whereupon the record was read as requested.)
9         THE WITNESS:  And I'll read this answer again.
10 "Nevertheless, Facebook's IP block was ineffective
11 because it blocked only one outdated IP address" and
12 Power used and did not block other I --
13        THE REPORTER:  I'm sorry.
14        THE WITNESS:  Sorry.
15        THE REPORTER:  Blocked only one data IP
16 address?
17        THE WITNESS:  "...blocked only one outdated IP
18 address" that "Power had used, and did not block other
19 IPs that Power was using in" its "normal course of
20 business."
21   Q.   BY MR. CHATTERJEE:  Okay.
22   A.   I -- I'm repeating what was stated in number
23 11 in answering your question.
24   Q.   The -- the -- the problem is paragraph 11 is a
25 declaration that you submitted to the court.

**Page 148**

1    A.   Yeah.
2    Q.   That isn't a question you were asked.
3         Read the question again --
4    A.   Okay.
5         MR. CHATTERJEE:  -- Madam Court Reporter.
6         (Whereupon the record was read as requested.)
7         THE WITNESS:  And I'm saying that number 11 --
8 I'm repeating that again.  Face -- that -- that's my
9 answer.  It's what we've already stated in this
10 statement.
11   Q.   BY MR. CHATTERJEE:  Why can't you answer my
12 question with a yes or no?
13        MR. FISHER:  Objection.  Argumentative.
14        THE WITNESS:  I've just answered it.
15        MR. FISHER:  Objection.  Argumentative.
16        THE WITNESS:  I've answered it more -- more
17 descriptively and I've actually reinstated the same
18 statement that I've -- that I've said here in this -- in
19 this testimony.
20   Q.   BY MR. CHATTERJEE:  You haven't.  Because the
21 way that this question is answer it -- is answering it
22 is you're saying there's a specific block that's put up
23 and there wasn't a preexisting technology.  Right?
24 That's the assumption in this -- in this statement.
25        My question is when the block was put up, did

1    Power Ventures circumvent it or not?

2        MR. FISHER:  Objection.  Argumentative.

3    Vague.  Mischaracterizes prior testimony.

4        THE WITNESS:  I --

5        MR. FISHER:  Mischaracterizes his declaration.

6        THE WITNESS:  I think the statement already

7    answers the question.  And if you don't -- if you

8    disagree, then you disagree.

9        Q.  BY MR. CHATTERJEE:  Were you lying to your

10   investor when you said you were able to easily adjust?

11       MR. FISHER:  Objection.  Argumentative.

12   Mischaracterizes the exhibit.

13       THE WITNESS:  I'm saying to you that -- that

14   -- that the block was ineffective because it blocked

15   only one address.  And I've also said to you -- said to

16   you that our system, you know, all -- this is a standard

17   feature in our system that if it cannot access it

18   automatically, it automatically tries again.  So if

19   you -- if you want to -- we've -- that's what we've

20   always said.  It's not -- it's exactly what we said in

21   this statement, that we use multiple IP addresses.  We

22   have said that.  And finally, there have been arguments

23   in the past we've -- where we've discussed this issue in

24   our -- in our -- in our thoughts and what we've done.

25       Q.  BY MR. CHATTERJEE:  Okay.  So the rotating IP

Page 149

1    approach was -- one of the purposes was to allow for

2    access when a web site blocked you, right?

3        A.   The rotating IP address just -- it's a

4    standard thing.  If it cannot access a site it -- it

5    it tries again with another IP address.  It doesn't know

6    what the reason.  It's a standard feature that -- and

7    that's what we say here "Facebook's" "block was

8    ineffective because it blocked only one outdated IP

9    address Power used, and did not block other IPs that

10   Power was using in" its "normal course of business."  I

11   mean, I've answered this question many times already.

12   And I'm -- and it's the same statement that we made

13   here.

14       Q.   All right.  Did Power's rotating IP addresses

15   allow a Power user to access the Facebook web site

16   despite the fact that Facebook had implemented a block?

17       MR. FISHER:  Objection.  Vague.

18       THE WITNESS:  I'll answer it again.

19   Facebook's IP block -- this answers the question right

20   there.  It -- it obviously says it was ineffective and

21   therefore the user accessed the site because it only --

22   it only blocked one IP address that Power had used and

23   did not block other IPs that Power was using in its

24   normal course of business.

25       MR. CHATTERJEE:  Madam Court Reporter, please

Page 150

1    read the question back.

2        (Whereupon the record was read as requested.)

3        THE WITNESS:  I think I've answered the

4    question.  I mean, I've answered the question already.

5        MR. FISHER:  Asked and answered.

6        MR. CHATTERJEE:  You didn't.  You read your

7    declaration.  That question's different.

8        MR. FISHER:  That's --

9        THE WITNESS:  I've -- I've -- I've given you

10   the same answer.  That's the same answer.

11       Q.  BY MR. CHATTERJEE:  Is it a yes?

12       A.   I've answered it.  I don't need to -- I've

13   answered it -- I've answered the question.

14       Q.   Let me -- let me put it this way.

15       A.   And I've kept it consistent with the same

16   answer that we --

17       Q.   Let me put it this way.  After Facebook

18   implemented a block -- you're with me so far?  Facebook

19   did implement a block.  You know that, right?

20       A.   And that's what -- we -- we said that today.

21       Q.   I don't care whether you think --

22       A.   Facebook's -- Facebook's IP block was

23   ineffective.  So therefore the answer -- you've -- this

24   question's already been answered in my declaration and

25   I've repeated it about four times.

Page 151

1        Q.   So you know that Facebook implemented a block,

2    correct?

3        A.   I think we've answered that question.

4        Q.   Did you know that Facebook implemented a

5    block --

6        A.   Did I know?

7        Q.   -- in 2008?

8        A.   Or did our system -- did I know?  Our system,

9    as I've said, it cannot access a site.  So it -- it

10   updated.  It used another IP address to access it.  So

11   you can interpret that however.  We've -- we've already

12   stated this.

13       Q.   So Power system knew that Facebook was not

14   allowing access from that IP address?

15       A.   I'm sorry.  I've answered this -- I've

16   answered this question already.

17       Q.   Did Power system know that Facebook was not

18   allowing access from an IP address?  Yes or no?  It's

19   not a difficult question, Mr. Vachani.

20       A.   And I've answered this.  I think -- I think

21   our statement's already addressed this.  And I'm -- and

22   I'm repeating the same answer.

23       Q.   I'm trying to break it down into smaller

24   components --

25       A.   Okay.

Page 152

1    Q.  -- so I can understand your testimony.

2    A.  Okay.

3    Q.  Did Power's system know that Facebook had

4  implemented a block to a particular IP address?

5    A.  Look, Power -- what Power system knew, that it

6  was not -- that it was not accessing the site.  And as I

7  said multiple times, our system when it cannot access a

8  site it automatically uses -- it uses other IPs in the

9  system that we have been using in our -- in our business

10  and it accesses the site.

11    Q.  And after that block was in place, Power users

12  were given the ability to access Facebook through a

13  different IP address, correct?

14    A.  I think I've answered that question already.

15    Q.  Is it a yes?

16    A.  Again, I don't -- I don't need to answer yes

17  or no.  I've answered it.  I've answered it exactly the

18  way we've answered it in the past.  And I've --

19    Q.  So could -- could they access it?

20    A.  You can -- you can interpret that as -- as how

21  you want to interpret that.  Again, if you want me to

22  read this, I'll repeat this again.

23    MR. CHATTERJEE:  Okay.  So, Tim, we're going

24  to have a meet and confer after this.  And I'm going to

25  ask the court to have a deposition of Mr. Vachani in

<div align="right">Page 153</div>

1  Judge Spero's courtroom because he's not answering the

2  questions.

3    THE WITNESS:  Why am I not answering the

4  question?  I've answered the question.

5    Q.  BY MR. CHATTERJEE:  It's a very simple

6  question, which is after Facebook put in place the block

7  of the IP address could a Power user through the Power

8  browser access the Facebook web site through a different

9  IP address?

10    A.  Yes.  Well, the -- the -- the system --

11    Q.  Now --

12    A.  The system --

13    Q.  Hold on.

14    MR. FISHER:  Let him finish his answer.

15    THE WITNESS:  Go ahead.

16    Q.  BY MR. CHATTERJEE:  And that different IP

17  address was an IP address that Power provided?

18    A.  Which Power -- it was all -- it was -- it's --

19  not which Power provide -- you're using terminology.

20  It's -- it's -- it's a Power IP address.

21    Q.  Okay.

22    A.  It's an existing Power IP address.  They don't

23  provide the IP address.  It's a -- it's an address.

24    Q.  And before Facebook ever put in place a

25  blocking measure, Power had designed its system to do

<div align="right">Page 154</div>

1  that, correct?

2    A.  If it could not access a site, it -- it -- it

3  had -- we had -- our system always had many IP

4  addresses.  That's -- that's been part of the standard

5  part of the feature and it -- it would -- and that's

6  correct.

7    Q.  And you did it with all of the social

8  networking web sites, right?

9    A.  Did it with all of the sites.  That's correct.

10    Q.  It was part of the core browser functionality?

11    A.  That's correct.  And that's exactly what we

12  said in statement 11.

13    MR. FISHER:  Is now a good time for a break,

14  Neel?

15    MR. CHATTERJEE:  Yeah, we can take a lunch

16  break.

17    THE VIDEOGRAPHER:  We are going off the

18  record.  The time is 12:44 p.m.

19    (Whereupon a lunch break was taken from 12:44

20  to 1:33.)

21    THE VIDEOGRAPHER:  We are back on the record.

22  The time is 1:33 p.m.

23    MR. CHATTERJEE:  I want to mark this.  This is

24  your previous deposition testimony.

25    THE WITNESS:  Okay.

<div align="right">Page 155</div>

1    MR. CHATTERJEE:  I don't know what we're on.

2    THE WITNESS:  Are we moving to the second?

3  Are we done the corporate or are you....

4    MR. CHATTERJEE:  No.  Still --

5    THE WITNESS:  Okay.  I just want to know.

6  It's not a big deal, but just let me know.

7    MR. CHATTERJEE:  We'll -- we'll -- we'll deal

8  with that in a second.

9    THE WITNESS:  Sure.

10    MR. FISHER:  Are you marking this one?

11    MR. CHATTERJEE:  Let's not.  I'll just ask

12  some questions.

13    Q.  I'm going to just -- Mr. Vachani, there are a

14  couple things in your previous testimony that I want to

15  at least make sure were cleared up here.

16    A.  Sure.

17    Q.  And I put a copy of your previous deposition

18  transcript --

19    A.  Okay.

20    Q.  -- in front of you.  And I just -- I want to

21  make sure that -- that I kind of understand a few

22  things.  If you turn to page 59 of your -- of your

23  deposition.

24    A.  Okay.

25    Q.  In -- in -- if you can read through lines 10

<div align="right">Page 156</div>

1  through 18 of page 59.  Let me know when you're done.
2      A.  Okay.
3      Q.  Okay.  In -- in your previous deposition was
4  taken around July of 2011, you made the statement "We
5  copied everything on the servers," and you're referring
6  to a backup.
7          Do you see that?
8      A.  Yep.
9      Q.  That was the AsaDrive?
10     A.  That was the AsaDrive, correct.
11     Q.  And would you agree with me that in light of
12 your testimony today that -- that there was a slight
13 inaccuracy in that testimony in the sense that not
14 everything was -- was copied from the servers to the
15 backup?  There were at least one thing that was not
16 copied.
17     A.  There were two files which the PowerFriends
18 and the PowerLogger which were not -- did not succeed.
19     Q.  Right.  So this testimony was slightly
20 inaccurate, right?
21     A.  That's -- yeah.  We discovered that later.
22 Yeah.  We -- well, we -- yeah.  That's correct.
23     Q.  And -- and --
24     A.  You can --
25     Q.  And the -- the activities with the AsaDrive

1      A.  Yeah.  I did instruct them.
2      Q.  Okay.  We did not see that.
3      A.  Okay.
4      Q.  That e-mail.  So if you --
5      A.  I'm pretty sure I have it.
6      Q.  If you do have it, have your counsel produce
7  it, please.
8      A.  Yeah.  Fine.  I told them just to keep
9  everything.  I didn't tell them that specific file.  I
10 said just keep our entire backup, if you can.
11     Q.  Okay.  I'm going to change focus for a little
12 while now.  And I want to talk a little bit about
13 Power's current or anticipated business operations.  So
14 just to give you a context --
15     A.  Yep.
16     Q.  -- I'm letting you know that.  And just
17 because of something you said right at the beginning,
18 if -- if -- if at any point you're testifying in your
19 individual capacity as opposed to as a corporate
20 designee and you feel like that distinction's important,
21 let me know.
22     A.  Okay.
23     Q.  Otherwise I'm going to assume you're
24 testifying as a corporate designee and also to your
25 personal --

1          had happened several months before this deposition?
2      A.  Correct.
3      Q.  Okay.
4      A.  Also one thing just to note, although
5  unfortunately, if you noted even -- I think I copied you
6  as far as attempts that file.  Even after it wasn't
7  copied, I requested for the other company to keep it and
8  I sent them an e-mail please keep it, but they didn't.
9  So I made even an effort, an additional effort to tell
10 them to try you to keep it.  And -- yeah.
11     Q.  And did they not keep it because you weren't
12 willing to pay for it?
13     A.  They just -- well, they didn't even respond.
14 They -- so they just would never share it.  And then
15 when it came up that it wasn't there.
16     Q.  Was there any e-mail or document that you
17 recall?
18     A.  Yeah.  I had -- I think the e-mail -- well,
19 you probably have the e-mail on that.  But there was an
20 e-mail to them saying please -- please keep it because,
21 you know -- you know, just -- just keep it.  We
22 didn't -- we didn't want to lose it if we didn't have
23 to, but....
24     Q.  So if you had instructed them to do it, it
25 would be in your e-mail box?

1      A.  Okay.
2      Q.  -- knowledge.  All right?
3      A.  Sure.
4      Q.  Okay.  Is -- is -- is Power Ventures have any
5  anticipated business that it intends to do?
6      A.  Obviously we're in a state right now in a -- I
7  guess you can call it a waiting state.  You know, we --
8  our business was, you know -- was every -- most -- a lot
9  of the business right now is -- it's in flux.  I mean,
10 the goal and hope, I mean, there would be naturally
11 looking and exploring opportunities.  But there's no
12 direct, like, operation right now.
13     Q.  Is there -- so when you say the goal and the
14 hope, what -- what is that goal and hope as to what
15 Power would do in the future?
16     A.  I think there's -- there's a lot of
17 brainstorming, you know.  I mean, I just -- I'm -- I'm
18 talk -- I'm thinking about things and, you know, talking
19 to people in the -- in the industry and just seeing --
20 seeing, you know, what the best applications of our
21 technology.
22     Q.  Does Power have any assets currently, money or
23 otherwise?  Other than the IP.
24     A.  Money, I mean, no.  But the -- the IP, we have
25 the IP.  That's our primary value right now.

1     MR. CHATTERJEE:  Okay.  Let's mark this as the
2  next exhibit.
3     THE WITNESS:  I mean, a better question is the
4  debts exceed the -- assets.
5     MR. CHATTERJEE:  And before we -- we -- we get
6  -- this is going to be Exhibit No. 203.
7     **Q.   Before we get the to Exhibit No. 203, in the**
8  **kind of brainstorming associated with the IP, originally**
9  **I understand that one of the value propositions of Power**
10 **was this ability to be -- to connect to multiple social**
11 **networking web sites because the usage of these web**
12 **sites differ greatly for many people that have multiple**
13 **accounts.  Would you agree with that?**
14    A.   That was -- that was one.  That was an app.
15 So this thing, power.com was one app --
16    **Q.   Right.**
17    A.   -- using our platform.  It was a -- it was a
18 demonstration app.
19    **Q.   Right.  The browser.**
20    A.   Well, the browser was another component.  But
21 the -- the browser was the plat -- yeah, that was a --
22 the browser was a way to navigate inside this app.  So
23 our -- our view of Power -- power.com was a what we
24 called a Power app.  It was an app that, you know,
25 allowed sites to interoperate with each other, allowed

Page 161

out?
1
2     A.   I think it's just a matter of getting -- you
3  know, the -- we need to have a clear thing to -- you
4  know.  And investors need to see something, you know.
5  See -- it would -- it would have to make sense.  I mean,
6  we're like many ways took a step back.
7     **Q.   What's the relationship between Serendipity**
8  **and Power Ventures?**
9     A.   Serendipity is a -- is a separate entity.
10 That's just where I'm -- it's like exploring other
11 projects and ideas.
12    **Q.   Who controls the IP for Power today?**
13    A.   Right now, I mean, it's -- the -- the series
14 -- the series A shareholders and -- and myself.  You
15 know, those are the two kind of --
16    **Q.   The owners of Power?**
17    A.   The owners of Power.
18    **Q.   Who are the other series A shareholders?**
19    A.   So there were -- DFJ is still a shareholder in
20 series A.  They had participated in series A and series
21 B.  Sold off -- when we did -- which you're familiar
22 with, that when we -- when we spun off, the spinoff, the
23 series B left and we gave them the assets of one of
24 the -- the company.  And the series A shareholders
25 essentially took over the series A together with my --

Page 163

1  data to be accessed among many sites and allowed it to
2  with the user as they went to different sites.
3     **Q.   Given the way that the world and the market**
4  **has developed --**
5     A.   Yeah.
6     **Q.   -- since that time, is that still -- that kind**
7  **of ubiquity concept, is that still one of the -- the**
8  **concepts that's within Power's goals or business models?**
9     A.   You know, honestly, it's -- we have -- there's
10 just so many possibilities right now, we're not -- it's
11 like any company that -- there's -- everything's on the
12 table.
13    **Q.   So you don't know?**
14    A.   Yeah, we don't have -- we don't have a
15 specific plan or strat -- you know, that's like that's
16 it.  You know, we're evaluating like any company that
17 goes through -- we went through a transitional stage
18 obviously at the end of -- about a year ago.  And then
19 shutting -- shutting down the power.com site was another
20 transitional stage.  And then, you know, we've been --
21 and that was about a year -- a year -- a little over a
22 year, year and a half ago.  And, you know, and there's
23 been a -- kind of a -- a wait -- a waiting -- a waiting
24 game right now.
25    **Q.   Because you want to see how the lawsuit plays**

Page 162

1  with myself were the primary -- are the primary
2  shareholders today.  The series A included DFJ plus a
3  range of other angels.
4     **Q.   Okay.  Did -- can you identify any specific**
5  **angels?**
6     A.   I mean, there's -- they're just -- they're not
7  like any big name.  I mean, Esther Dyson was in there,
8  but that was probably the only name that --
9     **Q.   The others are more or less friends and people**
10 **you know?**
11    A.   Not friends, but they were -- they were
12 angels.  But they're not angels that -- of, like, huge
13 note that I think that are widely known or....
14    MR. CHATTERJEE:  Let's give Mr. Vachani
15 Exhibit 203, please.
16    (Plaintiff's Exhibit No. 203 marked for
17    identification.)
18    THE WITNESS:  Okay.
19    **Q.   BY MR. CHATTERJEE:  So I have a foundational**
20 **question before we get into the contents of this -- of**
21 **this document.  Who is Igor Barenboim,**
22 **B-a-r-e-n-b-o-i-m?**
23    A.   He's a shareholder, a series A shareholder.
24    **Q.   Now, I notice that he appears to have a**
25 **power.com e-mail address.  Igor@power.com.**

Page 164

**Page 165**

```
 1      A.   Yeah.  We gave e-mail -- power.com e-mail
 2   addresses to most of our people because it was a nice
 3   name to include on -- this was giving Andreas a Power
 4   address.
 5      Q.   And Eric Santos also had one?
 6      A.   Yeah.  Well, I -- at that time every -- we
 7   gave -- we gave Power addresses to almost anyone that
 8   was a shareholder.  Some used it, some didn't.
 9      Q.   So if I wanted to find an e-mail from Eric
10   Santos to Rob Pollock where you weren't cc'd, where
11   would I look to get that e-mail?
12      A.   Well, Rob -- Rob -- you'd have -- you'd have
13   to ask Rob -- Rob Pollock, you know.  I mean, it was --
14   those -- those e-mails were all -- they were no -- there
15   was no like -- at this -- for most of the stage of the
16   company, it was the way that you have access to each
17   other's e-mail boxes.
18      Q.   So there was no centralized e-mail repository?
19      A.   There wasn't.
20      Q.   Okay.  And -- and was it basically a
21   technology where someone could have a power.com e-mail
22   address but it would forward --
23      A.   It was forward to their -- exactly.
24      Q.   Forward to a personal --
25      A.   Forwarded to --
```
Page 165

**Page 166**

```
 1           THE REPORTER:  Okay.  Let him finish, please.
 2      Q.   BY MR. CHATTERJEE:  And it would forward to a
 3   personal e-mail account?
 4      A.   Yeah.
 5      Q.   For everybody?
 6      A.   Some people accessed -- everyone had different
 7   ways to access their Power.  I mean, some people had
 8   their own servers.  You know, everyone had their own --
 9   their own way of accessing their e-mail.
10      Q.   But there was no centralized place at Power
11   where those e-mails were maintained?
12      A.   Not that I know of, I mean, that we -- that we
13   utilized.  I mean, I -- I know I personally utilized my
14   e-mail through -- through the box that I gave you access
15   to.
16      Q.   Right.  But your e-mail address typically says
17   steve@stevevachani.com and not power.com.
18      A.   Yahoo! makes it harder to your from.  A lot
19   of the people use them.  On their desktop they can --
20   because, like, Google and some others make it easier to
21   be able to put your e-mail there.
22      Q.   Okay.
23      A.   And I -- also I guess I had been using that so
24   long, I just -- I -- I -- I think my BlackBerry, you
25   know, it would -- it would send.  But all the send would
```
Page 166

**Page 167**

```
 1   connect to Yahoo! and send it, but it would come from
 2   Steve at Power, but it was basically still going through
 3   the Yahoo!  So the -- everything was connected to --
 4   through Yahoo! to sent and received.
 5      Q.   Now, as to all these different power.com --
 6   and was that the case even when the company was about
 7   100 people large?
 8      A.   I think there were -- we -- we moved solutions
 9   many times.  So we -- when we -- our servers switched so
10   there was, like, a major change, like, three, four years
11   ago.  And there was a time right around November of 2008
12   we had a major service switch.  A lot of things were --
13   were changed at that time.  This is before we launched
14   the Facebook thing.
15      Q.   And when -- when -- when that change occurred
16   in roughly 2008 time frame, did that create a
17   centralized e-mail server or not?
18      A.   No.  It didn't.  So we just --
19      Q.   So --
20      A.   We just switched server companies for our
21   hosting.
22      Q.   And it would still just forward e-mails on,
23   even with a hundred employees to their --
24      A.   Yeah, that's when we moved a bunch of things
25   that were really expensive, you know, things that were
```
Page 167

**Page 168**

```
 1   not necessary as we....
 2      Q.   So when this lawsuit was filed, did you e-mail
 3   the various power.com members and ask them to preserve
 4   documents?
 5      A.   Did I e-mail?  I mean, you have my e-mails,
 6   so.  I mean, I don't -- I don't think there was a --
 7   there was no law -- there was no law -- there was a -- I
 8   mean, I -- I don't know what -- what -- what we said to
 9   them, but it would be -- it would be my -- everything is
10   in my e-mail.
11      Q.   Do you recall ever instructing the power.com
12   employees not to -- not to destroy documents?
13      A.   It's our standard policy no one -- not to
14   destroy documents.  No one's -- as far as I know, no
15   one's -- no one's taken any direct effort to destroy
16   documents.
17      Q.   Did -- but my question's really precise.  When
18   the litigation was filed did you send out a reminder to
19   tell anyone not to destroy documents?
20      A.   Which?  You mean the Facebook litigation?
21      Q.   Yeah.
22      A.   No, I didn't.
23      Q.   Okay.  And was there any particular reason why
24   you didn't do that?
25      A.   There was no -- it was just a standard --
```
Page 168

Page 169

```
1   standard litigation.  It was not -- it was a threat
2   actually.  It was not even a -- you know, it was just
3   a --
4       Q.   Okay.
5       A.   -- a claim.  It was not like some major thing
6   at that -- it was just one -- our -- it was not a part
7   of our business at that time.
8       Q.   Okay.
9       A.   Obviously later on it --
10      Q.   What about when the lawsuit was filed, did you
11  -- was there a particular reason why you didn't instruct
12  people to keep documents that were relevant because of
13  the fact that -- that the e-mails were going to their
14  personal e-mail accounts and there was no central
15  repository?
16      A.   No one asked us to.  It was not something that
17  we -- we had ever been through before.
18      Q.   Did you -- did you understand that -- that
19  when a lawsuit is reasonably anticipated, a party has an
20  obligation to take measures to preserve relevant
21  documents?
22      THE WITNESS:  No one --
23      MR. FISHER:  Objection.  Vague.  Assumes facts
24  not in evidence.
25      THE WITNESS:  As I said, I -- we -- whatever
```

Page 170

```
1   instructions were made, you have access to my e-mails.
2   And you -- you've seen if there are anything -- no one
3   has ever been instructed to destroy anything.  And as
4   far as I understand, everybody's, you know --
5       Q.   BY MR. CHATTERJEE:  Right.  My question's
6   different.  Not no one's been instructed to destroy.
7   Were people instructed to make sure that they preserved?
8       A.   No one -- I don't believe anyone was
9   instructed, you know, either way.  But if there's an
10  e-mail otherwise -- to the best of my recollection, no.
11      Q.   Was there a written corporate policy that
12  employees were given as part of training or otherwise
13  that said what you said earlier that people aren't
14  supposed to get rid of documents or e-mails?
15      A.   We -- there was some corporate policies.  And
16  I don't know if those -- I don't know what -- what --
17  what -- how formal they were.  There were corporate
18  policies when the -- when the company was in that stage.
19      Q.   Okay.
20      A.   But I don't know if there was something
21  specific on that issue.  No one -- none of us had ever
22  been through -- I don't think anyone's ever discussed a
23  lawsuit.  The lawsuit had never been part of that.
24      Q.   I'm not sure I'll ask this question artfully.
25  So people had a power.com e-mail address which would
```

Page 171

```
1   forward to their personal address?
2       A.   No.  I mean, there -- there was a server.
3   But, I mean, I say everyone -- how they accessed it was
4   in different ways.
5       Q.   Okay.  But that server, would it house the
6   e-mails that people received as part of the business or
7   would it just forward things on?
8       A.   I -- I don't know how it was exactly work.
9   But I believe that you, know, there was -- everyone had
10  a different way of accessing their -- their e-mails.
11  That's all I know.  And all the people -- like I -- I
12  accessed mine through Yahoo! and Eric would access
13  through, you know, his own.  Everybody accessed on their
14  own.
15      Q.   So if that server did have e-mails between
16  people at Power that didn't include you, that would be
17  on the backup?
18      A.   I mean, yeah, it would be on the backup.
19      Q.   Okay.  And if it isn't there, then --
20      A.   Yeah.  Whatever -- whatever we have is in the
21  backup.
22      Q.   Okay.
23      A.   I mean, I don't know the technical details on
24  how these things were -- were working, so.
25      Q.   And if -- is it Power's view that an -- an
```

Page 172

```
1   e-mail sent to a power.com employee that was then
2   forwarded to a personal account, who -- whose e-mail is
3   that?  Is that the employee's e-mail or is it Power's
4   e-mail?
5       MR. FISHER:  Objection.  Vague.  Calls for a
6   legal conclusion.
7       Q.   BY MR. CHATTERJEE:  Do you follow me?
8       A.   Yeah.
9       Q.   I can give you a concrete example.
10      A.   Yeah.
11      Q.   If Eric Santos e-mailed Bruno Carvalho with
12  some sort of business instruction --
13      A.   Yeah.
14      Q.   -- and it went to their personal e-mail --
15      A.   Yeah.
16      Q.   -- through the server architecture, who would
17  be the owner of that e-mail?
18      A.   Well, I'll --
19      MR. FISHER:  Same objections.
20      THE WITNESS:  I'll answer it another way that
21  -- more practically.  That we were a small company.  So
22  if I look at the ten people that I personally
23  communicated with most regularly and think about each of
24  them, you know, I mean, from a practical standpoint --
25  although this doesn't answer your question -- almost --
```

## Page 173

1 almost any e-mail, you know, there -- that all the

2 people that are involved in this situation have -- have

3 pretty much been -- you know, they're -- they're -- they

4 had -- they had their own solution.  So I don't know who

5 own.  I mean, we had -- if they had access.  If they

6 chose to copy one person in Power, then obvious -- it's

7 accessible.  And so that's from practical purposes

8 anything that was copied to me or anything that was

9 copied to Eric or -- or Rob or Zak or all these key

10 people that were in the company, you know, they were all

11 essentially preserved.

12    Q.  BY MR. CHATTERJEE:  Right.  But if -- let's --

13 let's say that -- that there was an e-mail that went to

14 a person's personal e-mail account through the

15 forwarding tool on the servers and it had a bunch of

16 power.com business information, was the employee who

17 received that e-mail free to go and use that information

18 however they wanted outside of Power?

19    MR. FISHER:  Objection.  Vague.  Calls for a

20 legal conclusion.  Incomplete hypothetical.

21    THE WITNESS:  In -- in theory, no.  I mean,

22 they're not supposed -- they -- they -- when they sign,

23 when they join the company, they sign saying that

24 everything -- their -- their employment contracts, which

25 I believe you've seen some, you know, have references

## Page 174

1 to, you know, ownership and data and everything else

2 that they state.  So there's a certain level of -- we're

3 probably not large enough to have implemented really

4 rigid, you know, well-defined systems at that level.

5 But, you know, we -- they were pretty -- the employment

6 contracts state, you know, we own -- we own all the

7 stuff.  The standard stuff that are in most employment

8 contracts.

9    Q.  BY MR. CHATTERJEE:  Okay.  Let's go to Exhibit

10 2 -- 203.  On the second page this is -- this is an

11 e-mail from you to a whole bunch of people that April

12 30th, 2009.

13    A.  Yep.

14    Q.  Do you see that?

15    A.  Yeah.

16    Q.  At the very bottom of the page there's number

17 5.  It says "Our new US Launch scheduled in July."

18    A.  Yeah.

19    Q.  What -- what was the US-based launch going to

20 be?

21    A.  We had -- we had considered, you know, just

22 making -- starting to more -- to more aggressively push

23 our -- the Power site.  And we had also talked about,

24 you know, potentially turning back -- Facebook back on,

25 which we decided not to do.

## Page 175

1    Q.  And when you say turning Facebook back on,

2 what do you mean?

3    A.  It means just turning back the same system

4 that was on for the month of December.

5    Q.  So that wouldn't be accessing through Facebook

6 Connect, it would --

7    A.  Facebook wouldn't allow us to access through

8 Connect.  They denied us that opportunity.  We tried --

9 as you know, did launch through Facebook Connect and

10 Facebook turned it off without reason and basically

11 tried to tie the case to our usage of Facebook Connect

12 and basically would not allow us to use it, despite our

13 best efforts.

14    Q.  So in -- as of July 2009, Power was

15 considering reactivating the -- the technology to access

16 the Facebook web site that it employed in December?

17    A.  We were considering all options.  Our -- as

18 you can see in our discussions, we were continuing to

19 try to figure out a way to use Facebook Connect.  Rob

20 and other people were having conversations with

21 Facebook.  But we had to keep running our business.  And

22 if there -- was not going to allow us to -- to do that,

23 then we had to -- you know, we -- we had considered the

24 other option.  Those were all on the table.  We didn't

25 end up doing that, but it was definitely something we

## Page 176

1 looked at, we kept as an option.  In addition to

2 launching with Facebook Connect, had Facebook allowed us

3 to do that while still, you know, resolving these

4 differences, something we tried previously also.

5    Q.  If you turn to the following page in -- in the

6 section 9, you state "We have already built the new

7 Power.com using Facebook connect."

8    Do you see that?

9    A.  Yes.

10    Q.  What was the new power.com?  How did it

11 differ?

12    A.  Well, in February as you -- as you -- in

13 February -- so to take you back on the history, just to

14 refresh our memories here and -- in December we had

15 extensive conversations with Facebook representatives

16 through -- and we had basically said that we were -- we

17 were willing to and would like -- we would be happy

18 to try launching with Facebook Connect, this is how much

19 time we need.  And then as we looked into it, we really

20 took it pretty seriously and worked throughout the month

21 of January.  And we voluntarily took the site off on

22 January 2nd or 3rd and continued to work diligently to

23 build the Facebook Connect solution.

24    And on -- and on I think it was, like, Feb --

25 first week of February, I don't know the exact date, we

1  turned on the Facebook Connect.  And it was actually
2  something we were -- we were really proud of internally,
3  because our guys accomplished a lot of things at that
4  time which we felt were really pushing -- you know, we
5  were able to get the -- the Power browser could work
6  with Facebook Connect.  We had a lot of cool
7  functionality.  It was missing a lot of key things, but
8  it was a step in the right direction.  And as -- as you
9  see in our e-mails, we had hoped that we could go back
10 to Facebook and say, hey, look, this is what we've done,
11 let's keep a dialogue and let's try this.  But obviously
12 those -- those conversations -- first they turned it off
13 and then second started to hold us, you know, hostage
14 against if you don't sign this or this or this we're not
15 going to let you run your business with Facebook
16 Connect.
17        So that's when we say we had already built it,
18 we had already gone through that effort in February and
19 built that whole solution with Facebook Connect.  So we
20 had hoped -- we had -- definitely were trying to -- to
21 turn back.  We had hoped one of the options was we would
22 find some common ground and we could turn the Facebook
23 Connect solution that we had built back on and continue
24 building on that.
25    Q.  So when you were talking about the additional

1  things that Facebook was asking, was that something
2  other than the Facebook Connect kind of developer
3  agreements and things like that?
4    A.  So -- so as you know, Power was -- one of the
5  keys things of our technology was we were able to build
6  apps on top of Facebook with or without the Facebook
7  Connect platform.  And we were able to build connections
8  to Facebook with or without Facebook Connect platform.
9  It was driven by user generated -- it was able to
10 providing access to that.  And that was the core of our
11 technology.  So for us, with whatever company we worked
12 with, we would always look at what was -- what was
13 available.  If it was limited in users, one of the
14 features, we would add additional functionality.  So in
15 the case of -- in the case of Facebook we basically --
16 at that time we didn't know which direction, you know,
17 things would go and we had to keep moving forward with
18 our company.  And....
19    Q.  Right.  My question was a little different.
20 You had referred to a number of things that Facebook was
21 asking for that created obstacles on Facebook.  The --
22 the -- the kind of adoption of Facebook Connect.  And
23 I'm -- I'm wondering what those things were.
24    A.  Well, I think -- I mean, at that time, I mean,
25 data -- data portability was one -- one functionality.

1  There were a range of functionality with our Power
2  browser that were not possible, so we were able to build
3  much more -- much more vibrant applications inside of
4  sites that were not possible with standard platforms
5  where we could access five other sites.  And it was --
6  they were -- they -- these are the kind of things that
7  made us grow inside Orkut so large.  We had built a wide
8  range of apps inside of Orkut, even without -- Orkut
9  didn't have an app platform, so Power had built Power
10 apps inside of Orkut.
11        And so we -- we were looking -- there were a
12 range of really innovative apps that we wanted to turn
13 on that would be -- benefit Facebook users.  And that
14 was kind -- that's what we were trying to discuss with
15 Facebook at that time is, hey, look, we -- let's figure
16 out ways to have -- have conversations.  And so that --
17 that was really -- we had a lot of -- lot of ideas on
18 cool apps for Facebook that were not possible.  I'm not
19 thinking offhand right now, but they were -- our browser
20 was one for one example.
21        At that time Facebook Connect, you know, was
22 very -- on other sites was very limited and integrations
23 with other sites.  We were able to provide much more
24 robust integrations with other sites and put Facebook
25 features on other sites.  So if a user and browser went

1  to another site, they could be using Facebook in ways
2  that were not yet available.
3        Obviously Facebook has continued to evolve and
4  add new functionality.  But even to this day there's
5  probably hundreds of cool things that we could offer
6  that were not -- because our technology had a different
7  -- it was just built differently.  So....
8    Q.  Okay.  So -- so let -- let -- let's start.
9  There was a lot in there.  So I want to break it down a
10 little.
11    A.  Yeah.  There was basically --
12    Q.  Hold on.
13    A.  Yeah.
14    Q.  Let me ask the question.
15    A.  Okay.
16    Q.  It's real important to let me ask the question
17 because --
18    A.  Please.  Go ahead.
19    Q.  Okay.  So you used the term integration.
20    A.  Yes.
21    Q.  Can you define that term for me?
22    A.  Yeah.  So integration for us is when we --
23 well, in the case of Facebook, it's -- it's the way that
24 the PowerScript and the Power browser and the other
25 Power other thing communicate with different sites.  So

1    we -- we basically look how do we -- how -- the -- how
2    does -- how does the -- the Power browser and you talk
3    to other sites.  How does the PowerScript talk to other
4    sites.  This is what -- what I mean by integration.
5        **Q.  So when you -- when you're talking about**
6    **integration, the -- the issue as I understand what**
7    **you're saying with respect to the Power browser was that**
8    **Facebook didn't like the way that the PowerScript**
9    **applications interacted with the Facebook web site and**
10   **user data?**
11       A.  Actually, I don't -- I don't know.  I can't
12   answer that.  All I know is that what Facebook said,
13   which is they -- they didn't want any other way to
14   access the site except -- they don't want users to
15   access their data or connect with Facebook in any other
16   way except through Facebook Connect.
17       **Q.  Okay.  And so --**
18       A.  That's what -- that's what I know.
19       **Q.  That's very helpful.  So -- and that was kind**
20   **of the show stopper for you?**
21       A.  Well, actually, no.  The show stopper at that
22   time, we -- despite our strong -- you know, despite our
23   disagreement and we -- we -- we -- we -- we continued to
24   work with Facebook.  We continually say you know what,
25   we're going to have to compromise a lot of great

                                        Page 181

1    functionality for our users, but in the -- in the
2    best -- as, you know, as -- in the best interests of
3    trying to make this work, we turned it off on the 2nd,
4    we continued to work, and we say no, we're going to do
5    the best we can with Facebook Connect even though we're
6    going to reduce a lot of functionality.  And then we'll
7    kind of see where it goes.  And so actually we were
8    willing to and in fact we did -- we did cooperate.
9    Unfortunately, once we turned that on, they turned it
10   off on us and prohibited us from launching --
11       **Q.  Right.**
12       A.  -- Facebook Connect.
13       **Q.  But you -- again, going back to your earlier**
14   **testimony, you said when Facebook was talking about**
15   **signing up with Facebook Connect, they were making a**
16   **number of other demands or requests about what Power**
17   **could or could not do.  I'm just trying to figure out --**
18       A.  Yeah.
19       **Q.  -- what are those things.**
20       A.  One of the things that Facebook asked, I
21   believe, was we want you to never -- we want you to
22   never be able to use your technology again that you --
23   you know, with -- you know, completely close off the
24   possibility of ever being able to use your technology.
25   Even if -- even if we cut you off on Facebook Connect,

                                        Page 182

1    again, which they had already done on us, you would --
2    you would basically -- you're making a statement that
3    you'll -- you'll be -- you're essentially being
4    completely reliant on -- so this was -- you probably can
5    see all the discussions on this.  But they wanted us to
6    sign a thing saying what we did was -- was wrong, which
7    obviously we -- we strongly believed that we had -- we
8    didn't do anything wrong in terms of, you know, what we
9    were doing.  And they wanted us to also, you know, state
10   that our technology was -- was wrong and we were doing
11   something wrong in terms of giving users access to their
12   data.
13       And finally, when -- in relation to accessing
14   -- if -- if -- if Facebook had ever turned Facebook
15   Connect off on us for any reason, they said, well, you
16   know, you're going to sign things you'll -- that you'll
17   never be able to use your technology that you have
18   spent, you know, years, you know, building and
19   innovating and creating huge restrictions for us.  Those
20   are some of the issues.  I believe there were other
21   issues, too.
22       **Q.  Okay.**
23       A.  In the -- in the contract that they -- they
24   had insisted.
25       **Q.  Okay.**

                                        Page 183

1        A.  You can look back at all the dialogues on
2    that.
3        **Q.  So let me -- let me cast it in a slightly**
4    **different way.  Power Ventures today, is it willing to**
5    **limit its access to the Facebook web site through**
6    **whatever channels Facebook authorizes?**
7        A.  I can't speak about that today.  Today, I
8    mean --
9        **Q.  Is the answer yes or no or I don't know?**
10       A.  I don't know.
11       **Q.  Okay.  And why don't you know as the person**
12   **who oversees the ownership of --**
13       A.  Because we don't have -- at this point our --
14   our strategy for the future is not clearly defined and
15   there's too many variables.  I mean, it really -- you
16   have to -- obviously you're familiar with the state
17   we're in right now and we're going through a
18   redefinition of our strategy.
19       **Q.  Okay.**
20       A.  This -- this e-mail was -- is several years
21   old.
22       **Q.  Right.  We'll -- we'll -- we'll get to more**
23   **e-mails.  But I just have a couple other small questions**
24   **about this one.  In -- on April 30th, 2009, you sent an**
25   **e-mail in this chain -- it's on the first page -- where**

                                        Page 184

1    you said "Nobody should respond to that email at this
2    time."
3        Why did you say that?
4    A.   What is it responding to?
5    Q.   It's -- so the underlying e-mail is the e-mail
6    to what appears to be a number of the investors and
7    employees of Power.
8    A.   Oh, okay.
9    Q.   And then right above it -- I don't know who
10   you sent it to.
11   A.   Oh, that was -- no.  I just said -- all I was
12   saying is that that e-mail was sent to Andreas and, you
13   know, it was just to give him an update.  You know, it's
14   -- there's no need for anyone to respond and -- respond
15   to that specific e-mail.  I copied a bunch of people
16   because I wanted them to see, you know -- my only
17   purpose there was I wanted these people to see our
18   communication with our -- with our investor to
19   understand what we were thinking.  And it was more of an
20   update rather than to be a discussion.  That was an
21   update e-mail not intended to be a, you know, ongoing
22   e-mail.  That was the reason.
23        MR. CHATTERJEE:  Okay.  Let's go to 204.
24        (Plaintiff's Exhibit No. 204 marked for
25          identification.)

Page 185

Page 187

Page 186





Page 189



Page 193



25   //

---

1   there, but I want to bring up the sensitivity to --
2   since you've had access to my personal e-mail box, you
3   know, in a pretty deep way.  And this is a -- very
4   sensitive issue, was a sensitive issue for me.  And, you
5   know, I just want to be -- want to bring that up and
6   caution us to kind of be clear what's very sensitive
7   with things that are not related to Power.
8        MR. CHATTERJEE:  Okay.  Let's mark this as the
9   next exhibit.  I think we're on 207.
10       (Plaintiff's Exhibit No. 207 marked for
11       identification.)
12       THE WITNESS:  Go ahead.
13   Q.   **BY MR. CHATTERJEE:  Okay.  Do you know what**
14   **Exhibit 207 is?**
15   A.   It looks like an employment contract offer to
16   Eric.
17   Q.   **So on October 8th, 2011, you had sent an**
18   **employment contract from Serendipity Ventures Brasil,**
19   **dash, OpenWeb to Eric Santos?**
20   A.   Correct.
21   Q.   **Okay.  Has he accepted employment to begin at**
22   **any point in time with Serendipity Ventures or OpenWeb?**
23   A.   We have not finalized any -- anything at this
24   point.  But I'm not even sure if that's relevant to
25   this.  But it's not something I have anything to hide

---

1        (Whereupon a break was taken from 2:28 to
2        2:40.)
3        THE VIDEOGRAPHER:  This begins videotape
4   number three in the continuing deposition of Power
5   Ventures, Inc.  The time is 2:40 p.m. on January 9th,
6   2012, and we're back on the record.
7        MR. FISHER:  Neel, before you go on, can we
8   designate the transcript just confidential pursuant to
9   the protective order?
10       MR. CHATTERJEE:  That's fine.
11       THE WITNESS:  Yeah.  I want to just also make
12   a comment.  Obviously I understand that you, you know,
13   tried to focus this conversation on the specific
14   elements of Power, but obviously a lot -- just like I
15   have a lot of things going on in my personal life,
16   sensitive, confidential projects, things that have
17   nothing to do with Power and its involvement.  I -- I
18   realize there's crossovers at times and references and
19   so you're -- both the strategies and everything
20   discussed here are extremely confidential ideas.  Plus
21   everything else that's not related to -- you know, to
22   Power and other investments, other things, I want to
23   make sure that, you know, these are extremely
24   confidential.
25       I'm happy -- it's not like there's any secrets

---

1   though.
2   Q.   **Are those negotiations still underway?**
3   A.   I mean, we've -- we continue to have an open
4   channel and conversations, but just we have not -- we
5   have not completed anything.
6   Q.   **Okay.  If you can turn to the -- the second**
7   **page of this e-mail.  Or it might be the third page**
8   **actually.  Third page of this e-mail string.**
9   A.   And by the way -- go ahead.
10   Q.   **On July 8th, 2011, you sent an e-mail to Mr.**
11   **Santos that I want to ask you some questions about.  Do**
12   **you see that?  Very bottom.**
13   A.   Yep.
14   Q.   **One of the things you say at the very last**
15   **sentence and continuing on to the next page is "Many of**
16   **the things we wanted to do with Power, we will now be**
17   **able to do inside Serendipity and of course, we will**
18   **still build the next generation of Power."**
19       **What did you mean when you made the reference**
20   **to being able to do inside of Serendipity?**
21   A.   I'm expecting to -- I definitely have interest
22   to invest a large amount of money into Power as a -- not
23   me, but me and other partners and investors.  So I'm
24   basically working with some venture groups right now.
25   And my -- I'm basically lining up investment round once

1  we've kind of clarified our strategy to invest pretty
2  aggressively in bringing back whatever new applications
3  we decide.  So that's part of the goal right now is to
4  -- you know, we're lining up investors.  And one of
5  those investors would likely be Serendipity.
6      **Q.   So my -- my question is really around the use**
7  **of the term inside Serendipity.**
8      A.   It just means -- it's just saying that
9  Serendipity would be one of the investors in -- in this
10 new round if we close -- if we put together a new round
11 for -- for Power in the future.
12     **Q.   So if you -- so -- this statement was meant to**
13 **mean that if you can line up investors for Power,**
14 **Serendipity would be an investor?**
15     A.   Well, Serendipity is -- would be probably one
16 of the anchor investors.  You know, that's one of -- our
17 intention is we've got a bunch of companies we're
18 vesting in, but this would be one of the companies that
19 we're definitely seriously evaluating to invest in.
20     **Q.   And as far as the offer to Eric Santos, he was**
21 **going to have a role in both Serendipity and Power**
22 **Ventures, correct?**
23     A.   Potentially, yeah, that would be correct.
24 I've -- I've, you know, offered him to participate with
25 our -- with our venture and to also contribute with

Page 201

1  resources of an outside group have anything to do with
2  how --
3      MR. FISHER:  Can we go off the record?
4      MR. CHATTERJEE:  Yeah.  Sure.
5      THE VIDEOGRAPHER:  We are going off the
6  record.  The time is 2:46 p.m.
7      (Whereupon a break was taken from 2:46 to
8      2:51.)
9      THE VIDEOGRAPHER:  We are back on the record.
10 The time is 2:51 p.m.
11     **Q.   BY MR. CHATTERJEE:  Mr. Vachani, is**
12 **Serendipity ventures making any use of Power Ventures'**
13 **technology as part of its efforts?**
14     A.   No.
15     THE VIDEOGRAPHER:  Your microphone, sir.
16     THE WITNESS:  Serendipity is not making use of
17 the technology, but Serendipity does have -- is a
18 shareholder in -- in Power.
19     **Q.   BY MR. CHATTERJEE:  Okay.  What is -- without**
20 **going into the detail of who the other owners of**
21 **Serendipity may be, what percentage of ownership do you**
22 **have in Serendipity?**
23     A.   It's a -- it's a -- it's a significant
24 ownership.  It's not --
25     **Q.   More than 75 percent?**

Page 203

1  Power.
2      **Q.   And -- and I'm still struggling with the use**
3  **of the term inside.  That sounds like it's something**
4  **that's part of Serendipity, not an investment.**
5      A.   Well, Serendipity is an investor incubator, so
6  it's providing -- it's helping.  It's providing, you
7  know, investment resources.  So it would be -- we were
8  deaf -- we haven't made an investment yet, but we're
9  definitely evaluating an investment, especially looking
10 at, you know -- looking at the strategies and the plans
11 and the team and the people.
12     **Q.   Other than you, does -- is there any other**
13 **person that -- that has invested in Serendipity?**
14     A.   Yeah.  Serendipity has many other people in
15 it.
16     **Q.   How many?**
17     A.   It's confidential.  It has nothing to do with
18 Power.
19     **Q.   How many?**
20     A.   Serendipity's -- I believe is completely --
21 it's confidential.
22     **Q.   We're under seal.  It's confidential.**
23     A.   I understand that but --
24     **Q.   How many?**
25     A.   Again, I don't see any reason why the

Page 202

1      A.   It's more than 50.
2      **Q.   Okay.  Somewhere between 50 and 60?**
3      A.   Again, I don't -- I don't know if that's
4  relevant, the numbers.  And they're -- they're changing,
5  but....
6      **Q.   Give me an estimate.**
7      A.   It's above 50.  I mean, it's I guess I don't
8  --
9      **Q.   Are any of the investors in Serendipity the**
10 **same as investors in Power Ventures other than you?**
11     A.   At this point, no.
12     **Q.   Why would you offer Mr. Santos an employment**
13 **contract where he'd be employed by both Serendipity**
14 **Ventures and OpenWeb?**
15     A.   Because Eric obviously has played -- played a
16 crucial role in building the Power technology.  And if
17 Serendipity is going to invest, I'd like to see, you
18 know, him apply his experience and knowledge there.  But
19 we also believe Eric's -- knowing Eric and having worked
20 with him for many years and believe that he has much
21 greater potential and capacity and would like to see him
22 also contribute to both -- you know, to both -- both
23 entities.
24     MR. CHATTERJEE:  Let's mark this as Exhibit
25 208.

Page 204

1       (Plaintiff's Exhibit No. 208 marked for
2       identification.)
3       BY MR. CHATTERJEE:  Mr. Vachani, what I've
4   handed you marked Exhibit 208 is an employment agreement
5   between Serendipity Ventures Brasil and I believe Eric
6   Santos.  Is that correct?
7       A.   That's correct.
8       Q.   And Serendipity Ventures Brasil was offering
9   Mr. Santos both the position as CTO of Serendipity
10  Ventures and as president and chief operating officer of
11  OpenWeb and PowerWeb Technologies.
12      A.   Correct.
13      Q.   And is OpenWeb, slash, PowerWeb Technologies
14  the same thing as Power Ventures?
15      A.   Right now that's a -- that's -- that's -- that
16  is the company that we -- we haven't created this
17  company.  But in the future we -- we intend to, you
18  know, consolidate, you know, everything in a -- in a
19  company like called PowerWeb Technologies.
20      Q.   And so when you -- when you wrote -- did you
21  -- did you authorize this document to be sent to Mr.
22  Santos?
23      A.   I did.
24      Q.   And when you wrote OpenWeb, slash, PowerWeb
25  Technologies, was it your intention to be referring to

Page 205

1   2011 --
2       A.   Yep.
3       Q.   -- you were offering him a position in a
4   company that did not yet exist?
5       A.   Correct.
6       Q.   And --
7       A.   Well, it's a --
8       Q.   But -- hold on.  But he was going to be an
9   employee of Serendipity Ventures Brasil?
10      A.   He would -- well, PowerWeb would exist when he
11  -- I mean, it exists.  It doesn't have any assets right
12  now.  But the intention in the future is if -- is to
13  bring Serendipity -- sorry -- to bring Power Ventures
14  from a Cayman company to become a US company and to
15  consolidate its -- you know, its technology.  That's --
16  that's the -- that's the current -- current plan.
17      Q.   And he would be -- he would be an employee of
18  Serendipity Ventures Brasil even though he had these
19  titles of this other company?
20      A.   Well, he would be working for both.  He would
21  be working for both companies.  And both companies would
22  contribute to, you know, his payment until -- until --
23      Q.   Who would he have the employment relationship
24  with?
25      A.   The employment relationship -- well, he would

Page 207

1   Power --
2       A.   Yeah.
3       Q.   -- Ventures?
4       A.   My intention is to -- to -- we're going to --
5   in the future -- obviously this is all speculation.
6   None of this has happened.  It's been conversations that
7   we hope to happen.  But our hope is to find -- to find a
8   way to consolidate the technology into a company that we
9   can, you know, build other applications and that we want
10  to get Eric to at least play a role at least in the
11  early stage to help -- help with that.
12      MR. FISHER:  Can you read the question back,
13  please.
14      (Whereupon the record was read as requested.)
15      THE WITNESS:  No, it wasn't -- it's not
16  intended to be.  Because Power Ventures at this point we
17  see that they're the future.  You know, we've -- we've
18  -- we've looked at the possibility of bringing the
19  company to the US.  As you know, the company is a Cayman
20  company.  And if we were to bring the company to the US,
21  this would be the name of the company that we were --
22  OpenWeb or PowerWeb Technologies still.  Which is why we
23  haven't -- haven't decided on a final name.
24      Q.   BY MR. CHATTERJEE:  Okay.  So when you sent
25  this offer letter to Mr. Santos on or about October 8th,

Page 206

1   -- in Power he would be reporting to me.  And in
2   Serendipity, you know, that's -- he would be working --
3   same -- the same thing.  At this point -- this is --
4   this is also contingent that Serendipity has a strong
5   interest to invest in Power.
6       Q.   Who would pay him?
7       A.   That hasn't been determined yet, but it would
8   be both.  Probably -- probably -- probably would be
9   Power.  Power.  Serendipity would probably pay -- you
10  know, probably would go together with an investment in
11  the company.
12      Q.   So it wouldn't be Serendipity that would be
13  paying him if he has his employment obligations to?
14      A.   At this point because of the fact that we --
15  this is all too -- there's nothing been finalized.  We
16  left it open.  This is a detail that has not been
17  finalized.
18      Q.   So if you look at this, it says "On behalf of
19  SERENDIPITY VENTURES BRASIL," "a Delaware limited
20  liability company --
21      A.   Yes.
22      Q.   -- (the 'Company')."
23      Do you see that?
24      A.   Yes.
25      Q.   Do you understand that the way this is drafted

Page 208

**Page 209**

```
 1    is that phrase company is referring to Serendipity
 2    Ventures Brasil?
 3       A.  Correct.
 4       Q.  Okay.  If you turn to the second page wherein
 5    section 2(a) Salary.
 6       A.  Yep.
 7       Q.  It says, "The Company shall pay you as
 8    compensation for your services an initial monthly salary
 9    at a gross rate of" US 11,000.
10       A.  Okay.
11       Q.  Do you see that?
12       A.  Yep.
13       Q.  Is it fair to say that this offer that was
14    sent to Mr. Santos had Serendipity Ventures Brasil, LLC
15    paying Mr. Santos $11,000 to be -- to have these various
16    roles in this agreement?
17       A.  Again, I said -- said that the intention is
18    for Serendipity to -- to -- to invest and take a greater
19    role.  Because these things are -- you know, it's a
20    startup, very early stage, and both companies
21    specifically --
22       Q.  Would you agree with my reading of what I just
23    led you through?
24       A.  Would I agree with your reading that?
25       Q.  Serendipity Ventures is the one on the hook
```

**Page 210**

```
 1    for paying him under this agreement.
 2       A.  I guess it would -- Serendipity, that would be
 3    the correct.  But....
 4       Q.  Okay.  Thank you.
 5       A.  Actually, again, I -- I -- I want to correct
 6    that.  They would be on the hook would be both
 7    companies.  But, you know, both companies are -- would
 8    be employing him.  But Serendipity Ventures is the
 9    company that's right now the entity that's --
10       Q.  Where in this agreement does it say that
11    anyone other than Serendipity Ventures Brasil would have
12    to pay Mr. Santos' salary?
13       A.  Again, this is -- this is a -- this is not a
14    signed agreement.  This is -- this is a theoretical
15    agreement and a structure that has not been formally
16    defined and has not even gone through, you know, the --
17    the lawyers to -- you know, to clean it up yet.  So it's
18    a hypothetical agreement that until we figure out --
19    until we figure out the proper structure, the proper
20    role, the proper terms, there is -- it's all
21    hypothetical.  So I don't -- I don't -- I mean, I --
22    that's -- again, I -- I -- I don't know what the final
23    structure is going to be.  We're still evaluating that.
24       MR. CHATTERJEE:  Okay.  Let's mark this as
25    Exhibit 209.
```

**Page 211**

```
 1       (Plaintiff's Exhibit No. 209 marked for
 2        identification.)
 3       THE WITNESS:  Okay.
 4       Q.  BY MR. CHATTERJEE:  Who is Chris Matchett?
 5       A.  He was an early, very early investor in the
 6    series A.
 7       Q.  Was he on the board of directors?
 8       A.  He was in the early pre up until -- in the
 9    early days, yeah.
10       Q.  Until about November --
11       A.  Until November.
12       Q.  2008?
13       A.  Yeah.
14       Q.  And who's Tara Newell?
15       A.  Tara Newell?  Where is?
16       Q.  She's cc'd.
17       A.  I don't know.  I'm assuming that's someone
18    that he cc'd.  I assume it's someone that's on his legal
19    -- his legal side.
20       Q.  Did -- so Mr. Matchett sent this e-mail
21    resigning from the board of directors of Power Ventures.
22    Did anyone ever talk him out of it?
23       A.  No.
24       Q.  So -- so he resigned?
25       A.  He resigned, yeah.
```

**Page 212**

```
 1       Q.  Okay.
 2       A.  He was an early -- early investor and didn't
 3    really affect the company in any way.
 4       Q.  Okay.  So in the e-mail on top there's a -- a
 5    reference -- one, two, three, four -- on the fifth
 6    paragraph down from Mr. Olson where he says "Perhaps I
 7    am wrong, but I believe" we'll "have a good idea whether
 8    the company will survive two or three weeks after the
 9    December 1st guerilla launch...."
10       A.  Yep.
11       Q.  Do you see that?
12       A.  Yes.
13       Q.  Do you have any idea what he was referring to
14    when he refers to the guerilla launch?
15       A.  Yeah.  He's referring to -- that's -- that's
16    the date that power.com formally launched as a company.
17    I mean publicly.  You see all the press releases.  And
18    that's where we made our first introduction of power.com
19    with media, press, etcetera, and introduced some of our
20    core for the power.com application.  So it was referring
21    to the -- the December 1st launch that we -- that was
22    well documented in the media.
23       Q.  So when -- when he says "...I believe" "we
24    will have a good idea whether the company will survive
25    two or three weeks after the December 1st guerilla
```

1  launch..." it really is a matter of how much attention
2  and usage Power is getting?  Is that --
3      A.   Well, I think it was just -- the point is
4  that, as you know, 2008, that was a very difficult time
5  for -- investors were all trying to figure out if they
6  were willing to -- they were all under their own issues
7  and challenges internally.  And many -- many, you know,
8  were trying to make their decisions on how to invest
9  their money in 2008.  Obviously it was a -- for many
10  investors, they put a freeze on investment.  And this
11  was just a -- I think a conversation.  He was basically
12  just saying, look, let's -- let's see how things
13  continue to go.
14      Q.   Okay.  Now, in this e-mail it refers to a
15  third resignation by the only remaining independent
16  board member.  I take it from that that Mr. Matchett was
17  the second resignation?
18      A.   Andreas and Chris I think resigned at the same
19  time.
20      Q.   They both resigned from the board?
21      A.   Yeah.
22      Q.   In November?
23      A.   And Simon was -- Simon -- Simon and -- Simon
24  and Andreas were both DFJ board members.  And so Simon
25  stayed on and -- and Andreas -- Andreas and Chris

Page  213

1  resigned to leave room for new people.  So Simon was
2  going to take a greater role at that time and Andreas
3  was going to take a lesser role.
4      Q.   Okay.  So you just stated that they left to
5  make room for more people.
6      A.   Well --
7      Q.   Mr. Matchett did not leave for that reason.
8      A.   No.  Mr. Matchett left -- well, he made room.
9  He left the company -- his disagreed -- we had
10  disagreements.  And so we obviously were intending to
11  bring new people on that can --
12      Q.   Right.  But his reason was not to leave the
13  board to make room for more people.  That's what the
14  e-mail says, correct?
15      A.   Well, he -- we -- I was already -- it was we.
16  But we were making room.  He was an early investor that
17  he didn't share the same opinions so we wanted to
18  bring new fresh -- fresh voices and faces on.
19      Q.   But he didn't say he was leaving --
20      A.   No, he didn't say he was leaving for that
21  reason, that's correct.
22      Q.   Did Mr. Stavropoulos say the reason he was
23  leaving the board was to make room for other people?
24      A.   Well, his -- his -- his -- Mr. Stavropoulos
25  left because he said that I believe that you need to --

Page  214

1  you know, this is going to be a tough time, this next
2  year, and you're going to need to -- you've got Simon
3  there, but it's probably better that, you know, you work
4  with Simon.  And you can -- and you -- let you make the
5  decisions that you feel are best for the company.  That
6  was -- that was when I started this turn where Andreas
7  left.  There were two board members from DFJ.  We
8  reduced it to one.
9      Q.   And originally DFJ had two.  Was that as part
10  of the terms of the investment or --
11      A.   No.  They -- well, we had the -- they had the
12  right -- there were two -- we had two -- two investors
13  from -- from DF -- from DFJ.  But it was only -- we had
14  done that -- we -- it was only one that was actually
15  the -- the right to.  But we had two.  And so he felt
16  Basically Simon was more involved with the company and
17  Simon was much more actively involved and also more --
18  was closer to the office.  So they felt that -- at that
19  point Simon's -- Simon felt it would be best for him to
20  be the -- the DFJ board member that was most directly
21  involved.  And that's -- and then at that point that's
22  when I started to seek out new -- new partners, brought
23  in -- brought in other people to the company.
24      Q.   Did there ever come a time when the entire
25  board resigned other than you?

Page  215

1      A.   Well, no.  Simon was on -- Simon was always on
2  the board.
3      Q.   Did there ever come a time when the entire
4  board resigned?
5      A.   When the entire board?
6      Q.   From Power Ventures.
7      A.   Well, I think when we -- when we did the
8  spinoff of the company in 2009 or -- or -- no.  What,
9  two thousand -- August -- August -- I guess it was 2009
10  when we --
11      Q.   When you refer to spinoff, what do you mean?
12      A.   When we had Cart Up and power.com split up.
13  And we basically made a deal with the series B investors
14  that they would -- that we would give them those assets
15  and we would maintain -- Power Ventures would maintain
16  the core power.com assets.  And at that point those --
17  the series B investors, those people basically dissolved
18  all ownership into power.com and took ownership of -- of
19  another technology we had built that was completely
20  inside of Power called Cart Up.
21      Q.   Okay.  Does Power Ventures have board members
22  today?
23      A.   Today Power Ventures has only -- I'm the only
24  board member of Power Ventures.
25      Q.   Okay.  And is it your testimony as you sit

Page  216

1    here today that all of the other board members who left
2    since December of 2008 left because of the spinoff of
3    Cart Up?
4        A.   No.  That was -- that was two years, almost a
5    year and a half later.  So in two thousand -- in 2008 we
6    had Simon and myself -- we had -- we had a three man --
7    we had -- we had a board of Simon, myself, Andreas, and
8    Chris.  Chris was something that, you know, we
9    actually -- at that point know -- you know, most people
10   felt was kind of dead weight for the company.  And there
11   was difference of opinion.  He was -- so he was -- he
12   left.  With DFJ we -- we basically --
13       Q.   When you say "opinion of the company," who
14   other than you?
15       A.   I think everybody in the company had -- had an
16   opinion of Chris that was -- you know, he had a lot of
17   conflict with a lot of DFJ early -- early -- with people
18   earlier.  But again, that -- this is subjective
19   opinions.
20       Q.   Okay.
21       A.   I don't know.
22       Q.   So -- so as of December 1, 2008, Chris
23   Matchett was no longer a board member, correct?
24       A.   That's correct.
25       Q.   And Andreas Stavropoulos was no longer a board

1    member?
2        A.   That's correct.
3        Q.   Okay.  Other than those two people, who are
4    the people that comprised the board of Power Ventures?
5        A.   Myself and Simon Olson.
6        Q.   Okay.  Esther Dyson was no longer involved?
7        A.   She -- she was never a board member.  She just
8    had a small -- a very small investment in the company.
9    She was -- she was never a board member.
10       Q.   Did Rob Pollock ever have a board position?
11       A.   Yes.  Later on he joined the board.
12       Q.   Anyone else other than him join the board?
13       A.   Let me see.  Yeah.  Later -- later on we had
14   Neil -- Neil Azous and Omar Amanat were different people
15   that were on the -- Omar A-m-a-n-a-t.  Those people
16   that also had roles on the board.
17       Q.   Okay.
18       A.   They were part of a series B investment that
19   we raised -- that we raised the following year.
20       Q.   And did Omar Amanat and Neil Azous join the
21   board of Cart Up after the spinoff?
22       A.   I don't know what they did with Cart Up.  But
23   they were part -- when we -- we made a deal where we
24   basically -- we -- we had -- you know, we had no
25   interest in -- you know, I had no interest in the Cart

1    Up technology.  We made a deal that they would take --
2    they would take -- they would spin off their -- their
3    own -- they would give up their ownership in the company
4    in the series B.  So series A stayed intact and --
5    and -- and said -- were given -- were given an
6    opportunity to either -- the series A investors were
7    given an option to either take Cart Up shares or take
8    Power.  And the series A decided to stay with Power and
9    the series B decided to -- to give up everything and
10   take the -- take the ownership in Cart Up.
11       Q.   Okay.  So Rob Pollock, Neil Azous, and Omar
12   Amanat --
13       A.   Yes.
14       Q.   -- joined the board after December 1, 2008?
15       A.   Correct.
16       Q.   And anyone else join the board after December
17   1, 2008?
18       A.   Let me just think.  So -- so as far as I can
19   remember substantially, there were no board -- there
20   were discussions of people to join the board, but none
21   of those -- had, like, things go around where we had
22   people that were going to be on the board, but those
23   were never -- you know, they were -- they were never
24   formalized in the minutes.
25            MR. CHATTERJEE:  Let's mark --

1            THE WITNESS:  When I say the board, just to be
2    clear, it means minutes that were formalized in Cayman
3    Islands.
4            MR. CHATTERJEE:  Let's mark this as Exhibit
5    210.
6            (Plaintiff's Exhibit No. 210 marked for
7             identification.)
8            THE WITNESS:  One last thing.  I don't know at
9    the end -- because I was not with the company, you know,
10   when -- when -- the last two months.  I don't know if
11   Zak was technically on the board for a few weeks or not.
12   But I don't think he was.
13       Q.   BY MR. CHATTERJEE:  Okay.  So what I've handed
14   you is an e-mail string between Rob Pollock, yourself,
15   Michael Ross, and Zak Mandhro.  Mr. Ross was never a
16   board member of Power Ventures?
17       A.   As far as I can remember, I don't believe he
18   was ever a board member.  He was just a shareholder.
19       Q.   In this e-mail Mr. Pollock says, "Obviously,"
20   the "events surrounding Omar eclipsed Esther, however
21   she made it very clear that she wishes no further
22   association with Power due to the suit."
23       A.   Uh-huh.
24       Q.   So do you know what events surrounding Omar
25   Mr. Pollock is referring to in this e-mail?

**Page 221**

```
 1      A.  Yeah.  He's referring to investment.  We
 2   were -- we were -- we were in the final days of closing
 3   an investment that was much needed at that time with
 4   Neel, DFJ, and Omar.  And so Omar -- and Omar was
 5   playing an active role in that.  So the investment
 6   was -- was what he was referring to, the series B
 7   investment.
 8      Q.  Okay.  And -- did you ever talk to Esther
 9   Dyson about this lawsuit?
10      A.  Yeah.  We had many conversations.  She had in
11   the early days tried to, you know, offer, you know,
12   her -- her help.  She -- it was a very sensitive issue
13   for her because she's -- she has a relationship with --
14   with everybody.  And she didn't really want to be caught
15   in the middle of any kind of lawsuit on any side.  And
16   so she made it clear that she -- beyond, you know,
17   giving some advice, she really didn't want to be -- you
18   know, she's a -- she's a -- as an industry insider and
19   has a relationship with Facebook, has a relationship
20   with many other companies, and she only had a small,
21   very small investment in this -- in Power, $100,000.
22   That, you know, it was -- it was -- it was not important
23   to her.  She would rather even give up her -- her
24   investment to not have to be, you know, associated.  So
25   she never -- beyond a few conversations she's -- I think
```

**Page 222**

```
 1   she made an introduction to someone at -- back at the
 2   December 30th, she -- of -- when the -- the month of the
 3   lawsuit was starting, I think she had -- she had
 4   expressed that, you know, she would like -- she would
 5   like to see -- in her opinion she would like to see it
 6   resolved easily.  But as she's not a major shareholder,
 7   a board member, advisor, or had no substantial interest
 8   in the company -- company, you know, her opinion was
 9   noted.
10          But obviously, you know -- and we -- and we
11   did make efforts at her request to try to have
12   conversations with Facebook.  And in some ways in the
13   early days she did help, you know, as we -- you know,
14   her opinion was valued.  But later on she kept -- she
15   kept out of it.
16      Q.  So there's a statement in here by Mr. Pollock.
17   Says "...she's not going to hesitate to make it
18   perfectly clear how she feels about Power's lawsuit."
19          Do you see that?
20      A.  Yep.
21      Q.  Do you have any understanding as to what he
22   meant when he said that?
23      A.  I think in her opinion was find a way to
24   settle it.  So she -- she really didn't want us to be --
25   you know, she didn't really want -- you know, Power or
```

**Page 223**

```
 1   -- she was less about Power.  She didn't really
 2   personally want to be involved in this lawsuit.  And so
 3   that was her -- her opinion, is that if I'm -- you know,
 4   if I'm there, just -- I really don't want to be
 5   associated with this lawsuit.
 6      Q.  Make it go away?
 7      A.  She said it was -- yeah, she -- make it go
 8   away or at least don't get me involved in it.  Because,
 9   you know, as I said, she's a very -- she's a neutral
10   person in the industry and she didn't want to be
11   associated with that.
12          MR. CHATTERJEE:  211.
13          (Plaintiff's Exhibit 211 marked for
14          identification.)
15          MR. FISHER:  Two documents, Neel?
16          MR. CHATTERJEE:  Yes.  It's two -- two -- two
17   different documents.  But let's use them as one.
18      Q.  BY MR. CHATTERJEE:  Mr. Vachani, after you've
19   looked at this, let me know what these -- these
20   documents are.  It's Exhibit 210 -- or 211.
21      A.  I have 211.  Did you give me -- 210 is the one
22   with Esther?
23      Q.  Yeah.  211, I mean.
24      A.  Yeah, 211.  Okay.  I'm looking at it.  You
25   want to talk about that?
```

**Page 224**

```
 1      Q.  Yeah.  So there's a first one talks about
 2   "Power.Com is a free service..." and the second document
 3   is entitled "Changes in system conditions and Terms of
 4   Use."
 5      A.  I don't have that one.  Oh, it's on the same
 6   document.  Yeah.  Okay.  Sorry.  I do have that.
 7      Q.  So if you go to the -- did you -- were you
 8   involved in the drafting of this document?
 9      A.  I didn't write it, but I -- I obviously --
10   I -- I'm pretty sure I read it and saw it.  You know, I
11   was usually copied on these things.  And I don't
12   remember -- I don't think I had --
13      Q.  So if you go -- if you go to the second page
14   there's a section entitled "Content and Use Policy"?
15      A.  Yep.
16      Q.  There's a section in the start of the second
17   paragraph that says "The use of Power.Com is forbidden
18   for any illegal or non-authorized purposes."
19      A.  Yep.
20      Q.  "You (the user) are the only one responsible
21   for your conduct and use of services, including all
22   content posted by you..." and listed a bunch of things.
23      A.  Yep.
24      Q.  And then it says "Any violation in the Terms
25   of Use of third-party sites, as well as any damage
```

1  caused to third" party sites "through using Power tools,
2  will be the sole responsibility of the user."  Do you
3  see that?
4       A.  Yes.
5       Q.  Do you know why that provision was -- was
6  added to the terms of use?
7       A.  I do not.  But it looks like a pretty standard
8  term though.
9       Q.  And there's also a statement that says
10  "Power.Com may, at any moment and with no obligation on
11  Power.Com's part, block access to any user whose conduct
12  we determine to be illegal, threatening, defamatory,
13  obscene, fraudulent or break these terms of use or
14  violate the intellectual property of third parties."
15       A.  Uh-huh.
16       Q.  Do you see that?
17       A.  Yes.
18       Q.  Do -- do you understand that to mean that
19  Power could disable the user's ability to access data
20  that they stored on the Power web site for any of those
21  reasons that are listed?
22       A.  Correct.
23       MR. FISHER:  Objection.  Vague.  Calls for a
24  legal conclusion.  The document speaks for itself.  Go
25  ahead.

Page  225

1       Q.  Do you know why that section was added to
2  terms of service?
3       A.  No.  It's lawyers obviously had -- lawyers put
4  it in there.
5       Q.  Was Power concerned at all that third parties
6  like Facebook might assert claims based upon its
7  business model and was trying to put the obligation on
8  its users instead of taking it on themselves?
9       A.  No, that was not -- I don't believe that was
10  the intention.
11       Q.  Okay.  And the next --
12       A.  I believe it was a standard -- standard legal
13  clause that, you know, just -- you know, typically in
14  terms and conditions are very far reaching and -- and
15  very thorough and explicit, which is true to many terms
16  and conditions.
17       Q.  Going back to the paragraph that I read you
18  from the second page about any violation of terms of
19  use, is that also this kind of standard provision that
20  you're talking about?
21       A.  Yeah.  We trusted our lawyers on this, on this
22  document.
23       Q.  So your testimony is the lawyers told you it
24  was a standard provision?
25       MR. FISHER:  Objection.  Argumentative.

Page  227

1       THE WITNESS:  Power -- of course.  Most sites,
2  I think, we -- we maintain the right to cancel accounts
3  for users that we felt --
4       Q.  BY MR. CHATTERJEE:  So the user would not --
5       A.  -- was involved in some kind of, you know,
6  illegal activity.
7       Q.  So if someone broke the terms of use that
8  Power had with them, Power reserved the right to disable
9  the data portability of the data stored on Power's web
10  site, correct?
11       A.  Power reserves -- always has the right, yeah.
12       Q.  Okay.  Go to the -- the last -- the second to
13  last page, there's a section "Exemption of
14  responsibility."  If you can, read the first and second
15  paragraphs.  Let me know when you're done.
16       A.  Okay.
17       Q.  Okay.  The first paragraph says "You agree to
18  exempt Power.com from any civil obligation or
19  responsibility arising from third parties that may be a
20  direct or indirect consequence of your usage of
21  Power.com, including all responsibility for complaints,
22  loss, damages, legal action, sentences, legal costs or
23  fees of any form."
24       Do you see that?
25       A.  Yes.

Page  226

1       THE WITNESS:  I don't know if they told me
2  that it was a standard provision.  But I didn't -- I
3  didn't write this.  But, you know, I have seen a lot of
4  terms and conditions.  And, you know, I'm not saying I'm
5  an expert on them but, you know, this seemed -- seemed
6  reasonable and, you know, seemed -- seems very standard
7  and reasonable.
8       Q.  BY MR. CHATTERJEE:  And the last paragraph on
9  the third page says "By logging in to our site the user
10  is agreeing to and accepting the conditions stated in
11  these Terms of Use."
12       Do you see that?
13       A.  Yes.
14       Q.  And was it Power's intention to require its
15  users to comply with the terms of service that -- that
16  it had with its users?
17       A.  The terms of service that we had with our
18  users?
19       Q.  Correct.
20       A.  No.  I -- I think as you can say that, you
21  know -- I mean, you can -- you can respond maybe this
22  way.  Sites, including Facebook, explicitly violate
23  terms and conditions of other sites and have done that
24  by scraping other sites for other years.  And does that
25  mean that Facebook is intending, you know, to violate --

Page  228

1    they violated terms and conditions.  Google has an
2    explicit clause that -- that -- that Facebook and many
3    other sites -- that Facebook has explicitly scraped data
4    from sites against their terms and conditions.  The fact
5    is these are -- this has been happening for years.  And
6    there's -- it's common sense that there's some things
7    that while there's no legal precedence or no legal laws
8    on these issues, including the issue of terms and
9    conditions, which I think there was already a ruling on
10   this, you know, in -- in our case itself about -- about
11   the terms and conditions, which I'm sure you're familiar
12   with.
13          Again, I think you're -- to try to get --
14   nitpick a terms and conditions that was written --
15   it was to be overarching and say naturally I think sites
16   historically use common sense and they -- they make
17   their own subjective decisions if they feel something --
18   you know, something -- that's -- that's -- each side has
19   that right.  And I believe Facebook -- you know,
20   obviously -- that doesn't make it right, but they have
21   the right to -- you know, Facebook has the right to, you
22   know, to cancel accounts of users if they want to cancel
23   accounts of users.
24       Q.   That's not my question, Mr. Vachani.
25       A.   What's your question?

Page 229

1    you a very specific question.
2       A.   And I've answered the question.  I've said to
3    you that --
4       Q.   I am going to have a meet and confer --
5       A.   -- that --
6       Q.   Mr. Vachani --
7       A.   Listen to me.
8       Q.   Wait.  I'm going to have a meet and confer
9    with your counsel at the end of today.
10      A.   Okay.
11      Q.   We are going to send a letter to Judge Spero,
12   okay, if we don't -- if you don't -- if you refuse to
13   answer my questions.  And I will ask him to either
14   appoint a special master or to have you sit in the
15   witness stand and answer my questions with him calling
16   the balls and strikes there.
17          Very simple question.  Did you ask Power users
18   to accept a terms of use restriction?
19          MR. FISHER:  Objection.
20          THE WITNESS:  I've already told you.
21          MR. FISHER:  Asked and answered.
22   Argumentative.
23          THE WITNESS:  I've already told you the
24   answer.
25      Q.   BY MR. CHATTERJEE:  Is it yes or no?

Page 231

1       Q.   In that paragraph --
2       A.   Yes.
3       Q.   -- did power.com intend to hold its users to a
4    terms of use by asking them to accept the conditions
5    stated in them?
6       A.   Well, we -- we have a terms -- we have a terms
7    and conditions.  To hold -- as I said --
8       Q.   You wanted them to comply, right?
9       A.   We wanted them to comply.  But we also like --
10   like Facebook, like Google, and others, there's common
11   sense put in -- there's common sense things that have no
12   legal precedent, that have not been defined, that are --
13   that are -- that are -- that are not easily -- they're
14   not -- don't have precedence yet.
15      Q.   Move to strike as nonresponsive.
16          Mr. Vachani, isn't it true that when you had
17   users on the power.com web site, you asked them to
18   accept obligations under a term of use?
19      A.   Okay.  I already answered this question.
20      Q.   Is the answer yes or no?
21      A.   I've answered the question.
22      Q.   Is the answer yes or no?
23      A.   Can you repeat what I said to him and -- and
24   strike that as my answer?
25      Q.   That's not an answer.  Mr. Vachani, I'm asking

Page 230

1       A.   I've already told you we have a terms and
2    conditions with our users.  I've also stated, for
3    further clarification if you did not hear me, that we --
4    we -- we also understand that every site, including
5    Power, when they have a terms and conditions it has --
6    has certain level of discretion and makes -- makes a
7    decision on -- on what to enforce.  And there's a
8    certain level of common sense.  The same way that
9    Facebook has specifically broken laws of other sites
10   with their users over the years and not canceled
11   accounts.
12      Q.   So if --
13      A.   On occasion.
14      Q.   So if the user breached the agreement, Power
15   would decide whether to exercise those rights or not,
16   right?
17      A.   That's correct.
18      Q.   And -- and you decided to take the law into
19   your own hands and decide for Facebook whether they'd --
20   they could assert their terms of service or not.
21      A.   Take the law?  What law?
22          MR. FISHER:  Objection.  Vague.
23          THE WITNESS:  What law --
24          MR. FISHER:  Argumentative.
25          THE WITNESS:  What law --

Page 232

## Page 233

1    MR. FISHER:  Assumes facts not in evidence.

2    THE WITNESS:  -- are you referring to?

3    MR. FISHER:  Incomplete hypothetical.

4    THE REPORTER:  Okay.  Whoa.  Whoa.  Whoa.

5  Everybody's talking over each other.

6    THE WITNESS:  What law are you referring to?

7    Q.  BY MR. CHATTERJEE:  Sure.  It's very simple.

8  There's a terms of service that you knew restricted the

9  user's ability in using the Facebook web site, correct?

10    MR. FISHER:  Assumes facts not in evidence.

11  Lacks --

12    THE WITNESS:  That's not the law.

13    MR. FISHER:  -- foundation.  Argumentative.

14    THE WITNESS:  Facebook terms and conditions is

15  not a law.  You're a lawyer.  You understand that.

16  Neel, come on.

17    MR. CHATTERJEE:  Go back and read the

18  question, Madam Court Reporter.

19    Answer my question, Mr. Vachani.  Not the

20  question you want to hear.

21    THE WITNESS:  I've said to you Facebook's

22  terms and conditions is not a law.  And you also are

23  familiar with the -- with the case that --

24    Q.  BY MR. CHATTERJEE:  Mr. Vachani, you are not

25  answering my question.

## Page 234

1    A.  What is your question?

2    MR. CHATTERJEE:  Could you read it back, Madam

3  Court Reporter.  Shall I ask it again?  It might be

4  simpler that way.

5    THE REPORTER:  Well, I can kind of piece it

6  together.  I mean, people are talking on top of each

7  other.

8    Q.  BY MR. CHATTERJEE:  Mr. Vachani, you knew the

9  Facebook terms of service did not allow users to access

10  the Facebook web site in the way that Power wanted to

11  access the web site, correct?

12    MR. FISHER:  Objection.  Assumes facts not in

13  evidence.  Lacks foundation.  Incomplete hypothetical.

14  Vague.  Calls for legal conclusion.

15    THE WITNESS:  I repeat what he said and I am

16  going to hold to that.

17    MR. CHATTERJEE:  Would you read the question

18  back, please.

19    (Whereupon the record was read as requested.)

20    THE WITNESS:  And I think I already answered

21  that question.  Do you want to read -- read when I

22  responded when he asked it the first time back?

23    Q.  BY MR. CHATTERJEE:  First time I asked the

24  question that way, Mr. Vachani.

25    A.  No.  But, well -- can you -- can you repeat

## Page 235

1  the answer I -- I made to my previous question back to

2  Neel?  The one that was asked differently?  Would you be

3  able to repeat that?

4    Q.  Why don't you answer my question.

5    A.  I'm asking her -- I'm asking if she can repeat

6  the answer.

7    Q.  I get to ask the questions here, Mr. Vachani.

8  Can you answer my question?

9    A.  And I get to also ask her to repeat it so I

10  can clarify what I said.

11    Q.  You can have her read my question --

12    So I would like -- I would like --

13    Q.  Mr. Vachani, it's my deposition.  I ask you

14  questions, you give answers.  That's the way this works.

15    A.  I gave an answer.  Okay?  And I'm asking -- I

16  also have the right to ask her to repeat what I just

17  said here.  So will you please just stay relaxed and let

18  me ask this -- let me ask her to repeat that.  And then

19  I will lis -- and then if appropriate I will -- I will

20  either repeat the same answer or I will -- I will make a

21  change.  Okay?

22    Q.  Can you answer my question or not?

23    A.  Yes.  But can I -- can I ask her to repeat

24  what she recorded from what I just said?  I have the

25  right to do that, don't I?

## Page 236

1    Q.  I'm going to ask you the question one more

2  time.

3    A.  But I --

4    Q.  No.  Mr. Vachani, you can either answer it or

5  you can't.  If you can't answer it, tell me you can't

6  answer it.

7    You knew that the Facebook terms of service

8  did not allow Power users to access the Facebook web

9  site in the way Power wanted to do it; isn't that right?

10    MR. FISHER:  Objection.  Assumes facts not in

11  evidence.  Lacks foundation.  Argumentative.  Vague.

12    THE WITNESS:  And I would like to -- once

13  again, I would like to ask you the previous question,

14  can you repeat my answer?  I -- I'm not answering your

15  question yet.  I'm asking her to repeat the answer I

16  made to your previous question which was similar.

17    MR. CHATTERJEE:  Okay.  Let's take a break.

18  Tim, we're doing our meet and confer right now.

19    THE VIDEOGRAPHER:  We are going off the

20  record.  The time is 3:28 p.m.

21    (Whereupon a break was taken from 3:28 to

22    3:37.)

23    THE VIDEOGRAPHER:  We are back on the record.

24  The time is 3:37 p.m.

25    THE WITNESS:  So I previously wanted -- I

1  asked if I -- if it was possible for her to read back my
2  answer so I could listen to what -- what she recorded
3  for the previous answer, which you were not satisfied
4  with, so I can hear it and -- and then think about your
5  question again.  Can I do that?
6        MR. CHATTERJEE:  Read my question back,
7  please, Madam Court Reporter.
8        THE WITNESS:  Not the question.  I've asked
9  her to read back --
10       **Q.   BY MR. CHATTERJEE:  The answer's no.  Answer**
11  **my question, Mr. Vachani.  Are you going to answer it or**
12  **not?**
13       A.   Let me ask a question.  I don't know who --
14  who creates the rules here.  I'm -- previously when I
15  had a question and I wanted to hear something, I was
16  allowed to.  How come I'm not allowed to now?
17       **Q.   The rules, Mr. Vachani, are very simple.  I**
18  **ask a question, you give an answer.**
19       A.   And I'm not -- I'm now allowed -- you're
20  saying that I am not allowed to ask her to repeat?
21       **Q.   You -- you will have a chance to review your**
22  **deposition afterwards and make any changes you think are**
23  **appropriate.  You've chosen not to do that with respect**
24  **your 2011 deposition, even though there are clear errors**
25  **in it.**

                                        Page 237

1  similar process where almost -- where -- where almost,
2  for example, Google has a clause that states in their
3  things that users cannot do it, but Facebook has
4  continued to do it.  And -- and I'll ignore these
5  things.
6        And I said about five minutes ago -- let me
7  finish, please.
8        **Q.   BY MR. CHATTERJEE:  Finish.**
9        A.   I said five minutes ago that terms and
10  conditions are created by -- by a site.  And the
11  decision -- the decision on -- on interpreting those
12  terms and conditions and how companies choose to respond
13  to their users have been and continue to be very
14  subjective.  Facebook has been very subjective, Power
15  has been very subjective, and there is no legal
16  precedent.  So we can have a discussion all day on this
17  issue.  But I've answered the question to you that I --
18  we are very familiar and have read Facebook terms and
19  conditions.
20       **Q.   Okay.  Let's step back.  You said you've read**
21  **Facebook's terms and conditions.  That was prior to**
22  **accessing the Facebook web site as pursuant to the**
23  **December 2008 launch, correct?**
24       A.   Yes.
25       **Q.   Did you believe under your reading of the**

                                        Page 239

1        **Madam Court Reporter, read my question back.**
2        **If you cannot answer it, you can so state.**
3  **And we will go to court and we will get answers to these**
4  **questions.**
5        A.   So you're -- so you're not going to let me
6  hear -- hear what I said even though you're telling me
7  what -- my answer was not appropriate.  And I'm saying
8  to you the reason that I would like to hear it is so
9  that I can understand what I said, what you said, and
10  then think about your question again.  But you -- you
11  irrationally not allowing me to.
12       **Q.   I'm not going to argue with you.  I'm here to**
13  **ask you questions.  You're here to give answers.**
14       **Madam Court Reporter, read the question back.**
15       **(Whereupon the record was read as requested.)**
16       THE WITNESS:  Okay.  And what I -- what I
17  think I've already said in my previous question -- and
18  I'll try to -- try to repeat it again is that we have
19  read the terms and conditions.  We're familiar with the
20  terms and conditions.  And we -- we -- we knew -- we
21  knew what were in the Facebook terms and conditions.
22       And if -- if you look at my previous
23  deposition we -- we -- what I said here and I'll repeat
24  it again.  What we concluded is that Facebook for years
25  built its entire company against the will, against a

                                        Page 238

1  terms and conditions of Facebook's web site that the
2  access that Power was engaging in was a violation of the
3  terms of service or was it allowed by the terms of
4  service?
5        MR. FISHER:  By "you," do you mean him in his
6  individual capacity now, Neel?
7        MR. CHATTERJEE:  I will start there.
8        THE WITNESS:  Do I believe in my individual
9  capacity that is a violation of what?  Of the Facebook
10  terms and service?
11       **Q.   BY MR. CHATTERJEE:  Yeah.  Let me state it a**
12  **different way.  Did you believe that the -- that the**
13  **terms of service of the Facebook agreement authorized**
14  **Power users to access the Facebook web site in the way**
15  **the Power system operated?**
16       MR. FISHER:  Objection.  Vague.  Calls for a
17  legal conclusion.  You may answer.
18       THE WITNESS:  And I think I've answered this
19  previously and today.  Is that as part of our analysis
20  we've looked at not only Facebook -- and this is -- I'm
21  not a lawyer and -- but I'm telling you, you asked me
22  personally.  In part of our analysis we looked at
23  Facebook's previous conduct in addressing this issue
24  with many other sites and their blatant violation of --
25  of terms of conditions on -- and exacting data, we

                                        Page 240

1  looked at the industry as a whole, and we saw no -- no
2  precedent for -- you know, on these issues and therefore
3  felt that if it was an issue, this is something that
4  would be determined -- and it has been determined by the
5  courts. Finally, I -- I believe --
6      Q.  BY MR. CHATTERJEE:  Okay.  There -- there
7  might be some confusion in my question.
8      A.  Okay.
9      Q.  I'm not asking about anything other than the
10  terms of service.  Just that standing alone.
11      A.  Okay.
12      Q.  Was there any concern in your mind when you
13  read that terms of service that the way Power wanted to
14  access the Facebook web site would be a violation of
15  Facebook's terms of service?
16      MR. FISHER:  Objection.  Vague.  Calls for a
17  legal conclusion.
18      THE WITNESS:  I would agree calls -- you're
19  asking for a legal conclusion that I'm not able to --
20      Q.  BY MR. CHATTERJEE:  I'm just asking you for
21  whether there was any concern in your mind, not whether
22  there's a legal violation.
23      A.  Concern is irrelevant.  You know, this is --
24  you're asking me --
25      Q.  Mr. Vachani, it is not a matter of you to

Page  241

1  answer it.  We're not going to waste time on that.
2      A.  I just want it for the record, I plead my
3  answer.  I said yes, I have answered it, and I have it
4  recorded --
5      MR. CHATTERJEE:  Let's mark that as the next
6  exhibit.
7      (Plaintiff's Exhibit No. 212 marked for
8       identification.)
9      THE WITNESS:  Okay.
10      Q.  BY MR. CHATTERJEE:  The document I've handed
11  you, Exhibit 212, is a series of e-mails between Bruno
12  Carvalho and yourself.  Also Eric Santos is on some of
13  these e-mails.  What is Digsby, D-i-g-s-b-y?
14      A.  Digsby was a site that aggregated messaging,
15  which I believe Facebook also very aggressively
16  threatened with legal action in many other ways and
17  later, you know, I guess came to some kind of
18  resolution.
19      Q.  Okay.  Let's -- let's use this as a question
20  and answer training moment.
21      A.  Okay.
22      Q.  I asked you what is Digsby.
23      A.  Okay.
24      Q.  What is Digsby?
25      A.  I believe it was an internet downloadable

Page  243

1  determine relevance or not.
2      Was there a concern in your mind or not?
3      A.  Was there a concern?
4      MR. FISHER:  Same objections.  Argumentative.
5      THE WITNESS:  I think our company's actions
6  speak for themselves.  Because, you know, I -- I was
7  the CEO of the company.  And the company -- the company
8  made a -- made a -- made a decision which I've already
9  articulated, testified, and -- and I've also -- we've
10  also had years -- we've had years of discussions on this
11  issue, we've had court rulings on this issue, and you
12  continue to ask the same question which I think we're --
13  we're -- you know --
14      Q.  BY MR. CHATTERJEE:  It's because you're not
15  listening to my question.  I'm going to move on.
16      A.  I am listening to my question.
17      Q.  You aren't.  We're going -- Mr. Vachani --
18      MR. FISHER:  There's no point in arguing about
19  this.  Go to the next question.
20      Q.  BY MR. CHATTERJEE:  -- we're going to go to
21  court over this.  We're going to have these questions
22  answered.
23      A.  Do you mind asking the question one more time?
24      Q.  You're not answering them now.  No.  I'm --
25  I'm done.  I've asked it ten times.  You don't want to

Page  242

1  application that the user downloaded that aggregated
2  messages.  Instant messaging across many sites.
3      Q.  Was it like Meebo?
4      A.  Like Meebo, but I think it had other
5  functionality and it was a downloadable application.
6      Q.  Why did you ask Mr. Santos to study exactly
7  how Digsby is doing what they do so you can learn from
8  them?
9      A.  It's common sense when you're -- when you're
10  looking at -- at making business decisions, you're
11  looking to see what's out in the industry, you -- you --
12  you look at the way that they are interacting with
13  sites, you make common sense decisions based on what's
14  happening, you know, and things that don't necessarily
15  have precedence.  You know, the best thing you can do is
16  look at -- you know, look at the previous interaction to
17  sites, look at how the -- look at if there have been
18  legal issues, look at if there have been court issues to
19  make a -- make a -- a standard -- standard business
20  decision.
21      Q.  Okay.
22      A.  So we were analyzing Digsby, along with many
23  other sites, because they had relationships with -- with
24  these companies.
25      Q.  The following sentence you say "Facebook is

Page  244

1    not blocking them."
2        Do you see that?
3    A.  Yes.
4    Q.  Now, this is prior to the launch of -- of the
5    Power web site, right?
6    A.  I believe actually the Power site was live
7    more or less -- I mean, I don't know what day, it was
8    29th or 30th.
9    Q.  Had it launched on Facebook yet?
10   A.  I believe it was lawn -- it was on Facebook.
11   Q.  Okay.  Was there --
12   A.  I believe it went live on Facebook around the
13   29th or 28th.
14   Q.  Was there a concern at this time that Facebook
15   might block Power?
16   A.  Anything is possible.  I mean, when you say
17   concern, it's just standard, anything's possible.
18   Facebook could -- Facebook obviously had a history of --
19   of very aggressively bullying companies to -- around
20   different issues and every issue was on the table.  So
21   we wanted to understand -- you know, try to learn.  And
22   we say -- we saw that Digsby offered something and it
23   was working on Facebook.  And, you know, it -- it's a
24   part of our decision making.  We see that they're
25   offered in aggregated messaging, they're accessing

Page 245

1    without Facebook Connect at that time.  They didn't have
2    any Facebook Connect.  They were accessing -- doing
3    features that were not possible on Facebook Connect.
4        So we -- we were wondering how -- how -- how
5    does this company Digsby do that.  So may -- obviously,
6    you know, there -- they -- there may be other -- there
7    may be many different ways.  Obviously we're not the
8    only company out there that's accessing Facebook.  We
9    later found out that -- that Digsby may or -- you know,
10   did -- did have their own issues with -- with -- with
11   Facebook.  And they -- they -- they -- they had some
12   kind of -- I don't know what the final resolution was.
13   Q.  There was some resolution?
14   A.  Yeah, there was some resolution.
15   Q.  And but is it fair to say that while you may
16   have had many, many concerns, one of your concerns was
17   that Facebook may try and block Power from doing what
18   they were doing?
19   A.  I think I told you in the beginning that when
20   we started this company, we -- we -- we -- everything we
21   were doing it had no precedence.  Everything we were
22   doing with the user's relationship -- I mean no specific
23   precedence.  So the best that we could do is the same
24   thing that lawyers often do and CEOs do is look at --
25   look at precedence, look at actions on previous sites,

Page 246

1    look at Facebook's history over the years and make --
2    make business decisions.  And make -- you know, we --
3    we're not lawyers, but we -- we -- we consult and in
4    some occasions we consult our lawyers.  And we made a
5    business decision that this is -- you know, we're --
6    that we're not doing anything wrong here and we continue
7    to believe that we did nothing wrong.
8    Q.  And the business decision was to make sure
9    that you could avoid being blocked?
10   A.  It was not to avoid being blocked.
11       MR. FISHER:  Objection.  Assumes facts not in
12   evidence.
13       THE WITNESS:  The business decision --
14       MR. FISHER:  Lacks foundation.  Argumentative.
15       THE WITNESS:  -- was -- was how we're going to
16   launch the functionality to our users.  That was the
17   business decision.
18   Q.  BY MR. CHATTERJEE:  Okay.  Had you launched
19   now at the time this e-mail was sent?
20   A.  I believe we were live on that day, but I'm
21   not a hundred percent sure.
22   Q.  And why did you write the phrase "Facebook is
23   not blocking them"?
24   A.  Because we -- we were -- we were analyzing
25   that.  These guys launched something on there and

Page 247

1    Facebook's not blocking them.  So obviously it -- it
2    seems to be something that is acceptable, you know.
3    Q.  Right.  So you were concerned that there might
4    be other circumstances where Facebook would block
5    something?
6    A.  No.  We've seen history that Facebook had
7    very, very irrationally and, you know, threatened
8    companies.  It doesn't make it right.  Just because
9    Facebook has been irrational in the past or bullied
10   around companies or pushed things that did not have
11   legal precedence or in fact were wrong, doesn't make --
12   it doesn't make it right.  So the fact --
13   Q.  You're not a lawyer.
14   A.  I'm not a lawyer.
15   Q.  So don't talk about legal precedence.  Okay?
16   A.  Well, I can -- I can read legal precedence and
17   I can read decisions --
18   Q.  Okay.  So are you going to offer a legal
19   opinion on the terms of service or not?
20   A.  I'm not -- I'm not going to offer a legal
21   opinion.
22   Q.  Okay.  So let's not talk about that issue.
23   A.  Okay.  Then we don't have to.
24   Q.  Okay.  If you're not -- are you here to offer
25   legal opinions?

Page 248

1   A.  I'm not here to offer legal opinions.
2   Q.  Okay.  So don't go into legal precedence --
3   A.  Okay.
4   Q.  -- because that has nothing to do with your
5   testimony.
6   A.  Okay.
7   Q.  Okay?  Now, you noticed that Digsby was not
8   being blocked by Facebook, correct?
9   A.  Correct.
10  Q.  And you wanted to know why, correct?
11  A.  Yeah.
12  Q.  Your -- one of your concerns, among many
13  concerns that may have been the case, was that Facebook
14  might block you.  Whether or not it was rational or not,
15  you were worried about that?
16  A.  It's -- it's in the realm of possibilities.
17  Q.  And you were worried that Facebook might --
18  pardon me.  Let me start.
19      You were worried that Facebook might not like
20  what power.com was doing or was enabling its users to
21  do, right?
22  A.  As I said -- worry is probably not the right
23  word.  As I said that in the past exporting contacts is
24  something that nobody has ever, you know, liked when it
25  was they're the ones receiving it.  But it's some --

Page 249

1   it's standard practice for years.  And so just because
2   we're evaluating what sites are doing or not, it's --
3   it's just -- it's just that.  It's just that.  It's just
4   evaluating.  To say that I'm worried or not worried --
5   you know, I'm making standard business decisions looking
6   at what's out there.  And I'm not a lawyer.  I get legal
7   advice.
8   Q.  Okay.
9   A.  But -- and we did have legal advice on this
10  issue.
11  Q.  So if you go to the first sentence in that
12  paragraph you say "we might need to also work with
13  facebook terms and conditions to do this."
14      Do you see that?
15  A.  Yes.
16  Q.  What did you mean when you wrote that?
17  A.  I'm saying that Facebook has the terms and
18  conditions which we've already acknowledged that we're
19  familiar with.  And so if -- you know, while -- while
20  those things are vague and ambiguous and very extensive
21  and not -- and not -- and everybody -- and very
22  subjectively enforced when it's appropriate, it's like I
23  said previously, as a business we analyze everything
24  before making a business decision of what -- you know,
25  of what to do.  You know, that we made -- and we -- and

Page 250

1   we anal -- we analyzed the Facebook terms and
2   conditions.
3   Q.  Okay.  So the business decision when you're
4   talking about that, the business decision associated
5   with terms of use is really whether -- when you were
6   talking about your own web site Power --
7   A.  Yeah.
8   Q.  -- was really a matter of is it in the
9   business interest to enforce their terms of use or not?
10  A.  Is --
11      MR. FISHER:  Objection.  Vague.
12      THE WITNESS:  Is it in Facebook's business
13  interest to enforce?
14  Q.  BY MR. CHATTERJEE:  No.  No.  With respect --
15  -- you were talking about -- you kind of had two
16  concepts.
17  A.  Okay.
18  Q.  One is about what Facebook may do with its
19  terms of service and then the other is -- is what Power
20  might do with its terms of service.  I'm focused on what
21  Power might do.
22  A.  Okay.
23  Q.  Whether or not to enforce those terms of
24  service against, for example, Power users is a business
25  decision, right?

Page 251

1   A.  To enforce?
2   Q.  The terms of use that you have --
3   A.  Of Facebook?
4   Q.  No.  With Power users.  Power against Power
5   users.  Whether to enforce those terms of service.
6   A.  Which -- which terms of service?
7   Q.  Power's.
8   A.  I think I was referring to Facebook's terms of
9   service here.
10  Q.  Okay.
11  A.  Not Power's terms of service.
12  Q.  Put the document down.
13  A.  Okay.
14  Q.  You had a terms -- Power Ventures had a terms
15  of service --
16  A.  Yes.
17  Q.  -- with its users.
18  A.  Yes, we did.
19  Q.  Those users may breach that agreement, in
20  other words not comply with it.
21  A.  It's -- yes.
22      MR. FISHER:  Objection.  Lacks foundation.
23  Q.  BY MR. CHATTERJEE:  And whether Power would
24  want to do something about that or not would be a
25  business decision.

Page 252

1     A.   Well, first of all, whether they breached it
2   is a -- whether they're breaching it is a very
3   subjective issue and an issue that, you know, has first
4   to be decided.
5     Q.   I -- I understand that.
6     A.   Yeah.
7     Q.   But -- but whether or not Power would want to
8   try and assert its rights or not would be a business
9   decision if it felt there was a violation.
10     MR. FISHER:  Objection.  Assumes --
11     THE WITNESS:  If they --
12     THE REPORTER:  Let -- sorry.
13     THE WITNESS:  Sorry.  Go ahead.
14     THE REPORTER:  I'm sorry.
15     THE WITNESS:  Go ahead.
16     THE REPORTER:  Thank you.
17     MR. FISHER:  Lacks foundation.  Assumes facts
18   not in evidence.  Incomplete hypothetical.
19     THE WITNESS:  Okay.  So I will -- let me --
20   let me answer that.  I will try to answer that question
21   for you.  So the -- as I said, terms and conditions
22   exist.  And rules exist in stores and every -- common
23   sense that there are rules which stores, web sites,
24   etcetera, choose to enforce and there are rules they
25   don't.  You know, that's just common sense.

Page 253

1   conclusion.  Vague.
2     THE WITNESS:  And -- and -- and selectively
3   does that when it's appropriate and when they want to.
4     Q.   BY MR. CHATTERJEE:  Right.  You don't disagree
5   with that premise?
6     A.   I don't disagree with that, that a site -- and
7   I also don't disagree that it's -- that it's against the
8   law for -- for -- if a user chooses to enter a site --
9   and I think, in fact, we've had -- already had some kind
10   of legal precedent on this in our own case on this
11   issue.  That's already been discussed and, you know,
12   some decisions have been made by the court.
13     MR. CHATTERJEE:  This has been previously
14   marked as Niehaus Exhibit 146.  Just to keep clarity of
15   record, let's also mark it as Exhibit 213 to this
16   deposition.
17     (Plaintiff's Exhibit No. 213 marked for
18     identification.)
19     Q.   BY MR. CHATTERJEE:  Actually, before we -- we
20   get to that, I'll -- I'll turn back to it.  I just -- I
21   had one question for you that I want to make sure I ask
22   Mr. Vachani, that I've been forgetting to ask.  I'm
23   going to refer to the 100 by 100 by 100 campaign.
24     A.   Sure.
25     Q.   You know what I'm referring to?

Page 255

1     Q.   BY MR. CHATTERJEE:  And everyone's going to
2   choose which ones are important to them, right?
3     MR. FISHER:  Objection.  Vague.
4     THE WITNESS:  Every site -- every site has the
5   right to -- to choose -- choose that.
6     Q.   BY MR. CHATTERJEE:  Okay.  Is it -- is it
7   Power Ventures' position that Facebook doesn't have the
8   ability to choose which of its terms of service rights
9   it chooses to enforce?
10     THE WITNESS:  No.
11     MR. FISHER:  Objection.  Calls for
12   speculation.
13     THE WITNESS:  They -- they -- Facebook has the
14   right to do anything they want on their own site.
15     Q.   BY MR. CHATTERJEE:  What about with respect to
16   its terms of service?
17     A.   Yeah, face -- of course.  Facebook wants to,
18   you know, punish their users or punish -- punish their
19   users, they have the right to punish their users.  In
20   fact, they do disable accounts, you know, whenever --
21   on -- on many issues.
22     Q.   And Facebook, just like -- just like Power,
23   Facebook has the right to limit the authorization of
24   access to the web site, right?
25     MR. FISHER:  Objection.  Calls for legal

Page 254

1     A.   Yes, I do.
2     Q.   Did Power offer financial incentives to its
3   users to try and promote the Power web site by sending
4   event notices on Facebook?
5     MR. FISHER:  Objection.  Vague.  Assumes facts
6   be in evidence.  Lacks foundation.
7     THE WITNESS:  By sending event notices?
8     Q.   BY MR. CHATTERJEE:  Those event listings.
9     A.   What Power offered -- the specific offer was
10   if you generate 100 new users to Power, that's -- you
11   know, you -- you will -- you will -- you will be
12   rewarded.  You will -- it was a -- it was a -- it was a
13   promotion.
14     Q.   Was that a financial incentive?
15     MR. FISHER:  Objection.  Vague.
16     THE WITNESS:  I think it -- our -- our reward
17   was you get a hundred dollars.  So I believe that --
18   that's -- that's a financial incentive.
19     Q.   BY MR. CHATTERJEE:  Okay.  All right.  Let's
20   go to this Exhibit 213 which is also Niehaus 146.  This
21   is a press release that was sent out December 1, 2008.
22   Was this sent out in conjunction with the -- the launch
23   of power.com?
24     A.   The PR launch, yes.
25     Q.   Okay.  At the bottom of the first page it says

Page 256

1   "'Although Power is significantly'" access -- pardon me.
2   It says "'Although Power is significantly accelerating
3   this imminent evolution'" towards "'a borderless
4   internet, we are preserving the essence of these sites'
5   terms of use by giving users rightful control of their
6   own content and friends.'"
7         Do you see that?
8   A.   Yes.
9   Q.   Did you author this document?
10  A.   This was authored by I believe our PR agency
11  Ed Niehaus.
12  Q.   Did you review it and approve it?
13  A.   I did.
14  Q.   Did you have any contribution to the sentence
15  that I just read?
16  A.   I didn't.  But I -- I -- I -- I agree
17  with the sentence.
18  Q.   What -- do you know -- do you understand what
19  was meant by the statement "...we are preserving the
20  essence of these sites' terms of use by giving users
21  rightful control of their own content and friends"?
22        MR. FISHER:  Calls for speculation.
23        THE WITNESS:  Yeah, I tell you what I -- what
24  -- what -- what we feel.  Facebook, among with many
25  other sites, have -- you can call it hypocritically or

Page 257

1   the terms of use said.
2   A.   No.  So what -- this is a -- this is a
3   marketing statement, not a legal statement.  And the
4   word essence is a very vague statement and I think it
5   should be left at that and not tried to be viewed in any
6   way reference to the legal -- legal terms and other
7   issues.
8   Q.   What in the -- in the sites' terms of use
9   indicated that people weren't going to try and protect
10  their borders?
11  A.   Well, I think that across -- the -- the
12  biggest precedent that we have -- there's many other
13  issues.  But the biggest precedent referred to is
14  accessing and importing data.  A practice that seems to
15  be, you know, very -- it's a big part of data
16  portability and access to data.  We've seen that
17  happening across the entire internet for eight years,
18  seen Facebook applying that and never having any issue
19  and seeing Facebook make statements that users control
20  and own their own data.
21  Q.   And you don't know how Facebook does that,
22  right?  You don't know whether they have agreements with
23  other peer -- people or not?
24  A.   Actually, I do -- I do know.  I do know how
25  they started.  I know for the first few years that they

Page 259

1   have continued to make statements that support the
2   rights for users to own and control their own data.
3   And, in fact, it's widely and commonly expected across
4   the entire industry.  And so it's -- it was expected and
5   not only that, there are -- I think Facebook is even
6   members of data portability groups that have strong
7   statements about these rights.
8         And so the fact that Facebook has made -- has
9   made and continues to make, you know, such strong public
10  statements and the rest of the industry about the
11  ability to access data and also based on the fact that
12  we saw that Facebook for years had -- had -- had
13  authored -- had given tools to their own users to scrape
14  sites, get their own data, we -- we basically believe --
15  when we say the essence, the essence is that.  Is that
16  obviously there are no legal precedence on this issue.
17        But we -- we made -- we concluded that
18  Facebook and others, you know, seem to be in support of
19  the overall right of -- of users have access to their
20  own data.
21  Q.   BY MR. CHATTERJEE:  Right.  So the thing that
22  confused me was the use of that term terms of use in
23  there.  Because what I hear you saying is you're talking
24  about things that you felt were public statements by the
25  company that were maybe inconsistent with what you felt

Page 258

1   had no -- they -- they didn't have agreements.  And over
2   the years as they became larger and they -- they -- and
3   other companies, they have built some.
4         At times Facebook has even come -- Facebook
5   representatives have come to Power asking us to use
6   their exporting tools.  I don't know if you're familiar
7   with this.  But Facebook representatives historically
8   have -- have actually come to Power and asked us to help
9   them export users from Orkut in the -- in the past.
10  This is -- you know, there are -- there are -- these --
11  these are issues that you got to -- you got to
12  understand that we've seen Facebook doing, we -- we've
13  seen -- we -- we made a common sense decision based on
14  public statements, based on actual actions, but there is
15  no legal precedence on this issue.
16  Q.   Who from Facebook met with you?
17  A.   It was the -- Julio Vasconcellos who was
18  the -- who was Brazil manager for Facebook at one point
19  approached -- approached us and -- and asked us about
20  building an exporter to export contacts from Orkut.
21  Q.   And who is the "us"?
22  A.   Eric.
23  Q.   Eric Santos?
24  A.   Yes.
25  Q.   Did they meet with you or with him?

Page 260

67 (Pages 257 to 260)

1    A.   He -- he -- he approached Eric and Eric passed
2    that -- that request on to me.
3    Q.   Okay.
4    A.   And said that they've -- they've shown
5    interest in.
6    Q.   So the knowledge of what happened between Mr.
7    Santos and Mr. Vasconcellos is just based upon what Mr.
8    Santos told you?
9    A.   I believe there's an e-mail.  I'm not sure,
10   but there -- there may have been an e-mail on this
11   issue.  But....
12   Q.   It would be an e-mail from Mr. Santos to you?
13   A.   I believe -- I don't know what kind of --
14   how -- how the communication took place, but I'd -- I'd
15   be happy -- I can check.
16   Q.   Okay.
17   A.   But back to this issue --
18   Q.   And when was -- when was that -- when was that
19   discussion?
20   A.   This is about a year and a half or two years
21   ago.
22   Q.   In 2009?
23   A.   I don't know the exact time.  This person is
24   no longer with Facebook.
25   Q.   Okay.

Page 261

1    you're basically referring to this concept of people not
2    exercising those rights?
3    A.   Yeah.  And we're also -- not only exercising.
4    You're -- remember here -- we're not referring -- you
5    tend -- you tend to sort of always look at Facebook as
6    the center of everything.  We -- we -- we at this time,
7    especially at this time, we were working with many sites
8    and we had never had a problem with these -- you know,
9    with -- that were like -- like the problem with
10   Facebook, you know, at this level of legal issue.
11   Usually they're common sense issues that were discussed.
12   And we were allowed to continue because the essence is
13   that of most sites, you know, that are publicly stated
14   is that users do have the right to own and control their
15   data, to access their data, and most sites are not going
16   to stop that.
17   Q.   Okay.  So let me probe into that a little bit.
18   What other web sites, if any, have tried to block Power
19   from being able to access their web sites?
20   A.   To block or to -- well, there's different
21   discussions.  So we've had -- once we had a conversation
22   with Myspace.  And Myspace's issue was very different.
23   Myspace had no issue of users being able to access their
24   data.  They -- they wanted it -- they wanted us to -- to
25   work out -- say, you know, ways that they -- that we --

Page 263

1    A.   But back to your question is --
2    Q.   Well, let me -- let me -- the way this works
3    is I ask a question and you give an answer.
4    A.   Go ahead.  Please.
5    Q.   Going back to the statement "we are
6    preserving" these sites' -- "the essence of these sites'
7    terms of use."
8         So would you agree with me that most terms of
9    use generally forbid taking data off of one place and
10   exporting it to someplace else?
11        MR. FISHER:  Objection.  Vague.  Calls for
12   speculation.
13        THE WITNESS:  Every site's terms of use are
14   different.  I believe that there are -- many of the
15   major sites have clauses on this and also have -- have
16   chosen to interpret to not -- when it comes to data
17   portability, exporting contacts and user-generated
18   activities, most sites -- except for Facebook -- have
19   chosen to -- that to not -- not to believe that that's
20   in any way threatening or harming them.  I think
21   Facebook is the only company --
22   Q.   BY MR. CHATTERJEE:  Right.
23   A.   -- that we've seen that has done this.
24   Q.   When you're making -- when you're making this
25   reference to "the essence of these sites' terms of use,"

Page 262

1    that we could -- that we found that were mutually --
2    mutually agreeable and we actually were able to --
3    Q.   Okay.  You testified about that earlier.  You
4    had a discussion with Myspace.  Who else?
5    A.   We had discussions on data portability,
6    but with Twitter.  And with Twitter the issue was
7    actually different.  They just wanted to understand --
8    have -- ask questions about -- about the site to
9    understand how we worked.  Because we were a new company
10   to them and they -- they -- they had -- they had a range
11   of questions.  And I'm happy to talk further about the
12   Twitter --
13   Q.   Did Orkut ever block you?
14   A.   Orkut never -- we had an issue with Orkut.
15   Q.   It was a simple question.  Did Orkut ever
16   block you?
17   A.   Did Orkut ever block us?  I -- I don't know if
18   they ever blocked us --
19   Q.   Did hi5 ever block you?
20   A.   Hi5 never blocked us.  We had conversations
21   with hi5 and then were allowed to continue doing --
22   doing that.  And we worked on solutions.
23   Q.   How about Bebo?
24   A.   Bebo, no.  Not that I know of for Bebo.  I
25   want to clarify that each -- each company the -- when

Page 264

68  (Pages 261 to 264)

1    they have an issue, they approached us directly and we
2    had conversations and we solved them like -- like
3    civilized companies.
4           MR. CHATTERJEE:  Let's mark this as Exhibit
5    214.
6           (Plaintiff's Exhibit No. 214 marked for
7           identification.)
8    Q.    BY MR. CHATTERJEE:  Mr. Vachani, what I've
9    handed you is an e-mail from Andre Fernandes to Eric
10   Santos dated May 22nd, 2009.  Do you see that?
11   A.    Yes.
12   Q.    Okay.  Go ahead and read the e-mail and let me
13   know when you're done.
14   A.    Sure.  Here is the detail --
15   Q.    Read it -- read it -- read it quietly to
16   yourself and when you're done we can talk about it.
17   A.    Okay.  I've read it.
18   Q.    Okay.  Is it -- is it fair to say that that
19   sentence -- that's written in Portuguese, correct?
20   A.    Yes.
21   Q.    Is it fair to say that that second sentence
22   properly translated reads Amazon has been increasing in
23   recent months due to blockage Orkut of our IPs?
24   A.    Yeah.  So let me clarify this issue.  The
25   Orkut blocking issues were very different than other

Page 265

1    know, their issues were usually relating to how do you
2    store pass -- user names and passwords and these kind of
3    issues.  Which we had issues with Orkut in the early
4    days.  They wanted to know how -- you know, they wanted
5    to make sure that we were not a fishing site, for
6    example.  And that's a different issue when -- and
7    Twitter, in fact, had the same issue.  And hi5.
8           But once they understood that we were a
9    legitimate site that had a relationship with our users,
10   that we were not in the business of fishing or any kind
11   of illegal activities, they -- they changed their
12   issues.  But typically those were the kind of issues
13   that we had that were relating to making sure that we're
14   not a -- you know, we're not a fishing site.
15          MR. CHATTERJEE:  Let's mark this as the next
16   exhibit.
17          (Plaintiff's Exhibit No. 215 marked for
18          identification.)
19          THE WITNESS:  Okay.  Go ahead.
20   Q.    BY MR. CHATTERJEE:  What I've handed you is an
21   e-mail from Eric Santos to you as well as your response
22   dated January 7th, 2009.  Do you see that?
23   A.    Okay.
24   Q.    And hi5, according to this e-mail, was in fact
25   blocking Power's IPs, correct?

Page 267

1    issues.  These -- or -- Google has had -- had
2    standard -- had standard issues relating to increase of
3    too many -- this is generalized rules, not against or --
4    against Power specifically.  When you have too many
5    people accessing from a specific IP address, they had --
6    they had rules that -- that caught the blocking spiders,
7    blocking everything.  So these are generalized rules.
8    They were not Orkut Power-specific blocking.
9    Q.    I -- I understand that.
10   A.    So I want to clarify --
11   Q.    But my question before was very simple.
12   A.    Yeah.
13   Q.    Did -- did Power ever get blocked by Orkut?
14   The answer to that is yes, right?
15   A.    And I answered -- what I answered to you is I
16   said our issues with Orkut were different.  They were --
17   they were -- they were different in nature.  We had
18   issues, but they were -- they were -- they were resolved
19   and we had conversations and we had solutions for them.
20   Q.    Okay.  And the blockage was because of the way
21   that Google's system operates?
22   A.    As far as we understood it, the way they
23   operated -- and we had conversations with the people and
24   they -- most every other site except for Facebook, we
25   had -- we had conversations.  Sometimes they made -- you

Page 266

1    A.    As I said, that we did -- we did have an issue
2    with hi5 which we resolved with them.  They wanted us
3    to -- they wanted us to use, you know, solutions.  They
4    gave us solutions on how to -- on how to access the site
5    and we -- and we worked with them.
6    Q.    I understand that.  But hi5 was blocking the
7    IP access?
8    A.    They had -- they had a moment when they were
9    blocking, yes.
10   Q.    And the -- the decision that was made
11   originally while you were talking with them was to start
12   using these external proxies that would dynamically
13   change the IP addresses, correct?
14   A.    Well, that's where our system naturally --
15   when -- whenever there -- it -- it encountered it was
16   unable to access a site, it would -- it would rotate
17   prox -- rotate these I -- these I -- these IPs.
18   Q.    So I have a question about that actually.
19   A.    Yeah.
20   Q.    So in -- in the second sentence here that's
21   written in -- in Mr. Santos' e-mail, it says -- I can't
22   even -- I don't know how to pronounce it, but it says
23   "Vamos comecar a utilizar proxies externos com eles."
24   You'll have the document.
25          THE REPORTER:  Okay.

Page 268

**Page 269**

```
 1       Q.   BY MR. CHATTERJEE:  And isn't -- isn't that
 2    basically saying let's start by using the external
 3    proxies quickly?
 4       A.   What he's basically saying is that the IPs are
 5    not working so our -- it's already -- it's already
 6    happened.  It's already automatically.  Whenever the
 7    system happened, it's using -- like it's basically
 8    saying it's -- it's our proxy system -- our external
 9    proxy system is in place and it's -- it's rotating IPs.
10       Q.   So our translation doesn't quite say it that
11    way.
12       A.   Okay.
13       Q.   Our translation says that it says let's start
14    using the external proxies.
15       A.   Yeah.
16       Q.   And the reason I'm curious about that is if it
17    were an automated process, why would someone such as the
18    chief technology officer have to actually issue an
19    instruction to start using it?
20       A.   And the reason is that we actually had a
21    conversation with -- I believe with -- with -- if I'm
22    not mistaken, we had a conversation with hi5.  And they
23    -- the question is do we want to -- how do we want to
24    engage in this conversation with -- with the company.
25    And we -- we -- as we have always done, we've made every
```

**Page 270**

```
 1    effort to engage the companies and find the solution.
 2    And, you know, as -- although we -- you know, because we
 3    know what -- we believe in what we're doing is -- is --
 4    is right and correct, but we -- we understand that they
 5    need -- they want -- they have questions.
 6       Q.   I -- I -- I understand that.
 7       A.   Yeah.
 8       Q.   But -- but then it would seem to me the
 9    question would be should I -- should I stop this from
10    happening.  Because the way -- just the way I've heard
11    you talking about this dynamic IP thing is it's an
12    automated process.  Is that fair, that it's an automated
13    --
14       A.   Every system.  We have -- we still have the
15    right to turn on or off.  I mean, that's a -- that's
16    a -- that's a reality.
17       Q.   Right.  And -- and here --
18       A.   But we -- but this is a standard feature
19    that's built into our system.
20       Q.   Right.  And here --
21       A.   An external proxy.
22       Q.   -- he's giving an instruction to turn it on.
23       A.   He's asking -- he's basically --
24           MR. FISHER:  Document speaks for itself.
25           THE WITNESS:  Because we -- we had -- we had a
```

**Page 271**

```
 1    conversation, he was -- he's wanted to know if -- if it
 2    was happening.  But they have -- they have the ability
 3    to turn it off or turn it on.  I mean, that's a -- any
 4    feature in a technical system you can turn on or off.
 5       Q.   BY MR. CHATTERJEE:  Was there ever any
 6    discussion about turning -- turning it -- turning it off
 7    first?
 8           MR. FISHER:  Objection.  Vague.
 9           THE WITNESS:  Again, I -- I -- I don't
10    remember -- I remember that -- that we were having --
11    that we were having -- as you can see here, hi5 -- I
12    said hi5 and my spice (verbatim) want us to implement
13    oauth.  So there was already an active discussion with
14    them on this issue.  And even -- even their issue was
15    like it was -- it was -- there was a -- there was an
16    open channel of communication with the company at the
17    time of this.  So it's a very different issue than with
18    Facebook which refused to have conversations with --
19    with -- with product managers or technical or anybody at
20    Facebook to try to find resolution.  You know, every
21    single other company, we -- we were able to have
22    discussions with real people at the company, find real
23    solutions.
24           MR. CHATTERJEE:  Move -- move to strike as
25    nonresponsive.
```

**Page 272**

```
 1       Q.   It's a very, very simple question.
 2       A.   Okay.
 3       Q.   When you were accessing hi5 --
 4       A.   Yes.
 5       Q.   -- was that default that did this dynamic
 6    proxy thing, was it on or off?
 7       A.   I don't know if it was on or off.
 8       Q.   Okay.
 9       A.   I believe that -- I believe that because we
10    were having discussions with them and we were -- he was
11    aware that we were in active discussions, you know, he
12    said look, do you -- you know, whether it was
13    specifically on or off, that's -- I don't know.  But I
14    think he was really trying to say should we allow the
15    system to do this.  You know, should we like keep --
16    should we do this.  I don't know technically what --
17    what that day if it was on or off.
18       Q.   Okay.  So is it your testimony that what he
19    was saying here was not an instruction to start using
20    the external rotating proxies?
21       A.   I think that I had asked him at that time to
22    be sensitive to this issue.  We were -- I said, you
23    know, I think it's better to be -- let's have a
24    conversation so don't -- so I think he was basically
25    saying that since there's a conversation going on, I --
```

1  he didn't -- he didn't necessarily allow it to just
2  automatically do it.  He wanted to make sure that it was
3  okay, you know, to -- to turn it -- to keep it -- keep
4  it going.  And I told them that, you know, it's -- it's
5  our general --
6      **Q.   Was Mr. Santos asking you a question in this**
7  **e-mail?**
8      A.   He wasn't ask -- I don't know if he -- it says
9  let's -- let's -- it's not -- it's not a question mark
10  there.
11     **Q.   So he wasn't asking a question, he was telling**
12  **you this is what we're going to do?**
13     A.   I think he's saying this is what -- this is
14  what's happening.  But he's obviously telling me so if I
15  have an issue -- I have an issue to respond to it.
16     **Q.   What does "vamos" mean in Portuguese?**
17     A.   Is let's.  The literal translation is let's,
18  let's start.
19     **Q.   Let's start using external proxies with them.**
20     A.   But the understanding of this in this context
21  here is that I under -- I mean, what I understand is I
22  know you're in a conversation with people -- and I know
23  this is a sensitive issue -- because, you know, there
24  was already an active conversation with Facebook that
25  had become very sensitive -- so based on that -- that

1      **Q.   Okay.  And what does a production manager do?**
2      A.   She was helping oversee the production of
3  products.
4      **Q.   And in this e-mail dated April 24, 2009,**
5  **Juliane is -- is informing the three of you that Orkut**
6  **has blocked Power's IP.**
7      A.   Correct.
8      **Q.   Okay.  And then the second sentence that she**
9  **puts forward is that we are working to put the proxy on**
10  **Amazon.  Right?**
11     A.   That's correct.
12     **Q.   And Amazon is a web-based service that has**
13  **dynamically rotating IPs?**
14     A.   We had a -- we had a solution on -- on Amazon
15  that -- we had different -- different levels of
16  solutions and were standard IPs and different --
17  different IP rotating banks.  This was part of our
18  solution and was already in place for a long time.
19     **Q.   And Amazon was one of those rotating IP**
20  **things?**
21     A.   Amazon was one of the places that -- that
22  rotated IPs, correct.
23     **Q.   Okay.  Was that actually implemented?**
24     A.   It was I think -- that solution was already --
25  already in place.  But I think, as you know, at this

1  issue, that it was -- it was practice at that point
2  to -- to -- to talk to me and say, you know, look, you
3  know, we -- we have this issue with Facebook which was
4  well documented.  You know, how do you want to deal with
5  these other sites.  And our -- our general rule, which
6  was the same with Orkut in the early days, was let's --
7  let's keep an open channel, let's try to address every
8  concern, let's be -- and let's find through solutions as
9  we always did.
10     MR. CHATTERJEE:  Okay.  Let's go to the next
11  document.
12     (Plaintiff's Exhibit No. 216 marked for
13     identification.)
14     **Q.   BY MR. CHATTERJEE:  Exhibit 216 is an e-mail**
15  **from you -- form Juliane Conceicao to Eric Santos, you,**
16  **and Bruno Carvalho.**
17     A.   Yeah.
18     **Q.   Who is Ms. Conceicao?**
19     A.   Juliane was a --
20     **Q.   Hold on.  Hold on.  We've got to make sure the**
21  **court reporter gets it down.**
22     A.   Sorry.  Sorry.
23     **Q.   It's C-o-n-c-e-i-c-a-o.  Who is -- I'm going**
24  **to refer to her as Juliane, if that's all right.**
25     A.   Okay.  She was a production manager.

1  time -- even at this point we had been -- we had already
2  been on Orkut for two years, been through the
3  standard -- standard issues on their servers that turn
4  on -- every time Orkut -- Go Google would create new
5  rules in general for their site, you know, the system --
6  you know, occasionally there would be systems that have
7  to update.  But they -- we were one of -- we had
8  millions of users inside of Orkut and had a -- you know,
9  a relationship two years back.  So this is -- this kind
10  of solution -- usually the system just try -- you know,
11  turned on these different protocols or we --
12     **Q.   Let me just ask a general question.**
13     A.   Yeah.
14     **Q.   Why is it that web sites will block IP**
15  **addresses?  To the extent you know.**
16     A.   So typically --
17     MR. FISHER:  Objection.  Vague.  Calls for
18  speculation.  Assumes facts not in evidence.  Lacks
19  foundation.
20     THE WITNESS:  Typically the main reason for --
21  is that when there are too much access from a specific
22  IP address, the system have automatic detection systems
23  that think it might be -- might be actually some kind
24  of, like, hacking system or DOS attack or some other
25  type of, you know, thing that causes -- that causes

**Page 277**

```
 1   damage.  Not a standard site.  And that's usually the
 2   case.  Or if a site is not familiar with a site, they --
 3   they usually want to understand is this -- is this site
 4   a legitimate site.  And as -- what -- we've been through
 5   that issue many times with many different sites over the
 6   previous two years.
 7        Q.  BY MR. CHATTERJEE:  I know I've asked this
 8   before.  I just want to make sure that I -- I have a
 9   clear record on it.  Do you remember when approximately
10   the accesses to the Facebook web site started?
11        A.  It was I think I said the last two, three days
12   of November I believe.
13        Q.  So 29th, 30th?
14        A.  Something like that, yes.
15            MR. CHATTERJEE:  Okay.  Mark this as the next
16   exhibit.
17            (Plaintiff's Exhibit No. 217 marked for
18            identification.)
19            THE WITNESS:  I don't know the exact.  It was
20   within the last week of November.
21        Q.  BY MR. CHATTERJEE:  So, Mr. Vachani, this is a
22   document 217 is an e-mail from Eric Santos to you dated
23   December 2, 2008.  Approximately three or four days
24   after the launch promotion began.
25        A.  Yep.
```

**Page 278**

```
 1        Q.  Could you translate that second sentence for
 2   me?
 3        A.  Sure.  I will prepare for a possible block on
 4   the part of Facebook.
 5        Q.  What did you understand that to mean?
 6        A.  I believe that, as we've talked about
 7   previously, we understand that it's possible that
 8   Facebook, you know, may -- may -- either their system
 9   automatically -- or obviously because at this point
10   we had also received a -- you know -- in other words,
11   there could be -- they could take actions to -- to try
12   to block -- to try to block Power.  So I think that was
13   -- that was what he was saying.
14        Q.  Was -- was there any particular reason that
15   Mr. Santos and you didn't prepare for that before
16   launching the -- the hundred by hundred by hundred
17   campaign?
18        A.  Well, we have many -- we have many things --
19   standard things in place.  But if they're -- I think
20   he's saying, well, we don't really know what.  We had
21   received a -- you know, a letter from Facebook I think
22   that day or the day before on December 1st or December
23   2nd.  I'm not sure if this was, you know, known before
24   or after that.  I think it was -- it might have been -- I
25   think we may have received it on December 1st, if I'm
```

**Page 279**

```
 1   not mistaken.  I don't even know the issue.  But the
 2   main thing is we -- we -- we didn't know what -- we
 3   didn't really know what Facebook's reaction would be.
 4        Q.  All right.  So if I understand you correctly,
 5   by this point in time you had reviewed Facebook's terms
 6   of service and you may have received a cease and desist
 7   letter from Facebook?
 8        A.  I think it was either this day or the day
 9   after.  I'm not a hundred percent sure what day it was.
10        Q.  And around that time frame Mr. Santos stated
11   he'll prepare for a possible block by Facebook?
12        A.  Oh, he was -- he was trying to evaluate the
13   systems if -- if our -- if our system is unable to
14   access Facebook
15        Q.  Was there any doubt in your mind when he said
16   that that Facebook was considering or may block Power
17   from accessing the Facebook web site in the way that it
18   did?
19            MR. FISHER:  Objection.  Vague.
20            THE WITNESS:  Obviously -- obviously they --
21   they had sent a -- a legal -- a legal threat.  They had
22   sent a legal threat.  So, I mean, there -- there --
23   there were definitely, you know, possibilities.
24        Q.  BY MR. CHATTERJEE:  So you knew that they
25   didn't feel that Power was authorized to be accessing
```

**Page 280**

```
 1   Facebook in the way that Power was doing?
 2        A.  We knew that Facebook had -- Facebook had
 3   expressed, you know, their opinion that they -- that's
 4   correct.
 5            MR. CHATTERJEE:  We're getting to an easier
 6   part for a little while.  218.
 7            (Plaintiff's Exhibit No. 218 marked for
 8            identification.)
 9            THE WITNESS:  Okay.
10        Q.  BY MR. CHATTERJEE:  Okay.  The document I've
11   given you as Exhibit 218, what -- what is this document,
12   Mr. Vachani?
13        A.  What is this document?  This is a -- looks
14   like -- this looks like an e-mail from Facebook.
15        Q.  This is an e-mail that you received?
16        A.  This e-mail that I received.  I don't know if
17   this was a test e-mail or if this was from -- you know,
18   from Facebook.  I don't know that.  But it looks like it
19   was from Facebook.
20        Q.  And it was to you?
21        A.  Yep.
22        Q.  And then the subject line has "Ghostday
23   Leandro Abreu," A-b-r-e-u.
24        A.  Yeah.  This is an e-mail from Facebook.
25        Q.  And Leandro Abreu was -- we -- we talked about
```

1   him earlier today.

2       A.   Yeah.  Leandro Abreu.

3       Q.   And was he a Power employee?

4       A.   He was a programmer at Power.

5       Q.   Okay.  And this was an e-mail that you

6   received?

7       A.   This -- this is an e-mail I received.

8   Correct.

9       Q.   Okay.  And this is an -- was this e-mail sent

10  to you because an event had been listed on Mr. Abreu's

11  page?

12      A.   Yeah, this event most was -- was most likely

13  where Leandro manually went into Facebook.  He manually

14  created an event because -- based on the date.  He

15  manually created an event and, you know, I think --

16  that's -- on that date.

17      Q.   Do you know why he manually created the event?

18      A.   I don't believe we were operating on face --

19           THE REPORTER:  I'm sorry.  What was your

20  objection?

21           MR. FISHER:  Calls for speculation.

22           THE WITNESS:  On March 20th we were not

23  operating on Facebook.  So therefore, you know, this was

24  a -- you know, he would have -- he would have probably

25  manually created -- the group was still active.  There

Page 281

---

1   was still groups active on Facebook for creating this.

2   So he probably just went there and -- and created -- and

3   created an event.

4       Q.   BY MR. CHATTERJEE:  Do you know why he created

5   it?

6       A.   I don't.

7            MR. FISHER:  Calls for speculation.

8       Q.   BY MR. CHATTERJEE:  It lists the host as

9   Power.

10      A.   Yep.

11      Q.   Do you have any idea why it listed the host as

12  Power?

13           MR. FISHER:  Same objection.

14           THE WITNESS:  Because Power -- Power created

15  this event.  I mean, this was an event hosted by Power.

16  As you know, this was our whole thing, bring a new

17  friends, hundred bucks, that was -- that was an event

18  going -- that was a promotion and -- going on there.

19      Q.   BY MR. CHATTERJEE:  But other than the date

20  that's listed here, this -- this promotion language

21  that's used here is the same as what was put in the

22  events --

23      A.   This is the same -- same -- this is the same

24  language, correct, that -- for our -- for our previous

25  events that when users wanted to promote the -- the

Page 282

---

1   hundred hundred hundred campaign.

2       Q.   This occurred after Facebook had deactivated

3   Power from accessing -- or had blocked Power from

4   accessing the -- the Facebook web site?

5       A.   This occurred after Power's -- Power as a

6   company and Power's, you know, script-based systems were

7   -- were -- where we -- where we chose to take them off.

8       Q.   And had -- was Mr. Abreu employed by Power at

9   the time that this was posted?

10      A.   Yeah, I think he -- this was obviously posted

11  by him manually.  He must have went there and --

12      Q.   Are you aware of anyone else other than Mr.

13  Abreu posting a similar event notification after Power

14  stopped accessing the Facebook web site?

15      A.   It was not illegal to -- for users to go

16  create events.

17      Q.   I'm -- I'm -- I'm not -- that's not the

18  question I'm asking you.

19      A.   So I -- I -- I'm assuming that the group --

20  the group was still active.  If -- any e-mails that I

21  would have received, you would have already seen in my

22  e-mail box.

23      Q.   I -- I understand that.

24      A.   So --

25      Q.   My question is very different from that, Mr.

Page 283

---

1   Vachani.  Are you aware of any other Power employees

2   posting something like this after Power stopped

3   accessing the web site?

4       A.   I don't -- I -- I'm not -- I'm not aware.  But

5   I also -- if -- if there are e-mails in my box, then I

6   would have received it.  Somebody -- since the group was

7   active and Facebook -- you know, the group was a fully

8   valid group on Facebook, anybody was allowed to go

9   manually there and -- and -- and -- and, you know,

10  create an event.

11      Q.   Was the launch promotion, this hundred by

12  hundred by hundred campaign still active on March 12th

13  two thousand --

14      A.   Oh, yeah.  It had not -- it was a Power

15  promotion.  So it was going on on Orkut and other sites.

16      Q.   How long did it go on?

17      A.   I believe it was a hundred days.  So it was

18  more or less this was probably -- this was probably

19  around the final date.  And I'm guessing that, you know,

20  he probably, you know, went there.  So there was no

21  issue for -- whatsoever on users going to go create a

22  group on -- on Facebook.  In fact, you know, it was

23  fully valid thing to do, had nothing to do with our

24  scripts.

25           MR. CHATTERJEE:  Let's mark this as the next

Page 284

1    exhibit, 219.

2         (Plaintiff's Exhibit No. 219 marked for

3         identification.)

4         THE WITNESS:  Okay.  Go ahead.

5      **Q.  BY MR. CHATTERJEE:  What is this document?**

6      A.   This is a -- a screen shot.  I don't know if

7    this is a mock screen shot or whatever, but of -- of how

8    the campaign for 100 would look like.  I think this is

9    probably a mock screen shot.

10      **Q.   It's a mock?  So it's not an actual one?**

11      A.   I don't -- I don't know the difference.  I

12    mean, I -- I would have received -- you know, when we

13    were launching the campaign they would -- they would

14    most likely have sent to -- you know, we had previews of

15    what it would look like.  But this is -- this is more or

16    less the general way that it would look -- that it would

17    look -- that it would like.

18      **Q.   And if you look in the middle of the page**

19    **there's a section that says e-mails.**

20      A.   Yep.

21      **Q.   And there's a little Facebook logo.  Do you**

22    **see that?**

23      A.   Yes.

24      **Q.   I think you said earlier that you couldn't**

25    **send e-mails to Facebook users.  Why is it in that box?**

Page 285

---

1      A.   Our future -- I believe -- there are two

2    explanations for this.  One is it was our intention in

3    the future to -- to send Facebook messages even if it

4    was not a -- we, in fact, even built a thing in the

5    database which you guys referred to that was -- we have

6    never -- we have not used.  But to be able to -- so I

7    think our intention in the future was going to be to --

8    to send private messages instead of e-mails.  If a

9    person wanted to communicate, send a message -- if they

10    wanted to send an invitation to a friend instead of an

11    e-mail, they could send it as a private message box.

12    And we built a -- a database.

13      **Q.   You built a tool for that?**

14      A.   A tool for that.  I don't know -- I don't know

15    -- I believe we never -- never used it.  So this was --

16    but the second is if we already had -- there were very

17    small amount of users.  But if a user has already had

18    the e-mail address because it was either manually

19    entered or a user manually put the e-mail address in or

20    they had the e-mail address because it corresponded with

21    an e-mail in Orkut, I think we also had the ability to

22    cross -- cross-reference when an e-mail address was not

23    from Orkut but it was given to us by -- so I think --

24    but I don't -- I don't believe any of those were

25    actually put into action if I -- to the best of my

Page 286

---

1    recollection.

2      **Q.   Which one of these would you click on, if any,**

3    **if you wanted to do the event invitations through**

4    **Facebook?**

5      A.   This -- this was not -- the event invitation

6    was not -- this is not from this page, this part here.

7      **Q.   This was a separate form?**

8      A.   It was a -- it was either -- I think you --

9    you could either go create an event and there was also

10    a -- a separate banner which said create an event on

11    Facebook where the user said I want to create an event

12    or I want to post a status update.

13      **Q.   Is that the one where there were, like,**

14    **several boxes --**

15      A.   Yeah.  I believe you guys -- yeah -- have

16    that -- that -- that image.

17      **Q.   And do you know what the default was?  Did the**

18    **default have all of the boxes checked or some of them**

19    **checked?**

20      A.   I don't.  But I -- but I know that the user --

21    there was a box saying create an event.

22      **Q.   Okay.**

23      (Plaintiff's Exhibit No. 220 marked for

24      identification.)

25      **Q.   BY MR. CHATTERJEE:  And again we've attached a**

Page 287

---

1    certified translation.

2      A.   Okay.

3      **Q.   Okay.  So if you go to the -- the third**

4    **paragraph -- and I'll go to the certified -- is there**

5    **anything about the translation that you take issue with?**

6      A.   No.

7      **Q.   Okay.  In the third paragraph it says "It is**

8    **important that we ensure the campaign achieves the**

9    **maximum exposure possible and therefore PRIVATE MESSAGES**

10    **TO ALL FRIENDS must also be sent as part of it."**

11      **Do you see that?**

12      A.   Correct.  Yeah.

13      **Q.   Do you know what Mr. Santos was talking about**

14    **there?  Like what --**

15      A.   I think he was saying that the options on how

16    to communicate we should have -- private mess -- what I

17    just said in the previous comment, that it was our

18    intention to have private messaging on Facebook.  So if

19    a user said I want to invite a Facebook friend, they

20    could send a private message just like sending an e-mail

21    but sending it to a Facebook mailbox.

22      **Q.   Why was that important?**

23      A.   Because Facebook does not have e-mails.

24    Normally most sites allow you to import contacts and

25    send e-mails.  In the case of Facebook, Facebook

Page 288

---

74  (Pages 285 to 288)

**Page 289**

1  messaging is an equally-important communication channel.
2  So we wanted to give our users the right and the
3  opportunity, if they want to, to also be able to send
4  messages to Facebook mailboxes.  And that was part off
5  our intention.  We built a database scheme up, you know,
6  for that, but I -- I don't believe that we ever got
7  around to that.
8      Q.   Was -- was it important at all that it be the
9  users that were sending these messages instead of Power?
10     A.   Well, users -- when you -- if you're familiar
11 with the way that -- that -- if a -- user-generated
12 invitations typically work on Facebook, on Google,
13 everything else, you typically -- you basically are
14 shown a list.  On hi5 --
15     Q.   Right.  And I'm not talking about how the
16 technology works.
17     A.   Yeah.  But I was talking about generally the
18 way they work, you're basically able to choose friends
19 to send to and you have different options.
20     Q.   Right.
21     A.   And so it was really --
22     Q.   But I'm not -- I'm not talking about how the
23 users felt.
24     A.   Okay.
25     Q.   I'm asking was it important to Power that the

**Page 290**

1  users be the people that were actually sending those
2  private messages instead of Power itself?
3      A.   Well, the user -- their -- user -- when --
4  when invitations are sent, they're typically sent by --
5  by the company that's -- by the come -- by the company.
6  And they're authorized by the user.  The users say
7  send -- send the messages to these friends and I want to
8  send this kind of message, I want to send --
9      Q.   I -- I -- I understand that.
10     A.   Go ahead.
11     Q.   But was it important to Power that it be the
12 user sending that information rather than Power
13 contacting those Facebook users itself?
14     A.   But it is the -- the user is sending that
15 information.
16     Q.   I -- I understand.  But my question was, was
17 that important to Power?
18     A.   Yes.  Well, I mean --
19     Q.   And why?
20     A.   Well, typically when you -- when you have an
21 invitation campaign, it's the user saying I want to -- I
22 want to get friends to sign up and they -- and they
23 send -- and they send messages.  Typically you -- Power
24 cannot send messages.  Power is just an intermediary.
25 There's no -- not a -- especially -- well, in a Facebook

**Page 291**

1  message, it's definitely coming from the user.  In the
2  case of an e-mail, you have two choices.  Typically you
3  can have it come -- most -- about --
4      Q.   Move to strike as nonresponsive.
5      A.   Okay.
6      Q.   My question was why was it important to Power
7  to have the users send the invitations or the private
8  messages?
9      A.   Well, typically when users send invitations to
10 friends, you know, they're -- they're -- they --
11 friends are interested in what they -- what
12 they have to say.  That's why.
13     Q.   So was the reason it was important to Power
14 because you would then have the endorsement of those
15 users that would allow for greater adoption of Power
16 technology?
17     A.   I think that's what the purpose of
18 user-generated invitations are.
19     Q.   Okay.
20     A.   Is that -- that users send -- you know, send
21 or ask a site to send messages to their friends on their
22 behalf in order to join a site.
23     Q.   So in this e-mail it also talks about
24 "...let's activate an EVENT so that" the "users modify
25 the STATUS of all networks inviting friends to join

**Page 292**

1  POWER via the personalized link."
2      Do you see that?
3      A.   Yeah.
4      Q.   Do you know what he meant when he used the
5  term personalized link?
6      A.   So we give -- we give users events -- links.
7  You see there's a link there?  That they can copy and
8  paste that link.  They can -- and we tell them these are
9  all -- you can -- you can go promote this link, you can
10 go create events, you can go send e-mails, you can go
11 send messages.  So this -- we provided them a banner
12 stuff, we provided them a link.  We provided them many
13 different ways to promote -- you know, we wanted to give
14 them as many -- many ways as possible to promote the --
15 the site.  And status updates --
16     Q.   So my -- my question was simple.  Just this
17 reference here, "via the personalized link."
18     A.   Yeah.  It's referring to that.  The -- the --
19 a -- a user has their own --
20     Q.   So I'd have a status update where I'd say
21 something and then there would be a link that someone
22 would click on?
23     A.   Yeah.  You say, hey, go -- can you -- I
24 just -- I just joined Power and I want -- you know, this
25 is very similar when you're in an app on Facebook and



Page 293

Page 294

1    THE WITNESS:  I just don't want --
2    MR. CHATTERJEE:  This is Exhibit 222.
3    (Plaintiff's Exhibit No. 222 marked for
4    identification.)
5    **Q.   BY MR. CHATTERJEE:  And, Mr. Vachani, the**
6    **document I've given you is Exhibit 222.  The -- my -- my**
7    **primary questions are going to be about the e-mail from**
8    **Alexander Tabor dated July 22nd, 2008.**
9    A.   Is there a translation in here or do you want
10   me to read the Portuguese?
11   **Q.   I have a loose translation on my own but --**
12   A.   Do you want me to read the translation that
13   you're referring to?
14   **Q.   No.  You can go ahead and read the actual**
15   **language.  I'll -- I'll get you going on.  And I'm --**
16   **I'm mainly interested in that last bullet point starting**
17   **with "Usuarios ficam...."**
18   A.   Okay.
19   **Q.   Okay.  What does that last bullet point mean?**
20   A.   That -- users -- he's giving many
21   possibilities.  Right now in this -- this section he's
22   talking about hypothetically the many different
23   possibilities that a user, you know, could -- you know,
24   could or could not, you know, complain.  He's not
25   talking -- he's not giving any -- these are hypothetical

Page 295

1    scenarios.  That's because -- I just want to give you
2    context for all -- it could be slow, it could be bugs,
3    it could be a -- a blocking, the sites could be not
4    working.
5    **Q.   Right.  I'm just asking about the last bullet**
6    **point.**
7    A.   Yeah.  If the users could -- could also be --
8    you know, not -- it could said that the campaigns are
9    sending too many e-mails or scraps to their friends.
10   I -- if -- for example, if a campaign preselects a check
11   box and -- and has a system send e-mail scraps tell all
12   your friends, if -- do you think maybe this practice has
13   some users who might stop using PowerScrap because of
14   this.
15   **Q.   So isn't it true that that first sentence**
16   **translated means users are upset with our campaigns that**
17   **send many e-mails or comments to their friends?**
18   A.   He's making a hypothetical.  He's saying --
19   he's saying users could -- could be upset.
20   **Q.   Right.**
21   A.   You see the whole thing here is just
22   possibilities of things in his ideas of things that
23   users, you know, hypothetically could be upset with on a
24   site.
25   **Q.   Right.  And then in July of 2008, for some**

Page 296

**Page 297**

1  reason that was unknown to Power, the ability to access
2  the Orkut web site was encountering problems, right?
3      A.   That's a different issue.  There were -- there
4  were along the two years that we were working, you know,
5  we found -- for example, if -- if the frequency of
6  accessing increased too rapidly, a site -- or Google had
7  automatic blocks, you know, that if -- if they have too
8  frequency of access.  There was a range of different
9  reasons.  So....
10     Q.   So that first sentence above the bullet
11  points, doesn't that first sentence mean that access may
12  be decreasing for several reasons and it says some of
13  the possibilities are or may be?
14     A.   Yeah.  And he was trying -- we was saying that
15  apparently that -- that week there had been some
16  reduction.  And he just gave a hypothetical possibility
17  of all the possibilities of reasons.  None -- you know,
18  in his exhaustive list of anything that could possibly
19  be causing it.
20     Q.   These types of e-mails that were sent from Mr.
21  Tabor, Mr. Santos, Juliane --
22     A.   Yeah.
23     Q.   -- etcetera, these are documents that were
24  sent in the ordinary course of -- of Power's business?
25     A.   Yeah.  These are just like, you know, ordinary

**Page 298**

1  course of business.  You know, hey, what -- why -- why
2  is the site too slow today, why -- is there a bug on the
3  site that's causing a problem, is there a server
4  problem.  And he -- this is -- he's basically just
5  saying here these are --
6      Q.   He was listing all the potential causes?
7      A.   All of the potential things that -- that
8  could -- that could have -- could have caused it in his
9  opinion.
10         MR. CHATTERJEE:  I think we're about out of
11  tape.  Let's take a break for about ten minutes.
12         THE VIDEOGRAPHER:  This ends videotape number
13  three.  The time is 4:49 p.m. on January 9th, 2012, and
14  we are off the record.
15         (Whereupon a break was taken from 4:50 to
16          4:59.)
17         THE VIDEOGRAPHER:  This begins videotape
18  number four in the continuing deposition of Power
19  Ventures, Inc.  The time is 4:59 p.m. on January 9th,
20  2012, and we are back on the record.
21         MR. CHATTERJEE:  If we can mark that next
22  document 223.  Let me know when you're done reviewing
23  it, Mr. Vachani.
24         (Plaintiff's Exhibit No. 223 marked for
25          identification.)

**Page 299**

1          THE WITNESS:  Okay.
2      Q.   BY MR. CHATTERJEE:  Okay.  Who is Rick Latona?
3      A.   I believe he's a domain -- a domain financier.
4      Q.   What is a domain financier?
5      A.   Basically someone that lends you money on your
6  domain.
7      Q.   For what?
8      A.   Like if you -- like if you own a house and you
9  have equity in that, they can hold on to the domain and
10  provide you money.
11     Q.   Oh.  So he -- he -- did -- was he kind of like
12  a mortgage person?
13     A.   Well, domains like Power which have -- have --
14  have significant value, like a house or whatever, and
15  there's an appraisal value and then there's a value that
16  you can borrow on the domain.  So he's someone that --
17  he's a -- he's domain -- in the domain industry.  And
18  we had conversations on the possibility of taking out
19  a -- a loan at one point, which we didn't -- we never
20  actually completed.
21     Q.   And there's a -- a reference in here to
22  something called browser emulation.
23     A.   Uh-huh.
24     Q.   What was browser emulation?
25     A.   The Power browser is just -- one way that the

**Page 300**

1  Power browser works is it basically, it -- it's a
2  web-based browser, but it -- it can -- it can basically
3  have -- simulate or work similar to any of the major
4  browsers.  So when interacting with a site.  So it can
5  be in addition to -- it can be like -- it can work
6  with -- an internet explorer browser.  So it can have
7  compatibility when -- when -- it's a new type of browser
8  and it's just a feature inside our browser.
9      Q.   If you look at the first e-mail on the string,
10  one, two, three, four, five, you said "Users are
11  technically violating the terms and conditions of all
12  sites when they use contact book imports...."
13         Do you see that?
14     A.   Yep.
15     Q.   What did you mean when you said that?
16     A.   It's very simple.  So when you use Firefox and
17  if you give them -- if you -- Firefox asks you where you
18  can store your user name and password.  Technically
19  you're giving your user name and password to Firefox.
20  So technically Facebook could -- could sue Firefox for
21  doing that.  If you give your -- to Meebo and you give
22  your account as not through the Facebook Connect,
23  Facebook could say -- could go after -- or any -- any
24  site could say you're violating the terms and
25  conditions.

1  Q.  Right.  Because the terms and conditions say
2  don't give your password to other people?
3  A.  You know, most -- most -- most of them say
4  that.  And as I said earlier -- we've had this
5  conversation -- it's been almost standard practice for
6  ten years that you can give your -- you can give your
7  password to browsers, give it to other sites, and no
8  site to our -- our knowledge, except for Facebook,
9  has ever -- you know, these issues have -- have ever
10  come -- come up with.  But the terms -- that's why I
11  said, tech -- technically by -- you can say by, you
12  know, interpretation of sites if they wanted to they can
13  make that claim.
14  Q.  But what was your reference here to contact
15  book imports?
16  A.  Just saying contact book imports is another --
17  another situation.  So on Facebook when you want to
18  import your contacts from another site, you give your
19  user name and password.  And then Facebook on many of
20  the sites goes and scrapes that site.  Facebook is in --
21  is in violation -- the user is in violation of the terms
22  and conditions.  But, again, that site has to decide if
23  they want to -- to hold -- hold Facebook accountable or
24  not.  Or any site.  Google doing that or Power.
25  Q.  And did you -- did you believe this fact that

1  Q.  I'm going to state it again.
2  A.  Please.
3  Q.  I want you to listen really carefully to it.
4  A.  Okay.
5  Q.  Okay.  Prior to launching the hundred by
6  hundred by hundred campaign, did you believe that users
7  are technically violating the terms and conditions of
8  all sites when they use contact book imports when they
9  give their password to Firefox?
10  MR. FISHER:  Vague.  Calls for legal
11  conclusion.  Assumes facts not in evidence.  Lacks
12  foundation.  Go ahead.
13  THE WITNESS:  I think my previous answer --
14  and I'll answer it -- answer is technically based on --
15  now, this is my answer.  Is -- here.  Technically -- and
16  that's why I use the word -- technically can be accused
17  for violating the terms if they give their password to
18  another site.  So that includes -- that answers your
19  question and says not before or after I believe -- we
20  believe the same thing, so yes.
21  Q.  BY MR. CHATTERJEE:  Your views are unchanged
22  is my view.  Your -- your view of this statement was the
23  same prior to the launch promotion as it was in January
24  10th --
25  MR. FISHER:  Same objection.

1  you say in here to be true prior to launching the -- the
2  100 by 100 by 100 launch campaign?
3  A.  Whether importing contacts or?
4  Q.  Just the exact sentence here.  That -- let me
5  ask it -- let me ask it a little differently.
6  A.  Yeah.
7  Q.  Prior to -- to launching the hundred by
8  hundred by hundred launch campaign, did you believe that
9  users are technically violating the terms and conditions
10  of all sites when they use contact book imports when
11  they give their password to Firefox?
12  A.  What I believe is that if -- if -- if you --
13  if you want -- if a site decides -- in their
14  interpretation they can technically say that you put
15  your -- you put your thing into Firefox, therefore
16  Firefox knows your user name and password and you
17  violated it.  Or it says here Facebook is violating
18  terms if they take the user name and password they go
19  access Google.  This is a core of what we've always
20  believed.
21  Q.  Okay.
22  A.  Yeah.
23  Q.  So but my question is different from what your
24  answer was.
25  A.  Okay.

1  THE WITNESS:  We believe -- we believe that --
2  that site -- yeah, that any site can say you're
3  technically violating their terms if they want to.
4  Whether you agree or disagree is then open to dispute.
5  That's what we've always, you know, agreed.
6  Q.  BY MR. CHATTERJEE:  Well, but that isn't what
7  you said here.  You said "Users are technically
8  violating the terms and conditions of all sites when
9  they use contact book imports."
10  A.  I'm telling you what the -- what the content
11  and what I meant -- what I meant -- what I believe and
12  mean by that is that technically -- what I mean by
13  technically means that if you want to get technical,
14  every -- every single site on the web is -- can be --
15  another site can claim the technicality on this issue.
16  Q.  Right.  Okay.
17  A.  That doesn't -- you know, that's all I said.
18  That's all it meant.
19  Q.  And -- and -- and so are you saying that you
20  meant something other than what you said here?
21  A.  No.  That's what I meant there.
22  Q.  And has this view -- has this -- in your view,
23  just to make sure the record's clear, your view has been
24  the same as to this issue since before the launch
25  promotion was ever put in place?

Page 305

```
 1      A.   My view is that -- my view -- to clarify, this
 2  is what I mean here -- this -- I believe it's the same.
 3  I don't believe my view has changed.  This was in
 4  January of 2009.  So it was at a later point.  But I
 5  believe it's the same, which is any -- any site can
 6  technically make a claim that you're violating their
 7  terms and then it has to be, you know, worked out.
 8      MR. CHATTERJEE:  Let's mark this as Exhibit
 9  224.
10      (Plaintiff's Exhibit No. 224 marked for
11      identification.)
12      THE WITNESS:  Okay.
13      Q.   BY MR. CHATTERJEE:  Do you -- do you know what
14  this document is?
15      A.   Yeah.  It's our home page.
16      Q.   Okay.  This was your home page at the time the
17  launch promotion was going on?
18      A.   That's correct, yes.
19      Q.   Okay.  And this Exhibit 224, who -- who -- who
20  created this graphic on -- on the front associated --
21  listing these different social networking web sites?
22      A.   We -- we did.  Power.
23      Q.   And let me just go through the various things
24  in this little star.
25      A.   Okay.
```

Page 306

```
 1      Q.   This MSN, is that a -- a Microsoft logo?
 2      A.   That's correct.  That's not -- yeah, that's
 3  Microsoft.
 4      Q.   Did -- at the time that this launch promotion
 5  started, had Microsoft authorized Power to use the
 6  Microsoft logo on its web site?
 7      A.   So we didn't -- we didn't need authorization
 8  to --
 9      Q.   No.  My question was had they.
10      A.   No.
11      Q.   Okay.  What about Orkut, had Orkut authorized
12  Power to use their -- this is their logo, right?
13      A.   Yeah.
14      Q.   And had they authorized Power to use that name
15  or use that logo on their web site?  On the Power web
16  site?
17      A.   I -- I don't know what -- what their rules are
18  on -- on these things, on any of these issues.  I mean,
19  the logos.  And --
20      Q.   To the best of your knowledge, did Orkut --
21      A.   I will -- I will just make one -- one
22  statement that our view on this was we saw this being a
23  standard practice across the web with the proper
24  disclaimers and that -- that logos were used.  So we --
25      Q.   Let me narrow the question down.
```

Page 307

```
 1      A.   We don't have -- we don't have a specific
 2  signed agreement with these companies whether or not
 3  it's -- they authorized it, I don't know.
 4      Q.   Yeah.  Orkut had not specifically told --
 5      A.   Yeah, that's correct.
 6      Q.   -- Power --
 7      A.   Orkut did not specifically say you can go put
 8  this logo on this site.  That's correct.
 9      Q.   Got to make sure the record's clear.
10      A.   Great.
11      Q.   Orkut had not told Power --
12      A.   That's correct.
13      Q.   -- that Power was allowed to display its logo
14  on the home page?
15      A.   That's correct.
16      Q.   Okay.  Same question for Myspace.  Had Myspace
17  at the time this screen was created --
18      A.   That's correct.  Same -- same answer.
19      Q.   Okay.  You got to wait for my question to
20  finish.
21      A.   Okay.
22      Q.   I know it's been a long day.
23      A.   No worries.
24      Q.   Had Myspace specifically authorized Power to
25  display their logo on the Power home page?
```

Page 308

```
 1      A.   No.
 2      Q.   And what about Facebook, had Facebook
 3  specifically authorized Power to display the Facebook
 4  logo on its -- on Power's home page?
 5      A.   No.
 6      Q.   And hi5, had hi5 authorized Power to display
 7  the hi5 logo on the Power home page?
 8      A.   No.  And you do see our disclaimer on the site
 9  there also which says that we are an independent company
10  and not associated with Google, Facebook, Myspace, hi5,
11  Yahoo!, or MSN.
12      Q.   I understand.
13      A.   Clear -- clear disclaimer that we are not
14  associated with those companies.
15      Q.   Move to strike as nonresponsive.  There's also
16  a You Tube logo on here.
17      A.   Correct.
18      Q.   Had You Tube authorized Power to display its
19  logo on the power.com home page?
20      A.   No.  Not specifically.
21      Q.   On the sign in page here it says Power.com,
22  slash, Facebook e-mail.
23      A.   Correct.
24      Q.   Do you see that?
25      A.   Yes.
```

| | |
|---|---|
| 1    **Q.  Why did it only talk about Facebook and Power** | 1    they ask you -- they ask you if you want -- if you want |
| 2    **e-mails in that --** | 2    to do it.  But then in the future, then they do the log |
| 3    A.  Because on that specific screen shot it's -- | 3    in for you.  Because Firefox stores it on their -- on -- |
| 4    it's -- the person has -- has clicked on the Facebook | 4    on -- stores that information.  You authorize -- |
| 5    account.  If they click on Orkut, that changes to Orkut. | 5    **Q.  Is that stored on the Firefox servers or** |
| 6    **Q.  Got it.  So it would be however the sign in** | 6    **natively in your computer?** |
| 7    **protocol was?** | 7    A.  Well, Firefox has a -- a browser.  I don't |
| 8    A.  It switches to whichever account they want to | 8    know if they store it.  I know that most companies -- |
| 9    log in with. | 9    every company has a different policy on that issue. |
| 10   **Q.  How did you -- how did Power learn what the** | 10   Meebo, for example, stores the passwords.  Firefox, I -- |
| 11   **sign in protocol was for these various web sites?** | 11   since they have it on your -- on your browser, they can |
| 12   A.  What do you mean "the sign in protocol"? | 12   -- they can store it.  I don't know if they back it up. |
| 13   **Q.  Well, for example, in the Facebook box it says** | 13   Every company's got a different policy on that. |
| 14   **Power, slash, Facebook e-mail and then a password,** | 14   **Q.  Okay.** |
| 15   **right?** | 15   A.  It's -- |
| 16   A.  Yes. | 16   **Q.  So you -- you don't know how Firefox stores** |
| 17   **Q.  That's the way that someone would typically** | 17   **it?** |
| 18   **sign in to Facebook, correct?** | 18   A.  No.  I know every company has a different |
| 19   A.  Correct. | 19   policy. |
| 20   **Q.  That would be different potentially than the** | 20   **Q.  Okay.  When -- when Power launch -- launched** |
| 21   **way you signed in to Orkut, Myspace, or hi5?** | 21   **the launch promotion in 2008, did it -- did it have the** |
| 22   A.  Yeah.  Typically on -- on their web sites | 22   **money to pay people if they invited a hundred -- a** |
| 23   there's a -- there's a standard, they -- they -- when a | 23   **hundred users?** |
| 24   user has -- on their log in page they have a -- they ask | 24   A.  We did pay -- we did -- we did people -- we |
| 25   user name and password or e-mail and pass -- user name | 25   did pay people.  Yes. |
| <div align="right">Page 309</div> | <div align="right">Page 311</div> |
| 1    -- e-mail and password. | 1    **Q.  No.  No.  I know.  But did it have the money** |
| 2    **Q.  Right.  So how was it that Power figured out** | 2    **to do it?** |
| 3    **which of those kind of sign in protocols with the** | 3    A.  Yes.  It was a maximum liability of -- of |
| 4    **different social networking web sites -- how -- how to** | 4    $10,000.  The first hundred people who reach -- reach a |
| 5    **implement that on this screen?** | 5    hundred friends get a hundred dollars.  So if the fact |
| 6    A.  I assume we looked -- we looked at their web | 6    that we had the ability to pay $10,000, yes. |
| 7    site. | 7    **Q.  Do you know of any reason why Mr. Herrera** |
| 8    **Q.  It would be by reviewing the web site?** | 8    **would say we started a campaign without having the prize** |
| 9    A.  We would look at the home page of the site. | 9    **to give?** |
| 10   **Q.  Testing it?** | 10   A.  I don't know why. |
| 11   A.  Well, we -- that's what -- when we built a | 11   **Q.  Who is Cornelius Conboy?** |
| 12   Power -- a Power adapter, which is like a Power -- Power | 12   A.  He was another person working at the company |
| 13   log in for a site, it was built basically on looking -- | 13   on the -- on the administration, operations. |
| 14   what a user -- what a user is able to do and being able | 14   **Q.  Do you have any basis to understand why he'd** |
| 15   to automate doing that on behalf of the user. | 15   **say regardless, I'm not sure what the proper way to** |
| 16   **Q.  Is that the way Firefox does it?** | 16   **start a campaign like this since we do not have the** |
| 17   A.  Firefox pops up a -- a box.  Same -- similar | 17   **10,000 in prize money?** |
| 18   type of thing.  And says you can -- you can -- because | 18   A.  I think he was just asking do we -- do we -- |
| 19   it's a browser, so it's not -- it's -- they have it from | 19   do we have $10,000 in prize money.  And my answer was |
| 20   -- yeah, from the browser interface it pops up and you | 20   yes. |
| 21   can enter your user name and password.  And then it | 21   MR. CHATTERJEE:  Okay.  Let's -- let's mark |
| 22   stores the user name and password. | 22   this. |
| 23   **Q.  Doesn't -- doesn't it just say do you want me** | 23   THE WITNESS:  Those are financial -- financial |
| 24   **to remember this?** | 24   decisions.  And obviously the best answer is we did pay |
| 25   A.  Well, it's -- it's the same.  Yeah.  They -- | 25   -- we did pay out the prize to all the people that |
| <div align="right">Page 310</div> | <div align="right">Page 312</div> |

1    achieved it, so.  I think it speaks for itself.
2        (Plaintiff's Exhibit No. 225 marked for
3        identification.)
4        THE WITNESS:  Okay.  Go ahead.
5        Q.  BY MR. CHATTERJEE:  So in this e-mail Mr.
6    Conboy is not asking whether you have money or not.
7    He's saying that you don't have the 10,000, correct?
8        A.  Well, he's -- he's making a comment.  He's
9    basically asking what are our priorities.  And as the
10   CEO, I have to decide -- you know, I mean, everybody has
11   different opinions on where -- where we should -- should
12   we budget this $10,000 to marketing, should we budget it
13   to a new program, or should we budget it to whatever.
14   And so I think that's what he was -- he was looking for
15   clarification.
16       Q.  And what was his role in the company again?
17       A.  He was an administration -- administration
18   manager.
19       Q.  And what does an administration manager do?
20       A.  He was, like, helping with a lot of the day to
21   day, you know, internal administration of, like, non --
22   non like -- office administration and these kind of --
23       Q.  Why --
24       A.  -- helping with, like --
25       Q.  Why --

Page 313

1        A.  -- budget -- budgets and those kind of things.
2        Q.  So he was a finance person?
3        A.  He was a -- he was just a -- basically an
4    administration manager.  I'd call him administration
5    manager.
6        Q.  Did he report to you?
7        A.  He reported to me.
8        Q.  There were only a few people that reported to
9    you in the company, right?
10       A.  That's correct.  There were like five.  Like
11   five people.
12       Q.  Was he a senior-level executive?
13       A.  He was a -- he was a senior level.  At that
14   time we didn't have -- you know, we didn't -- he was
15   kind of -- he was the person that on finance and
16   administration issues at that time.  He was the person
17   that I -- that I was -- that was -- was reporting to me.
18       MR. CHATTERJEE:  Let's mark this as 226.
19       (Plaintiff's Exhibit No. 226 marked for
20       identification.)
21       THE WITNESS:  Okay.
22       Q.  BY MR. CHATTERJEE:  Okay.  This is an e-mail
23   between Bruno Carvalho and Eric Santos and he's also
24   forwarding the e-mail to you.
25       A.  Yeah.

Page 314

1        Q.  Mr. Santos is, correct?
2        A.  That's correct.
3        Q.  And as of March 29th, 2009, had the Power
4    users that had had won the hundred by hundred by hundred
5    campaign been paid?
6        A.  I believe they were paid sometime in April.
7    And I believe that the terms and the conditions said
8    that we had -- you know, it was way within the time that
9    we had said that we would pay the users.
10       Q.  Okay.
11       A.  So they just wanted to clarify.  They don't --
12   this -- they were just getting -- naturally at this time
13   we were making priorities on where we want to pay costs
14   so that --
15       Q.  Was -- was there any particular reason why you
16   waited?
17       A.  Well, I think that we had fired many people at
18   that time and we had reduced costs.  So they wanted to
19   understand if this was going to be paid.  And I said
20   yes.  And the fact is it was paid.  It was made to be a
21   priority to be paid as we had planned.
22       MR. CHATTERJEE:  Let's mark this as 227.
23       (Plaintiff's Exhibit No. 227 marked for
24       identification.)
25       THE WITNESS:  Okay.

Page 315

1        Q.  BY MR. CHATTERJEE:  Okay.  The document I've
2    given you as Exhibit 227, does this refresh your
3    recollection that -- that potentially as late as May
4    14th, 2009, the winners of the hundred by hundred by
5    hundred campaign had not yet been paid?
6        A.  Yeah.  If I remember correctly, the -- after
7    the -- the end, we had, like, three months or something
8    to pay them.  And so we -- we decided, like, a bill
9    date, that it was not -- you know, we didn't have to pay
10   it in a day, even though some users would have liked to
11   have received their money earlier.  And -- and this was
12   I think the final stage when -- when Felipe had been
13   authorized to go ahead and -- and pay it.  And he was
14   contacting my -- my assistant who was helping with some
15   things to -- to complete the payments.  And I think
16   shortly -- I think it was -- if I'm not mistaken, I
17   believe it was paid around that time.
18       MR. CHATTERJEE:  So this is 228.
19       (Plaintiff's Exhibit No. 228 marked for
20       identification.)
21       THE WITNESS:  Okay.
22       Q.  BY MR. CHATTERJEE:  Mr. Vachani, what I've
23   handed you as Exhibit No. 228 is a -- a red lined
24   version of power.com's terms of use.  Do you see that?
25       A.  Yes.

Page 316

1    Q.   It says in the top corner last updated May 26,
2    2009.
3    A.   Okay.
4    Q.   Do you see that?  Do you know why in May 26,
5    2009, Power was changing its terms of use or considering
6    changing its terms of use?
7    A.   Sites change and update their terms of use on
8    a regular basis.  I don't know what changes were made
9    that date.  But sites -- obviously I'm sure that you --
10   if I -- if it was -- it was a -- whatever it was, I'm
11   sure it was either -- it was either an e-mail -- if it
12   was a major change.  And if not it was -- you know, I
13   have no idea what the change was.  It's not a major
14   issue.
15   Q.   So it was just kind of an ordinary course of
16   business?
17   A.   I have -- I mean, all I know is terms and
18   conditions were updated on a regular basis.  And, like I
19   said, it was a few years ago.  So I had --
20   Q.   All right.  Do you know if this new one was
21   ever -- if there was ever a new terms of service in the
22   May time frame of --
23   A.   I have no idea.  But anything in my e-mail --
24   you would have -- if -- if it was major or whatever,
25   like, on something that they felt was necessary to

Page  317

1    was our terms and conditions, then that's correct.
2    Q.   You don't recall any specific discussions
3    about that?
4    A.   I don't recall them.  But again, this is not
5    -- terms and conditions are usually not -- in most cases
6    they're -- they're ongoing, you know, things.
7    Q.   Right.  Do you recall any discussions about
8    power.com's terms of use and restrictions on users?
9    A.   I remember having -- I've had discussions on
10   the issue.  And you probably have e-mails.  If it was
11   anything that was really substantial, it would probably
12   be in an e-mail of my comments and thoughts on it.
13   Q.   So other than reflected in the e-mail, you
14   don't have any specific recollections?
15   A.   No, I don't have any specific recollections.
16   Right.
17   MR. CHATTERJEE:  I'm going to go down memory
18   lane again.  Exhibit 229.
19   (Plaintiff's Exhibit No. 229 marked for
20   identification.)
21   Q.   BY MR. CHATTERJEE:  So, Mr. Vachani, what I've
22   handed you as Exhibit 229 is a chat log between you and
23   somebody named Greg.
24   A.   Okay.
25   Q.   Do you know who Greg is?

Page  319

1    update me, it would have been in my e-mail box saying,
2    you know, this is what the updates are or whatever.  If
3    not, if it was a minor change that it was felt -- where
4    they -- the manager felt in discretion it was not
5    needed, they wouldn't have updated me.  It's a pretty
6    standard issue.
7    Q.   If you can turn to the one, two -- the third
8    page.
9    A.   Okay.
10   Q.   In about the middle of the page it says --
11   there's a section entitled "Examples of incorrect use
12   cited above includes..." --
13   A.   On which page?  Second or third?
14   Q.   This is on the third page about halfway down.
15   A.   Okay.
16   Q.   Do you recall any discussions at Power about
17   modifying the terms of service that would require -- or
18   that would identify as an incorrect use harvesting or
19   collecting personal information of other power.com users
20   or using or disclosing personal information of power.com
21   users other than as permitted by the power.com privacy
22   policy?
23   A.   If that was in our terms and conditions, then
24   yes.  Of course.  I don't -- again, I don't -- I don't
25   remember the specific conversation.  But if -- if this

Page  318

1    A.   Yeah, Greg was a -- as I said, 2005 was two
2    years or -- one or two years before, you know, Power had
3    done anything.
4    Q.   I understand.
5    A.   That's correct.
6    Q.   Who's Greg?  What is his last name?
7    A.   Greg.  I don't remember his last name.  But he
8    was a technical -- like, just a technical guy.
9    Q.   Did he ever work for Power?
10   A.   Never worked for Power.
11   Q.   Okay.
12   A.   I had discussions with him at times early on
13   before -- way before in the early days about -- about
14   doing some work.
15   Q.   So in --
16   A.   Do you mind if I read this real quick?
17   Q.   Sure.
18   A.   Okay.
19   Q.   This is a instant message chat log between you
20   and Greg, correct?
21   A.   Correct.
22   Q.   And why -- why was it you were talking to Greg
23   about building an engine to grab the entire content of
24   Orkut and store it in XML and then let people's entire
25   content be activated instantly when they arrive on the

Page  320

**Page 321**

1  site?
2     A.  Sure.  So as I mentioned in very exploratory
3  just ideas, we were looking at ways to increase
4  conversion rates in -- in -- in exporting data.  And we
5  were trying to say that what are the best ways.  Is it
6  better to -- to do what, you know, Google or other sites
7  do where they cache -- cache sites on the web and then
8  when you access it it's much faster or do it all in real
9  time.  So when a user says grab all of my content.
10       So part of -- part of the goal there was to --
11  was a hypothetical exercise to understand if there are
12  ways to speed up.  Because importing an address book is
13  one -- one situation.  It's a lot faster.  But importing
14  hundreds of pages where a user says that -- so this was
15  a hypothetical kind of discussion or exercise to
16  understand what are the different ways if you were going
17  to do a very -- a very fast virally-growing campaign
18  that was going to have a million users exporting their
19  data.  So we were exploring -- it was really a technical
20  exercise on no specific --
21     Q.  So in this chat log you also say "also, when
22  activating the engine to grab all the data, we need to
23  have a strategy that lets us grab all the data without
24  being detected."
25       Why did it matter to you that you would be

**Page 322**

1  able to grab all the data without being detected?
2     A.  Typically, as I mentioned in the past, when --
3  when -- any site, if you access it too fast of a rate,
4  there are automatic triggers that will -- will -- that
5  that-- that they don't know -- they basically have
6  automatic triggers to -- to slow that down.  So that's
7  why the whole idea was if you're -- if you're going --
8  if you have a -- a very fast virally-growing campaign
9  where users are, say, exporting data, yeah, you -- there
10  are -- there might be limitations on how fast you can
11  go.
12       So this was a hypothetical exercise two years
13  before the company that had nothing to do with Power.
14  That was just trying to understand the technical
15  constraints necessary in importing massive amounts of
16  data in a -- in a campaign that was growing very fast
17  virally.  Because ultimately the goal of, you know, any
18  kind of project is --
19     Q.  Was one of the goals to avoid detection to
20  allow you to export all that data?
21     A.  Not to avoid detection.  It was to understand
22  what kind of -- this was a -- a hypothetical exercise to
23  understand what kind of -- what kind of issues are
24  possible when you're dealing with mass amounts of -- if
25  you're growing millions -- millions of users in a week

**Page 323**

1  rather than, you know, just --
2     Q.  So, Mr. Vachani, you'd agree with me that you
3  said here "...we need to have a strategy that lets us
4  grab all the data without being detected"?
5     A.  That's -- that correct.
6     Q.  Okay.
7     A.  So detected means if -- if -- if you're going
8  too fast, there's standard -- there's standard blocks or
9  standard systems that say slow down.  And so the
10  question was are there ways -- are there ways to slow it
11  down, is it ways to cache data.  It was a - again, a
12  hypothetical exercise.
13     Q.  Right.  So you wanted to avoid being detected
14  so you wouldn't be slowed down or blocked?
15     A.  I was -- again, it was a -- it was not about
16  what we wanted to do.  This was an academic exercise,
17  you know, that we were -- that we were discussing, you
18  know, the issues relating -- because this was all
19  uncharted territory exporting -- exporting contacts
20  had existed, but exporting profiles in a -- in a single
21  step is a hundred times more data.  It's the same
22  concept.  And so this is why we were just exploring --
23     Q.  Let's go to the next page.  Next page at the
24  top "Steve says" -- that's you, right, Steve?
25     A.  Yep.

**Page 324**

1     Q.  "we will have to have a clever ip rotating
2  system and other techniques.  this is something we were
3  just starting to think about."
4       Let me start with who is the "we"?
5     A.  I don't know.  Whoever the technical guys --
6  this is -- this is before Power.  I was working on --
7  you know, so I was just -- I must have had some contract
8  program guys that were just exploring -- we were just
9  exploring technical ideas on data extraction.
10     Q.  And this hypothetical concept that you were
11  developing you felt needed a clever IP rotating system?
12     A.  Well, we were trying to figure out what are
13  the different ways to export large amounts of data
14  when -- you know, if a user says import my whole social
15  network into -- import my whole social network instead
16  of just importing my contacts.  So this was again an
17  academic exercise to -- like, think about all the
18  different issues involved in exporting entire profiles
19  with -- with photos and everything else.
20     Q.  Do you mean to suggest that the statement made
21  there means something other than what it says?
22     A.  What does it say?
23     Q.  "we will have to have a clever ip rotating
24  system and other techniques."
25     A.  Well, I think that was -- that was one of the

## Page 325

```
 1    -- one of the ideas that -- you know, that we explored
 2    is an IP rotating system is potentially one way to -- to
 3    be able to access larger amounts of data.
 4        Q.   Without being slowed down and blocked?
 5        A.   Without being slowed down, correct.
 6        Q.   Then if you turn to the third page, there's a
 7    section that says "Steve says:  assuming the IP address
 8    was dynamically changing, is the danger" that "pattern
 9    that would be easily recognized?"
10        Do you see that?
11        A.   Yep.
12        Q.   Okay.  Could you explain to me what you meant
13    by that question?
14        A.   Yeah.  I think the whole -- the whole exercise
15    was to try to understand when you're dealing with
16    exporting large amounts of data what are -- I mean,
17    that's what the whole discussion was just are there --
18    what are the ways that you could -- you could address
19    this hypothetically.
20        Q.   And at least as early as 2005 you were aware
21    that one of the ways that you could try and address this
22    problem was by -- by dynamically rotating IP addresses?
23        A.   Yeah.  It says, as we've mentioned, we've --
24    we have built -- it's a way that has -- has proven to be
25    useful.
```

## Page 326

```
 1        MR. CHATTERJEE:  230.
 2        (Plaintiff's Exhibit No. 230 marked for
 3         identification.)
 4        THE WITNESS:  Okay.
 5    BY MR. CHATTERJEE:  Who is Paul King?
 6        A.   He was another technical person that I -- that
 7    I -- on this exercise that I contacted.
 8        Q.   If you look at the very end of this e-mail
 9    string --
10        A.   Yep.
11        Q.   -- Mr. King tells you Orkut's -- "Orkut's
12    license agreement" expressly "forbids robots, so they
13    are onto it and may be" do -- "doing things to prevent
14    automated retrieval."
15        Do you see that?
16        A.   Okay.
17        Q.   Do you know if that was a true or untrue
18    statement?
19        A.   I have no idea.  I'm assuming that -- you
20    know, robots in general are -- are things that, you
21    know, some -- data -- data extraction and caching -- for
22    example, when Google goes and caches the web and does
23    sites, there have been -- for a long time their robots
24    would be blocked.  And Google over the years, you know,
25    they gained both legitimacy and gained -- created
```

## Page 327

```
 1    different techniques for spidering and -- I mean,
 2    that's -- that's -- that's an evolved process.  So....
 3        Q.   Is the -- is the rotating IP technology
 4    something that could be characterized as a robot?
 5        A.   It's not a robot, no.
 6        Q.   Okay.
 7        A.   A robot is typically a -- when a script or
 8    something that does something -- that does something
 9    that is -- it's instructed to do.
10        Q.   There's also a statement here "...Orkut may
11    impose limits on the number of page requests from a
12    single IP address."
13        A.   Yeah.
14        Q.   Do you see that?  That's the same thing we
15    talked about --
16        A.   Same thing.  We said in general it's standard
17    practice for whatever the matter -- they don't really
18    know -- it's just like because in the past there have
19    been things like DOS attacks where -- you know what a
20    D-O-S attack is when -- when a company sends 5,000
21    servers to attack your site to try -- with the purpose
22    of causing harm.  Not with the purpose of, you know -- I
23    mean, Google -- when Google comes in your site, their
24    purpose is not to cause harm.  When a data -- there are
25    data companies that go out and mine data on the web,
```

## Page 328

```
 1    publicly-available data.  All this is talking about --
 2        Q.   Yeah.  But my -- my -- my question was a
 3    little simpler than that.
 4        A.   Yeah.
 5        Q.   Is dynamically rotating the IP addresses in
 6    order to access the web site something that would be
 7    considered a robot?
 8        A.   No.
 9        Q.   Okay.  Is a robot a -- a online tool to gather
10    information from -- from a web site?
11        A.   A robot as far as I understand it is just a --
12    a -- technically something that I can refer to,
13    something that's instructed to do something either --
14    usually through a script.
15        Q.   So why wouldn't rotating IP addresses fall
16    into that definition?
17        A.   Well, an IP is not -- that's not a robot.
18    That's just a IP address with the servers changing.
19        Q.   Okay.  So if I wrote a script to rotate IP
20    addresses --
21        A.   If you wrote a script to rotate, that could be
22    an action of -- of a robot.
23        Q.   That would -- that could be an action --
24        A.   That could be an action of a robot.
25        Q.   So just the -- having multiple IP addresses
```

**Page 329**

1  standing alone isn't a robot.  But if I wrote a script
2  to move from IP address to one -- to another IP address
3  --
4      A.  If you wrote a script to do anything in a
5  site, you know --
6      Q.  That would be a robot.
7      A.  -- that could be considered -- so, as I said,
8  when Facebook goes and scrapes a site and takes the
9  stuff, that's a robot.  In my definition that's a robot
10  going as a robot script that's going and accessing
11  contacts with or without the permission of that site.
12      Q.  All right.  And so was -- would you
13  characterize the script that allowed for a dynamic
14  assignment of IP addresses that was implemented by Power
15  as a robot?
16      A.  No, that's not a robot.
17      Q.  Why not?
18      A.  That was a -- that's a system that just
19  updated IPs.  It wasn't going out and doing things on --
20  you know, a robot is -- is something that's going out on
21  a site and doing something.  Changing -- having an IP --
22  IP address update is not a -- is a -- is a different
23  system.  It's not a robot PowerScript.
24      Q.  Now, you say here in your -- in your response
25  to Mr. King "...our plans" is "to have rotating IP

**Page 330**

1  addresses so we could have 10,000 or even more IP
2  addresses throughout the process."
3      A.  So in -- in this time in 2005, the whole
4  concept of rapid data -- data extraction or exporting --
5  again, this was a hypothetical exercise because no one
6  had ever exported -- people had exported context, but no
7  one had ever exported entire social -- social -- where
8  you could -- entire social graphs.  So this was again a
9  hypothetical exercise.  Because if you start growing
10  virally -- because if you are able to achieve this and
11  start growing even faster, what would be the issues that
12  you would have to face in dealing with the same type of
13  exports, but exporting as we -- you saw the exercise we
14  went to contact --
15      Q.  Right.  But this was the same sort of issue
16  where having rotating IP addresses was a tool that you
17  were considering using in order to avoid being blocked
18  or slowed down in the same way we discussed with those
19  other documents.
20      A.  To avoid -- as I -- it would be -- it would be
21  a way to -- to extract -- if a user said I want to
22  extract my data and that -- that was what the purpose
23  there was.  If a user says I want to import my whole
24  social network, what -- what are the technical issues
25  that would be encountered for a user wanting to access

**Page 331**

1  their whole social network.  Especially if -- you know,
2  if -- if, you know, if -- if -- if the site didn't allow
3  that much data to be extracted, even if the user wanted
4  it.
5          MR. CHATTERJEE:  This is Exhibit 231.
6          (Plaintiff's Exhibit No. 231 marked for
7          identification.)
8          THE WITNESS:  Okay.
9      Q.  BY MR. CHATTERJEE:  So this is an e-mail from
10  Eric Santos to you dated August 31st, 2006.
11      A.  Correct.
12      Q.  It appears that Orkut was blocking Power in
13  2006?
14      A.  Power didn't exist.  This was -- this was the
15  -- we were playing around with a -- another -- another
16  -- just the concepts of accessing -- we were just --
17  this is the beginnings of -- of -- of Power.  But the
18  earlier applications on -- on ways where users want to
19  -- we had different apps.  When they would access the
20  site the user would say I want to access by messaging
21  and send messaging apps or I want to create a browser
22  that browses.  And so he's commenting that irrelevant of
23  the -- irrelevant of what the application is, sites have
24  standard things in place that, you know, these are --
25  these are kind of standard things when, you know --

**Page 332**

1  usually -- they were originally built for spiders or
2  things that, you know, not --
3      Q.  Yeah, I understand the reason --
4      A.  Yeah.
5      Q.  -- that -- that you believe they were built.
6      A.  Yeah.
7      Q.  But there was a situation where Orkut was --
8  was blocking something you and Mr. Santos were trying to
9  do, right?
10      A.  There was this -- correct.  Yeah.
11      Q.  And what was torperkut?
12      A.  Torperkut was just another -- it was -- it was
13  one -- one of the apps.  We had many different apps that
14  we were playing with.
15      Q.  What did torperkut do?
16      A.  It was a -- it was an app where you could --
17  if you wanted to have -- instead of -- you know, right
18  now today when you want to send a message on Facebook,
19  you can cc friends.  Back then you couldn't cc.  If you
20  wanted to send a message you were writing and cc it to
21  40 friends, you would have to send 1 one by one.  So it
22  was an app that allowed you to cc a friend -- copy 40
23  friends on the same message instead of having to do it
24  manually.
25      Q.  And was -- one of the solutions Mr. Santos

1    explored was using multiple IPs to access Orkut?
2        A.   I believe -- I believe so.
3        (Plaintiff's Exhibit No. 232 marked for
4        identification.)
5        Q.   BY MR. CHATTERJEE:  So, Mr. Vachani, who was
6    Kiran Inampudi?
7        A.   He was another just technical person that --
8    that I -- I had -- was speaking to on different
9    technical stuff at that time.
10       Q.   Now, at this point in time there was an e-mail
11   address powerscrap.com?
12       A.   Correct.
13       Q.   Was -- had Power Ventures been formed at this
14   point in time?
15       A.   It was -- I think Power Ventures was formed
16   that -- that month.  That was basically around the month
17   November, December, so.
18       Q.   So this was a -- a document that was -- was
19   it -- was it about activities related to what Power
20   Ventures was starting to do?
21       A.   Let me see.  I believe this conversation was
22   dealing with, you know, this -- this IP rotation system
23   that we were -- that we had.  This was in the early days
24   of, you know, addressing issues relating to rotating
25   IPs, IP addresses.

                                        Page 333

1    kind of conversations that we had with most sites.  And
2    then they realized, okay, these guys are a
3    venture-funded company, they're -- they have users that
4    are involved, they're -- they're providing services to
5    the users, they -- these are the issues.  And that's the
6    kind of things that most civilized companies that we had
7    conversations with had --
8        Q.   When was the Amazon solution adopted by Power
9    Ventures?
10       A.   I think Amazon was one of many.  That's just
11   -- because they -- they -- later on they came in and
12   they had many -- they had unlimited IP addresses.  So it
13   was instead of having, you know, many different I -- you
14   know.
15       Q.   Was it before or after the launch promotion
16   started?
17       A.   I believe it was before the Amazon.  We had
18   been working on that, you know, before.
19       Q.   Okay.  But -- but was it -- was the Amazon
20   solution actually employed before or after the launch --
21       A.   I don't know the exact answer to that, but I
22   believe -- I believe I -- I believe it was -- it was -- it
23   was employed before.
24       Q.   Okay.  And what about -- was that applied
25   across the board for all of the Power activities or was

                                        Page 335

1    Q.   And was that related to something that Power
2    Ventures was trying to do?
3        A.   Again, Power Ventures had -- this -- this
4    issue of scalability of dealing with access of data was
5    -- was an issue that we were -- we were -- we were
6    exploring to try to understand.  So this was just
7    another conversation on that issue.
8        Q.   Right.  And -- and -- and again, it was the
9    same sort of problem as we talked about earlier where
10   you were worried about access getting slowed or being
11   blocked?
12       A.   So we were -- we were looking.  If we have a
13   Power browser and it's actually -- I mean, everything
14   relating to this platform, if you -- the speed at which
15   you access, we were exploring every possible kind of
16   issue.  So there were a lot of academic exercises that
17   went into understanding, you know, how the sites deal
18   with -- they -- you know, we're a new company, a new
19   site.  They don't -- they don't know your -- if -- if
20   you're friendly, if you're user generated.  They don't
21   know any of these things.  So typically until they
22   know -- and that's historically, as I mentioned, most of
23   our conversations when we were a new site, they'd say
24   who are you, what is your purpose, are you -- are you
25   fishing, are you user generated.  We -- these are the

                                        Page 334

1    it --
2        A.   Well, this IP address rotation, just because
3    of -- in whatever access to a site, whether with a
4    browser -- any type of access, not just -- this issue
5    crossed across any kind of activity that you're doing
6    when you're having -- whenever you're having scripts
7    dealing with -- with a site.  I mean, I'm sure that
8    Facebook went through this issue when they were
9    accessing -- when -- when users were accessing sites
10   and -- and if they had too many accesses -- these are
11   standard -- standard issues.  So we were trying to just
12   -- this -- all this exploration was trying to
13   understand, what are the kind of issues that involve
14   when you have too many accesses.  Because sites don't
15   know what you are.  And until they know what you are,
16   they, you know, they --
17       Q.   They may or may not let you in.
18       A.   They may have automatic -- most of the cases,
19   they were automatic detection systems that stopped
20   things at too fast of a speed.  You know, if it --
21   because traditionally those -- those are the same --
22   those are similar to people that have different
23   intentions.  Those are not -- that are not maybe there
24   to -- for users to get their own data.  They might be,
25   you know, trying other types of things like trying to

                                        Page 336

1   break in -- break into.  So they're completely different
2   issues, but the -- but the issues might -- might, you
3   know, be related.
4       Q.   But -- but the idea of having dynamically
5   rotating IP addresses was something that was implemented
6   by Power before the launch promotion; is that fair?
7       A.   Yeah.  I mean, I think we've said this over
8   and over and over again that Power has -- Power already
9   had an automatic IP rotation system, as you can see, for
10   a long time back.  It wasn't a concept that appeared the
11   day of Facebook.  Obviously it was an issue that -- that
12   affected so many -- so many activities of our -- our
13   browser, our PowerScript language, our Power everything.
14   Because it was -- it was something very new and
15   innovative.
16       MR. CHATTERJEE:  Let's mark this as 233.
17       (Plaintiff's Exhibit 233 marked for
18       identification.)
19       THE WITNESS:  Okay.
20       Q.   BY MR. CHATTERJEE:  So do you recognize the
21   document that I just handed you --
22       A.   Yes.
23       Q.   -- that's marked Exhibit 232 (sic).  This is
24   an e-mail between you and Eric Santos --
25       A.   Correct.

Page 337

1       Q.   -- and someone named Joao?
2       A.   Yep.
3       Q.   Who is Joao?
4       A.   Joao was another programmer within the
5   company.
6       Q.   If you look at the e-mail that's from you --
7   I'm trying to figure this out.  It's -- it's from you to
8   Eric Santos dated April 15th, 2007, at 4:48 a.m.
9       A.   Yep.
10       Q.   And you say "Tell me everything Orkut can do
11   to make our life difficult."
12       Do you see that?
13       A.   Where?
14       Q.   On the second page, last paragraph.
15       A.   Yep.
16       Q.   Why were you concerned about that?
17       A.   I think I've said this over and over again.
18   We were embarking on completely new territory which had
19   no legal precedence, no user precedence except contact
20   imports which were our best reference point.  And we
21   were working in an amount of data imported that were
22   more than -- way above what had ever been done before.
23   And we were dealing with fairly advanced technology that
24   was -- that was trying to create something new.  So we
25   were interested in every possible possibility of how,

Page 338

1   you know, a new type of browser, how a new -- we were
2   building a new type of browser, a new type of -- you
3   know --
4       Q.   Let me ask the question a different way.
5       A.   Okay.
6       Q.   Were you worried about Orkut doing something
7   to make your life difficult or were you only worried
8   about just the standard technical measures that Orkut
9   had in place?
10       A.   We were worried about standard technical
11   measures to -- to block -- block sites.  And this is
12   through every aspect of this new type of browser.
13   Because it was not a browser -- the browser we were
14   building was not like a typical browser.  So in the
15   beginning everything is new until people get used to it.
16   And so we -- we -- like any good company, we were
17   exploring every -- every technical possibility, every --
18   every -- it was a -- actually, to understand how do you
19   build something that you can scale and have tens of
20   millions of users and a new type of browser that can
21   interact with many sites, build applications that
22   interact with sites, and create -- I mean, it was a very
23   ambitious project.  So naturally, like any good company
24   building something, that was fairly revolutionary.  I
25   mean, the -- we -- we -- conversations exploring every

Page 339

1   type -- every subject took place.
2       (Plaintiff's Exhibit No. 234 marked for
3       identification.)
4       MR. CHATTERJEE:  234 previously marked as
5   Exhibit 145.
6       Q.   Have you seen this document before, Mr.
7   Vachani?
8       A.   Yes.
9       Q.   What is this document?
10       A.   It's a collection of different presentations
11   that -- different Power presentations.
12       Q.   Were they things that you put together?
13       A.   They were things that many people in the
14   company put together.  But I've seen -- I've seen all
15   the presentations in here.
16       Q.   Is there any particular reason why we haven't
17   been able to find copies of these presentations in your
18   e-mails?
19       A.   In my e-mails?  I don't.  But I'm sure -- I'm
20   sure they're -- they're in my e-mails.  But they're
21   probably not under -- I don't know how you searched.
22       Q.   When --
23       A.   But these things have existed and you've had
24   them for a long, long time.
25       Q.   I don't need you to argue with me.

Page 340

87 (Pages 337 to 340)

**Page 341**

1    A.  Okay.

2    Q.  I'm just asking a simple question if you know

3  why they're not in your e-mails.

4    A.  No worries.

5    Q.  Do you know why they're not in your e-mails?

6    A.  I don't.  But I'm sure -- these are -- they

7  are -- they are in my e-mails.

8    Q.  Okay.  This --

9    A.  In different -- they're not -- these are all

10  different presentations.  There are thousands -- there

11  are hundreds of presentations.

12    Q.  So this first power.com presentation, just the

13  first one, do you know when it was created?

14    A.  This one was I believe created around December

15  of -- around December of two thousand -- around the same

16  time when we were launching Facebook, launching our

17  power.com.  Around that time.

18    Q.  So if you turn to page 0309.  Do you see that?

19    A.  Yep.

20    Q.  There's a reference here to "Walled gardens

21  become more open" and you refer to Facebook Connect.

22    A.  Yes.

23    Q.  What did you mean when you were referring to

24  walled gardens?

25    A.  A walled garden is a -- a terminology that

**Page 342**

1  refers to sites that are completely closed and have only

2  one standard or one way to access their site and define

3  all the rules and have traditionally by many people been

4  seen as things that are not good for the future of the

5  web.

6    Q.  Okay.

7    A.  That's -- that's typically the -- the

8  understanding that commonly -- I mean, there are many

9  people have different terms of that.

10    Q.  So --

11    A.  AOL was at one point considered a walled

12  garden.  It was a closed system.  It was a closed system that everything was

13  happening inside there and nothing you know, it was

14  not -- it was a hundred percent controlled by AOL.  And

15  this -- this was -- what we were building is something

16  that we saw as an -- as an alternative to a walled

17  garden.  Something that was much more open.

18    Q.  So a walled garden -- let me make sure I

19  understood.  A walled garden was a web site service that

20  restricted other people's ability to access and take or

21  use data from the web site?

22    A.  So you're saying only --

23    Q.  Wait.  Wait.  Was that a yes?

24    A.  Yes.

25    Q.  Okay.  And -- and -- and the reason you are

**Page 343**

1  saying it was becoming more open was because Facebook

2  Connect, for example, was available and allowed people

3  to at least have an entry point to the Facebook

4  environment?

5    A.  No.  What we were saying is that this kind of

6  force people is -- these are structural possibilities

7  that instead of something only with -- with Facebook

8  where everything's closed and restricted and defined

9  only by Facebook and shutting off all other innovation

10  except by this one way, there could be other structural

11  possibilities such as what Google was working on, which

12  was trying to create.

13    Q.  Okay.

14    A.  You know, they're -- they're -- I mean, we're

15  saying that they were all possibilities.  They -- we

16  don't know.  These were all --

17    Q.  Right.

18    A.  We don't know how they were going to go.  So

19  we saw that Facebook could become more open.  And they

20  -- you know, but again, at that time everything was new.

21    Q.  Right.  Your statement was they're -- they're

22  becoming more open, who knows if it's a good idea or

23  not?

24    A.  Yeah.  We don't know how this is going to

25  happen.  There are many ways they could become more

**Page 344**

1  open.  They could be open with -- with one site

2  controlling everything, they could be open with

3  something like Open Social, they could be open with

4  something like what Power was creating.  There are many

5  different hypothetical possibilities.

6       And obviously on the next page we defined what

7  we sized wall garden initiatives and then we defined

8  shared gates between gardens.

9    Q.  What did you mean when you referred to shared

10  gates between gardens?

11    A.  Shared gates are typically industry standards.

12  Rather than one company controlling the entire standard,

13  one of the initiatives were many sites get together such

14  as Open ID, Open Social, and -- and Oauth, Open

15  Authorization, which was a shared standard for how to --

16  rules on how to access sites.  And as you know, when we

17  talk to many sites they would say, look, we have no

18  problem for you accessing to do things but, you know, if

19  -- are there other open standards that you could be able

20  to use.  And that was typically the conversations of,

21  you know, open -- open -- open standards basically.

22  That's what we referred to when creating shared gates.

23  So kind of open standards or other types of things that

24  are --

25    Q.  Open -- open standard -- open gates are --

1    A.   Open standards are one way to do it.  The
2  other way to do it is basically create tools for users
3  to access their own information without any standards.
4    Q.   Unrestricted data portability?
5    A.   Yeah.  Unrestricted data portability.  That's
6  another way.
7    Q.   That's -- that's what you're getting at?
8    A.   Yeah.
9    Q.   And -- and Facebook's methodology or approach
10  wasn't consistent with that in your view?
11    A.   At that -- at that time, the fact that they
12  limited many, you know, different activities and data
13  portability or any other way to access besides with
14  Facebook Connect was something that us and I -- I think
15  many people in the industry had, you know, similar
16  opinions on -- on this issue.  That it -- you know, that
17  was definitely not --
18    Q.   You'd agree with me at the time the launch
19  promotion was raised, was started --
20    A.   Yeah.
21    Q.   -- your views on data portability were not the
22  same as Facebook's views on data portability?
23    A.   I think our actions on data portability were
24  not the same.  Facebook may have had publicly stated
25  views, but we believe that Facebook's actions were this

1  companies and we said, wait, these guys are not using
2  Facebook Connect, they're working, what's going on here.
3  So we were -- we were trying to understand, but there
4  was no clear answer.  But we obviously new that Facebook
5  was --
6    Q.   Did you ever reach out to Facebook and ask
7  them?
8    A.   We did -- actually, had -- we -- we tried --
9  we tried -- we didn't -- we tried to make conversation.
10    Q.   Prior to the launch promotion, did you ever
11  reach out to Facebook and ask them?
12    A.   Ask them what?
13    Q.   Ask them if you could access the Facebook web
14  site in a way other than Facebook Connect.
15    A.   I don't believe that we had a direct
16  conversation.
17    Q.   Okay.  You were confused as to what the
18  intentions or objectives of Facebook were prior to the
19  launch promotion, correct?
20    A.   Correct.
21    Q.   And notwithstanding that confusion, you didn't
22  take any effort to reach out to Facebook and ask them
23  did you?
24       MR. FISHER:  Objection.  Vague.
25  Argumentative.  Assumes facts --

1  is the only way to connect to Facebook.  Any other way,
2  we're going to, you know, threat -- threaten this
3  company.
4    Q.   So let me reframe the question then to be more
5  precise in that way.
6    A.   Sure.
7    Q.   Prior to the launch promotion, you knew that
8  Facebook's approach, their actual technical approach to
9  data portability was different than the approach and
10  views you had.
11    A.   That's correct, yes.
12    Q.   And you knew that they didn't -- would not
13  want Power encouraging data portability in the way that
14  it was approaching the Facebook web site?
15    A.   Actually, we had no idea because they made
16  public statements saying one thing.  Their actions
17  stated other things.  There was a lot -- it was a very
18  convoluted message that they had.
19    Q.   You knew that their actions indicated that
20  they did not want to allow for data portability --
21       MR. FISHER:  Objection.  Vague.
22    Q.   BY MR. CHATTERJEE:  -- other than through
23  Facebook Connect, correct?
24    A.   Actually, we didn't know.  We didn't know.  As
25  you just saw, we went through exercises and we saw other

1       THE WITNESS:  As I said --
2       MR. FISHER:  -- not in evidence.  Lacks
3  foundation.
4       THE WITNESS:  Face -- Facebook was not our top
5  priority at that time.  And we were doing something that
6  we felt and we continue to feel was completely
7  legitimate.  So if, you know, the conversation -- we --
8  we -- if Facebook had an issue, they would -- they would
9  tell us and then we would have a conversation with it --
10  with it and we would try to solve it.
11    Q.   BY MR. CHATTERJEE:  So you wanted to ask for
12  forgiveness instead of permission?
13    A.   It's not about asking for forgiveness.  It's
14  just what -- that's what -- that's what we did.
15    Q.   So I'm going to ask you a really simple --
16    A.   That's what we did.
17    Q.   -- question, Mr. Vachani.
18       MR. FISHER:  Objection.  Argumentative.
19    Q.   BY MR. CHATTERJEE:  Prior to accessing the
20  Facebook web site --
21    A.   Yes.
22    Q.   -- through the launch promotion, did you or
23  did you not contact Facebook and ask for their views on
24  it?
25       MR. FISHER:  Objection.  Vague.  Asked --

**Page 349**

```
 1        THE WITNESS:  I don't know --
 2        MR. FISHER:  -- and answered.
 3        THE WITNESS:  I don't know if guys in our
 4   company did or did not.  But it was -- I don't -- I
 5   don't remember us having a -- meeting.  But we may
 6   have.
 7        BY MR. CHATTERJEE:  So as the corporate
 8   designee for Power Ventures, you have no recollection of
 9   anyone at Power reaching out to Facebook and asking them
10   if the Power approach was okay or not?
11        MR. FISHER:  Vague.  Asked and answered.
12   Mischaracterizes prior testimony.
13        THE WITNESS:  I don't believe -- I don't
14   believe so.  I don't think it -- it -- to us -- to us it
15   was, you know, we were -- we were just doing standard
16   access to data which was already being done across the
17   web.  So we didn't think -- we said you know what, the
18   better -- let's -- let's do what everybody's doing,
19   including Facebook, use the same -- same -- same
20   standards that Facebook is using.  And so we said if
21   Facebook's doing this, if other people are doing this,
22   you know, it's not -- it's probably not the highest
23   priority, but obviously if -- if they have an issue we
24   would be happy to sit down and -- and discuss it and
25   work it out and -- and -- and seek solutions.
```

**Page 350**

```
 1        MR. CHATTERJEE:  Let's take a five-minute
 2   break.  I think I'm done, but I just want to check with
 3   her and make sure I didn't miss anything.
 4        THE VIDEOGRAPHER:  We are going off the
 5   record.  The time is 6:03 p.m.
 6        (Whereupon a break was taken from 6:03 to
 7        6:07.)
 8        THE VIDEOGRAPHER:  We are back on the record.
 9   The time is 6:07 p.m.
10        Q.   BY MR. CHATTERJEE:  Mr. Vachani --
11        A.   I just wanted to be clear.  We -- is our
12   intention to finish everything today?
13        Q.   You're going to hear from me in just a minute.
14        A.   Okay.  Please go.  Sorry.
15        Q.   Mr. Vachani, did you receive any other cease
16   and desist letters other than the one you received from
17   Facebook?
18        A.   On which issue?
19        Q.   With respect to accessing -- well, what other
20   issues did you receive cease and desist letters?
21        A.   I'm saying back I think a long -- I mean, I
22   don't know if we had a cease and desist.  But we had
23   conversations on -- conversations on -- on, like, is
24   this fishing and determined that it wasn't.  Because it
25   was a legitimate --
```

**Page 351**

```
 1        Q.   Like the Myspace thing?
 2        A.   I think with -- even -- even with Orkut in the
 3   early days, had -- I don't know if it was a verbal or we
 4   had a conversation on the issue.
 5        Q.   Other than that?
 6        A.   Cease and desist letters?
 7        Q.   Correct.
 8        A.   We had conversation with Twitter, but I don't
 9   believe there was a cease and desist letter.  I believe
10   it was a -- a conversation, you know, hey, we want to
11   understand the -- we want to understand how you're
12   accessing the site, we want to understand your policies,
13   your procedures.  Very standard conversation that we had
14   with almost everyone.  That we usually had with product
15   managers, not with lawyers.
16        Q.   Any other -- any other notifications from
17   people telling Power to stop doing anything that it was
18   doing?
19        A.   I think that we've discussed our conversation
20   with hi5.  We discussed our conversation with Myspace.
21   As I said earlier, I don't believe we had any
22   conversation with Meebo, but I may be mistaken of that.
23   You may -- if you found, you can remind me.  I don't --
24   if it was, it was minor.
25        Q.   So --
```

**Page 352**

```
 1        A.   Google.  I'm just trying to go through the --
 2   the main companies.  Twitter.  To my best of my
 3   knowledge, no.  But again, I may be -- I may be missing
 4   a minor one.
 5        Q.   So we spent a fair amount of time talking
 6   about dynamically associated IP addresses.
 7        A.   Yes.
 8        Q.   I think you said that technology was
 9   implemented from the very beginning?
10        A.   Well, as you can see, it's the technology of
11   dynamic and rotating IPs was a conversation that was
12   part of our company's -- you know, built into our
13   core -- our core -- core technology from the -- you
14   know, from the beginning.  Obviously technologies
15   continue to evolve, continue to learn, continue to
16   become more dynamic.  And you can see we had very
17   extensive issues on scalability, on how you deal with,
18   you know, creating ground-breaking innovation.
19        Q.   I -- I -- I understand that.  Very limited
20   question.
21        A.   Okay.  Please.
22        Q.   The dynamically associated IP address --
23        A.   Yes.
24        Q.   -- that was something around from the
25   beginning?
```

**Page 353**

1    A.   Yes.

2    Q.   Okay.  And the Amazon option to -- to -- to go

3    to them to have an unlimited number of IP addresses was

4    also implemented shortly before -- shortly before the launch?

5    A.   It was -- it wasn't available in the

6    beginning.  It was -- you know, we had to work with many

7    different places.  Amazon later on, I don't know when,

8    they opened up the system where they had that -- their

9    web services.  When that -- that made -- that made --

10   that made that solution that we had already built just

11   more -- more robust.

12   Q.   Okay.  And -- and was that before or after the

13   launch promotion, if you know?

14   A.   I don't remember.

15   Q.   Okay.

16   A.   I don't know when it was.  Whenever Amazon

17   made it available, we started looking at it.

18   Q.   Other -- other than those two technical

19   solutions, was there anything else that Power did to

20   ensure that Power users could access the various social

21   networking web sites that -- that -- that were part of

22   power.com's architecture?

23   A.   Well, I'm -- I mean, I think in our -- our

24   browser, you know, we went through a lot of different

25   optimizations to make sure that our browser would be

**Page 354**

1    compatible when -- when you access a site.  You know, I

2    don't know --

3    Q.   What do you mean by compatible?

4    A.   So since we built -- we had built a new type

5    of browser.  It was, you know, not a traditional browser

6    where you downloaded it.  It was one where it was a

7    web -- a web-based browser, so you could browse, but you

8    were -- you were -- it was like a browser within a

9    browser.  So that's the best way to think about it.  So

10   there were range of -- just standard issues on how to

11   make -- how to make a browser within a browser work and

12   when you visit sites and things like that.  So these

13   are -- these are the kind of issues that --

14   Q.   Right.  What about -- what about technology

15   specifically directed towards efforts a web site would

16   use to limit access, in other words slow it down --

17   A.   Yeah.

18   Q.   -- or to prevent access?

19   A.   Prevent access?

20   Q.   Other than -- you know, were there any other

21   technologies employed by Power?

22   A.   I mean, you have access to -- I mean, our --

23   our -- this is -- we have a pretty, pretty broad

24   technology set and, you know, presentations that define

25   all the different components of our system.  So --

**Page 355**

1    Q.   So the other measures would be embodied in the

2    code if it?

3    A.   I mean, it's just everything is in the code

4    or -- and in the technical set that's in our

5    presentations, etcetera.  I mean, that I could think of.

6    There's nothing like -- the core -- the core components

7    are our browser, our proxy.  We've covered the core

8    ones.

9    Q.   Right.  So you -- you -- you can't identify

10   anything separate today, but the code would be the best

11   evidence of what it was?

12   A.   The code -- the code or --

13   Q.   Technical documents?

14   A.   Or technical documents.

15   Q.   Got it.

16   A.   Some things that were never -- might have

17   never been implemented but --

18   Q.   Okay.

19   A.   -- or at least were discussed.

20   MR. CHATTERJEE:  All right.  So at this point

21   I'm going to make two observations.  One is I don't

22   think Mr. Vachani has answered many of the questions

23   that I've asked.  And the second is I don't think he was

24   adequately prepared as a 30(b)(6) witness.  An hour of

25   time without reviewing any documents whatsoever or

**Page 356**

1    having really any -- any meaningful understanding of any

2    of the issues that are identified in the topics.  We're

3    going to reserve our rights to review the deposition

4    transcript, initiate a meet and confer, and decide

5    whether he needs to come back.

6    At this point I think we'll suspend the

7    deposition.  You don't have to come back tomorrow

8    because we want to review the transcript and then figure

9    out what to do.  I don't want to waste our time tomorrow

10   if -- if we're -- you know, if we're just going to have

11   nonresponsive answers like we've had today.  So we'll

12   suspend at this point.  We'll reserve our rights.  I'm

13   sure you're going to reserve your rights.  We'll look at

14   the transcript and then we'll figure out what to do.

15   MR. FISHER:  Obviously we disagree with your

16   characterization of the deposition, and we think Mr.

17   Vachani has been very forthcoming.  But as you can

18   reserve your rights, we'll reserve ours.

19   MR. CHATTERJEE:  Got it.

20   THE WITNESS:  Yeah.  I mean, I think I --

21   I'm -- the reason I'm very familiar with -- with every

22   aspect of the company and I think my deposition and

23   arguments, obviously, in our opinion were very

24   forthright, transparent, and we've been --

25   MR. CHATTERJEE:  Mr. Vachani, your opinion on

**Page 357**

1    this doesn't matter.  The record speaks for itself.
2         THE WITNESS:  Okay.
3         MR. CHATTERJEE:  You have not answered my
4    questions.  I think the record shows that.  I'll take it
5    to court.
6         THE WITNESS:  In your opinion.  Would you
7    please say in my opinion?
8         MR. CHATTERJEE:  No.  The record shows it.
9         THE WITNESS:  It's not the record.  It's your
10   opinion.
11        MR. CHATTERJEE:  The record shows it.  Mr.
12   Vachani, you -- you'll have the chance to review the
13   transcript.  It will speak for itself.  And we'll have
14   the judge make the call if we need him to.
15        THE WITNESS:  Okay.
16        MR. CHATTERJEE:  I am going to try to avoid
17   that, because I don't want to drag you here if we don't
18   have to.
19        THE WITNESS:  Okay.
20        MR. CHATTERJEE:  But -- but we've made our
21   objection.  Your counsel has responded.  I haven't asked
22   you additional questions.  We're going to suspend the
23   deposition at this point in time.  Thank you.
24        THE WITNESS:  Thank you.
25        THE VIDEOGRAPHER:  This ends videotape number

**Page 358**

1    four, and this ends the deposition of Power Ventures,
2    Inc., volume one.  The time is 6:14 p.m. on January 9th,
3    2012, and we are off the record.
4         (Discussion off the record.)
5         MR. FISHER:  I would like a PTX and a PDF
6    exhibits.  And I don't need a like hard copy.
7         THE REPORTER:  So no paper?
8         MR. FISHER:  I'd rather not have paper, if
9    possible.
10        (Whereupon the proceedings were concluded at
11        6:14 p.m.)
12             ---oOo---
13   //
14   //
15        I have read the foregoing deposition
16   transcript and by signing hereafter, approve same.
17
18   Dated_____.
19
20        _____
21             (Signature of Deponent)
22
23
24
25

**Page 359**

1         DEPOSITION OFFICER'S CERTIFICATE
2             (Civ. Proc. § 2025.520(e))
3    STATE OF CALIFORNIA     )
                             )  ss
4    COUNTY OF CONTRA COSTA  )
5
6         I, CHERREE P. PETERSON, hereby certify:
7         I am a duly qualified Certified Shorthand
8    Reporter, in the State of California, holder of
9    Certificate Number CSR 11108 issued by the Court
10   Reporters Board of California and which is in full force
11   and effect.  (Fed. R. Civ. P. 28(a)).
12        I am authorized to administer oaths or
13   affirmations pursuant to California Code of Civil
14   Procedure, Section 2093(b) and prior to being examined,
15   the witness was first duly sworn by me.  (Fed. R. Civ.
16   P. 28(a), 30(f)(1)).
17        I am not a relative or employee of any attorney
18   or counsel of any of the parties, nor am I a relative or
19   employee of such attorney or counsel, nor am I
20   financially interested in this action.  (Fed. R. Civ. P.
21   28).
22        I am the deposition officer that
23   stenographically recorded the testimony in the foregoing
24   deposition and the foregoing transcript is a true record
25   of the testimony given by the witness.  (Fed. R. Civ. P.

**Page 360**

1    30(f)(1)).
2         Before completion of the deposition, review of
3    the transcript (XX) was ( ) was not requested.  If
4    requested, any changes made by the deponent (and
5    provided to the reporter) during the period allowed, are
6    appended hereto.  (Fed. R. Civ. P. 30(e)).
7
8    Dated: JANUARY 13, 2012
9
10
11        _____
12
13
14
15
16
17
18
19
20
21
22
23
24
25