# EXHIBIT C

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| FACEBOOK, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. |
| vs. | ) 5:08-cv-05780 JW (JCS) |
| | ) |
| POWER VENTURES, INC., a | ) |
| Cayman Island Corporation; | ) |
| STEVE VACHANI, an individual; | ) |
| DOE 1, d/b/a POWER.COM, | ) |
| DOES 2-25, inclusive, | ) |
| | ) |
| Defendants. | ) |
| ______________________________ | ) |

CONFIDENTIAL

VIDEOTAPED DEPOSITION of POWER VENTURES, INC.'S 30(b)(6) Designee STEVEN VACHANI taken on behalf of Plaintiff, at Orrick, Herrington & Sutcliffe LLP, 405 Howard Street, 10th Floor, San Francisco, California beginning at 9:13 a.m., Monday, January 9, 2012, before CHERREE P. PETERSON, RPR, CRR, Certified Shorthand Reporter No. 11108.

Q. In the second paragraph you stated "Power has already produced the actual source code it used to access Facebook's website. The source code as well as the other documents Power has produced in this case such as the PowerScript Training documents and PowerScript Documentation Developer Manual show precisely how Power accessed Facebook's website." These "documents constitute the best possible information Power has to understand how Power accessed Facebook's website."

09:30

Do you see that?

09:31

A. Yes.

Q. Okay. So that statement was accurate when you made it?

A. Yes.

09:31

Q. Is it fair to say that the -- the actual source code that Power has produced in this case is the best evidence of what Power did and how it was doing it with respect to the Facebook web site?

MR. FISHER: Objection. Vague.

09:31

THE WITNESS: I believe we've provided everything that we had available. So -- so therefore everything that was possibly available as we provided, therefore that's the best that could be provided.

MR. CHATTERJEE: Okay. Could you read the question back, please.

09:31

(Whereupon the record was read as requested.)

THE WITNESS: All I can -- as I said, we've provided everything that's avail --

Q. BY MR. CHATTERJEE: I'm not asking a discovery question --

09:32

A. Yeah.

Q. -- Mr. Vachani.

A. Okay.

Q. I'm asking the question of is the source code --

09:32

A. Yeah.

Q. -- the best evidence of what Power Ventures did with respect to the Facebook web site?

MR. FISHER: Objection. Vague.

09:32

THE WITNESS: I don't -- I don't know. I don't know the answer if the source code is the best evidence. That's a -- I think a subjective opinion.

Q. BY MR. CHATTERJEE: Okay. So let me -- I'll -- let me explore that a little bit.

09:32

A. Sure.

Q. In your deposition that Mr. Cooper took, you characterized the way that some of the Power Ventures software worked. You recall testifying generally about that?

09:32

A. Yes.

BARKLEY Court Reporters

existed and it provides -- you can interpret that as best as you want. We provided you code, the company's code. We've provided everything that -- that's available.

09:34 Q. BY MR. CHATTERJEE: Okay.

A. And I have answered every question in the past in previous statements. So what I've said in those previous statements I -- I stand by.

Q. Okay. So let me ask it again. If your

09:34 testimony differ from what the actual source code used to access Facebook's web site shows --

A. Yes.

Q. -- which one of those two is the best possible information Power has to understand how Power accessed

09:34 Facebook's web site?

MR. FISHER: Objection. Vague. Assumes facts not in evidence. Incomplete hypothetical. Argumentative. Asked and answered.

THE WITNESS: I think this, again, you're

09:34 getting into hypothetical statements here. We've provided the code. You know what it does. I've told you in the past what it does. I've answered many questions and many answers on this. I don't know what -- what you're trying to --

09:34 Q. BY MR. CHATTERJEE: What I'm trying -- what

BARKLEY Court Reporters

tracked, right?

A. There would be data in the data -- that's correct.

Q. Okay. And we've referred generally to the database.

10:50

A. Yes.

Q. Can you tell me what that was called or what the file name of it was?

A. I -- the file names you guys have -- have reviewed everything that was there. So you -- you guys have probably -- your guys probably have better knowledge of that than I do personally. I mean, because you guys -- probably the most -- recently analyzed it the most.

10:50

Q. Do you know if that database exists today?

10:50

A. Everything -- everything that was -- we provided everything that exists today to you guys. And as far as I understand, everything -- and again was -- everything -- you guys were able to find all files except for a specific file that we -- we have that we've discussed that was a -- a -- a log-in file of -- of links of, like, pages visited, which I think that was the -- that was the file that was 180 gigs that was available for three years. But on two -- in -- on August 2011 was not able -- it was too large to transfer

10:50

10:51

A. Yeah. We gave e-mail -- power.com e-mail addresses to most of our people because it was a nice name to include on -- this was giving Andreas a Power address.

13:51 Q. And Eric Santos also had one?

A. Yeah. Well, I -- at that time every -- we gave -- we gave Power addresses to almost anyone that was a shareholder. Some used it, some didn't.

Q. So if I wanted to find an e-mail from Eric 13:51 Santos to Rob Pollock where you weren't cc'd, where would I look to get that e-mail?

A. Well, Rob -- Rob -- you'd have -- you'd have to ask Rob -- Rob Pollock, you know. I mean, it was -- those -- those e-mails were all -- they were no -- there 13:52 was no like -- at this -- for most of the stage of the company, it was the way that you have access to each other's e-mail boxes.

Q. So there was no centralized e-mail repository?

A. There wasn't.

13:52 Q. Okay. And -- and was it basically a technology where someone could have a power.com e-mail address but it would forward --

A. It was forward to their -- exactly.

Q. Forward to a personal --

13:52 A. Forwarded to --

13:52
13:52
13:52
13:53
13:53

THE REPORTER: Okay. Let him finish, please.

Q. BY MR. CHATTERJEE: And it would forward to a personal e-mail account?

A. Yeah.

Q. For everybody?

A. Some people accessed -- everyone had different ways to access their Power. I mean, some people had their own servers. You know, everyone had their own -- their own way of accessing their e-mail.

Q. But there was no centralized place at Power where those e-mails were maintained?

A. Not that I know of, I mean, that we -- that we utilized. I mean, I -- I know I personally utilized my e-mail through -- through the box that I gave you access to.

Q. Right. But your e-mail address typically says steve@stevevachani.com and not power.com.

A. Yahoo! makes it harder to do your from. A lot of the people use them. On their desktop they can -- because, like, Google and some others make it easier to be able to put your e-mail there.

Q. Okay.

A. And I -- also I guess I had been using that so long, I just -- I -- I -- I think my BlackBerry, you know, it would -- it would send. But all the send would

not necessary as we....

Q. So when this lawsuit was filed, did you e-mail the various power.com members and ask them to preserve documents?

13:54 A. Did I e-mail? I mean, you have my e-mails, so. I mean, I don't -- I don't think there was a -- there was no law -- there was no law -- there was a -- I mean, I -- I don't know what -- what -- what we said to them, but it would be -- it would be my -- everything is

13:54 in my e-mail.

Q. Do you recall ever instructing the power.com employees not to -- not to destroy documents?

A. It's our standard policy no one -- not to destroy documents. No one's -- as far as I know, no

13:55 one's -- no one's taken any direct effort to destroy documents.

Q. Did -- but my question's really precise. When the litigation was filed did you send out a reminder or tell anyone not to destroy documents?

13:55 A. Which? You mean the Facebook litigation?

Q. Yeah.

A. No, I didn't.

Q. Okay. And was there any particular reason why you didn't do that?

13:55 A. There was no -- it was just a standard --

instructions were made, you have access to my e-mails. And you -- you've seen if there are anything -- no one has ever been instructed to destroy anything. And as far as I understand, everybody's, you know --

13:56 Q. BY MR. CHATTERJEE: Right. My question's different. Not no one's been instructed to destroy. Were people instructed to make sure that they preserved?

A. No one -- I don't believe anyone was instructed, you know, either way. But if there's an e-mail otherwise -- to the best of my recollection, no. 13:56

Q. Was there a written corporate policy that employees were given as part of training or otherwise that said what you said earlier that people aren't supposed to get rid of documents or e-mails?

13:56 A. We -- there was some corporate policies. And I don't know if those -- I don't know what -- what -- what -- how formal they were. There were corporate policies when the -- when the company was in that stage.

Q. Okay.

13:57 A. But I don't know if there was something specific on that issue. No one -- none of us had ever been through -- I don't think anyone's ever discussed a lawsuit. The lawsuit had never been part of that.

Q. I'm not sure I'll ask this question artfully.

13:57 So people had a power.com e-mail address which would

BARKLEY Court Reporters

forward to their personal address?

A. No. I mean, there -- there was a server. But, I mean, I say everyone -- how they accessed it was in different ways.

13:57 Q. Okay. But that server, would it house the e-mails that people received as part of the business or would it just forward things on?

A. I -- I don't know how it was exactly work. But I believe that, you know, there was -- everyone had

13:57 a different way of accessing their -- their e-mails. That's all I know. And all the people -- like I -- I accessed mine through Yahoo! and Eric would access through, you know, his own. Everybody accessed on their own.

13:57 Q. So if that server did have e-mails between people at Power that didn't include you, that would be on the backup?

A. I mean, yeah, it would be on the backup.

Q. Okay. And if it isn't there, then --

13:58 A. Yeah. Whatever -- whatever we have is in the backup.

Q. Okay.

A. I mean, I don't know the technical details on how these things were -- were working, so.

13:58 Q. And if -- is it Power's view that an -- an

BARKLEY Court Reporters

13:58
13:58
13:58
13:59
13:59

e-mail sent to a power.com employee that was then forwarded to a personal account, who -- whose e-mail is that? Is that the employee's e-mail or is it Power's e-mail?

MR. FISHER: Objection. Vague. Calls for a legal conclusion.

Q. BY MR. CHATTERJEE: Do you follow me?

A. Yeah.

Q. I can give you a concrete example.

A. Yeah.

Q. If Eric Santos e-mailed Bruno Carvalho with some sort of business instruction --

A. Yeah.

Q. -- and it went to their personal e-mail --

A. Yeah.

Q. -- through the server architecture, who would be the owner of that e-mail?

A. Well, I'll --

MR. FISHER: Same objections.

THE WITNESS: I'll answer it another way that -- more practically. That we were a small company. So if I look at the ten people that I personally communicated with most regularly and think about each of them, you know, I mean, from a practical standpoint -- although this doesn't answer your question -- almost --

BARKLEY Court Reporters

almost any e-mail, you know, there -- that all the people that are involved in this situation have -- have pretty much been -- you know, they're -- they're -- they had -- they had their own solution. So I don't know who own. I mean, we had -- if they had access. If they chose to copy one person in Power, then obvious -- it's accessible. And so that's from practical purposes anything that was copied to me or anything that was copied to Eric or -- or Rob or Zak or all these key people that were in the company, you know, they were all essentially preserved.

13:59
13:59
13:59

Q. BY MR. CHATTERJEE: Right. But if -- let's -- let's say that -- that there was an e-mail that went to a person's personal e-mail account through the forwarding tool on the servers and it had a bunch of power.com business information, was the employee who received that e-mail free to go and use that information however they wanted outside of Power?

MR. FISHER: Objection. Vague. Calls for a legal conclusion. Incomplete hypothetical.

14:00

THE WITNESS: In -- in theory, no. I mean, they're not supposed -- they -- they -- when they sign, when they join the company, they sign saying that everything -- their -- their employment contracts, which I believe you've seen some, you know, have references

14:00

to, you know, ownership and data and everything else that they state. So there's a certain level of -- we're probably not large enough to have implemented really rigid, you know, well-defined systems at that level. But, you know, we -- they were pretty -- the employment contracts state, you know, we own -- we own all the stuff. The standard stuff that are in most employment contracts.

14:00

Q. BY MR. CHATTERJEE: Okay. Let's go to Exhibit 2 -- 203. On the second page this is -- this is an e-mail from you to a whole bunch of people that April 30th, 2009.

14:00

A. Yep.

Q. Do you see that?

A. Yeah.

14:00

Q. At the very bottom of the page there's number 5. It says "Our new US Launch scheduled in July."

A. Yeah.

Q. What -- what was the US-based launch going to be?

14:01

A. We had -- we had considered, you know, just making -- starting to more -- to more aggressively push our -- the Power site. And we had also talked about, you know, potentially turning back -- Facebook back on, which we decided not to do.

14:01

30(f)(1)).

Before completion of the deposition, review of the transcript (XX) was ( ) was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed, are appended hereto. (Fed. R. Civ. P. 30(e)).

Dated: JANUARY 13, 2012

Cherree P. Peterson
_______________________

360

Designee Steven Vachani, 30 (b) (6) - Confidential

BARKLEY Court Reporters