# EXHIBIT 2

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3               SAN FRANCISCO DIVISION

4

5   FACEBOOK, INC.,           )
                              )
6                             )
              Plaintiff,      )
7                             )
    vs.                       )    No.  5:08-cv-05780 JW
8                             )
    POWER VENTURES, INC., a   )
9   Cayman Island             )
    corporation; STEVE        )
10  VACHANI, an individual;   )
    DOE 1, d/b/a POWER.COM,   )
11  DOES 2-25 inclusive,      )
                              )
12            Defendants.     )
                              )
13  _____)

14

15        VIDEOTAPED 30(b)(6) DEPOSITION OF

16                 STEVE VACHANI

17

18     Held at the Orrick, Herrington & Sutcliffe

19       1000 Marsh Road, Menlo Park, California

20        Wednesday, March 7, 2012, 9:57 a.m.

21

22  REPORTED BY:  ELAINA BULDA-JONES, RPR, CSR #11720

23

24

25

                          2

BARKLEY
Court Reporters

1      Q.   On Facebook's terms of service and

2  compliance with it?

3      A.   We had reviewed it internally.

4      Q.   Yeah.

5      A.   We have -- we have -- had internal

6  counsel.

7      Q.   All right.  Do you recall at your July

8  deposition saying that while you had invested vetted

9  the general process of complying with terms of

10  service, you didn't specifically do anything with

11  respect to Facebook's?

12     A.   We didn't -- we reviewed them.

13     Q.   Okay.  But you -- now -- so you do recall

14  reviewing Facebook's terms of service before they

15  sued?

16     A.   Well, I think we have -- we have

17  established that in the past.

18     Q.   Okay.

19     A.   That we have read -- we have -- someone in

20  our company has read them, you know, read the terms

21  of service.

22     Q.   All right.  All I'm trying to figure out

23  is between December 2nd, 2008, and December 30th,

24  2008, did you follow through with Mr. Herrera's

25  suggestion to get advice from a litigation lawyer?

101

BARKLEY
Court Reporters

1      A.   Did I get -- I believe we had -- we had --

2  we had it, but I don't know who we talked to at that

3  time, but we did get -- I did get advice from people

4  I trusted.

5      Q.   Okay.  But you did not engage any attorney

6  formally by Power, correct?

7      A.   We did not engage any attorney formally by

8  Power.

9      Q.   And in fact, in this case you specifically

10  disavowed reliance on the advice of counsel as a

11  defense to actions, correct?

12      A.   We had -- we did have, obviously, internal

13  counsel, but you are correct, we got -- we got

14  advice on the issue and we continued to get advice.

15      Q.   All right.  And you elected, after

16  Mr. Herrera had advised to get litigation counsel,

17  to continue to make a connection to Facebook despite

18  the cease-and-desist letter, correct?

19      A.   That we -- that's correct.

20      Q.   And that --

21      A.   We continued to make -- to make -- you

22  know, we obviously continue to this day, believe

23  that we were -- you know, that we were -- you know,

24  we had a dialogue and we had -- and we -- at that --

25  at that point, in the month of -- up until December

Steve Vachani, 30(b)(6)



1  25th, we did have -- you know, we were -- we were in

2  conversation -- we were in open communication with

3  Facebook.

4          And obviously it was only on December 26

5  or 27th that, based on the fact that we were not

6  able to make the updates, we advised -- we advised

7  them that we would continue until -- in good faith

8  we would continue and try until we could complete

9  the update.

10          So we were in communication with Facebook,

11  as you -- as you are fully aware of.

12      Q.   I understand you were in communication

13  with Facebook.

14      A.   And no employees -- but they understood

15  that we were going to continue operating until the

16  -- Facebook had basically acknowledged that we would

17  continue operating until the 26 of --

18      Q.   I understand, Mr. Vachani.  But my point

19  is the decision, after Mr. Herrera, on December 2nd,

20  suggested getting a litigation lawyer, to continue

21  to connect to Facebook was your decision as the --

22      A.   I was the CEO of the company, so yes, that

23  is correct.

24      Q.   Okay.  Do you see he also says, "And I

25  don't mean any commercial person at Meebo, even

Steve Vachani, 30(b)(6)

BARKLEY
Court Reporters

1    whatever type of block.

2         Q.   Okay.  And then you say, "Please just make

3    sure they cannot block us"?

4         A.   Correct.

5         Q.   All right.  Did you take any action to

6    ensure that Facebook could not block you on or after

7    December 2nd, 2008?

8         A.   I don't believe that we did anything --

9    anything further.

10             The only thing that we had -- I don't

11   think -- I don't -- to the best of my knowledge,

12   beyond a system that -- you know, where IPs update,

13   I don't believe there was any other actions taken.

14        Q.   Do you recall Mr. Santos in any way

15   responding to your statement, "Please just make sure

16   they cannot block us"?

17        A.   I'm sure he responded.

18        Q.   All right.  Do you recall what --

19        A.   I don't recall specifically what he said,

20   but I would -- I'm sure that he would -- he

21   responded to it.

22        Q.   But you were the person making the

23   executive decision that you wanted to ensure that

24   Facebook could not block Power.com, correct?

25        A.   Well, obviously if -- it was -- we

141

BARKLEY
Court Reporters

1   would -- we did not wish for our -- for our service

2   to be blocked by -- by Facebook, obviously.

3        Q.   Okay.  But you made that decision on

4   behalf of Power, correct?

5        A.   I was the CEO of the company, so I made

6   the final decision.

7        Q.   Okay.

8             (Whereupon, Exhibit 241 was marked for

9   identification.)

10            THE WITNESS:  I don't know who made the

11   actual decision.  You know, this was when I wasn't

12   the CEO of the company.

13            (Whereupon, a brief discussion off the

14   record.)

15   BY MR. COOPER:

16        Q.   You directed Mr. Santos to ensure that

17   Power.com could not be blocked, correct?

18        A.   Yes.

19        Q.   All right.  As the CEO of the company, you

20   controlled the right to make that decision?

21        A.   That's correct, yes.

22        Q.   All right.  I put in front of you 241.

23   Exhibit 241, again, is an e-mail that you have

24   produced in the past, but with a new addition at the

25   top from the exhibit that was previously introduced.

142

BARKLEY
Court Reporters

1           Do you recall my showing you in July the

2    e-mail that you wrote to Joseph Cutler which begins

3    almost immediately on the first page and continues

4    for several pages?

5           A.    Correct, yes.

6           Q.    All right.  This was the e-mail that you

7    wrote on December 26th, 2008, informing Facebook

8    that you would continue to maintain access to the

9    Facebook service, correct?

10          A.    For business reasons until we could make

11   the transition properly, but that, yeah, we said

12   that we could not interrupt the service until the

13   new Facebook Connect solution was ready.

14          Q.    All right.  Do you see in this e-mail you

15   cut and pasted the e-mail you sent to Mr. Cutler and

16   then -- and sent an e-mail to Mr. Santos, saying,

17   "Please note that we will not remove anything or

18   change at this time on Facebook"?

19          A.    Correct.

20          Q.    All right.  Then you say, "I made a

21   decision and sent an e-mail to Facebook"?

22          A.    Yes.

23          Q.    Okay.  And that's because you did, in

24   fact, make the decision to continue to connect to

25   Facebook, correct?

143

BARKLEY
Court Reporters

1      A.   Well, actually, to be clear, we were

2  connected to Facebook up until that time with

3  Facebook's full knowledge and authorization --

4  authorization for that period up until the 26th

5  because we had had a conditional agreement with

6  Facebook that we could continue operating until the

7  26th.

8          This is something I think you understand

9  that, you know, on -- after we had discussions in

10  the beginning of December.

11          And after the 26th, that's when we had --

12  we had said unfortunately, the damage -- you know,

13  for business reasons, we cannot -- you know, we

14  need -- we need to keep this up for a few more

15  weeks.

16          And then obviously Facebook responded

17  accordingly.

18      Q.   My question was simple.  You wrote, "I

19  made a decision and sent an e-mail to Facebook,"

20  because you did, in fact, make the decision?

21      A.   I made the final decision, yeah.

22      Q.   And you controlled the right to make that

23  final decision, correct?

24      A.   I was the CEO of the company.

25      Q.   Right.  And as of December 26, 2008, you

144

BARKLEY
Court Reporters

1   block Power?

2        A.   Yes, as I said in the past, we had -- we

3   had -- blocks were common with those companies.  We

4   engaged and we -- and we resolved them in the case

5   of Orkut.

6             In the case of hi5, we met with them,

7   we -- you know, we explained to them our -- you

8   know, our position on it.  They -- we met with the

9   CEO and the people, and resolved them like -- you

10  know, resolved the solution together.

11            (Whereupon, Exhibit 242 was marked for

12  identification.)

13            (Whereupon, a brief discussion off the

14  record.)

15  BY MR. COOPER:

16       Q.   Mr. Vachani, I have put in front of you

17  one of the e-mails that was produced January 25th.

18  This is from Eric Santos to Elmo Cruz, Danilo

19  Delgado, cc'ing Julian Conceicao?

20       A.   Okay.

21       Q.   Have you seen this e-mail before today?

22       A.   This e-mail, I don't believe I have seen.

23       Q.   All right.

24            (Whereupon, a brief discussion off the

25  record.)

146

BARKLEY
Court Reporters

1   BY MR. COOPER:

2       Q.   Can you read to me how you would translate

3   the first sentence?

4       A.   Probably in the next few weeks, we will --

5   there will be blocks from -- attempted blocks from

6   Facebook, Hi5, or MySpace.

7            We need to have a structure -- yeah, to

8   have our structure in place to -- you know, to

9   prevent these blocks if -- if they -- if they -- if

10  they -- if they will happen.  And so just asking

11  what is the state of our current structure.

12      Q.   All right.  Then what does he ask Elmo in

13  the next sentence?

14      A.   Elmo, can you please configure Power to

15  use other servers and proxies, only for other Power

16  sites.  For example, Orkut using proxy local,

17  Facebook using Squid, and Amazon and MySpace using

18  Power proxy distribution.  We need to prioritize

19  this activity.

20      Q.   Okay.  Doesn't that reflect that

21  Mr. Santos, after December 2nd, actually had to take

22  additional activity to ensure that you would not be

23  blocked by Facebook?

24      A.   He's basically saying we have a structure

25  and it's possible -- anything is possible, so we --

147

BARKLEY
Court Reporters

1  we need to keep updating our system that we have,

2  our IP rotation system.

3      Q.   You are sure it's the IP rotation system

4  he's referring to?

5      A.   Either the IP rotation or updating IPs.

6  He is referring to different -- to different IPs

7  here, I believe.

8      Q.   Do you know?

9      A.   Let's see.  Well, he is referring to other

10  servers, other proxy servers, but -- other proxy

11  servers.

12      Q.   Do you know if this e-mail was written in

13  response to your instruction to Mr. Santos to be

14  prepared for blocks by Facebook?

15      A.   Probably, yes.

16      Q.   Okay.

17          (Whereupon, Exhibit 243 was marked for

18  identification.)

19  BY MR. COOPER:

20      Q.   Mr. Vachani, putting in front of you a

21  document dated January 7th, 2009, from Eric Santos

22  to you, cc'ing Felipe Herrera, Cornelius Conboy, and

23  Bruno Carvalho?

24      A.   Uh-huh.

25      Q.   Do you see the title, "Hi5 blockeo de

148



1  was -- it was one -- it was one -- I don't know.

2  The word "outdated" means an old IP address.  They

3  were probably blocking one of our -- one of our IP

4  addresses.

5      Q.   Was that -- and the address they were

6  blocking was a current IP address used by Power to

7  connect to Facebook?

8      A.   That was a current address.

9      Q.   All right.

10         (Whereupon, Exhibit 245 was marked for

11 identification.)

12         (Whereupon, a brief discussion off the

13 record.)

14 BY MR. COOPER:

15     Q.   Mr. Vachani, I put in front of you an

16 exhibit, 245, which is one of the e-mails that was

17 produced on January 25th for the first time.  And

18 it's an e-mail chain, which, if you go to the second

19 page, begins on December 23rd.  Do you see that?

20     A.   Okay.  Yes.

21     Q.   It begins with an e-mail that's subject

22 matter is "Blockeo di Facebook."  Do you see that?

23     A.   Yes.

24     Q.   All right.  And it's from Julian Conceicao

25 to you, Eric Santos, Cornelius Conboy, Patrick

BARKLEY
Court Reporters

1   Amorim, cc'ing Andre Fernandes and Elmo Cruz?

2       A.   Correct.

3       Q.   All right.   First is a practical question.

4   Do you know or have any understanding why this

5   e-mail was not produced prior to January 25th in any

6   of your other e-mail productions from your Yahoo

7   account or anything?

8       A.   I do not know.

9       Q.   All right.   Do you see we have produced,

10  because of the high importance of this particular

11  file, a certified translation already, as of today,

12  on an expedited basis?

13      A.   Correct.   Yes.

14      Q.   All right.   Please go to the second page

15  of the certified translation.

16          Do you see that the translator has

17  interpreted that first e-mail to read, in the body

18  of the e-mail, "Dear all, Power site Facebook is

19  disabled at the moment because Facebook has blocked

20  our access through web servers."

21      A.   Correct.

22      Q.   And then it says, "Andre is running a

23  configuration to use new IPs (Workaround Solution

24  1)."

25      A.   Yes.

154

BARKLEY
Court Reporters

1      Q.   All right.  Do you understand whether or

2   not this was the first or most -- or second or

3   any -- do you have any understanding whether

4   Facebook had blocked Power before December 23rd?

5      A.   I believe there would have been one --

6   there would have been one instance before and then

7   after the 26th, I guess, a second instance.

8      Q.   This was three days before you made the

9   executive decision to continue to connect to

10  Facebook, correct?

11     A.   To leave our connection, correct.

12     Q.   All right.  Now, do you see Andre

13  Fernandes, three hours or close to four hours after

14  Julian Conceicao sent her e-mail, said -- wrote,

15  "Facebook is working in Power.com again"?

16     A.   Yes.

17     Q.   And then he said, "We are using a proxy

18  solution that allows access to Facebook through

19  different IPs from our web servers"?

20     A.   Correct.

21     Q.   Was the proxy solution the workaround that

22  is referred to in Julian Conceicao's e-mail that you

23  were copied on?

24     A.   I am assuming that they -- they were

25  activating our solution to -- that was -- where the

155

BARKLEY
Court Reporters

1    IP was updated from our -- from our many IPs that we

2    have -- that we already had.

3         Q.   Okay.  On December 28th, the next e-mail

4    in the chain, Andre Fernandes informs all of you all

5    over again, "We have been blocked by Facebook yet

6    again," correct?

7         A.   That's correct.

8         Q.   All right.  And he then says, "I have

9    configured a server at Amazon to serve as proxy, and

10   Facebook is logging in normally at the moment"?

11        A.   Yes.

12        Q.   So Mr. Fernandes actually had to make a

13   change to your system of IP blocks -- or of rotating

14   IPs by switching it to Amazon, correct?

15        A.   Well, there was already some -- there was

16   already a system with Amazon, but he must -- he made

17   some updates.

18        Q.   He says, "I have configured a server at

19   Amazon," correct?

20        A.   I guess he configured.  I don't know what

21   he -- we had -- we already had a relationship with

22   Amazon but I don't know what he specifically did.

23        Q.   He had to --

24        A.   He made some kind of adjustment.

25        Q.   All right.  Then do you see Mr. Santos, in

156

BARKLEY
Court Reporters

1    response to that comment, informs everybody,

2    yourself included, "We need to develop a solution to

3    create proxy servers every six hours automatically

4    or something similar"?

5        A.   That's correct.

6        Q.   All right.  "I'm sure they will continue

7    blocking our services," is what he then adds,

8    correct?

9        A.   Yes.

10       Q.   All right.  So Mr. Santos recognized that

11   you needed to develop a new system to deal with the

12   fact that you wanted to continue accessing Facebook

13   despite their continued blocking of your site,

14   correct?

15       A.   I think what he is saying is it needs to

16   be more frequent or updated -- to be adjusted -- the

17   frequency needs to be adjusted.

18       Q.   Okay.  And that's because that

19   functionality didn't exist already?

20       A.   No, he's saying that the frequency -- he

21   says that the frequency needs to be adjusted.

22       Q.   He uses the word "solution," correct?

23       A.   Yeah, solution.  I mean, he is

24   basically -- the solution to change our IPs, update

25   and rotate already existed.  He basically is

157

BARKLEY
Court Reporters

1   referring to how often it gets updated, and it's

2   pool IP addresses.

3       Q.   Mr. Vachani, I'm going to again ask

4   something.

5       A.   Sure.

6       Q.   There have now been four e-mails I have

7   showed you that you have been cc'd on.

8       A.   Yeah.

9       Q.   Do you have an understanding why not one

10  of them was produced to us prior to January 25 in

11  any of your productions over the past three years?

12      A.   I do not.

13      Q.   All right.  Do you recall telling me at

14  the July 11th -- July 2011 depo that you searched

15  actively your e-mail accounts to find any that

16  referred to the events of December 2008?

17      A.   Yes.

18      Q.   Would you agree that these are referring

19  specifically to some of the biggest events in this

20  litigation, namely, the events involving Facebook's

21  attempt to block Power?

22      A.   Yes.

23      Q.   Would you agree these are amongst the type

24  of e-mails you assured me you would try to search

25  for?

158

BARKLEY
Court Reporters

1     A.    Yes.

2     Q.    All right.  And do you have any

3   understanding why they were not located, a single

4   one of them, in any of your prior searches?

5     A.    I don't know why they were not located.

6     Q.    All right.  Does that reflect that you

7   yourself may have from time to time deleted e-mails

8   after January -- or after January 1st, 2009, even if

9   they related to the issues in this case?

10    A.    I don't -- I don't believe so.  I don't --

11  I don't know where these -- I don't know why these

12  were not produced.

13    Q.    All right.  I will represent to you these

14  were only produced because we found them in Mr. --

15  in the backup server from the Micro Exchange server.

16    A.    Uh-huh.

17    Q.    But my question is if you have any idea

18  why you, as you testified, kept all your e-mails,

19  why they weren't actually produced through your

20  forward production, if you know?

21    A.    I don't know the answer to that.

22    Q.    Okay.  Do you see on December 29th, 2008,

23  Andre Fernandes sent an e-mail to Elmo Cruz, Julian

24  Conceicao, and Lucas Araujo?

25    A.    Yes.

BARKLEY
Court Reporters

1      Q.   All right.  And he asks Elmo, "Could you

2  please ask someone in your team to run a diagnostic

3  exclusively with Facebook?"

4      A.   Yes.

5      Q.   All right.  "This way we could receive a

6  notification via e-mail when log in is not possible

7  and we would know when Facebook was blocked again"?

8      A.   Correct.

9      Q.   All right.  "Tyaga could do this, but

10 since he's not here we need to find someone else,"

11 correct?

12     A.   Correct.

13     Q.   And then he says, "I'm checking a way to

14 always change the proxy server in a more optimized

15 manner"?

16     A.   Correct.

17     Q.   All right.  So again, this was a further

18 adjustment to your dynamic rotation system, in

19 addition to sending it to Amazon, that was necessary

20 to continue your access of the -- of the Facebook

21 blocks and to continue service, correct?

22     A.   Yes.

23     Q.   Did you have the ultimate authority to

24 instruct all of these individuals to make these

25 adjustments?

160

Steve Vachani, 30(b)(6)



1          A.   I had the authority, but -- I think that

2    they were -- they were taking natural steps to -- to

3    make adjustments.

4          Q.   All right.  But were you copied on --

5          A.   Correct.

6          Q.   -- every one of these e-mails?

7          A.   Yes.

8          Q.   And you approved of these steps, correct?

9          A.   Yes.

10         Q.   And you had the right to control these

11   steps, correct?

12         A.   Yes.

13         Q.   All right.  Monday, December 29th, 2008,

14   is the day before Facebook sued you in this case, is

15   it not?

16         A.   Yes.

17         Q.   All right.  And it's two days after you

18   made the executive decision -- that you wrote to the

19   team that you had made a decision to continue

20   accessing Facebook?

21         A.   That's correct, yes.

22         Q.   In light of Exhibit 245, do you believe

23   your statement in Paragraph 11 of Exhibit 244 is

24   accurate to the extent you said, "Power did not

25   undertake any effort to circumvent that block"?

1      A.   I think that statement should be updated

2  to more accurately reflect it, based on this

3  information.

4           MR. COOPER:  I am optimistic I'm going to

5  finish earlier than I thought.

6           But I would like to take a break right now

7  so I can try and siphon out some of the exhibits

8  that I was -- that I brought and not have to siphon

9  through them.  So you want to take 15 minutes?

10          THE WITNESS:  Sure.

11          THE VIDEOGRAPHER:  We are going off the

12  record.  The time is 1:36 p.m.

13          (Whereupon, a brief recess was taken.)

14          THE VIDEOGRAPHER:  This begins Videotape

15  No. 3 in the continuing deposition of Power

16  Ventures, Inc.  The time is 1:51 p.m. on March 7th,

17  2012, and we're back on the record.

18  BY MR. COOPER:

19      Q.   Mr. Vachani, before the break, I showed

20  you Exhibit 244, Paragraph 11, the sentence, "Power

21  did not undertake any effort to circumvent that

22  block and did not provide users with any tools

23  designed to circumvent it"?

24      A.   Yes.

25      Q.   And you said you did agree it should be

162

Steve Vachani, 30(b)(6)

BARKLEY
Court Reporters

1    system, we made -- we made adjustments, obviously I

2    think that's what -- how to phrase that.  I need to

3    get the proper -- look at that carefully.

4         Q.   All right.  And these adjustments were

5    made over multiple days?

6         A.   They were made over different -- there

7    were adjustments made, but again, adjustment whether

8    they pulled from pooled IP addresses or whether they

9    probably did them -- I mean, I think I would have to

10   look at this carefully just to see, but I think that

11   there could definitely be an update on that.

12        Q.   Okay.  To the extent that that exact same

13   sentence appears in other declarations you have

14   filed in this case, would it need to be -- those

15   declarations need also to be updated?

16        A.   I think we should -- we should look at

17   them.

18        Q.   All right.

19        A.   And potentially update them.

20        Q.   All right.  When you say "potentially

21   update them," I'm just asking you, before today, do

22   you recall ever seeing any of the e-mails in Exhibit

23   245?

24        A.   Most of these e-mails -- like a lot of the

25   stuff were internal operations on those issues.  I

164

Steve Vachani, 30(b)(6)



1    don't remember -- I don't remember seeing.

2        Q.   All right.  But you agree you are cc'd on

3    four of the five e-mails in this chain?

4        A.   Yeah.  I agree, yeah.

5        Q.   Who -- and who is Cornelius Conboy?

6        A.   He was another manager at the time over --

7    administrative manager.

8        Q.   When did he leave Power?

9        A.   Around that same time.

10       Q.   Okay.  Was it with -- over disagreements

11   with you on the Facebook case in any way?

12       A.   No, we had no money for him.  We -- he was

13   actually -- we just -- he was too expensive to

14   maintain under all of our cuts.

15       Q.   Okay.  Who is Patrick Amorim?

16       A.   He was another executive at that time.

17       Q.   What was his role?

18       A.   He was a project manager, I guess you can

19   say.

20       Q.   Project manager?

21       A.   Project manager.  I mean, he was like a --

22   I would say a -- probably the best is like a product

23   marketing manager or a product -- you know, he

24   did -- he managed both business-side -- business --

25   you know, client relationships and also project.

165



1        Q.   All right.

2             (Whereupon, Exhibit 248 was marked for

3    identification.)

4             (Whereupon, a brief discussion off the

5    record.)

6    BY MR. COOPER:

7        Q.   Mr. Vachani, this is an e-mail chain, part

8    of which was in an earlier exhibit, marked Exhibit

9    248, beginning on the 15th of December from Eric

10   Santos to Elmo Cruz, Danilo Delgado, and Julian

11   Conceicao.

12            Do you see where Mr. Santos titles it,

13   "Please Prepare For Blocks of IPs"?

14       A.   Yes.

15       Q.   All right.  And that's because he is

16   setting up a system for the -- his engineering team

17   to take steps to prepare for blocks by what he

18   anticipated were forthcoming from Facebook, hi5, and

19   MySpace, correct?

20       A.   Yes.

21       Q.   All right.  And this is at the same time

22   he was also, in Exhibit 247, asking for information

23   about the number of new users signing up from

24   Facebook since the launch of the campaign, correct?

25       A.   This was a completely different

                          178

BARKLEY
Court Reporters

1      Q.   Okay.  But they also -- as Mr. Santos

2  understood, they were complaining and threatening to

3  block your site?

4      A.   Not that they were complaining, I think

5  there was -- there were IPs that were not working.

6      Q.   Do you disagree that Mr. Santos'

7  December 15th e-mail specifically refers to

8  preparing for blocks by Facebook, hi5, and MySpace?

9      A.   He is saying that's something that we

10  always do.  Blocks were possible.

11      Q.   But he is also, in the title of the

12  e-mail, saying, we need to prepare for blocks of

13  IPs, correct?

14      A.   Well, blocks -- we have always, since our

15  thing, said that blocks are possible.

16          We have -- you know, they happen for

17  different reasons and this was a general, just kind

18  of saying we need to continue making our system for

19  IP rotation and dealing with blocks, upgrading that

20  system.

21          (Whereupon, Exhibit 249 was marked for

22  identification.)

23          (Whereupon, a brief discussion off the

24  record.)

25

Steve Vachani, 30(b)(6)

BARKLEY
Court Reporters

1    Q.   Okay.  By "them," are you referring to

2  Mr. --

3    A.   Mr. Cutler, yeah.  I believe we had a

4  conversation with him almost immediately.  So we had

5  an immediate response like the same day or the next

6  day.

7    Q.   Okay.

8    A.   And that's when our dialogue all kind of

9  began.

10    Q.   And throughout the period that you were

11  having the dialogue with Facebook's counsel, as CEO,

12  you were controlling and directing the company's

13  activities, correct?

14    A.   I was.

15    Q.   Okay.  You were controlling and directing

16  their activities as it related to Facebook?

17    A.   Yes.

18    Q.   And that included controlling and

19  directing the activities related to the use of the

20  Power 100 campaign in conjunction with Facebook

21  users?

22    A.   Yes.

23    Q.   And that included the use -- the control

24  and direction of Facebook activities -- or, I mean,

25  Power's activities related to responses to blocks of

Steve Vachani, 30(b)(6)

BARKLEY
Court Reporters

1   your IP addresses by Facebook?

2        A.   I'm sorry.  Repeat that?

3        Q.   Let me -- it was horribly said.  You

4   controlled the activities --

5        A.   I was the CEO of the company, so I made

6   the final -- I made the final -- all the final

7   decisions of the company at that time.

8        Q.   And that -- all I'm asking that would, in

9   the instance that we saw the e-mails earlier,

10  include your authorizing the changes that -- the

11  activities that were designed to ensure that even if

12  Facebook blocked Power, that Power would continue to

13  have access to Facebook?

14       A.   Well, as I said, I didn't necessarily

15  authorize some of the things because I delegated --

16  you know, because like, as you saw, there were

17  e-mails that were not -- were not copied to me, that

18  Eric was handling and were not bothering me with.

19            So, I mean, it was a standard company.  It

20  had a chain of command and obviously in the end I

21  was the CEO.  But I delegated things that I didn't

22  make directly, I -- you know, Eric reported to me.

23       Q.   Yeah, but you instructed Eric to ensure to

24  prepare for blocks by Facebook, correct?

25       A.   I have -- on some issues, I mean, that we

Steve Vachani, 30(b)(6)

BARKLEY
Court Reporters

1    have -- that we have seen, I have --

2         Q.   You --

3         A.   -- I have instructed him to, you know,

4    to -- you know, to address the situation.

5         Q.   All right.   To the extent Mr. Santos took

6    activities to ensure that Power continued to have

7    access to Facebook, he did so at your control and

8    direction, though, correct?

9         A.   I mean, to things that he asked me.   As I

10   said, there were things that he did that I was not

11   copied on, but, I mean, he was -- he was -- it was

12   his -- he felt in his opinion that he was able to

13   take care of those.

14        Q.   Okay.   But to the extent you were copied

15   on them, if you had disagreed with them, you would

16   have advised him, correct?

17        A.   If I -- yeah, if I disagreed.   And there

18   may have been e-mails, also, that I didn't see.   I

19   mean, e-mails sometimes -- but for the most part, I

20   saw most e-mails.

21        Q.   Okay.

22             MR. COOPER:   This is already marked, I'm

23   sorry.

24             (Whereupon, Exhibit 205, being previously

25   marked, was entered into the record.)

231

BARKLEY
Court Reporters

1   of the testimony given by the witness.  (Fed. R. Civ. P.

2   30(f)(1)).

3           Before completion of the deposition, review of

4   the transcript [XX] was [  ] was not requested.  If

5   requested, any changes made by the deponent (and

6   provided to the reporter) during the period allowed, are

7   appended hereto.  (Fed. R. Civ. P. 30(e)).

8

9   Dated: MARCH 8, 2012

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

264

BARKLEY
Court Reporters