# EXHIBIT 12

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3                  SAN JOSE DIVISION

 4

 5   FACEBOOK, INC.            :

 6              Plaintiff,     :

 7                             :

 8        v.                   :

 9                   :

10   POWER VENTURES, INC. d/b/a:

11   POWER.COM, a California   :

12   corporation; POWER        :        Case No.

13   VENTURES, INC. a Cayman   :     5:08-CV-05780

14   Island Corporation, STEVE :        JW (HRL)

15   VACHANI, an individual;   :

16   DOE 1, d/b/a POWER.COM, an:

17   individual and/or business:

18   entity of unknown nature; :

19   DOES 2 through 25,        :

20   inclusive, individuals    :

21   and/or business entities  :

22   of unknown nature,        :

23              Defendants.    :

24   _____

25         HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
```

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

BARKLEY
Court Reporters

1          Videotaped Deposition of STEVEN VACHANI

2     taken on behalf of the Plaintiff at the offices of

3     BURSOR & FISHER, P.A., 369 Lexington Avenue, New

4     York, New York, on Wednesday, July 20, 2011,

5     commencing at 9:47 in the forenoon before PATRICIA

6     MULLIGAN CARRUTHERS, a Certified Court Reporter and

7     Notary Public of the State of New Jersey and Notary

8     Public of the State of New York.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2

**BARKLEY**
*Court Reporters*

10:04  1          A.          Legally, no.  As I mentioned at

10:04  2  the moment, any new activities that I'm pursuing,

10:04  3  I'm pursuing under this entity, so I'm currently

10:04  4  engaged in conversations with -- with people.

10:04  5          Q.          And when did you join Power?

10:04  6          A.          Power was founded in -- It was

10:04  7  2006 is when our -- our primary activities started.

10:04  8  We incorporated Power, I believe it was, if I'm not

10:04  9  mistaken, late 2006 and -- but the activities

10:05 10  started previously as a start-up, we started

10:05 11  working on it.

10:05 12          Q.          Were you one of the creators of

10:05 13  Power?

10:05 14          A.          I was the founder of the company.

10:05 15          Q.          Now, when you say it was

10:05 16  incorporated in 2006 but started before then, was

10:05 17  it started under the Web site title www.power.com?

10:05 18          A.          No.  It was originally -- When we

10:05 19  originally started it, there was no Web site.  It

10:05 20  was a -- Like many startups we were -- we were

10:05 21  working on a core, you know, product idea, and

10:05 22  later the name power.com came about in 2007.  I

10:05 23  believe we acquired the domain in 2007.

10:05 24          Q.          Who helped -- Besides yourself,

10:05 25  who helped create Power.com.  You used the --

21

BARKLEY
Court Reporters

02:33 1          Q.       Do you know if there were

02:33 2    documents reflecting Power's ideas being bantered

02:33 3    about describing how they could get new members?

02:33 4          A.       Yes.  I believe we provided those

02:33 5    to you.

02:33 6          Q.       Do you know -- How many documents

02:33 7    do you believe you provided to Facebook

02:34 8    approximately?

02:34 9          A.       I think it was -- not -- less -- I

02:34 10   don't know.  It was less than ten, I believe.

02:34 11         Q.       The -- And how often were

02:34 12   marketing schemes discussed internally at Power, if

02:34 13   you know?

02:34 14         A.       How often?  They would be in

02:34 15   conversations, like, we'd have -- we -- meetings.

02:34 16   There would be conversations if anything became

02:34 17   relevant or useful.  There would be -- Most of them

02:34 18   were e-mail discussions, so e-mail discussions

02:34 19   would be where most of conversations took place,

02:34 20   but obviously they were also verbal conversations.

02:34 21         Q.       Do you know if any particular

02:34 22   discussions ever occurred relating to soliciting

02:34 23   members from Facebook?

02:34 24         A.       Soliciting members from Facebook?

02:34 25   What do you mean?

                                181

BARKLEY
Court Reporters

02:34  1          Q.        To join -- To join Power.

02:34  2          A.        We didn't have access to -- The

02:35  3    users could invite their friends.  So that was a

02:35  4    feature that -- One of our promotions in our

02:35  5    features was that you could invite your friends to

02:35  6    join, invite your friends on Facebook to join, and

02:35  7    so people could -- they could make promotions so

02:35  8    they could create events around -- around a power

02:35  9    creativity around Power.  So we gave our user -- We

02:35  10   encourage our users, in fact, to bring their

02:35  11   friends in the same way that Facebook encourages

02:35  12   its users to bring their friends from other sites.

02:35  13   But we employed same tactics that are used by --

02:35  14   similar tactics where you invite your friends, so

02:35  15   we did use invite friends features and promotions.

02:35  16          Q.        If you go back to Exhibit 103, you

02:35  17   see various -- "Displayed a Launch Promotion" in

02:35  18   the upper left-hand corner?

02:35  19          A.        Yup.

02:35  20          Q.        It says, "First 100 people who

02:35  21   bring 100 new friends to power.com earn $100?

02:36  22          A.        Yes.

02:36  23          Q.        Is that an example of a pop-up

02:36  24   that was made available on the site that was

02:36  25   designed to encourage new users to the site?

                             182

BARKLEY
Court Reporters

02:36  1          A.          I don't know if this was a pop-up.
02:36  2   You can see it was prominently displayed on the
02:36  3   front page.  That's not more than that, it's not a
02:36  4   pop-up.  I think the terminology is not pop-up it's
02:36  5   an ad -- In fact, it's a prime-placed ad on the
02:36  6   home page.
02:36  7          Q.          Do you know whose idea it was for
02:36  8   this particular promotion?
02:36  9          A.          That was mine.
02:36 10          Q.          Do you know when you came up with
02:36 11   it?
02:36 12          A.          While I was sleeping.  I just
02:36 13   thought a hundred, hundred, hundred was a good
02:36 14   idea.
02:36 15          Q.          All right.  And when you clicked
02:36 16   on the Number 100, what would happen?
02:36 17          A.          It gave you a chance to -- to
02:36 18   select which friends you wanted to -- to, I guess,
02:36 19   invite to -- to join -- to join Power.
02:36 20          Q.          All right.  And was that -- Would
02:36 21   you agree that, as reflected on Exhibit 103, that
02:37 22   particular promotion was made available at the time
02:37 23   that you were connected to Facebook?
02:37 24          A.          Yes.  It was.
02:37 25          Q.          And if you clicked on 100 people,

183

BARKLEY
Court Reporters

02:37 1  you would be invited to ask your friends to join

02:37 2  power.com?

02:37 3          A.      No.  You would have the option to

02:37 4  invite your friends to join just like you have the

02:37 5  option on Facebook to invite your friends to join

02:37 6  Facebook and every other site on the Internet, and

02:37 7  if they did, if they reach a hundred friends that

02:37 8  joined, they would earn $100.

02:37 9          Q.      And if you accepted the feature

02:37 10 that came up saying would you -- it said something

02:37 11 like, "Would you like to invite your friends to

02:37 12 Power"?

02:37 13         A.      Yes.

02:37 14         Q.      If you hit "yes" or "I agree" --

02:37 15         A.      Yes.

02:37 16         Q.          -- how -- what -- what

02:37 17 automation would occur at that point?

02:37 18         A.      So first of all, you have to

02:38 19 remember that 99 percent of our users were not --

02:38 20 were not using -- were not using Facebook.  They

02:38 21 were users on other sites, so we actually -- I

02:38 22 guess you could say we were actually a big source

02:38 23 of providing users to Facebook in Brazil.  In fact,

02:38 24 as -- I guess you could say it was a gift, but we

02:38 25 -- we brought a large amount of Orkut users to

184

BARKLEY
Court Reporters

02:38  1    Facebook, so that's where a lot of our promotions
02:38  2    were -- Because our users already, as you know,
02:38  3    have -- Prior to having Facebook, we had millions
02:38  4    of users who have hundreds of friends already in
02:38  5    the system, and that represented 99 percent of our
02:38  6    contacts in our system.  Facebook was a very small
02:38  7    part of this world.  At that time, obviously it's a
02:38  8    much larger site today but in our world, in our
02:38  9    growth it was -- it was introduced later.  So we
02:38  10   were encouraging our friends -- our users to go and
02:38  11   register at Facebook and become Facebook users.
02:38  12   Because in our -- in our view, the more social
02:39  13   networks that users were using, the more value it
02:39  14   would be to, you know, to aggregate different
02:39  15   sites.  So we encouraged users to sign up for
02:39  16   Facebook.  In fact, we're giving free marketing to
02:39  17   Facebook.  So to answer your question, a lot of
02:39  18   these users -- You could see all your friends from
02:39  19   all your sites and say, "Hey.  Join Facebook when
02:39  20   you're at Facebook."  That was a big part of our
02:39  21   promotions.  That was the largest part of our
02:39  22   promotions.  And then, of course, if they have
02:39  23   friends that are already using Facebook -- Facebook
02:39  24   and they wanted to invite their friends to come use
02:39  25   Power, that's the smaller part.  But the biggest

185

BARKLEY
Court Reporters

02:39 1  one were obviously the friends that the user had

02:39 2  already put in the system.

02:39 3          Q.       The promotion itself had to have

02:39 4  an attribute created for it in the MSQL database.

02:39 5  Correct?

02:39 6          A.       Yes.   That's correct.

02:39 7          Q.       And that attribute would then be

02:40 8  assigned to anybody who clicked on the promotion.

02:40 9  Correct?

02:40 10         A.       What do you mean "the attribute"?

02:40 11         Q.       Well, if someone clicked on the

02:40 12 promotion, their user name would then be assigned

02:40 13 to the attribute associated with the promotion.

02:40 14 Correct?

02:40 15         A.       If they selected to invite a

02:40 16 friend, they could send an invitation to that

02:40 17 friend.

02:40 18         Q.       That's not what I'm talking about.

02:40 19 The minute that -- Let's say I'm Ms. Almeirda who's

02:40 20 being shown on the screen shot.

      21         A.       Okay.

02:40 22         Q.       If Ms. Almeirda clicks on the

02:40 23 launch promotion --

02:40 24         A.       Yes.

02:40 25         Q.              -- she would have received a --

186

BARKLEY
Court Reporters

02:43  1    can tell you that every single user of our site had

02:43  2    the ability to invite friends.  And if -- if some

02:43  3    of them reached a hundred, which was obviously not

02:43  4    an easy task to reach, they would -- they would win

02:43  5    this award, so I think only 30 something people

02:43  6    reached it, if I -- if I remember correctly.

       7            Q.       All right.

02:44  8            A.       So I don't know if that answers

02:44  9    your question correctly.

02:44  10           Q.       What data was -- Whether it was

02:44  11   automatedly or manually viewed, what data was

02:44  12   viewed in order to determine who had invited 100

02:44  13   friends to join Facebook?

02:44  14           A.       Well, it's -- In the same -- When

02:44  15   any site creates an import or invitation, when a

02:44  16   friend registers because of your invitation, you

02:44  17   know this is -- This is a feature that was in our

02:44  18   site, always in our site.  We know how many friends

02:44  19   were invited.  We know how many friends were

02:44  20   converted.  Just as Facebook publicly displays it

02:44  21   on their site and every other site does that.  So

02:44  22   we just looked and saw the people that were above

02:44  23   the hundred on that date, and we -- and we -- and

02:44  24   we gave them a hundred dollar check.

02:44  25           Q.       And when you say you looked, you

                                     190

BARKLEY
Court Reporters

02:44  1   looked in the database.  Correct?

02:44  2            A.      We looked in our database,

02:44  3   correct.  And we provided the numbers, I believe,

02:44  4   on that promotion to you guys.

02:45  5            Q.      When somebody clicked on the

02:45  6   launch promotion and they were given, like you to

02:45  7   invite your friend" --

02:45  8            A.      That's correct.

02:45  9            Q.        -- and they hit yes, at that

02:45  10  point the importer, as we've been calling it, would

02:45  11  automatically contact all friends on Facebook to

02:45  12  invite them to --

02:45  13           A.      Let's be clear.  We don't have

02:45  14  access to any friends' e-mail addresses, so there

02:45  15  was not a single E mail sent by Face -- by Power

02:45  16  for -- We have e-mail addresses for friends on

02:45  17  other sites, but on -- so we -- If they wanted to

02:45  18  invite, as I said 99 -- well over 90 percent of our

02:45  19  users were Orkut users and Orkut friends and had

02:45  20  friends from other sites where they -- on sites

02:45  21  that allowed their E mails, but Facebook didn't --

02:45  22  didn't allow E mails, otherwise, we would have been

02:45  23  happy to send an invitation to those friends to

02:45  24  invite them; so that was not available for us for

02:46  25  Facebook.

                           191

BARKLEY
Court Reporters

02:46  1          Q.          At this point, I haven't even

02:46  2     talked about E mail.  All I meant is at the point

02:46  3     at which someone said yes they'd like to invite

02:46  4     their friends, the database would then recognize,

02:46  5     using its importer function and the idea of the

02:46  6     registered user Power, who the friends were.

02:46  7     Correct?

02:46  8          A.          It would show you a list of all

02:46  9     your friends, yes, from your friends list.

02:46 10          Q.          And the invitation to join was

02:46 11     then automatically forwarded to those friends

02:46 12     whether through E mail if you're on Orkut or some

02:46 13     other way on Facebook.  Correct?

02:46 14          A.          A user had to say, "I want to

02:46 15     invite this friend," so it's -- An authorized user

02:46 16     said, "Yes, these are my friends, and these are the

02:46 17     friends I want to invite to this site."  That is

02:46 18     correct.

02:46 19          Q.          All right.  And at that point, an

02:46 20     automated script would contact whatever friends

02:46 21     were identified.  Correct?

02:46 22          A.          Depends on -- So if the friend was

02:46 23     a non-- Facebook did not provide E mails.  If the

02:47 24     friend was, like, on another site and they had the

02:47 25     E mail, they could -- they could send on E mail

192

BARKLEY
Court Reporters

02:51 1    copy their friends and say, "Sign up with this

02:51 2    link."  They were unlimited ways that people can

02:51 3    communicate with their friends.

02:51 4          Q.        All right.  But the link was

02:51 5    provided in the communication by Power.  Correct?

02:51 6          A.        The link was given -- Power

02:51 7    provided a link to our users to encourage them to

02:51 8    invite their friends.

02:51 9          Q.        And did Power also prepare the

02:51 10   script that was included with that invitation?

02:51 11         A.        I think, yeah, we provided them --

02:51 12   we provided them a script, yeah.  As every single

02:51 13   -- As Facebook does and everybody else does.

02:51 14         Q.        Now, in the case of Facebook, you

02:51 15   say that Facebook didn't permit you to contact

02:51 16   through E mails?

02:51 17         A.        What do you mean "Facebook doesn't

02:51 18   permit"?  Facebook did -- It has nothing to do with

02:51 19   permitting it.  We wanted -- If we wanted to -- We

02:51 20   just didn't have access to the E mails because

02:52 21   Facebook -- If we wanted to, we could have -- We

02:52 22   didn't get to that, but we would be happy to build

02:52 23   a feature that imported your E mail contacts, but

02:52 24   we didn't -- we didn't do that.  We never got to

02:52 25   that point.

197

BARKLEY
Court Reporters

02:53  1    that you could determine how many Facebook

02:53  2    registered users were contacted as part of this

02:53  3    promotion?

02:53  4            A.        Facebook registered users?

02:53  5    Meaning if they were contacted -- In what manner?

02:53  6    If they happened -- If they were contacted at Orkut

02:53  7    and they happened to have an account on Facebook

02:53  8    but were not contacted through -- through the help

02:53  9    of Facebook?

02:53  10           Q.        No.  I'm talking about were there

02:53  11   individuals at Facebook contacted on the Facebook

02:53  12   -- through the Facebook system --

02:53  13           A.        Yes.

02:53  14           Q.        -- as a result of this promotion?

02:53  15           A.        Yes.  Of course.

02:53  16           Q.        Is there a way to determine how

02:53  17   many were contacted?

02:54  18           A.        Well, we could do -- If you take a

02:54  19   few minutes, we can probably figure out -- It's

02:54  20   obviously very small, but -- Because the Facebook

02:54  21   users were so small, but let's think about -- So

02:54  22   people created events on Facebook, so promoting it,

02:54  23   because our users were -- You know, some of them

02:54  24   created events saying, "Come on Facebook," about

02:54  25   come and joining, they created messages.  They

                                199

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

BARKLEY
Court Reporters

02:57 1    at that time, but I know it's usually standard, you

02:58 2    know, more common to have a default to invite all

02:58 3    your friends.  I think Facebook does that, in fact.

02:58 4         Q.        Setting aside what the default

02:58 5    was, as part of the invitation, would list the

02:58 6    friends that could be contacted?

02:58 7         A.        That's correct.

02:58 8         Q.        And that would list the friends

02:58 9    who were available as friends on Facebook.

02:58 10   Correct?

02:58 11        A.        I believe so, yes.

02:58 12        Q.        And for the friends who were

02:58 13   contacted on Facebook, an invitation to join Power

02:58 14   would then be set if the person had that person

02:58 15   selected as, "Yes.  I would like them to be

02:58 16   invited"?

02:58 17        A.        Yeah.  If they could communicate

02:58 18   to invite them, they would be invited.

02:58 19        Q.        And earlier you said that however

02:58 20   the mechanism was, whether it was events or E mails

02:58 21   for other Web sites or whatever -- setting aside

02:58 22   the telephone call, if it was in a text-based

02:58 23   communication --

02:58 24        A.        Yes.

02:58 25        Q.        -- Power would provide the text

203

BARKLEY
Court Reporters

02:58  1   and the URL link to Power as part of that

02:58  2   communication so --

02:58  3        A.        Yes.

02:59  4        Q.            -- so the friends would know

02:59  5   where to go to be invited.  Correct?

02:59  6        A.        We would provide them text that

02:59  7   they could use.  Correct.  Of course.

02:59  8        Q.        And the list of friends was

02:59  9   recovered from the database and the variables that

02:59  10  were associated with friends with that user ID?

02:59  11       A.        Every -- I think -- Every user --

02:59  12  One of our core features is you can access all your

02:59  13  friends and create a friends list.  So, yes, I

02:59  14  mean, you have a friends list and you can select

02:59  15  from your aggregated friends list who you want to

02:59  16  invite.

02:59  17       Q.        Now, earlier you said while most

02:59  18  people contacted their Web site dynamically inside

02:59  19  the browser, the functionality existed to have the

02:59  20  automation available on through the PowerScript

02:59  21  also contact the Web sites.  Correct?

02:59  22       A.        What do you mean?

02:59  23       Q.        In other words, you -- In order to

02:59  24  obtain -- user content, for instance, from Web

02:59  25  sites, you could use the automated script available

                              204

BARKLEY
Court Reporters

02:59  1    through PowerScript to download --

02:59  2          A.        That's what any importer does.

03:00  3    When you use an importer, you're -- you're

03:00  4    basically authorizing a script to go to another

03:00  5    site and access certain data.  So, like, when

03:00  6    Facebook -- as your Facebook import you authorize a

03:00  7    script written by Facebook to go to another site,

03:00  8    take that data, bring it back, and then Facebook

03:00  9    sends an invitation on behalf of the user.  That's

03:00  10   the same process that we go through.  That is

03:00  11   correct.

03:00  12         Q.        And in the invitation that was

03:00  13   then sent as part of the launch promotion to a

03:00  14   Facebook user, how would the Power site know what

03:00  15   function or what feature on Facebook to populate

03:00  16   the invitation to?  In other words, how would it

03:00  17   know to send it to an event or say an instant

03:00  18   message or whatever medium of communication?

03:00  19         A.        Well, Facebook doesn't have

03:00  20   instant message.  You know, a user can go and -- If

03:00  21   a user wanted to manually click on a friend and

03:01  22   say, "Hey," I don't believe even they had Facebook

03:01  23   chat at that time, so there wasn't even -- I don't

03:01  24   think it was a feature, so we didn't even interact

03:01  25   with that.  They could write a message to their

                               205

BARKLEY
Court Reporters

03:01   1   friend.  They could create an event or they could

03:01   2   go and, I guess, take that link up and paste it and

03:01   3   write an E mail to their friend.

03:01   4          Q.        Was one of the ways that Power was

03:01   5   able to make the invitation available to Facebook

03:01   6   users is that the PowerScript would set up an event

03:01   7   on Facebook on behalf of the user who had clicked

03:01   8   on --

03:01   9          A.        If the user authorized for the

03:01  10   creation of the event, yes.

03:01  11          Q.        And if the -- How did the -- How

03:01  12   did Power know it was to set up an event as opposed

03:01  13   to any other way of communicating --

03:01  14          A.        Because the user said, "Create an

03:01  15   event for me," so user authorized the creation of

03:01  16   an event.

03:01  17          Q.        Was that made available on the

03:01  18   promotion -- on the pop-up that made -- would come

03:02  19   up --

03:02  20          A.        That was -- As I said, if you

03:02  21   clicked that, that was one of the options that the

03:02  22   user had an option to create an event.

03:02  23          Q.        What other options did the user

03:02  24   have?  We can take a break here.

03:02  25                    THE VIDEOGRAPHER:  It's 3:01.  Off

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

BARKLEY
Court Reporters

03:02    1    the record, Tape 4.

03:02    2                          (Whereupon, a recess is taken.)

03:14    3                          THE VIDEOGRAPHER:   3:13, on the

03:14    4    record.  Beginning of Tape 5.

03:14    5           Q.       Mr. Vachani, just before the break

03:14    6    you indicated that in the instance of Facebook

03:14    7    being contacted by Power --

03:14    8                          MR. COOPER:  Strike that.

03:14    9           Q.       That in the instance in which a

03:14   10    friend of somebody who had indicated their interest

03:14   11    in participating in the launch promotion, the

03:14   12    friend was on Facebook, that one option that was

03:14   13    available to contact that friend was events.  Do

03:14   14    you recall that before the break saying?

03:15   15           A.       I believe creating a event.

03:15   16           Q.       Do you recall what the other

03:15   17    options were?

03:15   18           A.       I don't offhand, but I think they

03:15   19    provided a link where they could -- So everyone was

03:15   20    given a unique link so they could go do whatever

03:15   21    they want with that link, write E mails to friends,

03:15   22    call on the phone, whatever so that was -- When

03:15   23    they clicked, they were made available a link, and

03:15   24    I think that maybe send in a message so Facebook --

03:15   25    While they can't send an E mail, they can send a

207

BARKLEY
Court Reporters

03:15  1   message to friends on Facebook, so they could

03:15  2   message their friend.  So if the user said, "I want

03:15  3   to send a message, private message," they could

03:15  4   send a private message to their friend, if I'm not

03:15  5   mistaken.

03:15  6           Q.      Let me -- Any other options?

03:15  7           A.      I don't remember offhand, but

03:15  8   those are the -- I think the primary ones, but

03:15  9   obviously they had -- they had a link that they

03:15 10   could use whatever way they wanted to.  They could

03:15 11   create an event -- create an event, send a message.

03:16 12   Those are the ones I could think of off hand, but I

03:16 13   believe whatever details on this were also provided

03:16 14   in the past in the previous declarations.

03:16 15           Q.      In the case of providing a link,

03:16 16   in what way was the link displayed on Facebook?

03:16 17           A.      When the user is provided a link

03:16 18   on Power, and they can copy and paste and do

03:16 19   whatever they want to -- to go promote that link.

03:16 20           Q.      I see.

03:16 21           A.      So just as any invitation process

03:16 22   on sites.  You give a unique link which has your

03:17 23   unique identifier in it, so if someone signs up

03:17 24   from that link you -- you get credit for it.

03:17 25           Q.      And that link would be the URL to

                                    208

BARKLEY
Court Reporters

03:20  1    that was sent to Facebook --

03:20  2          A.      Usually --

03:20  3                  MR. BURSOR:  Objection.  Vague and

03:20  4    ambiguous.

03:20  5          Q.      Do you know who created the text

03:20  6    that was prepared through the automated script that

03:20  7    was sent by Power to Facebook users?

03:20  8                  MR. BURSOR:  Objection.  Vague and

03:20  9    ambiguous.  Assumes facts not in evidence.  Lacks

03:20 10    foundation.  You can answer.

03:20 11          A.      I'm repeating what he said.

03:20 12    Objecting.  It's vague and ambiguous.

03:21 13                  MR. BURSOR:  I objected.  If you

03:21 14    can understand it, you can answer it.

03:21 15          Q.      Mr. Vachani, as I said at the

03:21 16    beginning, your attorney has the right to interject

03:21 17    actions unless he instructs you not to answer --

03:21 18          A.      Okay.

03:21 19          Q.      Let me -- One of the ways that you

03:21 20    said that Facebook users would be contacted for

03:21 21    this promotion was the Power user could say they

03:21 22    wanted to participate and contact friends to create

03:21 23    an event?

03:21 24          A.      Correct.

03:21 25          Q.      And you said the automatic script

212

BARKLEY
Court Reporters

03:21  1    -- the automated script created by Power would, in

03:21  2    fact, create an event on Facebook?

03:21  3              A.        If the user authorized it and

03:21  4    indicated they wanted to do that.  That's correct.

03:21  5              Q.        As part of the creation of that

03:21  6    event, was text included as part of event set up --

03:21  7              A.        They were shown texts just like

03:21  8    standard practice.  They were shown it and

03:21  9    authorized it.

03:21 10              Q.        And that text included the same

03:22 11    link to the URL to Power?

03:22 12              A.        I would assume it has the link in

03:22 13    it, yes.

03:22 14              Q.        The E mails that you said were

03:22 15    sent to users of, like, Orkut that had e-mail

03:22 16    addresses available on your site --

03:22 17              A.        Correct.

03:22 18              Q.        To the best of your knowledge --

03:22 19    And you said the link itself was one way that you

03:22 20    would be allowed to contact users.  Correct?

03:22 21              A.        Well, you could take the link and

03:22 22    pass the link.  It's -- You provide them a unique

03:22 23    link and they can go to messenger and copy that

03:22 24    link and say, "Hey, go sign up for -- for Power."

03:22 25              Q.        Do you know if that URL had an ID

213

BARKLEY
Court Reporters

04:14 1   create an event as part of $100 promotion use the

04:14 2   language, "Bring 100 friends and 100 bucks"?

04:14 3                    MR. BURSOR:  Hold on a second.

04:14 4   Objection.  Vague, ambiguous.  Assumes facts not in

04:14 5   evidence.  Lacks foundation.  If you could clarify

04:14 6   whether you're referring to PowerScript or Facebook

04:14 7   script, that might help clear up some of the --

04:14 8                    MR. COOPER:  I asked specific -- I

04:14 9   will say it again.  Was the language, "Bring 100

04:14 10  friends and win 100 bucks," language that was used

04:14 11  in the Power automated script when it set up the

04:14 12  event on Facebook?

04:14 13                   MR. BURSOR:  Objection.  Vague,

04:14 14  ambiguous.  Assumes facts not in evidence.  Lacks

04:15 15  foundation.  Listen to the question carefully, and

04:15 16  if you can understand it, you can answer it.

04:15 17           A.        Bring 100 friends and 100 bucks

04:15 18  was our -- our tag line, so -- but I don't --

04:15 19  whether the user entered that in on their own or

04:15 20  whether they -- they put this.  I cannot say from

04:15 21  this -- from looking at this, but that was the

04:15 22  language that we suggested to users to use.  But

04:15 23  many users changed the language, too, and put other

04:15 24  language in those events, so I can't -- This is one

04:15 25  example of a user creating an event.  I cannot say

256

BARKLEY
Court Reporters

04:15  1    what -- you know, how this was specifically created

04:15  2    because they -- they had -- they could have created

04:15  3    this event and the language was -- That was the tag

04:15  4    line we were promoting, but I do not know if this

04:15  5    was specifically -- this specific E mail or if they

04:16  6    copied and pasted it if they did whatever.  But

04:16  7    what I do know is, this was an event where the user

04:16  8    specifically authorized us and said -- either

04:16  9    created this event manual or specifically

04:16  10   authorized us to create this event.

04:16  11                   MR. COOPER:  We've got to go off

04:16  12   the record.

04:16  13                   THE VIDEOGRAPHER:  It's 4:15.  Off

04:16  14   the record.  End of Tape 5.

04:16  15                   (Whereupon, a recess is taken.)

04:23  16                   THE VIDEOGRAPHER:  4:22, on the

04:23  17   record.  Beginning of Tape 6.

04:23  18            Q.       Before the break you indicated

04:23  19   that, "Bring 100 friends and win 100 bucks" was the

04:23  20   tag line but you couldn't say for sure how the --

04:23  21                   MR. COOPER:  Strike that.

04:23  22            Q.       Before the break, you indicated

04:23  23   that "Bring 100 friends and win 100 bucks" was the

04:23  24   tag line employed by Power.  Correct?

04:23  25            A.       That was the tag line of the

257

BARKLEY
Court Reporters

04:24  1    information exist today?

04:24  2          A.      I don't know if it exists today

04:24  3    because the site's been down for a long time.

04:24  4          Q.      Would it exist in the source code

04:24  5    for the automated script?

04:24  6          A.      No.  That wouldn't -- that -- The

04:24  7    images and everything, it wouldn't -- that's not --

04:24  8    I'm confusing the term "source code," so you're

04:25  9    talking about the PowerScript not the source code

04:25  10   of Power because it's two different things.

04:25  11         Q.      Would it exist in the PowerScript?

04:25  12         A.      I don't -- PowerScript's were

04:25  13   dynamic and changed regularly.  They were kind of

04:25  14   like HTML on a site, it's unlike source code.  They

04:25  15   were dynamically changed, so I don't know the

04:25  16   answer, you know.  It could have been updated on a

04:25  17   weekly basis so the -- PowerScript is like an HTML,

04:25  18   so it's not documented formally like source code,

04:25  19   but -- sorry.

04:25  20         Q.      Did the language ever exist in

04:25  21   PowerScript?

04:25  22         A.      I can verify that that is the

04:25  23   language that we used.  Whether -- You know, I

04:25  24   think that's what you want to know.  That's the tag

04:25  25   line that we used for this promotion so that would

                                   259

BARKLEY
Court Reporters

04:27  1          Q.       Okay.  Do you know if the text

04:27  2     that was suggested for private messages by the

04:27  3     automated script from Power exists as part of

04:27  4     PowerScript?

04:27  5          A.       I don't know if that exists today

04:27  6     because it was three or four years ago.

04:27  7          Q.       Do you know how the PowerScript

04:27  8     applications were stored by Power while it was

04:27  9     operational?

04:27 10          A.       How they were stored?

04:27 11          Q.       Yes.

04:27 12          A.       I believe that it's similar to --

04:27 13     to an -- I think a lot of this was done in XML.

04:28 14     HTML, XML references or -- where it pulled the

04:28 15     text, so I don't know how that was done.  I don't

04:28 16     know the source of where those offhand.

04:28 17          Q.       Do you know how many versions of

04:28 18     PowerScript you have available to you in stored

04:28 19     form to this day?

04:28 20          A.       I don't know offhand, but I'm sure

04:28 21     we have quite a lot of PowerScripts that are

04:28 22     available.

04:28 23          Q.       Do you know where, if at all, I

04:28 24     would be able to find out who was responsible for

04:28 25     creating the language that was used in the

261

BARKLEY
Court Reporters

04:28  1    application PowerScript application?

04:28  2          A.       The actual language?

04:28  3          Q.       Yes.

04:28  4          A.       Was -- That was -- That phrase

04:28  5    "Bring 100 friends, 100 bucks" was created by me.

04:28  6          Q.       Do you know if the remainder of

04:28  7    any text that was employed in suggested text in

04:28  8    private messages that were used on Facebook as a

04:29  9    result of automated script were prepared by you?

04:29 10                   MR. BURSOR:  Could you read that

04:29 11    back, please?

04:29 12                   (Whereupon, the last question is

04:29 13    read back by the reporter.)

04:29 14                   MR. BURSOR:  Objection.  Vague,

04:29 15    ambiguous.  Assumes facts not in evidence.  Lacks

04:29 16    foundation.  You can answer.

04:29 17          A.       Repeat the question one more time.

04:29 18          Q.       You earlier indicated private

04:29 19    messages were one of the ways that the automated

04:29 20    script would permit somebody using this campaign to

04:29 21    contact friends on Facebook.

04:29 22          A.       Okay.  So to be clear --

04:29 23          Q.       Yes or no.

04:29 24          A.       I want to clarify.  Earlier I said

04:29 25    that could be one of the ways that someone could

                              262

BARKLEY
Court Reporters

04:29  1    send it.  I honestly don't know if we actually ever

04:29  2    used private messages.  It was a long time ago.  To

04:29  3    my recollection, I don't -- I don't remember us

04:29  4    sending private messages, but it was definitely

04:30  5    something we -- we discussed, but I don't know if

04:30  6    we actually ever got to employing that method.

04:30  7    It's been a long time since that happened.  It's

04:30  8    possible that users took suggested text and wrote

04:30  9    messages to friends and if -- I don't remember if

04:30  10   we actually employed that technique, but it's

04:30  11   something we obviously would have been happy to do

04:30  12   because if the user authorized us to do it, I just

04:30  13   don't remember if we actually did it.

04:30  14        Q.       Looking at Exhibit 103, the launch

04:30  15   promotion --

04:30  16        A.       Yup.

04:30  17        Q.        -- who prepared the PowerScript

04:30  18   that is reflected in that launch promotion?

04:30  19        A.       It could have been Carlos or

04:30  20   Danilo.

04:30  21        Q.       What documentation shows how that

04:30  22   launch promotion was implemented on power.com?

04:30  23        A.       It was either -- It was either a

04:30  24   verbal, "Hey, use this text," in a meeting, said,

04:31  25   "Hey, this is the text you should use," and they

263

BARKLEY
Court Reporters

04:31   1   took it or there was an E mail.  I don't know.

04:31   2         Q.        But you see the box, "Launch

04:31   3   Promotion."  Correct?

04:31   4         A.        Yes.

04:31   5         Q.        That is a feature that is made

04:31   6   available to the power.com user through the

04:31   7   power.com Web site.  Right?

04:31   8         A.        Yes.

04:31   9         Q.        None of the aggregated social

04:31  10   networks prepared the contents shown in that

04:31  11   promotional box.  Correct?

04:31  12         A.        Right.

04:31  13         Q.        Where would I find documentation

04:31  14   showing me how that launch promotion was

04:31  15   implemented on power.com?

04:31  16         A.        So it either was in a meeting that

04:31  17   we had where I said, "Hey, this is the text you

04:31  18   want to use for this promotion," and they would

04:31  19   have noted it down, or it would have been an E mail

04:31  20   that was sent saying, "Use this text."  One of

04:31  21   those two.  I don't know which one it was because

04:31  22   we had weekly meetings where we discussed ideas and

04:31  23   this was -- this was an idea that I had come up

04:32  24   with.  So many times I would share my idea.  I

04:32  25   would say, "Eric, use this text.  This is a

264

BARKLEY
Court Reporters

04:33   1   -- just a standard HTML, XML -- HTML, Java script

04:33   2   page written by our team, so there's -- Because

04:33   3   this is actually -- They're on the front page right

04:33   4   now on this promotion.  This is someone's -- just

04:33   5   logged into power.com.  This is the first page they

04:33   6   come to.

04:33   7           Q.       And the PowerScript that would be

04:33   8   implemented when somebody pressed on the 100 in URL

04:34   9   that's embedded in this block, where does that

04:34  10   exist today, if at all?

04:34  11           A.       If it exists it would be on -- Let

04:34  12   me be clear.  This -- This -- This promotion, this

04:34  13   image, and this text that has nothing to do with

04:34  14   PowerScript.  This is just a HTML.  When they click

04:34  15   it and they arrive on the page, that's just

04:34  16   standard HTML.  If they, at that point, copy and

04:34  17   send a message, that's a user taking that and going

04:34  18   and sending a message.  So the only -- If -- If

04:34  19   they said go -- I authorize you to create an event

04:34  20   for me, that would be a PowerScript that would do

04:34  21   that.

04:34  22           Q.       And where would that PowerScript,

04:34  23   where would I find how that PowerScript was

04:34  24   functionally implemented today?

04:34  25           A.       That's a dynamic -- That's a

266

BARKLEY
Court Reporters

04:39   1    on the top of Exhibit Number 106?

04:39   2              A.        Yes.

04:39   3              Q.        Do you see it's January 13, 2009?

04:39   4              A.        Yes.

04:39   5              Q.        As of January 13, 2009, did Power

04:39   6    still have the ability to locate a script that was

04:39   7    used in conjunction with the launch promotion?

04:39   8              A.        If it existed, yes.

04:39   9              Q.        Do you know if at any time Power

04:39  10    had in place what is known as a litigation hold

04:39  11    instructing employees not to destroy documents

04:39  12    after this case was filed?

04:39  13              A.        We never -- We didn't destroy any

04:39  14    documents after that -- anything -- destroy

04:39  15    anything after this case started.

04:39  16              Q.        Then does that mean the

04:39  17    PowerScript should still exist?

04:39  18              A.        What I know is PowerScripts are

04:39  19    dynamic script's that are constantly updated, so I

04:40  20    don't know what exists for this.

04:40  21              Q.        If you go back to Exhibit 106 --

04:40  22    First of all, was any instruction ever given to

04:40  23    employees not to destroy any documentation relating

04:40  24    to the Facebook program?

04:40  25              A.        Not to -- We don't -- It's not our

271

BARKLEY
Court Reporters

04:40   1   standard practice to destroy anything, so there's

04:40   2   not -- Since we don't actively destroy something,

04:40   3   there's no need to tell them not to destroy it.  We

04:40   4   don't have any policy for destroying -- destroying

04:40   5   our documents.

04:40   6           Q.       And that includes your

04:40   7   PowerScripts?

04:40   8           A.       Well, PowerScripts, I believe, are

04:40   9   dynamic things.  There was no policy saying change

04:40   10   -- preserve an earlier version of that.  I don't

04:40   11   know how the -- The PowerScripts are like HTML

04:40   12   changes.  They're very similar to making an HTML

04:40   13   change.

04:40   14           Q.       Do you know when the promotion

04:40   15   shown on Exhibit 103 exist -- when it lasted from?

04:41   16           A.       That lasted from December of 2008

04:41   17   -- Was that eight?  Yes.  December of 2008 until

04:41   18   2000 -- I guess -- like the -- January -- Well,

04:41   19   Facebook -- It lasted well beyond Facebook, so it

04:41   20   probably lasted until about March or April, but

04:41   21   Facebook was only alive for four weeks, five weeks.

04:41   22           Q.       I'm sorry.  At that time in that

04:41   23   timeframe is when Power was sued by Facebook.

04:41   24   Correct?

04:41   25           A.       That's correct.

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

BARKLEY
Court Reporters

04:41  1          Q.          And it was sued, in part, because

04:41  2   of Facebook's allegations relating to how this

04:41  3   launch promotion was employed.  Correct?

04:41  4          A.          I don't know what Facebook made

04:41  5   allegations to is right there.

04:41  6          Q.          Earlier you said that Facebook is

04:41  7   responsible for sending the E mail notification

04:41  8   about the invite.

04:41  9          A.          Yeah.  That was sent by Facebook

04:42 10   servers.

04:42 11          Q.          But Facebook's E mail servers

04:42 12   would not send the invite, but for the initiation

04:42 13   of the event.  Correct?

04:42 14          A.          A user has to authorize -- A user

04:42 15   has to create an event for Facebook to do that and

04:42 16   a user has to log in with their user name and

04:42 17   password and do this, so Facebook authorizes its

04:42 18   users to create events as part of their -- That's

04:42 19   the relationship Facebook has with its users.

04:42 20          Q.          You indicated some of the events

04:42 21   are set up through the automated scripted?

04:42 22          A.          No.  What I indicated is that

04:42 23   users -- users created these events.  Whether the

04:42 24   user authorized -- whether they authorized an agent

04:42 25   to go do it for them or they did it, it's the same

273

BARKLEY
Court Reporters

04:42   1   thing.  It's initiated by the user, that's what we

04:42   2   know.

04:42   3           Q.      The automated script, though, is

04:42   4   operated by power.com?

04:42   5           A.      It's a -- An automated script for

04:42   6   PowerScript, are initiated by users and executed by

04:42   7   power.com in the same way that an exporter is

04:43   8   initiated by user and managed by the site that's

04:43   9   doing it on behalf of the user.  Did you get that?

04:43   10  Yes.

04:43   11              (Whereupon, Exhibit 107 is marked

04:43   12  for identification by the reporter.)

04:43   13          Q.      Mr. Vachani, Exhibit 107 is

04:43   14  Exhibit A to the first amended complaint that was

04:43   15  106.  Have you seen this document before today?

04:43   16          A.      What is this document I'm looking

04:43   17  at?

04:43   18          Q.      Exhibit A to the first amended

04:43   19  complaint.

04:43   20          A.      Is this the Facebook Terms and

04:43   21  Conditions?

04:43   22          Q.      Yes.

04:44   23          A.      I have -- Vaguely -- I've seen

04:44   24  this before, yes.  I don't know if I've seen this

04:44   25  specific version.  I've read the Facebook Terms and

274

BARKLEY
Court Reporters

06:24  1          Q.          Do you know if that PowerPoint was

06:24  2     ever created?

06:24  3          A.          I don't know if it was ever

06:24  4     created, but we obviously created the site and we

06:24  5     did launch with Facebook Connect, so they --

06:24  6     somehow or other they figured out what they were

06:24  7     going to do and it was launched.  We did launch

06:24  8     Facebook Connect.

06:24  9          Q.          Number 3 he's talking about the

06:24 10     prediction of changes of power.com to support the

06:24 11     new infrastructure.  Correct?

06:24 12          A.          Exactly.  So what would be needed

06:24 13     to support this new infrastructure.  Correct.

06:24 14                      (Whereupon, Exhibit 116 is marked

06:25 15     for identification by the reporter.)

06:25 16          Q.          Mr. Vachani, I put in front of you

06:25 17     in the e-mail chain that on the front page includes

06:25 18     a December 26, 2008, E mail from you to Mr. Herrera

06:25 19     and Mr. Cutler.  Do you see that?

06:25 20          A.          Yes.  I do.

06:25 21          Q.          Was this the E mail you prepared

06:25 22     in response to the information you received

06:25 23     following Mr. Santos' communications, a number of

06:25 24     users, Facebook?

06:25 25          A.          After I got a full analysis, which

                                353

BARKLEY
Court Reporters

06:25  1    is what -- what resources would be necessary to do

06:25  2    this, what it would take, when it would happen, you

06:25  3    know, the amount of users and the growth and all

06:25  4    the different questions, you know.  I basically had

06:25  5    to make a final decision and this E mail reflects

06:26  6    the -- you know, our best efforts to address the

06:26  7    issue that, you know -- Our business could not

06:26  8    handle an interruption in the service and,

06:26  9    therefore, we were -- we were requesting them to be

06:26  10   as you put in here to be, to give us until January

06:26  11   30th to do a proper integration and letting them

06:26  12   know that we -- while we may expect it, now, that

06:26  13   we've done our full analysis, this is what it's

06:26  14   realistically going to take.

06:26  15          Q.      And did you prepare this E mail on

06:26  16   your own or did you have help?

06:26  17          A.      I prepared it on my own.

06:26  18                  (Whereupon, Exhibit 117 is marked

06:26  19   for identification by the reporter.)

06:26  20          A.      Obviously, I got a lot of feedback

06:26  21   from a lot on their opinions and thoughts.

06:27  22          Q.      With respect to Exhibit 116, when

06:27  23   you say you got feedback from a lot of people, did

06:27  24   you solicit their thoughts on precise language you

06:27  25   were going to send to Mr. Cutler?

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

BARKLEY
Court Reporters

06:27  1          A.          No.  I wrote that.  I got their

06:27  2     opinions on irrelevant stuff, as you can see, with

06:27  3     Eric.  I -- I asked -- I wanted to understand

06:27  4     what's possible, what's feasible, can we create

06:27  5     something useful and valuable to the user which is

06:27  6     obviously our most important priority as for what

06:27  7     we were building.  And based on -- on all the

06:27  8     feedback I got from Eric and his feedback that he

06:27  9     got accordingly, that was -- this was -- this was

06:27  10    the culmination of that.  The conclusion that I

06:27  11    made.

06:27  12         Q.          Before we go to 117 very quickly

06:27  13    the first -- At the bottom of the first paper of

06:27  14    your December 26, 2008, E mail there's a reference

06:27  15    to, "Furthermore, we are about to launch a new

06:27  16    solution which will pass Facebook ads inside of all

06:27  17    Facebook content which is displayed outside of

06:27  18    Facebook."

06:28  19         A.          Yup.

06:28  20         Q.          Did that ever -- Did that solution

06:28  21    ever get developed?

06:28  22         A.          Well, we didn't even -- we didn't

06:28  23    -- we never continued with Facebook, since we were

06:28  24    -- we -- we had already -- What our goal was in --

06:28  25    part of our cooperation with Facebook was we were

                                355

BARKLEY
*Court Reporters*

# C E R T I F I C A T I O N

I, PATRICIA MULLIGAN CARRUTHERS, a Certified Shorthand Reporter and Notary Public of the State of New Jersey and a Notary Public of the State of New York, do hereby certify that prior to the commencement of the examination the witness was sworn by me to testify as to the truth, the whole truth, and nothing but the truth.

I do further certify that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place, and on the date hereinbefore set forth.

I do further certify that I am neither of counsel nor attorney for any party in this action and that I am not interested in the event nor outcome of this litigation.

_____
Patricia Mulligan Carruthers, CSR
Certificate No. XI00780
Notary Public of the State of New York
Notary Public of the State of New Jersey

Dated:  JULY 27, 2011

My commission expires October 28, 2015     (N.J.)
My commission expires December 21, 2013    (N.Y.)