# EXHIBIT 14

```
 1                  UNITED STATES DISTRICT COURT
 2                NORTHERN DISTRICT OF CALIFORNIA
 3                     SAN FRANCISCO DIVISION
 4
 5
     FACEBOOK, INC.,                   )
 6                                     )
              Plaintiff,               )
 7                                     )  Case No.
     vs.                               )  5:08-cv-05780 JW (JCS)
 8                                     )
     POWER VENTURES, INC., a           )
 9   Cayman Island Corporation;        )
     STEVE VACHANI, an individual;     )
10   DOE 1, d/b/a POWER.COM,           )
     DOES 2-25, inclusive,             )
11                                     )
              Defendants.              )
12   _____)
13
14
15                         CONFIDENTIAL
16
17          VIDEOTAPED DEPOSITION of POWER VENTURES,
18   INC.'S 30(b)(6) Designee STEVEN VACHANI taken on behalf
19   of Plaintiff, at Orrick, Herrington & Sutcliffe LLP, 405
20   Howard Street, 10th Floor, San Francisco, California
21   beginning at 9:13 a.m., Monday, January 9, 2012, before
22   CHERREE P. PETERSON, RPR, CRR, Certified Shorthand
23   Reporter No. 11108.
24
25
```

|        |    |                                                                  |
|--------|----|------------------------------------------------------------------|
|        | 1  | -- he's not available.  So I haven't talked to him.              |
|        | 2  | He's not -- we have no intention right now to try to,            |
|        | 3  | you know, locate him to be in at trial.                          |
|        | 4  |     MR. CHATTERJEE:  What number are we on, 193? |
| 10:56  | 5  |     THE REPORTER:  193.                      |
|        | 6  |     (Plaintiff's Exhibit No. 193 marked for  |
|        | 7  |      identification.)                   |
|        | 8  | Q.   BY MR. CHATTERJEE:  Unlike some of the other                |
|        | 9  | ones, we have a certified translation.                           |
| 10:56  | 10 | A.   Yeah, this is the e-mail I was just referring               |
|        | 11 | to.                                                              |
|        | 12 | Q.   Okay.  So let me just ask you so the record's               |
|        | 13 | clear.  Document number 193, what is this?                       |
|        | 14 | A.   So this -- on April 24th, 2011, as you know,                |
| 10:57  | 15 | that was -- that was the month when we were -- we had            |
|        | 16 | made the decision to remove Power.com, you know, off --          |
|        | 17 | take it offline.  And at that -- you know, it was a              |
|        | 18 | cost-cutting measure.  And we also had -- were not in a          |
|        | 19 | position to make payments on our servers and we were --          |
| 10:57  | 20 | we didn't know how many days -- it was already past the          |
|        | 21 | date to be removed so -- to be shut off.  And so we had          |
|        | 22 | went to a -- we were going through a process of trying           |
|        | 23 | -- of backing up everything on another server.  And the          |
|        | 24 | way -- the only way to back it up was had to be                  |
| 10:57  | 25 | transferred so -- through the internet.  So it was a             |

Designee Steven Vachani, 30 (b) (6) - Confidential

BARKLEY
Court Reporters

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | -- it was inside of -- it was an Orkut app.  So it had             |
|       | 2  | nothing to do -- it was completely unrelated.  It was              |
|       | 3  | launched about a year earlier I think or six months.               |
|       | 4  | Q.    But there was a functionality that Power                     |
| 11:01 | 5  | Ventures had that worked not only on Orkut but was used            |
|       | 6  | to work on other web sites as well?                                |
|       | 7  | A.    Yeah.  Well, worked on many sites.  Orkut was                |
|       | 8  | our largest -- user base was on Orkut.  So that's why we           |
|       | 9  | refer to -- a lot of our biggest innovations were on               |
| 11:01 | 10 | Orkut just because that's where our largest user base              |
|       | 11 | was.                                                               |
|       | 12 | Q.    Right.  So here it says is the basis of the                  |
|       | 13 | Orkut app PowerFriends.                                            |
|       | 14 | A.    Correct.                                                     |
| 11:01 | 15 | Q.    Is it your testimony that that Orkut app was                 |
|       | 16 | only used on Orkut?                                                |
|       | 17 | A.    Yes.  That -- that app was only used on Orkut                |
|       | 18 | and it was a much earlier time than even -- we're not              |
|       | 19 | even involved in Facebook.  So the -- the PowerFriends             |
| 11:01 | 20 | app is completely irrelevant to any discussions                    |
|       | 21 | whatsoever, you know, I think, relating to Facebook.               |
|       | 22 | It's a --                                                          |
|       | 23 | Q.    As of April 17th, 2011, the logger database                  |
|       | 24 | existed?                                                           |
| 11:02 | 25 | A.    It existed on the -- yeah, on the server.  It                |

83

```
       1   was available and accessed in whatever -- if anything,
       2   it was referenced in any questions.  If -- I don't know
       3   if that was specifically where -- but it was -- it was
       4   -- it existed until that date, that's correct.
11:02  5        Q.   Okay.  And then following that you made the
       6   decision to delete that database?
       7        A.   Yeah.  As you can see, the dialogue there we
       8   didn't have the time with -- to transfer it before our
       9   servers would be shut off.  So they -- the decision was
11:02 10   transfer all the most valuable stuff and if we have time
      11   and they're not shut off, do these two last.
      12        Q.   Other than what's stated in this e-mail, do
      13   you know specifically what was in the logger database?
      14        A.   I do not know specifically.  This was why I
11:02 15   asked that question right there.
      16        Q.   But other than what's stated here?
      17        A.   I -- I do not know.
      18        Q.   So as you sit here today, you don't know, for
      19   example, if the logger database would track event
11:03 20   invitations sent through links to -- to Facebook users?
      21             MR. FISHER:  Objection.  Vague.  Assumes facts
      22   be in evidence.
      23             THE WITNESS:  What I do --
      24             MR. FISHER:  Lacks foundation.  Incomplete
11:03 25   hypothetical.
```

84

|   |   |
|---|---|
|  1 | always believed that and we were exploring in those ways |
|  2 | what would -- what we do if a user wants to get their |
|  3 | data.  And -- and this was a -- an exploration. |
|  4 | Q.   Let me establish some foundation around this, |
| 12:07  5 | Mr. Vachani.  You said in this instant message "we also |
|  6 | need to do some planning to make sure that we do it in a |
|  7 | way where we are not really detected," correct? |
|  8 | A.   That's correct. |
|  9 | Q.   And the reason that you said that was because |
| 12:07 10 | you didn't want web sites like Orkut to detect what you |
| 11 | were doing, right? |
| 12 | A.   Not to detect.  If -- if they attempted to |
| 13 | block, block the -- the sites, we wanted to understand |
| 14 | what are the issues. |
| 12:07 15 | Q.   And you wanted to be able to interfere with |
| 16 | their ability to block you, right? |
| 17 | MR. FISHER:  Objection.  Vague. |
| 18 | Argumentative. |
| 19 | THE WITNESS:  To interfere with their ability |
| 12:07 20 | to block, no.  I'm saying -- we -- this -- exactly what |
| 21 | it says here.  We had a -- we had a hypothetical |
| 22 | conversation about -- about the issues relating to data |
| 23 | extraction where users wanted to access their own data. |
| 24 | Q.   BY MR. CHATTERJEE:  And you knew that the web |
| 12:07 25 | sites that were housing that data wouldn't like what you |

121

Designee Steven Vachani, 30 (b) (6) - Confidential



```
 1   were doing.
 2      A.     We didn't know --
 3             MR. FISHER:  Objection.  Calls for speculation
 4   --
 5             THE WITNESS:  We didn't know if they would
 6   like --
 7             THE REPORTER:  Okay.  Whoa.  I'm sorry.
 8   Please restate your --
 9             THE WITNESS:  We didn't know if they would
10   like it or not --
11             THE REPORTER:  I'm sorry.  Hold on.  Please.
12             MR. FISHER:  Vague.  Assumes facts not in
13   evidence.  Lacks foundation.  Incomplete hypothetical.
14   Argumentative.
15             THE WITNESS:  Okay.  We didn't -- we have no
16   idea what they were -- this is 2005.  But we know that
17   if -- if a user is -- obviously some sites and it turns
18   out Facebook that, you know, in the future was -- was
19   not Orkut.  It was -- you know, Facebook does not -- did
20   not want users to export their own data.  And while --
21   and we have always stated very publicly and clearly that
22   we believe that users, you know, do have rights to
23   access their data.  So we were exploring and
24   understanding what are the potential reactions that
25   sites could have.  This was a -- this was a hypothetical
```

122

|       |    |                                                                          |
|-------|----|--------------------------------------------------------------------------|
|       | 1  | something that while it's a right and something that's                   |
|       | 2  | been established that users have the right to do, not                    |
|       | 3  | every site -- not every site wants users to -- to be                     |
|       | 4  | able to get their own -- access their data.  Obviously                   |
| 12:11 | 5  | Facebook being one of the greatest, you know, companies                  |
|       | 6  | that have traditionally been against -- been against                     |
|       | 7  | this publicly.  You know, users trying to access their                   |
|       | 8  | own data.  This is -- this is something that we -- we                    |
|       | 9  | always understood that, you know, just because it's --                   |
| 12:11 | 10 | it's correct and it's okay for users to access their own                 |
|       | 11 | data doesn't mean that every site will -- will allow                     |
|       | 12 | users to access their own data.                                          |
|       | 13 | Q.    So you knew that the web sites may not like                        |
|       | 14 | having users access and export data?                                     |
| 12:11 | 15 | A.    Historically importing data has never been --                      |
|       | 16 | has never -- many sites have always objected to it and                   |
|       | 17 | it -- and despite that fact, it has been going on for                    |
|       | 18 | ten years and been a commonly-accepted practice.                         |
|       | 19 | Q.    I understand that.  But you -- you understand                      |
| 12:12 | 20 | that even at the time you wrote this instant -- or the                   |
|       | 21 | portions of this instant message chat log that web sites                 |
|       | 22 | were often against exporting data from their web site to                 |
|       | 23 | another place?                                                           |
|       | 24 |         MR. FISHER:  Objection.  Vague.  Calls for                       |
| 12:12 | 25 | speculation.                                                             |

125

|  |  |
|---|---|
| 1 | THE WITNESS: I understood that. And I also |
| 2 | understood that -- that's correct. |
| 3 | Q. BY MR. CHATTERJEE: Okay. That's correct. |
| 4 | And so one of the things that you wanted to do was to |
| 12:12  5 | have multiple IP addresses to allow for the extraction |
| 6 | of data without the ability of those web sites to block |
| 7 | you; isn't that fair? |
| 8 | A. If a user authorized that -- that, correct. |
| 9 | That's something we've -- we've always said. |
| 12:12 10 | Q. Okay. And -- and you said in -- in this chat |
| 11 | log "since we will only have one chance to do it." |
| 12 | What did you mean by "we will only have one |
| 13 | chance to do it"? |
| 14 | A. I believe that we were -- we were just sharing |
| 12:13 15 | -- conversation that -- that accessing -- importing |
| 16 | data, you know, we wanted -- we wanted to do it right. |
| 17 | You know, we wanted to make sure that if a user wanted |
| 18 | to access their own data that they would be able to do |
| 19 | it. That's basically that -- we understood that import |
| 12:13 20 | -- importing data is a sensitive -- is a sensitive |
| 21 | subject, despite the fact that we strongly believe its |
| 22 | the user's right. And that's basically what this |
| 23 | discuss -- discussion was about. |
| 24 | Q. Okay. Farther down you say "lets" "plan on |
| 12:13 25 | getting the data grab done as soon as possible." |

126

```
 1   not necessary as we....
 2       Q.   So when this lawsuit was filed, did you e-mail
 3   the various power.com members and ask them to preserve
 4   documents?
 5       A.   Did I e-mail?  I mean, you have my e-mails,
 6   so.  I mean, I don't -- I don't think there was a --
 7   there was no law -- there was no law -- there was a -- I
 8   mean, I -- I don't know what -- what -- what we said to
 9   them, but it would be -- it would be my -- everything is
10   in my e-mail.
11       Q.   Do you recall ever instructing the power.com
12   employees not to -- not to destroy documents?
13       A.   It's our standard policy no one -- not to
14   destroy documents.  No one's -- as far as I know, no
15   one's -- no one's taken any direct effort to destroy
16   documents.
17       Q.   Did -- but my question's really precise.  When
18   the litigation was filed did you send out a reminder or
19   tell anyone not to destroy documents?
20       A.   Which?  You mean the Facebook litigation?
21       Q.   Yeah.
22       A.   No, I didn't.
23       Q.   Okay.  And was there any particular reason why
24   you didn't do that?
25       A.   There was no -- it was just a standard --
```

168

|       |    |                                                                          |
|-------|----|--------------------------------------------------------------------------|
|       | 1  | Q.    I'm going to ask you the question one more                         |
|       | 2  | time.                                                                    |
|       | 3  | A.    But I --                                                           |
|       | 4  | Q.    No.  Mr. Vachani, you can either answer it or                      |
| 15:27 | 5  | you can't.  If you can't answer it, tell me you can't                    |
|       | 6  | answer it.                                                               |
|       | 7  |        You knew that the Facebook terms of service                       |
|       | 8  | did not allow Power users to access the Facebook web                     |
|       | 9  | site in the way Power wanted to do it; isn't that right?                 |
| 15:28 | 10 |        MR. FISHER:  Objection.  Assumes facts not in                     |
|       | 11 | evidence.  Lacks foundation.  Argumentative.  Vague.                     |
|       | 12 |        THE WITNESS:  And I would like to -- once                         |
|       | 13 | again, I would like to ask you the previous question,                    |
|       | 14 | can you repeat my answer?  I -- I'm not answering your                   |
| 15:28 | 15 | question yet.  I'm asking her to repeat the answer I                     |
|       | 16 | made to your previous question which was similar.                        |
|       | 17 |        MR. CHATTERJEE:  Okay.  Let's take a break.                       |
|       | 18 | Tim, we're doing our meet and confer right now.                          |
|       | 19 |        THE VIDEOGRAPHER:  We are going off the                           |
| 15:28 | 20 | record.  The time is 3:28 p.m.                                           |
|       | 21 |        (Whereupon a break was taken from 3:28 to                         |
|       | 22 |         3:37.)                                                           |
|       | 23 |        THE VIDEOGRAPHER:  We are back on the record.                     |
|       | 24 | The time is 3:37 p.m.                                                    |
| 15:37 | 25 |        THE WITNESS:  So I previously wanted -- I                         |

236

```
         1   similar process where almost -- where -- where almost,
         2   for example, Google has a clause that states in their
         3   things that users cannot do it, but Facebook has
         4   continued to do it.  And -- and I'll ignore these
15:40    5   things.
         6            And I said about five minutes ago -- let me
         7   finish, please.
         8        Q.   BY MR. CHATTERJEE:  Finish.
         9        A.   I said five minutes ago that terms and
15:40   10   conditions are created by -- by a site.  And the
        11   decision -- the decision on -- on interpreting those
        12   terms and conditions and how companies choose to respond
        13   to their users have been and continue to be very
        14   subjective.  Facebook has been very subjective, Power
15:40   15   has been very subjective, and there is no legal
        16   precedent.  So we can have a discussion all day on this
        17   issue.  But I've answered the question to you that I --
        18   we are very familiar and have read Facebook terms and
        19   conditions.
15:41   20        Q.   Okay. Let's step back.  You said you've read
        21   Facebook's terms and conditions.  That was prior to
        22   accessing the Facebook web site as pursuant to the
        23   December 2008 launch, correct?
        24        A.   Yes.
15:41   25        Q.   Did you believe under your reading of the
```

239

|      |    |                                                               |
|------|----|---------------------------------------------------------------|
|      |  1 | looked at the industry as a whole, and we saw no -- no        |
|      |  2 | precedent for -- you know, on these issues and therefore      |
|      |  3 | felt that if it was an issue, this is something that          |
|      |  4 | would be determined -- and it has been determined by the      |
| 15:42 |  5 | courts.  Finally, I -- I believe --                          |
|      |  6 |     Q.    BY MR. CHATTERJEE:  Okay. There -- there |

        1   looked at the industry as a whole, and we saw no -- no
        2   precedent for -- you know, on these issues and therefore
        3   felt that if it was an issue, this is something that
        4   would be determined -- and it has been determined by the
15:42   5   courts.  Finally, I -- I believe --
        6        Q.    BY MR. CHATTERJEE:  Okay.  There -- there
        7   might be some confusion in my question.
        8        A.    Okay.
        9        Q.    I'm not asking about anything other than the
15:42  10   terms of service.  Just that standing alone.
       11        A.    Okay.
       12        Q.    Was there any concern in your mind when you
       13   read that terms of service that the way Power wanted to
       14   access the Facebook web site would be a violation of
15:43  15   Facebook's terms of service?
       16              MR. FISHER:  Objection.  Vague.  Calls for a
       17   legal conclusion.
       18              THE WITNESS:  I would agree calls -- you're
       19   asking for a legal conclusion that I'm not able to --
15:43  20        Q.    BY MR. CHATTERJEE:  I'm just asking you for
       21   whether there was any concern in your mind, not whether
       22   there's a legal violation.
       23        A.    Concern is irrelevant.  You know, this is --
       24   you're asking me --
15:43  25        Q.    Mr. Vachani, it is not a matter of you to

241

```
 1  determine relevance or not.
 2          Was there a concern in your mind or not?
 3     A.   Was there a concern?
 4          MR. FISHER:  Same objections.  Argumentative.
 5          THE WITNESS:  I think our company's actions
 6  speak for themselves.  Because, you know, I'm -- I was
 7  the CEO of the company.  And the company -- the company
 8  made a -- made a -- made a decision which I've already
 9  articulated, testified, and -- and I've also -- we've
10  also had years -- we've had years of discussions on this
11  issue, we've had court rulings on this issue, and you
12  continue to ask the same question which I think we're --
13  we're -- you know --
14     Q.   BY MR. CHATTERJEE:  It's because you're not
15  listening to my question.  I'm going to move on.
16     A.   I am listening to my question.
17     Q.   You aren't.  We're going -- Mr. Vachani --
18          MR. FISHER:  There's no point to arguing about
19  this.  Go to the next question.
20     Q.   BY MR. CHATTERJEE:  -- we're going to go to
21  court over this.  We're going to have these questions
22  answered.
23     A.   Do you mind asking the question one more time?
24     Q.   You're not answering them now.  No.  I'm --
25  I'm done.  I've asked it ten times.  You don't want to
```

242

Designee Steven Vachani, 30 (b) (6) - Confidential

BARKLEY
Court Reporters

|       |    |                                                                 |
|-------|----|-----------------------------------------------------------------|
|       | 1  | not mistaken.  I don't even know the issue.  But the            |
|       | 2  | main thing is we -- we -- we didn't know what -- we             |
|       | 3  | didn't really know what Facebook's reaction would be.           |
|       | 4  | Q.   All right.  So if I understand you correctly,              |
| 16:23 | 5  | by this point in time you had reviewed Facebook's terms         |
|       | 6  | of service and you may have received a cease and desist         |
|       | 7  | letter from Facebook?                                           |
|       | 8  | A.   I think it was either this day or the day                  |
|       | 9  | after.  I'm not a hundred percent sure what day it was.         |
| 16:23 | 10 | Q.   And around that time frame Mr. Santos stated               |
|       | 11 | he'll prepare for a possible block by Facebook?                 |
|       | 12 | A.   Oh, he was -- he was trying to evaluate the                |
|       | 13 | systems if -- if our -- if our system is unable to              |
|       | 14 | access Facebook.                                                |
| 16:23 | 15 | Q.   Was there any doubt in your mind when he said              |
|       | 16 | that that Facebook was considering or may block Power           |
|       | 17 | from accessing the Facebook web site in the way that it         |
|       | 18 | did?                                                            |
|       | 19 | MR. FISHER:  Objection.  Vague.                                 |
| 16:24 | 20 | THE WITNESS:  Obviously -- obviously they --                    |
|       | 21 | they had sent a -- a legal -- a legal threat.  They had         |
|       | 22 | sent a legal threat.  So, I mean, there -- there --             |
|       | 23 | there were definitely, you know, possibilities.                 |
|       | 24 | Q.   BY MR. CHATTERJEE:  So you knew that they                  |
| 16:24 | 25 | didn't feel that Power was authorized to be accessing           |

279

```
          1    Facebook in the way that Power was doing?
          2         A.    We knew that Facebook had -- Facebook had
          3    expressed, you know, their opinion that they -- that's
          4    correct.
16:24     5               MR. CHATTERJEE:  We're getting to an easier
          6    part for a little while.  218.
          7               (Plaintiff's Exhibit No. 218 marked for
          8                identification.)
          9               THE WITNESS:  Okay.
16:25    10         Q.    BY MR. CHATTERJEE:  Okay.  The document I've
         11    given you as Exhibit 218, what -- what is this document,
         12    Mr. Vachani?
         13         A.    What is this document?  This is a -- looks
         14    like -- this looks like an e-mail from Facebook.
16:25    15         Q.    This is an e-mail that you received?
         16         A.    This e-mail that I received.  I don't know if
         17    this was a test e-mail or if this was from -- you know,
         18    from Facebook.  I don't know that.  But it looks like it
         19    was from Facebook.
16:25    20         Q.    And it was to you?
         21         A.    Yep.
         22         Q.    And then the subject line has "Ghostday
         23    Leandro Abreu," A-b-r-e-u.
         24         A.    Yeah.  This is an e-mail from Facebook.
16:26    25         Q.    And Leandro Abreu was -- we -- we talked about
```

280

30(f)(1)).

Before completion of the deposition, review of the transcript (XX) was ( ) was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed, are appended hereto. (Fed. R. Civ. P. 30(e)).

Dated: JANUARY 13, 2012

*Cherree P. Peterson*