NAME: Steven Vachani
TELEPHONE 1-917-267-8823
EMAIL vachani@yahoo.com

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

FACEBOOK, INC.,

                        Plaintiff,

-against-

POWER VENTURES, INC. a Cayman Island Corporation, STEVEN VACHANI, an individual; DOE 1, d/b/a POWER.COM, an individual and/or business entity of unknown nature; DOES 2 through 25, inclusive, individuals and/or business entities of unknown nature,

                        Defendants.

Case No. 5:08-CV-05780 JW

**SUPPLEMENTAL BRIEF BY *PRO SE* DEFENDANT STEVEN VACHANI REGARDING DAMAGES**

Date: August 15, 2012
Chief Judge James Ware

# TABLE OF CONTENTS

                                                                                                                             Page

I.    COURT ALLOWS *PRO SE* DEFENDANT VACHANI TO FILE A SUPPLEMENTAL BRIEF ON THE ISSUE OF DAMAGES……………………………………………………………………3

II.   CEOs HAVE A DUTY TO BE INVOLVED IN THE OPERATIONS OF THE CORPORATION AND MERE TITLE DOES NOT TRIGGER PERSONAL LIABILITY……………………………………………………………………...4

III.  PLAINTIFF SEEKS DAMAGES THAT ARE DISPROPORTIONATE TO THE ALLEGED OFFENSE AND WOULD BE CRIPPLING TO ANY INDIVIDUAL………………...8

IV.  PUBLIC POLICY REQUIRES THE COURTS TO IMPOSE PERSONAL LIABILITY WITH CAUTION……………..14

# TABLE OF CASES

*Conley v. Gibson,*
      355 U.S. 41 (1957)……………………………………………………………………3
*Davis v. Metro Productions, Inc.,*
      885 F.2d 515 (9th Cir. 1989)…………………………………………………..7
*DirectTV v. Le,*
      267 Fed. Appx. 636 (9th Cir. 2008)……………………………………….....8
*F.T.C. v. Phoenix Avatar, L.L.C.,*
      No. 04 C 2897, 2004 WL 1746698 (N.D. Ill. July 30, 2004)…………………8
*F.T.C. v. Sili Neutraceauticals, L.L.C.,*
      No. 07 C 4541, 2008 WL 474116 (N.D. Ill. Jan. 23, 2008) …………………..8
*Facebook, Inc. v. Fisher,*
      No.C09-05842 JF (PSG), 2011 WL 250395 (N.D. Cal. Jan. 26, 2011) ………9
*Facebook, Inc. v. Wallace,*
      No. C09-798 JF (RS), 2009 WL 3617789 (N.D. Cal. Oct. 29, 2009)………..10
*Hall v. Bellman,*
      935 F.2d 1106 (10th Cir. 1991)………………………………………………..3
*Haines v. Kerner,*
      92 S.Ct. 594 (1972)……………………………………………………………..3
*Hanger Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc.,*
      556 F. Supp. 2d 1122 (E.D. Cal. 2008) …………………………..…………...8
*Hulsey v. Owens,*
      63 F.3d 354 (5th Cir. 1995)…………………………………………………….3
*Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.,*
      No. C07-03952 JW, 2010 WL 5598337 (N.D. Cal., March 19, 2010)……….4
*Powell v. Lennon,*
      914 F.2d 1459 (11th Cir. 1990)………………………………………………...3
*Puckett v. Cox,*
      456 F.2d 233 (6th Cir. 1972) …………………………………………………..3
*United States v. Citrin,*
      972 F.2d 1044 (9th Cir. 1992)…………………………………………..........8

# I. COURT ALLOWS *PRO SE* DEFENDANT VACHANI TO FILE A SUPPLMENTAL BRIEF ON THE ISSUE OF DAMAGES

I would like to start off by humbly requesting the Court respect my lack of legal education and overlook my lack of technical accuracy in reference to legal terminology and legal prose. Instead, I request you please give due consideration to the substance of the following briefing. I would like to cite the following precedents regarding this statement.

**Non-Lawyer pro se litigants not to be held to same standards as a practicing lawyer**.

"Pleadings in this case are being filed by Defendant In Propria Persona, wherein pleadings are to be considered without regard to technicalities. Propria pleadings are not to be held to the same high standards of perfection as practicing lawyers. See *Haines v. Kerner*, 92 S.Ct. 594 (1927); *Powell v. Lennon,* 914 F.2d 1459 (11th Cir1990); *Hulsey v. Owens,* 63 F.3d 354 (5th Cir 1995); *Hall v. Bellmon*, 935 F.2d 1106 (10th Cir. 1991). In *Puckett v. Cox*, it was held that a pro-se pleading requires less stringent reading than one drafted by a lawyer, 456 F.2d 233 (6th Cir. 1972). Justice Black in *Conley v. Gibson*, 355 U.S. 41(1957), held "The Federal Rules rejects the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits. According to Rule 8(f) FRCP and the State Court rule which holds that all pleadings shall be construed to do substantial justice." *Id*. at 48.

By now, the Court is very familiar with the proceedings. As a co-defendant, I am respectfully filing this supplemental brief regarding the issue of damages and personal liability pursuant to the Honorable Court's order dated August 8, 2012. In that order, Judge Ware granted myself, Steven Vachani, who is now proceeding *pro se*,[1] the opportunity to make additional arguments regarding the issue of damages and why the Court should not find me personally liable for the alleged actions of co-defendant, Power Ventures, Inc., a corporation.

## II. CEOs HAVE A DUTY TO BE INVOLVED IN THE OPERATIONS OF THE CORPORATION AND MERE TITLE DOES NOT TRIGGER PERSONAL LIABILITY

Plaintiff argues that I, as CEO of Power Ventures, should be liable for damages because I "directed and authorized **all** of the activity giving rise to liability to a degree that reflects far more than [my] supervisory role of the company as CEO." (Facebook, Inc.'s Supplemental Brief Regarding Damages and Liability of Defendant Steve Vachani, hereafter, "FB Damages Brief") (emphasis added).

In their Brief seeking damages, Facebook cites several cases that are neither persuasive nor on point. Specifically, Plaintiff erroneously cites to an order entered by this Court in the case *Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, as an example of individual liability due to the corporation's owner having nearly

---

[1] I, Steven Vachani, filed a Notice of Self-Representation on August 9, 2012 after I was unable to secure legal representation due to the complex nature of this case and the history. I was previously represented by counsel, and counsel was granted leave to withdraw approximately one month earlier on July 2, 2012.

"complete control" over corporate operations. (FB Damages Brief, citation omitted). This case, however, is easily distinguished from the facts in the present case. First, the *Malletier* case involved contributory copyright infringement, and the issue of whether the defendants had direct knowledge of the infringement. Thus, the question of direct knowledge was the trigger for the defendant's liability. In that case, the issue of liability rested first and foremost on whether or not the individual had direct knowledge, and not whether or not liability was appropriate due to his role as owner of the corporations. Therefore, the analysis is not applicable to the present case. Second, the individual in *Malletier* was the sole owner of the defendant corporations, while I am not and was never the sole owner (or even a controlling shareholder or controlling board member) of Power Ventures, which had over 100 full-time employees, approximately six other executive officers as well as over a dozen other shareholders and multiple board members reflecting the multiple and diverse interests and opinions of many these different shareholders. The company also had received over $7.5 million in outside investment from venture capital and other sophisticated technology investors who shared in the decision making structure of the company through a fairly standard board and shareholder governance structure that is common in technology corporations that have received significant outside investment capital. The records are replete with evidence that I consulted, relied on, and discussed ideas, business plans, and programming with many other professionals, board members, and shareholders. I was not the sole owner or

decision-maker at Power Ventures. Third, unlike the individual in *Malletier*, I did not have the knowledge or training to exert the type of control over the corporation that the Plaintiff alleges.[2] I have limited programming skills (I have never in my life programmed a single piece of technical code in a professional manner), and I relied on team members including the Chief Technical Officer, Eric Santos, to oversee all a wide set of technical employees in our company. In fact, Eric Santos and his group of several other managers who reported to him, was in charge of hiring almost all of our technical programmers who all possessed skills beyond my own. In addition, Mr. Santos also assisted in marketing, which the Plaintiff failed to acknowledge and is significant because Plaintiff alleges that I acted alone with respect to the creation and implementation of the Power 100 Campaign. The marketing manager, Bruno Carvalho reported directly to Eric Santos and a majority of the meetings, decisions, and marketing initiatives were made by a diverse group of employees who worked in the groups supervised directly by Bruno Carvalho and Eric Santos. This is supported by the evidence, specifically in my answers at the deposition that Mr. Santos was instrumental in marketing strategies because Mr. Santos possessed the technical skills necessary for marketing. (Deposition of Steve Vachani dated July 20, 2011, pages 13, 36). As most of our company's marketing initiatives were product driven, I delegated a wide range of these activities to the marketing team which reported to

---

[2] This Court noted in the Feb. 16, 2012 Order Granting Plaintiff's Motions for Summary Judgment; Denying Defendant's Motion for Summary Judgment, that I consulted with staff and suggested a plan, but stated "[I] [d]on't really understand this too well. Greg may also have some ideas." (pg. 16, line 10-11).

other senior executives.

In addition, Plaintiff emphatically states that I "have **been personally involved** in all of Power's operations," as if that was enough to trigger personal liability. (emphasis added by Plaintiff). Just because a CEO is "personally involved" in operations does not automatically mean that he is the "guiding spirit" behind the contested conduct. CEOs, by design, are "personally involved" in most, if not all aspects of a corporation. The courts, however, require significantly more.

For example, "[Mark] Zuckerberg[3] consolidated his authority with bylaws that gave him an incontestable voting majority on the company's board." Brad Stone & Douglass MacMillan: *How Mark Zuckerberg Hacked the Valley,* Bloomberg Businessweek, May 17, 2012, *available at* http://www.businessweek.com/2012-05-17/how-mark-zuckerberg-hacked-the-valley. In contrast, there is no evidence that I enjoyed such control over Power Ventures considering I did not have control over the board of directors and did not having a controlling shareholder stake in the company at the time of the company activities being evaluated in this case

Moreover, another case discussed by the Plaintiff is also easily distinguished. In *Davis v. Metro Productions, Inc.*, two individual defendants were the **sole shareholders** of the corporation, and the legal issue was whether or not the court had proper personal jurisdiction based on the long-arm statute. Thus, the discussion of whether or not the individuals were the "guiding spirit" or the "central figure" of the

---

[3] Mark Zuckerberg is CEO of Plaintiff Facebook, Inc.

relevant corporate activity was in the context of personal jurisdiction. In fact, footnote 10, cited by the Plaintiff, actually acknowledge the significant differences inherent in the analysis, "potential consequences would arise where sufficient minimum contacts existed to permit jurisdiction over the individual defendant, but where the substantive prerequisites do not exist for liability to be imposed on the individual in his personal capacity." 885 F. 2nd 515, 523 n. 10 (9th Cir. 1989).

Other cases cited by the Plaintiff offer very little instruction to this Court because they are significantly different from the present case. In *F.T.C. v. Sili Neutraceauticals, L.L.C.,*, the individual was the **sole** officer; in *F.T.C. v. Phoenix Avatar, L.L.C.*, the plaintiff was seeking a preliminary injunction which is a much lower standard than the present case; and in *Hanger Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc.*, the court ruled on a motion for summary judgment which required a mere showing that a reasonable jury **could** infer that the CEO authorized, directed, or participated in unlawful acts. (citations omitted). The Plaintiff cannot cite to any case that is on point because the Plaintiff is asking this Court to extend the boundaries of officer liability too far, and courts have routinely refused to do that in CAN-SPAM, CFAA and §502 cases.

**III. PLAINTIFF SEEKS DAMAGES THAT ARE DISPROPORTIONATE TO THE ALLEGED OFFENSE AND WOULD BE CRIPPLING TO ANY INDIVIDUAL**

"The district court has 'wide discretion in determining the amount of statutory damages to be awarded.'" *DirectTV, Inc. v. Le*, 267 Fed. Appx. 636, 636 (9th Cir.

2008) (citation omitted). However, a statutory damages award may violate the due process rights of a defendant "where the penalty prescribed is so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable." *United States v. Citrin*, 972 F.2d 1044, 1051 (9th Cir. 1992) (citation omitted). Here, the Plaintiff has asked this Court for a staggering $18,188,100 in damages; and further to hold me jointly and severally liable. A salary of a startup Internet industry CEO, which has been my primary profession and source of income for the majority of the past 15 years, ranges between $100,000-$250,000 base and it is very common that little or no salary is given during the earliest stages of new projects or during tough times where startup companies may be short on cash. This of course has been the case in relation to Power Ventures over the past three years. Plaintiff is also attempting to further create additional onerous restrictions that could make it difficult for me to work, invest in, or taken an ownership stake in other companies in my industry. As this is my lifeblood to earn my income to care for myself, family, and children, such harsh statutes against my future activities with other companies is completely unprecedented. I was an employee of Power Ventures with specific and limited duties and control, just like any one of the 100 or so other employees of Power Ventures. To hold me, or any one of the other agents of Power Ventures would be a dangerous precedent to set. I therefore respectfully ask this Court to carefully consider how the weight of any damages assessed would impact an individual and his or her family and dependents as opposed to a corporation and

its diverse group of accredited and sophisticated investors and shareholders.

Similarly, I am asking this Court to award no damages to Facebook as argued in papers previously submitted. Plaintiff has asked for damages based on $300 per estimated occurrence, yet no court has awarded more than $50 per message – and those were for infractions that truly embody "hacking." For example, *Facebook, Inc. v. Fisher,* No. C09-05842 JF (PSG), 2011 WL 250395 (N.D. Cal. Jan. 26, 2011), the court refused to award Facebook over 2.1 billion dollars pursuant maximum penalties to CAM-SPAM. Instead, the court awarded $50 per email, however, the offense in *Fisher* was significantly different than in the present case. In *Fisher,* the individual defendant was the "sole person to act" on behalf of the corporation, and he obtained the login credentials of 116,000 Facebook users without authorization, and sent 7.2 million emails. Significant damages, complaints, and other security threats were clearly documented to support the magnitude of decisions made in this case. As mentioned, in the present case, Power Ventures, with complete authorization and clear consent and permission by its users, is alleged to have helped it users create events upon which Facebook's system sent an email informing the user that their friend had created and event which supported Power.com. Yet, plaintiff has been unable to identify a single complaint from a Facebook user in response to those alleged emails.

Similarly, in *Facebook, Inc. v. Wallace,* No. C09-798 JF (RS), 2009 WL 3617789 (N.D. Cal. Oct. 29, 2009), the court refused to award Facebook over 7

billion dollars despite the allegations that the defendant sent over 14 million emails and violated a TRO and "willfully violated the statutes in question with blatant disregard for the rights of Facebook and the thousands of Facebook users whose accounts were compromised by his conduct." *Id.* at *4. The court awarded Facebook $50 per violation, and again, the actions alleged in *Wallace* are significantly more egregious than the allegations in the present case. I could find no case where the court actually awarded Facebook the amount they asked for. Moreover in both of these cases I just mentioned, Facebook unsuccessfully asked the court for the **maximum** statutory awards permitted, and in both cases, the court refused, even though the actions in both cases fit squarely under the types of "phishing" schemes that CAN-SPAM intended to combat.

   Despite the fact that the court has found a violation of CAN-SPAM in its summary judgment, I humbly request that the Court consider the following final points prior to making a determination of the magnitude, ill-intent, and damages caused by these messages. In particular, I would ask the court to give special attention and consideration of the level or magnitude of ill intent by myself as CEO and damages as it relates to my personal liability. I also request that the Court consider the magnitude and potential impacts of its potential ruling on damages and personality liability to the rest of the industry of startup entrepreneurs, early stage internet industry investors, and executives who could be dramatically by decision that adversely effects the personal livelihood and family of an executive employee of

a startup company . Please consider these important points.

1) Power was at all times the authorized user agent with full permission and user consent of users requesting for us to help them complete actions which they could manually do on their own.

2) Facebook's own motion demonstrates that users were given a clear choice to participate in Power's promotion and clear notice that this would involve inviting their friends to an event. In its previous briefs, Facebook includes Power's promotional pop-up window through which users created the event invitation. Facebook Corrected Mot. Partial Summ. J. on Count 1 at 5:13- 23.

3) A pre-checked box plainly and prominently notifies users that they will "Share with friends through events," and the box could be unchecked by users who did not wish to do so. All of the users who responded to Power's button could have manually invited all of their friends to Power's events; creating CAN-SPAM liability for their actions because Power automated this process would be unprecedented, and extending such liability personally to myself as the CEO of a Power Ventures would be even more egregious.

4) The act of a user providing their user name and password and authorizing an agent to send invitations on their behalf inviting users to try new services is a truly standardized internet practice utilized by every major internet company. Facebook itself built a very significant portion of its 900+ million registered users through this similar practice of asking user to share their user name and password with Facebook and allowing the user to authorize Facebook to access a competitors sites (often in violation of opposing websites terms and conditions). Facebook would then pulls friends email addresses, often against the will of a competitors site, but at the request of the user, and then Facebook would send emails to each of a users friends inviting them to Facebook. My point is that we employees and executives of Power Ventures received trusted legal advice and business advice from multiple credible sources reconfirming the legality of these messages which Power initiated at the request and with authorization from our users in a practice no different than Facebook itself practices. This combined with common sense judgment and experience that this practice was truly a legal practice and for that matter a long standing industry practice led to the following conclusion: I honestly and sincerely had no intent or belief that this practice was violating any regulations. I

have clarified this because I believe that sincere intent of our company's employees and executives, including myself, taking these actions are important and relevant when you are considering the issue of damages and especially of damages as it relates to my personal liability.

5) I sincerely believe and continue to advocate that our 60,000 messages were directed and fully authorized by users who wanted to communicate with their friends. Misleading or unwanted spam messages usually have a minimum threshold of spam complaints which range from .2% to 1% or more from the messages sent. The undisputable fact that our 60,000 authorized and user directed messages did not produce even a single documented complaint is the strongest statement to support my statement that these actions can never be compared to the egregious actions of arguably the world's most notorious and dangerous spammers whose blatant hacking, phishing, and intent to spam is widely despised by most respectable Internet industry executives.

6) On the other hand, Power's actions related to our careful steps regarding our user authorized messages on Facebook have been vehemently defended by the Electronic Frontier foundation in their amicus brief submitted in support of my defense. The clear support and strong arguments of arguably the Internet's most respected consumer rights protection group (supported by 19,000+ paying members) only reinforce the clear differences between of Power Ventures in respect to magnitude, damages, intent, and personal liability. This is of course in comparison to some of the CAN-SPAM violators and cases referred to earlier I this brief. As a respected and long standing Internet industry entrepreneur and executive, a damages decision against a individual executive of a technology startup could have irreparable and a damaging effect on fellow entrepreneurs and their fellow entrepreneurial executives to pursue the world changing innovations. A severely adverse decision regarding damages could also set a dangerous precedent and potentially endanger and scare thousands innovative startup companies from pursing the kind innovation that has led to the creation of the companies that have changed lives over 1 billion Internet users. Facebook could also selectively target millions of its users who create events or post messages on walls of their friends promoting their parties or other commercial events and unknowingly subject users and companies to harsh damages.

7) It must be noted and the court must be reminded that our proactive response and civilized communication with Facebook trying to find an amicable solution during the approximately thirty days that our system was

     operational on Facebook clearly differentiated our interactions as professional communications between two fellow technology companies and not the actions of a rogue spamming organization whose intent is the hack into, phish, and cause significant damages to users and companies.

8) Finally, when the court prepares to make its final decision regarding the magnitude of this violation of CAN-SPAM and what the damages and personal liability should be, I would ask that in good faith that the Court, with the intent of determining the damages, culpability, and personal liability to myself, please carefully re-read the amicus brief and arguments made by the Electronic Frontier Foundation in its amicus brief submitted regarding this issue in January 2012. I will only hope that the Court will be able to clearly differentiate the magnitude of differences between previous cases relating to the CAN SPAM act that have been referred to earlier in this brief and conclude that there was no ill-intent, no harm done, no user accounts compromised, and no documented damages.

## IV. PUBLIC POLICY REQUIRES THE COURTS TO IMPOSE PERSONAL LIABILITY WITH CAUTION

Traditionally, officers were not personally liable for corporate torts absent a showing that the corporate veil was pierced. The protection of the personal assets of officers and shareholders was considered so important, that exceptions were rare. "The purpose of limited liability is to promote commerce and industrial growth by encouraging shareholders to make capital contributions to corporations without subjecting all of their personal wealth to the risks of the business." David H. Barber, *Piercing the Corporate Veil*, 17 Willamette L. Rev. 371, 371 (1980-1981). While the limits to these protections have been somewhat narrowed recently, there are several reasons why I should not be held personally liable. First, as discussed, my role as CEO of Power Ventures did not require me to be involved in most, if not all aspects of the business. However, I did not exert unilateral control or decision-making

authority. Second, Power Ventures was in its infancy, and only seeking to contribute to the world of social networking and improve users' experiences. Start-up companies would not be able to attract visionaries if they were subject to personal liability. Finally, the conduct and goals of Power Ventures were designed to enhance the social network technology. Ironically, Power Ventures goals were similar to goals identified by Mark Zuckerberg, creator and CEO of Facebook In an interview posted on January 27, 2007, he stated, "The most important thing is that we create an open information flow for people." *Available at* http://www.exeter.edu/news_and_events/news_events_5594.aspx.  He reiterated those same goals in a 2010 interview with *Wired* magazine, "The thing I really care about is the mission, making the world open." *Available at* http://www.wired.com/business/2010/05/zuckerberg-interview/.

In early December 2008, I spoke openly about our company's vision to create a truly open Internet where users could have complete ownership and control of their data and how our company's vision and products reflected the efforts and support of some of the world's most respected Internet investors including Draper Fisher Jurvetson.

http://vator.tv/news/2008-12-26-interview-with-powercom-ceo-steve-vachany

"**Draper Fisher Jurvetson** (DFJ) is a venture capital firm based in Menlo Park, California with affiliate offices in more than 30 cities around the world and over $7 billion in capital commitments. The firm has funded well-known technology

companies including Baidu, Hotmail (acquired by Microsoft), Overture (acquired by Yahoo), Skype (acquired by Microsoft) and Glam Media. Other notable investments include Tesla Motors, SugarCRM, Box.net, Interwoven, BrightSource Energy, SpaceX, Meebo, Cafemom and SolarCity among others.

*http://en.wikipedia.org/wiki/Draper_Fisher_Jurvetson*

This Court should note that the Plaintiff has failed to identify a single complaint from Facebook users in response to the services that Power Ventures offered. The Plaintiff could not produce a single email complaint in response to the 60,000 estimated emails generated. Moreover, as discussed in previous filings, the Plaintiff has cited negligible damages: specifically, three days spent by their technical manager (approximately $1500 assuming a $120,000 salary), and legal fees of $75,000. However, legal fees should not be considered damages[4] here for two reasons: (1) the $75,000 spent on legal fees were during a period of good faith negotiations between Facebook and Power Ventures (see emails exchanged between Power Ventures and Joseph Cutler demonstrating efforts to resolve this matter in December 2008); and (2) the amount of resources identified here are minuscule relative to the scope and breadth of Facebook. The technical manager spent approximately three days and Facebook estimated 60,000 emails, which could only be a small fraction of the amount of emails generated by hundreds of millions of

---

[4] See *Amicus* brief filed by Electronic Frontier Foundation (EEF) arguing the legal fees should not be calculated for purposes of CFAA claim.

Facebook users each day.

For these reasons pleaded in this entire brief, I humbly and fully ask this Court to find no personal liability or damages.

Dated: August 15th, 2012

By: __/s/__ *[signature: Steven Vachani]*
NAME

NAME  Steven Vachani
ADDRESS
TELEPHONE  1-917-267-8823
FACSIMILE
EMAIL  vachani@yahoo.com

Representing Self - Steve Vachani

1