# EXHIBIT A

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| Facebook, Inc., | NO. C 08-05780 JW |
| Plaintiff, | **ORDER GRANTING PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT; DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| Power Ventures, Inc., et al., | |
| Defendants. | |

## I. INTRODUCTION

Facebook, Inc. ("Plaintiff") brings this action against Defendants[1] alleging violations of the Controlling the Assault of Non-Solicited Pornography and Marketing Act ("CAN-SPAM Act"), 15 U.S.C. §§ 7701 *et seq.*, the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, and California Penal Code § 502. Plaintiff alleges that Defendants accessed its website in an unauthorized manner, and then utilized this unauthorized access to send unsolicited and misleading commercial e-mails to Facebook users.

Presently before the Court are Plaintiff's Motions for Summary Judgment on Counts One,[2] Two and Three,[3] and Defendants' Motion for Summary Judgment on all counts.[4] The Court

---

[1] Defendants are Power Ventures, Inc. ("Power") and Steven Vachani ("Vachani").

[2] (Facebook, Inc.'s Corrected Notice of Motion and Motion for Partial Summary Judgment on Count 1; Memorandum of Points and Authorities in Support Thereof, hereafter, "CAN-SPAM MSJ," Docket Item No. 215.)

[3] (Notice of Motion, Motion and Memorandum of Points and Authorities for Partial Summary Judgment under California Penal Code § 502 and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, hereafter, "Fraud MSJ," Docket Item No. 214.)

[4] (Notice of Motion, Motion, and Memorandum of Law in Support of Defendants' Motion for Summary Judgment, hereafter, "Defendants' MSJ," Docket Item No. 98.)

1   conducted a hearing on January 23, 2012.  Based on the papers submitted to date and oral argument,

2   the Court GRANTS Plaintiff's Motions for Summary Judgment on all counts, and DENIES

3   Defendants' Motion for Summary Judgment.

## II.  BACKGROUND

**A.      Undisputed Facts**

6          Plaintiff owns and operates the widely popular social networking website located at

7   http://www.facebook.com.[5]  Defendant Power is a corporation incorporated in the Cayman Islands

8   doing business in the State of California.[6]  Defendants operate a website, www.power.com, which

9   offers to integrate multiple social networking accounts into a single experience on Power.com.

10  (FAC ¶ 5; Answer ¶ 5.)  Defendant Vachani is the CEO of Power.  (Id. ¶ 11; Id. ¶ 11.)

11         Users of Plaintiff's website register with a unique username and password.  (FAC ¶ 21;

12  Answer ¶ 21.)  Before Plaintiff activates a username and permits a user to access certain features of

13  Facebook, the user must agree to Plaintiff's Terms of Use.  (Id. ¶ 29; Id. ¶ 29.)  The Terms of Use

14  require users to refrain from using automated scripts to collect information from or otherwise

15  interact with Facebook, impersonating any person or entity, or using Facebook website for

16  commercial use without the express permission of Facebook.  (Id. ¶ 30; Id. ¶ 30.)

17         On or before December 1, 2008, Power began advertising and offering integration with

18  Plaintiff's site.  (FAC ¶ 49; Answer ¶ 49.)  Power permitted users to enter their Facebook account

19  information and access Facebook site through Power.com.  (Id. ¶ 50; Id. ¶ 50.)  At no time did

20  Defendants receive permission from Plaintiff to represent that solicitation of Facebook usernames

21  and passwords was authorized or endorsed by Plaintiff.  (Id. ¶ 53; Id. ¶ 53.)

22         On or before December 26, 2008, Power began a "Launch Promotion" that promised

23  Power.com's users the chance to win one hundred dollars if they successfully invited and signed up

---

25         [5]  (First Amended Complaint ¶ 20, hereafter, "FAC," Docket Item No. 9; Amended Answer
26  and Counterclaims of Defendants Power Ventures, Inc. and Steve Vachani ¶ 20, hereafter,
    "Answer," Docket Item No. 54.)

27         [6]  (FAC ¶ 10; Answer ¶ 10.)

28                                                    2

United States District Court

For the Northern District of California

new Power.com users.  (FAC ¶ 65; Answer ¶ 65.)  As part of this promotion, Power provided

participants with a list of their Facebook friends, obtained by Power from Facebook, and asked the

participant to select which of those friends should receive a Power invitation.  (Id. ¶ 66; Id. ¶ 66.)

The invitations sent to those friends purport to come from "Facebook" and used an

"@facebookmail.com" address, not a Power.com address.  (Id. ¶ 68; Id. ¶ 68.)

On December 1, 2008, Plaintiff notified Defendant Vachani of its belief that Power's access

of Plaintiff's website and servers was unauthorized and violated Plaintiff's rights.  (FAC ¶ 57;

Answer ¶ 57.)  Facebook subsequently implemented technical measures to block users from

accessing Facebook through Power.com.  (Id. ¶ 63; Id. ¶ 63.)

**B.**     **Procedural History**

On December 30, 2008, Plaintiff filed its initial Complaint.  (See Docket Item No. 1.)  On

January 13, 2009, Plaintiff filed the First Amended Complaint naming both Power Ventures and

Vachani as Defendants.  (See FAC at 1.)  On March 23, 2009, Defendants moved to dismiss

Plaintiff's Complaint or, in the alternative, for a more definite statement.  (See Docket Item No. 17.)

On May 11, 2009, the Court denied Defendants' Motion to Dismiss as to all claims.  (See Docket

Item No. 38.)  On November 23, 2009, Defendants answered Plaintiff's First Amended Complaint

and asserted counterclaims under the Sherman Antitrust Act and California's Unfair Competition

Law.  (See Answer ¶¶ 167-185.)

On December 23, 2009, Plaintiff filed a Motion for Judgment on the Pleadings or, in the

Alternative, Partial Summary Judgment of Liability Under California Penal Code Section 502(c).

(See Docket Item No. 56.)  The same day, Plaintiff also filed a Motion to Dismiss Defendants'

Counterclaims and Strike Defendants' Affirmative Defenses.  (See Docket Item No. 58.)  On

January 15, 2010, Defendants filed a Cross-Motion for Summary Judgment.  (See Docket Item No.

62.)  On February 26, 2010, Judge Fogel recused himself from the case.  (See Docket Item No. 72.)

On March 2, 2010, the case was reassigned to Judge Ware.  (See Docket Item No. 73.)  On July 20,

2010, the Court denied Plaintiff's Motion for Judgment on the Pleadings or Summary Judgment,

**United States District Court**
For the Northern District of California

3

1    denied Plaintiff's Motion to Strike Defendants' Affirmative Defenses, denied Defendants' Motion

2    for Summary Judgment and granted Plaintiff's Motion to Dismiss Defendants' Counterclaims.[7]

3            Presently before the Court are the parties' Motions for Summary Judgment.

4                                    **III. STANDARDS**

5            Summary judgment is proper when the moving party shows that there is no genuine dispute

6    as to any material fact. Fed. R. Civ. P. 56(a). The purpose of summary judgment "is to isolate and

7    dispose of factually unsupported claims or defenses." Celotex v. Catrett, 477 U.S. 317, 323-24

8    (1986). The moving party "always bears the initial responsibility of informing the district court of

9    the basis for its motion, and identifying the evidence which it believes demonstrates the absence of a

10   genuine issue of material fact." Id. at 323. If the moving party meets its initial burden, the "burden

11   then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue

12   for trial." Miller v. Glenn Miller Prods., Inc., 454 F.3d 975, 987 (9th Cir. 2006) (citing Celotex, 477

13   U.S. at 324).

14           When evaluating a motion for summary judgment, the court views the evidence through the

15   prism of the evidentiary standard of proof that would pertain at trial. Anderson v. Liberty Lobby

16   Inc., 477 U.S. 242, 255 (1986). The court draws all reasonable inferences in favor of the non-

17   moving party, including questions of credibility and of the weight that particular evidence is

18   accorded. See, e.g., Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 520 (1992). The court

19   determines whether the non-moving party's "specific facts," coupled with disputed background or

20   contextual facts, are such that a reasonable jury might return a verdict for the non-moving party.

21           T.W. Elec. Serv. v. Pac. Elec. Contractors, 809 F.2d 626, 631 (9th Cir. 1987). In such a

22   case, summary judgment is inappropriate. Anderson, 477 U.S. at 248. However, where a rational

23   trier of fact could not find for the non-moving party based on the record as a whole, there is no

24   "genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986).

25

26           [7] (See Order Denying Facebook's Motion for Judgment on the Pleadings; Denying the
     Parties' Cross-Motions for Summary Judgment; Granting Facebook's Motion to Dismiss
27   Defendants' Counterclaims; Denying Facebook's Motion to Strike Defendants' Affirmative
     Defenses, hereafter, "July 20 Order," Docket Item No. 89.)

28                                          4

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    Although the district court has discretion to consider materials in the court file not referenced

2   in the opposing papers, it need not do so.  See Carmen v. San Francisco Unified Sch. Dist., 237 F.3d

3   1026, 1028-29 (9th Cir. 2001).  "The district court need not examine the entire file for evidence

4   establishing a genuine issue of fact."  Id. at 1031.  However, when the parties file cross-motions for

5   summary judgment, the district court must consider all of the evidence submitted in support of both

6   motions to evaluate whether a genuine issue of material fact exists precluding summary judgment

7   for either party.  Fair Housing Council of Riverside Cnty, Inc. v. Riverside Two, 249 F.3d 1132,

8   1135 (9th Cir. 2001).

9                                    **IV.  DISCUSSION**

10    Plaintiff moves for summary judgment on the grounds that: (1) the undisputed evidence

11   establishes that Defendants sent misleading commercial e-mails through Facebook's network in

12   violation of the CAN-SPAM Act;[8] and (2) the undisputed evidence also establishes that Defendants

13   utilized technical measures to access Facebook without authorization, in violation of both the CFAA

14   and California Penal Code Section 502.[9]  Defendants respond that: (1) because Plaintiff's own

15   servers sent the commercial e-mails at issue, Defendants did not initiate the e-mails as a matter of

16   law; and (2) Defendants did not circumvent any technical barriers in order to access Facebook site,

17   precluding liability under the CFAA or Section 502.[10]  Defendants further contend that Plaintiff

18   suffered no damages as a result of Defendants' actions, and thus lacks standing to bring a private suit

19   for Defendants' conduct.  (Id. at 15-16, 19-20.)

20   **A.      The CAN-SPAM Act**

21    At issue is whether the conduct of Defendants, as established by the undisputed evidence,

22   constitutes a violation of the CAN-SPAM Act.

23

24   _____

25    [8]  (CAN-SPAM MSJ at 12-16.)

26    [9]  (Fraud MSJ at 1.)

27    [10]  (Defendants' MSJ at 5, 16-17.)

28                                              5

United States District Court

For the Northern District of California

1    The CAN-SPAM Act provides that "[i]t is unlawful for any person to initiate the

2    transmission, to a protected computer, of a commercial electronic mail message, or a transactional or

3    relationship message, that contains, or is accompanied by, header information that is materially false

4    or materially misleading." 15 U.S.C. § 7704(a)(1).  The Act also creates a private right of action for

5    internet service providers adversely affected by violations of this provision.  See id. § 7706(g)(1).

6    To prevail on a CAN-SPAM Act claim, a plaintiff must establish not only that the defendant violated

7    the substantive provisions of the Act, but also that the plaintiff was adversely affected by this

8    violation such that it satisfies the statutory standing requirements.  See Gordon v. Virtumundo, Inc.,

9    575 F.3d 1040, 1048 (9th Cir. 2009).  The Court considers each requirement in turn.

10       **1.    Standing**

11    At issue is whether Plaintiff has standing to assert a claim under the CAN-SPAM Act.

12    Standing under Section 7706 "involves two general components: (1) whether the plaintiff is

13    an 'Internet access service' provider ('IAS provider'), and (2) whether the plaintiff was 'adversely

14    affected by' statutory violations." Gordon, 575 F.3d at 1049 (citation omitted).

15    Here, Defendants concede that Plaintiff is an IAS provider.[11]  Therefore, the only question

16    before the Court in determining Plaintiff's standing is whether Plaintiff was "adversely affected" by

17    the alleged violations at issue.

18    In Gordon, the Ninth Circuit explained that not all possible harms to an IAS provider

19    constitute harm within the meaning of the Act, and distinguished those harms sufficient to confer

20    standing from those outside the scope of Congress' intent.  See 575 F.3d at 1049-55.  After

21    discussing the congressional decision to confer standing upon IAS providers but not end-consumers

22    affected by commercial e-mails, the court concluded that "[l]ogically, the harms redressable under

23    the CAN-SPAM Act must parallel the limited private right of action and therefore should reflect

24    those types of harms uniquely encountered by IAS providers."  Id. at 1053.  Thus, while the "mere

25

26    _____

27        [11]  (See Defendants' MSJ at 13.)

28                                          6

1   annoyance"[12] of spam encountered by all e-mail users is not sufficient to confer standing, the court

2   identified the costs of investing in new equipment to increase capacity, customer service personnel

3   to address increased subscriber complaints, increased bandwidth, network crashes, and the

4   maintenance of anti-spam and filtering technologies as the "sorts of ISP-type harms" that Congress

5   intended to confer standing. Id. at 1053. Thus, the court noted, "[i]n most cases, evidence of some

6   combination of operational or technical impairments and related financial costs attributable to

7   unwanted commercial e-mail would suffice." Id. at 1054 (citation omitted).

8       Here, in support of its contention that it has standing to pursue a CAN-SPAM Act claim,

9   Plaintiff offers the following evidence:

10     (1)     Around December 1, 2008 Ryan McGeehan, manager of Plaintiff's Security
          Incident Response Team ("SIR Team"), determined that Power was running an
11        automated scripting routine to harvest data and download it to the Power.com
          website.[13] McGeehan then spent substantial time and effort determining what steps
12        were necessary to contain Power's spamming. (Id. ¶ 12.) It was determined that at
          least 60,627 event invitations were sent to Facebook users due to Power's activities.
13        (Id.) On December 12, 2008, after Plaintiff's counsel sent Power a cease and desist
          letter, and the activity did not stop, Plaintiff attempted to block Power's access by
14        blocking what appeared to be its primary IP address. (Id. ¶ 13.) On December 22,
          2008, McGeehan determined that Power was still accessing Facebook through new IP
15        addresses. (Id. ¶ 14.) Plaintiff then attempted to block these IP addresses as well.
          (Id. ¶ 13.) In early 2009, Facebook blacklisted the term Power.com, preventing that
16        term from appearing anywhere on the site. (Id. ¶ 16.) In implementing these
          measures, McGeehan spent at least three to four days of his own engineering time
17        addressing security issues presented by Power. (Id. ¶ 17.)

18     (2)     On December 1, 2008, Joseph Cutler sent a cease and desist letter to
          Power.com.[14] After this letter was sent Cutler was contacted by Steve Vachani, who
19        identified himself as the owner and operator of Power Ventures. (Id. ¶ 7.) In this and
          subsequent discussions, Vachani assured Cutler that the functionality of the Power
20        website would be changed to comply with Facebook's requests. (Id. ¶¶ 9-10.) On
          December 27, 2008, Cutler received an e-mail saying that Power Ventures would not
21        change its website as earlier stated. (Id. ¶ 13.) From fall of 2008 through early 2009,

22

23          [12] Id. at 1053-54.

24          [13] (See Declaration of Ryan McGeehan in Support of Facebook's Motion for Partial
    Summary Judgment on Count 1 Under the CAN-SPAM Act ¶¶ 1, 7, hereafter, "McGeehan Decl.,"
25   Docket Item No. 213-4.)

26          [14] (See Declaration of Joseph Cutler in Support of Facebook, Inc.'s Motion for Partial
    Summary Judgment for Liability Under the CAN-SPAM Act ¶ 6, hereafter, "Cutler Decl.," Docket
27   Item No. 213-2.)

28                       7

United States District Court
For the Northern District of California

1       Facebook spent approximately $75,000 on Cutler's firm related to Power Venture's
2  actions.  (Id. ¶ 15.)

3       Defendants do not dispute the accuracy or veracity of this evidence of Plaintiff's

4  expenditures.  Instead, Defendants contend that, as a matter of law, these are not the sorts of harm

5  that give rise to standing under Gordon, as they fall within the category of negligible burdens

6  routinely borne by IAS providers.[15]  In support of this contention, Defendants rely on the following

7  evidence:

8       (1)       In the fourth quarter of 2008, Plaintiff received 71,256 user complaints that
              contained the word "spam."  (McGeehan Decl. ¶ 5.)  Facebook did not produce any
9              evidence of customer complaints specifically referencing the e-mails at issue in this
              case.[16]

10       (2)       Craig Clark, litigation counsel at Facebook, testified that he was not aware of
              any documents that would be responsive to any of the requests for production made
11              by Defendants.[17]  These requests for production included requests for all documents
              regarding any injury that Plaintiff suffered, expenditures Plaintiff made, or user
12              complaints that Plaintiff received as a result of the events complained of in Plaintiff's
              First Amended Complaint.[18]

13       Upon review, on the basis of these undisputed facts, the Court finds that Plaintiff has

14  demonstrated an "adverse effect" from Defendants' conduct sufficient to confer standing.  The

15  evidence submitted by Plaintiff is not limited to documenting a general response to spam prevention,

16

17

18       [15] (Defendants' Memorandum of Points and Authorities in Opposition to Facebook's Motion
for Partial Summary Judgment on Count 1 (CAN-SPAM Act, 15 U.S.C. § 7704) at 14-15, hereafter,
19  "CAN-SPAM Opp'n," Docket Item No. 234.)

20       [16] (See Declaration of L. Timothy Fisher in Support of Defendants' Motion for Summary
Judgment ¶ 4, hereafter, "Fisher Decl.," Docket Item No. 106; see also Fisher Decl., Ex. B,
21  Facebook, Inc.'s Objections and Response to Defendants' Requests for Production, Set One, Docket
Item No. 106.)

22
       [17] (Fisher Decl., Ex. C, Deposition of Craig Clark at 118:20-118:23, hereafter, "Clark
23  Depo.," Docket Item No. 106.)  Plaintiff objects to Defendants' reliance on Mr. Clark's testimony
because Mr. Clark was deposed in his personal capacity, rather than pursuant to Fed. R. Civ. P.
24  30(b)(6), and thus Plaintiff contends that Mr. Clark's answers to the questions presented to him are
irrelevant because he does not speak on behalf of Facebook.  (See Docket Item No. 240 at 17-23.)
25  For the purposes of this Order only, Plaintiff's objection to the Clark deposition is OVERRULED
because harm to Plaintiff is established irregardless of Mr. Clark's testimony.
26
       [18] (Fisher Decl., Ex. A, Defendants' First Requests for Production Pursuant to Fed. R. Civ.
27  P. 34, Docket Item No. 106.)

28                                        8

United States District Court

For the Northern District of California

1    but rather shows acts taken and expenditures made in response to Defendants' specific acts.[19]  These

2    specific responses to Defendants' actions distinguish Plaintiff's damages from those in the cases

3    relied upon by Defendants, which asserted only the costs of general spam prevention as the basis for

4    standing.[20]  In particular, since Plaintiff documented a minimum of 60,000 instances of spamming by

5    Defendants, the costs of responding to such a volume of spamming cannot be categorized as

6    "negligible."  See Gordon, 575 F.3d at 1055-56.  The Court finds that under Gordon and Azoogle,

7    though the general costs of spam prevention may not confer standing under the CAN-SPAM Act,

8    documented expenditures related to blocking a specific offender may.  This is particularly true

9    where, as here, Defendants' spamming activity was ongoing, prolific, and did not stop after requests

10   from the network owner.  Thus, as the undisputed evidence establishes that Plaintiff expended

11   significant resources to block Defendants' specific spamming activity, the Court finds that Plaintiff

12   has standing to maintain a CAN-SPAM action.

13            **2.        Merits of CAN-SPAM Act Claim**

14            At issue is whether Defendants' conduct, as established by the undisputed facts, violates the

15   substantive provisions of the CAN-SPAM Act.  The Act makes it unlawful, *inter alia*, "for any

16   person to initiate the transmission, to a protected computer, of a commercial electronic mail

17   message, or a transactional or relationship message, that contains, or is accompanied by, header

18   information that is materially false or materially misleading."  15 U.S.C. § 7704(a)(1).  Defendants

19   contend that Plaintiff's CAN-SPAM Act claim must fail because: (1) the undisputed facts establish

20   that Plaintiff itself, and not Defendants, initiated the e-mails at issue; and (2) because Plaintiff sent

21   the e-mails, the header information identifying Facebook as the sender was accurate and not

22   misleading.[21]  The Court considers each element in turn.

23   _____

24            [19]  (See, e.g., McGeehan Decl. ¶¶ 8-17; see also id., Ex. 4, Electronic Ticket Documenting
     McGeehan's Attempts to Block Defendant's Access to Facebook, Docket Item No. 213-7.)

25
              [20]  (See, e.g., CAN-SPAM Opp'n at 15 (citing ASIS Internet Servs. v. Azoogle.com, Inc.,
26   357 Fed. Appx. 112, 113-14 (9th Cir. 2009).)

27            [21]  (Defendants' MSJ at 12-14.)

28                                                    9

### a.  Initiation of Commercial E-mails

At issue is whether Defendants initiated the e-mails associated with the Launch Promotion.

The CAN-SPAM Act provides that "[t]he term 'initiate,' when used with respect to a commercial electronic mail message, means to originate or transmit such message or to procure the origination or transmission of such message, but shall not include actions that constitute routine conveyance of such message.  For purposes of this paragraph, more than one person may be considered to have initiated a message."  15 U.S.C. § 7702(9).  The word "procure," in turn, is defined to mean "intentionally to pay or provide other consideration to, or induce, another person to initiate such a message on one's behalf."  Id. § 7702(12).

In support of its claim that Defendants initiated the e-mails at issue, Plaintiff offers the following undisputed evidence:

(1)  On or before December 26, 2008, Defendant Power began a "Launch Promotion" that offered site users $100 if they successfully invited and signed up the most new Power.com users. (FAC ¶ 65; Answer ¶ 65.)  As part of the promotion, Power obtained a list of the user's Facebook friends and asked the participant to select which of those friends should receive a Power.com invitation.  (Id. ¶ 66; Id. ¶ 66).  Selected friends would then receive an e-mail in which Facebook was listed as the sender, promoting an event "Bring 100 Friends and win 100 bucks!"  (Id. ¶70; Id. ¶ 70.)  Defendant admits that Power.com's "offer of potential monetary compensation may have induced some Facebook users to participate in Power's launch program."  (Id. ¶ 72; Id. ¶ 72.)

(2)  The testimony of Vachani that Power.com both authored the text contained in the e-mails and provided the link contained therein that would allow recipients to sign up for Power.com.[22]

(3)  The launch promotion feature that offered the $100 reward was made available to Power.com users through Power.com.  (Vachani Depo. at 264:2-264:8.)  None of the social networking networks on Power.com created the contents of the launch promotion feature.  (Id. at 264:9-264:12.)

(4)  The declaration of Facebook's technical expert, Lawrence Melling, that based on his study of the software created by Defendant Power and its code, the script

---

[22]  (Declaration of Monte M.F. Cooper in Support of Facebook, Inc.'s Motion for Partial Summary Judgment on Count 1 under the CAN-SPAM Act, hereafter, "Cooper Decl.," Ex. 2, Deposition of Steven Vachani at 197:4-197:12, hereafter, "Vachani Depo.," Docket Item No. 229.)

10

would automatically insert Power as the host of the event and the event location.[23] The script also automatically generated a guest list for the event if one was not provided, and did so by accessing the user's Facebook friends list. (Id. ¶ 19.) The script would then automatically send Facebook event invitations to each Facebook user on the guest list on behalf of Power. (Id. ¶ 20.)

(5) The testimony of Vachani that Power eventually paid 30-40 people who got 100 or more friends to sign up. (Vachani Depo. at 189:5-9.)

Defendants, while not disputing the accuracy of the above facts, contend that as a matter of law, they did not "initiate" the e-mails at issue because the e-mails were authorized by Facebook users and sent from Facebook's own servers.[24] In support of this contention, Defendants rely upon the facts, also undisputed, that after a user authorized the creation of an event as part of the Launch Promotion, Facebook servers automatically filled in the header information and sent an e-mail to each person on the event guest list.[25]

Upon review, the Court finds that based on these undisputed facts, Defendants initiated the e-mails sent through the Launch Promotion. Although Facebook servers did automatically send the e-mails at the instruction of the Launch Program, it is clear that Defendants' actions–in creating the Launch Promotion, importing users' friends to the guest list, and authoring the e-mail text–served to "originate" the e-mails as is required by the Act.[26] To hold that Plaintiff originated the e-mails merely because Facebook servers sent them would ignore the fact that Defendants intentionally caused Facebook's servers to do so, and created a software program specifically designed to achieve that effect. Further, while Defendants emphasize that Facebook users authorized the creation of events resulting in the e-mails,[27] the Court finds that Defendants procured these users to do so by offering and awarding monetary incentives to provide such authorization. Thus, even if Facebook

---

[23] (Declaration of Lawrence Melling in Support of Facebook, Inc.'s Motion for Partial Summary Judgment on Count 1 of the CAN-SPAM Act ¶ 18, hereafter, "Melling Decl.," Docket Item No. 217.)

[24] (See Defendants' MSJ at 5-8.)

[25] (See Clark Depo. at 98:18-99:25.)

[26] See 15 U.S.C. § 7702(9).

[27] (See, e.g., Defendants' MSJ at 7.)

11

United States District Court
For the Northern District of California

1   users may be viewed as initiators of the e-mails because of their participation in the Launch

2   Promotion, Defendants are nonetheless also initiators as a matter of law because of their

3   procurement of user participation.[28]

4        Accordingly, the Court finds that Defendants did initiate the e-mails at issue within the

5   meaning of the CAN-SPAM Act.

6        **b.        Whether the E-mails Are Misleading**

7        At issue is whether the e-mails sent as a result of the Launch Promotion contain header

8   information that is false or misleading.

9        The CAN-SPAM Act defines header information as "the source, destination, and routing

10  information attached to an electronic mail message, including the originating domain name and

11  originating electronic mail address, and any other information that appears in the line identifying, or

12  purporting to identify, a person initiating the message."  15 U.S.C. § 7702(8).  The Act further

13  provides that "header information shall be considered materially misleading if it fails to identify

14  accurately a protected computer used to initiate the message because the person initiating the

15  message knowingly uses another protected computer to relay or retransmit the message for purposes

16  of disguising its origin."  Id. § 7704(a)(1)(C).  A false or misleading statement is considered material

17  if "the alteration or concealment of header information" would impair the ability of an IAS provider

18  or a recipient to "identify, locate, or respond to a person who initiated the electronic mail message."

19  Id. § 7704(a)(6).

20       Here, for the reasons discussed above, Defendants were initiators of the e-mail messages at

21  issue.  But because Defendants' program caused Facebook servers to automatically send the e-mails,

22  these e-mails contained an "@facebookmail.com" address.[29]  These e-mails did not contain any

23  return address, or any address anywhere in the e-mail, that would allow a recipient to respond to

24

25

26       [28]  See 15 U.S.C. § 7702(12).

27       [29]  (FAC ¶¶ 68-69; Answer ¶¶ 68-69.)

28                                                        12

Defendants.[30]  Thus, as the header information does not accurately identify the party that actually

initiate the e-mail within the meaning of the Act, the Court finds that the header information is

materially misleading as to who initiated the e-mail.

Defendants contend that even if the Court finds that they did initiate the e-mails at issue, they

cannot be held liable for violations of the CAN-SPAM Act on the grounds that: (1) the text of the e-

mails itself includes information about Power.com; and (2) Defendants had no control over the

headers of the e-mails.[31]  The Court finds that both of these contentions are unavailing.  First, the

presence of a misleading header in an e-mail is, in and of itself, a violation of the CAN-SPAM Act,

insofar as the Act prohibits the use of misleading header information.[32]  Thus, the fact that the text of

the e-mails at issue may have included information about Power.com is irrelevant, for purposes of

liability under the Act.  Second, the question of whether Defendants had control over the headers is

also irrelevant.  In particular, the Court finds that the fact that Defendants used a program that was

created and controlled by another to send e-mails with misleading headers does not absolve them of

liability for sending those e-mails.[33]

---

[30]  (Declaration of Theresa Sutton in Support of Plaintiff Facebook, Inc.'s Opposition to Defendants' Motion for Summary Judgment, hereafter, "Sutton Decl.," Ex. 4, Defendant Power Ventures, Inc.'s Responses to Facebook, Inc.'s First Set of Requests for Admissions at No. 50, hereafter, "Defendants' Admissions," Docket Item No. 241-3.)

[31]  (Defendant's Motion at 14.)  The latter argument was also made by *Amicus Curiae* Electronic Frontier Foundation ("EFF"), which contends that because the Facebook system auto-generates the header information provided in the e-mails, commercial users should not be held responsible for their content.  (See Brief of Amicus Curiae Electronic Frontier Foundation in Support of Defendant Power Ventures' Motion for Summary Judgment on Count 1 (CAN-SPAM Act, 15 U.S.C. § 7704) and Under California Penal Code § 502 and the Computer Fraud and Abuse Act at 18-19, hereafter, "EFF Brief," Docket Item No. 206-2.)

[32]  See 15 U.S.C. § 7704(a)(1).

[33]  Amicus EFF contends that the CAN-SPAM Act's prohibition on the sending of misleading commercial e-mails should not be applied to e-mails sent through a system like that of Facebook, in which the headers are auto-generated by servers and not controlled by the individual users.  (EFF Brief at 20.)  However, the Court finds no statutory basis for creating such an exception to the CAN-SPAM Act.  The Act makes it unlawful to "initiate the transmission" of any e-mail message that is "accompanied by" misleading header information.  15 U.S.C. § 7704(a)(1).  Nothing in this language requires that the user actually create the misleading header information, as opposed to utilizing a system already in place to auto-generate a header.

13

United States District Court

For the Northern District of California

1   In sum, the Court finds that the undisputed facts establish that Defendants initiated the

2   sending of e-mails with false or misleading heading information under the CAN-SPAM Act, and that

3   Plaintiff suffered adverse effects as contemplated by the Act sufficient to convey standing to

4   maintain a private cause of action.  Accordingly, the Court GRANTS Plaintiff's Motion for

5   Summary Judgment on Count One, and DENIES Defendants' Motion for Summary Judgment as to

6   Count One.

7   **B.      California Penal Code § 502**

8   At issue is whether Defendants' conduct, as established by the undisputed facts, violated

9   California Penal Code § 502 ("Section 502").

10  Section 502(c) provides that a person is guilty of a public offense if he, *inter alia*: (1)

11  knowingly accesses and without permission takes, copies, or makes use of any data from a

12  computer, computer system, or computer network; (2) knowingly and without permission uses or

13  causes to be used computer services; or (3) knowingly and without permission accesses or causes to

14  be accessed any computer, computer system, or computer network.  See Cal. Penal Code §

15  502(c)(2), (3) & (7).  Section 502(e) provides that "the owner or lessee of the computer, computer

16  system, computer network, computer program, or data who suffers damage or loss by reason of a

17  violation of any of the provisions of subdivision (c) may bring a civil action against the violator for

18  compensatory damages and injunctive relief or other equitable relief."  See id. § 502(e).

19  Here, the Court has already held that Plaintiff has suffered sufficient harm to have standing

20  under Section 502.  (See July 20 Order at 8.)  In addition, Defendants admit that they took, copied,

21  or made use of data from Facebook website without Facebook's permission to do so.  (Defendants'

22  Admissions at 22.)  Therefore the only question remaining before the Court, in determining whether

23  Defendants violated Section 502, is whether Defendants' access to Facebook was "without

24  permission" within the meaning of Section 502.[34]

25  _____

26  [34]  Defendants continue to contend that Plaintiff did not suffer any loss as is required by
    Section 502 and therefore lacks standing to bring a private cause of action.  (See Defendants' MSJ at
27  19-20.)  In so doing, Defendants suggest that the Court's July 20 Order declined to reach the issue of

28                                                    14

1    In its July 20 Order, the Court explained at great length that a particular use of a computer

2    network which violates that network's terms of use is insufficient to establish that the use was

3    "without permission" pursuant Section 502.[35]  Where, however, a party accesses the network in a

4    manner that circumvents technical or code-based barriers in place to restrict or bar a user's access,

5    then the access does qualify as being "without permission."  (See id. at 18-20.)  Accordingly, the

6    question before the Court is whether the undisputed evidence establishes that Defendants

7    circumvented technical or code-based barriers in order to access Facebook.

8    In support of the contention that Defendants did circumvent technical barriers designed to

9    block their access to Facebook, Plaintiff relies on the following evidence:

10    (1)    In response to the question if he at any time became aware that Facebook was
attempting to block Power, Vachani answered: "I don't know if they

11    were–[o]bviously, we expected that they would but he we [sic] also know that our
system doesn't get blocked because there's nothing–there's nothing it's technically

12    doing.  It's just users accessing the site so that it can't really be blocked. . . .We know
[sic] that they would try, but we also know that it was built to – it would not be

13    blockable."[36]

14    (2)    The expert of report of Bob Zeidman and Lawrence Melling, who analyzed
the code and software used by Power.com to determine if it was designed to

15    circumvent technical barriers.[37]  The report concludes that the code used a number of
routines to avoid being blocked by websites like Facebook, including the use of proxy

16    servers if one server was blocked by a website.  (Id. ¶¶ 55-60.)  The code would
routinely monitor each server to see if an IP address was blocked and change the IP

17    address if it was.  (Id. ¶¶ 59-60.)  The report concludes that substantial effort went

18

19    loss because it denied both parties' motions for summary judgment at that time.  (Id.)  The Court
finds, however, that this interpretation of its Order is misguided, as it ignores the plain statement that

20    "[s]ince the undisputed facts demonstrate that Facebook has suffered some damage or loss in
attempting to block Power's access to Plaintiff's website, the Court finds that Facebook has standing

21    to bring suit under Section 502."  (July 20 Order at 8.)

22    [35]  (See July 20 Order at 8-20.)

23    [36]  (Declaration of Morvarid Metanat in Support of Facebook's Motion for Partial Summary
Judgment Under California Penal Code § 502 and the Computer Fraud and Abuse Act, 18 U.S.C. §

24    1030, hereafter, "Metanat Decl.," Ex. 2, Deposition of Steve Vachani at 323:17-324:8, hereafter,
"Vachani Depo. 2," Docket Item No. 236-2.)

25

26    [37]  (Expert Report of Bob Zeidman and Lawrence Melling ¶¶ 25, filed under seal.)  This
Report was filed under seal.  However, the Court finds that the portions of the Report discussed in

27    this Order were not appropriately sealed.  Accordingly, the Court UNSEALS the Report for
purposes of discussing its contents in this Order.

28

15

United States District Court
For the Northern District of California

into designing the proxy system and that one of the objectives of the design was to reconfigure the IP connections if an IP address was blocked.  (Id. ¶ 61.)

(3)     The testimony of Ryan McGeehan that on December 12, 2008, Facebook attempted to block Power's access to the site by blocking what appeared to be its primary IP address.  (McGeehan Decl. ¶ 13.)  Following the block, Facebook determined that Powers was circumventing the block by using other IP addresses.  (Id.)  Facebook attempted to block these addresses as they discovered them "in a game of cat and mouse."  (Id.)

(4)     An e-mail from Vachani to members of his staff, sent after Vachani received a cease and desist letter from Plaintiff, stating "we need to be prepared for Facebook to try and block us and then turn this into a national battle that gets us huge attention."[38]

(5)     A transcript of a discussion between Vachani and a member of his staff in which the they discuss the process of starting to fetch profile data from another social networking website, Orkut.[39]  Vachani says "we also need to do some planning to make sure that we do it in a way where we are not really detected.  [P]ossible rotating IP's or something.  [D]on't really understand this too well.  Greg may also have some ideas."  (Id. at 3.)  The staff member responds "yah.  [R]otating IP if we can set then its very good as when [O]rkut will see so much band[w]idth use by perticular [sic] IP then they will block that perticulat [sic] IP."  (Id. at 3-4.)  Vachani responds "We need to plan this very carefully since we will have only one chance to do it. . . we might need to rotate with over 200 IP's or even more to do it perfectly."  (Id. at 4.)

In support of their contention that they did not circumvent technical barriers imposed by Plaintiff, Defendants offer the following evidence:

Vachani's testimony that in December 2008, Facebook attempted to prevent Power's users from accessing Facebook through Power.com by blocking one IP address utilized by Power.[40]  "Facebook's IP block was ineffective because it blocked only one outdated IP address Power had used, and did not block other IPs that Power was using in the normal course of business."  (Id. ¶ 11.)  "Power did not undertake any effort to circumvent that block, and did not provide users with any tools designed to circumvent it."  (Id.)  After it

---

[38]  (Metanat Decl., Ex. 6, E-mail from Steven Vachani, Docket Item No. 236-6; see also Vachani Depo. 2 at 313:3-313:7.)

[39]  (Declaration of I. Neel Chatterjee in Support of Reply Memorandum in Support of Facebook's Motions for Partial Summary Judgment Under: 1) on [sic] Count 1 the Can-Spam Act; and 2) California Penal Code § 502 and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, Ex. 2, Docket Item No. 248-2.)

[40]  (Declaration of Steve Vachani in Support of Defendants' Opposition to Facebook's Motions for Partial Summary Judgment on Count 1 (Can-spam Act, 15 U.S.C [sic] § 7704) and Under California Penal Code § 502 and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ¶ 10, Docket No. 189.)

16

United States District Court
For the Northern District of California

became aware of the attempted IP blocking, Power undertook efforts to implement Facebook Connect as Facebook had requested.  (Id. ¶ 12.)[41]

Upon review, the Court finds that the undisputed facts establish that Defendants circumvented technical barriers to access Facebook site, and thus accessed the site "without permission."  Although the evidence shows that Defendants did not take additional steps to circumvent individual IP blocks imposed by Plaintiff after the fact, this does nothing to cast doubt on the overwhelming evidence that Defendants designed their system to render such blocks ineffective.  The Court finds no reason to distinguish between methods of circumvention built into a software system to render barriers ineffective and those which respond to barriers after they have been imposed.  This is particularly true where, as here, Defendant Vachani's own statements provide compelling evidence that he anticipated attempts to block access by network owners and intentionally implemented a system that would be immune to such technical barriers.[42]  Thus, in light of the undisputed evidence that Defendants anticipated attempts to block their access by Plaintiff, and utilized multiple IP addresses to effectively circumvent these barriers, the Court finds that Defendants violated Section 502 by accessing Plaintiff's network without permission.

Accordingly, the Court GRANTS Plaintiff's Motion for Summary Judgment as to Count Three and DENIES Defendants' Motion for Summary Judgment as to Count Three.

## C.   **The Computer Fraud and Abuse Act**

At issue is whether Defendants' conduct constitutes a violation of the CFAA.

The CFAA imposes liability on any party that "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains," *inter alia*, "information from any

---

[41]  Plaintiff objects to Vachani's testimony regarding Facebook's blocks of the Power site on the grounds that Vachani lacks personal knowledge of how such technical measures worked and because he is not an expert qualified to opine on the functionality of a technical barrier.  (See Docket Item No. 240 at 14.)  For purposes of this Order only, the Court finds that Vachani's lack of qualifications as an expert affects the weight his testimony should be accorded and not its admissibility.  Thus, Plaintiff's objection is OVERRULED.

[42]  (See, e.g., Vachani Depo. 2 at 323:17-324:8.)

17

United States District Court

For the Northern District of California

1    protected computer."   18 U.S.C. § 1030(a)(2).   Suit may be brought by any person who suffers

2    damage or loss in an amount above $5000.   See id. §1030(g); §1030(c)(4)(A)(i)(I).

3         Here, for the reasons discussed above, the undisputed facts establish that Defendants' access

4    to Facebook was without authorization.   In addition, Defendants admit that they obtained

5    information from Facebook website.   (Defendants' Admissions at 22.)   Thus, the only finding

6    necessary for Plaintiff to prevail on its CFAA claim is whether Plaintiff's damages exceed $5000,

7    thereby giving Plaintiff standing under the statute.[43]

8         The CFAA defines "loss" to include "any reasonable cost to any victim, including the cost of

9    responding to an offense, conducting a damage assessment, and restoring the data, program, system,

10   or information to its condition prior to the offense, and any revenue lost, cost incurred, or other

11   consequential damages incurred because of interruption of service."   18 U.S.C. § 1030(e)(11).

12   "Costs associated with investigating intrusions into a computer network and taking subsequent

13   remedial measures are losses within the meaning of the statute."   Multiven, 725 F. Supp. 2d at 895

14   (citation omitted).

15        Here, as discussed above with regard to Plaintiff's CAN-SPAM claim, Plaintiff has provided

16   uncontradicted evidence of the costs of attempting to thwart Defendants' unauthorized access into its

17   network.[44]   These documented costs were well in excess of the $5000 CFAA threshold.   (See Cutler

18   Decl. ¶ 15.)   Thus, the Court finds that on the basis of these costs, Defendants' unauthorized access

19   of Plaintiff's network did cause sufficient loss to Plaintiff to confer standing upon Plaintiff.

20        In sum, for the reasons discussed above regarding Plaintiff's Section 502 claim, the Court

21   finds that Defendants accessed Plaintiff's website without authorization and obtained information

22   from Facebook.   The Court further finds that Plaintiff suffered loss sufficient to confer standing as a

23

24   _____

25        [43]   See Mutiven, Inc. v. Cisco Sys., Inc., 725 F. Supp. 2d 887, 895 (N.D. Cal. 2010)
     (explaining that elements of a CFAA claim do not differ materially from the elements of a claim
26   under Section 502).

27        [44]   (See, e.g., McGeehan Decl. ¶¶ 11-17; Cutler Decl. ¶¶ 7-15.)

28                                                18

result of such access.  Accordingly, the Court GRANTS Plaintiff's Motion for Summary Judgment as to Count Two and DENIES Defendants' Motion for Summary Judgment as to Count Two.

### V.  CONCLUSION

The Court GRANTS Plaintiff's Motions for Summary Judgment on all counts. The Court DENIES Defendants' Motion for Summary Judgment on all counts.[45]

In light of this Order, the Court finds that additional briefing is warranted on two issues: (1) the amount of damages Plaintiff should receive in light of this Order; and (2) the individual liability of Defendant Vachani.

On or before **March 2, 2012**, the parties shall file simultaneous briefings addressing the two issues identified above.  Unless otherwise indicated by the Court, the matter will be taken under submission for decision without a hearing.  See Civ. L.R. 7-1(b).

Dated:  February 16, 2012

_____
JAMES WARE
United States District Chief Judge

_____

[45] Because the Court finds that the undisputed evidence submitted by Plaintiff with its Motions for Summary Judgment establishes that Plaintiff is entitled to judgment as a matter of law, the Court DENIES as moot Plaintiff's Motion to File Supplemental Evidence.  (See Docket Item No. 251.)

In addition, the Court DENIES as moot Plaintiff's Motion to Enlarge Time for Hearing Dispositive Motions.  (See Docket Item No. 261.)

19

United States District Court
For the Northern District of California

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

Alan R Plutzik aplutzik@bramsonplutzik.com
Cindy Ann Cohn cindy@eff.org
David P. Chiappetta david.chiappetta@corrs.com.au
Indra Neel Chatterjee nchatterjee@orrick.com
Joseph Perry Cutler Jcutler@perkinscoie.com
Lawrence Timothy Fisher ltfisher@bursor.com
Monte M.F. Cooper mcooper@orrick.com
Morvarid Metanat mmetanat@orrick.com
Sarah Nicole Westcot swestcot@bursor.com
Scott A. Bursor scott@bursor.com
Theresa Ann Sutton tsutton@orrick.com

**Dated:  February 16, 2012**                    **Richard W. Wieking, Clerk**

                                                 **By:___/s/ JW Chambers_____**
                                                     **Susan Imbriani**
                                                     **Courtroom Deputy**

**United States District Court**
For the Northern District of California