Amy Sommer Anderson (STATE BAR NO. 282634)
anderson@aroplex.com
Aroplex Legal Services & the Law Practice of Amy Sommer Anderson
156 2nd Street
San Francisco, California 94105
Telephone:    415-529-5148
Facsimile:    415-520-0606

Attorney for Defendant
POWER VENTURES, INC.

STEVEN VACHANI (*pro se*)
2425B Channing, #216
Berkeley, CA 94704
Telephone: (917) 267-8823

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| FACEBOOK, INC., <br><br> Plaintiff, <br><br> v. <br><br> POWER VENTURES, INC., a Cayman Island corporation and d//b/a POWER.COM, a California corporation; STEVE VACHANI, an individual; DOE 1, d/b/a POWER.COM, DOES 2-25, inclusive, <br><br> Defendants. | Case No. 5:08-CV-05780 LHK <br><br> **DECLARATION OF STEVEN VACHANI IN SUPPORT OF DEFENDANTS' OPPOSITION TO FACEBOOK, INC.'S REQUEST FOR INJUNCTIVE RELIEF** |

I, Steven Vachani, declare as follows:

1.  I am the CEO of Power.com ("Power"). I make this declaration in support of Defendants' Supplemental Memorandum In Opposition to Facebook's Request for Injunctive Relief. I have personal knowledge of the facts stated herein and, if called as a witness, I could and would competently testify to the truth thereof.

2.      Beginning in 2006, defendant Power operated a website known as Power.com, which allowed users to access various social networking websites (e.g. MySpace and Orkut) in one place. Specifically, Power created a browser that allowed users to login and access all of their various social networking accounts at once.  Users could update their photos, messages, music, and videos, and these updates would be portable across various social networking sites.

3.      For approximately one month, December 2008, Power offered a promotion to users who also had Facebook accounts. Power advertised to its users that, if they chose to invite their friends to try Power's system, they could win $100. The promotion displayed a pop-up box that said: "share with friends through events." While the specific "event" checkbox on the promotion was pre-checked, consent to participate in the campaign overall required an affirmative click by Power's users. When those users chose to participate in the promotion, Power automated the process of inviting the user's Facebook friends to join Power's service through Facebook's captive "events" interface, which, as described further below, prevented Power (and the user) from changing key elements of the invitation. Attached hereto as Exhibit A is true and correct copy of the above-referenced pop-up box.

4.      On December 1, 2008, Power received a cease and desist notice from Facebook's outside counsel demanding, *inter alia*, that Power discontinue their integration with Facebook. On December 4th, I promptly responded on Power's behalf, as CEO, expressing Power's eagerness to discuss the issues and work out a mutually agreeable solution.

5.      Upon becoming aware of Facebook's opposition to Power's integration, Power undertook full-time efforts to implement Facebook Connect—a platform designed by Facebook that allows third party websites to connect to Facebook—as Facebook requested.

6.      Discussions between Power and Facebook ensued throughout most of December as Power worked diligently to integrate their system with Facebook Connect.  Attached hereto as

Exhibit B are true and correct copies of e-mail correspondence exchanged between me, as Power's CEO and on Power's behalf, and Facebook counsel at various dates in December 2008.

7. On December 15, 2008, Facebook expressly granted Power until December 26th to integrate the Facebook API and authorized Power to continue operating on their site with the then-current version of their software.

8. Negotiations between Power and Facebook over the implementation of Facebook Connect broke down when Facebook refused to grant a reasonable amount of additional time necessary for Power to complete their Facebook Connect integration. At that point, Power shut down their integration at Facebook's demand.

9. Power completed their Facebook Connect integration in January 2009 and relaunched on Facebook in full compliance with their terms of use. Facebook approached Power, requiring consent to terms additional to those generally required of Connect partners, so Power voluntarily shut down their Connect integration at the end of January 2009.

10. Power never made any additional attempts to connect to Facebook in any way.

11. Power went out of business in April, 2011.

12. Facebook allows its users to create "events" and invite their friends to attend. The specific email referenced in Facebook's complaint was generated by Facebook as a result of a Facebook user named 'Nik' creating an event and selecting the friends to invite. It was Nik, not Power, that logged on to Facebook and created the event. It was Nik, not Power, that chose the friends he wished to invite. Nik could only send the invitation to other Facebook members who had agreed to 'friend' Nik, and thus had expressly agreed to receive communications from Nik. Facebook then sent an email to those friends on Nik's behalf. Power did not initiate this message. Power did not select the recipients to whom it was sent. And Power had no control over the content of the message or the header information. Only Facebook did. Power did not

transmit any email message to any Facebook account.  Nor did Power make available any utility that would enable a user to transmit such messages. Attached hereto as Exhibit C are screenshots demonstrating the Facebook "event" creation process.

13. The header information on the emails at issue in this case was accurate and showed that Facebook had sent the messages.  Power had no control over them.  They were auto-generated by Facebook and Power could not have changed them if it wanted to.

14. Like Facebook, Power also has not received a single complaint from a Facebook user about any of the events described in Facebook's complaint. Nor has anyone complained to Power about any of our activities related to Facebook.  Nor has anyone claimed to have been misled by anything we did.

15. Power did not access any nonpublic portion of Facebook's website.  Power merely offered users a different and potentially superior browser through which they could access their Facebook accounts to copy, update, and/or port their own "User Content."  And users did so by entering their own valid usernames and passwords, which Power never copied or stored for any purpose.  Power did not obtain any software, data, or other content of value from Facebook.  The only data accessed through Power's utilities were user's own "User Content," over which Facebook has disclaimed any ownership.

16. No file remotely relevant to the instant action has been deleted or destroyed. Years after the lawsuit started and after the company ran out of money and could not afford to maintain its servers, Power was pressed to back everything up in a short time before losing server access completely. There was insufficient time to transfer two files completely irrelevant to Facebook's action: One file was unrelated to Power.com's operations and the other file was a nonessential log file, which did not affect operation of the site. This file contained no information that was not duplicated in the data that was backed up and readily available for Facebook inspection.

17. My role as CEO of Power during all times relevant to this case required my involved, to some degree, in nearly all operations of the company. At no point, however, did I exert unilateral control or ultimate decision-making authority.

18. In 2008, Power Ventures was in its infancy, and only seeking to contribute to the world of social networking and improve users' experiences. Power Ventures, Inc. was funded by top tier Silicon Valley ventures and had dozens of sophisticated investors, as well as dozens of employees who owned shares in the company. The company maintained a professional board and at no time did I have control of the board or control over the decisions of a majority of the shareholders in the company.

19. Attached hereto as Exhibit D is a true and correct copy of *Supplemental Brief by Pro Se Defendant Steven Vachani Regarding Damages*, Dkt. No. 317 filed August 15, 2012.

20. Attached hereto as Exhibit E is a true and correct copy of *Electronic Frontier Foundation's Brief In Support of Defendants' Motion for Summary Judgment*, Dkt. No. 206-2.

21. I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Dated: August 15, 2013

By     /s/ Steven Vachani

PRO SE DEFENDANT STEVEN VACHANI
Steven Vachani (pro per)
2425B Channing, #216
Berkeley, CA  94704

# CERTIFICATE OF SERVICE

I hereby certify that this document(s) has been or will be filed through the ECF system, and notice will be sent via the following method(s):

**X**  **ECF System:** By filing the document(s) listed above on the Court's Electronic Case Filing System, I am informed and believe that the documents will be electronically served on all individuals registered with such system. To my knowledge, every individual to whom notice is required is registered with this system and, thus, has been served with due notice by action of this electronic filing.

I declare under penalty of perjury under the laws of the State of California that the above statements are true and correct.

Executed August 15, 2013 at San Francisco, California.

By: ____/s/_____
Amy Sommer Anderson