1  Amy Sommer Anderson (STATE BAR NO. 282634)
2  anderson@aroplex.com
   Aroplex Law
3  156 2nd Street
   San Francisco, California  94105
4  Telephone:     415-529-5148
   Facsimile:     415-970-5016
5  Attorney for Defendant
   POWER VENTURES, INC.
6
7  STEVEN VACHANI (*pro se*)
   2425B Channing, #216
8  Berkeley, CA  94704
   Telephone: (917) 267-8823
9
                    UNITED STATES DISTRICT COURT
10
                    NORTHERN DISTRICT OF CALIFORNIA
11
12                      SAN JOSE DIVISION
13
   FACEBOOK, INC.,
14
                Plaintiff,              Case No. 5:08-CV-05780 LHK
15
        v.                             **DEFENDANTS' CASE MANAGEMENT**
16                                      **STATEMENT**
   POWER VENTURES, INC., a Cayman Island
17 corporation and d//b/a POWER.COM, a
   California corporation; STEVE VACHANI, an    Date:        September 26, 2013
18 individual; DOE 1, d/b/a POWER.COM,          Time:        1:30 P.M.
   DOES 2-25, inclusive,                        Judge:       Hon. Lucy J. Koh
19                                              Courtroom: 8, 4th Floor
20              Defendants.
21
22        This Court has set a Case Management Conference for September 26, 2013. In light of

23 opposing parties' vastly differing positions on all but a few administrative points, Power

24 Ventures, Inc. and *pro se* defendant Steven Vachani hereby submit this Defendants' Case

25 Management Statement.

26
27 **I.      JURISDICTION AND SERVICE**

28        All parties have been served. This Court has subject matter jurisdiction pursuant to 28

U.S.C. §§ 1331 and 1367.  Facebook has asserted claims against Defendants alleging violations of the CAN-SPAM Act, 15 U.S.C. §2701 *et. seq.*, the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et. seq.* ("CFAA"), and California Penal Code § 502(c).  Venue is proper under 28 U.S.C. §1391(b).

## II.    FACTS

In December 2008, Plaintiff Facebook, Inc. ("Facebook") filed in the Northern District Federal court of California a complaint against joint defendants Power Ventures, Inc. ("Power") and Power's CEO, Vachani (Dkt. No. 9), for, among other things, violations of the CAN-SPAM Act, CFAA, and California Penal Code § 502. The actions underlying the tort claims consisted of approximately 60,627 emails sent through the Facebook server via a Power.com "event" creation to Facebook users by Facebook users. Upon learning that "event" invitations for the Power contest were being sent through its servers, Facebook took measures to intercept and control this activity. Not a single user complaint was received by Facebook in response to the Power campaign event emails.

After three years of litigation, summary judgment was awarded on Plaintiff's motion in February 2012 (Dkt. No. 275), erroneously finding no possibility of doubt that Defendant Power committed acts sufficiently violative of the CAN-SPAM Act, CFAA, and California Penal Code § 502. At that time, the Court reserved for determination on the separate issues of (1) Defendant Vachani's personal liability for the acts of the corporate defendant, and (2) damages. In support of their relative positions, the Plaintiff and the collective Defendants each submitted a brief on both remaining issues in March 2012. (Dkt. Nos. 288 and 299). In mid-August 2012, Defendant Vachani was permitted to submit, and so submitted, a supplemental brief on the issue of his personal liability for the adjudged actions of the corporation. (Dkt. No. 317).

In late August, both defendants filed for bankruptcy. As such, a stay was automatically

1  imposed in the case at issue, and the Court ordered administrative closure until such time as the

2  bankruptcy proceedings are resolved. (Dkt. No. 325).

3        In its brief on damages and personal liability (Dkt. No. 299), Facebook claims entitlement

4  to $80,543 for Power's violation of CFAA and CA Penal Code § 502 and $18,188,100 for

5  Power's violation of the CAN-SPAM Act. Private claims under the CAN-SPAM Act are of a

6  statutory and punitive nature. (See 15 U.S.C. § 7706(g)). Facebook reaches the $18,188,100 value

7  by claiming the statutory *maximum* penalty of $100 for each of the 60,627 emails and punitive

8  treble damages, totaling $18,188,100. Facebook's claim for actual damages is $80,543, which

9  consists of approximately $5,500 for the time spent by a Facebook employee to investigate and/or

10 address possible security matters associated with the Power campaign emails[1] and approximately

11 $75,000 for legal services performed by Facebook's counsel at Perkins Coie.

12

13        **A.        Background of CAN-SPAM, CFAA and CPC § 502 Claims**

14        Power Ventures, Inc. ran a social network aggregation website - then located at

15 www.power.com - which enabled users to access their various social network account

16 information and communication tools from a single user account on www.power.com. In late

17 2008, Power added Facebook to its social network collection and ran a launch campaign – "Bring

18 100 Friends, Win 100 Bucks! – using a monetary incentive to encourage users to invite their

19 Facebook friends to create a www.power.com account. The contest information was posted on a

20 Facebook event page, and users of both www.facebook.com and www.power.com could invite

21 their friends to view the contest event information by selecting which friends would receive the

22 invite. When the invitations were submitted, notification was sent to each selected friend via

23 whichever notification method each www.facebook.com user designated in his or her

24

---

[1] *Facebook*, Declaration of Ryan McGeehan in Support of Facebook's Motion for Partial Summary Judgment on Count 1 under the CAN-SPAM Act, Dkt. No. 213-4. FILED UNDER SEAL. The value of a few days' of an employee's time—an employee whose job is to conduct the activities for which damages are claimed—is closer to $1,500 than the $5,500 claimed by Facebook.

www.facebook.com notification settings. In other words, invited friends who opted to receive email notifications from www.facebook.com when their friends sent communications received said invitation to view the contest event via email.

Facebook's CAN-SPAM claim is based on their assertion that over 60,000 of these "unsolicited" emails were sent to www.facebook.com users and, despite receiving no complaints from these users, purport these email to be in violation of the Federal CAN-SPAM Act since the header information in the emails, which is automatically and exclusively controlled by Facebook, misleads the recipient as to the sender or initiator of the email. In fact, the mere reference of www.power.com in the email message and the fact that Power's campaign was targeted at recruiting new users to its website is inherently straightforward and in no way "materially misleading" as required under the statute. Thus, Facebook's CAN-SPAM claim must fail under the black letters of the statute, as well as under the guidelines for such analysis clearly set out in *Omega World Travel v. Mummagraphics, Inc.,* 469 F.3d 348 (4th Cir., 2006) .

Even if Facebook is awarded damages less than the amount sought, the Summary Judgment alone sends the message that the Court supports Facebook picking and choosing who can use its service – irrespective of compliance with their terms of use – by suing under the CAN-SPAM Act for an amount that would put most small businesses under. Arguably, such activity amounts to censorship and, undoubtedly, is one large step closer to court-sanctioned anti-competitive activity.

Irrespective of whether Power complied with Facebook's terms of use, as this is in no way relevant to any element of their CAN-SPAM claim, and *ignoring the fact that Power worked diligently with Facebook for weeks following Facebook's initial*, unofficial complaint to bring their program in compliance with Facebook's terms of use, the issue remains whether Facebook

can and should be allowed to prevail on a CAN-SPAM claim where there were no complaints, no misleading messages, and arguably no actual damages.

It is inconceivable as to why Facebook would fight so hard to send a message to its users and advertisers that Facebook, at its discretion, can sue and prevail on a claim for $300 per message against anyone who writes content or funds a contest or offers a deal interesting enough for users to share it with their Facebook friends via the mechanism Facebook created for precisely that purpose. The potential withholding of advertisers and users surely is not worth the efforts Facebook expended to put one, small competitor out of business, but the defendants' trust the Court will be less shortsighted in its ultimate ruling on this case.

In determining whether a material factual dispute exists, substantive law shall identify not only which facts are material but also which facts are critical and which are irrelevant. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248. Here, there is case law informing on the requirement that messages at the subject of a CAN-SPAM civil action not only be misleading but, specifically, *materially* misleading. 15 U.S.C. § 7704(a)(1) (*emphasis added*).  The Court erred when it found, in considering the evidence in the light most favorable to the non-moving party, there was evidence beyond a question of fact warranting summary judgment, as it did not find the messages to be *materially misleading* within the meaning and intent of the CAN-SPAM Act.

The Court erred in considering the alleged "hacking" of Facebook's network with respect to the CFAA and CPC § 502 (the California corollary to the CFAA[2]), which are laws ultimately concerned with protecting ownership of data. Defendant Power was not only expressly granted permission, but actually instructed, by each owner to access their personal information on Facebook. The question of "unauthorized access" has been a focus of this Court[3], but Plaintiff

---

[2] *See*, generally, *Multiven, Inc*. *v*. *Cisco Sys*. *Inc*., 725 F.Supp.2d 887, 2010 WL 2889262 (N.D. Cal., 2010).

[3] *See*, generally, Court Orders at Dkt. Nos. 89 and 275.

- 5 -

never established—and this Court has never found—that the accessed data at issue is proprietary to Plaintiff and, thus, fraudulently procured, as required under the CFAA and CPC § 502.

The relevant provision of the CFAA provides criminal penalties for anyone who: "knowingly and *with intent to defraud*, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct *furthers the intended fraud and obtains anything of value*…."18 U.S.C. § 1030(a)(4) (*emphasis added*). Section 1030(a)(4) clearly requires intent to defraud and obtain a thing of value, which cannot be established in the present case since the thing "taken" was users' personal information to which Plaintiff had no proprietary rights and, thus, was of no legal value to Plaintiff. Even if the Court finds that users' data was of some value to Plaintiff, users' lawful sharing and Defendants' subsequent access to said data posed no threat to Plaintiff's value since 1) Defendants did not destroy or otherwise impair the data in any way, and 2) Plaintiff did not have ownership, let alone exclusive ownership, to users' personal information. There may be a relevant statute under which Facebook could claim damages for unauthorized access to data it does not own, but such claims are unsupported here.

### B.    Facebook's Standing to Raise Claims

This Court erred in finding Plaintiff has standing to bring a private action under the CAN-SPAM Act because Plaintiff did not suffer damages sufficient to grant them standing under the Act. The *Gordon* court identified relevant damages establishing standing[4], and Plaintiff suffered none of these harms. Instead, Plaintiff deliberately mischaracterized their claimed "damages" of $5,543 for 3-4 days' salary for one engineer to "investigate" the alleged

---

[4] The costs of investing in new equipment to increase capacity, customer service personnel to address increased subscriber complaints, increased bandwidth, network crashes, and the maintenance of anti-spam and filtering technologies as the "sorts of ISP-type harms" that Congress intended to confer standing. *See, Gordon v. Virtumundo, Inc.*, 575 F.3d 1040 (9th Cir., 2009) at 1053.

1   spamming[5], which was clear from the messages themselves, and $75,000 in legal fees to initiate

2   litigation, which they colored as "investigative costs" incurred by "Cutler's Firm" (better known

3   as Perkins Coie LLP, who was Plaintiff's outside counsel at the time). Such self-imposed fees to

4   investigate and litigate a competitor's use of their system does not qualify as "harm" under any

5   interpretation or application of the Act.

6   Further, Plaintiff has not established standing under CFAA or CPC § 502 because they have not

7   established that their network suffered disruption or slowdown[6].  To allege a loss under the

8   CFAA, "plaintiffs must identify impairment of or damage to the computer system that was

9   accessed without authorization." *See*, *AtPac*, *Inc*., 730 F. Supp. 2d at 1184.  In *Farmers*, the Court

10   confirmed that "[c]osts not related to computer impairment or computer damages are not

11   compensable under the CFAA." *See Farmers Ins. Exch. v. Steele Ins. Agency, Inc.* (E.D. Cal.,

12   2013) at 721. Thus, Plaintiff's claim for attorney and engineer "investigation" fees, as described

13   above, could not be considered compensable and, thus, not confer standing under the CFAA.

14   **C. Facebook's Vexatious Interference in Defendants' Bankruptcy Cases**

15         Commencing on 27 August 2012 (the "Petition Date"), Power filed a voluntary petition

16   for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") and

17   Vachani filed a voluntary petition for relief under Chapter 13 of the Bankruptcy Code. In both

18   bankruptcy cases, Facebook argued for dismissal, purporting that the filings contravened the

19   purposes of the Bankruptcy Code under its good faith requirements. It is well established that it is

20   not necessarily "bad faith" for debtors to file for bankruptcy to avail themselves of certain Code

21   provisions. On June 20, 2013, Judge Efremsky issued an order explicitly overruling Facebook's

22   objection to Mr. Vachani's Chapter 13 petition on the alleged lack of good faith. *See*, *In re*

---

[5] *See*, Declaration of Ryan McGeehan, Dkt. No. 213-4.

[6] The CFAA defines "loss" as "any reasonable cost to any victim, including the cost of responding
to an offense… incurred *because of interruption of service* . . . ." 18 U.S.C. § 1030(e)(11)
(*emphasis added*).

1    *Vachani*, CANB Case No. 12-47150 RLE 13, Dkt. No. 174. In his Order, Judge Efremsky further

2    found:

3
        "With regard to the objection by Facebook that the Debtor is not eligible for relief under
4        chapter 13, the Court hereby finds that the unsecured claims of Facebook, asserted in the
         United States District Court for this District (the "District Court"), in Civil No. 5:08-CV-
5        05780 LHK, are noncontingent, but defers ruling on whether the claims were readily
         ascertainable on the Petition date, and therefore liquidated for purposes of 11 U.S.C. §
6        109(e), or in what amount, if any, until the District Court concludes its adjudication of the
         validity and amount, if any, of Facebook's claims against the Debtor, in that pending civil
7        action."

8    *See, Id.* at 2:8.

9
         Significantly, it is largely due to multiple years of Facebook litigation that Power finds
10
     itself in the position of filing for bankruptcy in order to salvage its assets and have a chance at
11
     rebuilding, but that is where the association ends. The timing of the filing was due to 1) the
12
     impracticality of waiting any longer to start rebuilding on its innovation infrastructure, and 2) a
13
     deal with former investors involving an intellectual property sale that allowed Power to remove
14
     over $6 million in debt and approximately $7.7 million in liquidation preferences. Power waited
15
     until the end of the two-year anniversary from this sale to further avoid any potential objections
16
     within the two-year statute of limitations. At the time of Power's Chapter 11 filing, Vachani
17
     opted to file for Chapter 13, as waiting until after a judgment, if any and if it were large enough,
18
     would disqualify him from Chapter 13 protections due to the debt limit.
19
         Further, Facebook repeatedly and consistently argued to both bankruptcy courts that the
20

21   present civil matter had been decided as to liability of *both* defendants. (*See* Vachani's Motion for

22   Clarification re Status of Liability, Dkt. No. 322). It is wholly unconscionable for Facebook to

23   mischaracterize the status of the District Court's judgment in an effort to interfere with Vachani's

24   ability to seek the financial protections afforded by the Court. Vachani's bankruptcy filing in no

25   way deprived Facebook the opportunity to pursue their purported claim, and, more significantly,

26   it in no way deprived Facebook the opportunity to represent itself fairly before the Court and
27

28

argue its position honestly.

### D. Vachani's Liability

Judge Ware only determined in his Summary Judgment that the actions—actions made by persons within the company, acting for the company and within the scope of their directorship and/or employment by the company—constituted a basis for Summary Judgment on the three counts. There was no finding that Vachani performed actions as an individual outside the scope of his position as CEO of the corporate defendant; there are no cases remotely related to the present facts wherein an individual representative was found liable for the CAN-SPAM violations of the company; and there were no additional counts alleged against Vachani as an individual. Further, as Power did not commit acts in violation of the CAN-SPAM Act, its representative cannot be held liable for the same alleged violation.

### E. Damages

As Power did not violate the CAM-SPAM Act and Facebook does not have standing to bring the private actions at issue, damages cannot and should not be established against the defendants. Facebook appears to be following its own pattern of pursuing valueless actions against companies that have already agreed not to—and have, in fact, ceased to—perform the offending activity. In the civil case at issue, the only associated damages, if any, were at Facebook's own unnecessarily reactionary instigation. Indeed, Power made good faith attempts to negotiate an amicable resolution upon Facebook's discovery of Power's contest emails.

Facebook's propensity to litigate claims under these Acts is well established. (See, e.g., *Facebook v. Wallace*, No. C-09-00798 JF, 2009 (where defendants who were known scam artists sent spam messages to Facebook users' message walls aimed at deceiving recipients into visiting defendants' phishing sites; case terminated in default judgment); *Facebook v. MaxBounty*, No. 5:10-cv-04712 LHK, 2011 (N.D. Cal. Nov. 14, 2011) (where defendants facilitated Facebook

user traffic to defendants' contracting sites by providing technical assistance in creating fake Facebook campaigns; case terminated in settlement); *Facebook v. Fisher*, No. C-09-5842 JF (PSG) (where defendants sent more than 7.2 million spam messages to Facebook users after obtaining information for at least 116,000 Facebook accounts without consent; case terminated in settlement or default judgment as to the various defendants); *Facebook v. Guerbuez*, No. 5:08-cv-03889-JF, 2008 (N.D. Cal. Nov. 25, 2008) (where defendants sent more than 4 million sexually explicit spam messages from members' profiles; case terminated in default judgment); *Facebook v. AdScend*, No. 5:12-cv-00414 LHK, 2012 (N.D. Cal. Apr. 25, 2012) (where defendants were accused of running a $20 million-a-year spam scheme that leads social-media users to advertising sites by offering fake links to salacious videos; case terminated in voluntary dismissal)). There is a private right of action to enable recovery of loss under CA Penal Code § 502 and the CFAA, but this does not permit a private company to police the field. Facebook seeks to "punish" those believed to be offenders where the penal code itself provides for such punishment, should law enforcement find it suitable. Here, no such criminal action was initiated, and no actual damages were sustained due to Power's innocuous campaign activity.

**F. Sanctions Award for Facebook**

Facebook has been awarded $39,796.73 in "reasonable costs and fees" for a one-day renewed 30(b)(6) deposition. Defendant Vachani is currently appealing this order.

**G. Defendants' Motion for Leave to File Motion for Reconsideration of the Summary Judgment**

On August 1, 2013, Defendants filed for leave to file motion for reconsideration of the summary judgment entered February 16, 2012. Dkt. No. 353.

**III.   LEGAL ISSUES**

At this time, it is the defendants' position that the following issues remain open:

**A.** Should this Court reconsider its analyses of the CAN-SPAM, CFAA and CPC § 502 claim elements and Facebook's standing to bring any of the private actions at issue in its 16 February 2012 Summary Judgment?

**B.** Should the Court reconsider the defendants' Motion for Summary Judgment in light of its reconsideration of the Summary Judgment order?

**C.** If this Court affirms the Summary Judgment, should Steve Vachani be held liable and, if so, to what degree?

**D.** If this Court affirms the Summary Judgment, what amount of damages, if any, should be imposed against the liable defendants?

**IV.    MOTIONS**

**A.    Pending Motions**

The following motions, or outstanding issues associated with motions, are presently before the Court:

1. Defendant Power's Motion for Leave to File Motion for Reconsideration of Court's Order for Summary Judgment. Dkt. No. 353.

2. Plaintiff Facebook's Request for Injunctive Relief. Dkt. No. 351.

3. To what amount of damages, if any, is Facebook entitled based on the Court's Order for Summary Judgment? Dkt. No. 275.

4. Is Defendant Steve Vachani individually liable for the damages awarded Facebook?

**B.    Anticipated Motions**

None.

## V.   AMENDMENT OF PLEADINGS

The case is now fully at issue.

## VI.   EVIDENCE PRESERVATION

The defendants have reviewed the Guidelines Relating to the Discovery of Electronically Stored Information ("ESI Guidelines"), and the parties have met and conferred pursuant to Fed. R. Civ. P. 26(f) regarding reasonable and proportionate steps taken to preserve evidence relevant to the issues reasonably evident in this action.

## VII.   INITIAL DISCLOSURES

Facebook served its initial disclosures on Defendants on July 29, 2011.  Facebook served its supplemental and second supplemental initial disclosures on Defendants on October 14, 2011 and January 13, 2012, respectively.  Defendants served their initial disclosures on Facebook on August 15, 2011.  To date, Defendants have not supplemented the initial disclosures.

## VIII.   DISCOVERY

Discovery closed on January 20, 2012.  Defendants believe no additional discovery is necessary at this time.

## IX.   CLASS ACTIONS

This is not a class action case.

## X.   RELATED CASES

Vachani's bankruptcy proceeding in the United States Bankruptcy Court for the Northern District of California, Case No. 12-47150 RLE 13, is related to this matter, as well as Defendant Vachani's pending appeal of the recent sanctions order, USCA Case No. 13-16795.

## XI.   RELIEF

Defendants seek review and reversal of the 16 February 2012 Summary Judgment (Dkt. No. 275), as well as reconsideration of defendants' Motion for Summary Judgment (Dkt. No. 98).

In the alternative, defendants seek leave to file supplemental briefs on the issue of damages and defendant Vachani's personal liability.

## XII.   SETTLEMENT AND ADR

The parties engaged in an ADR mediation session on December 14, 2009.  The session was facilitated by mediator Daralyn Durie, who has filed papers with the Court indicating that the ADR process is not yet complete and that further facilitated discussions are expected.  *See* Dkt. No. 59.  To date, the parties have engaged in numerous settlement discussions, but have been unable to reach resolution. The latest of these settlement discussions was on or around April 26, 2013.

## XIII.   CONSENT TO MAGISTRATE JUDGE FOR ALL PURPOSES

The parties have not consented to a magistrate judge.

## XIV.   OTHER REFERENCES

The parties do not believe any other references are necessary.

## XV.   NARROWING OF ISSUES

Defendants do not believe that issues can be narrowed at this time.

## XVI.   EXPEDITED TRIAL PROCEDURES

An expedited schedule is not necessary in this case.

## XVII. SCHEDULING

None.

## XVIII. TRIAL

Not applicable.

## XIX.   DISCLOSURE OF NON-PARTY INTERESTED ENTITIES AND PERSONS

Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the named parties, there is no such interest to report.

1   **XX.   OTHER MATTERS**

2       None.

3   Dated:  September 19, 2013          AROPLEX LAW

4                                       By        /s/ Amy Sommer Anderson

5                                       AMY SOMMER ANDERSON

6

7                                       Amy Sommer Anderson
                                        AROPLEX LAW
8                                       156 2nd Street
                                        San Francisco, CA 94105
9                                       Attorneys for Defendant
                                        POWER VENTURES, INC.
10

11

12
    Dated:  September 19, 2013          STEVEN VACHANI
13
                                        By        /s/ Steven Vachani
14
                                        STEVEN VACHANI
15

16                                      Steven Vachani (pro per)
                                        2425B Channing, #216
17                                      Berkeley, CA  94704

18

19  FILER'S ATTESTATION: Pursuant to General Order No. 45 §X(B), I attest under penalty of
    perjury that concurrence in the filing of the document has been obtained from its signatory.
20
    Dated: September 19, 2013           Respectfully submitted,
21
                                        By     /s/ Amy Sommer Anderson
22                                      Amy Sommer Anderson

23

24

25

26

27

28

1

2

**CERTIFICATE OF SERVICE**

3

4

5

6

7

I am a citizen of the United States and a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is Aroplex Law, 156 2nd Street, San Francisco, CA 94105.

8

9

On **September 19, 2013,** I served the following document(s) by the method indicated below:

10

• Defendants' Case Management Statement

11

12

13

14

15

16

**X   ECF System:** By filing the document(s) listed above on the Court's Electronic Case Filing System, I am informed and believe that the documents will be electronically served on all individuals registered with such system. To my knowledge, every individual to whom notice is required is registered with this system and, thus, has been served with due notice by action of this electronic filing.

17

18

19

20

I declare under penalty of perjury under the laws of the State of California that the above statements are true and correct.

21

Executed September 19, 2013 at San Francisco, California.

22

23

By: /s/ Amy Sommer Anderson

24

Amy Sommer Anderson

25

26

27

28

DEFENDANTS' CASE MANAGEMENT STATEMENT

- 15 -

CASE NO. 5:08-CV-05780 LHK