# EXHIBIT 5

# REDACTED

FACEBOOK, INC.,

PLAINTIFF,

V.

POWER VENTURES, INC. DBA POWER.COM, ET AL,

DEFENDANTS

---

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

CASE NO. C-08-05780-JW

# EXPERT REPORT OF RICHARD J. OSTILLER

NAVIGANT CONSULTING, INC.

DECEMBER 19, 2011

RICHARD J. OSTILLER

EXPERT REPORT OF RICHARD J. OSTILLER, DECEMBER 19, 2011

**TABLE OF CONTENTS**

I. INTRODUCTION .......... 1

II. CASE BACKGROUND .......... 2

III. WORK PERFORMED .......... 3

IV. EXECUTIVE SUMMARY .......... 3

V. OPINIONS .......... 4

Highly Confidential – Attorneys' Eyes Only

This expert report includes my initial opinions in the matter of Facebook, Inc. ("Facebook") v. Power Ventures, Inc. dba Power.com, et al. (collectively, "Power" or "Defendants"). The report contains five parts. The first part describes my credentials, including my professional and academic experience. The second part provides background information on the parties involved and the current dispute. The third part describes the work my team and I performed on this engagement. The fourth part contains an executive summary of my opinions. The final part includes my detailed findings and conclusions.

# I. INTRODUCTION

1. The attached resume (**Attachment A**) describes my professional experience, educational history, prior testimony, and professional affiliations. **Attachment B** lists cases in which I have testified as an expert witness either at trial, arbitration, or deposition during the last four years, as well as my publications and presentations since 2001.

2. I am a Managing Director in the Palo Alto office of Navigant Consulting, Inc. ("NCI"). I have over 30 years of professional experience, primarily providing accounting and financial consulting services, including expert witness services, to attorneys and clients in numerous industries. I earned a Master in Business Administration from the University of Chicago in 1985, and a Bachelor of Arts degree in Economics from Stanford University in 1980. I am a Certified Public Accountant ("CPA") in the state of California.

3. Orrick, Herrington & Sutcliffe LLP, on behalf of Facebook, retained NCI to render opinions related to damages in this matter. If the Defendants submit an expert report related to damages, I may respond to that report in a subsequent rebuttal report.

4. NCI is being compensated for my work on this matter. My current hourly rate on this engagement is $600 per hour. NCI's compensation does not depend on the outcome of this matter. Either I, or NCI personnel under my supervision, performed the work on this project.

Highly Confidential – Attorneys' Eyes Only

## II. CASE BACKGROUND

5. Facebook is a social networking site founded in February 2004.[1] Facebook developed and operates one of the most popular social networking sites on the Internet that connects people with their friends, family, and co-workers.[2] Presently, Facebook has over 800 million active users.[3]

6. Power began operations in 2006.[4] According to its founder, Mr. Steven Vachani, in late 2008, Power offered browsing capabilities that provided "users value added features across their Internet experience."[5]

7. In its First Amended Complaint (the "Complaint"), Facebook alleges that starting in late 2008 and continuing into early 2009 (the "Relevant Period"), Power engaged in numerous unauthorized activities, including:

a. conducting commercial activity on Facebook's website;
b. using user accounts to access Facebook's computer systems;
c. storing Facebook user passwords outside Facebook's network, and outside the control of Facebook's security staff; and
d. using automated scripts to collect information from or otherwise interact with Facebook's website or to access Facebook's computers to scrape user data and display it on Power's website.[6]

8. As a result of these alleged unauthorized activities during the Relevant Period, Facebook claims that Power violated several laws, including the:

a. Controlling the Assault of Non-Solicited Pornography And Marketing ("CAN-SPAM") Act (15 U.S.C., Section 7701);
b. Computer Fraud and Abuse Act (18 U.S.C., Section 1030); and

---

[1] http://www.facebook.com/facebook.
[2] First Amended Complaint, filed January 13, 2009, page 2.
[3] Declaration of Mr. Ryan McGeehan, dated November 13, 2011, page 1.
[4] Deposition of Mr. Steven Vachani, dated July 20, 2011, page 21.
[5] POWER 2011.02.03.0000082.
[6] First Amended Complaint, filed January 13, 2009, pages 10-11. The Complaint (page 3) indicates Power's unauthorized activities continued as of the filing date.

c. California Comprehensive Computer Data Access and Fraud Act (California Penal Code, Section 502).[7]

9. Power denies the vast majority of the allegations in the Complaint.[8]

## III. WORK PERFORMED

10. My team and I have reviewed case materials provided by counsel. These materials include court filings, deposition transcripts, and other relevant items. In addition, my team and I discussed pertinent issues with outside counsel, and conducted interviews with the following individuals:

a. Mr. Ryan McGeehan, Security Manager, Facebook Security Incident Response ("SIR") team (July 6, 2011, and October 18, 2011);

b. Sam O'Rourke, Esq., Deputy General Counsel, Facebook (September 8, 2011); and

c. Joseph Cutler, Esq., Perkins Coie LLP (October 10, 2011).

Craig Clark, Esq., from Facebook's legal department, also participated in several interviews.

11. **Attachment C** summarizes the materials my team and I have considered. Based on my review and analysis of these materials, I have reached opinions related to damages in this matter.

12. I may prepare graphical or illustrative exhibits to use at trial, based on my analysis of relevant documents and information. If additional information becomes available subsequent to the report date, I may supplement the opinions and analyses expressed in this report.

## IV. EXECUTIVE SUMMARY

13. Facebook is entitled to both compensatory damages for costs incurred to respond to Power's unauthorized activities during the Relevant Period, and statutory damages under

[7] First Amended Complaint, filed January 13, 2009, pages 15-21.

[8] Defendants' Motion for Summary Judgment, filed May 9, 2011, page 3. In preparing my damages analyses, I have assumed that Defendants are liable for the allegations in the Complaint.

CAN-SPAM.[9] The compensatory damages total $80,543, consisting of $5,000 for internal personnel costs, and $75,543 for outside legal services. The statutory damages total $18,188,100, consisting of $6,062,700 in base statutory damages, and $12,125,400 in aggravated damages. In my opinion, Facebook is entitled to total damages of $18,268,643 ($80,543 + $18,188,100). (See Summary Schedule.)

## V. OPINIONS

14. This part includes my initial opinions in this matter and includes two subparts. The first subpart covers Facebook's compensatory damages for costs incurred to respond to Power's unauthorized activities during the Relevant Period. The second subpart addresses Facebook's entitlement to statutory damages under CAN-SPAM.

### A. Compensatory Damages

15. This subpart includes my analysis of Facebook's compensatory damages. Facebook incurred two categories of costs in response to Power's unauthorized activities: 1) the effort of internal personnel to address Power's actions; and 2) outside legal fees. Schedule 1 shows that Facebook's compensatory damages resulting from Power's unauthorized actions total $80,543.

#### 1. Internal Effort

16. Mr. Ryan McGeehan is the Security Manager on Facebook's SIR team.[10] Mr. McGeehan participated in Facebook's initial response to Power's unauthorized activities on Facebook's website in late 2008.[11] Mr. McGeehan notified Facebook's legal department about the issue, and after some internal deliberation, Facebook decided to block Power's IP address from accessing Facebook.[12]

17. Over the next few weeks, Mr. McGeehan and network operations staff would block traffic from Power's IP address, only to have Power change its IP address and service provider,

---

[9] See statutory damages discussion in Facebook's Motion for Partial Summary Judgment on Count 1 (CAN-SPAM), filed November 14, 2011, pages 16-18.

[10] Declaration of Mr. Ryan McGeehan, dated November 13, 2011, page 1.

[11] Declaration of Mr. Ryan McGeehan, dated November 13, 2011, page 3.

[12] Declaration of Mr. Ryan McGeehan, dated November 13, 2011, page 4.

and access Facebook again, at which point he would block the new IP address.[13] At one point, Power changed to an IP address associated with a shared amazon.com server.[14] In that case, Mr. McGeehan elected not to block Power, because doing so could have denied legitimate amazon.com users access to Facebook.[15]

18. In addition to notifying in-house counsel and blocking Power's access to Facebook, Mr. McGeehan attended several meetings and collaborated with in-house counsel and outside counsel to respond to Power's unauthorized activities.[16]

19. Mr. McGeehan estimates that "[i]n addition to the many hours of time [he] spent investigating and discussing with Facebook personnel the problems associated with the Power website's proxying of Facebook, … [he] spent at least three to four days of [his] own engineering time addressing other security issues Power presented for Facebook and its users."[17] Mr. McGeehan estimates that he spent approximately 50 hours responding to Power's unauthorized activities during the Relevant Period.

20. In calculating the cost of internal personnel, I have used a rate of $100 per hour for the fully burdened payroll costs of Mr. McGeehan. The fully burdened rate includes his estimated salary and fringe benefits.

21. Schedule 1a shows that Facebook's compensatory damages from the internal effort of Mr. McGeehan totals $5,000. I understand other Facebook personnel, including in-house counsel, assisted Mr. McGeehan with the internal response to Power's unauthorized activities. I have not yet quantified the effort of other Facebook employees, and may update my damages calculation to reflect this additional internal effort.

---

[13] Declaration of Mr. Ryan McGeehan, dated November 13, 2011, page 5.
[14] Declaration of Mr. Ryan McGeehan, dated November 13, 2011, page 6.
[15] Declaration of Mr. Ryan McGeehan, dated November 13, 2011, page 6.
[16] Declaration of Mr. Ryan McGeehan, dated November 13, 2011, page 4. Declaration of Joseph Cutler, Esq., dated December 19, 2011, page 1.
[17] Declaration of Mr. Ryan McGeehan, dated November 13, 2011, page 6.

Highly Confidential – Attorneys' Eyes Only

2. External Effort

22. Facebook engaged Perkins Coie in late 2008 to assist with Facebook's response to Power's unauthorized activities.[18] The Perkins Coie attorney primarily responsible for this effort was Joseph Cutler, Esq.[19] Mr. Cutler's assignment was to identify the abuser and respond to the abuse.[20]

23. Mr. Cutler initially conducted forensic analyses in collaboration with SIR, until he identified Power as the entity responsible for the unauthorized access.[21] On December 1, 2008, Mr. Cutler sent a letter (the "Cease and Desist Letter" or the "Letter") notifying Power that "[i]t has come to Facebook's attention that [Power] is soliciting and storing Facebook user login information, scraping content from Facebook, and sending unsolicited commercial messages to Facebook users through [Power's] website: http://www.power.com."[22]

24. The Cease and Desist Letter informed Power that its website's functionality breached Facebook's Terms of Use and may violate the California Comprehensive Computer Data Access and Fraud Act (CA Penal Code, Section 502(c)); the California Anti-Phishing Act of 2005 (CA Business and Professional Code, Section 22948); the Computer Fraud and Abuse Act (18 U.S.C., Section 1030); the CAN-SPAM Act (15 U.S.C., Section 7701); and other California laws prohibiting interference with Facebook's business expectations and interests.[23]

25. The Cease and Desist Letter also stated that Power was displaying the Facebook trademark on its website without Facebook's authorization, and that visitors to Power's website could incorrectly believe that Facebook had approved or had become affiliated with Power's website.[24]

---

[18] Declaration of Joseph Cutler, Esq., dated November 14, 2011, page 1.
[19] Declaration of Joseph Cutler, Esq., dated November 14, 2011, page 1.
[20] Declaration of Joseph Cutler, Esq., dated November 14, 2011, page 1.
[21] Declaration of Joseph Cutler, Esq., dated November 14, 2011, page 1.
[22] Letter from Joseph Cutler, Esq., Perkins Coie, to Power, dated December 1, 2008. (POWER 2011.02.03.000001 - 2011.02.03.000003.)
[23] Letter from Joseph Cutler, Esq., Perkins Coie, to Power, dated December 1, 2008. (POWER 2011.02.03.000001 - 2011.02.03.000003.)
[24] Letter from Joseph Cutler, Esq., Perkins Coie, to Power, dated December 1, 2008. (POWER 2011.02.03.000001 - 2011.02.03.000003.)

26. The Letter requested Power confirm by December 3, 2008 that it had ceased and desisted from the activities described.[25]

27. Rather than comply with Facebook's requests in the Cease and Desist Letter, Power sought to take advantage of the situation. In an email to colleagues after receiving the Letter, Mr. Vachani suggested they "think carefully how to transform this into an opportunity for Power."[26] In that same email, Mr. Vachani noted that Power needs "to be prepared for Facebook to try and block us and the [sic] turn this into a national battle that gets us huge attention."[27] Presumably aware that others, including Facebook, might take exception to his suggestions, he closed the email to his colleagues with the admonition that they "[k]eep this letter confidential."[28]

28. Over the next few weeks, Mr. Cutler and Mr. Vachani corresponded on several occasions. (Exhibit 1 includes selected emails during that period.)[29] In summary, Exhibit 1 shows Power seeking time to integrate Facebook Connect into its main login page, Facebook agreeing to Power's request, and Power asking for an extension.[30,31] In an email dated December 26, 2008, however, Mr. Vachani informed Mr. Cutler that Power had determined its integration solution would take much longer than previously anticipated, and that Power had made a "business decision" not to comply with Facebook's requests to remove Facebook compatibility from its website.[32]

---

[25] Letter from Joseph Cutler, Esq., Perkins Coie, to Power, dated December 1, 2008. (POWER 2011.02.03.000001 - 2011.02.03.000003.)

[26] Email from Mr. Steven Vachani to Mr. Felipe Herrera and Mr. Eric Santos, December 1, 2008. (POWER 2011.02.03.0000089.)

[27] Email from Mr. Steven Vachani to Mr. Felipe Herrera and Mr. Eric Santos, December 1, 2008. (POWER 2011.02.03.0000089.)

[28] Email from Mr. Steven Vachani to Mr. Felipe Herrera and Mr. Eric Santos, December 1, 2008. (POWER 2011.02.03.0000089.)

[29] See, for example, emails dated December 12, 15, and 17, 2008, and references to other interaction in those messages. (Exhibit 1 - FBPOWER00296 – FBPOWER00299.)

[30] See emails dated December 12, 15, and 17, 2008, and references to other interaction in those messages. (Exhibit 1 – FBPOWER00296 – FBPOWER00299.)

[31] Facebook Connect "allows users to "connect" their Facebook identity, friends and privacy to any site using a trusted authentication interface." (Complaint, page 7.)

[32] Email from Steven Vachani to Joseph Cutler, dated December 26, 2008. (POWER 2011.02.03.0000082 - POWER 2011.02.03.0000085.)

29. At that point, Facebook elected to pursue its legal remedies. It filed the original complaint on December 30, 2008, and filed the Complaint on January 13, 2009.[33]

30. Mr. Cutler estimates that during the Relevant Period, "Facebook spent approximately $75,000 on [Perkins Coie] related to [Power's] actions."[34] Exhibit 2 is a schedule from Perkins Coie that identifies Facebook's payments to Perkins Coie for services related to Power during the Relevant Period (FBPOWER00300). Exhibit 2 indicates Facebook paid $38,719 for Perkins Coie's work in December 2008 related to Power. [REDACTED] Mr. Cutler estimates Power represented approximately $36,824 of the total enforcement payments to Perkins Coie from January 2009 to March 2009. Schedule 1b shows that Facebook's compensatory damages from the external effort of Mr. Cutler and other attorneys at Perkins Coie to respond to Power's unauthorized activities during the Relevant Period totals $75,543.

**B. Statutory Damages**

31. This subpart includes my analysis of Facebook's statutory damages. Under CAN-SPAM, Facebook is entitled to recover two statutory damages categories: 1) base damages; and 2) aggravated damages. Schedule 2 shows that Facebook's statutory damages resulting from Power's unauthorized actions total $18,188,100.

1. Base Statutory Damages

32. The CAN-SPAM Act prohibits false or misleading electronic mail transmissions.[35] It also establishes statutory damages of up to $100 for each violation, with "each separately addressed unlawful message that is transmitted or attempted to be transmitted… treated as a separate violation."[36]

33. According to Mr. McGeehan, Facebook "determined that at least 60,627 Event invitations appear to have been sent to Facebook users through the Facebook system due to the

---

[33] First Amended Complaint, filed January 13, 2009. See declaration of Joseph Cutler, Esq., dated November 14, 2011, page 3, for the original complaint filing date.

[34] Declaration of Joseph Cutler, Esq., dated November 14, 2011, page 3.

[35] CAN-SPAM Act, Section 7704(a)(1).

[36] CAN-SPAM Act, Section 7706(g)(3)(A)(i). The $100 ceiling applies to claims brought by providers of internet access service, such as Facebook.

Power website's spamming activities."[37,38] Under CAN-SPAM, Facebook is entitled to base statutory damages of $6,062,700 ($100 * 60,627) for the unauthorized messages sent by Power to Facebook's Event application alone.[39] Facebook believes Power sent many more unauthorized messages to Facebook's users through Facebook's systems, but has not yet quantified that amount.[40] (I may update my damages analysis if I receive information about additional unauthorized messages sent by Power.)

2. Aggravated Statutory Damages

34. CAN-SPAM states "[t]he court may increase a damage award to an amount equal to not more than three times the amount otherwise available… if the court determines the defendant committed the violation willfully and knowingly."[41] Under this provision, the additional (aggravated) damages would be $12,125,400 ($6,062,700 * 2).[42]

---

[37] Declaration of Mr. Ryan McGeehan, dated November 13, 2011, page 5.

[38] Facebook Events enables users to "organize gatherings, respond to invites, and keep up with what [their] friends are doing." http://www.facebook.com/help/events.

[39] In preparing my damages calculation, I have used the $100 per violation amount.

[40] Declaration of Mr. Ryan McGeehan, dated November 13, 2011, page 5. An email from Power's counsel to Facebook's counsel, dated November 9, 2011, indicates that Power did not maintain certain electronic data records. I understand Facebook could have determined the number of unauthorized messages Power sent Facebook's users through Facebook's systems from these records.

[41] CAN-SPAM Act, Section 7706(g)(3)(C)(i).

[42] In preparing my damages calculation, I have applied the maximum aggravated damages permitted under CAN-SPAM.

# ATTACHMENT A

NAVIGANT

# Richard J. Ostiller CPA, CFF

Richard J. Ostiller
Managing Director

Navigant Consulting
3000 El Camino Real
5 Palo Alto Square, Suite 225
Palo Alto, CA 94306
650-849-1171 Phone
650-849-1160 Fax

rostiller@navigantconsulting.com

Professional History

- Navigant Consulting Inc. 2004-
- Tucker Alan Inc., 2002-2004
- Arthur Andersen, 1985-2002
- Ampex Corporation, 1980-1983

Education and Certifications

- Master of Business Administration, University of Chicago, 1985
- Bachelor of Arts, Stanford University, 1980
- Certified Public Accountant in California

Mr. Ostiller is a Managing Director and leads Navigant's accounting investigations practice area as well as its Palo Alto office. He joined the company in 2004. Rick has provided financial and strategic consulting services to attorneys and corporate clients in numerous industries. He has testified in several venues, and has extensive experience with high profile investigative projects, damages calculations, lost profits analyses, and other cost analysis studies. He is a Certified Public Accountant in California, and is Certified in Financial Forensics.

Rick is a member of many professional associations, including the American Institute of Certified Public Accountants, the California Society of CPAs, and the American Bar Association (Associate Member) Litigation and Public Contract Law sections. Rick is Treasurer and past President of the Law Foundation of Silicon Valley Board of Directors.

## Prior Professional Experience

**Tucker Alan Inc.** (2002-2004), a national business and litigation consulting firm – Vice President.

**Arthur Andersen** (1985-2002), an international public accounting firm. Partner in Andersen's Northern California/Silicon Valley litigation and financial consulting services practice.

**Ampex Corporation** (1980-1983), a high-tech manufacturing company - internal audit and financial planning and analysis.

## Overall Experience Summary

### CLIENT AND INDUSTRY EXPERIENCE

Industry and client experience covers, among others, high technology companies, including equipment, networking, and software firms; aerospace, defense, and other government contractors; construction contractors; educational institutions; and health care.



**Richard J. Ostiller CPA, CFF**

**RELEVANT EXPERIENCE**

Engagements have included the following project categories:

| | |
|---|---|
| Contract/Commercial Disputes | Intellectual Property |
| Royalties | Corporate Investigations |
| Government Contracts | Construction |
| Corporate Strategy | Environmental Remediation |

## Contract / Commercial Disputes

Provided an expert report and courtroom testimony for a real estate investment company that had been denied funding on a refinancing transaction. The work included calculating the additional costs incurred as a result of the defendant's decision not to fund the loan. The jury awarded the client almost all of the out-of-pocket costs in the report, as well as a substantial punitive award. After the judgment, the parties settled at a very favorable amount for the client.

Managed several projects to assist a major research university defend itself against charges of improper accounting for indirect costs. The work included preparing cost submissions and proposals, demonstrating compliance with applicable regulations, responding to government inquiries and reports, and developing alternative costing methods. The project resulted in a highly favorable settlement for the client. This relationship resulted in numerous follow on assignments in the areas of intellectual property, government contracts, employment, and construction.

Authored an expert report for arbitration on behalf of a hotel and food service client who had terminated a catering contract. The opposition filed a wrongful termination claim, and the client responded with a breach of contract claim. Counsel retained NCI to rebut the claimant's allegations, and to prepare an affirmative claim for lost revenues, damages resulting from uncompleted contract requirements, and inventory losses. The parties settled before the arbitration.

Retained by counsel for a technology consulting company to assess damages in a contract termination dispute between the company and its subcontractor on a major state project. Our client terminated the subcontract for default because of lack of progress, and sought recovery of additional costs to complete the work. The subcontractor filed suit, alleging that our client improperly terminated the subcontract. Prepared three expert reports and deposition testimony. The matter settled during trial prior to my courtroom testimony.

Prepared three expert reports and deposition testimony on behalf of company that markets and sells outdoor power equipment motors. The client alleged that a competitor had disrupted a contractual

relationship with a supplier. The damages analysis calculated lost profits resulting from the defendant's alleged interference. The parties settled before courtroom testimony.

Assisted counsel for an acquired company in a post-acquisition dispute. The dispute involved the magnitude of adjustments to the deferred payment amount under the purchase agreement. The work included analyzing post-acquisition revenues, severance payments, and customer retention, and reporting on our findings. The parties settled the matter before any damages testimony.

Assisted a large private emergency medical transport company with its efforts to maintain service contracts in two major western population centers. The work involved calculating projected revenues and expenses for the local governments if they elected to replace the private firm with a public provider. In both instances, the analysis demonstrated that the public provider option would be significantly more expensive to the community than the existing private contract. Both locations chose to maintain the contractual relationship with our client.

Served as an arbitrator in a dispute between two companies related to the sale of a division. The dispute involved the valuation of assets on the closing balance sheet in accordance with generally accepted accounting principles.

## Intellectual Property / Royalties

Prepared an expert report and provided damages testimony on behalf of three defendants in a patent infringement matter related to imaging technology. The project involved coordinating the arguments for the three defendants, completing a reasonable royalty analysis based on Georgia-Pacific factors and rebutting the findings of plaintiff's expert. The court awarded judgment in favor of all three defendants.

Assisted an information technology manufacturer defend itself against a multimillion dollar patent infringement claim. Prepared an expert report and provided deposition testimony showing potential damages were only 2% of the alleged total. Based on this analysis, the opposing expert reduced his damages claim by over 60%. Ultimately, the parties settled at an amount very near to the prepared damages estimate.

Retained by outside counsel on behalf of a grocery company in a trademark dispute. A competitor had filed suit alleging our client had benefited from a corporate name change that was similar to the plaintiff's name. Our work involved analyzing sales and financial records to demonstrate, among other points, that the parties had dissimilar customer bases, and that the large majority of our client's customers had existed prior to the name change. Submitted two expert reports in the matter.

Assisted counsel for a high technology company facing patent infringement allegations over MPEG technology. Prepared an expert report and provided deposition testimony in the matter.

Engaged by a sound technology owner to perform a royalty review of a personal computer manufacturer whose product used the sound technology. The work identified additional royalties in excess of $1 million.

Assisted a client to analyze royalties due from a licensee. The parties reached an impasse in settlement discussions. The analysis demonstrated additional royalties due, and the licensee ultimately settled with the client for over four times its previous offer.

Assisted a data indexing and retrieval software company in assessing back royalties due from a multinational networking company. This networking company used the client's software source code in CD-ROMs. The work included a review of the licensee's royalty calculation method and the related accounting systems, and an evaluation of the licensee's adjustment for underpaid royalties during the prior three years.

## Corporate Investigations

Rick has served as one of the national leaders of NCI's stock options investigations team, and has managed several of these engagements. The investigations involve reviewing stock option accounting practices, determining compliance with company policy and accounting regulations, and advising on appropriate remediation as required. The projects include forensic accounting, electronic discovery, and statistical and economic analyses. In these matters, NCI has worked for Special Board Committees, company outside counsel, and company management. Rick has also testified on stock option accounting issues for individual defendants in SEC litigation.

Assisted management of a multi-billion dollar wholesale distributor of computer components and its outside counsel with an accounting restatement covering three fiscal years. Key areas of inquiry included reserves for accounts receivable, restructuring, and accounts payable offsets, and miscellaneous accruals. The work included reviewing source documents and forensic materials to determine proper accounting treatment, documenting analyses and conclusions in memos, and presenting conclusions to the company's outside auditor.

Retained by outside counsel for the Audit Committee of a technology company to investigate alleged improper accounting for various inventory items, including overhead, in-transit, excess and obsolete reserves, and intercompany profit. NCI conducted numerous forensic accounting analyses, assisted with electronic discovery preservation, collection, and review, participated in witness interviews, and met with both external auditors and government regulators. The company restated its financial statements after the investigation.

Assisted outside counsel for the Audit Committee of a technology company to investigate whistleblower allegations related to the accounting for an affiliated organization and to expense reporting. Our team reviewed financial records and expense reports, participated in numerous

interviews, evaluated corporate governance issues, and helped counsel prepare and report findings to the Audit Committee.

Retained by counsel for a company facing shareholder litigation alleging the entity violated securities laws by issuing inaccurate IPO and secondary registration statements that did not disclose certain accounting issues. The plaintiff further alleged that the company's stock fell when it subsequently announced plans to investigate the accounting issues. NCI conducted event studies and analyzed plaintiff and other major shareholder trading activities. Our team developed an alternative potential damages calculation that was far lower than the plaintiff's analysis. The parties ultimately settled at an amount close to our potential damages calculation.

Engaged by counsel for the Audit Committee of a high technology/software company to assist with an internal investigation resulting from the improper authorization of a sales contract and other forged correspondence. Our work included conducting interviews of key individuals, preparing financial analyses of key accounting metrics, and presenting our findings to the Audit Committee. The timely investigation allowed the company to meet its quarterly reporting deadlines.

Assisted a high technology company with a high profile investigation related to the embezzlement of corporate assets by a company executive. The team investigated numerous investments and acquisitions for fraudulent transactions, and estimated the value of the misappropriated funds or stock shares related to those transactions. The project also included reviews of the client's business development policies.

Retained by counsel for the Board of Regents of a nonprofit educational and scientific organization to investigate and quantify the misappropriation of funds by the Executive Director. The investigation involved reviewing and analyzing financial records, interviewing employees, and tracking accounting transactions. Our findings confirmed the misuse of funds, and identified additional areas of fraud. We reported our findings to counsel and the Board. We also prepared an internal controls report with observations and recommendations for improvement that assisted the new Executive Director in her transition to the organization.

Worked with counsel to investigate the financial advisory activities of an international private investment firm facing allegations of financial misconduct. Our work involved reviewing financial records, transactions, and personal records of the firm and its sole director, who was incapacitated and unable to assist in the investigation. Our effort provided valuable insight to counsel on the company's behavior over a period of two decades, and our team participated in the mediation that resulted in a settlement of the dispute.

Engaged by counsel for an executive at a publicly traded technology company that had multiple earnings restatements. Our work involved analyzing accounting transactions, including revenue recognition and reserve accounting, and other documents, to demonstrate that the executive did not have prior knowledge of the activities that led to the restatements.



Provided financial analysis and advice to clients in response to whistleblower allegations, and conducted investigations related to alleged contract cost mischarging.

## Government Contracts

Assisted a prime contractor and an intercompany subcontractor with the preparation of multimillion-dollar termination settlement proposals. Our assignments included developing a model to track and forecast termination costs, determining fee recovery, assisting with subcontractor settlements, analyzing employee severance expenses, accumulating termination costs incurred, preparing termination vouchers and billings, developing settlement proposal cost schedules and narratives, calculating rate change impacts on termination costs, and providing support with government audit responses.

Engaged by in-house counsel for a leading defense contractor to evaluate compliance with firewall requirements on a major program. Our work has included developing compliance evaluation procedures and interview questionnaires, performing recurring compliance reviews at numerous company locations, submitting compliance reports, and discussing our findings with the client.

Managed the preparation of a $240 million claim against the U.S. Navy on behalf of a major defense contractor. The claim covered contract changes and required identification of cost overruns from both scope growth and government caused inefficiencies. Assisted this contractor in its effort to convert a default termination to a termination for convenience. The parties resolved their disputes with a favorable settlement for the client.

Assisted a major university in calculating and submitting claims to the government for over $40 million in unrecovered indirect costs. This analysis required the detailed review of several hundred grants and contracts.

Assisted government contractors with numerous reviews of rate submissions, proposals, Federal Acquisition Regulation and Cost Accounting Standards compliance, and consulted on a variety of contracting issues. Served as a featured speaker at multiple ABA conferences, and taught the *Government Contract Accounting* and *Terminations of Government Contracts* courses for Federal Publications.

## Construction

Submitted multiple reports for a developer seeking reimbursement for contractor settlements from the project owner. The owner requested that the developer firm obtain external review of the settlements prior to reimbursement. The cost categories analyzed in the reports include labor, materials, equipment, field and office overhead, change orders, and interest.

Provided domestic and international construction project management assistance to a leading Silicon Valley high-tech manufacturer. The project included several task orders, covering project financial and cost analyses, project delivery evaluations, controls assessments, and subcontractor reviews. The work identified contractor overbillings, activities requiring immediate corrective action, and recommendations for improvement on subsequent projects.

Assisted the Capital Planning department at a large university to negotiate a final settlement on a $30 million reconstruction and renovation project. This project included performing a complete accounting of all general contractor costs over a five-year period. The review identified several million dollars of billed costs that were not reimbursable per the contract.

## Corporate Strategy

Assisted a semiconductor equipment manufacturer with the development of a strategic plan for one of its operating units. The plan addressed product development, operations, financial targets, corporate integration and employment issues, among others. The plan received strong positive feedback from client management and during the course of the engagement, the financial performance of the operating unit improved significantly. The successful engagement led to a subsequent project to evaluate progress against the strategic plan.

## Testimony and Alternative Dispute Resolution Experience

Provided expert testimony, either through deposition or before the trier of fact, in the following venues:

- United States District Court
- California Superior Court
- Colorado District Court
- International Chamber of Commerce
- Armed Services Board of Contract Appeals
- Arbitration



In addition, presented financial analyses on behalf of clients to the following government entities:

- San Jose, California - City Council
- Multnomah County, Oregon - Commission
- Fullerton, California, - City Council
- Seminole County, Florida - Commission
- State of New Mexico - Corporation Commission

## Professional Organizations

The American Institute of Certified Public Accountants

California Society of Certified Public Accountants

Board of Directors (Treasurer and Past President), Law Foundation of Silicon Valley

American Bar Association (Associate Member)

Note: Mr. Ostiller is a licensed CPA in California only. Neither Mr. Ostiller nor Navigant Consulting provide audit, attest or public accounting services, in this or any other state.

# ATTACHMENT B



**Richard J. Ostiller**
**Testimony and Publications**
**As of December 2011**

## TESTIMONY 2007 – 2011

**Bee-Dee Investments Ltd., et al. v. Ernest Rady, et al.** Superior Court of the State of California in and for the County of San Diego (Deposition), November 16, 2011.

**Securities and Exchange Commission vs. Douglas J. Bartek and Nancy A. Richardson.** United States District Court for the Northern District of Texas (Deposition), May 18, 2010.

**Securities and Exchange Commission vs. Raj P. Sabhlok and Michael C. Pattison.** United States District Court for the Northern District of California (Deposition), December 15, 2009.

**Cell Therapeutics, Inc. v. Spectrum Pharmaceuticals, Inc.** JAMS #1100058284 (Arbitration), May 14, 2009.

**GTX Corporation v. Kofax Image Products, Nuance Communications, Canon U.S.A., et al.** United States District Court for the Eastern District of Texas (Deposition), April 18, 2008.

**General Power Products LLP v. MTD Products Inc, et al.** United States District Court for the Southern District of Ohio (Deposition), November 9, 2007.

**Richard J. Ostiller**
**Testimony and Publications**
**As of December 2011**

## PUBLICATIONS and PRESENTATIONS 2001 – 2011

**Effectively Managing an Independent Investigation.** National Association of Corporate Directors, *NACD Directorship*, November 11, 2011

**Who's the Client: Ethical Questions and Considerations.** Association of Corporate Counsel, Burlingame, CA. January 13, 2011.

**Inside the Due Diligence – Applying Best Practices in the Acquisition of a Government Contractor.** American Bar Association, Public Contract Law Section, San Francisco, CA. August 8, 2010.

**A Calculated Approach: Effective Interaction with the External Auditor on Independent Investigations.** Navigant Consulting, Investigations Quarterly, June 2007.

**Attorney-Client Privilege: The Impact of External Auditor Policies and Information Requests.** CLE Presentation with Baker McKenzie. Palo Alto, CA. October 6, 2006.

**Terminations for Convenience**. American Bar Association, Public Contract Law Section, Telephone Conference. September 20, 2005.

**Accounting Fraud and the Sarbanes-Oxley Act of 2002**. CLE Presentation to Silicon Valley Project Management Institute. Mountain View, CA. May 16, 2005.

**Mining Uncle Sam's IP Portfolio: Strategies for Commercializing Government IP.** American Bar Association, Intellectual Property Law Section. Washington, D.C. April 15, 2005.

**Terminations Decanted: Termination for Convenience – Maximizing the Contractor's Recovery.** American Bar Association – Public Contract Law. Napa, CA. November 5, 2004.

**Working with Experts: Maximizing the Benefit to Your Team.** Law Seminars International: Mining Your Patent Portfolio. San Francisco, CA. May 12, 2003.

**Getting the Data for a Defensible Damages Study through Discovery.** Law Seminars International: Calculating and Proving IP Damages. San Francisco, CA. January 13, 2003.

**Other Speaking Engagements:**

- Stanford University – Civil Engineering Course
- Various Corporate and Law Firm Training
- Federal Publications, *Terminations of Government Contracts*

# ATTACHMENT C

**Facebook Inc. v. Power Ventures, Inc. et al**
**Documents Considered**

| Bates/Control Range | | Description |
|---|---|---|
| NA | NA | http://www.facebook.com |
| NA | NA | First Amended Complaint, filed January 13, 2009 |
| NA | NA | Power - Notice of Motion, Motion and Memorandum of Law in Support of Defendants' Motion for Summary Judgment, filed May 9, 2011 |
| NA | NA | Facebook - Notice of Motion and Motion for Partial Summary Judgment on Count 1; Memorandum of Points and Authorities in Support Thereof, dated November 14, 2011 |
| NA | NA | Facebook - Notice of Motion, Motion and Memorandum of Points and Authorities for Partial Summary Judgment, dated November 17, 2011 |
| NA | NA | Facebook Objections and Responses to Defendants' Interrogatories, Set One, dated December 15, 2010 |
| NA | NA | Declaration of Monte M.F. Cooper, dated November 14, 2011 |
| NA | NA | Declaration of Joseph Cutler, dated November 14, 2011 |
| NA | NA | Declaration of Lawrence Melling, dated November 14, 2011 |
| NA | NA | Declaration of Ryan McGeehan, dated November 13, 2011 |
| NA | NA | Declaration of Morvarid Metanat, dated November 17, 2011 |
| NA | NA | Deposition of Craig Clark, dated February 17, 2011 |
| NA | NA | Deposition of Steven Vachani, dated July 20, 2011 |
| NA | NA | California Comprehensive Computer Data Access and Fraud Act (California Penal Code, Section 502) |
| NA | NA | CAN-SPAM Act - 15 U.S.C., Sections 7701 - 7706 |
| NA | NA | Computer Fraud and Abuse Act - 18 U.S.C., Section 1030 |
| NA | NA | United States of America v. David Nosal, Appeal from the United States District Court, dated April 28, 2011 |
| POWER 2011.02.03.0000001 | POWER 2011.02.03.0000003 | Letter from Joseph P. Cutler, Esq., Perkins Coie, to Power, dated December 1, 2008 |
| POWER 2011.02.03.0000068 | POWER 2011.02.03.0000090 | Various Power email correspondence from December 2008 to February 2009 |
| FBPOWER00296 | FBPOWER00299 | Various Power email correspondence during December 2008 (Exhibit 1) |
| FBPOWER00300 | FBPOWER00300 | Perkins Coie billing summaries December 2008 to March 2009 (Exhibit 2) |

# SCHEDULES

Summary Schedule

**Facebook Inc. v. Power Ventures, Inc. et al**
**Damages Summary**

| Damages Category | Schedule Reference | Total | |
|---|---|---|---|
| Compensatory Damages[1] | Schedule 1 | $ | 80,543 |
| Statutory Damages[2] | Schedule 2 | | 18,188,100 |
| **Total Damages** | | $ | **18,268,643** |

Notes:
(1) Compensatory damages represent costs incurred by Facebook to respond to Power's unauthorized activities during the Relevant Period.
(2) Statutory damages represents the amount that Facebook can recover from Power under the Controlling the Assault of Non-Solicited Pornography And Marketing ("CAN-SPAM") Act.

Schedule 1

**Facebook Inc. v. Power Ventures, Inc. et al**
**Compensatory Damages**
**Summary**

| Compensatory Damages Category | Schedule Reference | Total | |
|---|---|---|---|
| Internal Effort[1] | Schedule 1a | $ | 5,000 |
| External Effort[2] | Schedule 1b | | 75,543 |
| **Total Compensatory Damages** | | $ | **80,543** |

Notes:
(1) This amount represents estimated fully burdened payroll costs for employees who participated in Facebook's response to Power's unauthorized activities.
(2) This amount represents total billings from outside counsel engaged by Facebook to respond to Power's unauthorized activities.

Schedule 1a

# Facebook Inc. v. Power Ventures, Inc. et al
## Compensatory Damages
## Internal Effort of Mr. Ryan McGeehan

| Description | | Internal Remediation |
|---|---|---|
| Estimated Remediation Hours Incurred by Mr. McGeehan[1] | | 50 |
| Hourly Rate[2] | $ | 100 |
| **Total Internal Effort by Facebook Personnel**[3] | $ | **5,000** |

Notes:

(1) Mr. McGeehan performed the following remediation tasks:

- Notified in-house counsel about Power's unauthorized activities;
- Repeatedly blocked Power's access to Facebook using a network management tool;
- Attended several meetings; and
- Collaborated with in-house counsel and outside counsel to respond to Power's unauthorized activities.

(2) This rate represents Mr. McGeehan's estimated fully burdened payroll costs (salary and fringe benefits).

(3) I understand other Facebook personnel, including in-house counsel, assisted with the internal response to Power's unauthorized activities. I have not yet quantified this effort by other Facebook employees.

Schedule 1b

Facebook Inc. v. Power Ventures, Inc. et al
Compensatory Damages
External Effort by Perkins Coie

| Billing Period[1] | Amount Paid |
|---|---|
| December 2008[2] | $ 38,719 |
| January - March 2009[3] | 36,824 |
| **Total External** | **$ 75,543** |

Notes:

(1) Facebook engaged Perkins Coie in late 2008, to assist with Facebook's response to Power's unauthorized activities.

(2) See Exhibit 2 for amounts paid by Facebook in December 2008.

(3) See Exhibit 2 for an estimate by Joseph Cutler, Esq. of the amount paid by Facebook to Perkins Coie during the period January 2009 to March 2009 related to Power.

Schedule 2

Facebook Inc. v. Power Ventures, Inc. et al
Statutory Damages
Summary

| Description | Amount | | |
|---|---|---|---|
| Unauthorized Event Messages from Power | 60,627 | | |
| Other Unauthorized Messages from Power | TBD | | |
| Total Unauthorized Messages from Power | 60,627 | | |
| CAN-SPAM Damages Rate Per Message[1] | $ 100 | | |
| **Base Statutory Damages** | | **$** | **6,062,700** |
| Aggravated Statutory Damages (Base Damages * 2)[2] | | | 12,125,400 |
| **Total Statutory Damages** | | **$** | **18,188,100** |

Notes:

(1) Under Controlling the Assault of Non-Solicited Pornography And Marketing ("CAN-SPAM"), 15 U.S.C. Section 7706(g)(3)(A)(i), Facebook is entitled to recover damages up to $100 per unauthorized message.

(2) Under CAN-SPAM, 15 U.S.C. Section 7706(g)(3)(C)(i), Facebook is entitled to recover up to treble damages if Power sent the unauthorized messages intentionally.

# EXHIBIT 1

**Dalton, Amy**

**From:** steve@stevevachani.com
**Sent:** Wednesday, December 17, 2008 10:29 PM
**To:** filipe.herrera@powerinc.net; Cutler, Joseph P. (Perkins Coie)
**Cc:** Demetrescu, Nicole (Perkins Coie); McCullagh, James R. (Perkins Coie)
**Subject:** Re: Power.com

Joseph,

I just finished a meeting with our team. They have changed the priorities of our product team to begin a complete reintegration of Facebook with Facebook connect. They are putting together a detailed product plan and studying intensively how to get the maximum innovation through Facebook connect.

I am waiting for them to final the complete product plan and schedule and allocation of resources.

Based on the more detailed feedback, I am concerned that my goal of December 26th may have been too optimistic. Rather than waiting until the last day, I would like to have an open and transparent conversation with you about our progress and also early next week share with you a visual product plan on what is being implemented for you to fully appreciate the amount of resources and time we are putting into this reintegration with Facebook connect.

It is my hope that after I present this that you and your team will see the good faith effort that our team is making to make this integration as smooth as possible.

I would like to reconvene by telephone with you on December 23rd at the end of the day to present the latest progress.

I am not expecting anything from you now, but only to provide you an update on our progress and ensure that we have open communication as we make a full effort to integrate this. On December 23rd, I will share a demo showing how we are integrating Facebook connect.

Thanks,
Steve

--- On **Mon, 12/15/08, Cutler, Joseph P. (Perkins Coie) *<JCutler@perkinscoie.com>*** wrote:
From: Cutler, Joseph P. (Perkins Coie) <JCutler@perkinscoie.com>
Subject: Re: Power.com
To: steve@stevevachani.com, filipe.herrera@powerinc.net
Cc: "Demetrescu, Nicole (Perkins Coie)" <NDemetrescu@perkinscoie.com>, "McCullagh, James R. (Perkins Coie)" <JMcCullagh@perkinscoie.com>
Date: Monday, December 15, 2008, 6:16 PM

Sounds good. Let's shoot for 1:30 pm?

I'll call you.

Thanks for getting back to me, Steve.

Joe

Joseph P. Cutler

Attorney at Law
Perkins Coie, LLP
206. 359. 6104 (Office)
206. 359. 7104 (Fax)
jcutler@perkinscoie.com

-----Original Message-----
From: steve@stevevachani.com <steve@stevevachani.com>
To: Cutler, Joseph P. (Perkins Coie); filipe.herrera@powerinc.net <filipe.herrera@powerinc.net>
CC: Demetrescu, Nicole (Perkins Coie); McCullagh, James R. (Perkins Coie)
Sent: Mon Dec 15 18:05:14 2008
Subject: Re: Power.com

I will be free to go over these terms tomorrow. I am on a flight all morning, but should be free to talk around noon.

Thanks,
Steve

Thanks,
Steve

Sent via BlackBerry by AT&T

---

From: "Cutler, Joseph P. (Perkins Coie)"
Date: Mon, 15 Dec 2008 17:00:53 -0800
To: <steve@stevevachani.com>; <filipe.herrera@powerinc.net>
Subject: RE: Power.com

Steve and Felipe,

I am sorry that we were not able to match schedules on Friday. Facebook has reviewed this letter, and is willing to accept your offer to have Facebook Connect implemented by EOD December 26 – which is two weeks from the date you sent the letter.

Meanwhile, as you may know, Facebook has taken technical measures to limit the interaction between Power.com and its network at this time. In order to fully initialize your integrated Facebook Connect status, and to lift those technical measures, Facebook requires written confirmation of the following:

1. That Power.com has purged and destroyed all data that it obtained from the Facebook network or from Facebook users prior to implementation of Facebook Connect, including all login information and/or any other data obtained or scraped from Facebook's site.
2. That Power.com has ceased displaying Facebook's trademarks on its website, except as expressly permitted by Facebook's Terms of Use, Developer Terms of Service, and/or Facebook's Connect Policies (see http://wiki.developers.facebook.com/index.php/Facebook_Connect_Policies).
3. That Power.com has implemented Facebook Connect in strict adherence to Facebook's Terms of Use, Developer Terms of Service, and/or Connect Policies.
4. That Power.com has removed all compatibility with Facebook's site that does not comply with Facebook's Terms of Use, Developer Terms of Service and/or Connect Policies.
5. That Power.com will in the future adhere to all of Facebook's Terms of Use, Developer Terms of Service, Connect Policies.

While Facebook does not object to Power.com's efforts to interact with Facebook's developer teams via normal channels, it will not set up any special developer meetings for Power.com.

Lastly, regarding your proposed notice to Facebook users: your Connect interaction must strictly comply with Facebook's applicable Terms and Policies. Posting a notice that casts Facebook's Connect system in a negative light will likely become counterproductive to your stated goals of working together with Facebook's developers. Facebook reserves its right to deny approval for any Facebook Connect application for any reason.

I would still like to go over these items together on the phone. Are you available for a call tomorrow (Tuesday)? If so, what time?

Please confirm that you agree with these terms, and that you will commit to integrating Facebook Connect by EOD, December 26, 2008. Please also confirm that you intend to provide the written confirmation as described above by that time.

Thanks,

Joe

---

From: steve@stevevachani.com [mailto:steve@stevevachani.com]
Sent: Friday, December 12, 2008 1:24 PM
To: Cutler, Joseph P. (Perkins Coie)
Cc: felipe.herrera@corp.power.com; Eric Santos
Subject: Power.com

Thank you for patience to allow us to clarify our plan of action on Power in regards to our discussion on Wednesday.

We decided to move forward with the following steps

1) We will implement Facebook connect on our main login page and work with the capabilities of Facebook connect for the login to our site. Instead of a login for Facebook, users will have a button which then opens the Facebook connect window and allows them to login through Facebook connect. We will say that Facebook connects current capabilities are extremely limited and we would love the opportunity to provide a Facebook connect extension to Facebook that would allow us to enrich the experience for Facebook users. We will show that to the bus dev guys when we have a chance to meet with them.

2) We will delete any Facebook friend information we currently have.

3) We will move forward and use the Facebook features to utilize Facebook's IM, updates, and some other functionality that is already available. After we finish the implementation, we would like the opportunity to get Facebook's feedback. We have some simple innovative ideas that will follow Facebook connects system, but allow for better usability and integration. As stated earlier, we do believe that the user experience of Facebook connect is extremely limited at this stage and we hope to have an open and friendly

relationship with the Facebook team to share ideas and complete solutions to allowing partners to do greater integration while addressing Facebook's concerns.

4) We are finishing a solution that we have already been discussing with other sites that is an extension to Facebook connect that Facebook could enable that will allow us to provide more functionality to Facebook users while protecting all the concerns of Facebook.

5) We do understand that there is no guarantee that Facebook will accept this solution, but our only request is that

6) We estimate that it will take us 2 weeks to completely finish this integration with Facebook connect and shift the user experience for our current users.

7) While have made the decision today to do this, we would request only one thing. We would like to meet with the business dev and guys involved on the product for thinking about solution for providing more flexibility with partners and at least present our simple code that Facebook could add that would allow us to provide a richer experience to our users and at the same time do it in a way that Facebook finds compatible with you they are envisioning their partners working with them in the future.

I believed that this email addresses everything we discussed.

The two requests we have and hope you will faciliate.

1) Can we get an email introduction to the correct people inside Facebook. We only ask for the introduction and we will follow up and see their interest to meet.

2) Provide us 2 (instead of one you offered) to implement this new solution.

We did study Digsby and others and saw the changes they made in their UI to implement Facebook connect.

Please call me now and we can discuss this further. I am heading to a flight shortly.

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

# EXHIBIT 2

**FACEBOOK PAYMENTS ATTRIBUTABLE TO ENFORCEMENT AGAINST POWER.COM**

| MONTHS | HOURS | VALUE |
|---|---|---|
| December 2008 | [redacted] | $38,719 |
| January-March 2009 | [redacted] | $36,824 |
| **Total** | [redacted] | **$75,543** |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
FBPOWER00300