# EXHIBIT 2

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                 SAN FRANCISCO DIVISION

4

5   FACEBOOK, INC.,             )
                                )
6                               )
              Plaintiff,        )
7                               )
    vs.                         )   No.  5:08-cv-05780 JW
8                               )
    POWER VENTURES, INC., a     )
9   Cayman Island               )
    corporation; STEVE          )
10  VACHANI, an individual;     )
    DOE 1, d/b/a POWER.COM,     )
11  DOES 2-25 inclusive,        )
                                )
12             Defendants.      )
                                )
13  _____)

14

15        VIDEOTAPED 30(b)(6) DEPOSITION OF

16                  STEVE VACHANI

17

18     Held at the Orrick, Herrington & Sutcliffe

19       1000 Marsh Road, Menlo Park, California

20        Wednesday, March 7, 2012, 9:57 a.m.

21

22  REPORTED BY:  ELAINA BULDA-JONES, RPR, CSR #11720

23

24

25

                            2

BARKLEY
Court Reporters

```
 1  time.
 2        Q.   All right.
 3             MR. COOPER:  This is a new one.
 4             (Whereupon, Exhibit 236 was marked for
 5  identification.)
 6             (Whereupon, a brief discussion off the
 7  record.)
 8  BY MR. COOPER:
 9        Q.   Mr. Vachani, I put in front of you a
10  December 1st, 2008, e-mail chain between you and
11  Leigh Power?
12        A.   That's correct.
13        Q.   Do you -- well, first of all, do you see
14  that the -- in the middle of the page there is a
15  March 1st, 2008, postmaster one at Power e-mail.org
16  e-mail?
17        A.   Yep.
18        Q.   That -- would you agree that that is Leigh
19  Power's e-mail?
20        A.   That is Leigh Power's.
21        Q.   Okay.  And do you see you -- that Leigh
22  Power, on December 1st, 2008, at 7:54 p.m., in the
23  middle of the page, wrote, "Steve, this looks
24  serious"?
25        A.   Yes, I do.
```

Steve Vachani, 30(b)(6)

BARKLEY
Court Reporters

1      Q.   All right.  Did you consider -- and this

2   e-mail that he was sending you contained the

3   December 1st, 2008, letter that I put in front of

4   you as Exhibit 108?

5      A.   That's correct, yes.

6      Q.   All right.  Did you agree with him that it

7   was -- that this -- that did you believe this was

8   serious?

9      A.   I don't believe this is -- I think

10  "serious" is a -- is a -- is an objective term.

11     Q.   I understand that.

12     A.   I think -- I don't think that's the

13  appropriate term.  I think it required a response.

14  And we did have communication with Facebook, proper

15  and transparent communication, which we did respond.

16          So I believe it required -- what I believe

17  is it required a communication with Facebook or

18  their lawyers, which we -- which we did have

19  obviously.

20     Q.   Do you see you responded to Mr. Power

21  personally?

22     A.   Yes, I do.

23     Q.   All right.  And do you see your -- you

24  said in the first sentence, "Thanks.  This is a

25  standard cease-and-desist letter"?

Steve Vachani, 30(b)(6)

BARKLEY
Court Reporters

1       Q.   All right.

2       A.   She reported to Eric.

3       Q.   All right.  And Eric reported to you?

4       A.   That's correct.

5            (Whereupon, Exhibit 238 was marked for

6    identification.)

7            (Whereupon, a brief discussion off the

8    record.)

9    BY MR. COOPER:

10       Q.   Mr. Vachani, I have put in front of you an

11   e-mail chain, which we have seen part of it in the

12   past, which begins on the cease-and-desist letter

13   dated -- the e-mail's on January 1st, the same

14   e-mail from Leigh Power that says, "This looks

15   serious," if you go to page 2.

16            Do you see it?

17       A.   Correct, yes.

18       Q.   All right.  And in the past, both at your

19   individual and at your last deposition, both

20   Mr. Chatterjee and I put in front of you your

21   response to this December 2nd, 2008, e-mail --

22       A.   Correct.

23       Q.   -- to Felipe Herrera and Eric Santos,

24   correct?

25       A.   That's correct.

Steve Vachani, 30(b)(6)

BARKLEY
Court Reporters

1  was -- it was one -- it was one -- I don't know.

2  The word "outdated" means an old IP address.  They

3  were probably blocking one of our -- one of our IP

4  addresses.

5       Q.   Was that -- and the address they were

6  blocking was a current IP address used by Power to

7  connect to Facebook?

8       A.   That was a current address.

9       Q.   All right.

10           (Whereupon, Exhibit 245 was marked for

11  identification.)

12           (Whereupon, a brief discussion off the

13  record.)

14  BY MR. COOPER:

15       Q.   Mr. Vachani, I put in front of you an

16  exhibit, 245, which is one of the e-mails that was

17  produced on January 25th for the first time.  And

18  it's an e-mail chain, which, if you go to the second

19  page, begins on December 23rd.  Do you see that?

20       A.   Okay.  Yes.

21       Q.   It begins with an e-mail that's subject

22  matter is "Blockeo di Facebook."  Do you see that?

23       A.   Yes.

24       Q.   All right.  And it's from Julian Conceicao

25  to you, Eric Santos, Cornelius Conboy, Patrick

153

BARKLEY
Court Reporters

1    Amorim, cc'ing Andre Fernandes and Elmo Cruz?

2         A.    Correct.

3         Q.    All right.  First is a practical question.

4    Do you know or have any understanding why this

5    e-mail was not produced prior to January 25th in any

6    of your other e-mail productions from your Yahoo

7    account or anything?

8         A.    I do not know.

9         Q.    All right.  Do you see we have produced,

10   because of the high importance of this particular

11   file, a certified translation already, as of today,

12   on an expedited basis?

13        A.    Correct.  Yes.

14        Q.    All right.  Please go to the second page

15   of the certified translation.

16             Do you see that the translator has

17   interpreted that first e-mail to read, in the body

18   of the e-mail, "Dear all, Power site Facebook is

19   disabled at the moment because Facebook has blocked

20   our access through web servers."

21        A.    Correct.

22        Q.    And then it says, "Andre is running a

23   configuration to use new IPs (Workaround Solution

24   1)."

25        A.    Yes.

154

BARKLEY
Court Reporters

1    Q.   All right.  Do you understand whether or

2   not this was the first or most -- or second or

3   any -- do you have any understanding whether

4   Facebook had blocked Power before December 23rd?

5    A.   I believe there would have been one --

6   there would have been one instance before and then

7   after the 26th, I guess, a second instance.

8    Q.   This was three days before you made the

9   executive decision to continue to connect to

10  Facebook, correct?

11   A.   To leave our connection, correct.

12   Q.   All right.  Now, do you see Andre

13  Fernandes, three hours or close to four hours after

14  Julian Conceicao sent her e-mail, said -- wrote,

15  "Facebook is working in Power.com again"?

16   A.   Yes.

17   Q.   And then he said, "We are using a proxy

18  solution that allows access to Facebook through

19  different IPs from our web servers"?

20   A.   Correct.

21   Q.   Was the proxy solution the workaround that

22  is referred to in Julian Conceicao's e-mail that you

23  were copied on?

24   A.   I am assuming that they -- they were

25  activating our solution to -- that was -- where the

155

BARKLEY
Court Reporters

1    IP was updated from our -- from our many IPs that we

2    have -- that we already had.

3         Q.   Okay.   On December 28th, the next e-mail

4    in the chain, Andre Fernandes informs all of you all

5    over again, "We have been blocked by Facebook yet

6    again," correct?

7         A.   That's correct.

8         Q.   All right.   And he then says, "I have

9    configured a server at Amazon to serve as proxy, and

10   Facebook is logging in normally at the moment"?

11        A.   Yes.

12        Q.   So Mr. Fernandes actually had to make a

13   change to your system of IP blocks -- or of rotating

14   IPs by switching it to Amazon, correct?

15        A.   Well, there was already some -- there was

16   already a system with Amazon, but he must -- he made

17   some updates.

18        Q.   He says, "I have configured a server at

19   Amazon," correct?

20        A.   I guess he configured.   I don't know what

21   he -- we had -- we already had a relationship with

22   Amazon but I don't know what he specifically did.

23        Q.   He had to --

24        A.   He made some kind of adjustment.

25        Q.   All right.   Then do you see Mr. Santos, in

156

BARKLEY
Court Reporters

1    response to that comment, informs everybody,

2    yourself included, "We need to develop a solution to

3    create proxy servers every six hours automatically

4    or something similar"?

5         A.   That's correct.

6         Q.   All right.  "I'm sure they will continue

7    blocking our services," is what he then adds,

8    correct?

9         A.   Yes.

10        Q.   All right.  So Mr. Santos recognized that

11   you needed to develop a new system to deal with the

12   fact that you wanted to continue accessing Facebook

13   despite their continued blocking of your site,

14   correct?

15        A.   I think what he is saying is it needs to

16   be more frequent or updated -- to be adjusted -- the

17   frequency needs to be adjusted.

18        Q.   Okay.  And that's because that

19   functionality didn't exist already?

20        A.   No, he's saying that the frequency -- he

21   says that the frequency needs to be adjusted.

22        Q.   He uses the word "solution," correct?

23        A.   Yeah, solution.  I mean, he is

24   basically -- the solution to change our IPs, update

25   and rotate already existed.  He basically is

157

BARKLEY
Court Reporters

1    referring to how often it gets updated, and it's

2    pool IP addresses.

3        Q.   Mr. Vachani, I'm going to again ask

4    something.

5        A.   Sure.

6        Q.   There have now been four e-mails I have

7    showed you that you have been cc'd on.

8        A.   Yeah.

9        Q.   Do you have an understanding why not one

10   of them was produced to us prior to January 25 in

11   any of your productions over the past three years?

12       A.   I do not.

13       Q.   All right.  Do you recall telling me at

14   the July 11th -- July 2011 depo that you searched

15   actively your e-mail accounts to find any that

16   referred to the events of December 2008?

17       A.   Yes.

18       Q.   Would you agree that these are referring

19   specifically to some of the biggest events in this

20   litigation, namely, the events involving Facebook's

21   attempt to block Power?

22       A.   Yes.

23       Q.   Would you agree these are amongst the type

24   of e-mails you assured me you would try to search

25   for?

BARKLEY
Court Reporters

1           A.    Yes.

2           Q.    All right.  And do you have any

3   understanding why they were not located, a single

4   one of them, in any of your prior searches?

5           A.    I don't know why they were not located.

6           Q.    All right.  Does that reflect that you

7   yourself may have from time to time deleted e-mails

8   after January -- or after January 1st, 2009, even if

9   they related to the issues in this case?

10          A.    I don't -- I don't believe so.  I don't --

11  I don't know where these -- I don't know why these

12  were not produced.

13          Q.    All right.  I will represent to you these

14  were only produced because we found them in Mr. --

15  in the backup server from the Micro Exchange server.

16          A.    Uh-huh.

17          Q.    But my question is if you have any idea

18  why you, as you testified, kept all your e-mails,

19  why they weren't actually produced through your

20  forward production, if you know?

21          A.    I don't know the answer to that.

22          Q.    Okay.  Do you see on December 29th, 2008,

23  Andre Fernandes sent an e-mail to Elmo Cruz, Julian

24  Conceicao, and Lucas Araujo?

25          A.    Yes.

BARKLEY
Court Reporters

1    Q.   All right.  And he asks Elmo, "Could you

2    please ask someone in your team to run a diagnostic

3    exclusively with Facebook?"

4    A.   Yes.

5    Q.   All right.  "This way we could receive a

6    notification via e-mail when log in is not possible

7    and we would know when Facebook was blocked again"?

8    A.   Correct.

9    Q.   All right.  "Tyaga could do this, but

10   since he's not here we need to find someone else,"

11   correct?

12   A.   Correct.

13   Q.   And then he says, "I'm checking a way to

14   always change the proxy server in a more optimized

15   manner"?

16   A.   Correct.

17   Q.   All right.  So again, this was a further

18   adjustment to your dynamic rotation system, in

19   addition to sending it to Amazon, that was necessary

20   to continue your access of the -- of the Facebook

21   blocks and to continue service, correct?

22   A.   Yes.

23   Q.   Did you have the ultimate authority to

24   instruct all of these individuals to make these

25   adjustments?

160



1        A.   I had the authority, but -- I think that

2   they were -- they were taking natural steps to -- to

3   make adjustments.

4        Q.   All right.  But were you copied on --

5        A.   Correct.

6        Q.   -- every one of these e-mails?

7        A.   Yes.

8        Q.   And you approved of these steps, correct?

9        A.   Yes.

10       Q.   And you had the right to control these

11   steps, correct?

12       A.   Yes.

13       Q.   All right.  Monday, December 29th, 2008,

14   is the day before Facebook sued you in this case, is

15   it not?

16       A.   Yes.

17       Q.   All right.  And it's two days after you

18   made the executive decision -- that you wrote to the

19   team that you had made a decision to continue

20   accessing Facebook?

21       A.   That's correct, yes.

22       Q.   In light of Exhibit 245, do you believe

23   your statement in Paragraph 11 of Exhibit 244 is

24   accurate to the extent you said, "Power did not

25   undertake any effort to circumvent that block"?

161

BARKLEY
Court Reporters

1      A.   I think that statement should be updated

2  to more accurately reflect it, based on this

3  information.

4           MR. COOPER:  I am optimistic I'm going to

5  finish earlier than I thought.

6           But I would like to take a break right now

7  so I can try and siphon out some of the exhibits

8  that I was -- that I brought and not have to siphon

9  through them.  So you want to take 15 minutes?

10          THE WITNESS:  Sure.

11          THE VIDEOGRAPHER:  We are going off the

12  record.  The time is 1:36 p.m.

13          (Whereupon, a brief recess was taken.)

14          THE VIDEOGRAPHER:  This begins Videotape

15  No. 3 in the continuing deposition of Power

16  Ventures, Inc.  The time is 1:51 p.m. on March 7th,

17  2012, and we're back on the record.

18  BY MR. COOPER:

19      Q.   Mr. Vachani, before the break, I showed

20  you Exhibit 244, Paragraph 11, the sentence, "Power

21  did not undertake any effort to circumvent that

22  block and did not provide users with any tools

23  designed to circumvent it"?

24      A.   Yes.

25      Q.   And you said you did agree it should be

162

BARKLEY
Court Reporters

1   of the testimony given by the witness.  (Fed. R. Civ. P.

2   30(f)(1)).

3         Before completion of the deposition, review of

4   the transcript [XX] was [  ] was not requested.  If

5   requested, any changes made by the deponent (and

6   provided to the reporter) during the period allowed, are

7   appended hereto.  (Fed. R. Civ. P. 30(e)).

8

9   Dated: MARCH 8, 2012

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

264

BARKLEY
Court Reporters